IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| CONTENTGUARD HOLDINGS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMAZON.COM, INC.; APPLE INC.; | ) | |
| BLACKBERRY LIMITED (FKA RESEARCH | ) | |
| IN MOTION LIMITED) AND BLACKBERRY | ) | |
| CORPORATION (FKA RESEARCH IN | ) | |
| MOTION CORPORATION); HTC | ) | |
| CORPORATION AND HTC AMERICA, INC.; | ) | No. 2:13-cv-01112 (JRG) |
| HUAWEI TECHNOLOGIES CO., LTD. AND | ) | |
| HUAWEI DEVICE USA, INC.; MOTOROLA | ) | JURY TRIAL DEMANDED |
| MOBILITY LLC; SAMSUNG ELECTRONICS | ) | |
| CO., LTD., SAMSUNG ELECTRONICS | ) | |
| AMERICA, INC., and SAMSUNG | ) | |
| TELECOMMUNICATIONS AMERICA, LLC, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DIRECTV, LLC | ) | |
| | ) | |
| Intervener. | ) | |

**DEFENDANTS' JOINT RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

INDEX OF EXHIBITS ......................................................................................... vi

STEFIK PATENTS-IN-SUIT ................................................................................ 1

    I.    Disputed Terms ....................................................................................... 1

        A.    The Court Should Follow the PTAB's Rulings ......................................... 1

            i.    Repository/Trusted ........................................................................ 2

            ii.    Physical Integrity ......................................................................... 4

            iii.    Behavioral Integrity ..................................................................... 4

        B.    The Court Should Adopt the Patentees' Express Definitions ..................... 7

            i.    Usage Rights/Rights/Usage Rights Information in the '859, '576, '956, '007, and '072 Patents .................................................... 7

            ii.    Usage Rights in the '160 Patent ................................................... 11

            iii.    Digital Work in the '859, '576, '956, '007, and '072 Patents ........................................................................................ 12

            iv.    Digital Work in the '160 Patent ................................................... 13

            v.    Content/Digital Content ............................................................... 13

            vi.    Requester Mode of Operation/Server Mode of Operation ............. 14

            vii.    Identification Certificate/Digital Certificate ................................. 14

        C.    The Court Should Adopt the Defendants' Other Constructions ............... 15

            i.    Digital Document/Document ....................................................... 15

            ii.    Manner of Use ............................................................................ 16

            iii.    Render(ing/ed/able) ..................................................................... 17

            iv.    Authorization Object ................................................................... 18

            v.    Grammar .................................................................................... 19

            vi.    Nonce/Random Registration Identifier ........................................ 20

II. Indefiniteness ........................................................................................... 21

    A. Document Platform .......................................................................... 21

    B. Distributed Repository .................................................................... 23

III. Judicial Correction .................................................................................. 24

    A. Determining, by the Document Platform ....................................... 24

    B. Validating ......................................................................................... 25

IV. Means-Plus-Function Terms ................................................................... 25

    A. Means for Communicating with a Master Repository for Obtaining an Identification Certificate for the Repository ....................... 25

    B. Means for Processing a Request from the Means for Requesting .......................................................................................... 26

    C. Means for Checking Whether the Request Is for a Permitted Rendering of the Digital Content in Accordance with Rights Specified in the Apparatus ............................................................... 27

    D. Means for Receiving the Authorization Obiect [sic] When it Is Determined That the Request Should Be Granted ................................. 28

    E. Means for Requesting a Transfer of the Digital Content from an External Memory to the Storage ......................................................... 29

NGUYEN PATENTS-IN-SUIT ...................................................................... 29

I. Disputed Terms ....................................................................................... 29

    A. The Court Should Follow the PTAB's Rulings ............................. 29

        i. Repository ............................................................................ 29

    B. The Court Should Adopt the Defendants' Other Constructions .............. 31

        i. Manner(s) of Use ................................................................ 31

        ii. Meta-right(s) ....................................................................... 31

        iii. Usage right(s) ...................................................................... 33

        iv. State Variable ...................................................................... 34

        v. License ................................................................................. 34

II. Indefiniteness ......................................................................................... 35

A.     The Usage Right and the Meta-Right Include at Least One Right That Is Shared Among One or More Users or Devices .................. 35

B.     State Variable Identifies a Location Where a State of Rights Is Tracked ....................................................................................... 36

III.   Means-Plus-Function Terms .................................................................. 36

A.     Means for Obtaining a Set of Rights Associated with an Item ................ 36

B.     Means for Determining ................................................................. 37

C.     Means for Exercising ................................................................... 37

D.     Means for Generating a License Including the Created Right ................. 38

DUNKELD PATENT-IN-SUIT ......................................................................... 38

I.     Disputed Terms ..................................................................................... 38

A.     Detect(ing) a Transfer ................................................................. 38

B.     Other Portion ............................................................................. 39

C.     Instance ................................................................................... 40

II.    Indefiniteness ....................................................................................... 40

A.     Over Said Network Between User Devices ........................................ 40

CONCLUSION ............................................................................................... 40

CERTIFICATE OF SERVICE ............................................................................ 47

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Novopharm Ltd.*,
  323 F.3d 1324 (Fed. Cir. 2003) ........................................................................ 6

*Adv. Tech. Incubator, Inc. v. Sharp Corp.*,
  No. 2:07-CV-468, 2009 WL 4403314
  (E.D. Tex. Jun. 26, 2009) ................................................................................ 24

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
  299 F.3d 1336 (Fed. Cir. 2002) ...................................................................... 25

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008) ................................................................ 27, 28

*Chimie v. PPG Indus., Inc.*,
  402 F.3d 1371 (Fed. Cir. 2005) ...................................................................... 17

*E-Watch, Inc. v. March Networks Corp.*,
  No. 9:06-CV-25, 2006 WL 2239069
  (E.D. Tex. Aug. 4, 2006) ................................................................................ 26

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
  452 F.3d 1312 (Fed. Cir. 2006) ........................................................................ 9

*H-W Tech., LC v. Overstock.com, Inc.*,
  758 F.3d 1329 (Fed. Cir. 2014) ...................................................................... 40

*Imperium (IP) Holdings, Inc. v. Apple, Inc.*,
  920 F. Supp. 2d 747 (E.D. Tex. 2013) ............................................................ 24

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004) ................................................................ 15, 39

*Mangosoft, Inc. v. Oracle Corp.*,
  525 F.3d 1327 (Fed. Cir. 2008) ...................................................................... 39

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014) .............................................................................. 21, 23

*Novo Indus. L.P. v. Micro Molds Corp.*,
  350 F.3d 1348 (Fed. Cir. 2003) ................................................................ 24, 40

*PACT XPP Techs., AG v. Xilinx, Inc.*,
  No. 2-07CV563-CE, 2011 WL 2469909
  (E.D. Tex. June 17, 2011) ................................................................................ 7

iv

*Reiffin v. Microsoft Corp.*,
   214 F.3d 1342 (Fed. Cir. 2000).................................................................................. 12

*Tidel Eng'g L.P. v. Fire King Int'l, Inc.*,
   613 F. Supp. 2d 823 (E.D. Tex. 2009) ....................................................................... 6

*United Carbon Co. v. Binney & Smith Co.*,
   317 U.S. 228 (1942).................................................................................................. 21

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)..................................................................................... 7

*WMS Gaming, Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999)........................................................................... 25, 36

**Statutes**

35 U.S.C. § 112 ¶ 2 (2006)................................................................................................ 21

35 U.S.C. § 311 (2006)...................................................................................................... 22

**Regulations**

37 C.F.R. § 42.100(b) (2012) ...................................................................................... 1, 22

**Rules**

Fed. R. Evid. 801(c) .......................................................................................................... 6

# INDEX OF EXHIBITS

Ex. 1: *ZTE Corp. v. ContentGuard Holdings, Inc.*, Case IPR2013-00134, Paper 34 (P.T.A.B. 2013)

Ex. 2: *ZTE Corp. v. ContentGuard Holdings, Inc.*, Case IPR2013-00137, Paper 58 (P.T.A.B. 2014)

Ex. 3: *ZTE Corp. v. ContentGuard Holdings, Inc.*, Case IPR2013-00139, Paper 57 (P.T.A.B. 2014)

Ex. 4: *ZTE Corp. v. ContentGuard Holdings, Inc.*, Case IPR2013-00133, Paper 61 (P.T.A.B. 2014)

Ex. 5: Mark Stefik, *Letting Loose the Light: Igniting Commerce in Electronic Publication* (1996)

Ex. 6: Mark Stefik Deposition Testimony Excerpts (Nov. 3, 2014)

Ex. 7: Marc Kaufman Deposition Testimony Excerpts (Nov. 24, 2014)

Ex. 8: *ZTE Corp. v. ContentGuard Holdings, Inc.*, Case IPR2013-00137, Deposition of Michael T. Goodrich (Dec. 11, 2013)

Ex. 9: Redline of '859 Patent to '160 Patent

Ex. 10: U.S. Application No. 09/778,001, Amendment (Dec. 4, 2002)

Ex. 11: Declaration of Dr. Jack Grimes

Ex. 12: The Merriam-Webster Dictionary (1998)

Ex. 13: ContentGuard's Patent Local Rule 4-2 Disclosures

Ex. 14: U.S. Application No. 11/304,794, Response to Office Action (Oct. 15, 2008)

Ex. 15: *ZTE Corp. v. ContentGuard Holdings, Inc.*, Case IPR2013-00133, Paper 15 (P.T.A.B. 2013)

Ex. 16: U.S. Application No. 10/345,390, Response Office Action (Mar. 8, 2005)

Ex. 17: U.S. Application No. 13/585,408, Response to Office Action (Nov. 5, 2012)

Ex. 18: *ZTE Corp. v. ContentGuard Holdings, Inc.*, Case IPR2013-00139, Paper 15 (P.T.A.B. 2014

Ex. 19: U.S. Patent No. 5,634,012

Ex. 20: U.S. Application No. 13/210,153, Amendment and Response (Oct. 9, 2012)

Ex. 21: Chart Showing Disputed Terms that Are Defined by the PTAB or in the Glossary and Showing When ContentGuard and When Defendants Adopt Those Definitions

Ex. 22: U.S. Patent No. 5,260,999

Ex. 23: U.S. Application No. 10/956,070, Reply Brief (Dec. 31, 2008)

Defendants base their proposed claim constructions on constructions of the same patent terms by the Patent Trial and Appeal Board ("PTAB"), on definitions provided by the patentees in the glossaries of the patents-in-suit, and on clear and unambiguous statements in the patent specifications.   ContentGuard, in contrast, asks the Court to ignore the expertise and reasoning of the PTAB in its decisions construing these claim terms, to disregard the patentees' own glossary definitions, and to rewrite supposed "mistakes" in the claim language and the patent specifications.

## STEFIK PATENTS-IN-SUIT[1]

I.    **Disputed Terms**

A.    **The Court Should Follow the PTAB's Rulings**

The PTAB recently reviewed four of the six Stefik patents in inter partes reviews ("IPRs") filed by ZTE Corporation and ZTE (USA) Inc., nonparties to this case.   In the IPR of the '160 patent, ContentGuard voluntarily canceled claims 12–22 and 30–38.   (*See* Ex. 1.)   In the remaining IPRs, the '859, '576, and '072 patents survived anticipation challenges based on the PTAB's construction of "repository."   (*See* Exs. 2, 3, 4.)   Adopting the "broadest reasonable construction," 37 C.F.R. § 42.100(b), the PTAB construed "repository" to mean "a trusted system which maintains physical, communications and behavioral integrity, and supports usage rights."   (*See, e.g.*, Ex. 2 at 8.)   The PTAB then defined physical, communications, and behavioral integrity based on the specifications.   (*See, e.g.*, *id.* at 9–14.)   After construing these critical terms, the PTAB found that the prior art asserted by ZTE failed to disclose the use of a digital certificate, which was required by the PTAB's construction of "behavioral integrity."   (*Id.* at 24–26.)   The PTAB rejected all of ZTE's anticipation challenges on this ground.   Having survived ZTE's anticipation challenges based on specific PTAB constructions, ContentGuard now proposes to broaden those constructions.   Defend-

---

[1]   The six Stefik patents are U.S. Patent Nos. 6,963,859; 7,523,072; 7,225,160; 7,269,576; 8,370,956; and 8,393,007. Plaintiff ContentGuard Holdings, Inc. claims that all of the Stefik patents are continuations of U.S. Application No. 08/344,760, filed on November 23, 1994.

The '859 patent was the first of the Stefik patents issued by the PTO.  Because the specifications of the '859, '072, '576, '956 and '007 patents are largely identical, unless otherwise noted, Defendants generally cite only to the '859 patent to avoid duplicative citations.  As discussed below, the '160 patent specification is critically different from the other Stefik specifications, and, thus, where appropriate, the '160 specification is separately cited.

ants, on the other hand, propose that this Court adopt the PTAB's "broadest reasonable constructions" verbatim.

### i.      Repository/Trusted

| Terms | Claims | ContentGuard's Construction | Defendants' Construction |
|-------|--------|-----------------------------|--------------------------|
| Repository | '859: 1, 15, 21, 24, 58, 71, 81<br>'576: 1, 18<br>'072: 1, 10 | A trusted system in that it maintains physical, communications, and behavioral integrity in the support of usage rights. | A trusted system, which maintains physical, communications and behavioral integrity, and supports usage rights. |
| Trusted | '956: 1, 7, 13<br>'007: 1, 6, 11 | Maintains physical, communications, and behavioral integrity in the support of usage rights. | Maintains physical, communications and behavioral integrity. |

The concepts of "repository" and "trusted" lie at the core of the Stefik patents.  The '859 patent, for example, is entitled "Content Rendering Repository."  The Stefik patents purport to solve the problem of digital piracy when a purchasing customer redistributes a digital work freely: "the content genie is out of the bottle and no more fees can be billed."  '859 6:25–28.  In the Stefik patents, "the digital work genie only moves from one trusted bottle (repository) to another, and all uses of copies are potentially controlled and billable."  *Id.* 6:29–32.

Both sides agree that these terms require what the parties refer to as the "three integrities": physical integrity, communications integrity, and behavioral integrity.  The key difference between the parties' proposed constructions is that ContentGuard tries to limit the three integrities to being required only "in the support of usage rights" instead of being required at all times.[2]

Defendants' proposed construction of "repository" follows the PTAB's construction verbatim; and Defendants' construction of the related term "trusted," which the PTAB did not construe, mirrors this construction.  (Ex. 2 at 8.)  To construe "repository," the PTAB started with the two-sentence glossary definition:

> Conceptually a set of functional specifications defining core functionality in the support of usage rights.  A repository **is** a trusted system in that it maintains physical, communications and behavioral integrity.

---

[2] The parties also disagree about the definitions of physical and behavioral integrity, which Defendants address below.  The parties do not differ substantively about the definition of communications integrity, so the Defendants have not addressed that term in this brief.

'859 50:47–52 (emphasis added).  The PTAB explained that by using the word "is" in the second sentence, the patentees "set[] forth an explicit definition of 'repository' as 'a trusted system in that it maintains physical, communications and behavioral integrity.'"  (Ex. 2 at 8.)  Although emphasizing that the second sentence provides the definition of repository, the PTAB did not ignore the first sentence.  It explained that the first sentence "specifies that the repository supports usage rights."  (*Id.*)  Hence the PTAB added "and supports usage rights" to the construction of repository.

ContentGuard asserts that its proposed construction "adopts the language from the glossary . . . : 'in the support of usage rights'" without informing the Court that ContentGuard actually rearranged pieces of the definition to alter the meaning of "repository."  In relocating the phrase "in the support of usage rights" from the first sentence to the second sentence, ContentGuard has made that phrase modify and limit the required three integrities.  Under ContentGuard's construction, instead of the three integrities being required at all times, as taught by the Stefik patents and required by the PTAB's construction, the three integrities only need to be present when supporting usage rights.

ContentGuard's proposed construction is not only inconsistent with the glossary definition and PTAB construction, but also with an article the inventor Mark Stefik authored at the time of his original patent filings describing his invention, entitled *Letting Loose the Light: Igniting Commerce in Electronic Publication*.  (Ex. 5.)[3]  In this article, Stefik states that "[i]n the case of digital works on repositories, **the requirement for trust is that the repositories follow—at all times and in every instance—**the rules about how digital works are used."  (*Id.* at 24 (emphasis added).)  Stefik also explains that trusted systems, which he calls "repositories," can "always be counted on to follow the rules of the trust."  (*Id.* at 12.)  The Court should reject ContentGuard's present attempt to eliminate the requirement that a repository maintain the three integrities at all times.

---

[3] Stefik testified that this article is "based on the same work that went into the patents."  (Ex. 6 at 82:14–21.)  In addition, the prosecuting attorney, Marc Kaufman, used the article to understand the inventions claimed.  (Ex. 7 at 51:16–52:8, 92:18–94:2, 221:15–230:20.)

### ii.   Physical Integrity

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| Physical integrity | '859: 1, 15, 21, 24, 58, 71, 81<br>'576: 1, 18<br>'072: 1, 10<br>'956: 1, 7, 13<br>'007: 1, 6, 11 | Prevents access to content by a non-trusted system. | Preventing access to information by a non-trusted system. |

The parties' proposed constructions of "physical integrity" differ in one respect: whether non-trusted systems are prevented from accessing just "content" or all "information."  Again Defendants propose that the Court adopt the PTAB's construction verbatim, which requires that non-trusted systems be prevented from accessing any "information" (not just "content") stored in a repository.  (Ex. 2 at 10–11.)  ContentGuard attempts to broaden the PTAB's construction, so that repositories and trusted systems need only prevent non-trusted systems from accessing "content."

> The PTAB focused on the following language when construing "physical integrity":

> Physical integrity applies both to the repositories and to the protected **digital works**.  . . .  In addition to protection of the repository itself, the repository design protects access to the **content of digital works**.  In contrast with the design of conventional magnetic and optical devices—such as floppy disks, CD-ROMs, and videotapes—repositories never allow non-trusted systems to access the **works** directly. . . .  Again, the functionality of the recorders depends on their ability to copy and they have no means to check whether a copy is authorized.  In contrast, repositories prevent access to the raw **data** by general devices and can test explicit rights and conditions before copying or otherwise granting access.  **Information** is only accessed by protocol between trusted repositories.

'859 11:62–12:20 (emphasis added).  In evaluating this language, the PTAB recognized that the patentees defined a repository as protecting itself and preventing access to "data," "content," and "digital works."  (Ex. 2 at 10.)  The PTAB then settled on the term "information," which encompasses all of those terms, i.e., the repository must protect all information.  ContentGuard's proposed change to the PTAB's construction should be rejected.

### iii.   Behavioral Integrity

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| Behavioral integrity | '859: 1, 15, 21, 24, 58, 71, 81 | Requires software that is to be installed in the repository to in- | Requiring software to include a digital certificate in order to be installed in the |

| | '576: 1, 18<br>'072: 1, 10<br>'956: 1, 7, 13<br>'007: 1, 6, 11 | clude a digital certificate, in oth-er words, an assurance that the software comes from a source known to the repository. | repository. |

Once again, Defendants propose that the Court adopt the PTAB's construction of "be-havioral integrity" verbatim, which requires that software "include a digital certificate in order to be installed in a repository." (Ex. 2 at 11.) ContentGuard asks the Court to tinker with the PTAB's construction in an effort to redefine the term "digital certificate" to encompass any "assurance that the software comes from a source known to the repository."[4] The PTAB rejected essentially the same argument from ContentGuard, and this Court should do so as well.

The PTAB's construction of "behavioral integrity" required the use of a digital certificate, and the PTAB did not find disclosure of a digital certificate in the prior art raised in the IPRs. (*Id.* at 24–26.) This construction saved the Stefik patents in the IPRs. Having survived the IPRs based on that construction, ContentGuard now makes a second attempt at eliminating the digital certificate requirement.

The specifications of the Stefik patents all explain that "behavioral integrity" requires a digi-tal certificate:

> **Behavioral integrity is maintained by requiring that repository software[5] be certified and be distributed with proof of such certification, i.e. a digital certifi-cate**. The purpose of the certificate is to authenticate that the software has been tested by an authorized organization, which attests that the software does what it is supposed to do and that it does not compromise the behavioral integrity of a reposi-

---

[4] The glossaries of the Stefik patents equate the terms "digital certificate" and "identification certifi-cate." '859 50:16. The parties disagree over the construction of the term "identification certificate," so a full discussion of this term appears below. *See supra* subsection I(B)(vii). For purposes of construing behavioral integrity, it should be noted that ContentGuard's expert, Dr. Goodrich, testified in the IPRs that a digital certificate has two components: tamper resistance and source certification. (Ex. 8 at 139.) Dr. Goodrich explained that tamper resistance "is extremely important" and that "without . . . tamper resistance as well as source certification, then you cannot have behavioral integrity under the board's construction of behavioral integrity." (*Id.*) Content-Guard's proposed construction of behavioral integrity eliminates the "extremely important" aspect of tamper resistance from a digital certificate.

[5] The PTAB rejected ContentGuard's argument that "repository software" referred only to the oper-ating system of a repository. (*See* Ex. 2 at 14–17.) Based on ContentGuard's opening claim construction brief, ContentGuard appears to have abandoned that argument. To the extent that Con-tentGuard attempts to resurrect it, this Court should also reject it.

tory.  **If the digital certificate cannot be found in the digital work or the master repository which generated the certificate is not known to the repository receiving the software, then the software cannot be installed**.

'859 12:40–50 (emphasis added).  The PTAB relied on this paragraph, finding that it defines behavioral integrity to require a digital certificate.  (Ex. 2 at 11.)

The use of "i.e." in this paragraph shows that behavioral integrity requires an actual digital certificate, not some vague alternative to a digital certificate.  As this Court has recognized, the "literal meaning of this abbreviation [is] *id est*, meaning 'that is'" in Latin.  *Tidel Eng'g L.P. v. Fire King Int'l, Inc.*, 613 F. Supp. 2d 823, 829 (E.D. Tex. 2009).  In fact, the "Federal Circuit has found that 'i.e.' defined the meaning of a term."  *Id.* (citing *Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1330 (Fed. Cir. 2003)).  ContentGuard would have this Court replace "i.e." with "e.g."

ContentGuard selectively quotes one sentence from the specifications to try to dilute the requirement of a digital certificate.  ContentGuard points out that the specifications state that the "integrity of the software is generally assured only by knowledge of its source."  (Dkt. No. 304 at 3 (quoting '859 12:36–37).)  At the same time, ContentGuard ignores the specifications' unequivocal explanation in the same paragraph that "[b]ehavioral integrity is maintained by **requiring** that repository software be certified and be distributed with proof of such certification, **i.e.**, a digital certificate."  '859 12:40–43 (emphasis added).

ContentGuard tries to rely on Dr. Goodrich's statement in the IPR that "a person of ordinary skill in the art [in 1994] would [have understood] a digital certificate to be an assurance that downloaded software comes from a reputable source."[6]  (Dkt. No. 304 at 3.)  ContentGuard fails to reveal that Dr. Goodrich tried to support the very argument ContentGuard raises now by stating that "a person of ordinary skill in the art of 1994 would [have understood] that the '859 patent specification refers to the use of digital certificates as only an exemplary method of preserving the behavioral integrity of a repository."  (Ex. 2 at 20.)  The PTAB, however, expressly rejected this opinion.  (*Id.*)

As the PTAB recognized when ContentGuard argued for a broad construction of behavioral integrity in the IPRs, "ContentGuard would like to generalize the feature [of a digital certificate] in-

---

[6] Defendants object to ContentGuard's citation of Dr. Goodrich's statement made in the IPR as hearsay.  *See* Fed. R. Evid. 801(c).

to a generic goal or purpose, entirely removed from any specific means for its implementation." (*Id.* at 19.)  Just like the PTAB, this Court should reject ContentGuard's renewed attempt to expand the scope of the term "behavioral integrity."

**B.      The Court Should Adopt the Patentees' Express Definitions**

"Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  A glossary of terms is just such a statement of special definitions.  *See PACT XPP Techs., AG v. Xilinx, Inc.*, No. 2-07CV563-CE, 2011 WL 2469909, at *14 (E.D. Tex. June 17, 2011) (adopting constructions contained in glossaries of the patents-in-suit).  In the original parent application to the Stefik patents, the patentees included a five-page glossary defining key terms, including "usage rights" and "digital work."  The patentees included a version of that glossary in the specifications of all the Stefik patents.  The patentees made clear that the glossary did not just provide examples from preferred embodiments, but, instead, defined terms so as to give clarity to their invention.  *See* '859 6:9–10 ("Appendix [A] provides a Glossary of the terms used herein.").

Yet now, when trying to enforce the patents, ContentGuard accepts only one, and disputes seven, of the express glossary definitions for claim terms at issue.  (*See* Ex. 21 (comparing which PTAB and glossary definitions each side proposes to adopt).)  ContentGuard picks and chooses pieces of the various glossary entries to construct entirely new definitions, and ContentGuard attempts to discard glossary definitions that it now dislikes as "mistakes."

**i.      Usage Rights/Rights/Usage Rights Information in the '859, '576, '956, '007, and '072 Patents**

| Terms | Claims | ContentGuard's Construction | Defendants' Construction |
|---|---|---|---|
| Usage rights<br>Rights<br>Usage rights information | '859: 1, 58<br>'576: 1, 15, 18, 32<br>'956: 1, 7, 13<br>'007: 1, 6, 11<br>'072: 1, 8, 10, 16 | An indication of the manner in which a [digital work/digital content/content/a digital document] may be used or distributed as well as any conditions on which use or distribution is premised. | Statements in a language for defining the manner in which a digital work may be used or distributed, as well as any conditions on which use or distribution is premised.  Usage rights must be permanently attached to the digital work. |

Defendants base their proposed construction of "usage rights" on the glossaries.  The term "usage rights" is defined in the glossary of the '859, '576, '956, '007 and '072 patents as follows: "A language for defining the manner in which a digital work may be used or distributed, as well as any conditions on which use or distribution is premised."  *Id.* 51:7–10.  Defendants propose to modify the glossary definition only slightly—to clarify that usage rights are "statements in" a language—to make the construction easier for a jury to apply.

ContentGuard argues that the Court should not adopt the glossary definition because it mistakenly defines "usage rights language" not "usage rights."  ContentGuard claims that it corrected this "error" in the '160 patent.  (Dkt. No. 304 at 9.)  Although ContentGuard did eliminate the "language for defining" phrase from the glossary in the '160 patent, ContentGuard reverted back to the parent application's definition, which includes the "language for defining" requirement, in all five of the other asserted Stefik patents, each of which was filed after the '160 application.  In the twenty years of multiple of patent applications prosecuted since it filed the parent application, ContentGuard has **never** suggested that the "usage rights" definition appearing across Stefik patent family contains an error or ambiguity.

The specifications do not support ContentGuard's argument and, in fact, are replete with teachings that the claimed usage rights are, and must be, statements in "a language."  *See* '859 16:63–17:12; *see also id.* Fig. 15, 17:13–18:8, 18:9–25:35, 51:4–6.  The specifications do not draw an artificial distinction between "usage rights" and the "usage rights language" but instead link the two terms:

> The present invention uses statements in a high level "usage rights language" to define rights associated with digital works and their parts. . . .  Defining usage rights in terms of a language in combination with the hierarchical representation of a digital work enables the support of a wide variety of distribution and fee schemes.

*Id.* 16:63–17:12.

To the glossary definition, Defendants add, "Usage rights must be permanently attached to the digital work."  Defendants base this addition on the unequivocal statement in the specification that, "**A key feature of the present invention is that usage rights are permanently 'attached' to the digital work**."  *Id.* 6:11–12 (emphasis added); *see also Honeywell Int'l, Inc. v. ITT Indus., Inc.*,

8

452 F.3d 1312, 1318 (Fed. Cir. 2006) (treating statements describing "the present invention" as restrictions on claim scope).   Indeed, the specification contains a section entitled "Attaching Usage Rights to a Digital Work," which explains, "It is fundamental to the present invention that the usage rights are treated as part of the digital work. . . .   The attachment of usage rights into a digital work may occur in a variety of ways."   *Id.* 10:45–58.   The specification makes clear throughout that "[u]sage rights are attached directly to digital works," and that "[t]he combination of attached usage rights and repositories enable distinct advantages over prior systems."   *Id.* 6:22–23; *see also id.* Fig. 1, 6:14–16 ("[T]he usage rights and any associated fees assigned by a creator and subsequent distributor will always remain with a digital work."); 10:44–11:2, 18:13–17.   As the specification discloses, "permanent attachment" is critical—if the "usage rights" attached to a particular copy of the digital work can be separated or removed, then the "genie" may be let out of the bottle and control over copies of the digital work will be lost.   *See id.* 6:25–32, 3:48–52.

The glossary definitions of "digital work" and "composite digital work" further confirm that usage rights must be "attached" to a digital work.   *See* '859 50:11–12 ("Usage rights and fees are attached to the digital work."); *id.* 49:49–51 ("Each of the distinguishable parts is itself a digital work which have usage rights attached.").   Stefik's article *Letting Loose the Light* also corroborates that the patentees intended "usage rights" to be permanently attached to digital content:

> *Attached Usage Rights.*  We start with an analogy.  When we go to a store to buy a shirt, there are various tags attached to it.  One kind of tag is a price tag.  If we want to buy the shirt, we must pay the amount on the tag.  Another tag gives cleaning instructions: for example, wash by hand in cold water or dry clean only.  Still another tag might say something about the style of the shirt or the history of the shirt company.  This is roughly the idea of *usage rights* on digital works.  Digital works come with tags on them. . . . [T]he tags are not removable.

(Ex. 5 at 14; *see also id.* at 30 ("Such tags [are] permanently attached and honored by the trusted systems . . . .").)   Even ContentGuard's own expert admits that "[t]he Stefik patents teach that a usage right is 'permanently attached' to a digital work."   (Dkt. No. 304-11 at 22.)   ContentGuard now suggests that "permanent" does not mean permanent and "attached" does not mean attached, but

ContentGuard offers no support whatsoever for this suggestion.  "Permanent" and "attached" indisputably are not specially defined in the glossary, specifications, or prosecution histories.[7]

To argue that "usage rights" need not be "attached" to a digital work, ContentGuard relies on the patents' discussion of a "description tree" file, suggesting that the "description tree" file "stores" the usage rights separately from the "contents."  (*Id.* at 7.)  Yet, the glossary makes clear that the "description tree" does not contain or constitute the actual usage rights for digital content; rather, the "description tree" is "[a] structure **which describes the location** of content and the usage rights and usage fees for a digital work."  '859 50:1–3 (emphasis added).  A description tree thus resembles a table of contents that "makes it possible to examine the rights and fees for a work without reference to the content of the digital work."  *Id.* 8:51–55.  Just as a book's table of contents shows the chapters' titles and page numbers without requiring a user to flip through the book page-by-page, the "description tree" allows a user to examine the titles/"identifiers," the "starting address[es]," and the applicable usage rights for the constituent chapters/"d-blocks" of a digital work without having to flip through the "contents files" line-by-line.  *Id.* 8:46–10:43.[8]  Accordingly, the "description tree" is different and distinct from the actual "usage rights" for a digital work (which are merely "described" by the description tree), and the fact that the "description tree" file can be stored separately from the "contents" file of a work does not, and cannot, negate the patents' explicit requirement that "usage rights are permanently 'attached' to the digital work."  *Id.* 6:11–12.[9]

---

[7] ContentGuard notes that the '072 patent claims storing a "usage right" separate from a "digital document."  This fact does not, and cannot, alter the unambiguous glossary definitions of "usage rights" nor eliminate the patents' unequivocal teachings regarding the "key feature" of "attaching."  Rather, this fact indicates that the claims of the '072 patent lack enablement and written description, which means that the claims of the '072 patent are not entitled to the November 23, 1994 priority date of the parent application.

[8] The patents describe an entire "Director Transaction" that allows a user to view and interact with the descriptions contained in the "description tree" (much like one would view and interact with a DVD's main menu).  '859 38:5–11.

[9] At a minimum, none of the discussion of "description tree" is presented as an alternative to permanent attachment of usage rights; it is presented in tandem with the requirement of permanent attachment.  Tellingly, the section that includes the discussion of the "description tree" file begins with the statement, "Usage rights are attached directly to digital works. . . .  Consequently, controls, i.e., usage rights, may be placed on each node by the creator."  '859 8:33, 41–42; *see also id.* 10:37–43.  The patents never show the usage right and the content being stored on different reposi-

Revealingly, although these five Stefik patents consistently describe "the invention" as requiring usage rights to be "permanently attached" to a digital work, the specification of the '160 patent was changed in critical respects to eliminate the "attachment" teachings and, instead, to require that usage rights only be "associated with" a digital work.  Every instance of the word "attached" in the five Stefik patent specifications was changed in the '160 patent to the word "associated."  (*See* Ex. 9 (showing a comparison of the '859 patent to the '160 patent).)  In addition, key glossary terms, such as "digital work," were modified in the '160 patent to eliminate the requirement of "attachment" of usage rights.[10]  ContentGuard's efforts to eliminate the "attachment" of usage rights teachings, and, instead, to inject "associated with" teachings into the '160 patent specification, demonstrate that ContentGuard, itself, recognizes the difference between "attachment" and mere "association" of usage rights and content, and that ContentGuard did not view the '859, '576, '072, '956 and '007 patents as teaching mere "association."  Given the critical differences between the '160 patent specification and the other five Stefik patent specifications, the definitions of "usage rights" must be different.  Defendants proposed constructions recognize and give meaning to this difference and track the specific definitions and teachings of the respective patent disclosures.

### ii.    Usage Rights in the '160 Patent

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| Usage rights | '160: 1, 2, 3, 9, 10 | An indication of the manner in which a [digital work/digital content/content/a digital document] may be used or distributed, as well as any conditions on which use or distribution is premised. | An indication of the manner of use by which a digital work may be used or distributed, as well as any conditions on which manner of use is premised. |

For the term "usage rights" in the '160 patent—which, as explained above, has a different specification than the remaining Stefik patents—Defendants and ContentGuard propose nearly identical constructions.  Defendants propose that the Court adopt the '160 patent's glossary definition verbatim, *see* '160 48:24–26, while ContentGuard proposes changing the second clause of the

---

tories.

[10] When asked about these changes to the '160 specification, Stefik testified that he was not consulted about the switch from "attached" to "associated" and that he "wasn't aware of that change." (Ex. 6 at 320:5–11, 321:1–9.)

definition from "conditions on which manner of use is premised" to "conditions on which use or distribution is premised." ContentGuard goes on to demand that the Court use its modified version of the '160 patent's glossary definition of "usage rights" for **all** of the Stefik patents, even though the '160 patent undeniably changed the glossary definition and corresponding teachings of the specification. For example, the '160 specification removed the sentence, "Usage rights and fees are attached to the digital work," from the glossary definition of "digital work." '859 47:37–39. By the same token, in the '160 specification, ContentGuard replaced the statement, "A key feature of the present invention is that usage rights are **permanently 'attached'** to the digital work," *id.* 6:11–12 (emphasis added), with, "Usage rights are **permanently associated with** the digital work," '160 5:34–35. *See also* Ex. 9 showing the changes in '160 specification.[11]

Because the '160 specification eliminated all references to, and requirement of, "attachment," Defendants propose that the Court adopt a construction of "usage rights" for the '160 patent (and only that patent) that does not contain the "permanently attached" requirement.

### iii. Digital Work in the '859, '576, '956, '007, and '072 Patents

| Terms | Claims | ContentGuard's Construction | Defendants' Construction |
|---|---|---|---|
| Digital work | '859: 1, 13, 19, 20, 21, 24, 58, 69, 71, 75, 76, 81<br>'576: 1, 4, 7, 15, 18, 21, 24, 32, 34<br>'072: 1, 8, 10, 16<br>'956: 1, 4, 5, 7, 10, 11, 13, 16, 17<br>'007: 1, 3, 4, 6, 8, 9, 11, 13 | No construction. | Any encapsulated digital information. Such digital information may represent music, a magazine or book, or a multimedia composition. Usage rights and fees are attached to the digital work. |

The glossaries to the '859, '576, '956, '007 and '072 patents define the term "digital work" to mean, "Any encapsulated digital information. Such digital information may represent music, a magazine or book, or a multimedia composition. Usage rights and fees are attached to the digital work." '859 50:8–12. Although the claims of the '859, '576, '956, '007, and '072 patents do not

---

[11] Given these substantive changes to the '160 specification, the '160 patent does not qualify as a continuation of the parent application, notwithstanding ContentGuard's claim of such status to the PTO. The claims of the '160 patent are, therefore, only entitled to a priority date of December 17, 2001. *See Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1346 (Fed. Cir. 2000) ("[C]laims to subject matter in a later-filed application not supported by an ancestor application in terms of § 112 ¶ 1 . . . do not receive the benefit of the earlier application's filing date.").

explicitly recite the term "digital work," the glossary defines other terms recited in the claims, such as "content," "description structure," "requester mode," "server mode," and "usage rights," in terms of their relationship to a "digital work."  So the jury will need to understand this term.

Defendants again propose that the Court adopt the glossary definition of "digital work" verbatim.  ContentGuard does not provide a proposed construction of "digital work" in these patents and instead argues that the Court should not construe this term.  ContentGuard also urges the Court to delete the last sentence from the glossary's definition of "digital work": "Usage rights and fees are attached to the digital work."  This is yet another attempt by ContentGuard to eliminate the requirement that usage rights be "attached" to the content, a "key feature" of the claimed invention.  ContentGuard asserts that this sentence represents only a preferred embodiment because the specification teaches that fees are optional.  (Dkt. No. 304 at 6.)  But this sentence does not mandate that every "digital work" have fees; rather, it simply and clearly explains that any fees that are required are "attached to the digital work."

### iv.     Digital Work in the '160 Patent

| Terms | Claims | ContentGuard's Construction | Defendants' Construction |
|-------|--------|-----------------------------|--------------------------|
| Digital work | '160: 1, 2, 3, 6, 9, 10 | No construction. Alternatively, Any work that has been reduced to a digital representation. | Digital content with any associated usage rights.  Such digital content may represent music, a magazine or book, or a multimedia composition. |

Defendants urge the Court to adopt the definition of "digital work" from the glossary of the '160 patent verbatim.  '160 47:37–40.  ContentGuard asks the Court to ignore the glossary definition and offers an alternative construction cherry-picked from the specification.  Again, the Court should adopt the express definitions provided in the glossary.

### v.     Content/Digital Content

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|-----------------------------|--------------------------|
| Digital content | '956: 1, 4, 5, 7, 10, 11, 13, 16, 17 '007: 1, 3, 4, 6, 8, 9, 11, 13 '576: 1, 4, 7, 18, 21, 24, 34 '160: 1, 9, 10 | Any work that has been reduced to a digital representation. | The digital information (i.e., raw bits) representing a digital work. |
| Content | '859: 1, 58 | Any work that has been reduced to a | The digital information (i.e., raw bits) |

13

| | | |
|---|---|---|
| '956: 1, 7, 13 | digital representation. | representing a digital work. |

Once more, Defendants ask the Court to adopt the glossary definition of "content" verbatim. '859 49:52–54.  ContentGuard offers no compelling reason to depart from this glossary definition. ContentGuard complains that the definition of "digital work" produces "circular nonsense" when read with the definition of "content."  (Dkt. No. 304 at 5–6.)  That is not so.  The patentees defined "content" as "the digital information (*i.e.*, raw bits) representing a digital work [(*i.e.*, any encapsulated digital information)]."  '859 49:53–54.  Thus, "digital work" and "content" are closely related, interdependent terms, with content referring to the "digital information (i.e. raw bits)" that make up a digital work, and digital work referring to encapsulating that "digital information."

### vi.    Requester Mode of Operation/Server Mode of Operation

| Terms | Claims | ContentGuard's Construction | Defendants' Construction |
|---|---|---|---|
| Requester mode of operation | '859: 1, 58 | No construction necessary in view of language already in the claims. | A mode of a repository where it is requesting access to a digital work. |
| Server mode of operation | '859: 1, 58 | No construction necessary in view of language already in the claims. | A mode of a repository where it is processing an incoming request to access the digital work. |

Defendants once again propose that the Court adopt the glossary definitions verbatim.  '859 50:53–55, 60-62.  ContentGuard's sole complaint about these definitions is that they include the term "digital work."  ContentGuard complains that relying on the patentees' own definitions of these terms will "import" the definition of "digital work."  (Dkt. No. 304 at 11.)  ContentGuard, however, offers no legitimate reason to reject or modify the decisions of the patentees in creating these glossary definitions.

### vii.    Identification Certificate/Digital Certificate

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|---|---|---|---|
| Identification certificate | '859: 24, 81<br>'956: 5, 11, 17<br>'007: 4, 5, 9, 10, 14, 15 | A signed digital message that attests to the identity of the possessor. | A signed digital message that attests to the identity of the possessor.  Digital certificates are encrypted in the private key of a well-known master repository. |
| Digital certificate | '859: 1, 15, 21, 24, 58, 71, 81<br>'576: 1, 18 | A signed digital message that attests to the identity of the possessor. | A signed digital message that attests to the identity of the possessor.  Digital certificates are encrypted in the |

14

| | | | |
|---|---|---|---|
| | '072: 1, 10<br>'956: 1, 7, 13<br>'007: 1, 6, 11 | | private key of a well-known master repository. |

Defendants propose that the Court adopt both sentences of the glossary definitions of "identification (digital) certificate."  ContentGuard, however, argues that the Court should adopt only the first sentence of the glossary definition ("A signed digital message that attests to the identity of the possessor.") and disregard the second sentence of the definition ("Typically, digital certificates are encrypted in the private key of a well-known master repository.")  '859 50:18–19.

ContentGuard asks the Court to rewrite the patentees' definitions to eliminate the second sentence because it includes the word "typically."  (Dkt. No. 304 at 14–15.)  ContentGuard's approach throws the baby out with the bath water.  The specifications make clear that identification certificates (also referred to as "digital certificates") are generated by a "master repository" and that "[c]ommunication with a master repository . . . occurs in connection with obtaining an identification certificate."  '859 12:34–50; 7:32–33.  Moreover, ContentGuard's own expert, Dr. Goodrich, testified in the IPRs that an identification certificate must provide both "source certification" and "tamper resistance."  (Ex. 8 at 139.)  ContentGuard's proposed construction eliminates what Dr. Goodrich described as the "extremely important" requirement of tamper resistance, which is provided by encrypting the digital certificate in the private key of a master repository.

## C.    The Court Should Adopt the Defendants' Other Constructions

### i.    Digital Document/Document

| Terms | Claims | ContentGuard's Construction | Defendants' Construction |
|---|---|---|---|
| Digital document /document | '072: 1, 8, 10, 16 | Any work that has been reduced to a digital representation. | A type of digital work that is written in or viewable as text, for example a book, magazine article, or a message. |

ContentGuard asks the Court to construe the term "digital document" to have the exact same meaning as "digital work" and "digital content."  By choosing to use the different terms "digital document" and "document" in the '072 patent, however, the patentees presumably intended the term to have a different meaning.  *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1119–20 (Fed. Cir. 2004) ("[W]hen an applicant uses different terms in a claim it is

permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms.").

As discussed above, the specification defines the terms "digital work" and "digital content" broadly, to encompass not only documents (such as magazines and books), but also video, audio and other material.  In using the term "digital document," the patentees intended to refer not to any form of digital content or digital work, but only to documents.  Table 1 explains what can be contained in the "document-descr[iption]" field, which is a "string containing various identifying information about a document."  '072 10:20–24.  "The exact format of this is not specified, but it can include information such as a publisher name, author name, ISBN number, and so on."  *Id.*  In this description of a "document," all the information, including the international standard book number ("ISBN"), relates specifically to written works.  The specification thus confirms a different meaning for this term and does not suggest that the document could be anything but a written work.

### ii.  Manner of Use

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|----------------------------|--------------------------|
| Manner of use | '859: 1, 19, 20, 58, 75, 76<br>'160: 1, 3<br>'072: 1, 10 | A way in which [a digital work/digital content/ content/a digital document] may be used. | A defined way of using or distributing a digital work (for example, PLAY, COPY, or PRINT), as distinct from conditions which must be satisfied before that way of using or distributing the digital work is allowed. |

The term "manner of use" relates to the claim term, "usage rights."  The glossary does not separately define "manner of use" but, as discussed above, makes clear that "usage rights" are statements in "[a] language for defining the manner in which a digital work may be used or distributed, as well as any conditions on which use or distribution is premised . . . ."  Accordingly, "usage rights" can provide two distinct categories of information: (1) the manner in which a digital work may be used or distributed and (2) the conditions, if any, on which use or distribution is premised. '859 17:23–40, 18:21–41.  Defendants' proposed construction preserves this distinction between the two categories of information that can be conveyed by usage rights, whereas ContentGuard's proposed construction conflates the two.

In fact, when prosecuting a sibling patent, ContentGuard expressly distinguished manner of use from conditions to use. Specifically, ContentGuard overcame the prior art Wyman reference by arguing that "although Wyman frequently discloses the granting of access to a product in whole or in parts [i.e., conditions to use], Wyman does not disclose usage rights which specify particular manners of use for a digital work." (Ex. 10 at 7.) ContentGuard may not recapture here what it gave up in prosecution. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution." (internal quotation mark omitted)).

ContentGuard's argument about Figure 15, element 1504, does not help its effort to conflate manners of use and conditions. Element 1504 shows code for playing and printing (i.e., manners of use). *See* '859, Fig. 15. ContentGuard claims that element 1504's references to Player-ID and Printer-ID are conditions imposed on use, but the specification does not identify those as conditions, as it does when describing other conditional elements. *Compare* '859 18:44–55, *with id.* 20:15–16 ("Grammar element 1510 . . . provides a condition . . . ."); *id.* 20:34–36 ("Grammar element 1511 . . . provides a condition . . . ."); *id.* 20:47–50 ("Grammar element 1512 . . . provides for speci-fication of time conditions . . . ."). The specification clarifies that the use of player-IDs is a way to distinguish between two manners of use that fall under the same code, e.g., between searching and viewing a database. *See id.* 48:32–35 ("The distinction between searching and viewing information would be made by having different 'players' for the different function."). Contrary to Content-Guard's allegations, element 1504 confirms Defendants' proposed construction distinguishing between manners of use and conditions.

### iii.     Render(ing/ed/able)

| Terms | Claims | ContentGuard's Construction | Defendants' Construction |
|-------|--------|-----------------------------|--------------------------|
| Ren-der(ing /ed/abl e) | '859: 1, 13, 19, 20, 21, 24, 58, 69 71<br>'160: 1<br>'576: 1, 18<br>'072: 1, 10<br>'956: 1, 7, 13<br>'007: 1, 3, 6, 8, 11, 13 | Converting into an ephemeral, transi-tory, or nondigital form, such as for playing digital movies, playing digital music, playing a video game, running a computer program, or displaying a document on a display. | Play, print, display, or execute [a digital work][digital con-tent/content][a digital document]. |

17

Although the specifications do not explicitly define "render," their description of types of rendering systems supports Defendants' construction.  "A rendering system is generally defined as a system comprising a repository and a rendering device which can render a digital work into its desired form.  Examples of a rendering system may be a computer system, a digital audio system, or a printer."  '859 7:50–54; *see also id.* 50:44–47.   In addition, the specifications describe the grammar element "Render-Code" to equal either "Play" (for "playing," "running," or "displaying") or "Print."  *Id.* 18:44–55.

The specification never compares rendering to "converting."  In fact, the words "convert" and "converting" never appear in the patents.  ContentGuard's construction contains terms that may be difficult for a jury to apply and it is so open-ended that it risks being read to encompass almost any transformation of data, including acts like decryption that persons of skill in the art would not consider to be "rendering."  (*See* Ex. 11 (Decl. of Jack Grimes) at ¶¶ 83–85.)  The Court should reject ContentGuard's attempt to broaden the claims by changing "render" to include operations not disclosed in the specification.

### iv.        Authorization Object

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|-----------------------------|--------------------------|
| Authorization object | '576: 1, 18 '956: 4, 10, 16 '007: 3, 8, 13 | Digital information that must be possessed to gain access to digital content. | A digital work that can be moved between repositories and, when specified by a usage right attached to another digital work, must be obtained to exercise the usage right. |

The parties' dispute over this term centers on two issues: whether an authorization object is a digital work and whether Defendants' proposed construction provides sufficient context.   The specification explains with clarity that an authorization object is a type of "digital work."  *See* '576, 7:55–57 ("An authorization is itself a digital work."); 22:42–43 ("Authorizations themselves are digital works (hereinafter referred to as an authorization object)."); 41:39–41 ("A usage right can specify an authorization-ID, which identifies an authorization object (a digital work in a file of a standard format) . . . .").  ContentGuard's proposed construction replaces "digital work" with "digital information," a formulation that does not appear anywhere in the patent in connection with an "authorization object."

ContentGuard complains that Defendants' construction, which provides more detail than its own construction, somehow fails to provide context.  Defendants' construction, however, captures the optional character of authorization objects described by the specification and glossary.  '576, 7:57–59; 22: 39–40; 41:38, 50:41–43.  By stating that authorization objects are only required "when specified by a usage right attached to another digital work," the construction explains when authorization objects are necessary and that they are separate from the digital content.

> **v.      Grammar**

| Term | Claim | ContentGuard's Construction | Defendants' Construction |
|------|-------|------------------------------|--------------------------|
| Grammar | '160: 1 | A manner of defining a valid sequence of symbols for a language. | A manner of defining a valid sequence of symbols consisting of brackets, bars and braces used to describe the language of usage rights sentences, parentheses used to group items together in lists, keywords followed by colons used to indicate a single value, typically an identifier or list of identifiers, and the suffix 'ID.'  Alternatively, indefinite. |

The patentees did not use "grammar" in the '160 patent as a generic term but rather a specifically disclosed sequence of symbols used to create the "usage rights language."  As the specification states, "[t]he usage rights language is based on the grammar described below."  '160 16:61–62.  That description then provides the symbols that constitute the grammar:

> **Note that brackets, bars and braces are used to describe the language of usage rights sentences** but do not appear in actual sentences in the language.

> **Keywords in the grammar are words followed by colons**.  Keywords are a common and very special case in the language. They are often **used to indicate a single value**, typically an identifier.

> Finally, in the usage rights language, various "things" will need to interact with each other.  For example, an instance of a usage right may specify a bank account, a digital ticket, etc.  **Such things need to be identified and are specified herein using the suffix "-ID."**

'160 17:1–4, 17:11–14, 17:25–29 (emphasis added).

Contrary to ContentGuard's argument, Defendants' proposed construction does not "shoehorn" in preferred embodiments.  The preferred embodiment in Figure 15 shows an example of how to use these grammar elements.  There are many ways to use and arrange the grammar elements, but

the grammar used to describe "usage rights" must be the particular grammar described by the specification.  If not, then grammar does not give any meaning to the claims in which it is used, and it would be indefinite.  (*See* Ex. 11 (Decl. of Jack Grimes) at ¶¶ 56–57.)

### vi.        Nonce/Random Registration Identifier

| Terms | Claims | ContentGuard's Construction | Defendants' Construction |
|-------|--------|-----------------------------|--------------------------|
| Nonce | '956: 6, 12, 18<br>'007: 5, 10, 15 | Random or variable information generated to establish a cryptographic connection. | Random and variable information used only once to establish a cryptographic connection. |
| Random registration identifier | '956: 5, 11, 17<br>'007: 4, 9, 14 | Same as "nonce." | Same as "nonce."<br>Alternatively, indefinite. |

The parties' constructions of these terms differ on two points: whether the information must be used only once and whether it must contain random **and** variable information.  The role of nonces and random registration identifiers demands that they be used only once (that is, in one session).  Both are used to establish cryptographic connections between repositories by verifying that a counterparty can decrypt unknown information.  *See* '956 27:3–7, 47–50.  If they were used more than once, a counterparty could fool a repository into creating a connection by using an unencrypted nonce or identifier from an earlier session.  Thus, the specification explains that nonces must be new: "If messages ever arrive with . . . an old nonce, . . . someone is interfering with communication."  *Id.* 26:26–29.  Dictionary definitions of "nonce" similarly emphasize the importance of uniqueness.  (*See, e.g.*, Ex. 12 (defining "nonce" as "occurring, used, or made only once or for a special occasion").)  ContentGuard's argument that nonces are used more than once is misleading.  Both parties to a transaction do use them, but that is a single use of the nonce—a nonce never communicated from one party to the other would be useless for establishing a connection.  Similarly, although it is theoretically possible that a number could be randomly generated more than once, that remote possibility is unlikely to confuse a jury.

ContentGuard also argues that nonces and random registration identifiers can be either random **or** variable.  Yet, the specifications state, "A nonce is a generated message based on some random **and** variable information (e.g. the time or temperature)."  '956 27:45–47.  Moreover, Con-

tentGuard's argument would render the word "random" in the term "random registration identifier" meaningless or indefinite.

## II.    Indefiniteness

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention." 35 U.S.C. § 112 ¶ 2 (2006). A claim fails to satisfy this requirement and is invalid for indefiniteness if its language, when read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2123 (2014). The need to balance public and private innovation drives this rule. A claim that fails to particularly describe its metes and bounds creates a "zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement [and] would discourage invention only a little less than unequivocal foreclosure of the field." *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942).

### A.    Document Platform

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| Document platform | '072: 1, 8, 10, 16 | Any computing system that holds a digital document, such as software. | Indefinite. Alternatively, A repository for rendering a digital document. |

A person skilled in the art cannot determine, with reasonable certainty, the meaning of "document platform." The term "document platform" appears only in the claims and in the abstract. Neither the glossary nor the specification defines it. The claims require a "document platform" that retrieves a "digital document" and at least one "usage right" from a "document repository" and that renders the digital document in accordance with those usage rights. The specification states that (1) "repositories will only communicate with other devices that are able to present proof that they are certified repositories," '072 12:31–33, and (2) repositories communicate with document platforms, *id.* 26:25–29. Thus, a document platform must be a repository or it could not communicate with other repositories. Yet, ContentGuard now alleges, based on the disclosure at column 26 lines 25

through 29 of the '072 patent, that it can be "[a]ny computing system that holds a digital document, such as software."[12]

ContentGuard itself has had great difficulty divining a proper construction of the term.  In its P.R. 4-2 disclosure and the parties' P.R. 4-3 submission, ContentGuard defined "document platform" as "a repository for rendering a digital document" and then abruptly changed direction in its brief to its current construction.  (Ex. 13 at 2; Dkt. No. 292-1 at 1.)

ContentGuard's new position should be rejected as inconsistent with the claims, the specification, and the prosecution history.  First and foremost, ContentGuard's proposed construction would inject an inconsistency into the claims by failing to require the document platform to be a repository even though it communicates with a "document repository."  '072 52:10–14.  The specification clearly states that "repositories will only communicate with other devices that are able to present proof that they are certified repositories."  '072 12:31–33.  For this reason, ContentGuard's own expert has admitted that the "document platform" must be a "repository":

> The claims of the '072 patent require the recited document platform to also be a rendering repository, as it receives access to content from a repository, receives usage rights from a repository, interprets and enforces usage rights, and renders content when permitted by the usage rights.

(Dkt. No. 304-11 at 28–29.)  To the extent "document platform" has a discernible meaning, it must be a "repository" as Dr. Goodrich's explains and ContentGuard's original construction reflects.[13]

Second, ContentGuard's proposed construction conflates "document repository" and "document platform."  The claims require both a "document repository" that **holds** digital documents and a "document platform" used by an end user to **render** the digital documents.  ContentGuard's proposed construction takes the "hold[ing]" function of the "document repository" and moves it to

---

[12] While the PTAB adopted the construction ContentGuard now proposes, ContentGuard did not propose any construction during the IPR, nor did the PTAB address the arguments Defendants make here.  (Ex. 15 at 16.)  In addition, the indefiniteness issue was not raised, nor could it have been, by the petitioner, and the PTAB was applying the "broadest reasonable construction" standard.  35 U.S.C. § 311 (2006); 37 C.F.R. § 42.100(b) (2012).

[13] For this reason, if the Court does not determine that the term "document platform" is indefinite, then it should adopt ContentGuard's original proposed construction from its Rule 4-2 and 4-3 disclosures, not the one proposed now.

the client-side "document platform."  That is incorrect and contrary to the distinction ContentGuard drew when prosecuting the '072 patent when it explained that the "document platform is the client side engagement that controls the document." (Ex. 14 at 12.)

Third, ContentGuard's proposed construction incorrectly uses "software" as an example of a "digital document," as explained more fully above in subsection I(C)(i).

While a "document platform" must at least be a repository, ContentGuard chose to claim its alleged invention using a term that is otherwise without meaning.  Given the lack of any definition in the specification, ContentGuard's own difficulty discerning its meaning, and the problems with ContentGuard's latest construction, the term "document platform" "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention" and is thus indefinite. *Nautilus*, 134 S. Ct. at 2124.  (*See also* Ex. 11 (Decl. of Jack Grimes) at ¶¶ 65−67.)

### B.      Distributed Repository

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| Distributed repository | '859: 1, 58 | A repository adapted for use in a distributed system. | Indefinite. |

Neither the specification nor the prosecution history provides any basis for a person skilled in the art to determine what it means for a repository to be "distributed." (*See* Ex. 11 (Decl. of Jack Grimes) at ¶¶ 58−64.)  ContentGuard does not dispute this but instead urges the Court to rewrite the claim so that "distributed" modifies the system as a whole, rather than the repository.  This is improper because (1) courts cannot rewrite claims and (2) it is inconsistent with the claim language, which recites both a "distributed repository" and a "distributed system."

ContentGuard's proposed construction also conflicts with the prosecution history.  ContentGuard argues that repositories are adapted for use in a distributed system "because they communicate with each other over a network." (Dkt. No. at 17.)  During prosecution, however, ContentGuard took the opposite position, distinguishing a piece of prior art by arguing that a license server connected with other devices in a distributed network is **not** a distributed repository. (Ex. 16 at 13−14.)  The Court should reject ContentGuard's attempt to rewrite the claims.

## III.   Judicial Correction

Conceding that the claims in which they appear are indefinite as written,[14] ContentGuard has requested judicial correction of two terms.  Judicial correction is permitted only where "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims."  *Novo Indus. L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003).  Content-Guard has failed to satisfy this "nearly impossible standard."  *Imperium (IP) Holdings, Inc. v. Apple, Inc.*, 920 F. Supp. 2d 747, 757 (E.D. Tex. 2013).

### A.   Determining, by the Document Platform

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| Determining, by the document platform | '072: 10 | Change to, Determining, by the document repository. | Indefinite. |

ContentGuard's requested correction is "more significant than a mere misspelling or missing letter."  *Adv. Tech. Incubator, Inc. v. Sharp Corp.*, No. 2:07-CV-468, 2009 WL 4403314, at *19 (E.D. Tex. Jun. 26, 2009).  "[M]ajor errors are subject only to correction by the PTO," not courts.  *Novo Indus.*, 350 F.3d at 1357.

ContentGuard cannot establish that the requested correction is "not subject to reasonable debate."  As an initial matter, it is unclear whether there is an error at all, and even if an error exists, there are several possibilities for correcting it.  For example, the entire phrase "by the document platform" could be deleted.  (*See* Ex. 11 (Decl. of Jack Grimes) at ¶¶ 68–71.)  As another example, the phrase "by the document platform" could be moved to follow "request."  (*Id.*)

Furthermore, the prosecution history not only suggests a different interpretation than the correction now proposed by ContentGuard, it confirms that the patentees intended to use the language of the claim as written.  The patentees relied on that language to overcome over prior art.  (*See* Ex. 14 at 10 ("Further, Perritt fails to disclose, teach or suggest the steps of determining, by the document platform, whether the request may be granted based on the at least one usage right . . . .").)

---

[14] ContentGuard identified several reasons why the "determining" term is indefinite absent a correction.  (Dkt. No. 304 at 18–19; Dkt. No. 304-11 at 29.)  ContentGuard also admitted that claim 1 of the '007 patent provides no antecedent basis for "the validating" term.  (Dkt. No. 304 at 18.)

The Court should deny ContentGuard's request to rewrite language that it explicitly confirmed during prosecution. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) ("It is not our function to rewrite claims to preserve their validity . . . .").

### B.    Validating

| Term | Claim | ContentGuard's Construction | Defendants' Construction |
|------|-------|------------------------------|---------------------------|
| Validating | '007: 5 | Change dependency to claim 4 | Indefinite |

The requested correction of the "validating" term is also subject to reasonable debate.  (Ex. 11 (Decl. of Jack Grimes) at ¶¶ 81–82.)  For example, the error could be corrected by replacing "validating" with "determining."  *See* '007 claims 6, 8–10.  In addition, ContentGuard amended claim 5 of the '007 patent during prosecution to "correctly depend on claim 1." (Ex. 17 at 7.)  The Court should not undo that deliberate action.

## IV.    Means-Plus-Function Terms

The PTAB construed six of the nine means-plus-function terms in the Stefik patents.  For three of these six terms, ContentGuard and Defendants now agree that the Court should adopt the PTAB's constructions of the corresponding algorithms in their entirety, including the hardware "processor" and the software "algorithm" disclosed to carry out the claimed function.  *See WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348–49 (Fed. Cir. 1999).  Only a narrow dispute remains over whether citations should be considered part of the construction.  *See* n.15, *infra*.  One of the remaining three terms is no longer in dispute.  The other five are addressed below.

### A.    Means for Communicating with a Master Repository for Obtaining an Identification Certificate for the Repository

| Term | Claim | ContentGuard's Construction | Defendants' Construction |
|------|-------|------------------------------|---------------------------|
| Means for communicating with a master repository for obtaining an identification certificate for the repository | '859: 24 | An external interface that provides for a signal connection with another device described at 13:52-59. | Indefinite. |

The recited function is indefinite because "the repository" could refer to the "distributed repository," the "another distributed repository," or the "master repository."  A repository is required to obtain an identification certificate from a master repository prior to operation, '859 13:1–9, so

"the repository" could refer to the "distributed repository."  Repositories also "only communicate with other devices that are able to present proof that they are certified repositories," e.g., by exchanging certificates. '859, 12:21–33.  Thus, "the repository" could refer to the "master repository" that provides its certificate to the "distributed repository." '859, 26:43–57 (describing a registration transaction between two repositories).  Claim 24 is therefore indefinite.  *See E-Watch, Inc. v. March Networks Corp.*, No. 9:06-CV-25, 2006 WL 2239069, at *10 (E.D. Tex. Aug. 4, 2006) (finding the term "the server" indefinite where the claim previously recited "a network based server" and "a central server").  Claim 81 is indefinite for the same reason.

**B.     Means for Processing a Request from the Means for Requesting**

| Term | Claim | ContentGuard's Construction | Defendants' Construction |
|------|-------|-----------------------------|--------------------------|
| Means for processing a request from the means for requesting | '576: 1 | Processing begins when a requester repository has sent a message to initiate a request. (36:35–40, 37:9–13.) | PTAB's construction (see below). |

The PTAB laid out a five-step algorithm as its construction of the corresponding structure for the "means for processing a request from the means for requesting":

> Processing begins when a requester repository has sent a message to initiate a request.  **First**, the server repository checks the compatibility of the requester repository and the validity of the requester's identification.  **Second**, the requester and server repositories perform the common opening transaction steps of determining whether authorization is needed, and whether the requested transaction is permitted given the usage rights.  **Third**, requester and server repositories perform a transmission protocol to read and write blocks of data, and then the requester repository renders the digital work.  **Fourth**, the contents are removed from the rendering device and the requester repository.  **Finally**, the requester and server repositories perform the common closing transaction steps of updating the usage rights and billing information.

(Ex. 18 at 21–22 (emphasis added, internal citations omitted).)  Defendants' construction recites each of these steps, as well as the hardware the PTAB identified for carrying them out.  *See id.*

Dr. Goodrich's construction disregards the five-step algorithm and uses only the first sentence of the PTAB's construction.  (*See* Dkt. No. 304-11 ¶¶ 17–18.)  This sentence only describes prerequisites for the processing to "begin[]" and not how it is carried out.  Indeed, the PTAB indicated as much based on its use of the past tense ("has sent") and its use of the term "First" in

connection with the next sentence.  Dr. Goodrich, however, contends that merely receiving a request is a sufficient algorithm to describe how the request is processed.  (*See id.*)

Dr. Goodrich also refers to a parenthetical citation ("36:35-40, 37:9-13") in his construction, but this reference does not transform the construction into an adequate algorithm.  First, that citation only corresponds to the first sentence of the PTAB's construction, not to the full set of steps.  (Ex. 18 at 21.)  Second, by merely describing the "message to initiate the play transaction" and "message to initiate a Print transaction," the cited passages at most restate the function without explaining the steps conducted to implement it.  *See Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1335 (Fed. Cir. 2008) (rejecting an alleged "algorithm" that was "at best, a description of the claimed function of the means-plus-function claim").  Third, to the extent Dr. Goodrich intends to incorporate the text of the cited passages into his construction, that text should actually be reproduced in the construction, to avoid burdening jurors with the need to look up each citation in the patent or confusing them as to whether the cited text is required structure.[15]

### C.   Means for Checking Whether the Request Is for a Permitted Rendering of the Digital Content in Accordance with Rights Specified in the Apparatus

| Term | Claim | ContentGuard's Construction | Defendants' Construction |
|---|---|---|---|
| Means for checking whether the request is for a permitted rendering of the digital content in accordance with rights specified in the apparatus | '576: 1 | The server repository determines whether the right is granted and whether any specified time, security, and access based conditions are satisfied. (31:13-33.) | PTAB's construction (see below). |

The PTAB construed the corresponding structure of the "means for checking . . ." to be a processor programmed to perform the following steps:

> **First**, the requester repository determines whether an authorization certificate or a digital ticket is needed.  **Second**, the server repository generates a transaction identifier.  **Third**, the server repository determines whether the right is granted and

---

[15] Similarly, to avoid jury confusion, the Court should decline ContentGuard's invitation to include parenthetical citations in its constructions of "means for processing the request to make the digital content available to the rendering engine for rendering when the request is for a permitted rendering of the digital [content]"; "means for authorizing the repository for making the digital content available for rendering"; and "means for making a request for an authorization object required to be included within the repository for the apparatus to render the digital content."  Outside of the parenthetical citations, the parties now agree on the substance of these three terms.

whether time, security, and access based conditions are satisfied. **Finally**, the server repository determines whether there are sufficient copies of the work to distribute.

(Ex. 18 at 22–23 (emphasis added, internal citations omitted).) Defendants adopt this construction.

Dr. Goodrich's construction does little more than restate the function, again violating the rule of *Aristocrat*, 521 F.3d 1328. Dr. Goodrich wrongly dismisses the PTAB's other corresponding steps rather than restricting the algorithm to only what was necessary to perform the recited function. (*See* Dkt. No. 304-11 ¶¶ 27–29.) The steps of the PTAB's construction are necessary to perform the claimed function. (Ex. 11 (Decl. of Jack Grimes) at ¶¶ 16–24.)

### D. Means for Receiving the Authorization Obiect [sic] When it Is Determined That the Request Should Be Granted

| Term | Claim | ContentGuard's Construction | Defendants' Construction |
|------|-------|------------------------------|---------------------------|
| Means for receiving the authorization obiect [sic] when it is determined that the request should be granted | '576: 1 | The remote repository transmits a block of data to the server repository and waits for an acknowledgement, which the server provides when the block of data has been completely received. (33:9-15.) Unless a communications failure terminates the transaction, that process repeats until there are no more blocks to transmit. (33:16-38, 33:46-49.) Finally, the server repository sends a completion acknowledgement to the remote repository. (33:39-45.) | PTAB's construction (see below). |

The PTAB construed the corresponding structure of the "means for receiving the authorization object" to be a processor programmed to perform the following steps of "a 'play' transaction to acquire an authorization object." (Ex. 18 at 26.):

> [T]he server repository transmits a block of data to the requester repository and waits for an acknowledgement, which the requester provides when the block of data has been completely received. Unless a communications failure terminates the transaction, that process repeats until there are no more blocks to transmit. Finally, the requester repository sends a completion acknowledgement to the server repository. In that regard, the specification states: "The key property is that both the server and the requester cancel a transaction if it is interrupted before all of the data blocks are delivered, and commits to it if all of the data blocks have been delivered."

(*Id.* (internal citations omitted).) Defendants agree.

Dr. Goodrich presumes to "correct [an] apparent clerical error in the PTAB construction" by changing "requester repository" to "server repository" and changing "server repository" to "remote repository." (*See* Dkt. No. 304-11 ¶ 33.) The PTAB's terminology, however, comes straight from the cited passages of the patent. *See, e.g.*, '576 33:9–10 ("The server enters a data transmit state

28

1906 and transmits a block of data … the requester[] enters a data receive state").  There is no reason to deviate from the PTAB's accurate reading of the corresponding structure disclosed in the patent.

### E.   Means for Requesting a Transfer of the Digital Content from an External Memory to the Storage

| Term | Claim | ContentGuard's Construction | Defendants' Construction |
|------|-------|------------------------------|---------------------------|
| Means for requesting a transfer of the digital content from an external memory to the storage | '576: 4 | User interface 1305 described at 16:35-44. | Indefinite. |

The PTAB did not construe this claim term.  Dr. Goodrich's proposal to construe a "user interface" as the corresponding structure fails to include any algorithm.  (*See* Dkt. No. 304-11 ¶ 34.) ContentGuard fails to include an algorithm because there is none, thus the term is indefinite.  (*See* Ex. 11 (Decl. of Jack Grimes) at ¶¶ 29–33.)  The specification provides only a generic description of user interfaces.  *See* '576, 16:35–44 (explaining that a "display, keyboard, cursor control device and software" "must permit a user to input information").  There is no disclosure of how the request is carried out after the user pushes a mouse or keyboard button.  Moreover, there is no disclosure of the claimed "external memory" in this passage at all.  (*See* Ex. 11 (Decl. of Jack Grimes) at ¶¶ 29–33.)

### NGUYEN PATENTS-IN-SUIT[16]

## I.   Disputed Terms

### A.   The Court Should Follow the PTAB's Rulings

#### i.   Repository

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| Repository | '280: 1, 12 '053: 1, 15 | A trusted system in that it maintains physical, communications, and behavioral integrity in the support of usage rights. | A trusted system, which maintains physical, communications and behavioral integrity, and supports usage rights. |

---

[16] The Nguyen patents are U.S. Patent Nos. 7,774,280 and 8,001,053.  ContentGuard does not assert the Nguyen patents against Amazon, BlackBerry, HTC, Huawei, Motorola, or Samsung.  Therefore, those Defendants do not join in this portion of the brief.

The Nguyen and Stefik patents share a common source of evidence on the meaning of "repository," U.S. Patent No. 5,634,012 ("the '012 patent").  The Nguyen patents incorporate the '012 patent by reference and contain the same "repository" disclosures as the Stefik patents.  *See* '280 2:9–11; '053 1:53–55; *see also* Ex. 19 53:23–27, 12:40–13:41.  ContentGuard and Defendants agree that "repository" should be construed the same way in the Stefik and Nguyen patents.  Just as with the Stefik patents, however, the Nguyen patents do not support ContentGuard's modifications to the PTAB's construction.

The Nguyen patents, just like the Stefik patents, describe repositories in terms of preventing access to information (rather than just limited classes of information like "content") by non-trusted systems.  (*See* Ex. 15 at 11 (observing that "prevent access" means "never allow access" and that "[w]hen referring to the relationship between the repository and data, the specification uses absolute terms such as 'never' and 'only'").)  The Nguyen patents explain that "existing computing environments such as PC's and workstations equipped with popular operating systems (e.g., Windows, Linux, and UNIX) and rendering applications, such as browsers, are not trusted systems and cannot be made trusted without significantly altering their architectures." '053 2:13–18; *see also* '280 2:2–7.  These devices allow untrusted access to at least some information, which is why "[b]uilding a trusted system usually entails introducing new hardware such as a secure processor, secure storage and secure rendering devices." '053 2:6–8; *see also* '280 1:60–62.  ContentGuard's proposal to change the PTAB's construction so that a "repository" only protects access to "content," and not all "information," contradicts the specification by sweeping in systems that "cannot be made trusted without significantly altering their architectures." '053 2:13–18; '280 2:2–7.  For that reason and the reasons described in subsection I(A)(i), the Court should adopt Defendants' construction.

## B.     The Court Should Adopt the Defendants' Other Constructions

### i.     Manner(s) of Use

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|--------------------------|
| Manner(s) of use | '053: 1, 15 | A way in which [a digital work/digital content/ content/a digital document] may be used. | A defined way of using or distributing a digital work (for example, PLAY, COPY, or PRINT), as distinct from conditions which must be satisfied before that way of using or distributing the digital work is allowed. |

Both sides propose their respective constructions of "manner(s) of use" for both the Stefik and Nguyen patents. *See supra* subsection I(C)(iii). Just like the Stefik patents, the '053 patent differentiates manners of use from conditions on use or distribution. *See* '053 2:42–44 ("The usage rights can permit various manners of use such as, viewing only, use once, distribution, and the like. Usage rights can be contingent on payment or other conditions."). The patent contrasts manners of use with "authorization conditions" that, after being met, release the content to the end-user. *Id.* 1:58–64. Essentially, authorization determines whether a user is allowed to access digital content, while usage rights define particular manners in which the authorized content can be used.

### ii.     Meta-right(s)

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|--------------------------|
| Meta-right(s) | '280: 1, 11, 12<br>'053: 1, 3, 4, 15 | A right that when exercised creates or disposes of usage rights or other metarights but is not itself a usage right. | A data structure that is used by a repository to create or dispose of 'usage rights' or other meta-rights relating to an item of content and is distinct from a usage right associated with the item of content. |

"Meta-rights" in the Nguyen patents are the rights to grant "usage rights" (or additional meta-rights) to others. In a sense, meta-rights are an electronic version of a license to intellectual property, with the right to grant sublicenses. ContentGuard's proposed construction refers to "rights" in the abstract, without any mention of data or devices. Defendants' proposed construction avoids reciting pure legal concepts and captures the three distinguishing characteristics of "meta-rights" in the Nguyen patents: "meta-rights" are (1) formed as a data construct associated with a

particular digital work; (2) used by a repository to create or dispose of usage rights or other meta-rights; and (3) distinct from a usage right.

First, "meta-rights" are data structures, not merely legal rights.  For example, Figure 9 of the '280 patent and Figure 13 of the '053 patent depict use of a "meta-right" to create "usage rights":

> In FIG. 9, rights 902 and 903 derived from an offer 901 are exclusive to each respective consumer. The offer 901 is a type of meta-right of which the recipients have the rights to obtain specific derivative rights when the conditions for obtaining such rights are satisfied.

'280 11:52–12:2; *see also* '053, 17:27–44.  In this example, values within the "meta-right" (e.g., "play") are transferred into the usage rights derived from the meta-right, implying that both rights are sets of computer instructions or data.  Every other example in the specifications also presents meta-rights as data.  *See, e.g.*, '280, 5:61-63 ("Meta-rights can be hierarchical and can be structured as objects within objects."); *id.*, 7:40-45 ("Meta-rights can be expressed by use of a grammar or rights language including data structures, symbols, elements, or sets of rules.  For example, the XrML™ rights language can be used.  As illustrated in FIG. 3, the structure of license 52 can consist of one or more grants 300 and one or more digital signatures 310.").

Second, the Nguyen patents explain that a repository exercises and enforces meta-rights.  ContentGuard's proposed construction fails to incorporate the patents' teachings that meta-rights are used **by a repository**.  For example, claim 1 of the '280 patent explains that "the meta-right is provided in digital form and is **enforceable by a repository**."  '280 15:10–14 (emphasis added).  Claim 1 of the '053 patent similarly explains that "at least one meta-right is **enforceable by a repository**."  '053, 20:51–53 (emphasis added).

Third, the Nguyen patents differentiate "meta-rights" from "usage rights."  *See, e.g.*, '280 7:26–31 ("When exercising usage rights, actions to content result. . . .  When meta-rights are exercised, new rights are created from the meta-rights or existing rights are disposed as the result of exercising the meta-rights."); '053 5:24–27 ("Meta-rights can be thought of as usage rights to usage rights.").  ContentGuard agrees "that a meta-right is not itself a usage right."  Thus, the construction should reflect that the same element of an item of digital content cannot be both a "usage right" and

a "meta-right."  ContentGuard appears to accept this distinction, but Defendants' construction conveys the point more clearly.

### iii.    Usage right(s)

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| Usage right(s) | '053: 1, 15 | An indication of the manner in which a [digital work / digital content / content / a digital document] may be used or distributed as well as any conditions on which use or distribution is premised. | Statements in a language for defining the manner in which a digital work may be used or distributed, as well as any conditions on which use or distribution is premised.  Usage rights must be permanently attached to the digital work. |

The parties agree that the Court should construe "usage rights" in the Nguyen '053 patent in the same way the Court construes that term for the majority of the Stefik patents because the '053 patent incorporates four Stefik patents by reference.  (*See* Dkt. No. 304 at 24.); *see also* '053 1:50–56 (incorporating the '012 patent; U.S. Patent No. 5,715,403; U.S. Patent No. 5,638,443; and U.S. Patent No. 5,629,980 by reference).  The parties disagree about which Stefik patents to base this construction on.  As discussed above in subsections I(B)(i)–(ii), ContentGuard suggests that the Court should adopt a definition of "usage rights" based on the '160 patent—the only Stefik patent to modify the specification to remove the requirement that usage rights be attached to the digital work—and then apply that definition to all of the Stefik patents and the Nguyen '053 patent.  ContentGuard fails to point out that although the '053 patent incorporates some Stefik patents by reference, it does not incorporate the '160 patent.  The four patents that the '053 patent does reference require that usage rights be "permanently attached" to the digital work, unlike the '160 patent. *See* Ex. 19 '012 6:50–51; U.S. Patent No. 5,715,403 6:62–63; U.S. Patent No. 5,638,443 5:62–63; U.S. Patent No. 5,629,980 6:51–52 (all stating, "A key feature of the present invention is that usage rights are permanently 'attached' to the digital work."); *see also* '053 1:50–56 (incorporating these patents by reference).  The '053 patent reinforces this point by stating, "Usage rights persist with the document content."  '053 2:42.  Therefore, the Court should adopt the construction of "usage rights" from the '859, '576, '956, '007 and '072 patents for the '053 patent.

### iv.    State Variable

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| State variable | '280: 1, 5, 12<br>'053: 1, 4, 5, 15, 23 | A variable having a value, or identifying a location at which a value is stored, that represents status of an item, rights, license, or other potentially dynamic conditions. | A variable having a value that represents the status of usage rights, license, or other dynamic conditions. |

The '280 patent expressly defines "state variables" as "variables having values that represent status of rights, or other dynamic conditions." '280 7:67–8:1.  Similarly, the '053 patent provides, "State variables are variables having values that represent status of an item, usage rights, license or other dynamic conditions." '053 5:43–45.  Defendants propose using these constructions.[17]

Neither of the patents include the phrase "or identifying a location at which a value is stored" that ContentGuard seeks to add to this definition.  (Dkt. No. 304 at 25–26.)  The example in ContentGuard's brief does not eliminate the need for the state variable to have a value that represents the status of dynamic conditions but simply states that the value can include a URL.  *See* '053 18:14–21; Fig. 15.  Notably, ContentGuard does not cite any part of the patents to support its construction.  As for ContentGuard's prosecution history argument, new subject matter added to the '053 patent by amendment cannot be used to expand the scope of this term.

The patents also do not justify ContentGuard's addition of "potentially" before "dynamic conditions."  Conditions are either dynamic or not.  "Potentially" turns the claim inside out by allowing it to encompass conditions that are not dynamic and might never become dynamic.

### v.    License

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| License | '280: 11, 12<br>'053: 1, 3, 4, 5, 15, 23 | Data embodying a grant of usage rights and/or metarights. | A data structure containing both a usage right and meta-right. |

The '280 and '053 patents explain that licenses embody the actual granting of usage rights to an end user.  '280, 4:7-8; '053, 4:40–42.  They describe licenses not as mere permissions or authorizations, but as particular data constructs:

---

[17] Defendants' original construction did not include the words "an item," but Defendants now concede "an item" can be included based on the definition in the '053 patent.

> These licenses embody the actual granting of usage rights to an end user. For example, rights label 40 may include usage rights permitting a recipient to view content for a fee of five dollars and view and print content for a fee of ten dollars. License 52 can be issued for the view right when the five dollar fee has been paid, for example. Client component 60 interprets and enforces the rights that have been specified in license 52.

'280 4:7–14; *see also* '053, 4:40–47.  The patents also depict a "license" data construct in Figure 4. In this figure, the "license" is an XML file.  '280, 3:21–23.  The XML file includes fields that will hold values reflecting a manner of use ("<play/>") along with "conditions" related to that manner of use ("<allCondition> . . . </allCondition>").  *Id.* Fig. 4.  Moreover, a "license" contains both a usage right and a meta-right.  *See* '053 4:40–42 ("Licenses 52 embody the actual granting of rights, **including usage rights and meta-rights**, to an end user." (emphasis added)).

## II.   Indefiniteness

### A.   The Usage Right and the Meta-Right Include at Least One Right That Is Shared Among One or More Users or Devices

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|---|---|---|---|
| Specifying, in a first license . . . at least one usage right and at least one meta-right for the item, wherein the usage right and the meta-right include at least one right that is shared among one or more users or devices | '053: 1, 15 | Specifying in a first license, at least one usage right and at least one meta-right for the item, wherein at least one of the meta-right or the usage right is shared among one or more users or devices. | Indefinite. |

This element requires that "the usage right and the meta-right **include**" at least one right that is "shared."  It is impossible to ascertain, with reasonable certainty, what this means.  Given that ContentGuard admits that a meta-right "is not itself a usage right," (Dkt. No. 304 at 23), it is nonsensical that a meta-right and a usage right could possibly both include a "shared" right.  Though ContentGuard attempts to shrug off the confusion by suggesting that this claim element refers to the sharing of either a single usage right or a single meta-right between users or devices, (*Id.* at 27), this is not what the element expressly requires.  The claim element expressly requires, "wherein the usage right **and** the meta-right include at least one right that is shared."  '053 20:47–50; 22:11–13 (emphasis added), it does not state "wherein the usage right **or** the meta-right," as ContentGuard now effectively urges.  An ordinarily skilled artisan cannot discern what it means for these two rights both to include one shared right.  (*See* Ex. 11 (Decl. of Jack Grimes) at ¶¶ 76–80.)

### B.      State Variable Identifies a Location Where a State of Rights Is Tracked

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| State variable identifies a location where a state of rights is tracked | '053: 1, 15 | Ordinary and customary meaning. | Indefinite. |

One of ordinary skill in the art cannot determine with reasonable certainty whether the "state variable" is and/or stores (1) an address or file in which another value is stored; (2) the identity of a group/organization for which a state variable is tracked; or (3) the "state of rights" itself.  Initially, the specification interchangeably refers to a "state variable," a "state variable identification," and a "state variable id."  *See, e.g.*, '053 4:64; 20:2; Fig. 17.  The specification compounds that confusion by inconsistently characterizing the state variable "id" as a number (Fig. 17), a right (Fig. 13), a priority (Fig. 18), an organization (Fig. 16), and even an unspecified element (Fig. 16).  The specification never explains if these values or elements are themselves "state variables" or merely "identification[s]" of the state variables.  The prosecution history adds to the confusion by declaring, "[A] state variable referring to a location on a server can be used to infer that the right is shared among multiple devices."  (*See* Ex. 11 (Decl. of Jack Grimes) at ¶¶ 72–75.)  Moreover, though the specification alludes to a state variable storing a location (such as a Web site address), the specification never discloses what is maintained at that location.  *See, e.g.*, '053 18:14–21, Fig. 15.  In short, this element has no single, reasonably ascertainable meaning, particularly in light of the confusing and contradictory statements of the specification.

## III.   Means-Plus-Function Terms

Each of the four means-plus-function terms in the Nguyen patents lacks a corresponding algorithm that is clearly linked to the recited function and is, therefore, invalid for indefiniteness.  *See WMS Gaming*, 184 F.3d at 1348–49.

### A.      Means for Obtaining a Set of Rights Associated with an Item

| Term | Claim | ContentGuard's Construction | Defendants' Construction |
|------|-------|------------------------------|---------------------------|
| Means for obtaining a set of rights associated with an item | '280: 12 | A client environment 30 capable of connecting to a web server 80 and storing a license 52 including metarights and/or usage rights in a license repository 818, which can be interpreted by a license interpreter 802. | Indefinite. |

The '280 patent does not identify a specific structure that "obtains a set of rights."  For example, there are no algorithms or other descriptions of software that function as a "means for obtaining a set of rights."  (*See* Ex. 11 at ¶¶ 34–38.)  Instead, the '280 patent provides only a conceptual description in which rights, content, or both are sent from a content provider to a recipient. '280 6:27–31 ("[K]eep in mind that, in a distribution chain that utilizes a DRM system to control use and distribution of content or other items, content can travel from publisher 210 to user 240 through any digital communication channel, such a network or transfer of physical media.").

### B.      Means for Determining

| Term | Claim | ContentGuard's Construction | Defendants' Construction |
|------|-------|----------------------------|--------------------------|
| Means for determining . . . | '280: 12 | Authorization manager 508 that authenticates the rights consumer 304 and verifies that the conditions 306 of the license 52 have been satisfied. | Indefinite. |

The '280 patent does not identify any specific structure for "determining whether the rights consumer is entitled to the derivable right."  There are no algorithms or other descriptions of software that show how the consumer's entitlement is determined.  (Ex. 11 at ¶¶ 39–42.)  Instead, the '280 patent provides only conceptual and abstract restatements of the claimed function.  *See id.* Abstract; 2:58–59; 9:60–61, 9:67–10:2; 10:13–15.  The patent declines to explain how this is done, alleging that the "principal 304 of license 52 is authenticated in a known manner." *Id.* 9:58–60.

### C.      Means for Exercising

| Term | Claim | ContentGuard's Construction | Defendants' Construction |
|------|-------|----------------------------|--------------------------|
| Means for exercising . . . | '280: 12 | Meta-rights manager module 510 that derives new rights from meta-rights 302 in accordance with a set of rules or other logic and updates the state of rights and the current value of the conditions in a state of rights repository. | Indefinite. |

The '280 patent explains that to "exercise" a meta-right is to create a usage right (or another meta-right) using the meta-right.  The '280 patent, however, provides no description of any algorithm for performing this "exercising" function.  (*See* Ex. 11 at ¶¶ 43–47.)  Instead, the '280 patent only describes the function in only general terms.  For example, the '280 patent identifies Figure 2 as being a "block diagram of an example distribution chain showing the derivation of rights from

meta-rights." *Id.* 3:17–18.  Figure 2, however, simply identifies a succession of entities, and provides no detail regarding how meta-rights are used to create "usage rights." *Id.* Fig. 2.

### D.      Means for Generating a License Including the Created Right

| Term | Claim | ContentGuard's Construction | Defendants' Construction |
|------|-------|------------------------------|---------------------------|
| Means for generating a license including the created right . . . | '280: 12 | License Server 50/License Manager 803. | Indefinite. |

The '280 patent does not identify any algorithm for "generating a license including the created right, if the rights consumer is entitled to the right specified by the meta-right."  It simply states, "License server 50 then generates license 52 for content 42 and Web server 80 causes both the content and license 52 to be downloaded." *Id.* 5:11–13.  This passage simply restates the function of generating a license.  The patent has no other disclosure of "generating" in any context that could be relevant to "generating a license including the created right."  It separately mentions "generating a license including the derived rights," (which are different from "created" rights), but again provides no explanation of how this generation is implemented in software. *Id.* 10:16–19.

### DUNKELD PATENT-IN-SUIT[18]

## I.      Disputed Terms

### A.      Detect(ing) a Transfer

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| Detect(ing) a transfer | '556: 1, 12 | To discover or determine the existence, presence, or fact of a transfer. | To discover the occurrence of a transfer. |

The specification mentions "detect(ing) a transfer" only by stating that "[a]t the completion of the transfer, Host Server Network Device initiates step 324 by contacting Serial Number Reconciliation Module 120 to report completion of the transfer . . . ." '556 15:20–22; *see also id.* 15:39–40 ("[I]t reports the transaction as being complete.").  The specification does not include the broader scope urged by ContentGuard.  In addition, Defendants' more clear and concise proposal will be easier for a jury to understand.  ContentGuard argues that its proposal should be adopted because it is broader, (Dkt. No. 304 at 28), but the Federal Circuit has rejected this position, holding it

---

[18] The Dunkeld patent is U.S. Patent No. 8,583,556.

error to adopt a broad dictionary definition and then whittle it down only if contradicted by the specification.  *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330 (Fed. Cir. 2008).

Moreover, the specification does contradict ContentGuard's proposed definition.  It describes "a key purpose of the present inventions" as discovering and tracking transfers carried out **by others**.  '556 10:13–17 (emphasis added).  The only paragraph that mentions "detecting" in the describes discovering that two **customers** are engaged in transferring an unauthorized "rogue" file.  *Id.* 16:10-16.  ContentGuard's definition implies that an entity could detect itself transferring an asset, contrary to the specification's focus on discovering transfers between others.

### B.    Other Portion

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| Other portion | '556: 1, 12 | An unused part of the digital asset or information prepended or postpended to the digital asset. | A part of the digital asset wherein embedding information does not affect the user-perceptible portion of content. |

ContentGuard's proposed construction ignores the specification, which shows that a customer identification can be embedded into many portions of the digital asset.  *See* '556 19:28–31 ("[The] preferred embodiment discussed above uses a steganographic technique [hiding data within other data] for embedding . . . ."); *id.* 12:43–47 (explaining that the customer identification can be "encoded one bit at a time in the least significant bit of successive data words").  In addition, dependent claim 23 of the '556 patent recites that the "other portion" is an "unused portion," *id.* 23:1–2, which, under the doctrine of claim differentiation, means that in the independent claims the "other portion" includes a "used portion."  *See Innova/Pure Water*, 381 F.3d at 1119–20.

Defendants' proposed construction takes into account a key part of the invention: that embedding the customer identification does not affect user-perceptible content.  *See* '556 8:8–9 (explaining that the identification is embedded using "steganographic techniques without noticeable quality degradation"); *id.* 1:24–26, 2:8–10 (explaining that "a primary object of the present invention" was to "overcome[] the aforementioned disadvantages," including distribution of assets "without quality degradation"); *id.* 3:37–39 (explaining that "modification does not alter user-perceptible content").  Finally, ContentGuard's proposal that an "other portion" can be either a "part" of the asset or "information" is illogical and completely without support.

### C.      Instance

| Term | Claims | ContentGuard's Construction | Defendants' Construction |
|------|--------|------------------------------|---------------------------|
| Instance | '556: 1, 12 | Instantiation. | A file containing the digital asset that is distinct from other files containing the same digital asset. |

Defendants' proposal clearly explains the meaning of "instance," while ContentGuard's proposal would be more confusing to the jury than "instance" itself.  Moreover, "instance" was changed from "instantiation" during prosecution.  (Ex. 20 at 2–3, 5–6.)  The Court should prevent ContentGuard from reclaiming scope it surrendered to obtain the claims.

## II.     Indefiniteness

### A.      Over Said Network Between User Devices

| Term | Claim | ContentGuard's Construction | Defendants' Construction |
|------|-------|------------------------------|---------------------------|
| Over said network between user devices | '556: 8, 19 | Rewrite claims to remove "over said network." | Indefinite. |

The parties agree that claims 8 and 19 of the '556 patent are indefinite as written.  Content-Guard asserts that the inclusion of the words "over said network" in each claim was an "obvious error" that this Court should correct.  The Court should not grant ContentGuard's request because the claims are subject to multiple potential "corrections," e.g., changing "said" to "a" or reciting a "network" in claim 1.  *See Novo Indus.*, 350 F.3d at 1354.

ContentGuard's request for judicial correction of its claims is also meritless because it argues only that the alleged "error" is apparent from the prosecution history, not from the patent itself.  (Dkt. No. 304 at 29–30.)  The Federal Circuit has held that "[a] district court can correct a patent only if, among other things, the error is evident **from the face of the patent**."  *H-W Tech., LC v. Overstock.com, Inc.*, 758 F.3d 1329, 1333 (Fed. Cir. 2014) (emphasis added, quotation and citation omitted).  The Federal Circuit has held "evidence of error in the prosecution history alone insufficient to allow the district court to correct the error."  *Id.* at 1334.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court adopt their proposed constructions of the disputed claim terms.

December 22, 2014

Respectfully submitted,

/s/ Jennifer Haltom Doan

Glen E. Summers (admitted pro hac vice)
glen.summers@bartlit-beck.com
Alison G. Wheeler (admitted pro hac vice)
alison.wheeler@bartlit-beck.com
Katherine Hacker (admitted pro hac vice)
kat.hacker@bartlit-beck.com
BARTLIT BECK HERMAN PALENCHAR &
SCOTT LLP
1899 Wynkoop Street, 8th Floor
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile:  (303) 592-3140:

Counsel for Defendant AMAZON.COM, INC.

Michael Valaik (admitted pro hac vie)
michael.valaik@bartlit-beck.com
Abby Mollen (admitted pro hac vice)
abby.mollen@bartlit-beck.com
Joshua Ackerman (admitted pro hac vice)
joshua.ackerman@bartlit-beck.com
BARTLIT BECK HERMAN PALENCHAR &
SCOTT LLP
54 West Hubbard Street, #300
Chicago, IL  60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440

Counsel for Defendant AMAZON.COM, INC.

Jennifer Haltom Doan
Texas State Bar No. 08809050
jdoan@haltomdoan.com
Joshua Reed Thane
Texas Bar No. 24060713
jthane@haltomdoan.com
HALTOM & DOAN
6500 Summerhill Road
Crown Executive Center, Suite 100
Texarkana, TX 75505
Telephone: (903) 255-1000
Facsimile:  (903) 255-0800

Counsel for Defendant AMAZON.COM, INC.

/s/ Melissa Richards Smith

Melissa Richards Smith
Texas State Bar No. 24001351
Melissa@gillamsmithlaw.com
GILLAM & SMITH LLP
303 South Washington Avenue
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

Counsel for Defendant APPLE INC.

David T. Pritikin                          Bryan K. Anderson
Dpritikin@sidley.com                       Bkanderson@sidley.com
Richard A. Cederoth                        Nathan Greenblatt
Rcederoth@sidley.com                       Ngreenblatt@sidley.com
Nathaniel C. Love                          SIDLEY AUSTIN LLP
Nlove@sidley.com                           1001 Page Mill Road, Building 1
SIDLEY AUSTIN LLP                          Palo Alto, CA 94304
One South Dearborn Street                  Telephone: (650) 565-7007
Chicago, IL 60603                          Facsimile: (650) 565-7100
Telephone: (312) 853-7000
Facsimile: (312) 853-7036                  Counsel for Defendant APPLE INC.

Counsel for Defendant APPLE INC.

James J. Elacqua
Texas State Bar No. 06507025
James.elacqua@skadden.com
Ian Chen
Ian.chen@skadden.com
William J. Casey
William.casey@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
525 University Avenue, Suite 1400
Palo Alto, CA 94301
Telephone: 650-470-4500
Facsimile: 650-470-4570

Counsel for Defendants BLACKBERRY
CORP. (FKA RESEARCH IN MOTION
CORP.) and BLACKBERRY LIMITED (FKA
RESEARCH IN MOTION LIMITED)

Mairead J. Schwab
Mairead.schwab@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 N. Wacker Drive, Suite 2700
Chicago, IL 60606
Telephone: 312-407-0700
Facsimile: 312-407-0411

Counsel for Defendants BLACKBERRY
CORP. (FKA RESEARCH IN MOTION
CORP.) and BLACKBERRY LIMITED (FKA
RESEARCH IN MOTION LIMITED)

/s/ John S. Torkelson
John S. Torkelson
Texas State Bar No. 00795154
Jtorkelson@carterscholer.com
Sheria Dranise Smith
Texas State Bar No.24075097
Ssmith@carterscholer.com
CARTER SCHOLER STAFFORD ARNETT
HAMAD & MOCKLER, PLLC
8150 N. Central Expressway, Suite 1950
Dallas, TX 75206
Telephone: 214-550-8188
Facsimile: 214-550-8185

Counsel for Defendants BLACKBERRY
CORP. (FKA RESEARCH IN MOTION
CORP.) and BLACKBERRY LIMITED (FKA
RESEARCH IN MOTION LIMITED)

/s/ Scott Partridge
Scott Partridge
Texas Bar No. 00786940
Scott.partridge@bakerbotts.com
Lisa Kelly
Texas State Bar No. 24041659
Lisa.kelly@bakerbotts.com
Bradley Bowling
Texas State Bar No. 24040555
Brad.bowling@bakerbotts.com
Baker Botts LLP
One Shell Plaza
901 Louisiana
Houston, TX 77002
Telephone: 713-229-1569
Facsimile: 713-229-7769

Counsel for Defendant HUAWEI
TECHNOLOGIES CO., LTD. and HUAWEI
DEVICE USA, INC.

Peter J. Wied
Pwied@goodwinprocter.com
Vincent K. Yip
Vyip@goodwinprocter.com
Jay Chiu
Jchiu@goodwinprocter.com
Goodwin Procter LLP
601 S. Figueroa Street, 41st Floor
Los Angeles, CA 90017
Telephone: 213-426-2500
Facsimile: 213-623-1673

Counsel for Defendants HTC CORP. and HTC
AMERICA, INC.

/s/ Eric H. Findlay
Eric H. Findlay
Efindlay@findlaycraft.com
Brian Craft
Bcraft@findlaycraft.com
Findlay Craft, P.C.
102 N. College Avenue, Suite 900
Tyler, TX 75702
Telephone: 903-534-1100
Facsimile: 903-534-1137

Counsel for Defendants HTC CORP. and HTC
AMERICA, INC.

Michael J. Malacek
Michael.malacek@kayescholer.com
Timothy K. Chao
Timothy.chao@kayescholer.com
Kay Scholer LLP
3000 El Camino Real
2 Palo Alto Square, Suite 400
Palo Alto, CA 94306
Telephone: 650-319-4500
Facsimile: 650-319-4700

Counsel for Defendants MOTOROLA
MOBILITY LLC
Gregory Blake Thompson

Blake@themannfirm.com
James Mark Mann
Mark@themannfirm.com
Mann Tindel & Thompson
300 W. Main Street
Henderson, TX 75652
Telephone: 903-657-8540
Facsimile: 903-657-6003

Counsel for Defendants MOTOROLA
MOBILITY LLC

/s/ Gregory Blake Thompson
Robert W. Unikel
Robert.unikel@kayescholer.com
Kay Scholer LLP
80 W. Madison Street, Suite 4200
Chicago, IL 60602-4231
Telephone: 312-583-2300
Facsimile: 312-583-2360

Counsel for Defendants MOTOROLA
MOBILITY LLC

Neil Phillip Sirota
Neil.sirota@bakerbotts.com
Robert Lawrence Maier
Robert.maier@bakerbotts.com
Brian Boerman
Brian.boerman@bakerbotts.com
Guy Eddon
Guy.eddon@bakerbotts.com
Baker Botts LLP
30 Rockefeller Plaza, 44th Floor
New York, NY 10112
Telephone: (212) 408-2548
Facsimile: (212) 259-2548

Counsel for Defendants SAMSUNG
ELECTRONICS CO., LTD. SAMSUNG
ELECTRONICS AMERICA, INC. and
SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC

Michael E. Jones
Texas State Bar No.10929400
Mikejones@potterminton.com
Allen F. Gardner
Texas State Bar No.24043679
Allengardner@potterminton.com
Potter Minton, A Professional Corporation
110 North College, Suite 500
Tyler, TX 75702
Telephone: 903-597-8311
Facsimile: 903-593-0846

Counsel for Defendants SAMSUNG
ELECTRONICS CO., LTD. SAMSUNG
ELECTRONICS AMERICA, INC. and
SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC

/s/ Michael E. Jones

Michael Joseph Barta
Michael.barta@bakerbotts.com
Baker Botts LLP
The Warner
1299 Pennsylvania Avenue NW
Washington, DC 20004
Telephone: (202) 639-7703
Facsimile: (202) 585-1058

Counsel for Defendants SAMSUNG
ELECTRONICS CO., LTD. SAMSUNG
ELECTRONICS AMERICA, INC. and
SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC

|  | /s/ Charles Everingham IV |
| --- | --- |
| Charles Everingham IV | Kevin G. McBride |
| Texas State Bar No. 00787447 | Kmcbride@akingump.com |
| Ceveringham@akingump.com | AKIN GUMP STRAUSS HAUER & FELD |
| AKIN GUMP STRAUSS HAUER & FELD | LLP |
| LLP | 4 Park Plaza, Suite 1900 |
| 911 West Loop 281, Suite 412 | Irvine, CA 92614 |
| Longview, TX 75604 | Telephone: (949) 885-4200 |
| Telephone: (903) 297-7404 | Facsimile: (949) 885-4101 |
| Facsimile: (903) 297-7402 | |
| | Counsel for Intervener DIRECTV, LLC |
| Counsel for Intervener DIRECTV, LLC | |

Todd Landis
Texas State Bar No. 24030226
Tlandis@akingump.com
Eric J. Klein
Texas State Bar No. 24041258
Eklein@akingump.com
AKIN GUMP STRAUSS HAUER & FELD
LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

Counsel for Intervener DIRECTV, LLC

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic service on December 22, 2014.  *See* Local Rule CV-5(a)(3)(A).

/s/ Jennifer Haltom Doan
Jennifer Haltom Doan
.

48