**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| ContentGuard Holdings, Inc.,<br><br>*Plaintiff*,<br><br>v.<br><br>Amazon.com, Inc.; Apple Inc.; BlackBerry Limited (fka Research In Motion Limited) and BlackBerry Corporation (fka Research In Motion Corporation); DirecTV, LLC; HTC Corporation and HTC America, Inc.; Huawei Technologies Co., Ltd. and Huawei Device USA, Inc.; Motorola Mobility LLC; Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC,<br><br>*Defendants*. | Civil Action No. 2:13-cv-01112-JRG<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF CONTENTGUARD HOLDINGS, INC.'S REPLY
TO DEFENDANT AMAZON.COM, INC.'S SEPARATE
<u>RESPONSIVE CLAIM CONSTRUCTION BRIEF (DKT. 336)</u>**

Amazon argues that ContentGuard's seminal Trusted Repository Patents—the '859, '072, '956, '576, and '007 patents—are invalid under 35 U.S.C. § 112 because they allegedly improperly make use of "purely functional language." Dkt. 336 at 3. Amazon's arguments should be rejected because they reflect an elementary misunderstanding of the applicable law and are not supported by any evidence. Indeed, the fact that none of Amazon's co-Defendants has joined these arguments should tell the Court everything it needs to know about their merits.

The Trusted Repository Patents disclose seminal innovations conceived under the leadership of Mark Stefik, the "acknowledged father of DRM." Dkt. 332-01.[1] These patents reflect Stefik's vision that "trusted systems . . . would be the only feasible way to implement [DRM] because general-purpose computers ha[d] too many security holes." Dkt. 332-06. A key feature of "trusted" systems is reflected in the requirement that they maintain three types of "integrities" in the support of usage rights associated with digital content. Amply described in the specification, the three "integrities" are referred to in the patents as "physical," "communications," and "behavioral." Although, as Amazon acknowledges, the parties have proposed constructions for each type of "integrity," Amazon argues that these constructions use language that is "purely functional," rendering the patents invalid for indefiniteness.

Amazon's arguments are built on the premise that "claims defined in purely functional terms are invalid." Dkt. 336 at 2. This premise is utterly false. Indeed, the 60-year-old case Amazon cites for this proposition, *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 9 (1946), was expressly overruled by Congress in the Patent Act, and the current state of the law is very much *the exact opposite* of what Amazon represents it to be. Just last year, the Federal Circuit noted that "defining a particular claim term by its function is *not improper*" and "is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of 35 U.S.C. § 112 ¶ 6." *Hill-Rom Servs., Inc. v. Stryker*

---

[1] The background story of the inventions disclosed in the Trusted Repository Patents is explained at length in ContentGuard's Response to Amazon's Motion to Dismiss. Dkt. 332

-1-

*Corp.*, 755 F.3d 1367, 1374-75 (Fed. Cir. 2014) (emphasis added).[2] *See also, e.g.*, *Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The use of comparative and functional language to construe and explain a claim term is not improper. A description of what a component does may add clarity and understanding to the meaning and scope of the claim."); *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) ("claims are not necessarily indefinite for using functional language . . . [and such language] may be used to limit the claims without having the means-plus-function format"); *In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 2008) ("a patent applicant is free to recite features of an apparatus either structurally or functionally"); *In re Swinehard*, 439 F.2d 210, 212 (C.C.P.A. 1971) ("there is nothing intrinsically wrong with defining something by what it does rather than what it is in drafting patent claims"); *Invensys Sys., Inc. v. Emerson Electric Co.*, 2014 U.S. Dist. LEXIS 107928, at *38 (E.D. Tex. Aug. 6, 2014) ("Defendants argue that terms such as 'configured to,' 'operable to,' and 'circuitry to,' used throughout the claims constitute broad functional language that render the claims indefinite . . . As Defendants concede, under current Federal Circuit precedent, this argument fails."); *UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*, 2013 U.S. Dist. LEXIS, at *55 (E.D. Tex. May 28, 2013) ("apparatus claims that are limited by functional language are not necessarily indefinite. . . . If the functional language of the claim merely describes 'the structure and capabilities of the claimed apparatus,' then the claim is sufficiently definite under 35 U.S.C. § 112 ¶ 2); *Camponex Corp. v. Electronics for Imaging, Inc.*., 2014 U.S. Dist. LEXIS 156875, at *15 n.6 (W.D. Wis. Nov. 4, 2014) ("the[] cases *do* support the proposition that defining claims by their function, outside the 35 U.S.C. § 112, ¶ 6 context, is proper").

Far from supporting a blanket prohibition—or, indeed, even a presumption—against claims that use functional language, precedent uniformly holds that the indefiniteness test that applies to functional claims is no different from the norm. That test turns on "whether one

---

[2] ContentGuard notes that, the law firm Bartlitt Beck, Amazon's lead counsel in this action, represented the defendant-appellee in the *Hill-Rom Servs., Inc.* case.

skilled in the art would understand what is claimed when the claim is read in light of the specification." *UltimatePointer, L.L.C.*, 2013 U.S. Dist. LEXIS 74278, at *53-54 (citing *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1372 (Fed. Cir. 2004)); *see also Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2123 (2014) (a claim is indefinite when it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention"); *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) ("[W]hen a claim limitation is defined in purely functional terms, the task of determining whether that limitation is sufficiently definite is a difficult one that is highly dependent on context (e.g., the disclosure in the specification and the knowledge of a person of ordinary skill in the relevant art area)."). Indefiniteness must be proven by clear and convincing evidence. *Nautilus, Inc.*, 134 S. Ct. at 2130.

Amazon's cursory indefiniteness arguments rest upon nothing more than counsel's unsupported say-so. There is no evidence, let alone clear and convincing evidence, that a person of ordinary skill in the art would have any plausible degree of confusion or uncertainty concerning the scope of the "repository" and "trust" limitations that incorporate the three integrities. Notably, Amazon and its co-Defendants' main claim construction brief is supported by the opinions of a professional expert, Jack Grimes. Mr. Grimes, however, offers no opinions whatsoever on the central questions raised by Amazon's motion. Mr. Grimes does not say that, based on the patents' disclosure, he does not know how to configure a repository that maintains "physical integrity," *i.e.*, a repository that prevents access to content by a non-trusted system. Mr. Grimes does not say that, based on the patents' disclosure, he does not know how to configure a repository that maintains "communications integrity," *i.e.*, a repository that only communicates with other devices that are able to present proof that they are trusted systems, for example, by using security measures such as encryption, exchange of digital certificates, and nonces. And Mr. Grimes does not say that, based on the patents' disclosure, he does not know how to configure a repository that maintains "behavioral integrity," *i.e.*, a repository that requires

3

software that is to be installed therein to include a digital certificate, in other words, an assurance that the software comes from a source known to the repository. Mr. Grimes' conspicuous silence concerning these key points is telling, but not at all surprising: there is ample support in the specification that describes the boundaries of the three integrities that define Stefik's concept of "trust":

> ***Physical integrity*** refers to the integrity of the physical devices themselves. Physical integrity applies both to the repositories and to the protected digital works. Thus, the higher security classes of repositories themselves may have sensors that detect when tampering is attempted on their secure cases. In addition to protection of the repository itself, the repository design protects access to the content of digital works. In contrast with the design of conventional magnetic and optical devices—such as floppy disks, CD-ROMs, and videotapes—repositories never allow non-trusted systems to access the works directly. A maker of generic computer systems cannot guarantee that their platform will not be used to make unauthorized copies. The manufacturer provides generic capabilities for reading and writing information, and the general nature of the functionality of the general computing device depends on it. Thus, a copy program can copy arbitrary data. This copying issue is not limited to general purpose computers. It also arises for the unauthorized duplication of entertainment "software" such as video and audio recordings by magnetic recorders. Again, the functionality of the recorders depends on their ability to copy and they have no means to check whether a copy is authorized. In contrast, repositories prevent access to the raw data by general devices and can test explicit rights and conditions before copying or otherwise granting access. Information is only accessed by protocol between trusted repositories.
>
> ***Communications integrity*** refers to the integrity of the communications channels between repositories. Roughly speaking, communications integrity means that repositories cannot be easily fooled by "telling them lies." Integrity in this case refers to the property that repositories will only communicate with other devices that are able to present proof that they are certified repositories, and furthermore, that the repositories monitor the communications to detect "impostors" and malicious or accidental interference. Thus the security measures involving encryption, exchange of digital certificates, and nonces described below are all security measures aimed at reliable communication in a world known to contain active adversaries.
>
> ***Behavioral integrity*** refers to the integrity in what repositories do. What repositories do is determined by the software that they execute. The integrity of the software is generally assured only by knowledge of its source. Restated, a user will trust software purchased at a reputable computer store but not trust software obtained off a random (insecure) server on a network. Behavioral integrity is

> maintained by requiring that repository software be certified and be distributed with proof of such certification, i.e. a digital certificate. The purpose of the certificate is to authenticate that the software has been tested by an authorized organization, which attests that the software does what it is supposed to do and that it does not compromise the behavioral integrity of a repository. If the digital certificate cannot be found in the digital work or the master repository which generated the certificate is not known to the repository receiving the software, then the software cannot be installed.

*See* '859 Patent (Dkt. 244-03) at col. 11:62-12:50.[3]  Amazon does not even attempt to explain how a person of ordinary skill in the art would be confused by these disclosures and scores of other portions of the specification that provide additional teachings about how trusted repositories operate.  That is fatal to Amazon's request for a holding of indefiniteness. *Halliburton Energy Servs.*, 514 F.3d at 1249 ("claims [should be] held indefinite only where a person of ordinary skill in the art could not determine the bounds of the claims").

Amazon's lead case, *Halliburton Energy Services*, is indeed instructive.  That case concerned claims directed to "fragile gels," a term that was defined in the specification in a way that was "too subjective and unclear because it relied on terms such as '*easily* transitions,' '*easily* disrupted or thinned,' 'less *gel-like*,' 'more *liquid-like*,' '*quickly* returns to a gel,' 'break instantaneously,' and '*minimum* pressure, force, and time." 514 F.3d at 1247 (emphasis added). Under these circumstances, although the district court and the Federal Circuit found that the specification did purport to articulate a "definition" for "fragile gel," the courts ultimately concluded that this definition was "not sufficiently definite because it does not adequately distinguish the fragileness of the invention from disclosed prior art, it is ambiguous as of whether a upper bound of fragileness is contemplated, and it is ambiguous as to its requisite ability to suspend drill cuttings." *Id.* at 1256.  Amazon's suggestion that the constructions either party has proposed for "physical integrity," "communications integrity," and "behavioral integrity" in any way resemble the claims at issue in *Halliburton Energy Services* is untenable.

For the foregoing reasons, Amazon's request that the Court find claims that recite the limitations "repository" and "trust" invalid as indefinite should be rejected.

---

[3] The specifications of Trusted Repository Patents are in all material respects identical.

Dated: January 9, 2015                                                    Respectfully submitted,

                                                  */s/ Sam Baxter*

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
MCKOOL SMITH P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

| | |
|---|---|
| Robert A. Cote | Holly E. Engelmann |
| rcote@mckoolsmith.com | hengelmann@mckoolsmith.com |
| Radu A. Lelutiu | Seth R. Hasenour |
| rlelutiu@mckoolsmith.com | shasenour@mckoolsmith.com |
| Shahar Harel | Eric S. Hansen |
| sharel@mckoolsmith.com | ehansen@mckoolsmith.com |
| David R. Dehoney | MCKOOL SMITH P.C. |
| ddehoney@mckoolsmith.com | 300 Crescent Court, Suite 1500 |
| Angela M. Vorpahl | Dallas, Texas 75201 |
| avorpahl@mckoolsmith.com | Telephone: (214) 978-4000 |
| MCKOOL SMITH P.C. | Facsimile: (214) 978-4004 |
| One Bryant Park, 47th Floor | |
| New York, New York 10036 | |
| Telephone: (212) 402-9400 | |
| Facsimile: (212) 402-9444 | |

                                                  **ATTORNEYS FOR CONTENTGUARD HOLDINGS, INC.**

McKool 1071842v2

## **CERTIFICATE OF SERVICE**

 The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic services on this the 9th Day of January 2015.  Local Rule CV-5(a)(3)(A).

*/s/ Radu A. Lelutiu*