# Exhibit D

2015 WL 226084
Only the Westlaw citation is currently available.
United States District Court,
D. New Hampshire.

EAST COAST SHEET METAL FABRICATING CORP., d/b/a EastCoast CAD/CAM
v.
AUTODESK, INC.

Civil No. 12–cv–517–LM.   |   Signed Jan. 15, 2015.

**Attorneys and Law Firms**

George C. Summerfield, Kyle L. Harvey, Rolf O. Stadheim, Steven R. Pedersen, Stadheim & Grear Ltd., Chicago, IL, Kenneth C. Bartholomew, Michael S. Lewis, Rath Young & Pignatelli PA, Concord, NH, Thomas Tracy Aquilla, Aquilla Patents & Marks PLLC, Center Harbor, NH, for East Coast Sheet Metal Fabricating Corp., d/b/a EastCoast CAD/CAM.

Alexander P. Ott, Artem N. Sokolov, Joel M. Freed, McDermott Will & Emery LLP, Washington, DC, Damian R. Laplaca, Nelson Kinder + Mosseau PC, Boston, MA, Richard C. Nelson, Robert F. Callahan, Jr., Nelson Kinder Mosseau PC, Donald J. Perreault, Grossman Tucker Perreault & Pfleger PLLC, Manchester, NH, for Autodesk, Inc.

## ORDER

LANDYA McCAFFERTY, District Judge.

 *1  This case now consists of a claim by East Coast Sheet Metal Fabricating Corp. ("EastCoast") that Autodesk, Inc. ("Autodesk") has infringed claim 1 of U.S. Patent No. 7,917,340 (the #340 patent), claim 4 of U.S. Patent No. 7,449,839 (the #839 patent), and claim 1 of U.S. Patent No. 8,335,667 (the # 667 patent). Before the court are three motions for summary judgment filed by Autodesk, all of which are opposed. The court heard oral argument on those motions on December 12, 2014. For the reasons that follow, two of Autodesk's motions are granted, and the third is denied as moot.

### I. Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Ponte v. Steelcase Inc.,* 741 F.3d 310, 319 (1st Cir.2014) (quoting *Cortés–Rivera v. Dept. of Corr.,* 626 F.3d 21, 26 (1st Cir.2010)); *see also* Fed.R.Civ.P. 56(a). When ruling on a motion for summary judgment, the court must "view [ ] the entire record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.' " *Winslow v. Aroostook Cnty.,* 736 F.3d 23, 29 (1st Cir.2013) (quoting *Suarez v. Pueblo Int'l,* Inc., 229 F.3d 49, 53 (1st Cir.2000)).

## II. Background

The court begins by describing, in a general way, the inventions claimed in the patents-in-suit. A person using the invention begins with visual representation of something the user ultimately wishes to build, such as a ventilation system for a building. Then the user employs a program code to assign values to various characteristics of the desired system, including its dimensions and the materials from which it is to be fabricated. Next, the invention maps the data describing the desired system to stored data describing the standard parts from which such systems are fabricated. Finally, the invention produces a manufacturing blueprint that depicts the desired system in terms of the standard parts.

For the purpose of ruling on the motions before the court, claim 1 of the # 340 patent is similar enough to the other claims at issue to serve as an exemplar. That claim recites:

**1** A computer readable medium having computer executable instructions for designing a ventilation system that when executed by a processor performs the following steps comprising

obtaining a visual representation of one or more components of the ventilation system,

assigning one or more property values to each of the components of said ventilation system using a first program code,

utilizing geometrical information representing said visual representation and said property values of each component for

mapping all components of the imported geometrical information to a plurality of standard fittings as a function of (1) standards information including (1A) information specific to each of the plurality of standard fittings and (1B) fabrication information of each of the plurality of specific standard fittings, (2) the imported geometrical information, and (3) the assigned property values, and

**\*2** generating a manufacturing blueprint comprising the standard fittings,

the fabrication information, and

a three-dimensional representation of the visual representation,

whereby each of the one or more components of the visual representation have been mapped to standard fittings and include fabrication information in the manufacturing blueprint, thus, eliminating a need to redraw every component of an architectural drawing before coordination, fabrication, and installation of the system.

#340 Patent (doc. no. 1–16) 7 l.20—col.8 l.24.

Each of the three patents-in-suit is titled "Method and Apparatus for Importing Data into Program Code." At oral argument, in response to a question from the court, Autodesk identified the claims in the patents-in-suit as apparatus claims of the *Beauregard* variety, [1] and EastCoast readily agreed. The court harbors a strong suspicion that those claims are actually method claims rather than apparatus claims, for reasons described in Section III.B.1. But, it is not clear how the court could impose such a determination upon Autodesk in the face of its concession/insistence that those claims are apparatus claims. It would be unusual for a court to reject a factual stipulation to which the parties have agreed. On the other hand, a court need not, and should not, accept an agreement by the parties that the court has subject-matter jurisdiction when it does not. *See Macera v. Mort. Elec. Reg. Sys., Inc.,* 719 F.3d 46, 48 (1st Cir.2013). Because "[c]laim construction is a matter of law," *Azure Networks, LLC v. CSR PLC,* 771 F.3d 1336, 1347 (Fed.Cir.2014) (citation omitted), this court's ability/obligation to accept the parties' agreement on what kind of claim the plaintiff asserts would seem to fall closer to the subject-matter-jurisdiction end of the spectrum. But, without legal authority to do so, the court is reluctant to override the parties' agreement that the claims at issue are apparatus claims. Accordingly, the court follows the parties' lead and treats the claims at issue as apparatus claims.

EastCoast frames its patent-infringement claim in the following way:

Autodesk has directly and literally infringed [the #340 patent, the # 839 patent, and the #667 patent] under 35 U.S.C. § 271(a) with the following combinations of Autodesk products: a) AutoCAD MEP in combination with Fabrication FABmep; b) AutoCAD MEP in combination with Fabrication CADmep; c) AutoCAD MEP in combination with Fabrication FABmep and Fabrication CADmep; d) Revit MEP in combination with Fabrication FABmep; e) Revit MEP in combination with Fabrication CADmep; and f) Revit MEP in combination with Fabrication FABmep and Fabrication CADmep.

Third Am. Compl. (doc. no. 119) ¶ 11. Unhelpfully, this paragraph does not allege any specific acts of infringement. Allegations elsewhere in the complaint hint that EastCoast could be basing its claim on Autodesk's alleged manufacture, offering for sale, and sale of infringing products. *See id.* ¶¶ 8–9 (alleging that Autodesk made certain products, offered them for sale, and sold them). Moving beyond the complaint, the excerpt from EastCoast's Final Infringement Contentions that is attached to Autodesk's memorandum of law, *see* Def.'s Mem. of Law, Freed Decl ., Ex. F (doc. no. 110–3), at 41–43 of 60, does not identify the specific acts of infringement on which EastCoast's claim is based. While the complaint vaguely suggests the possibility of a claim based upon acts other than the sale of the accused products, there is nothing in the subsequent litigation of the case to suggest that EastCoast's claim of infringement goes beyond the act of sale. And, there is at least one bit of litigation history suggesting that EastCoast's claim is limited to the act of sale. In its memorandum of law in support of its motion for partial summary judgment on the issue of infringement, Autodesk stated: "Grant of this motion would leave standing for resolution only EastCoast's assertions of infringement by distribution of the Stand-alone products individually as DVD/CD–ROMS." Doc. no. 110–1, at 10 n. 9. In its Objection, EastCoast did not object to that characterization of the case, and most certainly did not mention claims based upon other acts of infringement that would survive if the court were to grant Autodesk's motion. Consequently, the court understands EastCoast's infringement claims to be limited to the act of sale.

### III. Discussion

**\*3** The court considers in turn each of the three legal theories under which Autodesk moves for summary judgment, beginning with the issue of the patent eligibility of the claimed inventions.

### A. *Patent Eligibility of EastCoast's Subject Matter*

In document no. 114, Autodesk seeks judgment as a matter of law that the three patents-in-suit are all invalid because the subject matter they claim is not patentable. Specifically, Autodesk argues that: (1) the claimed inventions do not exist in a physical or tangible form; and (2) the subject matter of the patents-in-suit consists of nothing more than "abstract ideas unaccompanied by inventive concept," Def.'s Mem. of Law (doc. no. 114–1). Autodesk's second argument carries the day.

### 1. *The Relevant Law*

"Patent eligibility under [35 U.S.C.] § 101 presents an issue of law." *CLS Bank Int'l v. Alice Corp. Pty. Ltd.,* 717 F.3d 1269, 1276 (Fed.Cir.2013) (citing *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.),* 687 F.3d 1266, 1273 (Fed.Cir.2012)). "Section 101 of the Patent Act defines the subject matter eligible for patent protection." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l,* 134 S.Ct. 2347, 2354 (2014). That statute provides that

Case 2:13-cv-01112-JRG   Document 371-4   Filed 01/26/15   Page 6 of 23 PageID #:  20450

East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc., Not Reported in F.Supp.3d...

[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101. As used in § 101, "[t]he term 'process' means process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material." 35 U.S.C. § 100(b). Finally, the Supreme Court has long "held that [§ 101] contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice,* 134 S.Ct. at 2354 (quoting *Ass'n for Mol. Path. v. Myriad Genetics, Inc.,* 133 S.Ct. 2107, 2116 (2013)).


### 2. Abstract Ideas

Autodesk argues that the three claims at issue are directed to non-patentable subject matter in the form of abstract ideas. There is a growing jurisprudence on this issue which has been aptly described and summarized by Judge Pfaelzer in *California Institute of Technology v. Hughes Communications, Inc.,* ——F.Supp.3d ——, No. 2:13–cv–07245–MRP–JEM, 2014 WL 5661290 (C.D.Cal. Nov. 3, 2014). Much of that jurisprudence has arisen in the context of process claims. *See, e.g., Gottschalk v. Benson,* 409 U.S. 63 (1972); *Parker v. Flook,* 437 U.S. 584 (1978); *Diamond v. Diehr,* 450 U.S. 175 (1981); *Bilski v. Kappos,* 561 U.S. 593 (2010); *Mayo v. Collab. Servs. v. Prometheus Labs., Inc.,* 132 S.Ct. 1289 (2012). The lone exception to this pattern, in the Supreme Court, is *Alice,* which involved method claims, system claims, and an apparatus claim. *See* 134 S.Ct. at 2353. Given that all three claims in this case are apparatus claims, *Alice* is of particular relevance to this court's analysis.


**\*4**  In *Alice,* when describing the unpatentability of laws of nature, natural phenomena, and abstract ideas, Justice Thomas explained:

"[M]onopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it," thereby thwarting the primary object of the patent laws. *Mayo,* 132 S.Ct. at 1293; see U.S. Const., Art. I, § 8, cl. 8 (Congress "shall have Power ... To promote the Progress of Science and useful Arts"). We have "repeatedly emphasized this ... concern that patent law not inhibit further discovery by improperly tying up the future use of" these building blocks of human ingenuity. *Mayo,* 132 S.Ct. at 1301 (citing [*O'Reilly v. .] Morse,* [15 How. 62,] 113 [ ( (1853) ] ).

At the same time, we tread carefully in construing this exclusionary principle lest it swallow all of patent law. *Mayo,* 132 S.Ct. at 1293–94. At some level, "all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* at 1293.

Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept. See *Diamond v. Diehr,* 450 U.S. 175, 187 (1981). "[A]pplication[s]" of such concepts " 'to a new and useful end,' " we have said, remain eligible for patent protection. *Gottschalk v. Benson,* 409 U.S. 63, 67 (1972).

Accordingly, in applying the § 101 exception, we must distinguish between patents that claim the " 'buildin[g] block[s]' " of human ingenuity and those that integrate the building blocks into something more, *Mayo,* 132 S.Ct. at 1303, thereby "transform[ing]" them into a patent-eligible invention, *id.* at 1294.

*Alice,* 134 S.Ct. at 2354 (parallel citations and internal cross-references omitted).

The Supreme Court has established a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice,* 134 S.Ct. at 2355. As Justice Thomas explained:

First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. [*Mayo,*] 132 S.Ct. at 1296–97. If so, we then ask, "[w]hat else is there in the claims before us?" *Id.* at 1297. To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. *Id.* at 1298, 1297. We have described step two of this analysis as a search for an " 'inventive concept' "—i.e., an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 1294.

*Id.* (parallel citations and footnote omitted). In other words, at step one of *Alice/Mayo,* the court determines whether the claim involves an abstract concept. At step two, if the abstract concept is *not* accompanied by an inventive concept, then the patent claims unpatentable subject matter in the form of an abstract idea. [2]

**\*5** Autodesk argues that it has satisfied the first part of the *Alice/Mayo* framework because "[there] can hardly be [a concept] more abstract" than the [concept] of "mapping geometrical information components to standard fittings using the ... criteria" recited in the claims at issue. Def.'s Mem. of Law (doc. no. 114–1) 10. EastCoast disagrees, arguing that what Autodesk calls an abstract concept is actually an application of the basic concept of mapping to a new and useful end and thus, is not an abstract idea. Autodesk has the better argument.

In *Alice,* the patents-in-suit "disclose[d] a computer-implemented scheme for mitigating 'settlement risk' (*i.e.,* the risk that only one party to a financial transaction will pay what it owes) by using a third-party intermediary," 134 S.Ct. at 2351–52, and "the specification further explain [ed] that the 'invention relate[d] to methods and apparatus, including electrical computers and data

processing systems applied to financial matters and risk management.' " *Id.* (quoting the record). At step one of the *Alice/Mayo* framework, Justice Thomas determined that the "claims [were] drawn to the abstract [concept] of intermediated settlement." *Id.* at 2355.

In making that determination, Justice Thomas recognized several other abstract concepts the Court had identified in its previous decisions, including: (1) "an algorithm for converting binary-coded decimal numerals into pure binary form," *Alice,* 134 S.Ct. at 2350 (citing *Gottschalk,* 409 U.S. at 71–72); (2) "a mathematical formula for computing 'alarm limits' in a catalytic conversion process," *id.* (citing *Parker,* 437 U.S. at 594–95); and (3) "the basic concept of hedging, or protecting against [financial] risk," *id.* at 2356 (quoting *Bilski,* 561 U.S. at 611).

In *DDR Holdings, LLC v. Hotels.com, L.P.,* the Federal Circuit assembled a similar compendium of abstract concepts from its own cases:

> In *Ultramercial, Inc. v. Hulu, LLC,* 772 F.3d 709, —— (Fed.Cir.2014), the claims merely recited the abstract idea of using advertising as a currency as applied to the particular technological environment of the Internet. In *buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350, 1355 (Fed.Cir.2014), the claims recited no more than using a computer to send and receive information over a network in order to implement the abstract idea of creating a "transaction performance guaranty." In *Accenture Global Servs., GmbH v. Guidewire Software, Inc.,* 728 F.3d 1336, 1344–45 (Fed.Cir.2013), the claims merely recited "generalized software components arranged to implement an abstract concept [of generating insurance-policy-related tasks based on rules to be completed upon the occurrence of an event] on a computer." And in *Bancorp Servs ., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.),* 687 F.3d 1266, 1278 (Fed.Cir.2012), the claims recited no more than the use of a computer "employed only for its most basic function, the performance of repetitive calculations," to implement the abstract idea of managing a stable-value protected life insurance policy. Under Supreme Court precedent, the above claims were recited too broadly and generically to be considered sufficiently specific and meaningful applications of their underlying abstract ideas.

**\*6** —— F.3d ——, —, No.2013–1505, 2014 WL 6845152, at \*9 (Fed.Cir. Dec. 5, 2014); *see also Content Extr. & Trans. LLC v. Wells Fargo Bank, Nat'l* Ass'n, —— F.3d ——, ——, Nos.2013–1588, 2013–1589, 2014–1112 & 2014–1687, 2014 WL 7272219, at \*3 (Fed.Cir. Dec. 23, 2014) (identifying as an abstract concept "collecting data, recognizing certain data within the collected data set, and storing that recognized data in memory" (internal enumeration omitted)); *Dealertrack, Inc. v. Huber,* 674 F.3d 1315, 1333 (Fed.Cir.2012) (identifying as an abstract concept " 'the basic concept' of processing information through a clearinghouse" (quoting *Bilski,* 561 U.S. at 611).

"[I]dentifying the precise nature of the abstract [concept]" in a particular case is not always straightforward. *DDR Holdings,* 2014 WL 6845152, at \*10 (presuming that patents-in-suit were

directed toward abstract concept and proceeding to second step of *Alice/Mayo* framework). In this case, however, the court has no difficulty concluding that the patents-in-suit are directed to an abstract concept, for the purposes of performing the analysis required at step one of the *Alice/Mayo* framework. EastCoast concedes as much by arguing that its invention is a patent-eligible application of the concept of "mapping," and focusing its argument on the second step of *Alice/Mayo.* That is, EastCoast does not deny that its claim involves an abstract concept. EastCoast's concession is well-founded, as it would be difficult to conceive of a more abstract concept than "mapping," when that concept is not tied to any particular object or method. Because EastCoast does not contest the existence of an abstract concept in its patent claims, and because those claims do, indeed, involve an abstract concept, the court proceeds to the second step of the *Alice/Mayo* framework.

At step two of that framework, the key question is whether a disputed claim is directed to something *other than* an abstract concept. *See Alice,* 134 S.Ct. at 2355. The necessary "something else" is generally referred to as an "inventive concept," *see id.,* which is an additional feature "sufficient to transform the claimed abstract [concept] into a patent-eligible application [of that concept]," *id.* at 2357 (internal quotation marks and citation omitted).

The *Alice* Court provided the following guidance concerning what does not qualify as an innovative concept:

> [T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract [concept] into a patent-eligible invention. Stating an abstract [concept] "while adding the words 'apply it' " is not enough for patent eligibility. *Mayo,* 132 S.Ct. at 1294. Nor is limiting the use of an abstract [concept] " 'to a particular technological environment.' " *Bilski,* [561 U.S .] at 610–611. Stating an abstract [concept] while adding the words "apply it with a computer" simply combines those two steps, with the same deficient result. Thus, if a patent's recitation of a computer amounts to a mere instruction to "implemen[t]" an abstract [concept] "on ... a computer," *Mayo,* 132 S.Ct., at 1301, that addition cannot impart patent eligibility.

**\*7** *Alice,* 134 S.Ct. at 2358 (parallel citations and internal cross-references omitted).

In *Alice,* the Court identified the steps in the patent holder's process claims, and then held that those claims did not identify an inventive concept because they did no "more than simply instruct the practitioner to implement the abstract [concept] of intermediated settlement on a generic computer." 134 S.Ct. at 2359. Other examples of claims involving computers that have been held to lack an inventive concept include:

• process claims for a purported invention that collected, recognized, and stored data, when those claims merely recited "use of a generic scanner and computer to perform well-understood,

Case 2:13-cv-01112-JRG   Document 371-4   Filed 01/26/15   Page 10 of 23 PageID #:  20454

East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc., Not Reported in F.Supp.3d...

routine, and conventional activities commonly used in industry," *Content Extraction*, 2014 WL 7272219, at *4 (citations omitted);

• claims for a process and a computer-readable medium that, together, guaranteed the performance of on-line transactions, *see buySAFE*, 765 F.3d at 1351, where the claims' "computer functionality [was] generic—indeed, quite limited: a computer receives a request for a guarantee and transmits an offer of guarantee in return," *id.* at 1355;

• claims for a system for "generating tasks [based on] rules ... to be completed upon the occurrence of an event," *Accenture,* 728 F.3d at 1344 (Fed.Cir.2013) (quoting U.S. patent no. 7,013,284, col.107 ll.24, 3839), even where that idea was limited "by applying it in a computer environment and within the insurance industry," *id.* at 1345;

• claims for a method, system, and apparatus for "managing a life insurance policy," *Bancorp,* 687 F.3d at 1277, where the claimed computer was "employed only for its most basic function, the performance of repetitive calculations, and as such [did] not impose meaningful limits on the scope of those claims," *id.* at 1278; and

• claims for a method for processing information through a clearinghouse, where the claims' "computer aided" limitation did "not specify how the computer hardware and database [were] specially programmed to perform the steps claimed in the patent," *Dealertrack,* 674 F.3d at 1333, or explain "how a computer aid[ed] the method, the extent to which a computer aid[ed] the method, or the significance of a computer to the performance of the method," *id.*

The lesson of Alice and the other cases cited above is that when the alleged innovation involves the use of a generic computer to do what such computers typically do, *i.e.,* speed up a process by eliminating the need for human activity, that innovation is not an invention eligible for patent protection.

With regard to what does qualify as an inventive concept, the court turns to *Diehr, DDR,* and *Cal. Tech.* While the Supreme Court's opinion in *Diehr* pre-dates its decisions in *Mayo* and *Alice,* that opinion provides useful guidance regarding what constitutes an inventive concept.

**\*8** In *Diehr,* "[t]he claimed invention was a process for molding raw, uncured synthetic rubber into cured precision products." 450 U.S. at 177. Before the advent of the patent-in-suit in *Diehr,* those who molded synthetic rubber into cured precision products were faced with the twin problems of overcuring and undercuring. *See id.* Those problems, in turn, resulted from using a well-known formula to calculate a fixed cure time based upon the thickness of the object to be molded and the temperature inside the molding press, even in the absence of a way to adequately measure the temperature inside the molding press. *Id.* at 177–78. The claimed invention solved that problem by establishing a way to constantly monitor the temperature inside the molding press

Case 2:13-cv-01112-JRG Document 371-4 Filed 01/26/15 Page 11 of 23 PageID #: 20455

East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc., Not Reported in F.Supp.3d...

and feed those temperature readings into a computer that constantly recalculated the cure time. *See id.* at 179. Today, that would be called an inventive concept.

In *DDR Holdings,* the patents-in-suit were "directed to systems and methods of generating a composite web page that combines certain visual elements of a 'host' website with content of a third-party merchant." 2014 WL 6845152, at *1. As the Federal Circuit explained:

> The common specification of the patents-in-suit explains that prior art systems allowed third-party merchants to "lure the [host website's] visitor traffic away" from the host website because visitors would be taken to the third-party merchant's website when they clicked on the merchant's advertisement on the host site. The patents-in-suit disclose a system that provides a solution to this problem (for the host) by creating a new web page that permits a website visitor, in a sense, to be in two places at the same time. On activation of a hyperlink on a host website—such as an advertisement for a third-party merchant—instead of taking the visitor to the merchant's website, the system generates and directs the visitor to a composite web page that displays product information from the third-party merchant, but retains the host website's "look and feel." Thus, the host website can display a third-party merchant's products, but retain its visitor traffic by displaying this product information from within a generated web page that "gives the viewer of the page the impression that she is viewing pages served by the host" website.

*Id.* (citations to the record omitted). In holding that the patents-in-suit satisfied the second step of the *Alice/Mayo* framework, the court emphasized that the claims were directed to solving a specific problem in the prior art. *See id.* at *10–11. The court also observed:

> Unlike the claims in *Ultramercial,* the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink. Instead of the computer network operating in its normal, expected manner by sending the website visitor to the third-party website that appears to be connected with the clicked advertisement, the claimed system generates and directs the visitor to the above-described hybrid web page that presents product information from the third-party and visual "look and feel" elements from the host website.

**\*9** *Id.* at *12. Finally, in *Cal. Tech.,* Judge Pfaelzer ruled that the patents-in-suit claimed inventive concepts and prefaced her discussion this way: "When claims provide a *specific* computing solution for a computing problem, those claims should generally be patentable, even if their novel elements are mathematical algorithms ." 2014 WL 5661290, at *14 (emphasis added).

The lesson of *Diehr, DDR,* and *Cal. Tech.* is that an inventive concept is, among other things, a new idea that solves a recognized problem in a particular field of endeavor. Moreover, the inventive concepts in those three cases each involved an innovation that allowed a user of the invention to achieve a *better* result, rather than a result that was achieved more quickly due to the replacement of direct human activity with a computer. Those improved results are: (1) an increased ability to avoid overcuring and undercuring synthetic rubber products, *see Diehr,* 450 U.S. at 177; (2) website connectivity that did not require a visitor to leave a host site in order to view the content of a third-party merchant's site, *see DDR Holdings,* 2014 WL 6845152, at *1; and (3) more efficient correction of errors in transmitted digital data, *see Cal. Tech.,* 2014 WL 5661290, at *1–2. [3]

EastCoast identifies the inventive concept it purports to claim in the following way:

> [T]he claims effect an improvement in the technical field of CAD/CAM software. In particular, by providing *a specific way* to obtain and enhance a model created and stored in one software application and then manipulate and further define that model to make a fabrication blueprint—thus eliminating the need to redraw components of an architectural drawing before coordination, fabrication, and installation of a system—the invention improves the operation of such software.

Pl.'s Mem. of Law (doc. no. 133–1) 16–17 (emphasis added). There are several problems with EastCoast's attempt to identify an inventive concept.

First, EastCoast's argument refers to "a specific way to obtain and enhance a model created and stored in one software application and then manipulate and further define that model to make a fabrication blueprint," Pl.'s Mem. of Law (doc. no. 133–1) 16. That argument, in turn, appears to be rooted in the opinion of EastCoast's expert on patentable subject matter, Christopher Frerking, who stated in his declaration that "the claims provide specific operations that are to be performed by a computer to perform the operations, and so go beyond just providing a manual process and stating that is to be performed on a generic computer." Frerking Decl. (doc. no. 133–2) ¶ 45. Neither EastCoast nor Frerking, however, identifies what those specific operations might be.

To be sure, claim 1 of the #340 patent recites an apparatus composed of a computer-readable medium containing instructions that, when executed by a processor, perform the steps of: (1) obtaining visual representation of the components of a ventilation system; (2) assigning property values to those components; (3) utilizing geometrical information representing the visual representations and the property values; (4) mapping components of that geometrical information to standard fittings; and (5) generating a manufacturing blueprint. But, that claim only says what the invention does. Without a disclosure of how the invention does what it does, neither the specification nor the claim identifies an inventive concept. *See Dealertrack,* 674 F.3d at 1333. Rather, the patent merely recites the use of a generic computer to perform generic computer

operations, and that is not enough to establish an inventive concept. *See Alice,* 134 S.Ct. at 2358; *Content Extraction,* 2014 WL 7272219, at *4; *buySAFE,* 765 F.3d at 1355; *Bancorp,* 687 F.3d at 1278. Thus, this case is entirely distinguishable from *DDR Holdings,* where "the claims at issue ... specif[ied] how interactions with the Internet [were] manipulated to yield a desired result —a result that over [rode] the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink," 2014 WL 6845152, at *12. Here, by contrast, the patents-in-suit describe the inventions' computer programming as operating in the most generic of terms. They talk about data being processed, transferred, and stored using computer memory and a processor. There is no language in the patents-in-suit that describes the computer programming involved in the invention as operating in anything other than their "normal, expected manner," *id.* Thus, there is no support for EastCoast's argument that the claimed inventions improve the operation of the CAD/CAM software they employ.

**\*10** The claims at issue also fall short because they are not directed to a recognized problem in the field of CAD/CAM software. The closest that the # 340 patent comes to identifying a problem in the field is claim language stating that the invention "eliminat[es][the] need to redraw every component of an architectural drawing before coordination, fabrication, and installation of the system." Doc. no. 1–16, col.8 ll.22–24. However, there is nothing in the specification to suggest that hand-drawn blueprints pose any particular problem in the field of designing and manufacturing circulation systems for buildings. Indeed, EastCoast does not argue that its claimed apparatus produces manufacturing blueprints that are any better than those drawn by hand; it only argues that its invention replaces the human hand.

Because EastCoast does not identify any way in which computer-generated architectural blueprints are superior to hand-drawn blueprints, the court can only conclude that the advantage of the claimed invention is increased speed resulting from the normal operation of a generic computer. Given all the authority for the proposition that the use of generic computers operating in normal ways does not demonstrate an inventive concept, it must also be the case that one does not solve a problem in any given field simply by using existing technology to speed up a process once done by hand. That is not an inventive concept; it is just what generic computers normally do. The failure of the claimed invention to solve a recognized problem in the field of CAD/CAM software is yet another reason why the patents-in-suit fail to claim an inventive concept.

In sum, as between the line of cases that includes *Alice, Content Extraction, buySAFE, Accenture, Bancorp,* and *Dealertrack,* and the line that includes *Diehr, DDR Holdings,* and *Cal.* Tech., this case stands shoulder to shoulder with the cases in the first line. That is, the patents-in-suit claim unpatentable subject matter because they fail to identify an inventive concept sufficient to satisfy the second step of the *Alice/Mayo* framework. Thus, Autodesk is entitled to judgment as a matter of law that the patents-in-suit are invalid for claiming unpatentable subject matter, and its motion for summary judgment on that theory, document no. 114, is granted.

### B. Non–Infringement

In addition to moving for summary judgment that the patents-in-suit claim unpatentable subject matter, Autodesk also moves for partial summary judgment on the issue of infringement. Autodesk bases this motion on the fact that each of the products EastCoast accuses of infringement actually consists of two or more separate Autodesk products, *i.e.,* a "stand-alone" product and one or two "add-on" products, that are sold (and used) together. While Autodesk's entitlement to summary judgment on the issue of unpatentable subject matter is enough to end this case, the court, out of an abundance of caution, will also consider Autodesk's motion for partial summary judgment on the issue of infringement.

 **\*11**  In document no. 110, Autodesk argues that even if the patents-in-suit do claim patentable subject matter, it did not infringe those patents by selling components of the claimed invention or by selling those components via download. [4]  Autodesk's arguments are persuasive, but before addressing them, the court focusses on a matter on which the parties appear to agree, the nature of the claims at issue.

### 1. EastCoast's "Beauregard" Claims

As the court has already noted, notwithstanding the parties' agreement on this point, it seems far from clear that the claims at issue in this case are actually apparatus claims. In *CyberSource Corp. v. Retail Decisions, Inc.* ("*CyberSource I* "), Judge Patel questioned the legal validity of the *Beauregard* concept, *see* 620 F.Supp.2d 1068, 1078–80 (N.D.Cal.2009). Then, in its opinion affirming Judge Patel's decision that the patent-in-suit was drawn to unpatentable subject matter, the Federal Circuit explained:

> Regardless of what statutory category ("process, machine, manufacture, or composition of matter," 35 U.S.C. § 101) a claim's language is crafted to literally invoke, we look to the underlying invention for patent-eligibility purposes. Here, it is clear that the invention underlying both claims 2 and 3 is a method for detecting credit card fraud, not a manufacture for storing computer-readable information.

*CyberSource Corp. v. Retail Decisions, Inc.* ("*CyberSource II* "), 654 F.3d 1366, 1374 (Fed.Cir.2011). In *Digital–Vending Services International, LLC v. University of Phoenix, Inc.,* the Federal Circuit cited the principle articulated in *CyberSource II* in the context of an infringement analysis, see 672 F.3d 1270, 1275 n. 1 (Fed.Cir.2012) ("functionally-defined [Beauregard] claims should be treated as method claims to avoid 'exalt[ing] form over substance' ") (quoting CyberSource II, 654 F.3d at 1374)). Here, it would certainly appear that the invention underlying all three of the claims at issue is a method for creating manufacturing blueprints for circulation systems in buildings.

Based on *CyberSource II,* if Autodesk had argued that EastCoast's claims are method claims, the court most likely would have agreed. Moreover, the court would most likely have granted summary judgment in Autodesk's favor if Autodesk had argued that method claims may only be infringed by use, which is not one of the acts of infringement alleged by EastCoast. *See NTP, Inc. v. Research In Motion, Ltd.,* 418 F.3d 1282, 1318 (Fed.Cir.2005) (quoting *Roberts Dairy Co. v. United States,* 530 F.2d 1342, 1354 (Ct.Cl.1976)), *abrogated on other grounds by Zontek Corp. v. United States,* 672 F.3d 1309, 1323 (Fed.Cir.2012).

EastCoast's reasons for wanting an apparatus claim seem evident. Because it claims that Autodesk directly infringed the apparatus claims of the patents-in-suit by selling the accused products, it is not required to prove scienter. But, if it were claiming that Autodesk indirectly infringed a method claim by inducing its customers to use the patented invention, *see* 35 U.S.C. § 271(b), it would be required to prove scienter, *see Global–Tech Appliances, Inc. v. SEB S.A.,* 131 S.Ct. 2060, 2068 (2011). So, too, if EastCoast were claiming that Autodesk was liable for contributory infringement of a method claim, *see* 35 U.S.C. § 271(c), it would have to prove scienter, *see Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 488 (1964). Autodesk's reasons for wanting the claims at issue to be apparatus claims are not so evident. But, as stated above, for the purpose of resolving the issues before it, the court follows the parties' lead and treats the claims at issue as apparatus claims.

## *2. Infringement by Products Used in Combination*

 **\*12**  EastCoast bases its patent-infringement claim on 35 U.S.C. § 271(a), which states: "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States ... infringes the patent." In an action under that statute, "[t]o prove [that] an accused product literally infringes the patent in suit, the product must contain each and every limitation of the asserted claim(s)," *Trebro Mfg., Inc. v. FireFly Equip., LLC,* 748 F.3d 1159, 1166 (Fed.Cir.2014) (citing *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.,* 725 F.3d 1341, 1348 (Fed.Cir.2013)), and "[t]o infringe an apparatus claim, the device must meet all of the structural limitations," *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1311–12 (Fed.Cir.2005) (citing *Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 909 F.2d 1464, 1468 (Fed.Cir.1990); *In re Michlin,* 256 F.2d 317, 320 (C . C.P.A.1958)).

Patent infringement "is a question of fact," *EMD Millipore Corp. v. AllPure Techs., Inc.,* 768 F.3d 1196, 1201 (Fed.Cir.2014) (quoting *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353 (Fed.Cir.1998)), and "[i]t has long been established that the patent owner has the burden to prove infringement," *Yufa v. Lockheed Martin Corp.,* 575 F. App'x 881, 886 (Fed.Cir.2014) (citing *Medtronic, Inc. v. Mirowski Family Ventures, LLC,* 134 S.Ct. 843, 846 (2014)). Regarding the plaintiff's burden of proof, "patent-infringement litigation has always been governed by a preponderance of the evidence standard." *Octane Fitness LLC v. ICON Health & Fitness, Inc.,* 134 S.Ct. 1749, 1758

(2014) (citing *Bene v. Jeantet,* 129 U.S. 683, 688 (1889)). That said, "[s]ummary judgment of non-infringement [may be] proper, [but] if and only if 'no reasonable jury could find that every limitation recited in the properly construed claim ... is ... found in the accused device.' " *Yufa,* 575 F. App'x at 886 (quoting *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1339 (Fed.Cir.2001)).

The issue here is whether EastCoast can prove that Autodesk infringed the patents-in-suit by selling combinations composed of: (1) one of the Autodesk products the parties refer to as a "stand-alone;" plus (2) one or two of the Autodesk products they refer to as "add-ons." [5] In support of its motion for summary judgment, Autodesk makes the following argument: (1) each of the three patents-in-suit claims a computer-readable medium having a full set of computer-executable instructions; (2) each of the six accused products consists of a stand-alone product in combination with one or more add-on products; (3) neither a stand-alone product nor an add-on product has a full set of computer-executable instructions but, rather, a full set of instructions exists only when a stand-alone product is combined with an add-on; and (4) because it distributes only components that must be used in combination, rather than operable assemblies of components, it cannot be liable for direct infringement. In making its argument, Autodesk relies upon the Supreme Court's opinion in *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518 (1972).

**\*13** Before turning to Autodesk's *Deepsouth* argument, which focusses upon who made the allegedly infringing combinations and when such a combination comes into being, the court observes that Autodesk may have unnecessarily conceded, at least implicitly, that its combinations of stand-alone and add-on products meet all the limitations of the claims at issue.

Each of the patents-in-suit claims an apparatus composed of *a* computer-readable medium combined with computer-executable instructions that, when executed by a processor, perform a specific number of steps, either five (in the #340 and #667 patents) or eight (in the #839 patent). Those steps, in turn, are the *only* steps recited in any of the relevant claims. None of those claims recite: (1) "one or more" computer-readable media; or (2) "a plurality of" computer-readable media. [6] They all recite "a computer-readable medium." And, because each claim recites a single computer-readable medium, each claim necessarily requires that *all* of its steps are performed by that single computer-readable medium.

Based upon the foregoing, none of the accused products would appear to contain all the limitations of any of EastCoast's claims. Each of the accused products consists of a stand-alone product combined with at least one add-on product. Thus, at least as a theoretical matter, the combinations Autodesk could have sold its customers include: (1) two or three CD–ROMs or DVD–ROMs; (2) two or three downloads; or (3) one or two CD–ROMs or DVD–ROMs plus one or two downloads.

When Autodesk sold an accused product composed exclusively of CD–ROMs or DVD–ROMs, that product consisted of two or more computer-readable media, and thus did not meet the claim

Case 2:13-cv-01112-JRG  Document 371-4  Filed 01/26/15  Page 17 of 23 PageID #:  20461

East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc., Not Reported in F.Supp.2d...

limitation of "*a computer-readable medium.*" Similarly, such a product did not meet the limitation that the single claimed medium must contain all of the instructions necessary to perform all the claimed steps. [7]

When Autodesk sold an accused product composed exclusively of downloads, that product did not meet the claim limitation of "a computer-readable medium." Indeed, the language of the #340 patent limits the term "computer-readable medium" to tangible storage media. The specification uses the term only once, describing the invention's algorithm as being "typically stored on a computer-readable medium," #340 patent, col.5 l.32, and there is no plausible argument to be made that an algorithm (or any other kind of data) is being stored while it is being downloaded. In addition, courts have understood the term "computer-readable medium" to refer to tangible objects such as: (1) a "high density removable storage means such as a compact disc," *Bancorp,* 687 F .3d at 1276 (internal quotation marks and ellipsis omitted); and (2) "a disk, hard drive, or other data storage device," *CyberSource II,* 654 F.3d at 1374. Moreover, when considering a claim under 35 U.S.C. § 271(f), which makes it an act of infringement to supply a substantial portion of the components of a patented invention from the United States for assembly outside the country, the Supreme Court held that software not expressed on computer-readable medium such as CD–ROM is not a component of a device. *See Microsoft Corp. v. AT & T Corp.,* 550 U.S. 437, 449–50 (2007). There may well have been computer-readable media at various points in the supply chain through which Autodesk transmitted computer-executable instructions to its customers via download, but when Autodesk distributed its accused products in that way, it was not selling its customers a single computer-readable medium, and thus, the product it sold does not meet all the limitations of the claim at issue. [8]

**\*14** Finally, presuming that it is even possible to do so, if Autodesk sold an accused product composed of one or more computer-readable media and one or more downloads, that product did not meet the claim limitation of "*a computer-readable medium,*" nor did it meet the limitation that the claimed medium must contain all the instructions necessary to perform all the claimed steps.

Moreover, while Autodesk's combinations of stand-alone and add-on products might have been able to do what the patented inventions do, that is immaterial. *See Hewlett–Packard,* 909 F.2d at 1468 (explaining, in context of challenge to patentability, that "apparatus claims cover what a device *is,* not what a device *does* " (emphasis in the original)). In sum, based on EastCoast's own characterization of the accused products, it does not seem that anyone, not even Autodesk's customers, ever made a device that met all the limitations of the relevant claims of the patent-in-suit. For this reason alone, it would appear that no reasonable jury could find that every limitation recited in EastCoast's claims is found in any of the accused products, which would entitled Autodesk to judgment as a matter of law of non-infringement. *See Yufa,* 575 F. App'x at 886.

EastCoast's infringement claims, however, are also doomed by the Supreme Court's decision in *Deepsouth.* In that case, the Laitram Corporation ("Laitram") held valid patents for: (1) a machine, called "a 'slitter' which exposed the veins of shrimp by using water pressure and gravity to force the shrimp down an inclined [trough] studded with razor blades," 406 U.S. at 520; and (2) a second machine, called "a 'tumbler [which] 'mechanically remove [d] substantially all veins from shrimp whose backs have been previously slit,' " *id.* (quoting the record). As the Court explained:

> Both the slitter and the tumbler are combination patents; that is,

> "[n]one of the parts referred to are new, and none are claimed as new; nor is any portion of the combination less than the whole claimed as new, or stated to produce any given result. The end in view is proposed to be accomplished by the union of all, arranged and combined together in the manner described. And this combination, composed of all the parts mentioned in the specification, and arranged with reference to each other, and to other parts of the [machine] in the manner therein described, is stated to be the improvement, and is the thing patented."

*Deepsouth,* 406 U.S. at 520–21 (quoting *Prouty v. Ruggles,* 16 Pet. 336, 341, 10 L.Ed. 985 (1842)). When assembled together, the slitter and the tumbler functioned as a shrimp deveiner. *See Deepsouth,* 406 U.S. at 519.

The question in *Deepsouth* was whether Deepsouth Packing Co. ("Deepsouth") would directly infringe Laitram's patents were it "to make the parts of deveining machines, sell them to foreign buyers, and have the buyers assemble the parts and use the machines abroad." 406 U.S. at 523. On its way to answering that question in the negative, the Court explained that "[t]he sales question thus resolve[d] itself into the question of manufacture: did Deepsouth 'make' (and then sell) something cognizable under the patent law as the patented invention, or did it 'make' (and then sell) something that fell short of infringement?" *Id.* at 527. In this case too, the sales question generally resolves itself into the question of manufacture.

**\*15** In reaching its decision that Deepsouth's sale of parts from which a deveining machine could be assembled did not infringe Laitram's patents because Deepsouth never made an infringing deveining machine, the Court relied upon the following principles:

> We cannot endorse the view that the "substantial manufacture of the constituent parts of (a) machine" constitutes direct infringement when we have so often held that a combination patent protects only against the operable assembly of the whole and not the manufacture of its parts. "For as we pointed out in *Mercoid v. Mid–Continent Investment Co.* (320 U.S. 661, 676) a patent on a combination is a patent on the assembled or functioning whole, not on the separate parts." *Mercoid Corp. v. Minneapolis–Honeywell Regulator Co.,* 320 U.S. 680, 684 (1944). See also *Leeds & Catlin Co. v. Victor Talking Machine Co.,* 213 U.S. 301:

"A combination is a union of elements, which may be partly old and partly new, or wholly old or wholly new. But whether new or old, the combination is a means—an invention—distinct from them." *Id.,* at 318.

"[O]ne element is not the combination. Indeed, all of the elements are not. To be that—to be identical with the invention of the combination—they must be united by the same operative law." *Id.,* at 320.

And see *Brown v. Guild,* 23 Wall. 181, 23 L.Ed. 161 (1874). In sum,

"[i]f anything is settled in the patent law, it is that the combination patent covers only the totality of the elements in the claim and that no element, separately viewed, is within the grant." *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S., at 344.

It was this basic tenet of the patent system that led Judge Swan to hold in the leading case, *Radio Corp. of America v. Andrea,* 79 F.2d 626 ( [2d Cir.] 1935), that unassembled export of the elements of an invention did not infringe the patent.

"[The] relationship is the essence of the patent. "... No wrong is done the patentee until the combination is formed. His monopoly does not cover the manufacture or sale of separate elements capable of being, but never actually, associated to form the invention. Only when such association is made is there a direct infringement of his monopoly, and not even then if it is done outside the territory for which the monopoly was granted." *Id.,* at 628.

*Deepsouth,* 406 U.S. at 528–29 (parallel citations omitted).

Despite the factual differences between the accused device in *Deepsouth* and the accused products in this case, the legal principle on which the *Deepsouth* Court relied still applies, and compels a judgment of non-infringement. The accused device in *Deepsouth* was a machine, made from two separate machines, that met all the claim limitations of two separate combination patents. Here, each accused product consists of two (or three) separate products, none of which, either alone or in combination, meets all the limitations of the claims at issue. Moreover, just as the assembly of the accused device in *Deepsouth* was found to be non-infringing because it was performed by entities other than the alleged infringer, so too here; it is undisputed that any integration of stand-alone products and add-on products was performed by Autodesk's customers, not by Autodesk itself. [9] Following *Deepsouth,* if Autodesk did not make any product that met all the limitations of the claims at issue, no reasonable jury could find infringement based upon Autodesk's sales of its accused products.

**\*16** EastCoast responds to Autodesk's reliance upon *Deepsouth* by pointing out that this case does not involve the question presented in that case, i.e., whether it was an act of infringement to

East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc., Not Reported in F.Supp.3d...

Case 2:13-cv-01112-JRG Document 371-4 Filed 01/26/15 Page 20 of 23 PageID #: 20464

sell foreign customers the unassembled components of a machine that meets all the limitations of a patent claim. [10] EastCoast reads *Deepsouth* too narrowly. Resolution of the question presented in *Deepsouth* required the court to determine what constituted the manufacture of an infringing apparatus, which is very much at issue here. Accordingly, the court cannot conclude that *Deepsouth* is inapposite.

Autodesk also argues that rather than relying upon *Deepsouth,* the court should be guided by Judge Altonaga's order in *Atlas IP, LLC v. Medtronic, Inc.,* No. 13–23309–CIV, 2014 WL 5040317 (S.D.Fla. Oct. 8, 2014). The court does not agree.

In *Atlas,* Atlas IP, LLC, sued Medtronic, Inc. ("Medtronic") for infringing a patent on "wireless communication protocols used in medical devices." *Id.* at *1. Unlike the apparatus claims at issue in this case, the claims at issue in *Atlas* were system claims. *See id.* at *6. In *Atlas,* "Medtronic argue [d] [that] it [did] not infringe under section 271(a) because it [did] not make or sell the system, only its components, and even if it did make the system, there is no infringement until the system is turned on and operational." *Id.* Thus, according to Medtronic, "any alleged direct infringement would be by the doctor or patient who makes and uses the system." *Id.*

In rejecting that argument, Judge Altonaga explained that: (1) "Medtronic manufactures all of the devices [comprising the claimed system] as finished products capable of infringement when paired together," *id.* at *9; and (2) "[r]equiring more [than sale of the devices to constitute sale of the system] would erase any distinction between a claim for *making* a system and one for *using* a system," *id.* (quoting *NTP,* 418 F.3d at 1317) (emphasis in NTP). No such concern arises here because this case involves apparatus claims, not system claims. Moreover, as with the apparatus in *Deepsouth,* which had to be assembled by Deepsouth's customers, Autodesk's customers would have to do more than simply "turn on" a stand-alone product and an add-on product to use the apparatuses claimed in the patents-in-suit, each of which is a single computer-readable medium. In other words, given the claims and the subject matter in this case, adopting the reasoning of *Deepsouth* would not result in erasing the distinction between making and using the claimed apparatus. Accordingly, *Atlas* provides no legal basis for denying Autodesk's request for summary judgment of non-infringement as to its sale of the accused products.

### 3. Infringement by Downloading

Autodesk argues, in the alternative, that its distribution of stand-alone and add-on products via download is not an act of direct infringement because downloading over the internet involves disassembling the computer-executable instructions and transmitting them in several separate "packets" of data that must be reassembled before they can be used. In framing that argument, Autodesk again relies upon the statement in *Deepsouth* that "a combination patent protects only

against [manufacture or sale of] the operable assembly of the whole and not the manufacture of its parts." 406 U.S. at 528. Autodesk's argument is persuasive.

**\*17** That argument, however, tends to focus on *how* Autodesk transmits products to its customers while, in the court's view, the relevant inquiry concerns *what* Autodesk transmits. When Autodesk distributes its products via download, it distributes computer-executable instructions that, when executed by a processor, perform some number of steps. But that is not the claimed invention. The claimed invention is a combination of those instructions *plus* a computer-readable medium. When Autodesk sells only the instructions, it is not selling the claimed invention. Therefore, the sale of those instructions alone cannot be infringing, because the product Autodesk sells via download does not meet all the limitations of the claimed invention.

EastCoast also contends that Autodesk's downloading argument fails because downloadable computer software expressed as a computer-readable copy can be a component of a patented invention for purposes of 35 U.S.C. § 271(f), *see id.* (citing *Microsoft,* 550 U.S. at 449). EastCoast's reliance upon *Microsoft* is misplaced. In *Microsoft,* Justice Ginsburg explained:

> Until it is expressed as a computer-readable "copy," e.g., on a CD–ROM, Windows software—indeed any software detached from an activating medium—remains uncombinable. It cannot be inserted into a CD–ROM drive or downloaded from the Internet; it cannot be installed or executed on a computer. Abstract software code is an idea without physical embodiment, and as such, it does not match § 271(f)'s categorization: "components" amenable to "combination." Windows abstracted from a tangible copy no doubt is information—a detailed set of instructions—and thus might be compared to a blueprint (or anything containing design information, e.g., a schematic, template, or prototype). A blueprint may contain precise instructions for the construction and combination of the components of a patented device, but it is not itself a combinable component of that device. AT & T and its *amici* do not suggest otherwise. Cf. *Pellegrini v. Analog Devices, Inc.,* 375 F.3d 1113, 1117–1119 (C . A.Fed.2004) (transmission abroad of instructions for production of patented computer chips not covered by § 271(f)).

550 U.S. at 449–50.

Here, there can be no doubt that *before* Autodesk makes its products available to customers via download, the computer-executable instructions in those products are expressed as a computer-readable copy, presumably a copy resident on an Autodesk hard drive. And after a customer downloads Autodesk's products, it is fair to assume that the customer makes a computer-readable copy of the product's instructions before using them. Finally, when Autodesk sells its products in

East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc., Not Reported in F.Supp.3d...

the form of a CD–ROM or a DVD–ROM, the product's instructions are expressed as a computer-readable copy.

*But,* while Autodesk's products are in transit, via download, between its own computer-readable medium and whatever computer-readable medium the customer uses to store them, the instructions in those products are *not* expressed as a computer-readable copy; they are information abstracted from a tangible copy. And, as Justice Ginsburg has explained, the ease with which instructions in software can be encoded onto and retrieved from a computer-readable medium does not erase the distinction between software that is stored in a computer-readable medium and software that is not. *See Microsoft,* 550 U.S. at 451. That distinction might not loom so large in this case if the claims at issue were method claims, but EastCoast insists that those claims are apparatus claims, not method claims.

 **\*18**  In sum, no reasonable jury could find that Autodesk infringed EastCoast's patents by selling its accused products in the form of downloads, because a download does not meet the claim limitation of instructions on a computer-readable medium.

### 4. Summary

Because no reasonable jury could find that Autodesk infringed EastCoast's patents by selling components of the claimed inventions, Autodesk is entitled, as a matter of law, to a judgment that it has not infringed any of the patents-in-suit by selling any of the accused products. Accordingly, its motion for partial summary judgment on that theory, document no. 110, is granted.

### C. Lost–Profit Damages

Because Autodesk is entitled to summary judgment on both its invalidity and infringement arguments, the court need not address the issue of damages. Thus, Autodesk's motion for judgment as a matter of law that EastCoast cannot prove damages in the form of lost profits, document no. 122, is denied as moot.

## IV. Conclusion

For the reasons described above, Autodesk's motion for summary judgment of unpatentable subject matter, document no. 114, and its motion for partial summary judgment of non-infringement, document no. 110, are both granted. On that basis, its motion for summary judgment on the issue of damages, document no. 122, and all other pending motions, are denied as moot. Accordingly, the clerk of the court shall enter judgment in accordance with this order and close the case.

Case 2:13-cv-01112-JRG   Document 371-4   Filed 01/26/15   Page 23 of 23 PageID #:  20467

East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc., Not Reported in F.Supp.3d...

**SO ORDERED.**

## Footnotes

1    "Claims in *Beauregard* format formally recite a tangible article of manufacture—a computer-readable medium, such as a computer disk or other data storage device—but such claims also require the device to contain a computer program for directing a computer to carry out a specified process." *CLS Bank Int'l v. Alice Corp. Pty. Ltd.,* 717 F.3d 1269, 1287 (Fed.Cir.2013); *see also In re Beauregard,* 53 F.3d 1583 (Fed.Cir.1995)* (vacating decision by Board of Patent Appeals and Interferences in light of concession by Commissioner of Patents and Trademarks "that computer programs embodied in a tangible medium, such as floppy diskettes, are patentable subject matter under 35 U.S.C. § 101").

2    Terminology in this area of the law can be a bit confusing because courts tend to use the term "abstract idea" to describe two different things: (1) the finding a court must make at step one of the *Alice/Mayo* framework to justify proceeding to the second step; and (2) the conclusion that results after performing the second step, when a court determines that the claimed invention does not include an inventive concept. Following Justice Thomas's lead, *see Alice,* 134 S.Ct. at 2255, the court will utilize the word "concept" instead of "idea" at step one to avoid semantic confusion.

3    Recognizing increased efficiency as an improvement over the prior art in *Cal. Tech.* might seem to run counter to *Alice* and all the other cases that stand for the proposition that increased speed resulting from the use of computers does not demonstrate an inventive concept. In those other cases, however, increased efficiencies resulted from using a computer to do things once done by hand. In *Cal. Tech.,* the inventive step was a set of instructions that allowed the computer in the invention to work more efficiently than the computers in the prior art.

4    As the court has already noted, Autodesk states that if the court were to grant its motion for partial summary judgment on the issue of infringement, all that would remain "for resolution [are] East Coast's assertions of infringement [by distribution] of the Stand-alone products individually as DVD/CD–ROMS." Pl.'s Mem. of Law (doc. no. 110–1) 10 n. 9. But, EastCoast is asserting no such claims. *See* Pl.'s Mem. of Law (doc. no. 131–1) 2; Def.'s Reply (doc. no. 136) 1. Thus, if the court grants the relief requested in document no. 110, Autodesk is entitled summary judgment on EastCoast's entire infringement claim.

5    While the court would like to describe these two kinds of products and the functional relationships between them in more detail, there is not enough in the record to support such a discussion.

6    Those drafting choices must have been deliberate, given that claim 1 of the #340 patent uses the phrase "one or more" three times and uses the term "plurality" three times in other contexts.

7    It may seem to be an impermissible factual inference against EastCoast to say that when the accused product consists of two or more computer-readable media, no single medium has all the claimed instructions. But, in objecting to summary judgment, EastCoast made a point of explaining that it "has limited its infringement allegations to [six] combinations of products." Pl.'s Mem. of Law (doc. no. 131–1) 2. If any standalone product or any add-on product, on its own, contained all of the instructions claimed in any of the patents-in-suit, it stands to reason that EastCoast would have identified that individual product as infringing.

8    EastCoast points out that during patent prosecution, claim 1 of the #667 patent was amended, at the direction of the patent examiner, to recite "[a] non-transitory computer readable medium," doc. no. 1–18, col.7 l.21, thus suggesting that there might be such a thing as a "transitory computer-readable medium." That is not enough to overcome judicial authority for the proposition that a computer-readable medium is necessarily non-transitory.

9    The only possible exception would be if Autodesk ever loaded a full set of computer-executable instructions onto a single hard drive, thus making the claimed apparatus. But because EastCoast does not allege that Autodesk ever sold a hard drive to any of its customers, this possible exception is irrelevant to ruling on Autodesk's motion for partial summary judgment that it did not infringe the patents-in-suit by distributing the accused products.

10   Congress reacted to the Supreme Court's decision in *Deepsouth,* by enacting 35 U.S.C. § 271(f), which "expands the definition of infringement to include supplying from the United States a patented invention's components." *Microsoft,* 550 U.S. at 444–45. But nothing in that statute countermanded the Supreme Court's determination that an apparatus is not made until all of its components are assembled.

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.