# Exhibit E

2014 WL 7641155
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Steve MORSA, Plaintiff,
v.
FACEBOOK, INC., Defendant.

No. SACV 14–161–JLS (JPRx).   |   Signed Dec. 23, 2014.

**Attorneys and Law Firms**

Edward F. O'Connor, Stephen M. Lobbin, The Eclipse Group LLP, Irvine, CA, Matthew Delgiorno, Delgiorno IP Law PLLC, Allen, TX, Patrick J. Conroy, T. William Kennedy, Jr., Bragalone Conroy PC, Dallas, TX, for Plaintiff.

Michael G. Rhodes, Cooley LLP, San Francisco, CA, Elizabeth Lee Stameshkin, Heidi Lyn Keefe, Mark R. Weinstein, Cooley LLP, Palo Alto, CA, Phillip E. Morton, Cooley LLP, Reston, VA, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS (Doc. 56)

JOSEPHINE L. STATON, District Judge.

**I. INTRODUCTION**

*1 Before the Court is a Motion for Judgment on the Pleadings filed by Defendant Facebook, Inc. (Mot., Doc. 56.) Plaintiff Steve Morsa opposed, and Facebook replied. (Opp., Doc. 59; Reply, Doc. 62.) Having read and considered the papers and heard oral argument, the Court GRANTS the Motion.

**II. BACKGROUND**

On February 4, 2014, Plaintiff Steve Morsa filed a Complaint in this Court against Defendant Facebook, Inc., alleging Facebook has infringed and continues to infringe two of his patents.[1] (Compl., Doc. 1, ¶ 7.)

Both patents are titled "Match Engine Marketing" and share a common abstract, which reads in relevant part:

> Enabling advertisers using a computer network such as the Internet and a match engine to submit their offerings to product, service, benefit seeking entities.... An advertiser influences a position of an offering in the advertiser's account by first selecting offering relevant criteria. The advertiser enters the criteria and the description into a listing; influencing at least in part the position for the listing within a results page through an online bidding process. This results page is generated in response to a seeking entity query of the match engine. Pay for performance demographic, geographic, psychographic criteria/characteristics targeted directly advertising ... is enabled.

(*Id.* Exs. A–B.)

The specifications, which are largely identical, state that the patents improve on prevailing internet advertising practices, which largely "follow[ed] traditional advertising paradigms" at the time of invention—for instance, through the use of billboard-like banner advertisements atop webpages—rather than "utiliz[ing] the unique attributes of the Internet." (#337 Patent, col. 2:19–20.) The patents permit advertisers to target online advertisements only to those consumers fitting desired demographic, geographic and "psychographic" criteria. (*Id.,* col. 6:34–38.) Advertisers reach these consumers by bidding for the display and placement of their advertisements. (*Id.,* col. 6:29–33.)

The five asserted independent claims illustrate the forms this concept takes. Claim 12 of the #337 Patent reads:

> A method of generating an advertising presentation using at least in part a computer-compatible network, comprising:
>
> > maintaining a database including a plurality of advertisements, wherein each advertisement is associated with a provider and a modifiable bid amount that is independent of other component(s) of the advertisement, each advertisement being searchable;
> >
> > identifying the advertisement(s) having demographic and/or psychographic and/or firmographic criteria which generate at least a partial match with an entity;
> >
> > arranging the identified advertisement(s) into said advertising presentation at least in part in accordance with the values of the respective bid amounts for the identified advertisement(s).

(*Id.,* col. 40:23–37.) Claims 113 and 126 of the #337 Patent are substantially similar. Claim 113 reads:

**\*2** A method of presenting an advertisement, the method comprising:

associating one or more multigraphic and/or firmographic attributes with an advertisement;

receiving input from a user, wherein the received input comprises one or more multigraphic and/or firmographic attributes;

identifying at least a partial match between the multigraphic and/or firmographic attribute or attributes associated with the advertisement and the received input;

and presenting the advertisement to the user;

wherein the determination of the presentation order and/or size of and/or dimensions of and/or location of the advertisement is based at least in part on a bid on at least one of the said multigraphic and/or firmographic attributes.

(*Id.,* col. 50:40–51; *see also id.* col. 51:29–39.) Claim 1 of the #020 Patent reads:

A method comprising:

receiving through a network from a first device connected to the network information associating one or more demographic and/or psychographic and/or firmographic criteria with an ad;

receiving through the network from the first device or a second device connected to the network a bid associated with the criteria;

determining, by at least one processor, ad placement based at least in part on (i) the bid and (ii) ad performance and/or ad popularity.

(#020 Patent, col. 39:31–41.) Finally, Claim 97 of the #020 Patent reads:

A method comprising:

auctioning or bidding on or for, through a network via at least one device connected to the network, a(n):

ad, entity, user, seeker, or entity criteria; determining, by at least one processor, ad placement;

wherein one or more demographic and/or psychographic and/or firmographic criteria is associated with, a component of, a factor applicable to, or which corresponds to said ad, entity, user, seeker, or entity criteria.

(*Id.,* col. 45:6–14.) The fifteen asserted dependent claims recite various limitations on the above independent claims. (*See, e.g.,* Decl. of Elizabeth L. Stameshkin, Doc. 58, Appx. A.)

On November 13, 2014, Facebook filed the instant Motion for Judgment on the Pleadings, arguing that all asserted claims are drawn to patent-ineligible subject matter under Section 101 of the Patent Act, 35 U.S.C. § 101. (Mem., Doc. 57, at 1–2.) Morsa disputes this and additionally argues that (1) subject-matter invalidity under Section 101 is not a defense to an infringement claim and (2) to the extent that it is, it is premature at the Motion for Judgment on the Pleadings stage. (Opp. at 7–19; 19–20; 5–7.)

### III. *LEGAL STANDARD*

#### A. *Motion for Judgment on the Pleadings*

Where a motion for judgment on the pleadings under Federal Rule of Civil Procedure ("Rule") 12(c) is used to dismiss an action for failure to state a claim, it is "functionally equivalent" to a motion to dismiss under Rule 12(b)(6), and the same legal standard applies to both motions. *Harris v. County of Orange,* 682 F.3d 1126, 1131 (9th Cir.2012). Judgment on the pleadings is appropriate only "when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.,* 132 F.3d 526, 529 (9th Cir.1997) (internal quotation marks and citation omitted).

**\*3** Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Aschcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556).

When evaluating a Rule 12(b)(6) motion, the Court must accept as true all factual allegations in the complaint and draw all inferences in the non-moving party's favor. *See Seven Arts Filmed Entm't Ltd. v. Content Media Corp. PLC,* 733 F.3d 1251, 1254 (9th Cir.2013); *Association for L.A. Deputy Sheriffs v. County of L.A.,* 648 F.3d 986, 991 (9th Cir.2011). The Court is not required, however, to accept legal conclusions couched as factual allegations, supported "by mere conclusory statements" and "[t]hreadbare recitals of the elements of a cause of action." *Iqbal,* 556 U.S. at 678.

Unless a court converts a Rule 12(b)(6) or 12(c) motion into a motion for summary judgment, a court generally cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). *In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.,* 102 F.3d 1524, 1537 (9th Cir.1996), *rev'd on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). A court may, however, consider exhibits submitted with or alleged in the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir.1999); *see also Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir.2001).

**B.** *Patentable Subject Matter Under 35 U.S.C. § 101*
Section 101 of the Patent Act defines the subject matter that is eligible for patent protection: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. This section, however, contains important implicit exceptions. "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l,* ––– U.S. ––––, ––––, 134 S.Ct. 2347, 2354, 189 L.Ed.2d 296 (2014) (quoting *Association for Molecular Pathology v. Myriad Genetics, Inc.,* ––– U.S. ––––, ––––, 133 S.Ct. 2107, 2116, 186 L.Ed.2d 124 (2013)). The concern that drives these exceptions is preemption; laws of nature, natural phenomena, and abstract ideas are "the basic tools of scientific and technological work," and granting patents based on these exceptions might impede innovation more than it would promote it. *Id.* Yet, to some extent "all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice,* 134 S.Ct. at 2354 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.,* ––– U.S. ––––, ––––, 132 S.Ct. 1289, 1293, 182 L.Ed.2d 321 (2012)). "Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice,* 134 S.Ct. at 2354 (citing *Diamond v. Diehr,* 450 U.S. 175, 187, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981)).

**\*4** The Supreme Court has analyzed § 101 by distinguishing "between patents that claim the building[g] block[s] of human ingenuity and those that integrate the building blocks into something more, thereby transform[ing] them into a patent-eligible invention." *Alice,* 134 S.Ct. at 2354 (alterations in original) (internal quotations and citations omitted). In *Mayo,* the Supreme Court set forth a two-step framework for distinguishing between these two types of patents. "First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. If so, we then ask, '[w]hat else is there in the claims before us?' " *Alice,* 134 S.Ct. at 2355 (alteration in original) (quoting *Mayo,* 132 S.Ct. at 1296–97). The second step is essentially "a search for an 'inventive concept'—*i.e.,* an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.' " *Alice,* 134 S.Ct. at 2355 (alteration in original) (quoting *Mayo,* 132 S.Ct. at 1294).

The elements of each claim must therefore be considered both individually and "as an ordered combination." *Mayo,* 132 S.Ct. at 1298.

"Issues of patent-eligible subject matter are questions of law." *CyberSource Corp. v. Retail Decisions, Inc.,* 654 F.3d 1366, 1369 (Fed.Cir.2011). In attempting to invalidate a patent on Section 101 grounds, a challenger must overcome the presumption that "every issued patent is presumed to have been issued validly absent clear and convincing evidence to the contrary." *Open Text S.A. v. Alfresco Software Ltd.,* No. 13–CV–4843, 2014 WL 4684429, at *3 (N.D.Cal. Sept.19, 2014); *see also State Contracting & Eng'g Corp. v. Condotte Am., Inc.,* 346 F.3d 1057, 1067 (Fed.Cir.2003) ("A party seeking to establish that particular claims are invalid must overcome the presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence.").

## IV. DISCUSSION

### A. *Ripeness*

The parties first dispute whether the validity of the patents-in-suit may properly be decided at this stage of the litigation. (Mem. at 10–12; Opp. at 5–6.)

District courts have "broad discretion concerning the appropriate time to address § 101." *Eclipse IP LLC v. McKinley Equip. Corp.,* No. SACV 14–742–GW(AJWx), 2014 WL 4407592, at *5 (C.D.Cal. Sept. 4, 2014). It is ordinarily "desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.),* 687 F.3d 1266, 1273–74 (Fed.Cir.2012). However, there is no "bright line rule requiring district courts to construe claims before determining subject matter eligibility." *Id.* at 1273 (citations omitted); *see also Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.,* 558 Fed. App'x 988, 992 n. 1 (Fed.Cir.2014) ("There is no requirement that the district court engage in claim construction before deciding § 101 eligibility."). Rather, claim construction is a prerequisite to the § 101 inquiry "only where claim construction disputes are relevant." *Eclipse IP,* 2014 WL 4407592, at *5; *see Lumen View Tech. v. Findthebest.com, Inc.,* 984 F.Supp.2d 189, 205 (S.D.N.Y.2013) (finding claim construction unnecessary for a § 101 analysis because the claims were straightforward, covering broad subject matter categories, and "[n]o components [were] opaque such that claim construction would be necessary to flush out its contours").

 ***5** Morsa offers two reasons why this Motion is not ripe for decision. First, he argues that both he and Facebook rely on facts outside the pleadings in support of their respective positions and that "factual disputes abound," making this dispute unfit for resolution on the pleadings. (Opp. at 5–6.) The Court agrees that certain matters raised in the briefing are not properly considered at this point in the case. That is a reason to ignore certain contentions in ruling on the Motion; however, it is not a reason to refuse to decide it at all.

Morsa next argues that while he now asserts twenty claims against Facebook pursuant to the Court's Scheduling Order (Doc. 38), he will add additional claims once discovery is complete, and thus any decision on this Motion would result in "incomplete resolution" of this case. (Opp. at 6.) The deadline for Morsa to elect his asserted claims has long passed, however, and the Court grants leave to add additional claims after that deadline only upon a showing of good cause, which Morsa does not make in his Opposition. (*See id.*) Moreover, Morsa's argument, taken to its logical conclusion, would preclude the Court from *ever* considering a Motion to Dismiss or Motion for Judgment on the Pleadings, given that a Plaintiff could *always* seek the Court's leave to assert new claims before trial.

Accordingly, the Court does not find this Motion is premature.

**B.** *Section 101 as a Defense*
The parties next dispute whether patent-ineligibility may be raised as a defense to infringement. (Opp. at 19–20; Reply at 10–11 .)

Morsa argues that Facebook may not seek to dismiss his Complaint on Section 101 grounds because Section 282 of the Patent Act sets forth the available defenses to a claim of infringement, and Section 101 is not listed therein. (Opp. at 19.) As Facebook notes, however, the Federal Circuit has squarely rejected this argument. *See, e.g., Dealertrack, Inc. v. Huber,* 674 F.3d 1315, 1331 n. 3 (Fed.Cir.2012) (holding that the defenses enumerated in Section 282 include those set forth in Section 101).

Accordingly, Facebook may raise subject-matter ineligibility as a defense to Morsa's claim of infringement.

**C.** *Subject Matter Eligibility*

**1.** *Abstract Idea*
As noted above, the first step in the Court's Section 101 analysis is determining whether the claims at issue are directed to a "patent-ineligible concept." *Mayo,* 132 S.Ct. at 1296–97. Such concepts include "laws of nature, natural phenomena, and abstract ideas ...." *Alice,* 134 S.Ct. at 2354.

Facebook argues the asserted claims are directed to two abstract ideas: (1) determining the advertisement that will be shown to a consumer based on that consumer's demographic information; and (2) using advertiser bids to determine whether and how an advertisement will be displayed. (Mem. at 2–3.) In response, Morsa does not suggest a different concept for the claims, but instead argues that the claims of the #337 Patent "bear[ ] none of the hallmarks of abstract

ideas," and that the claims of the #020 Patent are even less abstract because they contain additional limitations not found in the #337 Patent claims. (Opp. at 9, 14.)

**\*6** Facebook's argument is persuasive. The above claims make clear that the purpose of the patents is to (1) target advertisements to certain internet users based on their characteristics and (2) permit advertisers to bid to have their ads shown to those users based on those characteristics. The specification confirms that these are the patents' twin aims:

> The present invention is unique in that never before has there been an entity demographic, geographic, psychographic criteria targeted pay-for-performance system which allows product, service, and benefit provider/advertiser/promoters to pay for the exposure of their offerings to their desired targeted entities/ marketplace(s) in real or substantially real time via a computer network.

(#337 Patent, col. 9:46–55.)

Morsa argues that even if Facebook accurately captures the patents' concept, it fails to demonstrate that it is a "fundamental, long-standing, well-known concept" that is ineligible under Section 101. (Opp. at 13). There are two problems with this argument. First, targeted advertising is just such a concept, insofar as matching consumers with a given product or service "has been practiced as long as markets have been in operation." *Tuxis Technologies, LLC v. Amazon.com, Inc.,* No. CV 13–1771–RGA, 2014 WL 4382446, at \*5 (D.Del. Sept.3, 2014); *see also OpenTV Inc. v. Netflix Inc.,* No. 14–CV–01525–RS, at 10 (N.D.Cal. December 16, 2014) ("The concept of gathering information about one's intended market and attempting to customize the information then provided is as old as the saying, 'know your audience.'"). Morsa does not attempt to dispute that advertisers targeted consumers based on their demographic data long before the internet existed —for instance, by directly mailing consumers in an affluent zip code.

Similarly, advertisers have long "placed bids," in effect, that determine whether and how their advertisements will be displayed, for instance, by paying more to be featured more prominently on a newspaper page. (Mem. at 16.) The specification is again instructive on this point, positing that the patents' bidding process "applies market principles to [customer] matching on the Internet." (#337 Patent, col. 7:66–67.) Thus, Morsa misses the mark in suggesting that Facebook has not identified any "long-standing, well-known concepts" to which the claims are drawn.

Moreover, Morsa fails to recognize that while a claim's implementation of a "fundamental, long-standing, well-known concept" is highly relevant to the Court's abstractness inquiry, it is not dispositive. The dispositive inquiry is whether the concept to which a claim is drawn has "no particular concrete or tangible form." *Ultramercial, Inc. v. Hulu, LLC,* 772 F.3d 709, 715 (Fed.Cir.2014). Here, there can be no doubt that this is the case. In *Ultramercial,* for instance,

the Federal Circuit considered claims that, like the claims at issue in this case, concerned online advertising. Specifically, the claims described the following steps:

> *7 (1) receiving copyrighted media from a content provider; (2) selecting an ad after consulting an activity log to determine whether the ad has been played less than a certain number of times; (3) offering the media for sale on the Internet; (4) restricting public access to the media; (5) offering the media to the consumer in exchange for watching the selected ad; (6) receiving a request to view the ad from the consumer; (7) facilitating display of the ad; (8) allowing the consumer access to the media; (9) allowing the consumer access to the media if the ad is interactive; (10) updating the activity log; and (11) receiving payment from the sponsor of the ad.

*Id.* at 714–15. The Court found the above steps "recite[d] an abstraction—an idea, having no particular concrete or tangible form," namely that of "showing an advertisement before delivering free content." *Id.* at 715. And while certain additional limitations such as consulting an activity log added *particularity* to the claims, the Court found that they did nothing to change the underlying *idea.*

That conclusion controls this case. As in *Ultramercial,* the claims here are drawn to two abstract ideas: targeting advertisements to certain consumers, and using a bidding system to determine when and how advertisements will be displayed. While both of these are "fundamental, long-standing, well-known concepts," they also have "no particular concrete or tangible form" and are therefore abstract. While Morsa argues the dependent claims add various limitations that prevent them from "monopoliz[ing] the alleged abstract ideas" identified by Facebook (Opp. at 16–17), these limitations do not alter the claims' underlying concept in any meaningful way. If they are relevant, then, it is only at the next step in the Court's invalidity analysis. *See Ultramercial,* 772 F.3d at 715.

Morsa's remaining arguments are without merit. Morsa suggests that the Court should view Facebook's arguments as to the claims' abstractness with "extreme skepticism" in light of allegedly contrary positions Facebook has taken before the Patent Office with respect to patents not at issue in this case. (Opp. at 9–11.) Even accepting this as true, however, Facebook's contrary arguments before another tribunal do not permit this Court to confer patent eligibility on otherwise ineligible subject matter. *Cf. McRO, Inc. v. Namco Bandai Games Am., Inc.,* No. CV 12–10322–GW FFMX, 2014 WL 4749601, at *7 (C.D.Cal. Sept.22, 2014).

Morsa also argues that the logic advanced by Facebook, applied consistently, would mean that "all software is necessarily directed to an abstract idea." (Opp. at 11.) While courts are grappling with *Alice* 's implications on this point, this concern is most acute where a claim presents "a unique computing solution that addresses a unique computing problem." *California Inst. of Tech.*

v. *Hughes Commc'ns Inc.,* —— F.Supp.3d ——, 2014 WL 5661290, at \*20 (C.D.Cal. Nov.3, 2014). It is not implicated where, as here, claims recite only the use of a generic computer to implement abstract ideas. *See* Section IV(C)(2), *infra.*

 **\*8** Thus, having found the claims at issue in this case abstract, the Court moves on to the second step of its *Mayo* analysis.

### 2. *Inventive Concept*

In the second step, the Court considers whether the challenged claims contain an " 'inventive concept'—*i.e.,* an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.' " *Alice,* 134 S.Ct. at 2355 (alteration in original) (quoting *Mayo,* 132 S.Ct. at 1294). This inventive concept ensures "that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Mayo,* 132 S.Ct. at 1297. Thus, an inventive concept requires that the claim do "more than simply stat[ing] the [abstract idea] while adding the words 'apply it.' " *Id.* at 1294.

Facebook argues the claims at issue contain no inventive concept because they simply implement the above abstract concepts through the generic computer elements. (Mem. at 18–20.) In response, Morsa argues that the claims' inventive concept arises not from their implementation on the computer, but because the claims *themselves* reflect an inventive concept. (Opp. at 16.)

As for Facebook's argument, it is worth noting that some of the claims contain no computer element of any kind. (*See* claims 113, 118, and 119 of the #337 Patent.) Even those that do, however, speak only of generic computer elements such as "processor electronics configured to perform operations." (#337 Patent, col. 51:29–31.) As Morsa implicitly acknowledges, these recitations do not lift otherwise ineligible claims to safety. *See, e.g., Bancorp Servs.,* 687 F.3d at 1278 ("To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention ...."); *SiRF Tech., Inc. v. Int'l Trade Comm'n,* 601 F.3d 1319, 1333 (Fed.Cir.2010) ("In order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e ., through the utilization of a computer for performing calculations.")

Morsa instead contends that the claims *themselves* contain inventive concepts through their various limitations. As to the #337 Patent, Morsa cites the following features as limiting the patents' monopolization of their abstract ideas and thereby saving them from ineligibility: targeting customers based on demographic criteria; requiring the bid amount to be "modifiable"; making the advertisements "searchable"; requiring the user to be the source of the demographic information; altering the display of the advertisement in various ways; and using "negative" criteria to determine not to present an advertisement to a given user. (Opp. at 16–17.) As to the #020 Patent, Morsa

points to limitations such as: altering a given advertisement's display based on its "performance and/or ... popularity"; requiring the advertisements to be delivered to users in a specific geographic location or on a specific wireless device; dictating that the advertisements be delivered via video or audio; and collecting user data in various ways. (*Id.* at 17–18.)

**\*9** These limitations are not nearly as significant as Morsa suggests. Targeting customers based on demographic or geographic criteria is an abstract concept, as discussed above in the first step of the Court's *Mayo* analysis. Whether the information originates with the customer or is used on a "negative" basis does not change that. *See In re Grams,* 888 F.2d 835, 840 (Fed.Cir.1989) (noting that data-gathering steps cannot make an otherwise nonstatutory claim statutory) (citations omitted). Nor does the Court apprehend how slight—and extremely general—modifications to the bidding process or method of displaying the advertisements prevent the claims from monopolizing their underlying abstract ideas. *Cf. Bilski v. Kappos,* 561 U.S. 593, 610–11, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010) ("[P]atenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.' ") (citations omitted). Indeed, the Supreme Court has squarely held that where claims drawn to an abstract concept are limited solely through the use of "conventional steps, specified at a high level of generality," those limitations are insufficient to supply an inventive concept to otherwise abstract claims. *Mayo,* 132 S.Ct. at 1300. That holding controls here.

In sum, the asserted claims are drawn to the abstract ideas of (1) displaying advertisements to consumers based on their demographic information, and (2) permitting advertisers to bid on whether and how their advertisements will be displayed. Moreover, the Court apprehends no "inventive concept" that would "ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice,* 134 S.Ct. at 2355 (alteration in original) (quotation marks and citation omitted). Accordingly, the asserted claims are drawn to patent-ineligible subject matter and are invalid under Section 101 of the Patent Act.

## V. *CONCLUSION*

For the foregoing reasons, the Court GRANTS the Motion for Judgment on the Pleadings. Facebook shall submit a proposed judgment forthwith.

Footnotes

1  The patents are U.S. Patent Nos. 7,904,337 (hereinafter, "the #337 Patent") and 8,341,020 (hereinafter, "the #020 Patent"). (Compl. ¶¶ 7, 12–16, 17–21; *id.* Exs. A–B.)