**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| ContentGuard Holdings, Inc., | |
| *Plaintiff*, | Civil Action No. 2:13-cv-01112-JRG |
| v. | JURY TRIAL DEMANDED |
| Amazon.com, Inc. et al., | |
| *Defendants*. | |

**PLAINTIFF CONTENTGUARD HOLDINGS, INC.'S SURREPLY IN FURTHER
RESPONSE TO DEFENDANT AMAZON.COM, INC.'S
<u>MOTION TO DISMISS (DKT. 298)</u>**

Amazon's motion is premised on the assertion that the limitation "trusted" is "an abstract mental step." Dkt. 298 at 18, 20.  As ContentGuard demonstrated in its Response, however, this assertion flies in the face of the patents' teachings concerning the characteristics required to establish "trust" between a server that acts as a gatekeeper and a device that seeks to access digital content.  Specifically, as described at length in the patents' specification, "trust" requires maintaining three distinct "integrities" "in the support of usage rights":  (i) "physical integrity," *i.e.*, a device that prevents access to content by a non-trusted system; (ii) "communications integrity," *i.e.*, a device that only communicates with other devices that are able to present proof that they are trusted systems, for example, by using security measures such as encryption, exchange of digital certificates, and nonces; and (iii) "behavioral integrity," *i.e.*, a device that requires software that is to be installed therein to include a digital certificate, in other words, an assurance that the software comes from a known source.[1]  Although Amazon now concedes that the limitation "trusted" is in fact replete with meaning,[2] Amazon argues that a holding of invalidity under 35 U.S.C. § 101 ("Section 101") remains warranted because (1) the '007 and '956 patents allegedly "for all practical purposes describe nothing more than a digital version of a trip to the library using a library card" and (2) "each of the three integrities itself [allegedly] represents an age-old abstract concept, and nothing about their combination or arrangement transforms these patents into something more than an abstract idea."  Dkt. 351 at 1.  These arguments, and Amazon's other assertions in its Reply, are so full of holes that they cannot be taken seriously.

1.      Merely making the assertion that the '007 and '956 patents teach the "computer" version of "a trip to the library" (Dkt. 351 at 1) does not make it true.  It may be that "libraries 'trust' only patrons with library card to receive books" (*id.* at 6), but concocting an "analogy to

---

[1] For the same of simplicity, we cite herein only ContentGuard's proposed construction for the "trusted" limitation.  Defendants' competing construction, which to a large extent overlaps with ContentGuard's, is set forth in ContentGuard's Response.  *See* Dkt. 332 at 1-3.

[2] In its motion, Amazon misleadingly failed even to acknowledge that ContentGuard and Amazon had both offered lengthy, meaningful constructions for the limitation "trusted."

conventional [practices] is no substitute for an analysis of how, or why, the claim language supports [Amazon's] assertion that the claims merely recite [an allegedly] abstract [conventional practice]." *Google Inc. v. SimpleAir, Inc.*, Case CBM2014-00170, Slip op. at 15 (U.S. Patent Trial & Appeal Board, Jan. 22, 2015), attached hereto as Exhibit A.  There is nothing in the record to support Amazon's suggestion that any well-known method for "control[ing] the distribution and use of . . . proprietary works" (*cf.* Dkt. 298 at 1) utilized, on both sides of the transaction, devices that act "in the support of usage rights" and display three distinct types of "integrity."  Conventional libraries may be surrounded by walls that make them "secure" (*cf.* Dkt. 351 at 8), but their patrons most certainly do not evidence "physical integrity."  In a conventional library, books are not lent and borrowed through the performance of security measures such as encryption, exchange of digital certificates, and nonces.   And neither conventional libraries nor their patrons display "behavioral integrity."  Amazon's inability to demonstrate how and why the actual claims of the '007 and '956 patents resemble "a trip to the library" is fatal to Amazon's motion.  *SimpleAir, Inc.*, Slip op. at 16 ("[E]very method can be generalized to the point of abstraction if the claim language is ignored.  Here, Petitioner overlooks the various physical components recited by the claims . . . [and] Petitioner's analogy to conventional periodical publication delivery still fails because it does not account for each step of the claimed method. . . .  Petitioner's generalized arguments, not directed to the specific language of the challenged claims, are insufficient to show that the claims more likely than not are directed to a patent-ineligible abstract idea.").

2.       Amazon's assertion that "each of the three integrities itself represents an age-old abstract concept" (Dkt. 351 at 1) is equally misguided.  To support this statement, Amazon purports to engage in a prior art analysis that consists of nothing more than unsupported lawyers' assertions.  *E.g.*, Dkt. 351 at 8 ("militaries have long used similar techniques to ensure that their communications were with known parties and secure from interception.  Still today the Marines and Army use encryption keys to enable their radios to communicate only with other radios that

have the same key.").  Even if these conclusory, drive-by invalidity attacks carried any weight in the context of a motion to dismiss (and they do not), they still do not establish that any one of the three "integrities" taught by the '007 and '956 patents is an "abstract concept" devoid of inventiveness.  As an initial matter, the Federal Circuit has made clear that the threshold of "inventiveness" is not high.  *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012) ("Often the inventive contribution lies in defining the problem in a new revelatory way.").  Something inventive may exist, for instance, when an inventor makes a contribution that is "not insignificant in quality" and goes beyond "well-known concepts and/or the current state of the art."  *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998).  Furthermore, it is well established that "a claim element is not conventional just because it appears in prior art."  *Cal. Institute of Tech. v. Hughes Commcn's Inc.*, 2014 U.S. Dist. LEXIS 156763, *10 (C.D. Cal. Nov. 3, 2014).  Indeed, "[o]n a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions."  *DDR Holdings, LLC v. Hotels.com, L.P.*, 2014 U.S. App. LEXIS 22902, *28 n.5 (Fed. Cir. Dec. 5, 2014).  *See also Cal. Institute of Tech.*, 2014 U.S. Dist. LEXIS 156763, *11 ("[C]ourts should remember that a series of conventional elements may together form an unconventional, patentable combination.).  Finally, and perhaps most significant, none of the three "integrities" concerns abstraction.  Rather, each of them "requires a *physical* act in the world" and "clearly articulates a *bounded universe of applications* for the claimed [inventions]."  *Rockstar Consortium US LP, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 U.S. Dist. LEXIS 67097, *15 (E.D. Tex. May 15, 2014) (Gilstrap, J.) (emphasis added).

3.     There can also be little doubt that the three "integrities" that define the "trusted repository" limitation represent a significant advance over the prior art.  Amazon does not contest that, based in large part on the patents' teachings concerning physical, communications, and behavioral integrity, the U.S. Patent Office's Trial and Appeal Board ("PTAB") recently confirmed the validity of four other patents-in-suit (the '859, '072, '576, and '160 patents) that

- 3 -

share a specification with the '007 and '956 patents.  While Amazon is quick to point out that the '007 and '956 patents were not challenged before the PTAB, the fact of the matter is that all six Trusted Repository patents-in-suit teach *the exact same* three integrities.  As such, the PTAB's conclusion that the prior art does not disclose the three integrities applies with equal force to the '007 and '956 patents and underscores these patents' novelty.  While Amazon also notes that patentability under section 101 was not an issue before the PTAB, that too is unavailing.  It stretches credulity to argue that the PTAB, an institution that has been immensely uncharitable to patent holders (*see* Dkt. 332-10), would have affirmed the validity of the '859, '072, '576, and '160 Trusted Repository patents if indeed they disclose nothing more than a computer-facilitated "trip to the library."  *Cf.* Dkt. 351 at 1.  Put differently, if Amazon's characterization of these patents were true, the challenger should have had no trouble identifying to the PTAB a reference that describes "a trip to the library" alongside a reference disclosing a "generic computer[] with conventional programming" (*cf. id.* at 9).

    4.    Amazon's plea that the Court disregard ContentGuard's voluminous, uncontroverted documentary evidence that the Trusted Repository Patents teach novel and revolutionary inventions is nonsensical.  While Amazon calls this evidence "hearsay" (*cf.* Dkt. 351 at 1),[3] virtually all of it is quoted or paraphrased in the Second Amended Complaint.  *See* Dkt. 244 ¶¶ 2-4, 9, 39-41.  It is elementary that "[t]he Court must accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff."  *Olivares v. JPMorgan Chase Bank, N.A.*, 2014 U.S. Dist. LEXIS 117314, at *2 (E.D. Tex. July 14, 2014) (citing *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996)).  It is equally elementary that the type of evidence of novelty ContentGuard has proffered is routinely presented by experts at trial, and the Federal Circuit has made clear that "courts handling patent infringement matters [should] treat [such] evidence . . . *as strong, if not the best, evidence of*

---

[3] Amazon overlooks that the entirety of its motion to dismiss consists of hearsay, unsupported statements by counsel.  It is also noteworthy that, unlike ContentGuard, Amazon failed to attach a single exhibit to its motion.

*innovation.*"  *Apple Inc. v. ITC*, 725 F.3d 1356, 1375 (Fed. Cir. 2013) (Reyna, J., concurring in part and dissenting in part) (emphasis added).  Given that Amazon's motion expressly requires the Court to search for an "inventive concept," *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014), it is perfectly appropriate for the Court to consider evidence establishing that the Stefik Trusted Repository Patents are no ordinary patents.  As ContentGuard demonstrated in the Response, these patents rest upon "pioneering" work that has received numerous accolades.[4] Dkt. 332-7.  They were conceived in the face of enormous skepticism and solved what leading commentators considered an "immense, unsolved conundrum."  Dkt. 332-3, 332-5.  "Trusted" systems are now firmly considered a "core technolog[y] that underlie[s] . . . technological protection systems" (Dkt. 332-7), and Stefik is "acknowledged [as the] father of DRM" (Dkt. 332-1).  Stefik's Trusted Repository Patents have been praised as disclosing fundamental technology "*necessary* to make the digital delivery of music, movies and other files secure." Dkt. 332-8 (emphasis added).  Indeed, the fundamental nature of the Trusted Repository Patents

---

[4]  Amazon states that ContentGuard's evidence "show[s] at most that some individuals, who presumably received their information from ContentGuard or Stefik, held Stefik in high esteem." Dkt. 351 at 5.  This is blatantly false.  Each of the publications ContentGuard cited was authored by a third-party with no affiliation with ContentGuard or Stefik, and each of them expressly praises Stefik's inventions and patents.  *See, e.g.*, Dkt. 332-2 ("Skim the patents and you'll see they're impressive. They cover using markup languages to attach machine-readable rights to content; they cover incorporating charging mechanisms.  In fact, they cover much of what we'd describe as digital rights management."); Dkt. 332-6 ("The third major development that catalyzed the DRM paradigm was the publication of the paper 'Letting Loose the Light: Igniting Commerce in Electronic Publication,' by Dr. Mark Stefik, a researcher at Xerox PARC research labs. This landmark paper . . . said, in essence, that it should always be possible to strictly define and control who can do what to a piece of content, when, on what devices, and for how much money or other form of consideration.  'Letting Loose the Light' defined something called a trusted system.  A trusted system is a device that holds some data and implements a precisely defined set of behaviors on that data.  There is no way to access or modify the data other than to go through the trusted system.  Trusted systems, Stefik said, would be the only feasible way to implement digital rights management because general-purpose computers have too many security holes. . . . We call Stefik's paper the 'techie's view' of DRM because it envisions a world where all content rights are defined and controlled by automated processes."); Dkt. 332-7 ("The conceptual underpinnings of trusted computing technologies trace back to Dr. Mark Stefik's pioneering work at Xerox PARC.").

- 5 -

prompted the EU antitrust authorities to threaten legal action against Microsoft out of concern that it could use the patents to become a monopolist in the market for DRM technologies.  Dkt. 332-2.  ContentGuard has successfully licensed the Stefik Trusted Repository Patents, for substantial consideration, to scores of companies.  Dkt. 244 ¶ 39.  Finally, Stefik's vision concerning the role "trusted" systems must play in the distribution of digital content over the Internet is one of the seminal "development[s] that catalyzed the DRM paradigm" (Dkt. 332-6) and created an entirely new industry that has benefitted Amazon and its co-Defendants to the tune of billions of dollars (Dkt. 332-4).

     *5.*     Because Amazon's patent eligibility attacks are simply divorced from the actual teachings of the '007 and '956 patents, Amazon's citation to various cases granting motions to dismiss pursuant to Section 101 (*see* Dkt 351 at 2-4) is unavailing.  The alleged inventions at issue in the cases Amazon cites simply have nothing in common with the '007 and '956 patents.  Take the two cases Amazon deems "especially notable," *Cloud Satchel, LLC v. Amazon.com, Inc.*, 2014 U.S. Dist. LEXIS 174715, *19-24 (D. Del. Dec. 18, 2014), and *Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs.*, 2014 U.S. Dist. LEXIS 172567 (D. Del. Dec. 15, 2014).  The patent found invalid in *Cloud Satchel, LLC* was directed to "the abstract idea of cataloguing documents to facilitate their retrieval from storage in the field of remote computing" and "the court conclude[d] that the claimed computers and hardware elements of the claimed subsystem [we]re generic" and devoid of any inventiveness because they merely "describe how to apply the abstract idea of cataloguing to pre-existing, conventional computers."  2014 U.S. Dist. LEXIS 174715, *19-24.  In *Joao Bock*, the court held that the patent-in-suit described nothing more than the computer implementation of a "stop payment" instruction on a check.  2014 U.S. Dist. LEXIS 172567, *17-22.  Amazon's argument that *Cloud Satchel* and *Joao Bock*

involve "patents that closely resemble the '007 and '956 patents" (Dkt. 351 at 2) does not even pass the red face test.[5]

Because Amazon has not come close to proving that the '007 and '956 patents claim inventions that are unworthy of patent protection, Amazon's motion should be denied.

Dated:  January 26, 2015                                    Respectfully submitted,

                                                    _____
                                                    /s/ Sam Baxter
                                                    Samuel F. Baxter
                                                    Texas State Bar No. 01938000
                                                    sbaxter@mckoolsmith.com
                                                    MCKOOL SMITH P.C.
                                                    104 East Houston, Suite 300
                                                    Marshall, Texas 75670
                                                    Telephone:  (903) 923-9000
                                                    Facsimile: (903) 923-9099

Robert A. Cote                                      Holly E. Engelmann
rcote@mckoolsmith.com                              hengelmann@mckoolsmith.com
Radu A. Lelutiu                                    Seth R. Hasenour
rlelutiu@mckoolsmith.com                           shasenour@mckoolsmith.com
Shahar Harel                                       Eric S. Hansen
sharel@mckoolsmith.com                             ehansen@mckoolsmith.com
David R. Dehoney                                   MCKOOL SMITH P.C.
ddehoney@mckoolsmith.com                           300 Crescent Court, Suite 1500
Angela M. Vorpahl                                  Dallas, Texas 75201
avorpahl@mckoolsmith.com                           Telephone:  (214) 978-4000
MCKOOL SMITH P.C.                                  Facsimile:   (214) 978-4004
One Bryant Park, 47th Floor
New York, New York 10036
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

                                                    **ATTORNEYS FOR CONTENTGUARD
                                                    HOLDINGS, INC.**

---

[5]  Amazon's other cases (*see* Dkt. 351 at 2 n.1) are also inapposite.   This is evident from Amazon's own description of the patents at issue therein.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic services on this the 26th Day of January 2015.  Local Rule CV-5(a)(3)(A).

*/s/ Radu A. Lelutiu*_____
