**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ContentGuard Holdings, Inc., <br>  Plaintiff, <br> v. <br><br> Amazon.com, Inc.; Apple Inc.; BlackBerry Limited (fka Research in Motion Limited); BlackBerry Corporation (fka Research In Motion Corporation); HTC Corporation and HTC America, Inc.; Huawei Technologies Co., Ltd. and Huawei Device USA, Inc.; Motorola Mobility LLC; Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and Samsung Telecommunications America, LLC., <br><br>  Defendants. | Civil Action No. 2:13-cv-1112-JRG |

**MOTOROLA MOBILITY LLC'S MOTION FOR JUDGMENT ON THE PLEADINGS**
**DECLARING ALL ASSERTED PATENT CLAIMS AGAINST IT INVALID**
**<u>PURSUANT TO 35 U.S.C. § 101</u>**

# TABLE OF CONTENTS

I.  STANDARD OF REVIEW ................................................................................... 2

II.  THE FRAMEWORK FOR SECTION 101 ANALYSES. ................................. 4

III.  THE ASSERTED PATENT CLAIMS ARE DRAWN TO UNPATENTABLE SUBJECT MATTER. ........................................................................................................... 6

    A.  The Dunkeld Patent ............................................................................... 6

        1.  Representative Claim 1 ............................................................... 7

            a.  Claim 1 is drawn to an abstract idea. .............................. 7

            b.  Claim 1 lacks any inventive element sufficient to render it patentable. ... 8

        2.  The remaining claims lack any inventive element. .............................. 9

    B.  The Stefik Patents .............................................................................. 11

        1.  The '859 patent .......................................................................... 11

            a.  Representative Claim 1 ................................................... 11

                i.  Claim 1 is drawn to an abstract idea. ............................ 11

                ii.  Claim 1 lacks any inventive element sufficient to render it patentable. ....................................................................... 13

                iii.  The remaining claims of the '859 patent lack any inventive element. ......................................................................... 14

        2.  The '576 patent. ....................................................................... 15

            a.  Representative Claim 1 ................................................... 15

                i.  Claim 1 is drawn to an abstract idea. ............................ 15

                ii.  Claim 1 lacks any inventive element that could render it patentable. ....................................................................... 16

        3.  The '072 patent .......................................................................... 17

            a.  Representative Claim 1 ................................................... 17

                i.  Claim 1 is drawn to an abstract idea. ............................ 17

                ii.  Claim 1 lacks any inventive element to render it patentable. ....... 18

                iii.  The remaining claims of the '072 patent lack any inventive element. ......................................................................... 18

        4.  The '956 patent .......................................................................... 19

            a.  Representative Claim 1 ................................................... 19

                i.  Claim 1 is drawn to an abstract idea. ............................ 19

                ii.  Claim 1 lacks any inventive element that could render it patentable. ....................................................................... 20

iii.    The remaining claims of the '956 patent do not add any inventive
        elements. ................................................................................... 20

5.   The '160 Patent ................................................................................... 22

    a.    Representative Claim 1 ......................................................... 22

        i.    Claim 1 is drawn to an abstract idea. ........................................... 22

        ii.   Claim 1 lacks any inventive element sufficient to render it
              patentable. ................................................................................. 23

        iii.  The Dependent Claims fail to add any inventive element ............ 23

IV.   CONCLUSION ................................................................................................ 23

# TABLE OF AUTHORITIES

## Cases

*Alexander v. City of Greensboro*,
   762 F. Supp. 2d 764 (M.D.N.C. 2011) ................................................................................. 3

*Alice Corp. Pty. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014) .......................................................................................... passim

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*,
   No. 10-910, 2014 WL 5430956 (E.D. Va. Oct. 24, 2014) ........................................ 7, 14, 16

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada*,
   687 F.3d 1266 (Fed. Cir. 2012) .......................................................................................... 10, 13

*Bascom Research, LLC v. LinkedIn, Inc.*,
   No. 12-6293, 2015 WL 149480 (N.D. Cal. Jan. 5, 2015) ........................................ 4, 7, 18

*Bilski v. Kappos*,
   561 U.S. 593 (2010) .......................................................................................................... 4

*Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*,
   No. 12-674, Slip. Op. (E.D. Tex. Jan. 21, 2014) ...................................................... 3

*Cloud Satchel LLC v. Amazon.com, Inc.*,
   No. 13-941, 2014 WL 7227942 (D. Del. Dec. 18, 2014) ........................................ 20

*Cybersource Corp. v. Retail Decisions*,
   654 F.3d 1366 (Fed. Cir. 2011) ........................................................................................ 11

*Gen. Star Nat'l Ins. Co. v. Adams Valuation Corp.*,
   No. 13-2973, 2014 WL 479759 (N.D. Ill. Feb. 6, 2014) ........................................ 2

*I/P Eng., Inc. v. AOL Inc.*,
   2014 WL 3973501 (Fed. Cir. Aug. 15, 2014) .......................................................... 3

*Intellectual Ventures I LLC v. Mfgs. & Traders Trust Co.*,
   No. 13-1274, 2014 WL 7215193 (D. Del. Dec. 18, 2014) ...................................... 15

*Joao Bock Trans. Sys., LLC v. Jack Henry & Assocs., Inc.*,
   No. 12-1138, 2014 WL 7149400 (D. Del. Dec. 15, 2014) ...................................... 7

*Johnson v. Didson Schs.*,
   *Dist. No. 2-A(C)*, 463 F. Supp. 2d 1151 (D. Mont. 2006) ...................................... 2

*Mack v. Midland Credit Mgmt., Inc.*,
   No. 14-265, 2015 WL 140034 (E.D. Tex. Jan. 7, 2015) .......................................... 2

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1289 (2012) ...................................................................................................... 4, 9

*Morales v. Square, Inc.*,
   No. 13-1092, 2014 WL 7396568 (W.D. Tex. Dec. 30, 2014) .............................. 3, 4, 5

*Newton v. Greenwich Twp.*,
   No. 12-238, 2012 WL 3715947n.1 (D.N.J. Aug. 27, 2012) ................................ 2

*Open Text S.A. v. Alfresco Software Ltd.*,
    No. 13-4843, 2014 WL 4684429 (N.D. Cal. Sept. 19, 2014) .................................................. 10

*Ultramercial, Inc. v. Hulu, Inc.*,
    772 F.3d 709 (Fed. Cir. 2014).......................................................................................... 10, 20

*Wells Fargo Fin. Leasing, Inc. v. Griffin*,
    970 F. Supp. 2d 700 (W.D. Ky. 2013) ..................................................................................... 2

*Wolf v. Capstone Photography, Inc.*,
    No. 13-09573, 2014 WL 7639820 (C.D. Cal. 2014) ............................................................... 3

**Statutes**

35 U.S.C. § 101 ............................................................................................................... 2, 4, 5, 24

**Rules**

Fed. R. Civ. P. 12(c) ..................................................................................................................... 2

Since the dawn of the printing press, people have imposed and enforced rights, restrictions and conditions on the use of written works.  For centuries, libraries and other repositories of written texts (and, later, audio and video recordings) have loaned and/or permitted restricted access to, and use of, those works to authorized patrons.  Anyone who has ever (a) presented a library card to a librarian, (b) written their name on a check-out card glued to the inside cover of a book or CD, and (c) agreed to abide by the return date and other restrictions spelled out on that check-out card (or printed inside the book's or CD's cover) before walking out the library door with an item, can attest to the fact that libraries restrict use of their works only to authorized users who agree to abide by rules and restrictions on use.  Lose your library card, destroy a CD, or return a book well past its due date, and your borrowing privileges may be revoked and fees may be assessed.  This basic library loan concept was adapted for video movie rental stores in the 1980s and for video game rental stores in the 1990s.[1]

The six patents that Plaintiff ContentGuard Holdings, Inc. has asserted against Defendant Motorola Mobility, LLC ("Motorola") do nothing more than take this basic library loan concept and effectively say "use computers to do this for digital works."  Using terms such as "repository", "trusted system" and "authorization object", the patent claims pretend to ground the library loan concept in specific computer requirements and components.  But, looking past the artificial complexity suggested by these carefully selected terms, it is apparent that ContentGuard's patents specify nothing beyond using generic computer hardware and software to perform the basic functions of a computer – storage, transmission of data, and reliable execution of instructions – to enforce usage rights, just as librarians have done for hundreds of years.  The Supreme Court, in *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014), and other recent cases, has made clear that, even when specified in great detail, merely "requir[ing] a generic computer to perform generic computer functions" cannot transform an abstract idea (like

---

[1] Though the Court likely is familiar with, and can take judicial notice of, the basic concepts of (a) a library card, (b) a library check-out card that is attached to the inside cover of a book, and (c) a library usage rights sticker that is similarly attached to the inside cover of a book, exemplars of such items are attached hereto as Exhibits 10, 11 and 12, respectively.

enforcing usage rights on works, as in a library loan transaction) into patentable subject matter. *Id.* at 2359.  Ultimately, if ContentGuard were permitted to maintain its patent claims, the entire abstract idea of imposing and enforcing usage rights and restrictions on digital content would be monopolized.

Accordingly, applying the Supreme Court's most recent decisional guidance to ContentGuard's asserted patent claims makes clear (a) that all of those claims are invalid as drawn to unpatentable subject matter under 35 U.S.C. § 101, and (b) that judgment on the pleadings under Federal Rule of Civil Procedure 12(c) should issue in favor of Defendant Motorola.

## I.    STANDARD OF REVIEW

A Rule 12(c) motion for judgment on the pleadings is considered under the same standard as a Rule 12(b)(6) motion to dismiss.  *Mack v. Midland Credit Mgmt., Inc.*, No. 14-265, 2015 WL 140034, at *2 (E.D. Tex. Jan. 7, 2015).  A court may consider documents referred to in the plaintiff's complaint, or which are central to the plaintiff's claims, *id.* at *3, such as the patents-in-suit attached to ContentGuard's Second Amended Complaint as Exhibits C-D, G-H, and J-K. (Dkt. 244.)

A Rule 12(c) motion may be brought "after the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  A district court has discretion, however, to consider a Rule 12(c) motion even where the pleadings have not closed, when circumstances warrant such treatment and no prejudice would result.  *See Gen. Star Nat'l Ins. Co. v. Adams Valuation Corp.*, No. 13-2973, 2014 WL 479759, at *4 (N.D. Ill. Feb. 6, 2014) (considering Rule 12(c) motion filed before pleadings closed where it presented "pure question of law" and had been briefed on the merits); *Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 705 (W.D. Ky. 2013) (recognizing discretion to consider motion filed before close of pleadings); *Newton v. Greenwich Twp.*, No. 12-238, 2012 WL 3715947, at *1 n.1 (D.N.J. Aug. 27, 2012) (listing cases); *Johnson v. Didson Schs., Dist. No. 2-A(C)*, 463 F. Supp. 2d 1151, 1156 (D. Mont. 2006) (same).

In the instant case, ContentGuard's Second Amended Complaint was filed on October 17, 2014.  (Dkt. 244.)  In response, Motorola, along with several codefendants, filed a Rule 12(b)(6) motion to dismiss on November 14, 2014.   (Dkt. 283.)   Codefendants Apple, Inc. and Amazon.com Inc. have filed separate motions to dismiss the Second Amended Complaint.  (Dkt. 254, 298.)   Argument on Motorola's and Apple's motions was held before the Court on November 18, 2014.  The motions have not been ruled on.  Because defendants have not yet filed their answers, the pleadings have not closed.  However, Motorola requests that the Court use its discretionary power to consider the instant motion in light of the status of the case.  In particular, Amazon's motion to dismiss is based, in part, on the unpatentable subject matter of one of the same patents-in-suit.   Motorola's Section 101 motion thus may inform the treatment of Amazon's similar motion.   ContentGuard would not be prejudiced by consideration of Motorola's motion before the pleadings have closed, as it is a pure issue of law, and ContentGuard has already responded to Amazon's motion on the merits.  It would thus be most efficient to consider this issue of law as soon as possible in the case, rather than at the close of the pleadings.[2]

The court has broad discretion as to when Section 101 issues should be determined.  *Wolf v. Capstone Photography, Inc.*, No. 13-09573, 2014 WL 7639820, at *5 (C.D. Cal. 2014).  One Federal Circuit judge has noted that "there are clear advantages to addressing section 101's requirements at the outset of litigation.  Patent eligibility issues can often be resolved without lengthy claim construction, and an early determination that the subject matter of asserted claims is patent ineligible can spare both litigants and courts years of needless litigation."  *I/P Eng., Inc. v. AOL Inc.*, 2014 WL 3973501, at *12 (Fed. Cir. Aug. 15, 2014) (Mayer, J., concurring).  Many district courts have determined the Section 101 patentability issue on Rule 12 motions.  *See Morales v. Square, Inc.*, No. 13-1092, 2014 WL 7396568 (W.D. Tex. Dec. 30, 2014) (granting Rule 12(b)(b) motion to dismiss under Section 101); *Clear with Computers, LLC v. Dick's*

---

[2] In the alternative, Motorola requests that the Court treat this motion as an additional Rule 12(b)(6) motion. *See Alexander v. City of Greensboro*, 762 F. Supp. 2d 764, 780 n.6 (M.D.N.C. 2011).

*Sporting Goods, Inc.*, No. 12-674, Slip. Op. (E.D. Tex. Jan. 21, 2014) (granting Rule 12(c) motion for judgment on pleadings under Section 101).  Here, although the parties have presented several claim construction disputes to the Court, none of them alter the Section 101 analysis.  In any event, the Court's hearing on claim construction is scheduled for February 6, 2015, so that construction disputes most likely will be resolved before this motion is ready for resolution.  It is thus appropriate to resolve the Section 101 issue at this time.

## II.   THE FRAMEWORK FOR SECTION 101 ANALYSES.

Under 35 U.S.C. § 101, "whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore, subject to the conditions and requirements of this title."  There are, however, three exceptions to the categories of patentable subject matter: laws of nature, physical phenomena, and abstract ideas may not be patented.  *Bilski v. Kappos*, 561 U.S. 593, 594 (2010).

In recent decisions *Mayo Collab. Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012), and *Alice Corp. Pty. v. CLS Bank*, 134 S. Ct. 2347 (2014), the Supreme Court established a two-part test for "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts" (hereinafter "the *Alice* analysis").  *Id.* at 2355.  At step one, a court must evaluate a representative claim to determine whether it is drawn to, as relevant here, an abstract idea.  *Id.*  The abstract ideas category is "broad."  *Morales*, 2014 WL 7396568, at *6.  A claim is drawn to an abstract idea "when it describes a fundamental concept or longstanding practice."  *Id.* at *6.  "In determining whether a claim is directed to an abstract idea, courts look past the claim language to the purpose of the claim—in other words, what the invention is trying to achieve."  *Id.*

In *Bascom Research, LLC v. LinkedIn, Inc.*, No. 12-6293, 2015 WL 149480, at *2, 7-8 (N.D. Cal. Jan. 5, 2015), for example, the patent claim at issue claimed a method for "providing a framework for document objects located on a network"; the patentee argued that it covered a concrete technological development, requiring "a particular type of data structure for linking

data" involving "link directories."  The court rejected this argument, looking past the computer jargon to the function the computer was actually performing, to hold that the claim "describes the abstract idea of creating, storing and using relationships between objects."  *Id.* at *8.

In *Morales*, 2014 WL 7396568, at *2, 5, the claim at issue recited a method of data communication, including "generating a unique signal by receiving an audible signal from an electronic device," combining it with a unique identifier, communicating it to a "repeater station," and verifying the signal, which the patentee described as narrowly drawn to cover a "specific method for data communications."  The district court held these elements merely described the abstract idea of "relaying a signal containing the sender's identity."  *Id.* at *7.  The Court noted that terms such as "repeater station" and "response unit" were used to refer to known communication processes using satellite or telephone communications.  *Id.* at *7 n.2.

If the claim is drawn to an abstract idea, the court moves to step two: whether there is an "inventive concept" "sufficient to ensure that the patent in practice amounts to *significantly more* than a patent upon the [abstract concept] itself."  *Alice*, 134 S. Ct. at 2355 (emphasis added).  Claims that merely implement an abstract idea on a computer fail to transform it into a patent-eligible invention.  *Id.* at 2357.  "Given the ubiquity of computers . . . wholly generic computer implementation is not the sort of additional feature that provides any practical assurance than the process is more than a drafting effort designed to monopolize the [abstract idea] itself."  *Id.* at 2358.  Finally, the "novelty of any element or steps in a process, or even the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possible subject matter.  What is relevant is whether the claimed subject matter is directed to an abstract idea, and if so, whether there is an inventive concept that sufficiently limits the claims to a patentable application thereof."  *Wolf*, 2014 WL 7639820, at *10.

In *Bascom*, while the claim at issue required that the computing device create "link directories" and "link relationships," the court noted that these terms were merely used to describe tables or databases, "which were known prior to Bascom's patents," and thus were not inventive elements.  2015 WL 149480, at *10.  Likewise in *Morales*, the court found that despite

claim references to various types of hardware (local area repeater, response unit, data center) these were all "conventional electronics" that were "well known in the prior art," used for their generic purposes, and thus there was no inventive element that would render the claim patentable.  2014 WL 7396568, at *8.  Thus a court must look past the terminology used to determine whether an inventive element is actually present, or merely artful drafting.

III.   **THE ASSERTED PATENT CLAIMS ARE DRAWN TO UNPATENTABLE SUBJECT MATTER.**

ContentGuard has asserted forty-nine patent claims against Motorola, involving six patents in two separate patent families.  Each of the asserted patent claims is drawn to unpatentable subject matter, and should be invalidated under Section 101.

A.     **The Dunkeld Patent**

ContentGuard has asserted Claims 1, 8, 9, 11, 12, 19, 20, and 22 of U.S. Patent No. 8,583,556 ("Dunkeld").  (Ex. 1.)  During prosecution of the Dunkeld application, the Examiner rejected all of the pending method claims under 35 U.S.C. § 101 for claiming abstract ideas. (Ex. 2 at 3-5.)  In response, patentees cancelled the rejected method claims and replaced them with new claims that simply added language stating that the method be performed by "one or more computing devices."  (Ex. 3 at 6-7.)  Patentees argued that the Section 101 rejection had been overcome because "New claim [then 40] is clearly tied to a machine by reciting that the steps are accomplished by computing devices."  (*Id.* at 10.)  The Examiner accepted this argument.  (Ex. 4.)  Although adding a reference to a generic "computing device" was then considered sufficient to transform an abstract process claim into patentable subject matter, the Supreme Court now has made clear that this was error.  *Alice*, 134 S. Ct. at 2360.

### 1.    Representative Claim 1[3]

#### a.    Claim 1 is drawn to an abstract idea.

Claim 1 of the Dunkeld patent purports to cover a method for the abstract idea of marking an object with information identifying the object and a user so that the object can be tracked. The claim steps have long been well-known and used, e.g., by lending libraries.[4] An element-by-element comparison between Claim 1 and a hypothetical library loan transaction demonstrates that the elements cover an abstract idea:

| Claim Element | Corresponding Action |
|---|---|
| 1. A method implemented by one or more computing devices for providing a digital asset for distribution, the method comprising: | The steps of this method can be practiced without a computer when a library patron borrows a book (or an, album or movie) from a lending library. |
| [a]  storing, by at least one of the one or more computing devices, the digital asset, the digital asset including digital content; | A library stores books, which include content (text). |
| [b] associating, by at least one or more of the computing devices, an asset identifier with the digital asset to thereby generate a first instance of the digital asset, the asset identifier identifying the digital asset; | The library associates several pieces of identifying information with each copy of a particular book, including book title, book author, Library of Congress card catalogue number, and Dewey decimal number. |
| [c] receiving from a user, by at least one of the one or more computing devices, an acceptance of terms of use of digital assets; | When a library patron applies for a library card, he or she must accept terms of use of the library's materials, including, for example, that books may be checked out for no more than two weeks, or that the patron will not photocopy a book. |
| [d] providing, by at least one of the one or more computing devices, a list of one or more digital assets to the user, the list including the digital asset; | A patron may browse available library books in lists, for example, in the library's card catalogue, or in a list of newly-arrived or recommended books. |
| [e] receiving from the user, by at least one of the one or more computing devices, a request for the digital asset; | When the patron wants to borrow a particular book, he or she asks the librarian for that book, or finds the book on the shelves, takes it to the check-out desk and asks to check it out. |

---

[3] Courts analyzing the Section 101 validity of multiple patent claims routinely consider a representative claim under the *Alice* framework, and then, if the representative claim is determined to be unpatentable, move on to determine whether any additional limitations contained in the related patent claims are sufficient to render those claims patentable. *Bascom*, 2015 WL 149480, at *10 n.7.

[4] Lending libraries have been well-established since at least the 1730s, when Benjamin Franklin established the first lending library in America. *See http://en.wikipedia.org-/wiki/Library_Company_of_Philadelphia.*

Courts applying the *Alice* analysis recognize that a hypothetical scenario can be utilized to show how the elements of a claim can be performed without a computer, and thus are drawn to an abstract idea. *See Joao Bock Trans. Sys., LLC v. Jack Henry & Assocs., Inc.*, No. 12-1138, 2014 WL 7149400, at *6 (D. Del. Dec. 15, 2014). "Although performance by a human may be sufficient to find that an idea is abstract, it is not necessary." *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, No. 10-910, 2014 WL 5430956, at *7 (E.D. Va. Oct. 24, 2014).

| | |
|---|---|
| [f] in response to the request for the digital asset, creating, by at least one of the one or more computing devices, a second instance of the digital asset for transfer to the user device, the second instance of the digital asset including content and at least one other portion, and embedding in the at least one other portion of the second instance of the digital asset at least a customer identification associated with the user and the asset identifier, wherein other instances of the digital asset have customer identifications embedded therein and the customer identifications are used to track instances of the digital asset; | A book contains both content (text) and unused, blank spaces, such as the inside of the front and back covers.  The library typically pastes a library checkout card folder onto one of the unused portions. The library checkout card (that goes into the folder) may contain various types of information, but will contain at least the book's title, author, and card catalogue number (asset identifier).  The name of the borrower will be added to the checkout card (customer identification) and will be recorded by the librarian.  A second copy of the book may be loaned to a second patron, and that patron's name will be recorded on the checkout card included in that instance of the book. The customers' names on the checkout card can be used to track that copy of the book.  Anyone finding the book can use the name written on the checkout card to return the book to the correct  borrower (or to identify the names of the persons who have borrowed the book in the past). And the library can track the customer/borrower identification to notify that person if the book is overdue or if similar books might be available. Although the library does not create a new copy of the book for the user to check out, the creation of a new copy for distribution is inherent in the distribution of electronic content over a network, and thus is not inventive and does not distinguish Claim 1 of the '556 patent from the known steps of a library transaction. |
| [g] detecting, by at least one of the one or more computing devices, a transfer of the second instance of the digital asset to the user based at least in part on the customer identification; | The librarian and the patron are made aware that the book has been checked out by the patron through the checkout process, which includes the recording of the customer name (identification) and the book he or she has checked out by the librarian. |
| [h] debiting an account of the user related to the transfer of the second instance of the digital media asset to the user; and | For some works, there may be a charge for borrowing.  The patron's account can be debited to reflect payment for the book or video he or she has borrowed. In addition, even in a free public library context, when a patron fails to return a book in time, the library will debit the patron's account to reflect a late fee, which is "related to" the transfer of the book to the user. |
| [i] updating, by at least one of the one or more computing devices, a transaction database to reflect a transfer of the second instance of the digital media asset to the user. | The library maintains records containing information on the specific books that have been checked out by each patron. |

### b.      Claim 1 lacks any inventive element sufficient to render it patentable.

Under the next step of the *Alice* analysis, the court must determine whether the claims add any "inventive concept" to the abstract idea that is "sufficient to ensure that the patent in practice amounts to *significantly more* than a patent upon the [abstract concept] itself."  *Alice*,

134 S. Ct. at 2355 (emphasis added).  A valid claim must include "additional features" beyond the abstract idea itself, which "requires more than simply stating the abstract idea while adding the words 'apply it.'"  *Id.* at 2357.  This necessitates more than the recitation of "well-understood, routine, and conventional activity" or technology.  *Mayo*, 132 S. Ct. at 1294.  In particular, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention," particularly given the ubiquity of computers and the myriad ways in which they can be programmed to perform any particular function.  *Alice*, 134 S. Ct. at 2358.  Dunkeld Claim 1 simply directs that the steps of the abstract idea be performed by a "computing device," and does not provide any technological method of such implementation that would render the claim patentable by, *i.e.*, improving the operation of the computer itself.  The Dunkeld specification acknowledges that the claimed method may be performed on generic computers and that the claims do not require specific software.  (Ex. 1 at 20:2-11.)  The specification further makes clear that no particular software programming is required, but that known techniques should be used to implement the claimed functionality.  (*Id.* at 13:38-43, 16:3-7.)  The actions described in Claim 1 are "the most basic functions of a computer," such as storing information (recordkeeping), obtaining information, manipulating and processing information (including transferring and tracking data), and issuing instructions; "all of these computer functions are well-understood, routine, conventional activities previously known in the industry."  *Alice*, 134 S. Ct at 2359.  In addition, the step of embedding customer and asset identifications does not claim any new technological methodology; rather, the Dunkeld specification explains that "many approaches" could be used.  (Ex. 1 at 19:28-31.)  Thus, this element does nothing more than apply the abstract idea to a generic computer through already-known processes.  Claim 1 is thus invalid under Section 101.

## 2.     The remaining claims lack any inventive element.

Claim 12 is the only other independent claim of the Dunkeld patent at issue.  It is drawn to the same elements as Claim 1, but is presented to cover a "computer system" rather than a

method.  Claim 12 thus falls with Claim 1 under Section 101.  *Alice*, 134 S. Ct. at 2360; *Amdocs*, 2014 WL 5430956, at *5 ("various claim types (method, system, etc.) directed to the same invention should rise and fall together").  The only addition in Claim 12 is the recitation of two generic computing components: "processors," and "memories operatively coupled to" the processors with instructions to implement the abstract concept of marking an object with identification information.  These well-known and generic computing components cannot render Claim 12 patentable.  *Ultramercial, Inc. v. Hulu, Inc.*, 772 F.3d 709, 715-16 (Fed. Cir. 2014) (implementation of abstract idea with "routine, conventional activity" not patentable); *Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) (claims reciting "digital storage" are unpatentable because "[u]sing a computer to accelerate an ineligible mental process does not make that process patent-eligible.").

After determining that a representative claim is invalid under Section 101, courts consider the additional limitations contained in the remaining claims to determine whether they constitute an inventive element that renders the claim drawn to "significantly more" than the abstract concept of the representative claim.  *See, e.g., Open Text S.A. v. Alfresco Software Ltd.*, No. 13-4843, 2014 WL 4684429, at *5 (N.D. Cal. Sept. 19, 2014).  The additional limitations in Dunkeld fail to do so.  Dependent claims 8 and 19 add the limitation that "distributions of said digital asset between user devices are not preconditioned on securing authorization for individual copies of said digital asset."  This limitation is nothing more than the abstract idea of permitting a user to distribute copies of an object without pre-authorization, a concept that is employed when a library patron is permitted to share a borrowed book with his friend without getting pre-approval from the library.  Specifying that this abstract concept be performed on a generic computer does not make it patentable.  *Alice*, 134 S. Ct. at 2358.

Claims 9 and 20 add the limitation of "updating a transaction database to indicate identities of parties involved in a transfer of said digital asset, and a timestamp for the transfer."  Maintaining databases is a basic computer function, and can be illustrated in the hypothetical when the library maintains records reflecting the identities of the patrons who borrow particular

books or videos. *Cybersource Corp. v. Retail Decisions*, 654 F.3d 1366, 1372-73 (Fed. Cir. 2011) (noting that where a method can be performed in the human mind, or with pen and paper, this is a "clear" indicator that a claim is drawn to unpatentable subject matter).  In addition, a timestamp is recorded when a book is checked out in order to calculate the book's due date, hardly a patentable concept when done by a computer.  Finally, Claims 11 and 22 add the limitation that "said digital content includes audio and/or video data."  Again, this is not an inventive concept: library patrons have long been able to borrow music albums and movies, as well as audio books.  Directing a generic computer to keep track of such lending is not inventive.

## B.       The Stefik Patents

ContentGuard has asserted claims from five related patents to Stefik: Claims 1, 13, 15, 19, 20, 21, 24, 58, 69, 71, 75, 76, and 81 from U.S. Patent No. 6,963,859 ("the '859 patent") (Ex. 5); Claims 1, 4, 7, 15, 18, 21, 24, 32, and 34 from U.S. Patent No. 7,269,576 ("the '576 patent") (Ex. 6); Claims 1, 8, 10, and 16 from U.S. Patent No. 7,523,072 ("the '072 patent") (Ex. 7); and Claims 1, 4-7, 10-13, and 16-18 from U.S. Patent No. 8,370,956 ("the '956 patent") (Ex. 8); Claims 1, 3-6, 8-11, and Claims 1, 2, and 9 from U.S. Patent No. 7,225,160 ("the '160 patent") (Ex. 9).  Each of these patents claims the concept of associating usage rights with digital content and enforcing them.

### 1.       The '859 patent

#### a.       Representative Claim 1

##### i.       Claim 1 is drawn to an abstract idea.

Claim 1 purports to cover the abstract idea of enforcing usage rights for a digital work. The claim specifies nothing more than use of a generic computer system and generic computer concepts to execute the abstract, usage rights enforcement idea.  The following shows how each element is simply part of the abstract idea:

| Claim Element | Corresponding Action |
|---|---|
| 1. A rendering system adapted for use in a distributed system for managing use of content, said rendering system being operative to rendering content in accordance with usage rights associated | A library maintains a set of rules ("usage rights") regarding the usage of its books, CDs and videos ("content"), and librarians distribute books, CDs and videos in accordance with these usage rules. |

| | |
|---|---|
| with the content, said rendering system comprising: | The library stores its materials in a secure location until specific materials are requested by patrons.  In this way, the library is a "repository" for its materials.  The library will only lend or permit use of its materials by patrons who are authorized and trusted to honor the usage rights specified by the library for particular content.  These trusted patrons ("repositories") are given a library card establishing their authorization to borrow and use materials and verifying their commitment to honour the rules. |
| [a] a rendering device configured to render the content; and | A library patron can borrow a book or CD and can use ("render") them by opening and reading the book or listening to the CD on a CD player. |
| [b] a distributed repository coupled to said rendering device and including a requester mode of operation and server mode of operation, | When a library patron (the "distributed repository"[5]) asks to borrow a book, he is acting in a "requestor mode", meaning he is requesting use of the content.  When the patron opens the book to read it, he is acting in "server mode", in that is he is "serving" the content to his eyes (his own personal "rendering device"). |
| [c] wherein the server mode of operation is operative to enforce usage rights associated with the content and permit the rendering device to render the content in accordance with a manner of use specified by the usage rights, | When the patron obtains the book from the library to read it, he agrees to and does use the book only in accordance with the library's specified rules and restrictions on usage (i.e., he "enforces the usage rights associated with the content").  If for example, the usage rights permit making a single copy, the patron will make only a single copy; if the library requires that the book be read inside the library, the patron reads the book only in the library; or if the rights permit the book to be borrowed, but returned in one week, the patron will borrow the book and return it in one week. |
| [d] the requester mode of operation is operative to request access to content from another distributed | The patron requests access to and use of a book or CD from the library ("another distributed repository"), |

---

[5] Ultimately, a "repository" in the Stefik patents is simply a computer element that can be counted on to follow specified rules governing use of a particular piece of content (e.g., a book), in the same way that a library patron can be counted on to follow a library's specified rules for use of its books.  The "integrities" for a "repository" discussed in the Stefik patents (Ex. 5 at 11:52-12:50) are the exact "integrities" that are required/assumed for a person to borrow from a library: (1) the library and the patron are assumed to have "physical integrity", in that they can physically hold and store a book so it cannot surreptitiously be copied or sold by an unauthorized person; (2) the library's interaction with the patron has "communications integrity" because the library will only lend directly/face-to-face to a patron who can present a valid library card, such that an unauthorized person cannot intercept the delivery from library to patron; and (3) the library and the patron both have "behavioral integrity", in that both agree to and do follow the specified rules and restrictions on use, and the library will only lend or permit use of materials to patrons whose identity can be confirmed through presentation of a "certificate" (e.g., a valid library card or student id).

A "distributed repository" is simply one element (a person, organization, computer, etc.) that is part of an overall system for distributing content; "another distributed repository" is simply another element in the same overall system.

| repository, and | which securely stores books and CDs until they are requested by patrons. |
| [e] said distributed repository is operative to receive a request to render the content and permit the content to be rendered only if a manner of use specified in the request corresponds to a manner of use specified in the usage rights | The patron (the "distributed repository") agrees to and does use/"render" the book or CD only in a manner permitted by the library rules (e.g., he will read the book, but will not photocopy the book, if photocopying is prohibited by the library's rules). |

### ii. Claim 1 lacks any inventive element sufficient to render it patentable.

Claim 1 lacks any inventive element under the second part of the *Alice* analysis. The claim is drawn to a generic "rendering system," which the specification states can be any known device, such as a generic printer. (Ex. 5 at 7:30.) Similarly, the references to server and requester "modes of operation," as well as enforcing the user rights, merely invoke general and unspecified computer programming that permits the use of common computer functionality (sending and receiving "requests"). That a computer may perform these functions faster or more efficiently than a person does not render these elements inventive. *Bancorp*, 687 F.3d at 1279.

The "repository" element similarly requires only general purpose computing devices and common computer functionality. As explained in the specification, in order to be "trusted" and/or to be considered a "repository", a computer element (either hardware or software) must possess three "integrities": physical integrity, communications integrity and behavioral integrity. (Ex. 5 at 11:52-12:50.) None of these "integrities" constitute an inventive concept, but rather describe well-known and basic computing security concepts. Physical integrity is simply the integrity of a physical computing device. (*Id.* at 11:62-12:20.) The Stefik specification requires no specific or inventive way of maintain physical integrity; it only broadly identifies known ways that physical integrity can be maintained. (*Id.*) Communications integrity simply refers to maintaining the integrity of communication channels between generic computer devices. (*Id.* at 12:21-33.) The specification acknowledges that this can be accomplished with various well-known and basic methods, such as encryption, exchanging digital certificates, and nonces. (*Id.*) The specification does not require any minimum amount of communications integrity, nor does it require use of any particular one of the listed, well-known mechanisms. (*Id.*) Finally, behavioral

integrity is simply the integrity "in what repositories do," which the specification explains can be implemented with the common and well-known method of requiring a "certificate" verifying the source of software (*id.* at 12:34-50) – essentially, the digital version of a librarian checking the picture on a library card to assure that a patron really is who he says he is.

Thus, a "trusted system" or "repository" is nothing more than a basic computer element that can store, transfer, receive and process digital information with some level of fidelity, reliability and security.  The specification does not require any particular hardware or software; and the specification does not even require any particular *level or degree* of fidelity, reliability and/or security for an element to count as a "trusted system" or "repository."  (Ex. 5 at 14:54-15:43, "Table 2 – Repository Security Levels", showing repositories that range from "Level 0", with virtually no security whatsoever, to "Level 10", with "a very high level of security.")

Accordingly, Claim 1's use of the term "repository" and other high-level computer terminology does not and cannot transform the recited abstract idea of enforcing usage rights and restrictions on content (as in a library lending transaction) into patentable subject matter.   As the Supreme Court explained when invalidating the claims in *Alice*, 134 S. Ct. at 2360:

> [W]hat petitioner characterizes as specific hardware — a "data processing system" with a "communications controller" and "data storage unit," for example — is purely functional and generic. Nearly every computer will include a "communications controller" and "data storage unit" capable of performing the basic calculation, storage, and transmission functions required by the method claims. As a result, none of the hardware recited by the claims "offers a meaningful limitation beyond generally linking 'the use of the [method] to a particular technological environment,' that is, implementation via computers."

### iii.       The remaining claims of the '859 patent lack any inventive element.

The remaining asserted independent claim of the '859 patent, Claim 58, does no more than rewrite Claim 1 as a claim directed to a "computer readable medium" rather than a "system," and thus must fall with Claim 1.  *Alice,* 134 S. Ct. at 2360; *Amdocs*, 2014 WL 5430956, at *5.  The dependent claims fare no better.  Claims 13 and 69 add the limitation that the "rendering device comprises a video system."  Video systems were well-known and used to "render" video content, and their invocation here does not add an inventive element.  Claims 16

and 71, likewise, merely state that "said rendering device comprises a computer system and said repository comprises software executed on the computer system."  This reference to generic computer hardware and software cannot render a claim patentable.  *Alice,* 134 S. Ct at 2359. Claims 19, 20, 75 and 76 limit the "manner of use" to a manner of "displaying" (Claims 19 and 75) and "playing" (Claims 20 and 76).  Again, this is simply the inclusion of well-known, generic steps/terms for viewing books, movies and/or music.  Claim 21 states that " the rendering device and the repository are integrated into a secure system having a secure boundary."  This is no more that the abstract idea implemented, e.g., by a library with doors that lock or a security gate at the exit to prevent people from walking out with books or CDs.  Claims 24 and 81 include the limitation that the rendering system comprises "means for communicating with a master repository for obtaining an identification certificate for the repository."  This element is not inventive, but is exemplified by a local library agreeing to loan to registered patrons of an entire "library system" who can show a valid card (e.g., the engineering library at Baylor University might lend to a student showing a valid student id card issued by the University administrative office).  *See Intellectual Ventures I LLC v. Mfgs. & Traders Trust Co*., No. 13-1274, 2014 WL 7215193, at *8 (D. Del. Dec. 18, 2014) (means plus function limitations will not render a claim patent eligible where the specification identifies only generic computers and components).

## 2.     The '576 patent.

### a.     Representative Claim 1

#### i.     Claim 1 is drawn to an abstract idea.

Claim 1 is drawn to the abstract idea of permitting access to a work only upon verification that access is authorized.  This is an old idea, which Claim 1 merely restricts to performance on generic computing elements.  As with the related Stefik patents, all the elements can be performed without a computer, as shown in a library "special collections" exchange:

| Claim Element | Corresponding Action |
|---|---|
| 1. An apparatus for rendering digital content in accordance with rights that are enforced by the apparatus, said apparatus comprising: | A library restricts access to "special collection" manuscripts to certain registered patrons, who may peruse them only in a climate-controlled room of the |

| | library with library attendants present. |
|---|---|
| [a] a rendering engine configured to render digital content; | The manuscripts can be read/viewed by registered patron (using their eyes – "rendering engines"). |
| [b] a storage for storing the digital content; | The library keeps manuscripts in its secure storage facilities. |
| [c] means for requesting use of the digital content stored in the storage; and | A registered patron may request access to the manuscripts from a librarian. |
| [d] a repository coupled to the rendering engine, wherein the repository includes: | The library: |
| [e] means for processing a request from the means for requesting, | reviews an individual request for access; |
| [f] means for checking whether the request is for a permitted rendering of the digital content in accordance with rights specified in the apparatus, | determines whether the request is for a permitted review of the requested manuscripts (i.e., the patron is authorized, and has agreed to the restrictions on access and use); |
| [g] means for processing the request to make the digital content available to the rendering engine for rendering when the request is for a permitted rendering of the digital; and | the library transfers the requested manuscripts from the storage facility to the "special collections" reading room; |
| [h] means for authorizing the repository for making the digital content available for rendering, wherein the digital content can be made available for rendering only by an authorized repository, the repository comprising: | the library will transfer the requested manuscripts to its "special collections" reading room only after it determines that the patron is authorized and has agreed to the restrictions on access and use of the manuscripts; |
| [i] means for making a request for an authorization object required to be included within the repository for the apparatus to render the digital content; and | the patron can request access to the manuscripts by applying for, and receiving from the library, the required authorization(s); and |
| [j] means for receiving the authorization object when it is determined that the request should be granted. | the patron will receive his "special collections" registration card or credentials if the library approves his application.  He can then show those credentials to the librarian in order to access the manuscripts in the "special collections" reading room. |

### ii.      Claim 1 lacks any inventive element that could render it patentable.

Claim 1 lacks any inventive element that would render it patentable.  Rather, the claim simply invokes generic computer functionality and elements to define the "apparatus" – a "rendering engine," "storage," "means for requesting," "means for processing," "means for checking," "means for authorizing," and "means for receiving."  The specification does not require any particular hardware or software to perform the recited functions or create the identified elements; off-the-shelf products can be used.

Likewise, Claim 18 falls with Claim 1, as it is simply rewritten into "method" form.  *Alice,* 134 S. Ct. at 2360; *Amdocs*, 2014 WL 5430956, at *5.  The dependent claims likewise

add no inventive concept to the abstract idea of Claim 1.  Claims 4 and 21 add a limitation of "requesting a transfer of the digital content from an external memory to the storage."  This simply recites common computer functionality, and can be illustrated with the abstract idea of the library transferring a manuscript from an external storage facility to the "special collections" reading room.  Claims 7 and 24 merely add that "the digital content is video content."  This is not inventive; a library could also make movie content (e.g., the Zapruder film) available only to authorized patrons.  Claims 15 and 32 recite that "the rights are embodied in software instructions which implement the use privileges for the rights."  As discussed, simply directing that an element be performed with generic computer software does not render an abstract idea patentable.  *Alice*, 134 S. Ct. at 2357.  Claim 34 adds "requesting receipt of digital content stored externally; and receiving the digital content if it is permitted to receive the digital content."  This simply claims computer implementation of the idea of, e.g., a patron requesting materials from the library stored externally, and receiving the materials if she is authorized.

### 3.   The '072 patent

#### a.   Representative Claim 1

##### i.   Claim 1 is drawn to an abstract idea.

Claim 1 is drawn to the abstract idea of restricting the use of a document.  Each element of the claim can be accomplished by people without use of a computer:

| Claim Element | Corresponding Action |
|---|---|
| 1. A method for securely rendering digital documents, comprising: | A library can control access to and use of books and documents in its collection. |
| [a] retrieving, by a document platform, a digital document and at least one usage right associated with the digital document from a document repository, the at least one usage right specifying a manner of use indicating the manner in which the digital document can be rendered; | The library may receive a book or document from a publisher or distributor that includes certain usage restrictions (e.g., library patrons may not photocopy the book or document, or a document can only be viewed inside the library - it cannot be checked-out). |
| [b] storing the digital document and the at least one usage right in separate files in the document platform; | The library may store restricted books and documents in a secure storage area, and the rules pertaining how those books and documents may be used may be listed and kept at a librarian's desk and/or posted on a library wall. |
| [c] determining, by the document platform, whether the digital document may be rendered based on the | When a patron asks the librarian for access to and use of a restricted  document, the librarian will determine |

| | |
|---|---|
| at least one usage right; and | whether the access or use that the patron has requested is allowed by the usage rights (e.g., does the patron want to check out a document, or does he wish to view the document in the library).  If the patron's requested use is permitted, the librarian will provide the patron with access to the requested document. |
| [d] if the at least one usage right allows the digital document to be rendered on the document platform, rendering the digital document by the document platform. | If the use requested by the patron is allowed, the librarian will permit the patron to access and read the requested document. |

### ii. Claim 1 lacks any inventive element to render it patentable.

Claim 1 lacks any inventive element that would render it patentable under the second step of the *Alice* analysis.  Recitation of the generic computer functions and elements "retrieving," "storing," "determining," "rendering" and "digital document" do no more than restrict the abstract idea to the general realm of computers, which does not render the claim patentable. *Alice,* 134 S. Ct. at 2358-60; *Bascom*, 2015 WL 149480, at *6.

### iii. The remaining claims of the '072 patent lack any inventive element.

The remaining claims of the '072 patent fail to include any additional elements that would suffice to take them beyond coverage of mere abstract ideas.  Claim 8 requires that "at least one part of the digital document and at least one usage right are stored on different devices."   As in the library example above, this element can be performed when the librarian keeps the restricted materials and the rules regarding their use in different places.

Claim 10 adds multiple additional elements to Claim 1, none of them inventive, but rather all part of the same abstract idea as exemplified in the library example:

| Additional Claim Element | Corresponding Action |
|---|---|
| at least one usage right is associated with the digital document | At least one usage right (e.g., only view on library premises, not for check-out) is associated with a particular document. |
| receiving a request from a document platform for access to the digital document | The library receives a request from a library patron for access to the restricted document. |
| determining, by the document platform, whether the request may be granted based on the at least one usage right, the determining step including authenticating the document platform and determining whether the at least one usage right | The librarian determines whether the patron is authorized to use the restricted document as requested based on the rules governing its use.  The librarian first verifies (e.g., by requiring production of a library card) that the patron is a library member entitled to |

| | |
|---|---|
| includes a manner of use that allows transfer of the digital document to the document platform | borrow the restricted document. |
| if the at least one usage right allows the transfer of the digital document to the document platform, transferring the digital document and the at least one usage right associated with the digital document to the document platform; | If the patron is permitted to access and view the restricted document, as requested, the librarian will provide the document to the patron and may provide the patron with a printed copy of the usage rules that pertain to the document. |

Claim 16 adds the element that "at least one part of the digital document and the at least one usage right are stored on a same device."  Again, this can be performed in the library example when the restricted material and rules regarding its use are stored together, and is not inventive.

### 4.    The '956 patent

#### a.    Representative Claim 1

##### i.    Claim 1 is drawn to an abstract idea.

Under the first step of the *Alice* analysis, Claim 1 is drawn to the abstract idea of restricting access to materials.  As illustrated by the library example, the claim simply recites a process that can be performed by humans without computers:

| Claim Element | Corresponding Action |
|---|---|
| 1. A computer-implemented method of rendering digital content by at least one recipient computing device in accordance with usage rights information, the method comprising: | Library patrons may use library materials pursuant to usage rules. |
| [a] receiving the digital content by the at least one recipient computing device from at least one sending computing device only if the at least one recipient computing device has been determined to be trusted to receive the digital content from the at least one sending computing device; | A patron may borrow certain library materials only when she can present proof (e.g., a library card) that she has been authorized by the library.  The library will issue such proof of authorization only after the patron fills out an application form, agrees to the library's terms of use, and, perhaps, provides a credit card number for payment of any late, damage or other fees.  Once she has obtained her valid library card, the patron is "trusted" by the library to borrow books, CDs or other materials. |
| [b] receiving, by the at least one recipient computing device, a request to render the digital content; | The patron requests to use certain library materials. |
| [c] determining, based on the usage rights information, whether the digital content may be rendered by the at least one recipient computing device; and | The librarian determines whether the borrower is authorized to access and use the materials as requested. |
| [d] rendering the digital content, by the at least one recipient computing device, only if it is determined that the content may be rendered by the at least one recipient | If the rules permit the requested use, the patron is given the materials to use. |

| computing device. | |
|---|---|

### ii.  Claim 1 lacks any inventive element that could render it patentable.

There is no inventive element that renders the claim patentable; the generic computer functionality called out in the claim cannot take it out of the category of an abstract idea.  Claim 1 recites that a generic "computer-implemented method" is used, with no particular hardware or software identified.  *Alice,* 134 S. Ct. at 2358-60.  The actions of "receiving," "determining," and "rendering" digital information are among the "most basic functions of a computer," *id.* at 2359, and thus cannot render Claim 1 patentable.  *Alice,* 134 S. Ct at 2359.

### iii.  The remaining claims of the '956 patent do not add any inventive elements.

The remaining claims of the '956 patent do not add any inventive elements to those of Claim 1, and thus are also drawn to unpatentable subject matter.  The other independent asserted claims, Claims 7 and 13, must fall with Claim 1, as they include the same elements as Claim 1, rewritten in "apparatus" (Claim 7) and "computer-readable medium" (Claim 13) forms.  It has been well-established that the generic computer components added by these claims: "processors," "memories coupled to processors," and "instructions," cannot qualify as an "inventive element" that can render a claim patentable.  *Ultramercial*, 772 F.3d at 716; *Cloud Satchel LLC v. Amazon.com, Inc.,* No. 13-941, 2014 WL 7227942, at *8 (D. Del. Dec. 18, 2014).

Claims 4, 10, and 16 each add the same set of limitations:

| Additional Claim Element | Corresponding Action |
|---|---|
| requesting an authorization object for the at least one recipient computing device [apparatus] to make the digital content available for use, the authorization object being required to receive the digital content and to use the digital content; and | A patron may borrow certain library materials only when she can present proof (e.g., a library card) that she has been authorized by the library. |
| receiving the authorization object if it is determined that the request for the authorization object should be granted. | The library will issue the library card only after the patron fills out an application form, agrees to the library's terms of use, and, perhaps, provides a credit card number for payment of any late, damage or other fees.  The library approves the request, issues the card, and then the patron can borrow and use library materials. |

Neither of these additional elements do more than claim the abstract idea of requesting

authorization to access material, as exemplified by the issuance of a library card, and Claims 4, 10 and 16 thus fail to claim patentable subject matter.

Claims 5, 11, and 17 add identical elements regarding receiving the digital content:

| Additional Claim Element | Corresponding Action |
|---|---|
| generating a registration message, the registration message including an identification certificate of the recipient computing device [apparatus] and a random registration identifier, the identification certificate, the identification certificate being certified by a master device; | Upon certifying that the library patron meets the qualifications, the patron is issued a library card which may include a member number, name, picture, term of membership, etc. The "messages" on the card are used to permit identification of the patron by a librarian. |
| exchanging messages including at least one session key with at least one provider computing device, the session key to be used in communications during a session; and | The patron must present the library card in all borrowing transactions with the library. In-person presentation of the card, and comparison by the librarian of the picture on the card with the patron, provide assurances that the patron is who he says he is. |
| conducting a secure transaction using the session key, wherein the secure transaction includes receiving the digital content. | The patron is permitted to borrow a book only after the librarian has verified, using the library card and the information printed thereon, that the borrower is authorized to borrow. |

Again, the additional elements in Claims 5, 11 and 17 simply recite an abstract idea as implemented in a computer environment. Although the claim uses computer jargon, e.g., "session key" and "random registration identifier," only generic computer functionality is identified, rather than any novel way of programming or improvements to generic hardware. The patent itself makes clear that "[t]he term key refers to a numeric code that is used with encryption and decryption algorithms," and that "public key encryption is *a well-known technique in the encryption arts*". (Ex. 8 at 26:2-5 (emphasis added).)

Finally, Claims 6, 12 and 18 add the limitation of "receiving a message to test the authenticity of the at least one recipient computing device [apparatus], the generated message including a nonce; and processing the generated message to indicate authenticity." This is simply the computer-implementation of a borrower presenting a library card to the librarian, who verifies the picture and name on the card to "authenticate" that the borrower is authorized to use library materials. As explained in the patent's specification, a "nonce" is term used in the computer field to refer to a message generated in order to test whether the recipient is using the

correct encryption keys.  (Ex. 8 at 27:45-50.)  These elements thus add nothing more than the computer-implementation of verifying the identity of another computer it is interacting with; it does not describe any new or novel way of doing so.  *Alice,* 134 S. Ct at 2359.

### 5.  The '160 Patent

#### a.  Representative Claim 1

##### i.  Claim 1 is drawn to an abstract idea.

Claim 1 of the '160 patent purports to cover the abstract idea of associating usage rights to a document or portions thereof.  This concept was well-known long before the purported invention.  For example, a library might place separate usage rights on each volume of a multi-volume book set, or a government agency might place various security clearance stamps on various portions of a "Top Secret" document.  The '160 patent does nothing more than suggest that this well-known practice be implemented on a generic computing device:

| Claim Element | Corresponding Action |
| --- | --- |
| 1. A computer readable medium having embedded thereon a digital work adapted to be distributed within a system for controlling use of digital works, said digital work comprising: | A library contains books and CDs that can be used and borrowed by library patrons subject to specific library rules. |
| [a] a digital content portion that is renderable by a rendering device; | A library book can be rendered when a patron opens the book and reads it; a library CD can be rendered when a patron puts it in a CD player and listens to it. |
| [b] a usage rights portion associated with said digital content portion and comprising one or more computer readable instructions configured to permit or prohibit said rendering device to render said digital content portion, said usage rights portion being expressed as statements from a usage rights language having a grammar defining a valid sequence of symbols, and specifying a manner of use relating to one or more purposes for which the digital work can be used by an authorized party; and | The library sets rules as to how particular content can be used by patrons.  For example, the rules may state that only registered library card holders may have access to library materials, that card holders may only borrow books for a two-week period, that photocopying of library materials is prohibited and/or that reference books may only be perused within the library for a limited period of one hour.  The library's policy and the specific usage rights and restrictions for a particular book or movie are set forth in statements in English (or some other language) and are printed or affixed to the book or move, often on or inside the cover. |
| [c] a description structure comprising a plurality of description blocks, each of said description blocks comprising address information for at least one part of said digital work, and a usage rights part for associating one or more usage | As discussed in the patent itself, printed materials (like a book or magazine) often include multiple elements, such as text and pictures or tables, which are laid out in a particular way or format.  The "description structure" simply refers to the layout of materials' various elements (which the patent calls "description blocks").  Thus, the library materials necessarily |

| | |
|---|---|
| rights portions. | have a description structure as described in the patent.  The library's usage rights are associated with all portions of a book or magazine once they are printed or affixed to the cover. |

### ii.    Claim 1 lacks any inventive element sufficient to render it patentable.

Claim 1 does not add any "inventive concept" to the abstract idea that is "sufficient to ensure that the patent in practice amounts to significantly more" than a patent on the abstract idea itself. *Alice*, 134 S. Ct. at 2355.  Claim 1's reference to a "computer readable medium" is simply drawn to any generic computer medium, such as a CD.  Similarly, a "rendering device" is simply any generic device, such as a CD player or printer, that permits the medium to be used in some way.  Claim 1's references to a "usage rights language," "grammar" and "description structure" are merely references to generic computer programming under ContentGuard's proposed construction, with no special programming required by the claims.  Such a use of known computer-programming principles to embody an abstract idea does not render the claim patentable. *Alice,* 134 S. Ct at 2359.

### iii.    The Dependent Claims fail to add any inventive element

The remaining asserted claims of the '160 patent fail to include any inventive element. Claim 2 adds the limitation of "said usage rights portion further specifies status information indicating the status of the digital work."  The patent explains that the "status" is simply information relating to "the state of a right and the digital work."  (Ex. 9 at 9:4-7.)  This adds nothing inventive to the abstract concept; in the library example, library records will include information about each digital work and its usage rights.  Claim 9 simply adds that the digital content portion and the usage rights portion are stored on the same physical devices.  Again, this does nothing to add any inventive element.  In the library example, usage rights for various types of library materials may be on a notice attached to the materials.

## IV.    CONCLUSION

For the foregoing reasons, Google respectfully requests that the Court grant Google judgment on the pleadings that all of the asserted claims in this actions are invalid as drawn to

unpatentable subject matter under 35 U.S.C. § 101.

Dated: February 3, 2015                    Respectfully submitted,

/s/ *Robert Unikel*_____
James Mark Mann
Gregory Bake Thompson
MANN TINDEL & THOMPSON
300 W. Main
Henderson, TX 75652
Telephone: (903) 657-8540
Facsimile: (903) 657-6003
Email: blake@themannfirm.com
mark@themannfirm.com

Robert W. Unikel (admitted *pro hac vice*)
Deanna Keysor (admitted *pro hac vice*)
Michelle Marek (admitted *pro hac vice*)
KAYE SCHOLER LLP
70 W. Madison St., Suite 4200
Chicago, IL  60602-4231
Telephone: (312) 583-2300
Facsimile: (312) 583-2360
Email: robert.unikel@kayescholer.com
deanna.keysor@kayescholer.com
michelle.marek@kayescholer.com

Michael J. Malacek
Timothy K. Chao (admitted *pro hac vice*)
KAYE SCHOLER LLP
3000 El Camino Real
2 Palo Alto Square, Suite 400
Palo Alto, CA  94306
Telephone: (650) 319-4500
Facsimile: (650) 319-4700
Email: michael.malacek@kayescholer.com
timothy.chao@kayescholer.com

*Attorneys for Defendant Motorola Mobility LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a) and served via the Court's electronic filing system on all counsel who have consented to electronic service on this the 3rd day of February, 2015.


*/s/ Robert Unikel*