# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| **ContentGuard Holdings, Inc.,** | |
| **Plaintiff,** | |
| v. | Civil Action No. 2:13-cv-1112-JRG |
| **Amazon.com, Inc.,** *et al.* | |
| **Defendants.** | |

**APPLE'S NOTICE OF JOINING MOTOROLA MOBILITY LLC'S MOTION FOR JUDGMENT ON THE PLEADINGS DECLARING ALL ASSERTED PATENT CLAIMS AGAINST IT INVALID PURSUANT TO 35 U.S.C. § 101 AND ADDITIONAL SUBMISSION REGARDING CLAIMS NOT ASSERTED AGAINST MOTOROLA**

**TABLE OF CONTENTS**

I. THE FRAMEWORK FOR SECTION 101 ANALYSIS ........................................................1

II. THE '007 AND '160 STEFIK PATENTS ARE NOT PATENT-ELIGIBLE ....................2

    A. The '007 Patent ........................................................................................................2

    B. Claims 3 and 10 of the '160 Patent .........................................................................5

III. THE NGUYEN PATENTS ARE NOT PATENT-ELIGIBLE .........................................6

    A. The Nguyen '280 Patent ..........................................................................................7

    B. The Nguyen '053 Patent. .......................................................................................10

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014) ................................................................................................... passim

*Bilski v. Kappos*,
   561 U.S. 593 (2010) ................................................................................................... 1, 9, 10

*Cybersource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011) ............................................................................................ 9

*Gametek LLC v. Zynga, Inc.*,
   2014 WL 1665090 (N.D. Cal. Apr. 25, 2014) ...................................................................... 2

*In re Comiskey*,
   554 F.3d 967 (Fed. Cir. 2009) .............................................................................................. 7

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*,
   No. 2:13-CV-655, 2014 WL 4364848 (E.D. Tex. Sept. 3, 2014) ......................................... 2

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1289 (2012) ................................................................................................ 8, 9, 11

*Ultramercial, Inc. v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014) ........................................................................................... 3, 4

Defendant Apple, Inc. ("Apple") hereby gives notice that it joins in the Motion for Judgment on the Pleadings Declaring All Asserted Patent Claims Against It Invalid Pursuant to 35 U.S.C. § 101 (Dkt. 390) filed by Defendant Motorola Mobility LLC ("Motorola") ("Motorola Mot."). For the reasons stated therein, Apple respectfully requests that the Court grant Apple judgment on the pleadings that all of the claims addressed by Motorola's motion are invalid as drawn to unpatentable subject matter under 35 U.S.C. § 101. As Motorola does not address all claims asserted against Apple, Apple respectfully provides this supplemental submission directed to the claims of the '007, '280, and '053 patents, and two claims of the '160 patent.

## I.   THE FRAMEWORK FOR SECTION 101 ANALYSIS

Motorola's brief addresses the legal framework for Section 101 analysis (*see* Motorola Mot. 4-6). Apple provides a supplemental statement of the law here to address the Court's questions concerning preemption arising at the February 5, 2015 hearing. Preemption of a field of endeavor is a policy consideration underlying Section 101, but it is not a test or requirement for finding a claim invalid. *See Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2358 (2014) (describing "the pre-emption concern that undergirds our § 101 jurisprudence"). *Alice* clarifies that *Bilski v. Kappos*, 561 U.S. 593 (2010), in describing preemption as a result that is to be avoided, did not mandate a "preemption test" for patent eligibility. Rather, concerns about preemption risks justify the bar on patenting abstract ideas. *Alice*, 134 S. Ct. at 2354-55.

The *Alice* test is: (1) does the claim recite an abstract idea, and (2) if so, does it contain an inventive concept sufficient to transform the idea into a patent-eligible application. *Id.* at 2355. Under (2), the Court does not ask whether the claim *completely* preempts all uses of the abstract idea, but whether it adds something meaningfully inventive to the abstract idea, "considering the elements of each claim both individually and as an ordered combination." *Id.* (quotation marks omitted). If it does not, the claim "risk[s] *disproportionately* tying up the use of the underlying

ideas, and [is] therefore ineligible for patent protection." *Id.* at 2354-55 (emphasis added, quotation marks omitted). In other words, preemption is *not* required in order to find a claim invalid. *See Gametek LLC v. Zynga, Inc.*, 2014 WL 1665090, at *5 (N.D. Cal. Apr. 25, 2014) ("A patent need not, however, preempt an entire field to run afoul of § 101; instead, the question is whether the patent 'would risk disproportionately tying up' the use of the abstract idea.") (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012)); *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, No. 2:13-CV-655, 2014 WL 4364848, at *11 (E.D. Tex. Sept. 3, 2014) (Bryson, J.) (finding claims invalid and observing "although the field of use is narrow—the conversion of one entity's loyalty award points into those of another entity—the preemptive effect of Loyalty's claims within that field of use is broad").

## II.     THE '007 AND '160 STEFIK PATENTS ARE NOT PATENT-ELIGIBLE

In addition to the claims of the five Stefik patents addressed in Motorola's brief (*see* Motorola Mot. 11-23), ContentGuard has asserted against Apple claims 1, 3-6, 8-11, and 13-15 from U.S. Patent No. 8,393,007 ("the '007 patent") (Ex. A) and claims 3 and 10 from U.S. Patent No. 7,225,160 ("the '160 patent") (Ex. B). Like the other Stefik patents, these patents claim the concept of associating usage rights with digital content and enforcing those rights.

### A.     The '007 Patent

Claim 1 of the '007 patent is drawn to the abstract idea of restricting access to materials. As illustrated by the basic library loan scenario (*see* Motorola Mot. 1), the claim recites elements of a process that can be, and has been, performed by humans without computers:

| Claim Element | Corresponding Action |
|---|---|
| 1.  A computer-implemented method of distributing digital content to at least one recipient computing device to be rendered by the at least one recipient computing device in accordance with usage rights information, the method comprising: | A library permits a patron to use library materials, such as a book or CD, in accordance with certain restrictions, *e.g.*, length of borrowing period, permission to use outside the library, or permission to make copies. |

| Claim Element | Corresponding Action |
|---|---|
| [a] determining, by at least one sending computing device, if the at least one recipient computing device is trusted to receive the digital content from the at least one sending computing device; | A librarian examines a patron's library card or other credentials to determine whether the patron is a library member, or is otherwise authorized to use the library materials. |
| [b] sending the digital content, by the at least one sending computing device, to the at least one recipient computing device only if the at least one recipient computing device has been determined to be trusted to receive the digital content from the at least one sending computing device; and | A patron may borrow certain library materials only when she can present proof (*e.g.*, a library card) that she has been authorized to access those materials by the library. The library will issue a card only after the patron fills out an application form and agrees to the library's terms of use. Once she has obtained her valid library card, the patron is "trusted" by the library to borrow books, CDs or other materials. Only after a patron shows a valid library card to a librarian will the librarian obtain requested materials from library storage and provide that material to the patron, or otherwise permit the patron to take custody of library materials, including the right to remove them from library premises. |
| [c] sending usage rights information indicating how the digital content may be rendered by the at least one recipient computing device, the usage rights information being enforceable by the at least one recipient computing device. | The librarian also provides the patron with rules regarding use of the materials. The patron agrees to, and does, follow those rules. |

Claim 1 provides no features beyond the abstract concept of a library providing access to materials to its authorized patrons. Restricting access to materials is not a technical problem unique to computing environments, and in any event Claim 1 does not identify any particular technological solution to this library loan scenario. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716-17 (Fed. Cir. 2014). The generic recitations of "computer-implemented" and "computing device," and "sending" and "determining" from data (which are among the "most basic functions of a computer") do not render Claim 1 patentable. *Alice*, 134 S. Ct. at 2358-59.

Independent Claims 6 and 11 fall with Claim 1, as they include the same elements rewritten in "apparatus" (6) and "computer-readable medium" (11) forms. *See Alice*, 134 S. Ct.

3

at 2360. The generic components added by these claims ("processors," "memories coupled to processors," and "instructions") do not qualify as "inventive elements" rendering the claims patentable. *See Ultramercial,* 772 F.3d at 716.

Claims 3, 8, and 13 each add that the determination of trust comprises:

| Additional Claim Element | Corresponding Action |
| --- | --- |
| receiving a request from at least one recipient computing device for an authorization object required to render the digital content; and | A patron requests, and must obtain, a valid library card before she is able to access, read, listen to, view, or otherwise use library materials. |
| transmitting the authorization object to the at least one recipient computing device when it is determined that the request should be granted. | The library will issue the library card only after the patron fills out an application form, agrees to the library's terms of use, and, perhaps, provides a credit card number for payment of any late, damage or other fees. Once she has obtained her valid library card, the patron is "authorized" by the library to borrow books, CDs, or other materials. |

These limitations add nothing more than the idea of embodying a patron's authorization to access materials in an "object"—a library card. The use of basic computing functions such as "receiving" and "transmitting" do not render these claims patentable. *Alice*, 134 S. Ct at 2359.

Claims 4, 9 and 14 add identical limitations, that the determination of trust comprises:

| Additional Claim Element | Corresponding Action |
| --- | --- |
| receiving a registration message from the at least one recipient device, the registration message including an identification certificate of the recipient computing device and a random registration identifier, the identification certificate being certified by a master device; | The librarian is given a patron's library card. The library card may include a member number, bar code, magnetic stripe, patron name, picture, or other identifying information. These "messages" on the card are used to permit identification of the patron by the librarian. |
| validating the authenticity of the at least one recipient device; | The librarian uses the card to verify the patron's identity and/or the status and validity of the patron's account, by looking up the patron's account by number, or by comparing a picture on the card with the patron. |
| exchanging messages including at least one session key with the at least one recipient device, the session key to be used in | The librarian verifies that the library card is valid, e.g., by checking the patron's ID and library records. |

4

| | |
|---|---|
| communications; and | |
| conducting a secure transaction using the session key, wherein the secure transaction includes sending the digital content to the at least one recipient device. | The librarian gives the patron access to the requested library materials as part of the same transaction in which the librarian verified the patron's identity and authorization. |

These limitations are a generic computer implementation of verifying that a user is authorized before giving access to restricted materials, as part of the same transaction. As in the '956 patent (*see* Motorola Mot. 21), the '007 patent explains that a "session key" is a "numeric code that is used with encryption and decryption algorithms," and that "public key encryption is *a well-known technique in the encryption arts*," not an inventive contribution. (Ex. A at 26:2-5.)

Finally, Claims 5, 10 and 15 add identical limitations, that validating comprises:

| **Additional Claim Element** | **Corresponding Action** |
|---|---|
| verifying the identification certificate of the at least one recipient device; | The librarian checks the patron's library card. |
| generating a message to test the authenticity of the at least one recipient device, the generated message including a nonce; | The librarian asks the patron for identifying information retained by the library, for example her phone number, so that the librarian can confirm the patron's identity. |
| sending the generated message to the at least one recipient device; and | The library asks the patron to verify identifying information. |
| verifying if the at least one recipient device correctly processed the generated message. | The librarian checks to make sure the patron has responded correctly to the request for information. |

These limitations describe the abstract idea of verifying patron identity; performing these steps on a computer cannot qualify as an inventive element. *See Alice*, 134 S. Ct. at 2358-59. As in the '956 patent (*see* Motorola Mot. at 21-22), a "nonce" refers to "a message generated in order to test whether the recipient is using the correct encryption keys." (Ex. A at 27:45-50.) This is a well-known method for a computer to verify the identity of another. *Alice*, 134 S. Ct at 2359.

B. **Claims 3 and 10 of the '160 Patent**

For the reasons set forth in Motorola's motion, claims 1, 2, and 9 of the '160 patent are invalid as drawn to unpatentable subject matter. (*See* Motorola Mot. 22-23.) The remaining

5

claims asserted against Apple do not add any inventive elements. Claim 3 adds "wherein said usage rights portion further specifies a usage fee associated with exercise of the manner of use, said usage fee comprising a fee type and fee parameters." The patent explains that the "usage fee" is simply "[a] fee charged to a requester for access to a digital work." (Ex. B at 48:21-22.) This adds nothing inventive to the abstract concept; in the library example, certain loan types of certain works may incur fees of different types, with different parameters. Interlibrary loans may incur a fee, and overdue fees vary across media types (books, magazines, reference books, videos) and are parameterized by time. *See* Ex. C (Santa Clara Cty. Library Dist. Fines & Fees Policy). Claim 10 simply adds that "said digital content portion and said usage rights portion are stored on different physical devices." This adds no inventive element. In the library example, usage rights for various types of library materials may be on a notice attached to the materials, or may they be posted only on nearby signage and/or in the library's printed policies.

### III. THE NGUYEN PATENTS ARE NOT PATENT-ELIGIBLE

Content Guard asserts Claims 1, 5, 11, 12 and 22 of U.S. Patent No. 7,774,280 ("the '280 patent") (Ex. D) and Claims 1, 3, 4, 5, 15, and 23 from U.S. Patent No. 8,001,053 ("the '053 patent") (Ex. E) (collectively "the Nguyen patents").

The Nguyen patents are abstractions on top of the abstract idea recited by the Stefik patents. (*See* Ex. D at 5:42-49.) In Stefik's library-loan scenario, content already has usage rights associated with it. The Nguyen patents describe the *creation* of usage rights by content publishers and libraries. The Nguyen patents acknowledge that "[t]he interpretation and enforcement of usage rights are well known generally and described in" the Stefik patents. (Ex. D at 5:22-24.) Irrespective of whether Stefik's usage rights claims are unpatentable (as set forth above, they are), the ostensible point of novelty of the Nguyen patents is the *sublicensing* of usage rights in a generic computer environment. That abstract legal concept is not patentable.

6

*Cf. In re Comiskey*, 554 F.3d 967, 981 (Fed. Cir. 2009) (claims "describ[ing] an allegedly novel way of requiring and conducting arbitration…are unpatentable").

The Nguyen patents purport to add to usage rights the additional abstract concepts of "meta-rights" and "state variables." (*See* Ex. D at 5:43-51, 1:18-20.) But a "meta-right" is no more than the right to create, modify, or dispose of usage rights associated with content, or to create, modify, or dispose of meta-rights themselves. (*Id.* at 5:47-50.) That is sublicensing. For example, a publisher could provide a book to library, with permission for the library to lend it out to patrons. The publisher thereby creates a meta-right held by the library, and the library can exercise that right by creating usage rights for the book. A "state variable" simply records the status of some usage rights or meta-rights. *Id.* at 7:67-8:3. For example, a usage right might be the right to make three copies of the content, and a state variable for that usage right might reflect that the patron holding that right has already made two out of the three copies. *See id.* at 8:3-10. These status records do not make the claimed sublicensing any less abstract.

During prosecution of the both patent applications leading to the Nguyen patents, the examiner rejected the pending claims under Section 101. (Ex. F at 5; Ex. H.) To overcome these rejections, the patentee amended claims of the '280 patent to indicate that claims were "computer-implemented" and "meta-rights are provided in digital form" (Ex. G), and amended claims of the '053 patent to indicate that the limitations were performed "by a processor" (Ex. I) These claims would not have issued but for the limitations that the Supreme Court has made clear are insufficient to render abstract ideas patentable. *Alice*, 134 S. Ct. at 2360.

### A. The Nguyen '280 Patent

Claim 1 recites steps for the abstract idea of providing consumers with rights to an item, such as a video cassette or a book. This idea can be (and has been historically) implemented using written agreements and over-the-counter transactions. Claim 1 is drawn to steps practiced

7

in, for example, a basic video rental transaction, in which a video store has the right (granted to it by movie studios) to generate downstream rights for its video rental customers, allowing them to borrow and view videos. Claim 1 does nothing more than suggest the use of general processors and electronic storage to automate the steps of this idea, and lacks any inventive, technological solution to any particular technical problem involving sublicensing usage rights:

| Claim Element | Corresponding Action |
| --- | --- |
| 1. A computer-implemented method for transferring rights adapted to be associated with items from a rights supplier to a rights consumer, the method comprising: | Video Store obtains a movie from Movie Studio, and receives rights to sell or rent that movie to Customer subject to certain rights defined by Movie Studio. |
| [a] obtaining a set of rights associated with an item, the set of rights including a meta- right specifying a right that can be created when the meta-right is exercised, wherein the meta-right is provided in digital form and is enforceable by a repository; | Movie Studio specifies, in a license to Video Store, that (for example) Video Store may rent newly released movies for one day at a time, but movies that have been available for more than two months may be sold or rented for a week at a time. The Video Store follows the terms of the license. |
| [b] determining, by a repository, whether the rights consumer is entitled to the right specified by the meta-right; | Customer decides to rent Movie A, which is a new release. Customer hands his membership card and Movie A to Clerk. Clerk will look up Customer's membership information and the rental price for Movie A. Clerk determines that Customer does not have any unpaid late fees and may rent Movie A upon payment of the rental fee. Clerk determines that Customer is entitled to take possession of Movie A for playing in a private home when Customer pays the rental fee. |
| [c] and exercising the meta-right to create the right specified by the meta-right if the rights consumer is entitled to the right specified by the meta-right, | Upon receiving the rental fee, Clerk will hand Movie A and a receipt specifying how Movie A maybe used and that it must be returned by the end of the next day. |
| [d] wherein the created right includes at least one state variable based on the set of rights and used for determining a state of the created right. | Clerk notes in a transaction log that Customer must return Movie A by the end of the next day. Customer's receipt also indicates that Movie A must be returned by the end of the next day. |

Claim 1's only limitation on the abstract idea of sublicensing is requiring "a particular technological environment" and "well-understood, routine, conventional activity," by specifying

8

the use of general "processors" and "repositories." *Alice*, 134 S. Ct. at 2358; *Mayo*, 132 S. Ct. at 1298. This is insufficient to save the claim from invalidity. *Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011) ("[T]he incidental use of a computer ... does not impose a sufficiently meaningful limit on the claim's scope."). The claimed "repository" is a "wholly generic computer" that automates the ineligible abstract idea of sublicensing, and provides no "practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself." *Alice*, 134 S. Ct. at 2358. The inclusion of a "state variable"— a parameter associated with the usage right (for example, the loan period)— "[s]imply appending conventional steps, specified at a high level of generality," is not enough to supply an "inventive concept." *Mayo*, 132 S. Ct. at 1292.

The remaining independent claim, Claim 12, is drawn to the same alleged invention as Claim 1, but is presented as a system claim. Claim 12 thus falls with Claim 1. *See Alice*, 134 S. Ct. at 2360. The additional limitations of the dependent claims do not contain any inventive element sufficient to render the claims drawn to "significantly more" than the abstract idea of Claim 1. Claim 5 adds the limitation that "the state variable is updated upon exercise of a right associated with state variable." This step is accomplished in the video store example by the clerk updating the due date of a movie in a log if the customer pays to renew or add days to the rental period. Claims 11 and 22 add the limitation of "generating a license including the created right, if the rights consumer is entitled to the right specified by the meta-right." This is a restatement of the abstract sublicensing concept. In the video store example, as the rental transaction is completed, the clerk would draw up a receipt including the terms and conditions of the customer's rights (*e.g.*, Movie A must be returned by the end of the next day).

### B.  The Nguyen '053 Patent.

Claim 1 is drawn to the abstract idea of licensing and sublicensing rights for users to access and use content. Like the risk hedging claimed in *Bilski*, the idea of granting and sharing rights to use content under licenses is an "economic practice long prevalent in our system of commerce." 561 U.S. at 619. Claim 1's steps are no different than those practiced by libraries (or video stores) in acquiring materials, using them, and loaning them out to patrons:

| Claim Element | Corresponding Action |
|---|---|
| 1. A method for sharing rights adapted to be associated with an item, the method comprising: | Library obtains a book from Publisher and receives rights to share/lend that book to Patron subject to certain rights defined by Publisher and by Library. |
| [a] specifying, in a first license, using a processor, at least one usage right and at least one meta-right for the item, wherein the usage right and the meta-right include at least one right that is shared among one or more users or devices; | Publisher specifies, in a license to Library, that Library can make five copies of book (usage right), three of which can be shared/loaned to Patrons under specific terms and/or for a specific length of time (meta-rights), and two of which are retained by the Library for on-site reference use (usage rights). |
| [b] defining, via the at least one usage right, using a processor, a manner of use selected from a plurality of permitted manners of use for the item; | Publisher's license to Library includes the usage right to copy the book only five times. Copying is one of many possible manners of use for the book that could be permitted by Publisher (read and loan being other possible manners of use). |
| [c] defining, via the at least one meta-right, using a processor, a manner of rights creation for the item, wherein said at least one meta-right is enforceable by a repository and allows said one or more users or devices to create new rights; | Publisher's license explicitly allows Library to loan three copies of the book to Patrons. Library exercises its "meta-right" by actually loaning each of three copies to Patrons. In loaning each copy to a Patron, Library creates a new right for each Patron to read the book for one week. |
| [d] associating, using a processor, at least one state variable with the at least one right in the first license, wherein the at least one state variable identifies a location where a state of rights is tracked; | Publisher's license limits Library to making five copies of the book, only three of which may be loaned to Patrons for a maximum length of two weeks. Library is required to, and does, keep track in a log book (or on a computer system) of the total number of copies made, the total number of copies borrowed by Patrons at any time, and the length of each Patron's borrowing period. |

10

| Claim Element | Corresponding Action |
|---|---|
| [e] generating, in a second license, using a processor, one or more rights based on the meta-right in the first license, where in the one or more rights in the second license includes at least one right that is shared among one or more users or devices; | When Patron borrows a copy of the book from Library, he agrees (by filling in a card or entering his information into a computer system) to the second license terms defined and created by the Library, including length of loan (two weeks) and permitted manners of use (read, not copy). All Patrons who borrow copies of the book share the same rights (read for two weeks, do not copy). |
| [f] and associating at least one state variable with the at least one right that is shared in the second license, wherein the at least one state variable that is associated with the second license is based on the at least one state variable that is associated with the first license. | Publisher's first license to Library requires Library to keep track of the number of copies made, the number of copies loaned to Patrons at any one time, and the length of time that each Patron borrows a copy. Library's license with Patron requires Patron to return the copy to Library after two weeks; accordingly, both Patron and Library keep track of the number of days remaining in Patron's borrowing period (or, alternatively, the number of days since Patron borrowed the copy). |

Claim 1 lacks any inventive element. It merely limits the abstract idea of rights sharing and sublicensing to "a particular technological environment" and "well-understood, routine, conventional activity," by specifying the use of general "processors" and "repositories." *Alice*, 134 S. Ct. at 2358; *Mayo*, 132 S. Ct. at 1298. Claim 15 is a "system" version of method claim 1, and necessarily falls with it. *See Alice*, 134 S. Ct. at 2360.

The dependent claims fail to add any limitations that render them patentable. Claim 3 adds that "the state variable in the first or second license shares a state thereof for content usage or rights derivation with other generated usage rights and meta-rights." Keeping track of sublicenses and their terms adds noting inventive to the abstract idea. In the library example, if Patron 2 borrows a second copy of the book, the library updates its log to show that a second copy of the book has been loaned and, as with Patron, tracks the number of days remaining in

11

Patron 2's borrowing period. The state variables of "copies loaned" and "time remaining in borrowing period" are shared between Library, Patron and Patron 2.

Claim 4's added limitation, "wherein the state variable in the first or second license inherits a remaining state for content usage or rights derivation from other generated usage rights and meta-rights," is not inventive either. In the library example, this limitation would be met where Patron 2 can only borrow a copy of the book if fewer than three copies of the book already have been checked out by other Patrons. When Patron 2 checks out a copy, the number of available copies is accordingly reduced.

Claim 5 adds the non-inventive limitation that "wherein the state variable in the first or second license is updated upon exercise of a right associated with the state variable." In the library example, Claim 5 would be met when the library makes a copy of the book and updates its record of the total number of copies made. Similarly, when the library loans a copy of the book to Patron, the library's record of the total number of copies loaned out is updated; when a Patron renews the book, the library updates the Patron's due date. Finally, Claim 23 adds the limitation, "where in the state variable in the second license is transferred from the at least one right in the first license and is associated with the right that is shared in the second license." In the library example, this claim would be met where Patron 1 checks out a copy of the book, and the library updates its record of the total number of copies loaned out. When Patron 2 checks out another copy of the book, the library updates the same record.

## CONCLUSION

For the reasons set forth above and in Motorola's motion, Apple respectfully requests that the Court grant judgment on the pleadings that all of claims asserted against Apple in this action are invalid as drawn to unpatentable subject matter under 35 U.S.C. § 101.

Dated:  February 24, 2015              */s/ Melissa R. Smith*

                                              Melissa R. Smith
                                              State Bar No. 24001351
                                              GILLAM & SMITH, L.L.P.
                                              303 S. Washington Ave.
                                              Marshall, Texas 75670
                                              Telephone:  (903) 934-8450
                                              Facsimile:  (903) 934-9257
                                              melissa@gillamsmithlaw.com

                                              Bryan K. Anderson
                                              bkanderson@sidley.com
                                              Nathan Greenblatt
                                              ngreenblatt@sidley.com
                                              SIDLEY AUSTIN LLP
                                              1001 Page Mill Road, Bldg. 1
                                              Palo Alto, CA 94304
                                              650/565-7007
                                              Fax:  650-565-7100

                                              David T. Pritikin
                                              dpritikin@sidley.com
                                              Richard A. Cederoth
                                              rcederoth@sidley.com
                                              SIDLEY AUSTIN LLP
                                              One South Dearborn St.
                                              Chicago, IL 60603
                                              312/853-7359
                                              Fax:  312/853-7036

                                              Kelly A. Krellner
                                              kkrellner@sidley.com
                                              SIDLEY AUSTIN LLP
                                              555 California Street, Ste.  2000
                                              San Francisco, CA 94101
                                              415/772-7418
                                              Fax:  415/772-7400

                                              ***Attorneys for Defendant Apple Inc.***

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing document was filed using the Court's electronic filing and case management system (CM/ECF) which will provide electronic service on all counsel of record.

/s/ *Melissa R. Smith*

**CERTIFICATE OF CONFERENCE**

The undersigned certifies that the parties complied with Local Rule CV-7(g)'s meet and confer requirement. On February 24, 2015, counsel for Defendant, including the undersigned, met and conferred with counsel for Plaintiff by telephone. The parties attempted to resolve the issue in this motion but reached an impasse.

/s/ *Melissa R. Smith*