**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| ContentGuard Holdings, Inc.,<br><br>        Plaintiff,<br><br>  -against-<br><br>Google, Inc.<br><br>        Defendant. | Civil Action No. 2:14-cv-00061-JRG<br><br>JURY TRIAL DEMANDED |
| ContentGuard Holdings, Inc.,<br><br>        Plaintiff,<br><br>  -against-<br><br>Amazon.com, Inc., *et al*.<br><br>        Defendants. | Civil Action No. 2:13-cv-01112-JRG<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF CONTENTGUARD HOLDINGS, INC.'S RESPONSE TO GOOGLE, INC.'S**
**AND MOTOROLA MOBILITY LLC'S MOTIONS FOR**
**<u>JUDGMENT ON THE PLEADINGS</u>**

# TABLE OF CONTENT

I.   **Introduction** ........................................................................................................... 1

II.  **Relevant Background** ........................................................................................... 2

   A.   The Trusted Repository ('859, '576, '072, '956, 007, and '160) Patents .................... 2

   B.   The Meta-rights ('280 and '053) Patents ................................................................. 5

   C.   The Transaction Tracking ('556) Patent ................................................................. 5

   D.   The Importance of DRM ......................................................................................... 6

III. **Legal Principles** ................................................................................................... 7

IV.  **Argument** ............................................................................................................. 8

   A.   The Trusted Repository Patents Are Eligible for Patent Protection. ........................... 9

      1.   The Trusted Repository Patents Do Not Disclose "Abstract Ideas." ...................... 9

      2.   The Trusted Repository Patents Teach Inventive Concepts. ............................... 14

   B.   The Meta-rights Patents Are Eligible for Patent Protection. ..................................... 17

      1.   The Meta-rights Patents Do Not Disclose "Abstract Ideas." ............................... 17

      2.   The Meta-rights Patents Teach Inventive Concepts. ......................................... 19

   C.   The Transaction Tracking Patent Is Eligible for Patent Protection. ........................... 20

      1.   The Transaction Tracking Patent Does Not Disclose "Abstract Ideas." .............. 20

      2.   The Transaction Tracking Patent Teaches Inventive Concepts. .......................... 25

V.   **Conclusion** ........................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. ITC*,
  725 F.3d 1356 (Fed. Cir. 2013).............................................................................16

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*,
  687 F.3d 1266 (Fed. Cir. 2012)..................................................................2, 8, 15, 20

*Bilski v. Kappos*,
  561 U.S. 593 (2010)..............................................................................................7

*Cal. Institute of Tech. v. Hughes Commcn's Inc.*,
  2014 U.S. Dist. LEXIS 156763 (C.D. Cal. Nov. 3, 2014)............................................ *passim*

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  2014 U.S. App. LEXIS 22902 (Fed. Cir. Dec. 5, 2014).............................................. *passim*

*Diamond v. Chakrabarty*,
  447 U.S. 303 (1980)..............................................................................................7

*Diamond v. Diehr*,
  450 U.S. 175 (1981)..............................................................................................8

*Google Inc. v. SimpleAir, Inc.*,
  Case CBM2014-00170 (U.S. Patent Trial & Appeal Board, Jan. 22, 2015) ................... *passim*

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
  133 S. Ct. 1289 (2012).........................................................................8, 14, 19, 25

*Mintz v. Dietz & Watson, Inc.*,
  679 F.3d 1372 (Fed. Cir. 2012)...............................................................................15

*Pannu v. Iolab Corp.*,
  155 F.3d 1344 (Fed. Cir. 1998)...............................................................................15

*PNC Bank v. Secure Access, LLC*,
  Case CBM2014-00100 (U.S. Patent Trial & Appeal Board, Sept 9, 2014) ...............22, 23, 24

*Rockstar Consortium US LP, Inc. v. Samsung Elecs. Co., Ltd.*,
  2014 U.S. Dist. LEXIS 67097 (E.D. Tex. May 15, 2014).........................................13, 19, 24

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 1335 (Fed. Cir. 2013)...............................................................8, 10, 15, 20

i

*Vanderbilt Univ. v. ICOS Corp.*,
601 F.3d 1297 (Fed. Cir. 2010)...........................................................................................15

**Statutes**

35 U.S.C. § 101 ...................................................................................................... *passim*

ii

## I.    INTRODUCTION

Beyond seeking a broader declaration of invalidity under 35 U.S.C. § 101, Google and Motorola's motions for judgment on the pleadings[1] add nothing of substance to the motion to dismiss filed by Amazon on November 22, 2014.  *See Amazon* Action Dkt. 298.[2]  Just like Amazon, Google and Motorola argue that the patents-in-suit concern concepts that have been around "[s]ince the dawn of the printing press."  *Google* Action Dkt. 137 at 1; *compare Amazon* Action Dkt. 298 at 1 (asserting that "hundreds of years ago Gutenberg's printing press led to an explosion of printed material and the development of basic systems and methods for limiting its distribution and use").  Just like Amazon, Google and Motorola argue that the patents-in-suit "do nothing more than take [a] basic library loan concept and effectively say 'use computers to do this for digital works'."  *Google* Action Dkt. 137 at 1; *compare Amazon* Action Dkt. 351 at 1 (asserting that ContentGuard's patents "describe nothing more than a digital version of a trip to the library using a library card").  And, just like Amazon, Google and Motorola argue that "if ContentGuard were permitted to maintain its patent claims, the entire abstract idea of imposing and enforcing usage rights and restrictions on digital content would be monopolized."  *Google* Action Dkt. 137 at 2; *compare Amazon* Action Dkt. 298 at 23 (asserting that "ContentGuard has improperly attempted to stake a claim to every computer-implemented application—both present and future—of the basic concepts that have supported trade in written works for centuries").

It should come as no surprise, therefore, that Google and Motorola's copycat motions fail for the exact same reasons as Amazon's.  That is, just like Amazon's motion, Google and Motorola's motions are premised on a mischaracterization of the inventions claimed in the

---

[1]  Google's and Motorola's respective motions are substantively identical, but Motorola's addresses solely the patents being asserted against Motorola.  For the sake of simplicity we cite herein only to Google's motion, *Google* Action Dkt. 137.

[2]  Given that Google and Motorola ask the Court to "consider the instant motion[s] . . . [alongside] Amazon's similar motion" (*Google* Action Dkt. 137 at 3), it is puzzling that Google and Motorola chose to sit on the sidelines while Amazon's motion was being briefed.  Google and Motorola's conduct manifests a troubling disregard for the Court's limited resources.

patents-in-suit, on improper invitations that the Court "look[] past the . . . complexity" of those inventions (*Google* Dkt. 137 at 1), and on the fiction that ContentGuard's inventions are "analogous" to conventional practices implemented by through manual processes (*e.g.*, library cards, contracts, lists, etc.).

## II.    RELEVANT BACKGROUND

Consistent with their strategy of ignoring and misrepresenting the actual inventions taught by the patents-in-suit, Google and Motorola carefully avoid making any mention of these inventions' background.   Because "the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter," *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012), we provide the missing context below.

### A.    The Trusted Repository ('859, '576, '072, '956, 007, and '160) Patents

In the early 1990s the research-oriented Advanced Research Projects Agency Network, aka ARPANET, was undergoing its transition to become the first public Internet.[3]   It was apparent at the time that the Internet was going to fundamentally alter the way in which digital content would be offered to and accessed by consumers, but there was enormous skepticism that the owners of content could continue to protect the fruits of their labor.  Exs. 3, 5.  Because the Internet was perceived as "a pirate's paradise," "the instant and practically costless copying and distribution the Net facilitates ha[d] made many creators, authors, and copyright-holders balk at digitizing and posting their ideas."  Ex. 5.  John Perry Barlow, a well-known commentator and a co-founder of the Electronic Frontier Foundation, summarized the challenge as follows:

> If our property can be infinitely reproduced and instantaneously distributed all over the planet without cost, without our knowledge, without its even leaving our possession, how can we protect it?  How are we going to get paid for the work we do with our minds?  And, if we can't get paid, what will assure the continued creation and distribution of such work?  *Since we don't have a solution to what is a profoundly new kind of challenge, and are apparently unable to delay the*

---

[3] *See* http://www.internetsociety.org/internet/what-internet/history-internet/brief-history-internet.

> *galloping digitization of everything not obstinately physical, we are sailing into the future on a sinking ship.*

Ex. 3 (emphasis added).

Determined to find a solution that would ignite Internet-based commerce in digital content, a small team of scientists working at Xerox's Palo Alto Research Center ("Xerox PARC") set out to solve Barlow's "immense, unsolved conundrum." *Amazon* Action Dkt. 244 ¶ 4. Led by Mark Stefik, the Xerox PARC team began to explore technical solutions that would not only prevent piracy, but would also enable musicians, authors, photographers, publishers, and producers to share, track, control, and monetize their content. *Id.* Through a series of revolutionary inventions, Stefik and his colleagues Peter Pirolli and Ralph Merkle laid the technological foundation for what would ultimately become the prevailing paradigm for securely distributing digital content over the Internet. *Id.* In November 1994, realizing the potential unlocked by Stefik and his colleagues' work, Xerox PARC sought patent protection for their digital management rights ("DRM") innovations.

Because they "cover much of what we'd [today] describe as digital rights management," Stefik's patents are complex. Ex. 2. Of special significance here, however, is a particular aspect of Stefik's innovations, specifically their teachings concerning "trusted" systems. At bottom, Stefik's vision was that "trusted systems . . . would be the only feasible way to implement digital rights management because general-purpose computers ha[d] too many security holes." Ex. 6. As described at length in Stefik's Trusted Repository Patents (*see Amazon* Action Dkt. 244-03 ('859 Patent) at cols. 12-13), a key feature of such "trusted" systems is reflected in the requirement that they maintain three types of "integrities"—physical, communications, and behavioral—in the support of usage rights that are associated with the content. As envisioned by Stefik,[4] a "trusted" system (1) prevents access to content by a non-trusted system; (2) ensures

---

[4] For the same of simplicity, we cite herein only ContentGuard's proposed construction for the "repository"/"determined to be trusted" limitations of the Trusted Repository Patents. Defendants' competing construction, which to a large extent overlaps with ContentGuard's, is set forth in Defendants' *Markman* briefing.

that it only communicates with other devices that are able to present proof that they are trusted systems, for example, by using security measures such as encryption, exchange of digital certificates, and nonces; (3) requires software to be installed in the repository to include a digital certificate, in other words, an assurance that the software comes from a known source. *Id.*

Stefik's "pioneering" work with respect to "trusted" systems has received numerous accolades. Ex. 7. As commentators have noted, Stefik's vision concerning the role "trusted" systems must play in the distribution of digital content over the internet is one of the seminal "development[s] that catalyzed the DRM paradigm." Ex. 6. "Trusted" systems are now firmly considered a "core technolog[y] that underlie[s] . . . technological protection systems" (*id.*), and Stefik is "acknowledged [as the] father of DRM" (Ex. 1). Along the same lines, Stefik's Trusted Repository Patents have been praised as disclosing fundamental technology "*necessary* to make the digital delivery of music, movies and other files secure." Ex. 8 (emphasis added). Indeed, when Microsoft Corporation sought to acquire a controlling interest in ContentGuard,[5] the EU antitrust authorities threatened legal action out of concern that Microsoft could use ContentGuard's patents to suppress competition. Ex. 2.

Four of the six Trusted Repository Patents at issue in this action were recently challenged before the PTAB in *Inter Partes* Reviews. Ex. 9. Since its founding, the PTAB has been extraordinarily uncharitable to patent holders, prompting the former Chief Judge of the Federal Circuit to liken this institution to a "death squad[]" on a mission to "kill[ intellectual] property rights." Ex. 10. The PTAB, however, reaffirmed the validity of each and every claim at issue in these patents,[6] distinguishing the challenger's asserted prior art on the basis that it did not disclose Stefik's "trusted" repository limitations. Ex. 11.

---

[5] As explained in the Second Amended Complaint, ContentGuard was formed in 2000 as joint venture between Microsoft and Xerox. *Amazon* Action Dkt. 244 ¶ 5.

[6] With respect to the '160 Patent, the PTAB declined to institute a review concerning the claims at issue in these litigations.

4

## B.      The Meta-rights ('280 and '053) Patents

ContentGuard's Meta-rights Patents build upon the innovations taught by the Trusted Repository Patents.   Recognizing that "business models for creating, distributing, and using digital content and other items involve a plurality of parties," *i.e.*, content creators, publishers, distributors, and end-users (*Amazon* Action Dkt. 244-05 ('280 Patent) at col. 2:24-26), and that parties residing upstream in the distribution chain may wish to exercise "control over downstream parties" (*id.* at col. 2:33-34), the inventors of the '280 and '053 Patents invented the concept of "meta-rights . . . enforceable by a repository."   The '280 and '053 Patents define "meta-rights" as "the rights that one has to generate, manipulate, modify, dispose of or otherwise derive other rights."   *Id.* at col. 5:45-47.   Unlike the "usage rights" taught by the Trusted Repository Patents, whose exercise result in "actions to content" (*id.* at col. 7:26-27), "[w]hen meta-rights are exercised, new rights are created from the meta-rights or existing rights are disposed as the result of exercising the meta-rights" (*id.* at col. 7:28-31).   No "actions to content," however, result from the exercise of meta-rights.

The claims of the Meta-rights Patents recite "repository" limitations and expressly incorporate the Trusted Repository Patents' teachings concerning trusted repositories.   Thus, to ensure that the entirety of the content distribution chain maintains its integrity, the Meta-rights Patents require that "meta-rights" be "enforceable by a repository."   *See Amazon* Action Dkt. 244-05 ('280 Patent) claim 1; *Amazon* Action Dkt.244-06 ('053 Patent) claim 1.   As Google, Motorola, and its co-Defendants have recognized, the term "repository" carries the same meaning in the Trusted Repository and Meta-rights Patents, respectively.   *See Amazon* Action Dkt. 331 at 30 ("ContentGuard and Defendants agree that 'repository' should be construed the same way in the Stefik and [Meta-rights] patents").

## C.      The Transaction Tracking ('556) Patent

The inventions claimed in the '556 Patent offer a complementary DRM solution to those taught by the Trusted Repository and Meta-rights Patents.   *Amazon* Action Dkt. 244-11 ('556

Patent) at col. 2:10-19.   In the early 2000s, the inventors of the '556 Patent shared Stefik's concern that "[w]ith the advent of the Internet and its subsequent distribution capability and broad acceptance, intellectual property assets that can be digitized can now be reproduced and distributed without quality degradation or compensation to the rights holders." *Id.* at col. 1:22-27.   Unlike Stefik, however, the inventors of the '556 Patent believed that, in certain circumstances, digital assets could sufficiently be protected without the use of trusted repositories that distribute content and enforce associated usage rights.   The '556 Patent thus teaches a different type of DRM solution: the marking of digital assets distributed to customers with "a[n] . . . identification associated with the user and the asset identifier." *Id.* at col. 3:54-64; claim 1.   These unique IDs are "prepended or postpended" to the digital asset, or, alternatively, embedded in unused portions of the digital assets. *Id.* at col. 19:36-38.

### D.      The Importance of DRM

Individually and in combination, the patents-in-suit offer concrete technology solutions that address Barlow's "immense, unsolved conundrum."  Ex. 3.   In turn, these DRM solutions have catalyzed the creation of a whole new industry dedicated to the sale and distribution of digital content.   As a senior member of the engineering team that developed the accused Apple FairPlay DRM technology, former Apple employee Rod Schultz, explained:

> Without DRM the iTunes store would never have been born.   No music label would have licensed content to Apple, and the majority of the general public would not have purchased iTunes content that didn't come from a major label. . . .

> For video, DRM is even more important, and the studios can still set the rules without yielding to a public demand for DRM-free movies.   When the cost of creating a movie like Avatar ranges between $300 million and $500 million, the studios naturally want their money back. They want protections in place that will give confidence to release digital copies to the world.

Ex. 4.

6

ContentGuard has successfully licensed the patents-in-suit, for substantial consideration, to companies around the world, including Casio, Fujitsu, Hitachi, LG Electronics, NEC, Nokia, Panasonic, Pantech, Sanyo, Sharp, Sony, Toshiba, and others.  *Amazon* Action Dkt. 244 ¶ 39.

## III.   LEGAL PRINCIPLES

In Section 101, the Patent Act defines patentable subject matter:  "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  In drafting the Patent Act, "Congress took [a] permissive approach to patent eligibility to ensure that ingenuity should receive a liberal encouragement."  *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (internal quotation marks omitted).  That said, Section 101 does not encompass all products of human effort and ingenuity:  laws of nature, physical phenomena, and abstract ideas are not patentable.  *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980).

In analyzing patent ineligibility challenges, courts "must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more, thereby transforming them into a patent-eligible invention."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (citations and internal punctuation omitted). "On occasion, the Federal Circuit has described § 101 as a 'coarse eligibility filter'" to be applied *before* "the finer sieves" of Sections 102, 103, and 112 come into play.  *Cal. Institute of Tech. v. Hughes Commc'ns Inc.*, 2014 U.S. Dist. LEXIS 156763, *9 (C.D. Cal. Nov. 3, 2014) (quoting *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 1335, 1341, 1354 (Fed. Cir. 2013), *vacated sub nom.*, *WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014)).

Courts evaluate challenges under Section 101 using a two-part test.  First, a court must ask if the claim is "directed to one of those patent-ineligible concepts"—a law of nature, physical phenomenon, or abstract idea.  *Alice Corp.*, 134 S. Ct. at 2355.  Second, if it determines that the claim is directed to one of these concepts, the court must ask "[w]hat else is there in the claims

7

before us?" *Mayo Collaborative Servs. v. Prometheus Labs.*, *Inc.*, 133 S. Ct. 1289, 1297 (2012). "This second step determines whether there is an 'inventive concept' that 'ensure[s] that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Cal. Institute of Tech. v. Hughes Commcn's Inc.*, 2014 U.S. Dist. LEXIS 156763, *9 (citing *Alice Corp.*, 134 S. Ct. at 2355).

In *Alice Corp.*, the Supreme Court cautioned that courts should "tread carefully in construing th[e] exclusionary principle [of Section 101] lest it swallow all of patent law," noting that "at some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice Corp.*, 134 S. Ct. at 2354 (citations and internal punctuation omitted). Thus, in the context of a Section 101 analysis, it is not appropriate to ignore the claims' *actual* limitations. "[A]ny claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed. [But a] court cannot go hunting for abstractions by ignoring the concrete, palpable, tangible limitations of the invention the patentee actually claims." *Ultramercial Inc.*, 772 F.3d at 1344. *See also Diamond v. Diehr*, 450 U.S. 175, 188 (1981) ("In determining the eligibility of respondent's claimed process for patent protection under section 101, the[] claims must be considered as a whole.").

While "claim construction is not an inviolable prerequisite to a validity determination under § 101," the Federal Circuit has held that "it will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis." *Bancorp Servs., L.L.C.*, 687 F.3d at 1273. That is because "the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter." *Id.* at 1273-74.

## IV.  ARGUMENT

All the DRM inventions taught by the patents-in-suit are eligible for patent protection. Far from "merely recit[ing] the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," *DDR Holdings, LLC v.*

8

*Hotels.com, L.P.*, 2014 U.S. App. LEXIS 22902, *26 (Fed. Cir. Dec. 5, 2014), each of ContentGuard's patents teaches concrete, innovative solutions that address the challenge of protecting and distributing digital content in the advent of the Internet.

### A.   The Trusted Repository Patents Are Eligible for Patent Protection.

### 1.   The Trusted Repository Patents Do Not Disclose "Abstract Ideas."

Google and Motorola spend 14 pages of their motion attempting to line up the myriad elements of the asserted claims with alleged "corresponding action[s]" purportedly existing in bricks-and-mortar libraries. *Google* Action Dkt. 137 at 11-12, 15-25. According to Google and Motorola, this exercise demonstrates that the Trusted Repository Patents cover "nothing more than use of a generic computer system and generic computer concepts to execute the abstract, usage rights enforcement idea." *Id.* at 11. These assertions are meritless.

*First*, the entirety of Google and Motorola's arguments are premised on the conclusory statement—which is tellingly buried in a footnote—that "a 'repository' in the Stefik patents is simply a computer element that can be counted on to follow specified rules governing use of a particular piece of content (e.g., a book), *in the same way that a library patron can be counted on to follow a library's specified rules for use of its books*." *Google* Action Dkt. 137 at 11 n.5 (emphasis added). But merely stating Google and Motorola's hypothesis exposes its fatal flaws. The "physical" integrity taught by the Trusted Repository Patents is *not the same* as whatever may be required of a library patron to physically "*hold* and store a book," *i.e.*, parts of human anatomy, a briefcase, etc. *Cf.* Dkt. 137 at 11-12 n.5 (emphasis added). The "communications integrity" taught by the Trusted Repository Patents is *not the* same as a "direct[]/face-to-face" interaction with a patron in a library setting. *Cf. id.* Finally, the type of "behavioral integrity" allegedly existing in the library setting is *not the same* as that taught by the Trusted Repository Patents. Concocting a far-fetched "analogy to conventional [practices] is no substitute for an analysis of how, or why, the claim language supports [the] assertion that the claims merely recite

9

[an allegedly] abstract [conventional practice]."[7]  Google and Motorola's inability to demonstrate how and why the actual claims of Trusted Repository Patents meaningfully resemble a trip to the library is fatal.  *SimpleAir, Inc.*, Ex. 14 at 16 ("[E]very method can be generalized to the point of abstraction if the claim language is ignored.  Here, Petitioner overlooks the various physical components recited by the claims . . . [and] Petitioner's analogy to conventional periodical publication delivery still fails because it does not account for each step of the claimed method. . . .  Petitioner's generalized arguments, not directed to the specific language of the challenged claims, are insufficient to show that the claims more likely than not are directed to a patent-ineligible abstract idea."); *Ultramercial Inc.*, 772 F.3d at 1344 ("[A]ny claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed.  [But a] court cannot go hunting for abstractions by ignoring the concrete, palpable, tangible limitations of the invention the patentee actually claims.").

 *Second*, what Google and Motorola are really telling the Court is that a novel, concrete, technology-based solution for ensuring the integrity of content-distribution systems and of usage rights associated with the content being distributed is analogous to an honor-based code practiced for centuries by libraries and their patrons, *e.g.*, "I pledge not to copy and will return the book after 7 days."[8]  That assertion also does not pass the straight-face test.  Indeed, Google and Motorola have it *exactly backwards*.  That is, Stefik and his colleagues saw past an *abstract*, unenforceable idea of "trust" that was plainly unsuitable to protect digital-distribution systems in the advent of a new medium acknowledged as a "pirate's paradise" (Ex. 5), and replaced it with

---

[7] *See Google Inc. v. SimpleAir, Inc.*, Case CBM2014-00170, Slip op. at 15 (U.S. Patent Trial & Appeal Board, Jan. 22, 2015), attached hereto as Ex. 14.

[8] *See, e.g.*, *Google* Action Dkt. 137 at 12 (equating "the server mode of operation is operative to enforce usage rights associated with content . . ." with "[w]hen the patron obtains the book from the library to read it, he agrees to and does use the book only in accordance with the library's specified rules . . .").

a comprehensive, technology-based solution that solved what Barlow coined as "the problem of digitized property" (Ex. 3).

It is important to note that preventing the unauthorized copying and distribution of digital content presents altogether different challenges from those that surround the protection of content existing in physical form, *e.g.*, printed books.  To protect printed matter, libraries rely for the most part on an honor code—the patron will be trusted to not copy the book and return it on the stipulated date.  And while the library may impose financial penalties to guard against the theft or late return of a book, *e.g.*, a late $0.15 per day (*see* Ex. 12), once the book has left the premises there is nothing the library can do to *actually* guard against its theft, unauthorized copying,[9] or further lending.  Once the content is digital, however, the challenges of protecting it are far more complex and the stakes are infinitely higher.  An honor code will simply not do.  As Karen Coyle, an expert in library technologies, has explained:

> [L]et's say that I have the very same book in a digital format.  If I want to make a copy, I can make that copy almost instantly.  It will cost me nothing.  And the end result will be a perfect copy of the original.  Not only that, I can make one hundred or a thousand copies almost as easily as I can make one.  I can email the file to everyone in my address book, or I can place the file on a peer-to-peer network and let anyone on the Internet have access to it.  With the digital file, the economics are slanted very much toward making copies.
>
> Note that the digital file is protected by the very same copyright law that the hard copy is, the one that doesn't really prevent us from making copies.  What we have here is the Napster effect, which is based on the ease of copying.  And because law doesn't seem to have worked as a preventive measure, there is some justification that *only a technology-based protection will ever work to protect digital works*.

---

[9] In the library setting, an honor code may suffice because, given the economics involved, it makes little sense for the patron to engage in wholesale unauthorized copying.  *See* Ex. 13 ("Say I have a book, a hard copy book, that I have borrowed from the library.  Maybe I would like to have a copy of my own. . . .  Yet I am unlikely to copy the book. Why is that?  Because I don't want to spend an hour and a half at a copy center opening the pages and punching the copy button.  Because in the end the copy will cost me as much or more than buying a copy of the book in paperback.  And because what I will end up with is a poor copy on bad paper in an 8.5x11 format, unbound.  In the end, making a copy of a hard copy books is uneconomical, in terms of time and money, and the result is pretty undesirable.").

Ex. 13 (emphasis added).

Thus, rather than "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet," *DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *26, the Trusted Repository Patents disclose precisely the type of "technology-based" solutions Coyle had in mind.  Using Stefik's Trusted Repository Patents, an online digital content distributor (like iTunes or Google Play) can *effectively prevent* the theft, unauthorized use, copying, or further distribution of content.  By way of example, (i) a customer who has paid for the right to watch the content only once can be prevented from watching it again; (ii) a customer who has paid for the right to watch the content on a particular device (*e.g.*, a tablet) can be prevented from watching it on a different device (*e.g.*, a high-definition TV); (iii) a customer who has paid for the right to watch the content for 24 hours can be prevented from watching it upon the expiry of the specified rental period, and so on and so forth.  All of these "usage rights" restrictions are *enabled* and *effectively enforced* using the "technology-based" teachings of Stefik's Trusted Repository Patents.  In contrast, however, *none* can be accomplished in the library setting, and thus, to see their books returned on time and in the same condition in which they left, libraries must rely solely on their patron's unenforceable promises.  And, to be sure, solutions of the type disclosed in Trusted Repository Patents, which are grounded in *technology* and yield *tangible results*, are the opposite of abstraction.

*Third*, Google and Motorola's assertions that the Trusted Repository Patents require nothing more than the "use of generic computer system and generic computer concepts" (*Google* Action Dkt. 137 at 11) are flatly incorrect.  In truth, Stefik's Trusted Repository Patents teach that "trusted systems . . . [are] the only feasible way to implement digital rights management *because general-purpose computers* have too many security holes."  Ex. 6 (emphasis added).

And there is *zero* proof in the record that a "generic computer" maintains the three integrities taught by the Trusted Repository Patents.[10]

*Fourth*, Google and Motorola's throw-away argument that the Trusted Repository Patents stake a claim to "the entire abstract idea of imposing and enforcing usage rights and restrictions on digital content" (*cf. Google* Action Dkt. 137 at 2) is facially untenable.  The subject matter of the Trusted Repository Patents is narrow and "inherently limited to the sphere of application rather than abstraction." *Rockstar Consortium US LP, Inc. v. Samsung Elecs. Co., Ltd.*, 2014 U.S. Dist. LEXIS 67097, at *15 (E.D. Tex. May 15, 2014) (Gilstrap, J.).  That is, the inventions are limited devices that maintain physical, communications, and behavioral integrity, rather than *all* devices that are capable to receive content via the Internet.  Put differently, while these patents teach a cornerstone of modern DRM, Google and Motorola are certainly free *not* to use DRM or the Trusted Repository Patents.  Google and Motorola are free to build their infringing devices and content-distribution systems using general-purpose processors and software that do not implement the patents' teachings concerning physical, communications, and behavioral integrity.[11]  As such, the Trusted Repository Patents are not abstract.  *Rockstar Consortium US LP*, 2014 U.S. Dist. LEXIS 67097, at *16 (noting that limitations that "clearly articulate a process that is meaningfully limited" are not abstract).

---

[10] Google and Motorola assert that "the specification does not even require any particular *level or degree* of fidelity, reliability, and/or security for an element to count as a 'trusted system' or 'repository'," and note that Table 2 of the specification includes "repositories . . . with virtually no security whatsoever." *Google* Action Dkt. 137 at 13.  That is incorrect.  As the PTAB found during the recently-concluded *Inter Partes* reviews, this assertion is "directly contrary to the meaning of 'repository' as defined in the glossary. . . . The contrary evidence based on level '0' security shown in Table 2 is [thus] insufficient to outweigh the rest of the evidence including, in particular, the explicit definition provided in the glossary." Ex. 11 at 12.

[11] Indeed, the '556 Patent teaches a DRM solution that is quite different from those taught by the Stefik Trusted Repository Patents.  This further demonstrates the falsity of Google and Motorola's preemption arguments.

13

### 2.   The Trusted Repository Patents Teach Inventive Concepts.

Even if Google and Motorola were correct (and they are not) that the Trusted Repository Patents concern "abstract ideas," the limitations taught by the asserted claims are inventive and involve meaningful limitations that cover much more than "well-understood, routine, [or] conventional activity."  *See Mayo Collaborative Servs.*, 132 S. Ct. at 1298.

*First*, the three integrities required to implement a "trusted repository" are not merely the routine or conventional use of a general-purpose computer.  "Prevent[ing] access to content by a non-trusted system," so as to implement "physical integrity," is no routine business activity, and Google and Motorola have not proven otherwise.  Nor is ensuring that the recipient computing device implements "communications integrity" by "only communicat[ing] with other devices that are able to present proof that they are trusted systems, for example, by using security measures such as encryption, exchange of digital certificates, and nonces."[12]   Finally, implementing "behavioral integrity" by "requiring software that is to be installed in the repository to include a digital certificate, in other words, an assurance that the software comes from a source known to the repository" is also not a routine, conventional business activity.  To the contrary, individually and in combination, the requirement that these integrities be implemented are precisely the type of "inventive concept" that can render an otherwise "abstract idea" patentable.  *See DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *31 (holding that claims that do not "recite a commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and

---

[12] Google and Motorola argue that the patents teach the use of "various well-known and basic methods."  *Google* Action Dkt. 137 at 13.  This assertion is beside the point.  "On a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions."  *DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *28 n.5 (citing *Parks v. Booth*, 102 U.S. 96, 102 (1880) ("Modern inventions very often consist merely of a new combination of old elements or devices, whether nothing is or can be claimed except the new combination.")).

conventional network operations, such as the claims in *Alice*, *Ultramercial*, *buySAFE*, *Accenture*, and *Bancorp* . . . [are] patent-eligible under § 101").

*Second*, there is no evidence in the record that the "trusted repository" inventions taught by the Stefik patents are a feat of "routine," "prosaic" engineering, such that they are devoid of an "inventive" concept.[13]  *See DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *30 (holding that a patent "that overrides the routine" does not run afoul of *Alice Corp.*); *Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1302 (Fed. Cir. 2010).   To the contrary, all the evidence in the record compels the opposite conclusion: that Stefik's Trusted Repository Patents are one of the seminal "development[s] that catalyzed the DRM paradigm" (Ex. 6) and a novel technical solution to a problem previously thought to be "immense" and "unsolved" (Ex. 3).   Indeed, experts in library technologies have noted that "trusted systems" are "sophisticated technology" and, as of 2003, *i.e.*, nearly 10 years after Stefik and his colleagues conceived the Trusted Repository Patents, the "development of trusted systems [was still] occupying the attention of computer scientists."  Ex. 13.

*Third*, the inventiveness of the "trusted" repository concepts taught by the Trusted Repository Patents is underscored by the PTAB's recent decisions reaffirming the validity of four of these patents.  As noted, the '859, '576, '072, and '160 Patents were recently challenged before the PTAB in *Inter Partes* reviews.  Ex. 9.  The PTAB, however, reaffirmed the validity of each and every claim of the '859, '576, and '072 Patents, and altogether refused to institute a review of the asserted claims of the '160 Patent.  The principal basis for the PTAB's decisions was its conclusion that the challenger's asserted prior art did not disclose Stefik's "repository"

---

[13]  In cases involving inventorship disputes, the Federal Circuit has made it clear that the threshold for "inventiveness" is satisfied when, among other things, an inventor makes a contribution that is "not insignificant in quality" and goes beyond "well-known concepts and/or the current state of the art."  *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998).  The Federal Circuit has also made clear that the threshold of "inventiveness" is not very high.  *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012) ("Often the inventive contribution lies in defining the problem in a new revelatory way.").

limitations—a limitation that is present in all asserted claims.  Ex. 11.  If Google and Motorola were correct that a "repository" is nothing more than a general-purpose computer that implements an abstract idea, the PTAB would not have affirmed the '859, '576, and '072 Patents' validity or declined to institute a review of the asserted claims of the '160 Patent.  Given the PTAB's long track record of invalidating patents, it would defy logic to conclude otherwise. The PTAB's decision to firmly go against the tide in the case of the Stefik Trusted Repository Patents is dispositive of Google and Motorola's arguments here.

*Fourth*, the "inventiveness" of the "trusted" system limitation taught by the Stefik patents is reinforced by the numerous "objective indicia of non-obviousness" that exist here.[14]  The Stefik Trusted Repository Patents are no ordinary patents.  They rest upon "pioneering" work that has received numerous accolades.  Ex. 7.  They were conceived in the face of enormous skepticism and solved what leading commentators considered an "immense, unsolved conundrum."  Ex. 3, 5.  "Trusted" systems are now firmly considered a "core technolog[y] that underlie[s] . . . technological protection systems" (Ex. 7), and Stefik is "acknowledged [as the] father of DRM" (Ex. 1).  Stefik's Trusted Repository Patents have been praised as disclosing fundamental technology "*necessary* to make the digital delivery of music, movies and other files secure."  Ex. 8 (emphasis added).  Indeed, the fundamental nature of the Trusted Repository Patents prompted the EU antitrust authorities to threaten legal action against Microsoft out of concern that it could use the patents to become a monopolist in the market for DRM technologies.  Ex. 2.  ContentGuard has successfully licensed the Stefik Trusted Repository Patents, for substantial consideration, to scores of companies.  Dkt. 244 ¶ 39.  Finally, Stefik's

---

[14] ContentGuard does not mean to suggest that it would be appropriate for the Court to conduct a validity analysis in the context of this motion, let alone that the presence or absence of objective indicia of non-obviousness should be a litmus test for determining patent eligibility.  However, as Federal Circuit Judge Jimmy Reyna recently noted, "courts handling patent infringement matters [should] treat evidence corresponding to the factors identified in *Graham* as strong, if not the best, evidence of innovation—i.e., the manner in which the industry and the marketplace responded to the disclosure in a patent."  *Apple Inc. v. ITC*, 725 F.3d 1356, 1375 (Fed. Cir. 2013) (Reyna, J., concurring in part and dissenting in part).

vision concerning the role "trusted" systems must play in the distribution of digital content over the internet is one of the seminal "development[s] that catalyzed the DRM paradigm" (Ex. 6) and created an entirely new industry that has benefitted Google, Motorola, and their co-Defendants to the tune of billions of dollars.

*Fifth*, even if the "repository"/"trusted" system limitation taught by the Trusted Repository Patents were not inventive by itself (and it plainly is), Google and Motorola's motion still fails because Google and Motorola have not demonstrated that the patents are devoid of inventiveness "as an ordered combination" when considered alongside other limitations recited by the claims. *Cal. Institute of Tech.*, 2014 U.S. Dist. LEXIS 156763, *10. "When viewing claim elements as an ordered combination, the court should not ignore the presence of *any* element, even if the element, viewed separately, is abstract. If the ordered combination of elements constitutes conventional activity, the claim is not patentable, but courts should remember that a series of conventional elements may together form an unconventional, patentable combination." *Cal. Institute of Tech.*, 2014 U.S. Dist. LEXIS 156763, *10-11; *see also DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *28 n.5 ("[o]n a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions.") (citations omitted). While they attempt to dissect the claims element by element, Google and Motorola never address the entire "ordered combinations" taught by the Trusted Repository Patents. Nor do Google and Motorola prove that, as a matter of law, those "ordered combinations" are not eligible for patent protection.

**B.    The Meta-rights Patents Are Eligible for Patent Protection.**

**1.    The Meta-rights Patents Do Not Disclose "Abstract Ideas."**

The crux of Google's patent ineligibility attacks with respect to the Meta-rights Patents is the assertion that both patents recite merely "the idea of using 'meta-rights' associated with content to generate downstream rights to the content for consumers," and that "[t]his idea can

17

[allegedly] be implemented using written agreements and traditional mail." *Google* Action Dkt. 137 at 26, 28. Google is mistaken for several reasons.

*First*, contrary to Google's contention, these patents teach much more than "the idea of using 'meta-rights'." *Cf. id.* at 26. The patents in fact claim "meta-rights" that are "*enforceable by a repository.*" *See Amazon* Action Dkt. 244-05 ('280 Patent) claim 1; Dkt. 255-06 ('053 Patent) claim 1 (emphasis added). To quote Apple's own counsel, who spoke on behalf of all Defendants during the *Markman* hearing,[15] "that is very important" because within the context of the actual claims "a meta-right" is "*not something that is abstract or generalized*, but [rather something that] is used by a repository." Ex. 15 at 125:6-10 (emphasis added). Defendants' unambiguous admission that "meta-rights" that are "used by a repository" are "*not something that is abstract or generalized*" dooms Google's motion.[16]

*Second*, Google's suggestion that the inventions taught by the '280 and '053 Patents can be "implemented using written agreements and traditional mail" (*cf. Google* Action Dkt. 137 at 26, 28) is demonstrably false, and fails for the same reason as Google's flawed "library" analogy discussed above. *See supra* 9-13. Interactions undertaken via "written agreements and traditional mail" simply lack the three integrities required by a trusted "repository," and Google

---

[15] Counsel for Google did not disavow these statements during the hearing, nor did counsel give any indication that counsel for Apple was not authorized to speak on behalf of the entire defense group. Moreover, counsel for Apple spoke in response to the Court's request to "hear from the Defendants." Ex. 15 at 124:17-21.

[16] Google states that, during the prosecution of the '280 and '053 Patents, the PTO Examiner issued a summary rejection of the claims under Section 101, and that the "patentee amended [the] claims to indicate that the limitations were performed 'by a processor.'" *Google* Action Dkt. 137 at 26 (citing *Google* Action Dkt. 137-14). This is *blatantly untrue*, and yet another instance where Google is attempting to mislead the Court, as it did during the *Markman* hearing when asserting that the originally-filed application that provides priority for all the Trusted Repository Patents did not teach the "association" between usage rights and content. *See* Ex. 15 at 69:10-24, 74:15-24. In fact, the term "processor" does not appear anywhere in the claims of the '280 and '053 Patents or the prosecution excerpt Google cites. The actual limitation the patentee added in the excerpt from the prosecution history cited by Google is the *very limitation* counsel for Apple indicated renders "meta-rights" "*not something that is abstract or generalized*"—the requirement that meta-rights by "enforceable *by a repository.*"

18

fails to show otherwise.  Moreover, the Meta-rights Patents specifically disclose and claim "state variable" elements that are used to track and control the exercise of created rights, further removing these patents from the realm of patent-ineligible ideas.  At bottom, the mode of analysis proposed by Google is "unhelpful for computer inventions.  Many inventions could be theorized with pencil and paper, but pencil and paper can rarely produce the actual effect of the invention.  Likewise, with regard to software, a human could spend months or years writing on paper the 1s and 0s comprising a computer program and applying the same algorithms as the program.  At the end of the effort, he would be left with a lot of paper that obviously would not produce the same result as the software." *Cal. Inst. of Tech.*, 2014 U.S. Dist. LEXIS 156763, at *49.

*Third*, Google raises no credible preemption arguments with respect to the Meta-rights Patents, nor could it.  Like the Stefik Trusted Repository Patents, the Meta-rights Patents are "inherently limited to the sphere of application rather than abstraction." *Rockstar Consortium US LP*, 2014 U.S. Dist. LEXIS 67097, at *15.  That is, the inventions are limited to the use of "meta-rights" enforceable by devices that maintain physical, communications, and behavioral integrity, rather than *all* devices that are capable of receiving content via the Internet.  Further, the meta-rights contemplated by the '280 and '053 Patents are limited to "rights that one has to generate, manipulate, modify, dispose of or otherwise derive other rights" *but* without resulting in "actions to content." *Amazon* Action Dkt. 244-05 ('280 Patent) at col. 5:45-47, 7:26-31.

## 2.  The Meta-rights Patents Teach Inventive Concepts.

Even if Google were correct (and it is not) that the Meta-rights Patents concern "abstract ideas," the asserted claims teach inventive, meaningful limitations that cover much more than "well-understood, routine, [or] conventional activity." *See Mayo Collaborative Servs.*, 132 S. Ct. at 1298.

The combination of, among other things, "meta-rights," trusted "repositor[ies]," and "state variable[s]" taught by the claims is precisely the type of "inventive concept" that can

19

render an otherwise "abstract idea" patentable. *See DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *31 (holding that claims that do not "recite a commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operations, such as the claims in *Alice*, *Ultramercial*, *buySAFE*, *Accenture*, and *Bancorp* . . . [are] patent-eligible under § 101"). There is no evidence in the record that the combination of "meta-rights," trusted "repositor[ies]," and "state variable[s]" are a feat of "routine," "prosaic" engineering, such that they are devoid of an "inventive" concept, and Google does nothing to prove that the claims are ineligible for patent protection "as an ordered combination." *Cal. Institute of Tech.*, 2014 U.S. Dist. LEXIS 156763, *10. While Google asserts—without support—that there is nothing "inventive" about any element recited by the claims, "courts should remember that a series of conventional elements may together form an unconventional, patentable combination." *Cal. Institute of Tech.*, 2014 U.S. Dist. LEXIS 156763, *10-11; *see also DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *28 n.5 ("[o]n a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions.") (citations omitted).

### C.    The Transaction Tracking Patent Is Eligible for Patent Protection.

#### 1.  The Transaction Tracking Patent Does Not Disclose "Abstract Ideas."

Google's attacks with respect to the Transaction Tracking Patent are also unpersuasive.

*First*, Google's arguments rest upon an analogy that just doesn't work. We reproduce below the relevant portions of the chart Google presents in its motion (*see Google* Action Dkt. 137 at 7-8), with emphases that will reveal the flaws in Google's reasoning:

| Claim Element | Alleged Corresponding Action |
| --- | --- |
| [f] in response to the request for the digital asset, creating, by at least one of the one or | The library checkout card (that goes into the folder) may contain various types of |

20

| Claim Element | Alleged Corresponding Action |
|---|---|
| more computing devices, *a second instance of the digital asset for transfer to the user device*, the second instance of the digital asset including content and at least one other portion, *and embedding in the at least one other portion of the second instance of the digital asset at least a customer identification associated with the user and the asset identifier, wherein other instances of the digital asset have customer identifications embedded therein and the customer identifications are used to track instances of the digital asset.* | information, but will contain at least the book's title, author, and card catalogue number (asset identifier).  The name of the borrower will be added to the checkout card (customer identification) and will be recorded by the librarian.  *A second copy of the book may be loaned to a second patron*, *and that patron's name will be recorded on the checkout card included in the instance of the book.*<br><br>*The customers' names on the checkout card can be used to track that copy of the book. Anyone finding the book can use the name written on the checkout card to return the book to the correct borrower* (or to identify the names of the persons who have borrowed the book in the past).  And the library can track the customer/borrower identification to notify that person if the book is overdue or if similar books might be available. |

The notion that what Google writes on the right column meaningfully resembles the teachings of the *actual* limitations of the Transaction Tracking Patent reproduced on the left is facially untenable.  In particular, in Google's analogy:  (1) there is no "second instance of the digital asset"—instead the library provides copy 1 to patron 1 and copy 2 to patron 2; (2) the books do not travel with the patrons' information—they travel with the information of the checkout cards, and it is the checkout cards (which remain with the library) that contain the

patrons' information; (3) there is no embedding of information concerning the work and the patron *in the book*—instead, the patron's information is recorded in the checkout card that remains with the library; and (4) there is no "tracking" of any kind of the "second instance of the digital asset"—instead Google's analogy contemplates the "finding" of the book, presumably because it was misplaced.  Thus, it is simply disingenuous for Google to pretend that the elegant technology-based solution offered by the Transaction Tracking Patent is in anyway equivalent to a practice that is cumbersome and revolves around library checkout cards.   As it did in *SimpleAir, Inc.*, Google completely overlooks "the various physical components recited by the claims . . . [and its] analogy to conventional periodical publication delivery still fails because it does not account for each step of the claimed method. . . .  [Google]'s generalized arguments, not directed to the specific language of the challenged claims, are insufficient to show that the claims more likely than not are directed to a patent-ineligible abstract idea." *SimpleAir, Inc.*, Ex. 14 at 16.

*Second*, Google's arguments rest upon the same flawed reasoning discussed *supra* (at pp. 10-12) that equates manually-implemented techniques that lack any meaningful accountability with computer-implemented enforcement mechanisms that *actually work*.  In the library setting, checkout cards are used for maintaining records of transactions involving two parties—the library and the patron.  If the patron walks out of the library and hands off the book to someone else, the checkout card will not reflect this unauthorized transaction and the library will have no means of "tracking" it.   Nor will the library checkout card reflect that the unauthorized user copied the book, defaced it, etc.  Again, Google's analogy to conventional practices simply does not hold water.

*Third*, in a recent case involving a patent claiming subject matter very similar to the '556 Patent, the PTAB rejected the very type of arguments Google is pressing here.  *PNC Bank v. Secure Access, LLC*, Case CBM2014-00100 (U.S. Patent Trial & Appeal Board, Sept 9, 2014), attached hereto as Ex. 16.  The representative claims at issue in *PNC Bank* read as follows:

22

1.      A method comprising:

transforming, at an authentication host computer, received data *by inserting an authenticity key* to create formatted data; and

returning, from the authentication host computer, the formatted data to enable the authenticity key to be retrieved from the formatted data and to locate a preferences file,

wherein the authenticity stamp is retrieved from the preferences file.

29.      An authentication system comprising:

an authentication processor configured to send formatted data *having an authenticity key to a client*, wherein the authenticity key enables location of a preferences file, and wherein the authenticity stamp is retrieved from the preferences file.

*PNC Bank*, Ex. 16 at 5 (emphasis added).

Just like Google before this Court, the *PNC Bank* challenger argued that "the claims are unpatenable under § 101, because the claims are drawn to patent-ineligible 'abstract ideas, with only insignificant, well-known subject matter added.'"   *Id.* at 20.   The PTAB rejected those arguments.   It wrote:

Claim 1, as a whole, relates to a computer-implemented method *to transform data in a particular manner—by inserting an authenticity key to create formatted data, enabling a particular type of computer file to be located and from which an authenticity stamp is retrieved.*   On its face, *there is nothing immediately apparent about these physical steps that would indicate the claim is directed to an abstract idea. . . .*

Petitioner asserts that claim 1 is an abstract idea, because it is nothing more than computerizing a purported centuries old practice of placing a trusted stamp or seal on a document to indicate the authenticity of the document. . . . Petitioner's position is unpersuasive, because as indicated by Patent Owner . . ., Petitioner does not tie adequately the claim language to the purported abstract concept of placing a trusted stamp or seal on a document. *Although the claim recites retrieving an authenticity stamp, the claim does not recite placing the stamp, much less doing so on a paper document, presumably as "centuries-old" practices have done.   Similarly, the claim does not recite a paper document.* Moreover, claim 2, which depends from claim 1, additionally recites that the formatted data is a web page, not a paper document. . . .

23

> We also find that Petitioner does not provide sufficient persuasive evidentiary support that the *placing of a trusted stamp or seal on a document is "a fundamental economic practice" or a "building block of the modern economy."* *See Alice*, 134 S. Ct. at 2356 (citing various references concerning the concept of intermediated settlement, including an 1896 reference).

*PNC Bank*, Ex. 16 at 20-21 (emphasis added).  The PTAB further found Secure Access's patent eligible under Section 101 because "the claims require *a fundamental change to the data; a change that cannot be performed in the human mind*."  *Id.* at 22.  The PTAB's reasoning applies with equal force here.  The solutions claimed in the Transaction Tracking Patent require (1) physical steps—the *physical* insertion of unique *physical* identifications in *physical* digital assets; (2) the claims are expressly limited to "digital assets" rather than paper documents, and thus Google's analogy to longstanding library practices involving paper books is inapposite; (3) inserting unique identifications into specific portions of digital assets is decidedly not a fundamental economic practice or a building block of modern economy; and (4) the invention results in a "fundamental change" to the format of the digital assets.

*Fourth*, Google raises no preemption arguments with respect to the Transaction Tracking Patent, nor could it.  The patent claims a very specific method of distributing digital content—it does not stake a claim to "the entire abstract idea of imposing and enforcing usage rights and restrictions on digital content would be monopolized."  *Cf.  Google* Action Dkt. 137 at 2.  In fact, contrary to Google's assertions, the Transaction Tracking Patent has *nothing* to do with "imposing and enforcing usage rights" and ContentGuard has asserted this patent with respect only to a portion of Google's music distribution systems.  Furthermore, like the eight other patents-in-suit, the Transaction Tracking Patent is "inherently limited to the sphere of application rather than abstraction."  *Rockstar Consortium US LP*, 2014 U.S. Dist. LEXIS 67097, at *15.[17]

---

[17] Google notes that during the prosecution of the '556 Patent, the examiner issued a cursory rejection based on Section 101.  This observation is not relevant here, nor is it a substitute for analysis.

## 2. The Transaction Tracking Patent Teaches Inventive Concepts.

Even if Google were correct (and it is not) that the Transaction Tracking Patent concerns "abstract ideas," the asserted claims teach inventive, meaningful limitations that cover much more than "well-understood, routine, [or] conventional activity." *See Mayo Collaborative Servs.*, 132 S. Ct. at 1298.

The numerous limitations of the asserted claims—storing assets, associating unique identifiers therewith, providing asset lists, creating second copies of the assets, inserting unique identifications associated with the assets and the purchaser in particular portions of the assets, detecting transfers, etc.—are precisely the type of "inventive concept" that can render an otherwise "abstract idea" patentable. *See DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *31. There is no evidence in the record that the combination of these elements are a feat of "routine," "prosaic" engineering, such that they are devoid of an "inventive" concept, and Google does nothing to prove that the claims are not eligible for patent protection "as an ordered combination." *Cal. Institute of Tech.*, 2014 U.S. Dist. LEXIS 156763, *10. Again, while Google asserts—without support—that there is nothing "inventive" about any element recited by the claims, "courts should remember that a series of conventional elements may together form an unconventional, patentable combination." *Cal. Institute of Tech.*, 2014 U.S. Dist. LEXIS 156763, *10-11; *see also DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *28 n.5 ("[o]n a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions.") (citations omitted).

\*　　\*　　\*

At bottom, because Google and Motorola's patent eligibility attacks are simply divorced from the actual teachings of the patents-in-suit, their motion for judgment on the pleadings fails.

## V. CONCLUSION

For the foregoing reasons, Google and Motorola's motion should be denied.

Dated:  February 25, 2015

Respectfully submitted,

_____
*/s/ Sam Baxter*
Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
MCKOOL SMITH P.C.
104 East Houston, Suite 300
Marshall, Texas 75670
Telephone:  (903) 923-9000
Facsimile: (903) 923-9099

Robert A. Cote
rcote@mckoolsmith.com
John C. Briody
jbriody@mckoolsmith.com
Radu A. Lelutiu
rlelutiu@mckoolsmith.com
Shahar Harel
sharel@mckoolsmith.com
David R. Dehoney
ddehoney@mckoolsmith.com
Dana E. Vallera
dvallera@mckoolsmith.com
Angela M. Vorpahl
avorpahl@mckoolsmith.com
MCKOOL SMITH P.C.
One Bryant Park, 47th Floor
New York, New York 10036
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

Holly E. Engelmann
hengelmann@mckoolsmith.com
Seth R. Hasenour
shasenour@mckoolsmith.com
Eric S. Hansen
ehansen@mckoolsmith.com
MCKOOL SMITH P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone:  (214) 978-4000
Facsimile:  (214) 978-4004

**ATTORNEYS FOR CONTENTGUARD HOLDINGS, INC.**

26

McKool 1078808v1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic services on this the 25th Day of February 2015.  Local Rule CV-5(a)(3)(A).

<em>/s/ Radu A. Lelutiu</em>                                    