# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| ContentGuard Holdings, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Amazon.com, Inc.; Apple Inc.; Blackberry Ltd.; Blackberry Corp.; HTC Corp.; HTC America, Inc.; Huawei Technologies Co., Ltd.; Huawei Device USA, Inc.; Motorola Mobility LLC, Samsung Electronics America, Inc.; and Samsung Telecommunications America, LLC, <br><br> Defendants. | CIVIL ACTION NO. 2:13-cv-1112-JRG <br> Jury Trial Demanded |

**DEFENDANT MOTOROLA MOBILITY LLC'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS DECLARING ALL PATENT CLAIMS ASSERTED AGAINST IT INVALID PURSUANT TO 35 U.S.C. § 101**

Each of the patents-in-suit claims the abstract ideas embodied in the age-old library loan transaction applied to digital, rather than paper, content. In place of librarians and patrons, the Stefik patent claims use "repositories" and "trusted" recipients with three "integrities"—physical (physical security measures), communications (steps to assure that content is given to users whose identity is verified, as with showing a valid library card), and behavioral (only lending to users under restrictions, *e.g.*, a limited time to borrow materials). Though ContentGuard urges that its patent claims are "concrete" and "technology-based," (Opp. at 12), the claims make clear that the "technology" is simply conventional computer functionality and hardware—memory to store content and instructions, processors to execute instructions, basic encryption and authentication techniques for security. As this Court has made clear, "recit[ing] only generic computer components configured to perform otherwise conventional steps" does not convert claims covering abstract ideas into patentable subject matter. *Clear with Computers LLC v. Altec Indus., Inc.*, No. 6:14-cv-79, Slip Op. at 7 (E.D. Tex. Mar. 3, 2015) (rejecting similar claims under § 101).

## DISCUSSION

ContentGuard attempts to deflect a Section 101 analysis in two ways. First, the majority of its brief extols the alleged general novelty and non-obviousness of its patents collectively, as well as digital rights management (DRM) technology in general, *e.g.,* citing to licensing (Opp. at 7), and articles on the general importance of DRM (*id.* at 4, 16.) None of this is relevant. *Diamond v. Diehr*, 450 U.S. 175, 190 (1981) (§ 101 inquiry is distinct from other conditions of patentability); *TLI Comms.*, No. 14-2534, 2015 WL 627858, at *9 (E.D. Va. Feb. 6, 2015) ("plaintiff's focus on novelty is misplaced; it conflates whether a patent is directed to eligible subject matter under § 101 with whether a patent meets § 102's novelty requirement"); *Money Suite Co. v. 21st Century Ins.*, No. 13-1748, 2015 WL 436160, at *3 (D. Del. Jan. 27, 2015) (argument that claim elements not in prior art "sound[s] in § 102 novelty [and] is beside the point for a § 101 inquiry"). Second, ContentGuard never addresses *any* of the particular claims at issue, instead referring to each patent family (and all of the asserted claims and elements therein)

as one undifferentiated group. The Section 101 analysis, however, requires an element-by-element analysis, as performed by Motorola's motion[1]. *Alice*, 134 S. Ct. at 2355 n.3, 2359. ContentGuard's conclusory assertions that the asserted claims are "technology-based" (Opp. at 12) and "pioneering" (*id.* at 16) neither diminishes the impermissible breadth of those claims not establishes how any claim elements "'transform the nature of the claim' into a patent eligible application." *Clear*, Slip Op. at 6 (quoting *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014), and *Mayo Collab. Servs. v. Prometheus Labs.*, 132 S. Ct. 1289, 1297-98 (2012)).

I.     **The Dunkeld Patent**

   A.     **Representative Claim 1 is Drawn to an Abstract Idea**

Each step of the method of representative Claim 1 of the '556 patent is part of the abstract idea of marking an object with identifying information so that the object can be tracked, as illustrated by the library check-out analogy detailed in Motorola's Motion. (Mot. at 7-8.)

ContentGuard argues that Motorola's hypothetical fails to include every element of Claim 1[f], an argument with no merit.[2] (Opp. at 21.) First, the claim term "second instance of the digital asset" simply refers to a copy of the asset (such as a book), and an analogue exists in the hypothetical where the library holds multiple copies of a book. Second, though ContentGuard argues that identification information does not travel with a library book, the "customer identification" (name of patron) is "embedded" in a checked-out book (written on a card placed in the book), and travels with the book: as explained in Motorola's motion (and illustrated in Ex. 18 thereof), library books typically include a library check-out card holder attached to their inside cover. The library check-out card will remain in the holder even after

---

[1] ContentGuard accuses Motorola of wasting the Court's resources by "sitting on the sidelines" while Amazon's motion to dismiss was briefed. This is an unfair characterization. At the time Amazon filed its motion to dismiss, Motorola's motion to dismiss was already pending. Motorola regarded the Section 101 inquiry as most properly addressed with a Rule 12(c) motion brought at the close of pleadings. Yet, the pleadings remain open due to the pendency of the motion to dismiss. Once the Court scheduled argument on Amazon's motion (which addresses only a small subset of the claims addressed here), Motorola filed the instant motion to alert the Court to Motorola's position concerning Section 101 and to minimize waste of judicial resources. ContentGuard has not objected to the Court considering this Rule 12(c) motion.

[2] ContentGuard's reliance on a decision by the PTAB is misplaced. (Opp. at 22-24.) That decision found a claim not drawn to an abstract idea because the petitioner had not "tie[d] adequately the claim language to the purported abstract concept," (Opp. Ex. 16 at 20-21), a failure not present in Motorola's motion.

check-out, and will typically include a patron's name (the "customer identification") as well as other information such as the book title (the "asset identification"). (Ex. 18.) Finally, the library check-out card attached to a borrowed book permits that book to be tracked in exactly the same way as the "customer identification" of the '556 patent. ContentGuard criticizes the library hypothetical by arguing that a book would need to be misplaced and "found" for tracking to be performed (Opp. at 22); yet the *same* scenario is discussed in the Dunkeld specification: a digital asset is "uncovered" with "no appropriate tracking record," so that the embedded serial number (customer and asset IDs) is used to track the asset. (Ex. 1 at 16:11-28.)

ContentGuard's central argument is that the Dunkeld claims require use of computers, and computers are more efficient and reliable than humans. (Opp. at 22.) Yet human (manual) implementation of an abstract idea will almost always be less efficient and/or reliable than computer implementation of that same abstract idea, and it is well established that merely taking advantage of computers' speed and reliability advantages does not make a claim cover more than an abstract idea. That a claim *can* be performed manually is evidence that it is drawn to an abstract idea. *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 2014 WL 7272219, at *3 (Fed. Cir. Dec. 23, 2014); *Clear*, Slip Op. at 7 (considering whether steps of computer-based claims could be performed by humans); *Loyalty Conversion Sys. Corp. v. Am. Airlines*, No. 13-655, 2014 WL 4364848, at *9, 10 (E.D. Tex. Sept. 3, 2014) ("speed and convenience" of computer implementation doesn't make claim patentable); *Money Suite*, 2015 WL 436160, at *5 (that a computer can "handle volumes and complexity at levels impossible for humans" is inherent in use of computers and does not render claim patentable); *Certusview Techs. LLC v. S&N Locating Servs.*, No. 13-346, 2015 WL 269427, at *20 (E.D. Va. Jan. 21, 2015) (use of technology to reduce effect of human error does not make abstract idea patentable).[3]

Finally, ContentGuard's argument that the Dunkeld claims are sufficiently narrow to avoid preempting an abstract idea because they are "limited to digital assets rather than paper

---

[3] For example, no one would dispute that the concept of adding numbers is an abstract idea. That numbers can be added manually, without computers, demonstrates rather than refutes the abstract nature of the concept. That a computer can be programmed to add numbers faster and with fewer mistakes than a person does *not* render the computer-implemented process of addition patentable.

3

documents" is meritless. (Opp. at 24.) As stated by the Supreme Court in *Alice*, 134 S. Ct. at 2358, "[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the idea to a particular technological environment." *See also Content Extraction*, 2014 WL 7272219, at *4 (attempt to limit claim to include only use of a computer in a particular environment, and exclude hard copy documents, insufficient to render it patentable).[4]

**B.     There is No Inventive Element in the Dunkeld Claims.**

ContentGuard states that "the numerous limitations of the asserted claims [listing elements with an "etc."] are precisely the type of inventive concept that can render an otherwise abstract idea patentable," and that the combination of all claim elements is an inventive element. (Opp. at 25.) Yet ContentGuard offers no explanation of how or why this is true; ContentGuard does not even identify any specific element (or combination of elements) that it contends is inventive. Courts have squarely rejected such attempts to avoid identifying the inventive elements and evade explaining how the identified elements (or combination) are "inventive". *Open Text SA v. Box, Inc.*, No. 13-4910, 2015 WL 269036, at *5 (N.D. Cal. Jan. 20, 2015) (rejecting conclusory assertion that ordered combination of elements was inventive with "no reason to find that lumping these additional limitations together somehow creates a synergistic result that is more than the sum of its parts. All [patentee] does is assert in a brief that the Court should accept that unsupported argument as true. It offers nothing beyond the conclusory statement that it is the combination [that is inventive]."). In order for an ordered combination of components to be an inventive element, something "more" must result from the combination, such as improved functioning of the computer itself. *Alice*, 134 S. Ct. at 2359. The Dunkeld claims recite only generic computer implementation of the abstract idea. (Ex. 1 at 13:38-43, 16:3-7, 20:2-11.) *Certusview Techs.*, 2015 WL 269427, at *34 (ordered combination of claims

---

[4] ContentGuard confusingly argues the Dunkeld claims require "physical" steps, even though the assets being operated on are digital. (Opp. at 24.) Ultimately, this confusion is irrelevant, as courts, including this one, have made clear that merely using and/or changing digital data does not render an abstract idea claim patentable. *See, e.g., Clear with Computers*, Slip Op. at 7 (invalidating claims that required computer manipulation to combine pictures and text into single output); *Certusview Techs., LLC v. S&N Locating Servs. LLC*, No. 13-346, 2015 WL 269427, at *16 (E.D. Va. Jan. 21, 2015) (invalidating claim that attached information to digital file).

not inventive concept "because they merely recite the use of generic computer components configured to perform routine, conventional computer functions").

## II. The Stefik Patents

Although Section 101 analyses require reviewing each claim element of a representative claim for each patent, ContentGuard fails to distinguish between any of the five Stefik patents-in-suit or their claim elements, treating them only as a unified entity. Motorola will thus likewise address each argument as it is universally argued by ContentGuard, *and relies on its Motion for the required claim element-by-element analysis*. (Mot. at 11-23.)

### A. The Stefik Patents Are Drawn to Abstract Ideas.

Each Stefik patent claim is drawn to the computer implementation of abstract ideas, as shown by Motorola's hypotheticals. (Mot. at 11-23.)[5] *Content Extraction*, 2014 WL 7272219, at *3 (tying computer patent steps to analogous actions taken by humans shows claim is drawn to abstract idea); *Clear*, Slip Op. at 7. The three "integrities" required by the Stefik "repository" and "trusted" system elements, as shown in the hypotheticals, can be performed by humans. (Mot. at 11 n.5; *id.* at 11-23.) Physical integrity is established by locking a library's doors and by a patron's putting a book in a briefcase. Communications integrity is demonstrated, e.g., when the library requires the patron to present a valid library card before borrowing a book. Behavioral integrity is exhibited through the library's rules of use, and the patron's agreement to follow them, and when a library restricts use of materials to those with a valid library card. ContentGuard asserts that computer implementation of the integrities "is not the same" as implementation by humans, (Opp. at 9), yet never explains why this is so. ContentGuard cannot avoid the impact of Motorola's element-by-element analysis by conclusorily suggesting that computer implementation is different in some unspecified way. (Opp. at 16.)

ContentGuard's argument that computer-implementation can enforce the three types of integrities (security measures) more effectively than human enforcement fails for two basic reasons: First, that computers can perform the same tasks as humans more efficiently and/or

---

[5] Contrary to ContentGuard's mischaracterization, Motorola's motion identifies different abstract ideas covered by the different Stefik patents, which illustrate each element, not a single abstract idea for all.

reliably is inherent in the use of computers, and is not enough to render computer-implementation of an abstract idea patentable. Alice, 134 S. Ct. at 1357-58; Loyalty, 2014 WL 4364848, at *9, 10; Money Suite, 2015 WL 436160, at *5; Certusview, 2015 WL 269427, at *20 (use of technology to reduce effect of human error does not make abstract idea patentable).

Second, the Stefik claims are so broad that they cover *any* level of security for each of the three integrities, *whether or not* that security is more or less effective than human implementation in, *e.g.*, a library. The Stefik patents explain that security levels are variable and can range from "minimal security" (1 out of 10) to a "very high level of security" (10 out of 10), any of which is covered by the claims as long as *some minimal level* of security is present. (*See, e.g.,* Ex. 5 at 14:45-15:43.) Motorola's hypotheticals include some level of physical, communications, and behavioral "integrity," and thus illustrate the non-computer implementation of the claims.

The Stefik claims require only generic computer implementation of the abstract ideas; the claims do not require any specialized computer hardware. ContentGuard claims that "Stefik's . . . Patents teach" that "general-purpose computers have too many security holes." (Opp. at 12.) Reading this, one would expect to find this "teaching" in the Stefik patents, yet it does not exist. In fact, ContentGuard's support is an *anonymous* review of a book *not* written by the Stefik inventors, and not referring to the patents. (*Id.* at Ex. 6.) Moreover, this statement would be irrelevant even if true: that general purpose computers have "too many security holes" does not indicate that the asserted claims require specialized hardware or software or that general purpose computers cannot be used. To the contrary, the specifications actually instruct on the use of such generic devices. (*See, e.g.*, Ex. 5[6] at 50-55 ("Examples of a rendering system may be a computer system, a digital audio system, or a printer."); *id.* at 13:20-24, 29-31 (required hardware has only generic computer components: "a repository is comprised of a processing means 1200, storage system 1207, clock 1205 and external interface 1206. The processor means 1200 is comprised of a processor element 1201 and processor memory 1202….The processor element 1201 may be a

---

[6] As the Stefik specifications do not differ in any relevant way, the '859 patent is cited as representative.

microprocessor or other suitable computing component."); *id.* at 14:33-36 ("simple and inexpensive handheld repositories and network-based workstations may be suitable repositories, even though the measures and guarantees of security are modest").) That the claims are limited to computer implementation of the abstract ideas does not save them, as limiting a claim to a certain technological area is insufficient. *Alice*, 134 S. Ct. at 2358; *Buysafe, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014).[7]

### B.   There is No Inventive Element in the Stefik Claims.

ContentGuard identifies the "integrities required to implement a trusted repository"[8] as an inventive element, but these integrities (physical, behavioral and communications) are no more than abstract ideas themselves.[9] The computer-implementation of the "integrities" is purely conventional, and likewise lacks any inventive element.

First, "*physical integrity*" is the "integrity of the physical devices themselves." (*See, e.g.*, Ex. 5 at 11:62-63.) There is nothing technologically innovative about that. And while *some* level of physical integrity is required by the claims, no particular *method* or *type* of implementation of physical integrity, technological or otherwise, is required. (*See, e.g., id.* at 11:62-12:2.) Rather, any known physical integrity type or method will meet this claim requirement, and it thus cannot constitute an "inventive element." *Loyalty*, 2014 WL 4364848, at *11 (claims lack inventive element when they "do not provide any significant description of the particular means by which the various functions are performed [and] there is no disclosure of

---

[7] ContentGuard's argument regarding the import of computer implementation is circular: a patent directed to computer-implementation of an abstract idea is not patentable simply because it is "limited to the sphere" of computer-implementation. To claim otherwise ignores *Alice* and its progeny.
[8] To the extent the "repository" claim term relied on by ContentGuard has special meaning, that term is *not* present in two of the Stefik patents: the '956 patent and the '160 patent.
[9] ContentGuard argues that the Stefik patents' survival of IPR proceedings before the PTAB is relevant to this motion. (Opp. at 15-16.) That is false, not only because the PTAB did *not* consider any Section 101 issues in the IPRs, and because the proceedings were conducted prior to *Alice*, but because the PTAB <u>cannot consider unpatentable subject matter claims under Section 101 in an IPR proceeding</u>. Similarly, ContentGuard's invocation of inventorship and obviousness evidence is completely irrelevant to the question of patentable subject matter. (Opp. at 15-17.) *Clear*, Slip Op. at 11 (rejecting argument based on same patents' survival of prior invalidity challenges under Sections 102 and 103, as "the patent eligibility of these claims *under § 101* is an issue of first impression); *Diamond*, 450 U.S. at 190 (novelty and obviousness separate consideration from § 101 inquiry).

the precise method by which the computer performs these functions."); *Clear*, Slip Op. at 8-9.

Nor is "*communications integrity*" an inventive element. The claims only require *some* level of communications integrity, without any particular technological implementation. (*See, e.g.,* Ex. 5 at 12:21-33.) ContentGuard recognizes this lack of any specific technological teaching in its statement that communications integrity can be met "*for example*, by using security measures *such as* encryption, exchange of digital certificates, and nonces." (Opp. at 14 (emphasis added).) Each of these "examples" is a well-known computer functionality, *not* invented by the Stefik patent inventors, and ContentGuard does not argue otherwise. (*See, e.g.*, Ex. 5 at 25:65-26:3 ("Public key encryption is a well-known technique in the encryption arts."); *id*. at 27:43-48 (describing known use of nonces).) A patent claim is not patentable when the specification identifies specific methods of implementation (even when the disclosed method is inventive, which is not the case here), if the claim itself is broad enough to cover more than that specific inventive method of implementation. *See Loyalty*, 2014 WL 4364848, at *11.

Finally, "*behavioral integrity*" simply requires installed software to include a digital certificate (of no specific type) indicating a trusted source, computer functionality well known before the Stefik patents, which do not purport to have invented this functionality. Moreover, even the *combination* of the three integrities was conventional at the time of the alleged Stefik inventions, as shown in a prior art article by Tygar & Yee. (Ex. 13 at 124, 131, 145 (discussing communications integrity, *i.e.*, encryption; behavioral integrity, *i.e.*, exchange of digitally signed certificates; and physical integrity, *i.e.*, "physical shield" of hardware).)

ContentGuard concedes that the patents merely require use of "various well-known and basic methods," (Opp. at 14 n.12), but argue this is "beside the point." Rather, ContentGuard argues that the requirement that each of these three known functionalities be implemented together is itself the inventive element. (*Id*. at 14.) ContentGuard never explains why requiring some level of each of these types of security measures is an inventive concept that renders the claims drawn to more than the abstract ideas laid out by Motorola, particularly given that all three integrities are exhibited together in the library hypotheticals. (Mot. at 12 n.5.) *Certusview*,

8

2015 WL 269427, at *20 (that claim elements (or combination thereof) may be novel is not enough to constitute inventive concept). ContentGuard's conclusory statement that claims are inventive as "an ordered combination when considered alongside other limitations recited in the claims," (Opp. at 17), cannot carry the day, as ContentGuard does not disclose what the "other limitations" are, or how they combine to constitute an inventive element. *Open Text*, 2015 WL 269036, at *5 (conclusory claim that ordered combination of elements is inventive insufficient).

## CONCLUSION

For the forgoing reasons, as well as those discussed in the Motion, Motorola respectfully requests that its Motion for Judgment on the Pleadings be granted.

Respectfully submitted,

Dated: March 9, 2015   By: */s/ Robert Unikel*

Robert W. Unikel (admitted *pro hac vice*)
KAYE SCHOLER LLP
70 W. Madison St., Suite 4200
Chicago, IL 60602-4231
Telephone: (312) 583-2300
Facsimile: (312) 583-2360
Email: robert.unikel@kayescholer.com

J. Mark Mann
State Bar No. 12926150
Gregory Bake Thompson
State Bar No. 24242033
MANN TINDEL & THOMPSON
300 W. Main
Henderson, TX 75652
Telephone: (903) 657-8540
Facsimile: (903) 657-6003
Email: mark@themannfirm.com
blake@themannfirm.com

Michael J. Malecek
Timothy K. Chao (admitted *pro hac vice*)
KAYE SCHOLER LLP
3000 El Camino Real
2 Palo Alto Square, Suite 400
Palo Alto, CA 94306
Telephone: (650) 319-4500

Facsimile: (650) 319-4700
Email: michael.malecek@kayescholer.com
timothy.chao@kayescholer.com

*Attorneys for Motorola Mobility LLC*

## CERTIFICATE OF SERVICE

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served this 9th day of March, 2015, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

By /s/ *Robert Unikel*