**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| ContentGuard Holdings, Inc., <br><br> Plaintiff, <br><br> -against- <br><br> Google, Inc. <br><br> Defendant. | Civil Action No. 2:14-cv-00061-JRG <br><br> JURY TRIAL DEMANDED |
| ContentGuard Holdings, Inc., <br><br> Plaintiff, <br><br> -against- <br><br> Amazon.com, Inc., *et al*. <br><br> Defendants. | Civil Action No. 2:13-cv-01112-JRG <br><br> JURY TRIAL DEMANDED |

**PLAINTIFF CONTENTGUARD HOLDINGS, INC.'S SURREPLY IN FURTHER
RESPONSE TO GOOGLE, INC.'S AND MOTOROLA MOBILITY LLC'S MOTIONS
<u>FOR JUDGMENT ON THE PLEADINGS</u>**

Google and Motorola continue to urge that the patents-in-suit are nothing more than the digital-age version of a trip to a "library" or a "video store," and that while ContentGuard's inventions may be pioneering, that counts for nothing under 35 U.S.C. § 101 ("Section 101").[1] Google and Motorola are mistaken, and their copycat, wasteful motions are meritless.[2] Each of the patents-in-suit claims subject matter that is firmly eligible for patent protection and the "hypotheticals" Google and Motorola conjure up in their papers (*cf.* Dkt. 148 at 2, 5, 9) are on their face inapt and at odds with the patents' actual teachings.

A.  **The Trusted Repository Patents Are Eligible for Patent Protection.**

1.  **The Trusted Repository Patents Do Not Disclose "Abstract Ideas."**

Google and Motorola advance four arguments to support their assertion that the Trusted Repository Patents teach "abstract ideas." None withstands scrutiny.

*First*, Google and Motorola argue, as they did in their opening motion, that the Trusted Repository Patents teach abstract concepts because the "three 'integrities' required [by the claims] . . . can be performed by humans." *Google* Action Dkt. 148 at 5. Google and Motorola,

---

[1] In material respects, Google's and Motorola's Reply briefs are substantively identical. For the sake of simplicity we cite herein only to Google's Reply, *Google* Action Dkt. 148.

[2] Google and Motorola argue that it was appropriate for them to sit on the sidelines while Amazon's similar motion was being briefed because a "Section 101 inquiry [i]s most properly addressed with a Rule 12(c) motion brought at the close of the proceedings." Dkt. 148 at 2 n.1. Google and Motorola also argue that they filed their motions "[o]nce the Court scheduled argument on Amazon's motion . . . to minimize waste of judicial resources." *Id.* These assertions are not credible. If Google and Motorola had any genuine desire to preserve the Court's resources, they had many opportunities to tell the Court that they planned to file their own copycat motion—in mid-November 2014, after Amazon filed its motion (*see Amazon* Dkt. 298); in early December 2014, after ContentGuard and Amazon jointly requested a hearing on Amazon's motion (*see Amazon* Action Dkt. 315); or promptly after the Court issued its January 22 order setting a hearing on Amazon's motion (*see Amazon* Action Dkt. 372). Instead of taking any steps to alert the Court about their plan, Google and Motorola did nothing until February 3, 2015, some 36 hours before the Court heard argument on Amazon's motion. This course of conduct does not evidence any concern for the Court's limited resources, or those of ContentGuard. ContentGuard notes that in other litigations Google has not been shy about seeking declarations of patent ineligibility at the motion to dismiss stage. *See* Exhibit A attached hereto.

1

however, never care to describe how any activities "performed by humans" meaningfully resemble the teachings of the Trusted Repository Patents. They do not. As ContentGuard explained in the Response, (1) "locking a library's doors" and "putting a book in a briefcase" (*cf. Google* Action Dkt. 148 at 5) does not amount to "physical integrity" within the meaning of the patents—a brick wall is a very different thing from hardware and software that prevent access to untrusted systems; (2) "present[ing] a valid library card before borrowing a book" (*cf. Google* Action Dkt. 148 at 5) does not amount to "communications integrity" within the meaning of the patents—a picture ID is a very different thing from an encryption/decryption algorithm; and (3) "the library's rules of use, and the patron's agreement to follow them" (*cf. Google* Action Dkt. 148 at 5) do not and amount to "behavioral integrity" within the meaning of the patents—an unenforceable, honor code is a very different thing from software protocols "requiring [other] software to include a digital certificate in order to be installed in the repository" (*see Markman* Order at 21). Google and Motorola's arguments to the contrary are untenable, and merely repeating them in the face of evidence that irrefutably disproves them does not make them true. As the Patent Trial and Appeals Board held in *Google Inc. v. SimpleAir, Inc.*, concocting a far-fetched "analogy to conventional [practices] is no substitute for an analysis of how, or why, the claim language supports [the] assertion that the claims merely recite [an allegedly] abstract [conventional practice]." *See Google Inc. v. SimpleAir, Inc.*, Case CBM2014-00170, Slip op. at 15 (U.S. Patent Trial & Appeal Board, Jan. 22, 2015), *Google* Action Dkt. 137-14. "[A]ny claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed. [But a] court cannot go hunting for abstractions by ignoring the concrete, palpable, tangible limitations of the invention the patentee actually claims." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 1335, 1344 (Fed. Cir. 2013), *vacated sub nom.*, *WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014)).

      *Second*, Google and Motorola argue that the Trusted Repository Patents employ

"computer-implementation" merely to perform "human" activities "more effectively," and as such are not eligible for protection under Section 101. *Google* Action Dkt. 148 at 5. This too is blatantly untrue, and, as ContentGuard explained in the Response, gets the matter exactly backwards. Dr. Stefik and his colleagues saw past an abstract, unenforceable idea of "trust" that, while perhaps adequate in a bricks-and-mortar library, was unsuitable to protect the distribution of digital content over the Internet. Further, Dr. Stefik and his colleagues replaced that abstract notion of "trust" with a comprehensive, technology-based solution that solved what leading commentators coined as "the problem of digitized property." *Google* Action Dkt. 147-3. Thus, rather than "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet,"[3] the Trusted Repository Patents disclose precisely the type of technology-based solutions the Patent Act was designed to protect. Stated differently, Dr. Stefik's Trusted Repository Patents do not improve upon the state of the prior art in the way in which a computer improves over, say, an abacus. Rather, Dr. Stefik's Trusted Repository Patents effectuated one of the seminal "development[s] that catalyzed the DRM paradigm." *See Google* Action Dkt. 147-6 at 7. Using Dr. Stefik's inventions, an online digital content distributor (like iTunes or Google Play) can now *effectively prevent* the theft, unauthorized use, copying, or further distribution of content, *e.g.*, (i) a customer who has paid for the right to watch the content only once can be prevented from watching it again; (ii) a customer who has paid for the right to watch the content on a particular device (*e.g.*, a tablet) can be prevented from watching it on a different device (*e.g.*, a high-definition TV); (iii) a customer who has paid for the right to watch the content for 24 hours can be prevented from watching it upon the expiry of the specified rental period, and so on and so forth. All of these "usage rights" restrictions are *enabled* and *effectively enforced* using the technology-based teachings of Stefik's Trusted Repository Patents. In contrast, however, none

---

[3] *DDR Holdings, LLC v. Hotels.com, L.P.*, 2014 U.S. App. LEXIS 22902, *26 (Fed. Cir. Dec. 5, 2014).

can be accomplished—indeed, *none even existed*—in the library setting.

*Third*, Google and Motorola assert that "the claims are so broad that the cover *any* level of security for each of the integrities, *whether or not* that security is more or less effective than human implementation in, *e.g.*, a library." *Google* Action Dkt. 148 at 6.  Here too, Google and Motorola are just not being straight with the Court.  As ContentGuard explained in the Response, the PTAB rejected this very argument during the recently-concluded *Inter Partes* reviews, finding that it is "directly contrary to the meaning of 'repository' as defined in the glossary. . . . The contrary evidence based on level '0' security shown in Table 2 is [thus] insufficient to outweigh the rest of the evidence including, in particular, the explicit definition provided in the glossary." *Google* Action Dkt. 147-11 at 12.  Google and Motorola never address the PTAB's findings in their Reply, and that is telling.

*Fourth*, Google and Motorola assert that Dr. Stefik's patents require nothing more than a "generic computer implementation," and mock ContentGuard's contrary evidence because it purportedly consists of "an *anonymous* review of a book." *Google* Action Dkt. 148 at 6.  This too is false.  ContentGuard did not cite "an anonymous review of a book" to support the proposition that Dr. Stefik's patents teach that "trusted systems . . . [are] the only feasible way to implement digital rights management *because general-purpose computers* have too many security holes." *See Google* Action Dkt. 147-6 at 7 (emphasis added).  The source for the quoted statement is the preface of *Digital Rights Management: Business and Technology*, a well-known reference book that was published by John Wiley & Sons in 2001.  This is apparent from the face of the document ContentGuard attached to its Response, which includes an actual picture of the book. *Google* Action Dkt. 147-6 at 1.  Perhaps more importantly, there is nothing in the record to support Google and Motorola's assertion that a "generic computer," without any special programing or hardware, displays the three integrities required by the claims.  True, as Google and Motorola are quick to point out, Dr. Stefik's patents note that the inventions taught therein may be implemented on "computers." *See Google* Action Dkt. 147 at 6-7.  But *improving* a

4

generic computer to make it more secure and thereby suitable to distribute and receive valuable digital content does not render a patentable invention void under Section 101.  Indeed, the opposite is true.  *DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *26.

### 2.  The Trusted Repository Patents Teach Inventive Concepts.

Google and Motorola's conclusory assertions that Dr. Stefik's patents are devoid of any inventive concept are similarly misguided.  As an initial matter, all that Google and Motorola are saying is that Dr. Stefik, like all inventors, drew upon a pre-existing body of knowledge.  That proves nothing.  "[A] claim element is not conventional just because it appears in prior art," and indeed, "[o]n a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions." *Cal. Institute of Tech. v. Hughes Commcn's Inc.*, 2014 U.S. Dist. LEXIS 156763, *10 (C.D. Cal. Nov. 3, 2014); *DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *28 n.5.  "[C]ourts should remember that a series of conventional elements may together form an unconventional, patentable combination." *Cal. Institute of Tech.*, 2014 U.S. Dist. LEXIS 156763, *11.[4]

Equally unpersuasive are Google and Motorola's attempts to discount the ample evidence of novelty and non-obviousness ContentGuard has proffered.  *See Google* Action Dkt. 147 at 1, 7 n.9.  Google and Motorola's motion expressly requires the Court to search for an "inventive concept," *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014), and the Federal Circuit has made clear that the type of evidence ContentGuard has proffered should be treated as "*strong, if not the best, evidence of innovation.*" *Apple Inc. v. ITC*, 725 F.3d 1356, 1375 (Fed. Cir. 2013) (Reyna, J., concurring in part and dissenting in part) (emphasis added).  While it is true that an otherwise abstract idea cannot be saved by arguments that it is "novel," the Court

---

[4] To be clear, ContentGuard does not mean to suggest that anything in Dr. Stefik's patents is in any way "conventional."

5

should not overlook evidence that establishes that Dr. Stefik's inventions are precisely the type of work the Patent Act was designed to protect.[5]

Finally, Google and Motorola cannot discount the PTAB's recent findings of validity with respect to the '859, '072, '576, and '160 patents. While it is true that that patentability under Section 101 was not an issue before the PTAB, that is beside the point. It stretches credulity to argue that the PTAB, an institution that has been immensely uncharitable to patent holders (*see Google* Action Dkt. 147-10), would have affirmed the *validity* of these patents if indeed they disclose nothing more than a computer-facilitated trip to the library.

### B. The Meta-rights Patents Are Eligible for Patent Protection.

#### 1. The Meta-rights Patents Do Not Disclose "Abstract Ideas."

Google presents no new arguments to support its assertions that the Meta-Rights are invalid under Section 101. It merely rehashes its opening brief, while ignoring and mischaracterizing ContentGuard's Response.

*First*, for all of Google's efforts to disown counsel for Apple's admission during the *Markman* hearing that "a meta-right" is "*not something that is abstract or generalized*, but [rather something that] is used by a repository" (*Google* Action Dkt. 147-15 at 125:6-10 (emphasis added)), that admission is dispositive. Whether or not Google is "bound by [the]

---

[5] As ContentGuard demonstrated in the Response, Dr. Stefik's patents are widely acknowledged as "pioneering." *Google* Action Dkt. 147-7. They were conceived in the face of enormous skepticism and solved what leading commentators considered an "immense, unsolved conundrum." *Google* Action Dkt. 147-3, 147-5. "Trusted" systems are now firmly considered a "core technolog[y] that underlie[s] . . . technological protection systems" (*Google* Action Dkt. 147-7), and Dr. Stefik is "acknowledged [as the] father of DRM" (*Google* Action Dkt. 147-1). Dr. Stefik's Trusted Repository Patents have been praised as disclosing fundamental technology "*necessary* to make the digital delivery of music, movies and other files secure." *Google* Action Dkt. 147-8 (emphasis added). Indeed, ContentGuard has successfully licensed the Trusted Repository Patents, for substantial consideration, to scores of companies. *Google* Action Dkt. 1 ¶ 31. Finally, Dr. Stefik's vision concerning the role "trusted" systems must play in the distribution of digital content over the Internet is one of the seminal "development[s] that catalyzed the DRM paradigm" (*Google* Action Dkt. 147-6) and created an entirely new industry that has benefitted Google, Motorola, and its co-Defendants to the tune of billions of dollars (*Google* Action Dkt. 147-4).

statement by Apple counsel" (*Google* Action Dkt. 148 at 9 n.11) is not the point.  The point is that what counsel said is accurate, and Google's attempts to split hairs in a footnote of the Reply do not pass muster.

*Second*, Google's suggestion that the inventions taught by the '280 and '053 Patents can be implemented by "clerk[s] maintaining a transaction log" and "generic devices" (*cf. Google* Action Dkt. 148 at 9-10) is demonstrably false.  Transaction logs and "generic devices" simply lack the three integrities required by a trusted "repository," and Google fails to show otherwise.

*Third*, while Google is correct that preemption is not a litmus test for a Section 101 analysis (*see Google* Action Dkt. 148 at 10), the *Alice* court itself "described the concern that drives th[e] exclusionary principle [of Section 101] as one of pre-emption."  *Alice Corp. Pty.*, 134 S. Ct. at 2354.  As such, even after *Alice*, the extent to which a claimed invention preempts or fails to preempt a particular field remains highly relevant to Section 101.  *See, e.g.*, *DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *31 (rejecting the appellant's Section 101 challenge because, among other things, "the claims at issue d[id] not attempt to preempt every application of the [allegedly abstract] idea").  The fact that Google has raised no preemption arguments with respect to the Meta-rights Patents is important, and underscores that the Meta-rights Patents are "inherently limited to the sphere of application rather than abstraction." *Rockstar Consortium US LP, Inc. v. Samsung Elecs. Co.*, *Ltd.*, 2014 U.S. Dist. LEXIS 67097, at *15 (E.D. Tex. May 15, 2014) (Gilstrap, J.).

### 2.  The Meta-rights Patents Teach Inventive Concepts.

Google's arguments that the Meta-rights Patents are devoid of any inventive concept merely repackage Google's incorrect assertion that these patents "claim only generic functionality."  *Google* Action Dkt. 148 at 10.  Again, the fact that a generic computer can be *configured through special software and/or hardware* to act as a trusted repository and enforce "meta-rights" does not mean that the Meta-Rights Patents claim *only* generic computer functionality.  Furthermore, Google's assertions that the combination of the various claim

7

limitations is not "inventive" (*id.*) are similarly unpersuasive. There is no evidence in the record that the combination of "meta-rights," trusted "repositor[ies]," and "state variable[s]" are a feat of "routine," "prosaic" engineering, such that they are devoid of an "inventive" concept, and thus Google has not proven that the claims are ineligible for patent protection "as an ordered combination." *Cal. Institute of Tech.*, 2014 U.S. Dist. LEXIS 156763, *10. Finally, Google's attempts to shift the burden to ContentGuard to disprove that the combination is *not* inventive ignore that Google, not ContentGuard, bears the burden of proof.

### C. The Transaction Tracking Patent Is Eligible for Patent Protection.

#### 1. The Transaction Tracking Patent Does Not Disclose "Abstract Ideas."

Google's attacks with respect to the Transaction Tracking Patent similarly fall flat.

*First*, Google's attempt to defend its library "hypothetical" is unpersuasive. Indeed, the analogy falls apart at step 1—the fact that a library holds "multiple copies of [the same] book" (*cf. Google* Action Dkt. 148 at 2) and will necessarily treat and track each copy as a separate asset is enough to render Google's analogy apples-to-oranges. Furthermore, Google is incorrect that the "'customer identification' (name of patron) is 'embedded' in a checked-out book (written on a card placed in the book), and travels with the book." *Cf. id.* In truth, in the library setting, the check-out card that lists the customer's name remains with the library.[6] Finally, in Google's "hypothetical" the library in no way "tracks" the whereabouts of the book once it leaves the library. At bottom, therefore, it is simply untenable for Google to argue that the elegant technology-based solution offered by the Transaction Tracking Patent is analogous to a library check-out system. As it did in *SimpleAir, Inc.*, Google completely overlooks "the various

---

[6] *See* Exhibit B attached hereto ("Before there were computers, libraries used a paper based system to keep track of borrowed books. . . . Each had a card—a 'record' within the database. The card was moved from the 'in library' section of the index to the 'borrowed' section of the index. The overdue ones were eventually placed in the 'overdue' section of the index. So the librarian knew where every book was located and who had them out on loan. The system worked well but it was very labor intensive as the paper cards had to be constantly re-indexed."). The blurry picture attached as Exhibit 18 to Google's motion says nothing about how the library check-out process actually worked.

McKool 1078808v1

physical components recited by the claims . . . [and its] analogy to conventional periodical publication delivery still fails because it does not account for each step of the claimed method. . . . [Google]'s generalized arguments, not directed to the specific language of the challenged claims, are insufficient to show that the claims more likely than not are directed to a patent-ineligible abstract idea." *SimpleAir, Inc.*, Slip op. at 16, *Google* Action Dkt. 137-14.

*Second*, Google never addresses the PTAB's recent *PNC Bank v. Secure Access, LLC* decision, which was prominently featured in ContentGuard's Response. *See Google* Action Dkt. 147 at 22-24 & Dkt. 147-16. For good reason: the claims at issue in *PNC Bank* are very similar to those of the Transaction Tracking Patent, and the PTAB rejected Section 101 arguments that are very similar to those made by Google here. The PTAB's reasoning in *PNC Bank* applies with equal force here. The solutions claimed in the Transaction Tracking Patent require (1) physical steps—the *physical* insertion of unique *physical* identifications in *physical* digital assets; (2) the claims are expressly limited to "digital assets" rather than paper documents, and thus Google's analogy to longstanding library practices involving paper books is inapposite; (3) inserting unique identifications into specific portions of digital assets is decidedly not a fundamental economic practice or a building block of modern economy; and (4) the invention results in a "fundamental change" to the format of the digital assets.

*Third*, Google's "no preemption" arguments are meritless for the reasons discussed *supra* at 7.

### 2. The Transaction Tracking Patent Teaches Inventive Concepts.

Google argues that no "inventive concept" is embodied in the Transaction Tracking Patent because "ContentGuard offers no explanation of how or why" the numerous limitations of the asserted claims amount to an "inventive concept." *Google* Action Dkt. 148 at 4. Google's attempt to shift the burden to ContentGuard should be rejected. Again, there is no evidence in the record that the combination of these elements is a feat of "routine," "prosaic" engineering, such that they are devoid of an "inventive" concept, and Google does nothing to prove that the

9

claims are ineligible for patent protection "as an ordered combination." *Cal. Institute of Tech.*, 2014 U.S. Dist. LEXIS 156763, *10. Again, while Google asserts—without support—that there is nothing "inventive" about any element recited by the claims, "courts should remember that a series of conventional elements may together form an unconventional, patentable combination." *Cal. Institute of Tech.*, 2014 U.S. Dist. LEXIS 156763, *10-11; *see also DDR Holdings, LLC*, 2014 U.S. App. LEXIS 22902, *28 n.5 ("[o]n a fundamental level, the creation of new compositions and products based on combining elements from different sources has long been a basis for patentable inventions.") (citations omitted).

*   *   *

For the foregoing reasons, Google and Motorola's motion should be denied.

Dated:  March 20, 2015                                         Respectfully submitted,

                                                  */s/ Sam Baxter*
                                                  Samuel F. Baxter
                                                  Texas State Bar No. 01938000
                                                  sbaxter@mckoolsmith.com
                                                  MCKOOL SMITH P.C.
                                                  104 East Houston, Suite 300
                                                  Marshall, Texas 75670
                                                  Telephone:  (903) 923-9000
                                                  Facsimile: (903) 923-9099

| Robert A. Cote | Holly E. Engelmann |
|---|---|
| rcote@mckoolsmith.com | hengelmann@mckoolsmith.com |
| John C. Briody | Seth R. Hasenour |
| jbriody@mckoolsmith.com | shasenour@mckoolsmith.com |
| Radu A. Lelutiu | Eric S. Hansen |
| rlelutiu@mckoolsmith.com | ehansen@mckoolsmith.com |
| David R. Dehoney | MCKOOL SMITH P.C. |
| ddehoney@mckoolsmith.com | 300 Crescent Court, Suite 1500 |
| Dana E. Vallera | Dallas, Texas 75201 |
| dvallera@mckoolsmith.com | Telephone:  (214) 978-4000 |
| Angela M. Vorpahl | Facsimile:   (214) 978-4004 |
| avorpahl@mckoolsmith.com | |
| MCKOOL SMITH P.C. | |
| One Bryant Park, 47th Floor | |
| New York, New York 10036 | |
| Telephone: (212) 402-9400 | |
| Facsimile: (212) 402-9444 | |

                                                  **ATTORNEYS FOR CONTENTGUARD HOLDINGS, INC.**

**CERTIFICATE OF SERVICE**

    The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic services on this the 20th Day of March 2015.  Local Rule CV-5(a)(3)(A).

                                                                          */s/ Radu A. Lelutiu*