**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| CONTENT GUARD HOLDINGS, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:13-CV-1112-JRG |
| | § | |
| AMAZON.COM, INC., et al., | § | |
| | § | |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Defendants Amazon.com, Inc. ("Amazon"), Blackberry Limited and Blackberry Corporation (collectively, "Blackberry"), HTC Corporation and HTC America, Inc. (collectively, "HTC"), Huawei Technologies Co., Ltd. and Huawei Device USA, Inc. (collectively, "Huawei"), Motorola Mobility LLC ("Motorola"), Samsung Electronics Co., Ltd., Samsung Electronics America, Inc. and Samsung Telecommunications America, LLC's (collectively, "Samsung") (collectively, the "Movants") Joint Motion to Transfer Venue to the Northern District of California (Dkt. No. 110); and ContentGuard's Supplemental Response to Motion to Transfer to the Northern District of California (Dkt. No. 184). Movants seek to transfer under 28 U.S.C § 1404(a) from the Eastern District of Texas ("EDTX") to the Northern District of California ("NDCA"). Having considered the parties' written submissions, the Court DENIES Movants' Motion for the reasons set forth below.

## APPLICABLE LAW

28 U.S.C § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district court or division where it might have been brought." 28 U.S.C. § 1404(a). However, a motion to transfer venue should only be granted upon a showing that the transferee venue is "clearly more

convenient" than the venue chosen by the plaintiff. *In re Nintendo Co.*, 589 F.3d 1194, 1197 (Fed. Cir. 2009); *In re Genentech, Inc.*, 566 F.3d 1388, 1342 (Fed. Cir. 2009); *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008); *In re Volkswagen of America, Inc. (Volkswagen II)*, 545 F.3d 304, 315 (5th Cir. 2008). District courts have "broad discretion in deciding whether to order a transfer." *Balawajder v. Scott*, 160 F.3d 1066, 1067 (5th Cir. 1998) (quoting *Caldwell v. Palmetto State Sav. Bank*, 811 F.2d 916, 919 (5th Cir. 1987)).

The first inquiry when analyzing a case's eligibility for § 1404(a) transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagen AG* (*Volkswagen I*), 371 F.3d 201, 203 (5th Cir. 2004). If the transferee district is a proper venue, then the Court must weigh the relative public and private factors of the current venue against the transferee venue. *Id.* In making such a convenience determination, the Court considers several private and public interest factors. *Id.* "Factors relating to the parties' private interests include '[1] relative ease of access to sources of proof; [2]] availability of compulsory process for attendance of unwilling, and [3]] the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and [4]] all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 581 n.6 (2013) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, n.6, (1981); *Nintendo*, 589 F.3d at 1198; *Genentech*, 566 F.3d at 1342; *TS Tech.*, 551 F.3d at 1319; *Volkswagen II*, 545 F.3d at 315. "Public-interest factors may include '[1] the administrative difficulties flowing from court congestion; [2]] the local interest in having localized controversies decided at home; [and] [3]] the interest in having the trial of a diversity case in a forum that is at home with the law.'" *Atl. Marine*, 134 S. Ct. at 581 n.6 (citing *Piper Aircraft*, 454 U.S. at 241 n.6); *Volkswagen I*, 371

F.3d at 203; *Nintendo*, 589 F.3d at 1198; *TS Tech*, 551 F.3d at 1319. Other public factors are: 4) the familiarity of the forum with the law that will govern the case; and 5) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *Volkswagen I*, 371 F.3d at 203; *Nintendo*, 589 F.3d at 1198; *TS Tech*, 551 F.3d at 1319. Although the private and public factors apply to most transfer cases, "they are not necessarily exhaustive or exclusive," and no single factor is dispositive. *Volkswagen II*, 545 F.3d at 314-15.

In the Fifth Circuit, the plaintiff's choice of venue has not been considered a separate factor in this analysis. *Volkswagen II*, 545 F.3d at 314-15. However, "[t]he Court must also give some weight to the plaintiffs' choice of forum." *Atl. Marine*, 134 S. Ct. at n.6 (citing *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955)). "Plaintiffs are ordinarily allowed to select whatever forum they consider most advantageous (consistent with jurisdictional and venue limitations), [and the Supreme Court has] termed their selection the 'plaintiff's venue privilege.'" *Atl. Marine*, 134 S. Ct. at 581 (citing *Van Dusen v. Barrack*, 376 U.S. 612, 635 (1964).) In the Fifth Circuit, the "venue privilege" has been seen as contributing to the defendant's burden in proving that the transferee venue is "clearly more convenient" than the transferor venue. *Volkswagen II*, 545 F.3d at 315; *Nintendo*, 589 F.3d at 1200; *TS Tech*, 551 F.3d at 1319.

"The idea behind § 1404(a) is that where a 'civil action' to vindicate a wrong—however brought in a court—presents issues and requires witnesses that make one District Court more convenient than another, the trial judge can, after findings, transfer the whole action to the more convenient court." *Van Dusen*, 376 U.S. at 622 (quoting *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960)). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting

*Van Dusen*, 376 U.S. at 622). Section 1404(a) requires this discretionary "individualized, case-by-case consideration of convenience and fairness." *Genentech* 566 F.3d at 1346 (quoting *Van Dusen*, 376 U.S. at 622).

## BACKGROUND

This suit is a suit concerning the infringement and validity of certain U.S. patents. Plaintiff ContentGuard was originally formed as a partnership between Xerox Corporation and Microsoft Corporation[1] to pursue digital rights management ("DRM") technology.[2] As part of its business, ContentGuard filed and obtained various patents, including the nine patents that it asserts in this action. The Defendants in this action—Amazon, Apple, Huawei, Motorola, HTC, and Samsung[3]—are well-known technology companies that, among their varied businesses, provide electronic hardware and software products. Generally in this suit, ContentGuard accuses DRM aspects of certain of Defendants' software applications ("apps") (e.g. iTunes, Amazon Kindle, Amazon Instant Video) and hardware and software components of infringing its patent claims.

---

[1] ContentGuard is now owned by Pendrell Technologies, LLC. (Dkt. No. 2.) ContentGuard's website suggests that may also be owned by Time Warner. *See* http://contentguard.com/company/ ("ContentGuard is owned by Pendrell Corporation and Time Warner") (last visited January 30, 2015).

[2] Broadly, DRM technology, which might also be thought of as "copy protection," seeks to control access (e.g. viewing, copying) to digital information, including media, such as music, movies, and software.

[3] BlackBerry Corporation (f/k/a Research In Motion Corporation), another technology company, was dismissed on January 21, 2015. Blackberry was a signatory to the pending motion. BlackBerry is a Delaware corporation with its principal place of business in Irving, Texas. Irving, Texas is located to the west of Richardson, Texas in Dallas County, which is in the Northern District of Texas. The Court's preliminary analysis of BlackBerry's facts in the briefing, strongly suggest that including BlackBerry in this analysis would weigh against transfer. As the Court otherwise finds that the evidence does not favor transfer, the Court does not undertake the full analysis of BlackBerry's facts and therefore excludes BlackBerry from its analysis.

**DECLARATIONS AND EXHIBITS**

**Huawei:**

Huawei provides a declaration by Mr. James Jiang of San Diego, California, Executive Vice President for Huawei Device USA. (Jiang Decl., Dkt. No. 110-17 ¶ 1.) Mr. Jiang's responsibilities have included marketing Huawei phones in the United States since December 2011. (*Id.* ¶ 3.) According to Mr. Jiang, Huawei Device USA's headquarters is in Plano, Texas, and Huawei's research and development of smartphones, to the extent it occurs in the U.S., is performed in either California or Washington. (*Id.* ¶ 5.) Mr. Jiang declares that Huawei employs one person in Washington who is involved in smartphone technology; fifty people in San Diego for the same purpose; and ten people in Cupertino, California who are responsible for sales and marketing. (*Id.*) Mr. Jiang declares that Huawei's documents are equally accessible in its Plano or California facilities. (*Id.* ¶ 6.) The Court observes that, in contrast to the information it provides for California and Washington, Huawei provides no substantive information about its headquarters beyond the fact that it is located in Plano, Texas.

ContentGuard asserts that Huawei's headquarters are in Plano, Texas; that this facility has "been fully responsible for the sales and marketing of Huawei smartphones in the United States since December 2011"; and that Huawei's headquarters employs significantly more employees in Plano (apparently over 600) than it does in California and Washington combined. (Resp. at 5; Dkt. No. 110-17.) ContentGuard asserts that Mr. Jiang regularly travels to Plano and argues that it is disingenuous for him to assert that he would be inconvenienced by traveling to Marshall. (Resp. at 5.) Movants' reply that "ContentGuard's insinuation, with no support, that Huawei could have a Plano-based employee testify rather than Mr. Jiang is pure speculation." (Mot. Reply at 4.)

ContentGuard also adds, citing to custodial information produced by Huawei, that

"ContentGuard has been able to determine the likely geographical locations of five of the Huawei Defendants' custodians, which are as follows: two in Plano, Texas; one in Southern California; one in Europe; and one in Asia." (Dkt. No. 138 at 2 (citing Donahue Decl. ¶¶ 6-7, Ex. 5-6, 11).)

**<u>Amazon</u>:**

Amazon provides a declaration by Mr. Kevin Keller, Associate General Counsel of Lab126, which is a wholly owned subsidiary of Amazon.com, Inc. (Keller Decl., Dkt. No. 124-1 ¶ 1.) Mr. Keller represents that Amazon is headquartered in Seattle, Washington and Lab126 is headquartered in Cupertino, California. (*Id.* ¶ 2.) According to Mr. Keller, the Kindle Fire product was developed at Lab126 (or under the supervision of employees at Lab126) and there are six specific witnesses at Lab126 who can testify about the Kindle Fire's development and implementation of DRM. (*Id.* ¶ 3.) Mr. Keller also declares that the Kindle app was developed in Seattle as are four specific likely witnesses who can testify about the Kindle app. (*Id.* ¶ 4.) Mr. Keller also declares that Amazon Instant Video was similarly developed in Seattle and that the implementation on the Amazon Fire was developed in both Seattle and at Lab126. (*Id.* ¶ 5.) Mr. Keller declares that the likely witnesses for Amazon Instant Video are the same specific Lab126 witnesses and four specific Seattle employees. Mr. Keller declares that "nearly all of the documents relating to the development" of the Kindle Fire are located at Lab126, that those relating to the development of the Kindle app are in Seattle, and that those relating to Amazon Instant Video are in Seattle and at Lab126. (*Id.* ¶¶ 7-9.) Mr. Keller declares that "[t]here are no documents or other evidence relating to the Amazon products accused of infringement located in Texas." (*Id.* ¶ 10.) The Court observes that Mr. Keller makes no statements as to where the additional supervised employees are located.

Amazon also provides a declaration by Mr. Adam Riggs, Senior Technical Program Manager at Amazon.com, Inc. (Riggs Decl., Dkt. No. 110-6 ¶ 1.) Mr. Riggs declares that the "Kindle software app products accused in the complaint in the above referenced action were developed at Amazon's offices in Seattle, Washington, or under the supervision of Amazon employees located [there]." (*Id.* ¶ 2.) Mr. Riggs declares that he is a developer of the Kindle app and that he and a Mr. Matt Goldberg of Seattle are likely witnesses.[4] (*Id.* at 4.) Mr. Riggs also makes statements equivalent to those of Mr. Keller considering Lab126's involvement with the Kindle Fire. (*Id.* ¶ 5.) The Court observes that Mr. Riggs makes no statements as to where the additional supervised employees are located.

ContentGuard adds evidence that Amazon has a sizable office in this District, and that the office has job postings for a Cloud Infrastructure Architect, Security Specialist, IT Transformation consultant, and Solutions Architect. (Resp. at 7.) ContentGuard also asserts that Amazon's accused Kindle devices incorporate chipsets made by Texas Instruments, which is headquartered in Dallas and maintains a fabrication plant in Richardson, Texas. (*Id.*) ContentGuard also asserts that Amazon is establishing microprocessor manufacturing facilities in Austin, Texas. (*Id.*) Movants' reply states that ContentGuard "presents no evidence to suggest that [its Plano] activities have any connection with this case," that "there are no Amazon employees in Texas with material evidence," and that Movants believe that ContentGuard's theory of infringement places less of an emphasis on hardware. (Mot. Reply at 2-3.)

ContentGuard also adds, in its supplement filed shortly after briefing completed and citing to custodial information produced by Amazon, that "[t]he likely geographical locations of the Amazon Defendants' custodians are as follows: four in the Northern District of California;

---

[4] Mr. Keller also lists Mr. Riggs and Mr. Goldberg as specific witnesses.

ten in Seattle; one in Asia." (Dkt. No. 184 at 3 (citing Donahue Decl. ¶¶ 10-11, Ex. 9-11).)

The Court observes that Amazon does not appear to provide evidence as to its accused Music app. The Court notes that the Amazon severs associated with its Kindle, Video, and Music apps appear to also be accused in this action. It is unclear from Amazon's declarations whether or not information concerning these servers is disclosed in Amazon's declarations.

**HTC**:

HTC America, Inc. provides a declaration by Ms. Stephanie Bariault of Bellevue, Washington, Vice President of Operations for HTC America. (Bariault Decl., Dkt. No. 110-16 ¶ 1.) Ms. Bariault declares that HTC America is a Washington corporation, headquartered in Bellevue, and that HTC America imports its phones from HTC Corporation, which is a Taiwanese corporation headquartered in Taipei. (*Id.* ¶¶ 2-3.) Ms. Bariault declares that HTC America's sales and marketing activities are coordinated from Bellevue; that HTC America does not sell directly to consumers; and that HTC America instead "sells mobile phones only to distributors, carriers, and third-party vendors in the United States." (*Id.* ¶¶ 4, 6.) Ms. Bariault declares that HTC's "design and operation records of its mobile phones" are "primarily located" in Washington, as are its "records relating to corporate finances and to marketing and sale[s]." Ms. Bariault declares that there are a "relatively small number of U.S.-based engineers who worked on the hardware and software design, development, integration, and manufacturability" of HTC products and that they work "out of their homes close to various customer locations." (*Id.* ¶ 8.) Ms. Bariault declares that "HTC America routinely conducts business in the San Francisco Bay Area which is part of the Northern District of California." The Court observes that Ms. Bariault does not describe if HTC regularly conducts business in any other area of the

U.S., such as the locations of the "distributors, carriers, and third-party vendors in the United States" or the "various customer locations" where its engineers work.

ContentGuard also adds, in its supplement filed shortly after briefing completed and citing to custodial information produced by HTC, that "HTC identified 21 'likely' custodians, with fifteen of them identified as 'key,'" and that "ContentGuard has been able to determine the likely geographic locations of 16 HTC custodians, which are as follows: three in Seattle; one in Boston; one Europe; and eleven in Asia. (Dkt. No. 184 at 2-3 (citing Donahue Decl. ¶¶ 8-9, Ex. 7-8, 11).)

The Court observes that HTC provides the Court with no information regarding the HTC Watch and HTC Watch Server that HTC has stated are also accused. (*See* Dkt. No. 174 at 4.)

**Motorola:**

Motorola provides a declaration by Mr. Archan Mehta, Senior Engineering Manager at Motorola Mobility, LLC. (Mehta Decl., Dkt. No. 110-19 ¶ 1.) Mr. Mehta declares that Motorola Mobility is a Delaware company with its principal place of business in Chicago, Illinois. (*Id.* ¶ 3.) Mr. Mehta declares that integration of apps into the Motorola Moto X smartphones in the United States occurs in either Sunnyvale, California, and Libertyville, Illinois. (*Id.* ¶ 3.)

Motorola also provides a declaration by Mr. Ray Warren, Senior Licensing Counsel at Motorola Mobility, LLC. (Warren Decl., Dkt. No. 110-18 ¶ 1.) Mr. Warren declares that Motorola maintains "significant business operations in California" and "maintains several facilities in California, including one in Sunnyvale, California." (*Id.* ¶ 2.) Mr. Warren identifies Dmitry Sokolov, an employee of Motorola's Sunnyvale, California facilities, as a likely witness on the Moto Smartphone. (*Id.* ¶ 9.a.) Mr. Warren represents that "all or nearly all of the

documents relating to Motorola Mobility's products, general operations, and the research, design, and development of accused Moto X smartphones are available in Sunnyvale, California and Chicago, Illinois." (*Id.* ¶ 10.)  Mr. Warren also represents that "[f]inancial and marketing information related to the accused Moto X smartphones is located in Chicago, Illinois" as are Motorola "employees likely to have financial and marketing information relevant to the Motorola X smartphones." (*Id.* ¶ 11.)  The Court observes that Mr. Warren does not describe if there are other locations where Motorola's documents are available or whether Motorola's documents are primarily located in one location or another.

ContentGuard adds evidence that Motorola "makes infringing devices in Fort Worth, Texas, just miles away from the Eastern District of Texas, at a rate of 100,000 units per week." (Resp. at 4; Dkt. No. 125-9.)  ContentGuard asserts that the Fort Worth facility manufactures more Motorola devices than all of Motorola's facilities in California and that Motorola's CEO has made statements that suggest that Motorola's Illinois engineers regularly travel to the facility. (*Id.*)  ContentGuard observes that Motorola's declarant provides no mention of this facility. (*Id.* at 5.)  Movants reply that the Fort Worth facility is operated by Flextronics and that "Motorola Mobility has only 29 employees and six contractors at that facility." (Mot. Reply at 4.)

ContentGuard also adds, in its supplement filed shortly after briefing completed and citing to custodial information produced by Motorola, that "[t]he likely geographical locations of the Motorola Defendants' custodians are as follows: eleven in the Chicago area . . . and four in Northern California." (Dkt. No. 184 at 2 (citing Donahue Decl. ¶¶ 4-5, Ex. 3-4, 11).)

**<u>Samsung</u>:**

Samsung provides a declaration by Mr. James Botello, Sr. Director of Product Management for Samsung Telecommunications America, LLC. (Botello Decl., Dkt. No. 110-22 ¶ 1.) According to Mr. Botello, Samsung Telecommunications is a "Delaware Company with a principal place of business in Richardson, Texas, and supporting facilities in the Dallas-Fort Worth area." (*Id.* ¶ 3.) Mr. Botello also declares that Samsung Telecommunications has a "facility in San Diego and a sales force throughout California." (*Id.*) Mr. Botello also states that Samsung Telecommunications maintains "other office facilities in Bellevue, Washington; Atlanta, Georgia; Herndon, Virginia; Overland Park. Kansas: and Bridgewater. New Jersey." (*Id.*) Mr. Botello also declares that Samsung operates a Mobile Communications Lab, located in San Jose and Santa Clara, California, as part of its Samsung Research America subsidiary and that the Mobile Communications Lab employees have responsibility for technical issues related to Google software. (*Id.* ¶ 5.) Mr. Botello declares that prior to April 1, 2014, the Mobile Communications Lab was part of Samsung Telecommunications. (*Id.*) The Court observes that Mr. Botello does not provide additional locations for Samsung Researchgood America. ContentGuard notes that, while Mr. Botello's declaration states that he is not aware of relevant documents or witnesses in this District, Mr. Botello's statement is specific to "Google Play, Amazon Kindle or Amazon Instant Video apps" and omits Samsung's own accused products, such as its devices and apps. (Resp. at 3.)

Samsung also provides a declaration by Ms. Rami Jung, Principal Engineer for Samsung Electronics Co., Ltd. (Rami Decl., Dkt No. 110-20 ¶ 1.) According to Ms. Jung, Samsung Electronics is a Korean corporation headquartered in Suwon, and that Samsung Electronics' Korean employees have responsibilities that include the design, engineering, testing, manufacture, and assembly of Samsung Galaxy Smartphones. (*Id.* ¶ 3.) Ms. Jung also makes a

declaration virtually identical to that of Mr. Botello concerning Samsung's Mobile Communications Lab.  (*Id.* ¶ 2.)  The Court observes that Ms. Jung does not provide additional facility locations for Samsung Electronics Co.

Samsung also provides a declaration by Ms. Maria Brzica, manager of the Consumer Business Division of Samsung Electronics America, Inc.  According to Ms. Brzica, Samsung Electronics America is a New York Corporation with a principal place of business in Ridgefield Park, New Jersey.  (Brzica Decl., Dkt. No. 110-21 ¶ 3.)  Ms. Brzica declares that Samsung Electronics America employs 240 people at several facilities in California, including a team of 20 in San Jose; a sales office of five in Irvine; 44 in Rancho Dominguez; and 93 in San Diego with the remainder working from home throughout the state.  (*Id.* ¶ 4.)  According to Ms. Brzica, Samsung Electronics America is only involved in the marketing, sales, service, repair, importation, and distribution of Wi-Fi only accused products.  (*Id.* ¶ 5.)  The Court observes that Ms. Brzica does not provide additional facility locations or information outside of California, such as for SEA's New Jersey headquarters.

ContentGuard adds evidence that Samsung Telecommunications America, which is headquartered in Richardson, "researches, develops and markets a variety of personal and business communications products throughout North America, including handheld wireless phones, wireless communications infrastructure systems, fiber optics and enterprise communications systems."  (Dkt. No. 125-2.)  Further, ContentGuard notes this facility "work[s] with carrier network operators in the U.S. to develop and commercialize mobile devices, including the Samsung Galaxy line of smartphones" accused in this case.  (Dkt. No. 125-5.) ContentGuard also notes that Samsung maintains additional facilities in Texas, including an office in Dallas, Texas that "leads Samsung's standardization initiatives" and a facility in Austin,

Texas, that manufactures chipsets incorporated into accused products. (Resp. at 4.) ContentGuard asserts that its infringement contentions identify a particular characteristic of accused chipsets as relevant to infringement. (*Id.*) Movants' reply only dismisses ContentGuard's arguments regarding Samsung and does not address their substance. (Mot. Reply at 4-5.)

ContentGuard also adds, in its supplement filed shortly after briefing completed and citing to custodial information produced by Samsung, that "[t]he likely geographical locations of the Samsung Defendants' custodians are as follows: two in the Dallas/Fort Worth area; four in the New York area; one in southern California; one in the Northern District of California; and seven in Asia." (Dkt. No. 184 at 2 (citing Donahue Decl. ¶¶ 2-3, Ex. 1-2, 11).)

The Court observes that Samsung provides the Court with no information regarding the Samsung Books Server, Samsung Books app, Samsung Hub Server, Samsung Hub, Vudu App, or OMA DRM that Samsung has stated are also accused. (*See* Dkt. No. 174 at 4.)

## II. The Movants' Joint Motion to Transfer

By this motion, five Defendants – two with Texas-based headquarters, two from Washington, and one from Illinois – have jointly moved the Court to transfer this case to the NDCA pursuant to 28 U.S.C. § 1404(a). These Defendants assert that the Northern District of California is "clearly more convenient" than the forum chosen by Plaintiff ContentGuard – also a Texas entity. The briefing and exhibits before the Court comprise 730 pages.[5] The Court will examine each of the applicable private and public factors listed above, addressing the parties' specific arguments where applicable.

---

[5] In advance of determining this motion, the Court also resolved a number of motions to sever, which comprised over 1700 pages of briefing and exhibits. (*See* Dkt. No. 456.)

**A.    Proper Venue**

The Northern District of California and the Eastern District of Texas are proper venues.

**B.    Private Interest Factors**

**1.    Relative Ease of Access to Sources of Proof**

"In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer.  Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location."  *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009) (citation omitted).

Plaintiff ContentGuard Holdings, Inc. ("ContentGuard") is a Texas corporation maintaining its principal place of business in Plano, Texas.[6]  Huawei is a Chinese company maintaining its US technology and device headquarters in Plano, Texas.  Samsung is a Korean corporation with a Richardson, Texas headquarters focusing on mobile technology.[7]  Amazon is a Delaware corporation headquartered in Seattle, Washington.[8]  HTC is a Taiwanese corporation maintaining a US headquarters in Bellevue, Washington.[9]  Motorola is a Delaware limited liability company with its principal place of business in Chicago, Illinois.[10]  Thus, three parties,

---

[6] Plano, Texas is located in Collin County, which is in the Eastern District of Texas.

[7] Richardson, Texas is located immediately south of Plano, Texas in Dallas and Collin counties, which are respectively in the Northern and Eastern Districts of Texas.

[8] Seattle, Washington is located in King County, which is in the Western District of Washington.

[9] Bellevue, Washington is located in King County, which is in the Western District of Washington.

[10] The Movants appear to have asked this Court to also take Defendant Apple Inc. ("Apple") into consideration when determining their transfer request.  (*See, e.g.*, Dkt. No. 110 at 8.)  Apple, however, did not join the instant motion.  Nor have the Movants identified any evidence in Apple's possession that bears on the claims asserted against them.  Therefore, the

including the Plaintiff, maintain headquarters or a principal place of business in this District. In contrast, no party is headquartered or has a principal place of business in the Northern District of California.

The Movants first argue that the Court should discount ContentGuard's EDTX presence, because ContentGuard moved its headquarters from El Segundo, California, to Plano, Texas, in August, 2013, about four months before filing the instant action. The Court previously rejected a similar argument raised by Google, Inc. ("Google") in a related action. (*See* Memorandum and Opinion at 4-5, ContentGuard Holdings, Inc. v. Google, Inc., Civil Action No. 2:14-cv-061-JRG (Apr. 16, 2014), ECF No. 38 (the "Google Transfer Order").) There, the Court considered the un-contradicted declaration from ContentGuard's Vice President of Product Development, who explained the three primary reasons behind ContentGuard's move from California to Texas. (*See* Google Transfer Order at 5-6.) Specifically, ContentGuard was drawn to Texas because of the low cost of doing business, convenient access to telecommunication companies and manufacturers, and the high-tech talent pool. (*Id.*) The Court found these to be legitimate business considerations, and accordingly held that ContentGuard's presence in Texas should be afforded proper weight in the venue analysis. (*Id.* at 6.)

Here, having raised the exact same argument as Google, the Movants fail to identify any evidence that may undermine ContentGuard's purported motive in relocating to Texas.[11] Therefore, as in the Google Action, the Court is not persuaded that ContentGuard's EDTX

circumstances of Apple are irrelevant to this Court's consideration of the instant motion. Further the Court observes that, to the extent Apple evidence might become relevant, it is a co-defendant in this case and therefore within the subpoena power of either this Court or the transferee Court.

[11] Indeed, when explaining why Samsung chose Richardson, Texas, as its U.S. headquarters, a Samsung executive cited to similar rationales as ContentGuard. (See Samsung Telecommunications America on Richardson, Texas, https://www.youtube.com/watch?v=Fl4iJSJC9WY (last visited December 11, 2014).)

presence should be discounted based solely on the timing of its relocation.

The Court previously found that ContentGuard's Plano, Texas headquarters houses all documents relating to "conception, development and reduction to practice" of eight of the nine asserted patents. (Google Transfer Order at 4.) In addition, ContentGuard's Vice President of Product Development, Vice President of Licensing, two Senior Research Engineers – including one inventor of two asserted patents – and an Engineer, work in its Plano, Texas headquarters. (*Id.* at 4.)

Movants provide approximately one page of analysis regarding the ease of access to sources of proof. (*See* Mot. at 10-11.) Movants' analysis is, essentially, a conclusory statement that "the Northern District of California would provide easier access to sources of relevant and important proof; because the greater proportion of relevant documents and other evidence are located there, or nearby on the West Coast." (*Id.* at 10.) Movants provide no citation to support this conclusion, and the Court finds significant omissions in Movants' analysis of this factor. Movants' analysis entirely omits three out of the five Movants—Samsung, HTC, and Huawei— from its consideration of ease of access to sources of proof and only includes some specific accused products of some Movants. (*Id.* at 10-11.) For the other Movants, Movants' analysis consists entirely of blanket statements regarding where evidence is located. As an example, the discussion as to Motorola only states that "[d]ocuments and evidence relating to the development of the accused Moto X Smartphones are located in Sunnyvale, California and Chicago, Illinois." (*Id.* at 11.) While such a statement is suggestive, such a statement, by itself, is difficult for the Court to assess in the correct context.

Movants also assert that Universal Music Group developed the UITS standard and "is headquartered in Santa Monica, California and New York, New York," citing only to the FAQ

on Universal's web page. (Mot. at 11.) From this Movants conclude that "[e]vidence relating to the development of the UITS standard is likely located in Santa Monica." (*Id.*) The Court is unable to conclude from such evidence, where relevant material may be located. It is possible that evidence related to UITS might be located in either of these places, but it is also possible that the relevant evidence is located elsewhere, such as another Universal domestic office, a Universal foreign office, or with a third party developer.

Movants assert that "there is no meaningful connection between the relevant evidence and this District." (Mot. at 1.) The Court does not find that the evidence presented bears out Movants' assertion. The Plaintiff and two Movants—Huawei and Samsung—are headquartered in this district (or in a city that is partially in this district). The evidence reflects that design and marketing of certain accused products occurs in this District, that a significant Motorola manufacturing facility is nearby, and that Amazon has a sizable office in this District. Movants' sources of evidence in the Northern District of California are a subsidiary of Amazon that developed at least one of its accused products; a subsidiary of Samsung[12] that works with Google on "technical issues relating to the Android Operating System and Google Mobile Services"; and a Motorola integration manufacturing facility. The evidence before the Court suggests that this District does have a meaningful connection to relevant evidence in this case.

While Movants assert that the "Northern District of California would provide easier access to sources of relevant and important proof," Movants' briefing does not put forward a substantive analysis as to the difference in ease of access to prospective sources of proof. Movants do provide the Court with statements as to where information concerning certain, presumably accused, products can be located. Such information is helpful but, without more,

---

[12] At the time of filing, the parent of this subsidiary was headquartered in Richardson, Texas.

does not provide the Court with a clear picture of where the relevant information is located and what the difference in ease of access is. For example, Movants exclude numerous accused products (sometimes all of the accused products of an entire Movant) from their analysis. The evidence before the Court is that there are significant amounts of relevant evidence in both forums.

The Court finds that this factor weighs against transfer.

The Court feels compelled to note, that in reading through the declarations provided by the Movants, the Court was struck by a concerning pattern: the Movants repeatedly emphasized their California and West Coast (primarily Washington) connections, downplayed (or omitted) their connections to the other states they were headquartered in, including this state, and generally omitted their connections to any other part of the country, including the East Coast. Those Movants with offices in or immediately adjacent to this District—Amazon, Huawei, Motorola, and Samsung—provided little to no information about their facilities here (or nearby)—Amazon and Motorola omitted them entirely—and, in contrast, Movants provided detailed information about their West Coast operations, regardless of whether they have any relevance or not. For example, Huawei and Samsung describe the activities and number of employees in their facilities throughout California, while omitting equivalent details as to their headquarters. The Court also observes that Movants' declarations also go in to significant detail to describe their documents in or near the transferee forum, whereas Movants with documents clearly in this forum—Huawei and Samsung—omit any substantive discussion of documents from their declarations. To the extent such Movants make statements about their documents, it is only to say that they can make their documents available in their Northern District of California offices. The Court observes that other Movants make no equivalent declaration that they can

also make their documents available in this District.

The Court also notes that the declarations make distinctions of unexplained significance between different corporate entities and types of documents. For example, Amazon's Mr. Botello creates a distinction between Amazon and its wholly owned Lab126 subsidiary, and then makes some statements that only refer to one entity without a corresponding statement for the other: "[t]here are no documents or other evidence relating to the Amazon products accused of infringement located in Texas" and "Lab126 has no employees or property in Texas." In the latter case, it is clear why Amazon makes the distinction and omits a corresponding statement— Amazon has a considerable number of employees and property in Texas. However, it is unclear to the Court what to make of the former statement: does it mean that there is no relevant evidence in Texas or is Amazon again exercising the distinction between itself and Lab126?

Such discrepancies and distinctions may simply reflect inadvertent omissions or differences in corporate technology and phrasing, but they are sufficient to cause the Court concern over the Movants' candor. In the Motion to Transfer context, one side often has exclusive access to a substantial portion of information regarding the locations of relevant evidence, facilities, witnesses, and other pertinent factors. This is why the duty of candor imposed upon the parties is of special emphasis in the Motion to Transfer context. If it were otherwise, parties might advocate their positions by selective disclosure rather than by disputing the merits.

### 2. Cost of Attendance for Willing Witnesses

"The convenience of the witnesses is probably the single most important factor in a transfer analysis." *In re Genentech, Inc.*, 566 F.3d 1338, 1342 (Fed. Cir. 2009). While the Court must consider the convenience of both the party and non-party witnesses, it is the convenience of non-party witnesses that is the more important factor and is accorded greater weight in a transfer

of venue analysis. *Aquatic Amusement Assoc., Ltd. v. Walt Disney World Co.*, 734 F.Supp. 54, 57 (N.D.N.Y. 1990); *see also* 15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3851 (3d ed. 2012). "A district court should assess the relevance and materiality of the information the witness may provide." *In re Genentech, Inc.*, 566 at 1343. However, there is no requirement that the movant identify "key witnesses," or show "that the potential witness has more than relevant and material information . . . ." *Id.* at 1343-44.

Movants' analysis for this factor consists of the conclusory assertion that "many potential non-party and party witnesses reside in or near the Northern District of California, but relatively few live in Texas." (Mot. at 13.) Movants assert that "for the vast majority" of witnesses "who do not live in the Northern District of California," that travel "would be significantly more convenient to San Francisco than to Marshall." (*Id.*) The Court notes that, while a number of witnesses live in each forum, the "vast majority" of potential witnesses do not live in either forum. Instead of a detailed analysis examining the convenience of the witnesses who must travel in this case, Movants' support for their assertion—that San Francisco is "significantly more convenient" for the "vast majority" of witnesses who do not reside there—are statements by two Seattle witnesses that travel to Texas would personally inconvenience them. (Mot. at 13 (citing to Riggs Decl ¶ 6, Bariault Decl. ¶ 11).)

In their Reply, Movants provide a chart describing the location of potential witnesses. While the Court generally welcomes summary materials, the chart provided by Movants is problematic for multiple reasons. First, the chart contains additional non-party witnesses that were not disclosed in Movants' initial brief, and are therefore before the Court for the first time in Movants' Reply. Second, Movants do not disclose that they are providing new evidence in this Chart; rather, the Chart is only cited as a summary of evidence. Third, Movants provide no

reason why the additional witnesses were not presented in Movants' opening brief or could not have been presented in that brief.  Fourth, the chart purports to describe the "relevance to case" of particular witnesses, but for non-party witnesses, this field is generally only a description of the witnesses' LinkedIn job title.  Fifth, the chart further references exhibits that are either LinkedIn profiles (some containing little more than a name) and old news articles, which, without some more definite tie to the case, provides indeterminate evidence.  The Court therefore does not consider the newly added witnesses.

ContentGuard asserts that Movants fail to mention the convenience of known East Coast witnesses.  (Resp. at 11.)  ContentGuard asserts that, since so many parties are headquartered here and since none are headquartered in the Northern District of California, transfer would actually promote inconvenience.  (*Id.*)  ContentGuard asserts that, at best, transfer would simply shift convenience.  (*Id.*)  Movants conceded that "[f]ive relevant nonparty witnesses are located in Washington D.C.," but Movants assert that "they have no meaningful bearing on the relative convenience between Texas and California."  (Mot. Reply at 3.)  The Court notes that Movants do not explain why these non-party witnesses have "no meaningful bearing."

There are a considerable number of witnesses in each forum.  Regardless of where this case is tried, though, it seems clear that the majority of the witnesses will have to travel; the question is simply how far and to where.  The briefing presents a considerable number of potential party witnesses who are spread across the United States and the globe.  Though the calculation was neither easy nor straightforward, as best the Court can determine, this forum is somewhat closer for the U.S. based party witnesses in the aggregate, though it may be less

convenient for some, including Amazon.[13]   The Court observes that, if the Court were to assume—which it does not—that not all potential witnesses would come to trial (e.g. that some are redundant) and that each party would bring a handful (e.g. 5) witnesses to trial (instead of the 10+ for some parties at present), this District appears to become, based on the evidence currently available to the Court, notably more convenient in the aggregate calculation.

The known non-party witnesses consist primarily of the inventors of the patents in suit. As the Court noted in the Google Transfer Order, "three non-party inventors reside within NDCA, five reside elsewhere in California and one splits his time between Texas and Washington."  Google Transfer Order at 10.  "The eight inventors residing in California would ordinarily be inconvenienced by having to travel to Texas to attend trial."  *Id.*  "Six of them, however, together with the inventor who splits his time between Texas and Washington, have volunteered to travel to Texas to attend trial as well as declaring that such live appearances will not be inconvenient."  *Id.*

The Court finds that this factor weighs against transfer.

### 3.    Availability of Compulsory Process to Secure the Attendance of Witnesses

This factor instructs the Court to consider the availability of compulsory process to secure the attendance of witnesses, particularly non-party witnesses whose attendance may need to be secured by a court order.  *See In re Volkswagen II*, 545 F.3d at 316.   Third-party subpoenas are governed by Fed. R. Civ. P. 45, which, as recently amended in 2013, provides the presiding court with nationwide subpoena power to order third-party witnesses to attend deposition, so long as the deposition is to take place within 100 miles of the witness's residence or regular

---

[13] The Court observes that many of Movants' West Coast employees have to travel a considerable distance even if the case is transferred.  For example, Seattle, Washington, and San Francisco, California, are nearly 700 miles apart, and Santa Monica, California and San Francisco, California are nearly 350 miles apart.

place of business.  Fed. R. Civ. P. 45(a)(2), 45(c)(1)(A).  As such, both forums are essentially equivalent in terms of securing depositions from third-parties.  The primary difference then is the use of the subpoena power to compel attendance at trial, which a court may order, generally speaking, within either 100 miles of the witness's residence or regular place of business or within the state of the witness's residence or regular place of business, so long as the witness would not incur substantial expense.  Fed. R. Civ. P. 45(c)(1)(A), 45(c)(1)(B).

Movants assert that the "likely non-party witnesses" the subpoena power might be used on are the inventors of the patents-in-suit, Google, Universal Music Group, and Adobe.  (Mot. at 11-12.)  Movants acknowledge that "almost all" of the inventors have signed declarations stating they will appear in this District.  Movants provide no definite evidence that relevant employees of either Universal Music Group or Adobe are within the subpoena power of the NDCA.

ContentGuard asserts that Movants' assertion that the NDCA's subpoena power might be used against unidentified witnesses allegedly in the forum should be given little weight.  (Resp. at 10.)  ContentGuard notes that Google is a party to a co-pending suit before this Court, that transfer was denied in that suit, and that Google witnesses "will be available to Moving Defendants as well."  (Resp. at 10.)  ContentGuard argues that a majority (7 of 9) inventors have voluntarily agreed to appear in this District and that only three of those inventors reside in the Northern District of California, so it is possible that transfer would result in a lesser attendance of these non-party witnesses.  (*Id.* at 10-11.)  ContentGuard asserts that the subpoena power might be used to secure the attendance of a specific Texas Instruments' chip designer and of telecommunications companies, such as AT&T.  (*Id.* at 11.)  ContentGuard asserts that a specific

Universal Music Group employee, allegedly the most likely to be knowledgeable on the UITS standard, actually resides in New York. (*Id.*)

Though Google is not a party to this case, it is the defendant in another ContentGuard suit that is co-pending in this Court. While Google asked the Court to deny joinder with this action, which the Court granted, the Court observes that Google and ContentGuard then jointly agreed that the Google action and this action should proceed in parallel, which the Court granted. Movants assert this does not mean that Google employees will be available for trial in this case. (Mot. Reply at n.1.) In the ordinary course, the Court would agree with Movants. However, as part of the considerable severance proceedings in this case, Google stated that it believes the parties should be tried on a claim basis. (*See* Dkt. No. 456.) The Court agreed with Google, and while the Court is waiting on further briefing from the parties, the Court has no reason to believe that Google witnesses will not be available in Movant's trials.

As the Court discussed in denying the Google Transfer Order, "while NDCA has the so called 'absolute subpoena power' – the subpoena power for both deposition and trial – over the three non-party inventors living within that district, neither this Court nor NDCA clearly has the power to command the remaining inventors to attend trial." Google Transfer Order at 8. "In other words, the compulsory process available at NDCA only works to secure the attendance of three non-party inventors." *Id.* "Seven out of the nine non-party inventors, however, have declared their willingness to voluntarily appear in person at trial '*if [the case] is held in Texas.*' *Id.* (emphasis in original). "These seven inventors have not expressed similar willingness to voluntarily appear at trial should the case be tried in NDCA." *Id.* "As such, despite the availability of compulsory process at NDCA for the three inventors residing there, transferring the case to NDCA may actually result in a *lesser* attendance of these non-party witnesses." The

Court also noted that "[t]he three inventors residing in NDCA (Stefik, Pirolli and Merkle) do not cover all nine of the asserted patents, while the seven inventors who have declared their willingness to attend trial before this Court do cover every asserted patent." *Id.*

The evidence as to other third-party witnesses within the forums is also unfortunately unclear. ContentGuard provides conclusory statements as to potential witnesses within this Court's trial subpoena power (e.g. a specific TI employee) and Movants provide conclusory statements as to potential witnesses within the subpoena power of the NDCA court (e.g. unnamed Adobe and Universal Music witnesses). Having considered the issue, the Court has concluded that it lacks information sufficient to make a clear determination.

The Court therefore finds this factor to be neutral.

### 4. All Other Practical Problems that Make Trial of a Case Easy, Expeditious, and Inexpensive

This Court finds that this factor is neutral.

## C. Public Interest Factors

### 1. Administrative Difficulties Flowing From Court Congestion

The speed with which a case can come to trial and be resolved is a factor in the transfer analysis. A proposed transferee court's "less congested docket" and "[ability] to resolve this dispute more quickly" is a factor to be considered. *In re Hoffman-La Roche*, 587 F.3d 1333, 1336 (Fed. Cir. 2009). This factor is the "most speculative," and in situations where "several relevant factors weigh in favor of transfer and others are neutral, the speed of the transferee district court should not alone outweigh all of those other factors." *In re Genentech*, 566 F.3d at 1347.

Movants filed this transfer motion approximately five months after this case was filed. Before this motion was filed, at the Court's April 7, 2014 scheduling conference, the parties were provided with their September 8, 2015 jury selection date. Movants assert that, if transferred,

"this case likely will reach trial sooner in the Northern District of California than it would in the Eastern District of Texas." (Mot. at 15.) Movants cite to federal case management statistics for the 12 month period ending March 31, 2013. (*Id.* (citing Dkt. No. 110-26).) According to these March 31, 2013 statistics, this District has a median time to termination of 8.7 months and a median time to trial of 25.5 months, and the Northern District of California has a median time to termination of 6.4 months and a median time to trial of 27.5 months. It is unclear to the Court why, in filing a motion in April 2014, that Movants chose to use outdated March 2013 statistics. The Court observes the Administrative Office of the U.S. Courts produces quarterly statistical reports. *See, e.g.*, http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics/ FederalCourtManagementStatistics_Archive.aspx (last visited March 2, 2015). According to federal case management statistics for the more relevant 12 month period ending on December 31, 2013 (this case was filed in December of 2013), this District has a median time to termination of 8.9 months and a median time to trial of 20.8 months, and the Northern District of California has a median time to termination of 7.8 months and a median time to trial of 31.0 months. The Court observes that, like the December 2013 report, the June and September 2013 and March 2014 statistical reports also show swifter times to trial in this District than in the Northern District of California: June 2013 (E.D. Tex. 18.5, N.D. Cal. 30.9); September 2013 (E.D. Tex. 20.5, N.D. Cal. 27.4); and March 2014 (E.D. Tex. 21.3, N.D. Cal. 34.2). The Court does not find that the evidence supports Movants' assertion that the case "likely will reach trial sooner in the Northern District of California." The evidence before the Court suggests that there was an approximately 10 month difference in the expected time to trial at the time of filing.

The Court finds that this factor weighs against transfer.

### 2. Local Interest in Having Localized Interests Decided at Home

This factor considers the interest of the locality of the chosen venue in having the case resolved there. *Volkswagen I*, 371 F.3d at 205-06. This consideration is based on the principle that "[j]ury duty is a burden that ought not to be imposed upon the people of a community [that] has no relation to the litigation."

Movants primary theory for local interest depends on products that were developed by a non-party—Google. (Mot. at 14.) The Court does not find Movants' argument persuasive: the Movants are accused under multiple theories of infringement, including the manufacture of their own devices and apps, so the case does not solely concern Google. Assuming *arguendo* that it did, the Court observes that Movants have not provided the Court with authority that the hypothetical local interest of a third-party replaces the local interest of a movant. Movants' most persuasive evidence as to local interest is that "the Amazon subsidiary responsible for developing the accused Amazon Kindle Fire and its implementation of Amazon Instant Video" is located in the Northern District of California. (*Id.*) The Court also notes that there is evidence that Motorola and Samsung perform some of their design work in the Northern District of California.

However, as Movants concede, the design and development of accused products is also tied to this District and the manufacturing of accused products, including some of the accused chipsets, occurs nearby. In contrast to the transferee forum, multiple parties are also headquartered in this district. The Plaintiff in this suit is a Texas corporation with its principal place of business in this district. Movant Huawei is headquartered in this District and Movant Samsung is headquartered in a county that is partially in this District and partially in the Northern District of Texas.

The Court finds that this factor weighs against transfer.

**3-4.** **Familiarity of the Forum With the Law that Will Govern the Case and Avoidance of Unnecessary Problems of Conflict of Laws or in the Application of Foreign Law**

These factors are neutral.

## CONCLUSION

A movant seeking to transfer bears the evidentiary burden of establishing that the movant's desired forum is clearly more convenient than the forum where the case was filed. Having considered the evidence presented by the Parties in view of the applicable law, the Court finds that the weight of the evidence presented by Defendants has not met their burden of establishing that the Northern District of California is a clearly more convenient forum than the Eastern District of Texas. For the reasons set forth above, the Court hereby **DENIES** Movants' Motion to Transfer Venue (Dkt. No. 110).

**So ORDERED and SIGNED this 31st day of March, 2015.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE