**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| CONTENTGUARD HOLDINGS, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:13-CV-1112-JRG |
| | § | |
| AMAZON.COM, INC., et al., | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the briefing on Defendant Apple Inc.'s ("Apple") Motion to Sever and Transfer (Dkt. No. 156); Defendant Apple Inc.'s Sealed Supplemental Statement in Support of its Motion to Sever and Transfer (Dkt. No. 221); Defendant Apple Inc.'s Supplemental Brief in Support of Its Motion to Sever and Transfer (Dkt. No. 265); Apple's Notice of Supplemental Authority in Support of Motion to Sever and Transfer (Dkt. No. 282); Apple's Opposed Motion for Leave to Supplement the Record in Support of Apple, Inc.'s Motion to Sever and Transfer (Dkt. No. 385); Apple's Notice of Supplemental Authority (Dkt. No. 433); Notice of Supplemental Facts in Support of Defendants' Motion to Transfer to the Northern District of California (Dkt. No. 435.) The Court previously considered and denied the portions of Apple's Motion concerning severance. (*See* Dkt. No. 456, filed March 19, 2015.) Having reviewed the record, the Court **DENIES** Apple's motions for the reasons set forth below.

## BACKGROUND

This is a suit concerning the alleged infringement and validity of certain U.S. patents. Plaintiff ContentGuard was originally formed as a partnership between Xerox Corporation and

Microsoft Corporation[1] to pursue digital rights management ("DRM") technology.[2]  As part of its business, ContentGuard filed and obtained various patents, including the nine patents that it asserts in this action.  Movant Apple is one of six Defendants in this action—Amazon, Apple, Huawei, Motorola, HTC, and Samsung.[3]  The Defendants are well-known technology companies that, among their varied businesses, provide electronic hardware and software products. Generally in this suit, ContentGuard accuses DRM aspects of certain of Defendants' software applications ("apps") (e.g. iTunes, Amazon Kindle, Amazon Instant Video) and hardware and software components of infringing its patent claims.

Apple's motion, which was filed six months after the case was filed, is the third (and last) transfer motion that was filed between both this case and the related co-pending Google action. Two months before Apple's Motion was filed, the Court ruled upon the motion to transfer filed in the related co-pending Google action.  Case No. 2:14-cv-61, Dkt. No. 38.  Since the time that Apple filed its Motion to transfer, Apple has regularly supplemented and expanded its requests of this Court.  The Court observes that the briefing and exhibits flowing directly from Apple's Motion and its six supplements comprise more than 800 pages.  The briefing on Apple's two most recent supplements (one of which was an opposed motion) did not finish until March of 2015.  Shortly after the briefing on Apple's most recent supplementation completed, the Court ruled upon a number of different motions to sever, including the portions of this Motion relating

---

[1] ContentGuard is now owned by Pendrell Technologies, LLC.  (Dkt. No. 2.)  ContentGuard's website suggests that it may also be owned by Time Warner.  *See* http://contentguard.com/company/ ("ContentGuard is owned by Pendrell Corporation and Time Warner") (last visited April 15, 2015).

[2] Broadly, DRM technology, which might also be thought of as "copy protection," seeks to control access (e.g. viewing, copying) to digital information, including media, such as music, movies, and software.

[3] BlackBerry Corporation (f/k/a Research In Motion Corporation), another technology company, was dismissed on January 21, 2015.

to severance.  (*See* Dkt. No. 456.)  The Court has also recently ruled on a motion to transfer filed by the other defendants in this action, which Apple alone elected not join.  (Dkt. No. 472.)

## APPLICABLE LAW

28 U.S.C § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district court or division where it might have been brought."  28 U.S.C. § 1404(a).  However, a motion to transfer venue should only be granted upon a showing that the transferee venue is "clearly more convenient" than the venue chosen by the plaintiff.  *In re Nintendo Co.*, 589 F.3d 1194, 1197 (Fed. Cir. 2009); *In re Genentech, Inc.*, 566 F.3d 1388, 1342 (Fed. Cir. 2009); *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008); *In re Volkswagen of America, Inc. (Volkswagen II)*, 545 F.3d 304, 315 (5th Cir. 2008).  District courts have "broad discretion in deciding whether to order a transfer."  *Balawajder v. Scott*, 160 F.3d 1066, 1067 (5th Cir. 1998) (quoting *Caldwell v. Palmetto State Sav. Bank*, 811 F.2d 916, 919 (5th Cir. 1987)).

The first inquiry when analyzing a case's eligibility for § 1404(a) transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed."  *In re Volkswagen AG* (*Volkswagen I*), 371 F.3d 201, 203 (5th Cir. 2004).  If the transferee district is a proper venue, then the Court must weigh the relative public and private factors of the current venue against the transferee venue.  *Id.*  In making such a convenience determination, the Court considers several private and public interest factors.  *Id.*  "Factors relating to the parties' private interests include '[1] relative ease of access to sources of proof; [2] availability of compulsory process for attendance of unwilling, and [3] the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and [4] all other practical problems that make trial of a case easy, expeditious and inexpensive.'"  *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568,

581 n.6 (2013) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, n.6, (1981); *Nintendo*, 589 F.3d at 1198; *Genentech*, 566 F.3d at 1342; *TS Tech.*, 551 F.3d at 1319; *Volkswagen II*, 545 F.3d at 315. "Public-interest factors may include '[1] the administrative difficulties flowing from court congestion; [2)] the local interest in having localized controversies decided at home; [and] [3)] the interest in having the trial of a diversity case in a forum that is at home with the law.'" *Atl. Marine*, 134 S. Ct. at 581 n.6 (citing *Piper Aircraft*, 454 U.S. at 241 n.6); *Volkswagen I*, 371 F.3d at 203; *Nintendo*, 589 F.3d at 1198; *TS Tech*, 551 F.3d at 1319. Other public factors are: 4) the familiarity of the forum with the law that will govern the case; and 5) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *Volkswagen I*, 371 F.3d at 203; *Nintendo*, 589 F.3d at 1198; *TS Tech*, 551 F.3d at 1319. Although the private and public factors apply to most transfer cases, "they are not necessarily exhaustive or exclusive," and no single factor is dispositive. *Volkswagen II*, 545 F.3d at 314-15.

In the Fifth Circuit, the plaintiff's choice of venue has not been considered a separate factor in this analysis. *Volkswagen II*, 545 F.3d at 314-15. However, "[t]he Court must also give some weight to the plaintiffs' choice of forum." *Atl. Marine*, 134 S. Ct. at n.6 (citing *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955)). "Plaintiffs are ordinarily allowed to select whatever forum they consider most advantageous (consistent with jurisdictional and venue limitations), [and the Supreme Court has] termed their selection the 'plaintiff's venue privilege.'" *Atl. Marine*, 134 S. Ct. at 581 (citing *Van Dusen v. Barrack*, 376 U.S. 612, 635 (1964).) In the Fifth Circuit, the "venue privilege" has been seen as contributing to the defendant's elevated burden of proving that the transferee venue is "clearly more convenient" than the transferor venue. *Volkswagen II*, 545 F.3d at 315; *Nintendo*, 589 F.3d at 1200; *TS Tech*, 551 F.3d at 1319.

"The idea behind § 1404(a) is that where a 'civil action' to vindicate a wrong—however brought in a court—presents issues and requires witnesses that make one District Court more convenient than another, the trial judge can, after findings, transfer the whole action to the more convenient court." *Van Dusen*, 376 U.S. at 622 (quoting *Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960)).  "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen*, 376 U.S. at 622).  Section 1404(a) requires this discretionary "individualized, case-by-case consideration of convenience and fairness."  *Genentech* 566 F.3d at 1346 (quoting *Van Dusen*, 376 U.S. at 622).

## ANALYSIS

## I. DEVELOPER AGREEMENT

Apple asserts that ContentGuard has signed (by clicking) multiple versions of its standard Apple's iOS Developer Program License Agreement ("Agreement"), which is apparently a contract of adhesion that is required of any party seeking to develop and/or distribute an application for Apple's iOS.  (Mot. at 11; Dkt. No. 156-25 ¶¶ 24-27.)  Apple asserts that section 15.10 of the Agreement requires that this suit be transferred pursuant to the following forum selection clause (underlined in relevant part):

> 15.10 Dispute Resolution; Governing Law. <u>Any litigation or other dispute resolution between You and Apple arising out of or relating to this Agreement, the Apple Software, or Your relationship with Apple will take place in the Northern District of California</u>, and You and Apple hereby consent to the personal jurisdiction of and exclusive venue in the state and federal courts within that District with respect any such litigation or dispute resolution. This Agreement will be governed by and construed in accordance with the laws of the United States and the State of California, except that body of California law concerning conflicts of law. Notwithstanding the foregoing: [the agreement then

> conditionally exempts (a) an agency instrumentality or department of the federal government of the United States; (b) U.S. public and accredited educational institution or an agency, instrumentality, or department of a state or local government within the United States; and (c) an international, intergovernmental organization that has been conferred immunity from the jurisdiction of national courts]

(*Id.* (citing Dkt. No. 156-27 at § 15.10).)   Apple asserts that the "clause applies to ContentGuard's claims in this case on three independent grounds."  (*Id.* at 11.)   The three possible grounds listed by the forum selection clause are: 1) the case relates to ContentGuard's "relationship with Apple"; 2) the case "relat[es] to [the] Agreement;" and 3) the case "relat[es] to . . . the Apple Software."  (*Id.*)   According to Apple, "[t]he forum-selection clause requires *all* claims against Apple to be transferred, and those claims should be severed in order to facilitate transfer." (*Id.* (emphasis in original).)

ContentGuard responds that this litigation is not within the meaning of the "relationship" as defined by the Agreement, which ContentGuard contends is defined by the Agreement as the "agency appointment as specifically set forth in Schedule 1." (*See* Resp. at 8.) ContentGuard also asserts that Apple's assertion that this case "relat[es] to [the] Agreement" is "facially untenable."  (*Id.* at 9.)   ContentGuard argues that this case does not relate to the Agreement as "none of ContentGuard's claims against Apple 'aris[e] out of or relat[e] to' ContentGuard's software development activities."  (*Id.*)   ContentGuard asserts that the case does not relate to "the Apple Software" as "iOS" is defined as "the iOS operating system software provided by Apple for use by You only in connection with Your Application development and testing."  (*Id.* (emphasis removed).)

Apple replies that the "relationship" is not defined by the Agreement and should be given its plain and ordinary meaning.  (Reply at 9.)  Apple asserts that the claim does "'arise out of or relate to' ContentGuard's software development activities" because Apple's App Store, which is

accused of patent infringement, distributes ContentGuard's app.  (*Id.* at 6-7.)  Regarding the "Apple Software," Apple only observes that "iOS" also covers the commercial version of iOS. Apple does not address the term's specific limitation to use "only in connection with Your Application development and testing."

At the hearing held by this Court, ContentGuard asserted that "ContentGuard, Inc., is not a party to that agreement.  It doesn't apply to us.  We're simply not a party." (Dkt. No. 299 at 79:7-9.)   After having heard argument by Apple's counsel as to the alleged scope of the Agreement, the Court asked Apple, "[t]ell me what [the Agreement] doesn't cover. Is there anything that it doesn't cover? . . . How could you stand up and say, I'm outside the bounds of that application?" (*Id.* at 86:8-12.)  Apple's Council responded that "[i]t's a broad -- it is a broad agreement"; that he "might be able to hypothesize some" lawsuits that did not involve the agreement; and "if they're going to enter into this agreement with Apple, and they're going to use the Apple ecosystem to distribute their app, that they have agreed that there is a broad category of lawsuits that are going to be in the Northern District of California."  (*Id.* at 86:13-25.)

"When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause."  *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568, 581 (2013).  "[A] valid forum-selection clause should be given controlling weight in all but the most exceptional cases."  *Id.*  Further, the Supreme Court has outlined the analysis which a district court should undertake to determine whether or not a case is exceptional.  *Id.*  However, this "analysis presupposes a contractually valid forum-selection clause."  *Id.* at 581 n.5.  By extension, the *Atlantic Marine* analysis also presupposes a valid contract and a dispute that unquestionably falls within the scope of that contract.  *See id*; *see also Stinger v. Chase Bank, USA, NA*, 265 F. App'x 224, 226–27 (5th

Cir. 2008) (determining whether an arbitration clause is contractually valid by first determining (1) whether there is a valid agreement and (2) whether the dispute in question falls within the scope of that agreement); *Brown v. Federated Capital Corp.*, 991 F. Supp. 2d 857, 860 (S.D. Tex. 2014) ("The Court must first determine whether a contractually valid forum-selection clause exists that applies to the present case, which involves two separate inquiries: (1) whether the parties agreed to a contractually valid forum-selection clause, and (2) whether the present case falls within the scope of the forum-selection clause."); *In re Lloyd's Register N. Am., Inc.*, 780 F.3d 283 (5th Cir. 2015) (assessing whether or not the contract applied to the action in determining whether the forum selection clause applied); *Morgan Tire of Sacramento, Inc. v. Goodyear Tire & Rubber Co.*, No. 2:13-CV-2135 KJM AC, 2014 WL 6390282, at *9 (E.D. Cal. Nov. 13, 2014). "[T]he Ninth Circuit has found that provisions using the phrases 'arising under,' 'arising out of,' and 'arising hereunder' (collectively referred to as "arising under" language) should be narrowly construed to cover only those disputes 'relating to the interpretation and performance of the contract itself.'" *Robles v. Comtrak Logistics, Inc.*, No. 2:13-CV-00161-JAM-AC, 2015 WL 1530510, at *3 (E.D. Cal. Apr. 3, 2015) (citations omitted). "In contrast, provisions that include or add phrases such as 'relating to' and 'in connection with' (collectively referred to as 'relating to' language) have a broader reach." *Id.*

The Agreement, which is a click-through form agreement, sets out its purpose as follows: "You would like to use the Apple Software (as defined below) to develop one or more Applications (as defined below) for Apple-branded products running the iOS." (citing Dkt. No. 156-27 at 1.)  "Apple is willing to grant You a limited license to use the Apple Software to develop and test Your Applications on the terms and conditions set forth in this Agreement." (*Id.*)  The Court observes that Apple is asserting that the forum selection clause contained in this

agreement should, in effect, reach any action involving Apple Software or any action that involves a relationship (e.g. connection) to Apple.

Having reviewed the record and the Agreement in light of the applicable law, the Court does not find that the claims at issue in this suit either "aris[e] out of or relat[e] to th[e] Agreement [or] the Apple Software or Your relationship with Apple" as that phrase is read in the Agreement.  For example, the Agreement defines "iOS" to mean the "iOS operating system software provided by Apple for use by You only in connection with Your Application development and testing . . . ."  (Dkt. No. 156-27 at 3.)  Apple asks the Court to read the provision of "Apple Software" to, in effect, encompass any use of Apple Software (e.g. iOS) in any context—even if the use is outside the scope of "development and testing."  Apple has provided the Court with no credible evidence or argument to suggest that the Court should read the Agreement's provision on "Apple Software" as anything other use in connection with the "development and testing" of an application.  Between the parties, the Court finds ContentGuard's arguments regarding the term "Your relationship" to be more persuasive.  Apple's argument that the term "Your relationship" should have plain and ordinary meaning would effectively encompass any conduct involving a signatory and Apple.  Such a reading would, in effect, convert every other limitation to surplusage.  The Court notes that, when asked, Apple's counsel could articulate no litigation concerning Apple that would fall outside of the Agreement.  The Court therefore finds that the patent claims at issue in this litigation are not within the scope of the forum selection clause contained in the Agreement.

## II. CONFIDENTIALITY AGREEMENT

On January 30, 2015, approximately thirteen months after the suit was filed and six months after Apple filed its Motion to Transfer, Apple filed an Opposed Motion for Leave to Supplement the Record in Support of Apple Inc.'s Motion to Sever and Transfer.  (*See* Dkt.

No. 385.)  Apple's Motion to Supplement asserts that, because of the need for a hypothetical future ruling on the scope of a March 22, 2011 Confidentiality Agreement ("NDA") between Apple and ContentGuard that "should be heard and decided by a court in California," this case should be transferred to the Northern District of California.  (*See id.* at 4.)  Apparently, the potential dispute is as follows: "ContentGuard does not believe that any communications prior to the NDA entered into by ContentGuard and Apple on March 22, 2011 are covered by the NDA; however, Apple claims that all communications between the parties regardless of time are protected by the NDA."[4]  (*Id.* at 3.)  The NDA contains a provision stating, in part, that "parties further submit to and waive any objections to the jurisdiction and venue in the state and federal courts located in the Northern District of California, Central District of California, Santa Clara County, or Los Angeles County, for any litigation arising out of breach of this Agreement."  (Dkt. No. 385-4 ¶ 13.)

ContentGuard responds that the NDA does not require that litigation arising out of the breach of the NDA must be brought in California.  (Dkt. No. 416 at 1-2.)  ContentGuard asserts that the first draft of the NDA contained a provision providing "exclusive jurisdiction" to California courts, but that the final negotiated agreement explicitly removed such a provision.  (*Id.*)  Apple responds that the parties intended the clause to be mandatory, and that it was only ContentGuard's final edit—"without notice to Apple"—removed the "exclusive" provision.  (Dkt. No. 422 at 2-4.)  ContentGuard responds that Apple "attempts to contradict the express terms" of the NDA and that the history of the agreement clearly shows that the language was affirmatively removed.  (Dkt. No. 432 at 1-2.)

---

[4] The apparent dispute is over the effect of a provision stating that "[n]either Discloser nor Recipient shall disclose to any person, except to those who may receive Confidential Information pursuant to the terms of this Agreement, the terms, status or existence of the discussions between the parties."  (Dkt. No. 385-4 ¶ 9.)

By its plain language, the forum clause in the NDA is permissive and not mandatory. While the NDA provides that jurisdiction and venue are waived in specific California courts under specific circumstances, the NDA does not require that all disputes under the NDA must be heard by those Courts.  Further, the form provision is strictly limited to "litigation arising out of breach of this Agreement."  As noted above, "arising under" language "should be narrowly construed to cover only those disputes 'relating to the interpretation and performance of the contract itself.'"  Apple does not allege that ContentGuard is in breach of the NDA or that this litigation arises out of a breach of the NDA.

The Court finds that the NDA agreement has no clear bearing on transfer.  The agreement does not contain a mandatory forum selection provision, and there is no allegation of breach of the agreement that would fall under it even if it did.  To the extent an actual dispute becomes ripe under the agreement, this Court, like its fellow federal courts, is amply capable of interpreting the NDA under California law.  If there were a separate litigation "arising out of breach of" the NDA, such litigation could potentially be brought in this District.  The Court therefore **DENIES** Apple's Opposed Motion for Leave to Supplement the Record in Support of Apple, Inc.'s Motion to Sever and Transfer (Dkt. No. 385.)  In so ruling, the Court makes no determination regarding the parties' potential dispute over the meaning of the confidentiality provision of the NDA.

### III. MOTION TO TRANSFER

While Apple's briefing primarily focuses on the issues of severance and the forum selection clause in the iOS Agreement (discussed above), Apple also requests transfer under 28 U.S.C. § 1404(a).  The Court observes that the portions of Apple's Motion that argue for transfer under 28 U.S.C. § 1404(a) are premised on the assumption that Apple has been or would be severed as a party from this litigation.  For example, Apple asserts that "[f]ollowing the

severance . . . no evidence maintained by other defendants has any relevance to the claims against Apple's software and services," and that "[f]or Apple-only claims against Apple software and services, the Northern District of California is clearly the more convenient forum."  (Mot. at 15; Reply at 7.)

## A.      Proper Venue

The Northern District of California and the Eastern District of Texas are both proper venues.

## B.      Private Interest Factors

### 1.      Relative Ease of Access to Sources of Proof

"In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer.  Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location."  *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009) (citation omitted).

Apple provides a declaration by Augustin Farrugia, Senior Director at Apple Inc.  (Dkt. No. 156-24 ¶ 1.)  Mr. Farrugia states that "Apple developed and utilizes DRM technology called FairPlay to protect some media sold through Apple's iTunes and iBook stores."  (*Id.* ¶ 3.) According to Mr. Farrugia, Apple's FairPlay-related documents and its witness are located in either Cupertino, California or France.  (*Id.*)  Mr. Farrugia states that "Apple takes extraordinary steps to limit the distribution of materials that could compromise FairPlay or any of its encryption protocols" and that transporting its source code presents significant commercial risks. (*Id.* ¶¶ 5-6.)

Apple also provides a declaration by Mark Buckley, Finance Manager, at Apple Inc. (Dkt. No. 156-25 ¶ 1 (hereinafter "Buckley Decl.").)  According to Mr. Buckley, Apple is headquartered in Cupertino, California and "designs and markets personal computers, portable

digital music players, and mobile communication devices and sells a variety of related software, services, peripherals, and networking solutions." (*Id.* ¶¶ 2-3.)  According to Mr. Buckley, aside from "two retail stores, Apple does not otherwise maintain any facilities or corporate offices in the Eastern District of Texas." (*Id.* ¶ 11.)  Mr. Buckley states that "Apple has other facilities in Texas" that "are largely dedicated to customer service and support, sales, and accounting functions."[5] (*Id.* ¶ 12.)    Mr. Buckley also states that the two Apple "campuses in the Austin area are the Riata campus and the Lonestar Design Center," and that the Lonestar Design Center "is devoted to hardware engineering, specifically development work on ASICs (application-specific integrated circuits)." (*Id.*)  Mr. Buckley declares that the "vast majority of design and development, as well as sales and marketing, for Apple devices, iTunes, iBooks, and the App Store took place in or near Cupertino" and that the documents associated with this work are "are located in or near Cupertino," as are "Apple business records related to product and service revenue." (*Id.* ¶ 13.)  Mr. Buckley asserts that "[m]ore than 83% of the 252 employees listed in the source code commit logs related to distribution of digital content by iTunes, iBooks, and App Store client and server software were located in or near Cupertino, California."[6] (*Id.* ¶ 14.)  Mr. Buckley states that he "identified no [Apple] jobs in Texas relating to the development or implementation of iTunes, iBooks, and App Store client and server software" and that the "vast majority of Apple's employees who may have technical knowledge about distribution of digital content by iTunes, iBooks, and App Store client and server software to Apple devices are based in or near Cupertino, California." (*Id.* ¶¶ 16-17.)  Mr. Buckley also provides a supplemental

---

[5] While Mr. Buckley's declaration omits any detail as to the number of employees that Apple has in Texas in general or Austin in particular, ContentGuard asserts that Apple maintains 3,500 employees in Austin.  (Resp. at 11.)

[6] Mr. Buckley does not state where the remaining employees are located.  The Court observes that Apple's identified French employees would not make up the entirety of the difference.

statement that, of Apple's fifteen email custodians, thirteen work in Cupertino, one works in Santa Clara, and one splits his time between Colorado and Cupertino.  (Dkt. No. 221 ¶¶ 2-4.)

Apple asserts that ContentGuard has dropped its hardware related claims and that this case concerns software.  (*See* Dkt. No. 265.)  ContentGuard responds that it asserts and has always asserted that hardware is at issue in this litigation in addition to software, and that, for example, Apple's A7 chip, allegedly manufactured by Samsung for Apple in Austin, Texas, is specifically implicated in the infringement it alleges.  (Resp. at 11.)  Apple asserts that ContentGuard "ignores, and fails to rebut or otherwise challenge, the sworn declaration that Apple submitted" and that "none of Apple's activities or employees in Austin has any connection to ContentGuard's allegations."  (Reply at. 7.)  The Court observes that Apple's declarant expressly omits statements as to whether or not any of Apple's facilities in Texas are related to ContentGuard's allegations against Apple's hardware.[7]  For example, the Court observes that Apple's declarant uses different phrasing when referring to Apple's Texas facilities as opposed to Apple's Cupertino headquarters.  *Compare* ¶ 16 ("no jobs in Texas *relating to the development or implementation* of iTunes, iBooks, and App Store client and server software") *to* ¶ 17 ("Apple's employees who *may have technical knowledge about distribution of digital content* by iTunes, iBooks, and App Store client and server software *to Apple devices* are based in or near Cupertino, California") (emphasis added).  The Court observes that Apple's declarant also fails to mention that, at least, Apple's laptops and some of its smartphone chipsets are manufactured in Texas.  Similarly, though Apple's declarant states that Apple's facilities in Texas are "are largely dedicated to customer service and support, sales, and accounting

---

[7] The Court observes that the declarant was apparently informed that "ContentGuard's infringement disclosures identify Apple desktop, laptop, and mobile devices, and the Apple TV." (Buckley Decl. ¶ 4.)

functions," the declarant makes no statement as to whether or not employees or documents relevant to other aspects of this case, such as damages, sales, or marketing, are located at Apple's Texas facilities.  Additionally, ContentGuard observes that the iOS Agreement, which Apple asserts is tied to this litigation, states that all notices should be sent to Apple's "iOS Developer Program Licensing" office in Austin, Texas.  (Resp. at 11.)

Apple's asserts that "Apple is headquartered in the Northern District, where it stores most, if not all, materials relevant to Apple's iTunes, iBooks, and App Store applications and the servers and the DRM technology they incorporate."  (Mot. at 14.)  Apple also asserts that "[m]arketing, sales, research, design and development activities relevant to the accused software, as well as Apple's activities related to interactions with content or app providers are all *centered in* Apple's headquarters."[8]  (*Id.* (emphasis added).)

ContentGuard asserts that its headquarters is located in this District.  (Resp. at 13.) ContentGuard asserts that its documents, servers, and key personnel are located in this District (*Id.*)

Apple's briefing takes the position that (and presents its evidence as if) only Apple's iTunes, iBooks, and its App Store are relevant to the case and that, despite being accused by specific patent claims, Apple's hardware is effectively irrelevant.[9]  (*See* Mot. at 7 ("ContentGuard's contentions . . . do not meaningfully implicate Apple's operating systems and hardware"); *see also* Buckley Decl. (stating he has been informed that Apple hardware has been

---

[8] While Apple's evidence proves that the "vast majority" of such work "took place in or near Cupertino," Apple's evidence is unclear where particular aspects of Apple's work, such as sales and marketing, presently takes place.

[9] As discussed in, at least, the Court's order regarding severance (Dkt. No. 456), in addition to ContentGuard, the majority of other defendants in this action do not appear to share Apple's position that hardware and/or operating systems are irrelevant.

identified as infringing and then focusing on locations "related to distribution of digital content by iTunes, iBooks, and App Store client and server software.").)  Further, Apple's briefing also takes the position that evidence related to other co-defendants is irrelevant based on the presumption that Apple would be severed as a party.[10]  Apple's choices make the extent and weight of Apple's evidence uncertain.  For example, instead of describing where "relevant" information is located, Mr. Buckley's declaration focuses on the location of sources defined by a specifically created phrase: "distribution of digital content by iTunes, iBooks, and App Store client and server software."[11]  Had Apple presented additional evidence on relevant sources of proof, such as Apple's hardware, the analysis might be unchanged—the evidence before the Court suggests that the majority of Apple's employees work in or near its headquarters.  However, Apple appears to have omitted substantive discussions regarding the sources of proof on topics Apple has acknowledged are relevant, such as Apple's hardware.  The Court weighs this against Apple.

Apple's briefing makes clear that the majority of the employee-witnesses that Apple has selected to testify in this case work at its headquarters in Cupertino, California, and that the majority of Apple's documents are also located there.  ContentGuard's briefing makes clear that the majority of the employee-witnesses that ContentGuard has selected to testify in this case work at its headquarters in this District, and that the majority of ContentGuard's documents are also located in this District.

On balance, the Court finds that this factor weighs against transfer.

---

[10] Again, as discussed in, at least, the Court's order regarding severance (Dkt. No. 456), Apple's position that party based severance was appropriate was appears to be at odds with the bulk of the other co-defendants (and ContentGuard).  Other defendants argued that the case should be divided along the lines of claims, placing parties, such as Apple, into multiple suits.

[11] Mr. Buckley's declaration, for example, does not contain the important qualifier "relevant."

### 2.        Cost of Attendance for Willing Witnesses

"The convenience of the witnesses is probably the single most important factor in a transfer analysis."  *In re Genentech, Inc.*, 566 F.3d 1338, 1342 (Fed. Cir. 2009).  While the Court must consider the convenience of both the party and non-party witnesses, it is the convenience of non-party witnesses that is the more important factor and is accorded greater weight in a transfer of venue analysis.  *Aquatic Amusement Assoc., Ltd. v. Walt Disney World Co.*, 734 F.Supp. 54, 57 (N.D.N.Y. 1990); *see also* 15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3851 (3d ed. 2012).  "A district court should assess the relevance and materiality of the information the witness may provide."  *In re Genentech, Inc.*, 566 at 1343.  However, there is no requirement that the movant identify "key witnesses," or show "that the potential witness has more than relevant and material information . . . ."  *Id.* at 1343-44.

Apple asserts that "[a]ll of Apple's necessary witnesses and evidence are located in the Northern District."   (Reply at 8.)   Apple asserts that "three inventor witnesses live in the Northern District."  (Mot. at *Id.*).  Apple also asserts that "[p]rosecution counsel for the patents in suit (Reed Smith LLP and Nixon Peabody LLP) also have local offices in the Northern District."[12]  Apple asserts that, since "[t]hese witnesses would need to travel substantial distance to the current venue, away from their regular employment and almost certainly for overnight stays," this factor weighs in favor of transfer.

ContentGuard asserts that it is headquartered in this District and that its office houses its documents and a number of key personnel.  (*Id.* at 13.)  ContentGuard asserts that its patent prosecution counsel "are actually based in Washington, D.C." and not the Northern District of California   (*Id.* at 14.)  ContentGuard asserts that it has "submitted sworn declarations from

---

[12] Apple provides no information regarding the attorneys who prosecuted the patents-in-suit, such as whether or not they are still with these firms or work at these offices.

numerous inventors of the patents-in-suit—key witnesses in this case—that establish that this Court is a convenient forum in which they agree to appear voluntarily."   (Sur-Reply at 5.) ContentGuard also asserts that it has "provided ample evidence, which Apple unconvincingly seeks to dismiss, that other relevant third-party witnesses are located in Texas or outside California." (*Id.*)

The known non-party witnesses consist primarily of the inventors of the patents in suit. As the Court noted in the Google Transfer Order, "three non-party inventors reside within NDCA, five reside elsewhere in California and one splits his time between Texas and Washington."  Google Transfer Order at 10.  "The eight inventors residing in California would ordinarily be inconvenienced by having to travel to Texas to attend trial."  *Id.*  "Six of them, however, together with the inventor who splits his time between Texas and Washington, have volunteered to travel to Texas to attend trial as well as declaring that such live appearances will not be inconvenient."  *Id.*

On balance, the Court finds that this factor weighs in favor of transfer.

### 3.       Availability of Compulsory Process to Secure the Attendance of Witnesses

This factor instructs the Court to consider the availability of compulsory process to secure the attendance of witnesses, particularly non-party witnesses whose attendance may need to be secured by a court order.  *See In re Volkswagen II*, 545 F.3d at 316.   Third-party subpoenas are governed by Fed. R. Civ. P. 45, which, as recently amended in 2013, provides the presiding court with nationwide subpoena power to order third-party witnesses to attend deposition, so long as the deposition is to take place within 100 miles of the witness's residence or regular place of business.  Fed. R. Civ. P. 45(a)(2), 45(c)(1)(A).  As such, both forums are essentially equivalent in terms of securing depositions from third-parties.  The primary difference then is the use of the subpoena power to compel attendance at trial, which a court may order, generally

speaking, within either 100 miles of the witness's residence or regular place of business or within the state of the witness's residence or regular place of business, so long as the witness would not incur substantial expense.  Fed. R. Civ. P. 45(c)(1)(A), 45(c)(1)(B).

Apple asserts that the use of the subpoena power to secure the attendance of three named inventors weighs in favor of the Northern District of California.  (Mot. at 16.)  In a footnote, Apple only obliquely acknowledges that most of the named inventors have signed declarations stating they will appear for trial in this District.  (Mot. at 16, n.6.)  Apple attempts to side-step the issue by arguing that the inventors' declarations should not be considered because they do not expressly state that, if Apple's case were to be severed, that the inventors would attend such a separate trial.  (*Id.*)

ContentGuard asserts that seven of the nine non-party inventors have declared their willingness to appear at a trial held in this District.  (Resp. at 13.)  ContentGuard asserts that "nothing in the inventors' declarations indicates that their commitment is limited to a single trial appearance."  (Resp. at 14 n.11.)  ContentGuard asserts that its patent prosecution counsel "are actually based in Washington, D.C." and not the Northern District of California   (*Id.* at 14.)

As the Court discussed in the Google Transfer Order, "while NDCA has the so called 'absolute subpoena power' – the subpoena power for both deposition and trial – over the three non-party inventors living within that district, neither this Court nor NDCA clearly has the power to command the remaining inventors to attend trial."  Google Transfer Order at 8.  "In other words, the compulsory process available at NDCA only works to secure the attendance of three non-party inventors."  *Id.*  "Seven out of the nine non-party inventors, however, have declared their willingness to voluntarily appear in person at trial '*if [the case] is held in Texas.*'  *Id.*

(emphasis in original).[13]  "These seven inventors have not expressed similar willingness to voluntarily appear at trial should the case be tried in NDCA."  *Id.*  "As such, despite the availability of compulsory process at NDCA for the three inventors residing there, transferring the case to NDCA may actually result in a *lesser* attendance of these non-party witnesses."  The Court also noted that "[t]he three inventors residing in NDCA (Stefik, Pirolli and Merkle) do not cover all nine of the asserted patents, while the seven inventors who have declared their willingness to attend trial before this Court do cover every asserted patent."  *Id.*

The parties' briefing only provides evidence that the subpoena power might be used to compel the attendance of non-party inventors at trial.  While the record appears clear that a greater number of the inventors are located within the Northern District of California's subpoena power, the Court has been presented with declarations indicating that a greater number of inventors would be present for trial in this Court, and that the inventors available for trial in this Court would, in contrast to the those available in the Northern District of California, cover all of the patents in suit.  The Court therefore finds this factor to be neutral.

### 4.    All Other Practical Problems that Make Trial of a Case Easy, Expeditious, and Inexpensive

"Practical problems include those that are rationally based on judicial economy.  Particularly, the existence of duplicative suits involving the same or similar issues may create practical difficulties that will weigh heavily in favor or against transfer."  *Eolas Technologies, Inc. v. Adobe Sys., Inc.*, 6:09-CV-446, 2010 WL 3835762 (E.D. Tex. Sept. 28, 2010), *aff'd In re*

---

[13]  Apple suggests that, despite his declared willingness, one of the inventors residing in the Northern District of California might not appear at trial in the Eastern District of Texas.  (*See* Dkt. No. 435.)  The Court observes that, to reach its conclusion, Apple selectively edits the inventor's testimony.  For example Apple quotes the inventor as stating I'd be inclined . . . not to do so" in response to being asked if he would appear for trial when the inventor actually testified "I'd be inclined, if I didn't have to appear in these things, not to do—not to do so."  Having examined the record, the Court does not find that the testimony contradicts his earlier statement.

*Google, Inc.*, 412 Fed. Appx. 295 (Fed. Cir. 2011).   Furthermore, "the existence of multiple lawsuits involving the same issues 'is a paramount consideration when determining whether a transfer is in the interest of justice.'" *In re Vicor Corp.*, 493 Fed. App'x 59, 61 (Fed. Cir. 2012).

As noted above, there are co-pending claims (and suits) before this Court concerning the patents-in-suit.  On balance, the Court finds that this factor weighs against transfer.

## C.     Public Interest Factors

### 1.     Administrative Difficulties Flowing From Court Congestion

The speed with which a case can come to trial and be resolved is a factor in the transfer analysis. A proposed transferee court's "less congested docket" and "[ability] to resolve this dispute more quickly" is a factor to be considered. *In re Hoffman-La Roche*, 587 F.3d 1333, 1336 (Fed. Cir. 2009). This factor is the "most speculative," and in situations where "several relevant factors weigh in favor of transfer and others are neutral, the speed of the transferee district court should not alone outweigh all of those other factors." *In re Genentech*, 566 F.3d at 1347.

Apple filed this transfer motion approximately six months after this case was filed. Before this motion was filed, at the Court's April 7, 2014 scheduling conference, the parties were provided with their September 8, 2015 jury selection date.  Apple's supplemental briefing to its Motion was completed in March of 2015.

Apple asserts that the Northern District of California has a 1.1 month faster time to termination than this District.  (*Id.* (citing Dkt. No. 156-9).)  Apple asserts that the Northern District of California has a "median time to trial of 31 months, as compared to the 21-month [time to trial] schedule[d] in this case." (*Id.*)  Apple concludes that "[t]his factor is neutral at best given the lack of data available specific to patent cases." (*Id.*)

According to federal case management statistics for the 12 month period ending on December 31, 2013 (this case was filed in December of 2013), this District has a median time to

termination of 8.9 months and a median time to trial of 20.8 months, and the Northern District of

California has a median time to termination of 7.8 months and a median time to trial of 31.0

months.  The Court observes that, like the December 2013 report, the June and September 2013

and March 2014 statistical reports also show swifter times to trial in this District than in the

Northern District of California: June 2013 (E.D. Tex. 18.5, N.D. Cal. 30.9); September 2013

(E.D. Tex. 20.5, N.D. Cal. 27.4); and March 2014 (E.D. Tex. 21.3, N.D. Cal. 34.2).  The Court

observes that the 21 month time to trial scheduled in this case tracks the 20.8 month median time

to trial shown in the December 2013 statistical report.  The evidence before the Court suggests

that there was an approximately 10 month difference in the expected time to trial at the time of

filing.

      The Court finds that this factor weighs against transfer.

### 2.      Local Interest in Having Localized Interests Decided at Home

      This factor considers the interest of the locality of the chosen venue in having the case

resolved there. *Volkswagen I*, 371 F.3d at 205-06. This consideration is based on the principle

that "[j]ury duty is a burden that ought not to be imposed upon the people of a community [that]

has no relation to the litigation."

      In its brief discussion of local interest, Apple asserts that its "headquarters and at least

eleven likely employee witnesses, as well as three inventor witnesses, give the Northern District

a significant interest."  (Mot. at 19.)  Apple also argues its accused DRM technology creates a

"strong interest" in the Northern District of California because the technology is confidential.

(*Id.*)  Apple also asserts that transporting its source code presents risks.  While it may be true that

transportation of Apple's source code presents risks, the Court observes that the record in this

case reflects that the Apple engineers regularly working on this code are located in, at least,

California and France, suggesting that the source code is frequently transported, at least in part,

across the planet.  Further, the Court's experience suggests that only portions of Apple's source code would be presented as evidence at trial, making it highly unlike that anything other than very small portions of an entire program would ever be transported, regardless of where the trial is held.

The Plaintiff in this suit is a Texas corporation with its principal place of business in this district.  A number of other defendants in this action are also headquartered either in or near this district.  The Court does not find that the confidentiality of Apple's accused technology substantively alters its assessment.  The Court observes that it tried a case involving Apple's DRM technology, including Apple's FairPlay technology, to a verdict approximately two months ago.  The Court observes that the trial proceedings were not remarkably different than those in many patent cases.

The Court finds that this factor weighs against transfer.

### 3-4.   Familiarity of the Forum With the Law that Will Govern the Case and Avoidance of Unnecessary Problems of Conflict of Laws or in the Application of Foreign Law

These factors are neutral.

## CONCLUSION

A movant seeking transfer bears the evidentiary burden of establishing that the movant's desired forum is clearly more convenient than the forum where the case was filed. Having considered the evidence presented by the Parties in view of the applicable law, the Court finds that the weight of the evidence presented by Apple has not met this burden of establishing that the Northern District of California is a clearly more convenient forum than the Eastern District of Texas.  For the reasons set forth above, the Court hereby **DENIES** Apple's Motion to Sever and Transfer (Dkt. No. 156) and **DENIES** Apple's Opposed Motion for Leave to Supplement the Record in Support of Apple, Inc.'s Motion to Sever and Transfer (Dkt. No. 385.)

**So Ordered and Signed on this**

**Apr 23, 2015**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE