**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - - - x

ContentGuard Holdings, Inc.,                    :

                Plaintiff,        :

        v.                              :    Civil Action No. 2:13-cv-1112-JRG

Amazon.com, et. al,                             :        JURY TRIAL DEMANDED

             Defendants.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- - - - x

**DEFENDANTS' JOINT RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS
DECLARING ALL ASSERTED PATENT CLAIMS INVALID
<u>PURSUANT TO 35 U.S.C. § 101</u>**

# TABLE OF CONTENTS

I.  STANDARD OF REVIEW ....................................................................................... 2

II.  THE FRAMEWORK FOR SECTION 101 ANALYSIS. ................................................ 3

III.  THE ASSERTED PATENT CLAIMS ARE DRAWN TO UNPATENTABLE SUBJECT
MATTER. ............................................................................................................ 7

   A.  The Stefik Patents ....................................................................................... 7

      1.  The '007 patent ......................................................................... 8

         a.  Representative Claim 1 is drawn to an abstract idea. .................... 8

         b.  Claim 1 lacks any inventive element that could render it
            patentable. .................................................................................. 9

         c.  The remaining claims of the '007 patent do not add any inventive
            elements. .................................................................................. 16

      2.  The '956 patent ....................................................................... 17

         a.  Representative Claim 1 is drawn to an abstract idea. .................. 17

         b.  Claim 1 lacks any inventive element that could render it
            patentable. .................................................................................. 18

         c.  The remaining claims of the '956 patent do not add any inventive
            elements. .................................................................................. 19

      3.  The '072 patent ....................................................................... 19

         a.  Representative Claim 1 is drawn to an abstract idea. .................. 19

         b.  Claim 1 lacks any inventive element to render it patentable. ....... 20

         c.  The remaining claim of the '072 patent lacks any inventive
            element. .................................................................................. 21

      4.  The '576 patent. ...................................................................... 21

         a.  Representative Claim 1 is drawn to an abstract idea. .................. 21

         b.  Claim 1 lacks any inventive element that could render it
            patentable. .................................................................................. 23

      5.  The '859 patent ....................................................................... 24

         a.  Representative Claim 1 is drawn to an abstract idea. .................. 24

         b.  Claim 1 lacks any inventive element sufficient to render it
            patentable. .................................................................................. 25

         c.  The remaining claims of the '859 patent lack any inventive
            element. .................................................................................. 26

      6.  The '160 Patent ....................................................................... 26

         a.  Representative Claim 1 is drawn to an abstract idea. .................. 26

         b.  Claim 1 lacks any inventive element sufficient to render it
            patentable. .................................................................................. 27

        c.    The dependent claims fail to add any inventive element.............. 28

    B.   The Nguyen Patents ....................................................................... 28

        1.    The Nguyen '280 Patent ........................................................ 30

            a.    Representative Claim 1 is drawn to an abstract idea. ................... 30

            b.    Claim 1 lacks any inventive element sufficient to render it
                  patentable. .................................................................. 32

            c.    The remaining claims lack any inventive element....................... 34

        2.    The Nguyen '053 Patent. ........................................................ 34

            a.    Representative Claim 1 is drawn to an abstract idea. ................... 34

            b.    Claim 1 lacks any inventive element sufficient to render it
                  patentable. .................................................................. 36

            c.    Remaining Claims of the '053 Patent. ......................................... 36

IV.   CONCLUSION............................................................................................... 37

# TABLE OF AUTHORITIES

## Cases

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013) ................................................................................... 3

*Adv. Auctions, LLC v. eBay, Inc.*,
    No. 13CV1612, 2015 WL 1415265 (S.D. Cal. Mar. 27, 2015) ................................. 3

*Alice Corp. Pty. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ................................................................................... passim

*Amdocs (Israel) Ltd. v. Opennet Telecom, Inc.*,
    No. 1:10CV910 (LMB/TRJ), 2014 WL 5430956 (E.D. Va. Oct. 24, 2014) .................... passim

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada*,
    687 F.3d 1266 (Fed. Cir. 2012) ................................................................. 6, 9, 12, 25

*Bascom Research, LLC v. LinkedIn, Inc.*,
    No. 12-6293, 2015 WL 149480 (N.D. Cal. Jan. 5, 2015) ................................. 5, 8, 20

*Bilski v. Kappos*,
    561 U.S. 593 (2010) ............................................................................................. 3, 32

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014) ................................................................................... 3

*CertusView Techs., LLC v. S & N Locating Servs., LLC*,
    Civil No. 2:13cv346, 2015 WL 269427 (E.D. Va. Jan. 21, 2015) ............................ 4

*Clear with Computers LLC v. Altec Indus., Inc.*,
    No. 6:14-cv-79, Slip Op. at 7 (E.D. Tex. Mar. 3, 2015) ...................................... 2, 4

*Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*,
    No. 12-674, Slip. Op. (E.D. Tex. Jan. 21, 2014) ...................................................... 2

*Cloud Satchel, LLC v. Amazon.com, Inc.*,
    --- F. Supp. 3d ----, 2014 WL 7227942 (D. Del. Dec. 18, 2014) ................................ 4, 19, 36

*Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*,
    --- F. Supp. 3d ---, Civil Action No. 12-205-RGA, 2014 WL 3542055
    (D. Del. July 16, 2014) ............................................................................................. 4

*In re Comiskey*,
    554 F.3d 967, 981 (Fed. Cir. 2009) ......................................................................... 29

*Compression Technology Solutions LLC v. EMC Corp.*,
    2013 WL 2368039 (N.D. Cal. May 29, 2013) ........................................................ 16

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    --- F.3d ----, 2014 WL 7272219 (Fed. Cir. Dec. 23, 2014) ...................................... 3

*Cords, Inc. v. Walgreen Co.*,
    No. 2:13-cv-00631-ODW (SHx), 2014 WL 7339201 (C.D. Cal. Dec. 23, 2014) ...................... 4

*Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*,
   558 F. App'x 988 (Fed. Cir. 2014) ...................................................................... 3

*Cybersource Corp. v. Retail Decisions*,
   654 F.3d 1366 (Fed. Cir. 2011)........................................................................... 33

*DDR Holdings, LLC v. Hotels.com, L.P.*,
   773 F.3d 1245 (Fed. Cir. 2014).......................................................................... 15

*Diamond v. Diehr*,
   450 U.S. 175 (1981) ............................................................................................ 6

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
   758 F.3d 1344 (Fed. Cir. 2014)........................................................................... 3

*East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc.*,
   Civil No. 12-cv-517-LM, 2015 WL 226084 (D.N.H. Jan. 15, 2015) ................... 4

*Enfish LLC v. Microsoft Corp.*,
   2014 WL 5661456 ............................................................................................. 23

*Enpat, Inc. v. Tenrox, Inc.*,
   No. 6:13-cv-948, 2015 WL 541673 (M.D. Fla. Feb. 10, 2015)............................ 4

*Essociate, Inc. v. Clickbooth.com, LLC*,
   No. 13-01886, 2015 WL 1428919 (C.D. Cal. Feb. 11, 2015) .............................. 4

*Hewlett Packard Co. v. ServiceNow, Inc.*,
   No. 14-cv-00570, 2015 WL 1133244 (N.D. Cal. Mar. 10, 2015) ........................ 4

*I/P Eng., Inc. v. AOL Inc.*,
   2014 WL 3973501 (Fed. Cir. Aug. 15, 2014) ..................................................... 2

*Intellectual Ventures I LLC v. Mfrs. & Traders Trust Co.*,
   --- F. Supp. 3d ----, 2014 WL 7215193 (D. Del. Dec. 18, 2014)..................... 4, 23

*Intellectual Ventures I, LLC v. Motorola Mobility, LLC*,
   No. 11-908, 2015 WL 846532 (D. Del. Feb. 24, 2015)....................................... 4

*IpLearn, LLC v. K12 Inc.*,
   --- F. Supp. 3d ----, 2014 WL 7206380 (D. Del. Dec. 17, 2014) --- F. Supp. 3d ----, 2014 WL
   7185921 (N.D. Cal. Dec. 16, 2014) ..................................................................... 4

*Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*,
   Civ. No. 12-1138-SLR, 2014 WL 7149400 (D. Del. Dec. 15, 2014)............... 4, 8, 16

*KomBea Corp. v. Noguar L.C.*,
   No. 2:13-CV-957 TS, 2014 WL 7359049 (D. Utah Dec. 23, 2014)...................... 4

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*,
   __ F. Supp. 3d __, No. 2:13-CV-655, 2014 WL 4364848 (E.D. Tex. Sept. 3, 2014) ............... 4

*Mack v. Midland Credit Mgmt., Inc.*,
   No. 14-265, 2015 WL 140034 (E.D. Tex. Jan. 7, 2015)....................................... 2

*Mayo Collab. Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1289 (2012) .............................................................................. passim

*Morales v. Square, Inc.*,
  No. 13-1092, 2014 WL 7396568 (W.D. Tex. Dec. 30, 2014) ........................................... 2, 4, 5

*Morsa v. Facebook, Inc.*,
  No. SACV 14-161-JLS (JPRx), 2014 WL 7641155 (C.D. Cal. Dec. 23, 2014) ........................ 4

*Mortgage Grader, Inc. v. Costco Wholesale Corp.*,
  Case No. SACV 13-00043 AG (ANx), 2015 WL 778125 (Jan. 12, 2015) ............................... 4

*Open Text S.A. v. Alfresco Software Ltd*,
  No. 13-CV-04843-JD, 2014 WL 4684429 (N.D. Cal. Sept. 19, 2014) ............................... 4, 16

*Open Text S.A. v. Box, Inc.*,
  Case No. 13-cv-04910-JD, 2015 WL 269036 (N.D. Cal. Jan. 20, 2015) ................................. 4

*OpenTV, Inc. v. Apple, Inc.*,
  No. 14-cv-01622, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015) ............................................ 3

*Planet Bingo, LLC v. VKGS LLC*,
  576 F. App'x 1005 (Fed. Cir. 2014) ................................................................................. 3

*Priceplay.com, Inc. v. AOL Advertising, Inc.*,
  No. 14-92, 2015 WL 1246781 (D. Del. Mar. 18, 2015) ..................................................... 3

*Shortridge v. Foundation Construction Payroll Service, LLC*,
  Case No. 14-cv-04850-JCS, 2015 WL 1739256 (N.D. Cal. Apr. 14, 2015) ........................... 3

*Synopsys, Inc. v. Mentor Graphics Corp.*,
  No. C 12-6467 MMC, 2015 WL 269116 (N.D. Cal. Jan. 20, 2015) ..................................... 4

*Tenon & Groove, LLC v. Plusgrade S.E.C.*,
  No. 12-1118, 2015 WL 1133213 (D. Del. Mar. 11, 2015) ................................................. 4

*The Money Suite Co. v. 21st Century Ins. and Fin. Servs.*,
  C.A. No. 13-984-GMS+, 2015 WL 436160 (D. Del. Jan. 27, 2015) ..................................... 4

*In re TLI Comms., LLC Patent Litig.*,
  MDL No. 1:14md2534, 2015 WL 627858 (E.D. Va. Feb. 6, 2015) ...................................... 4

*Tuxis Techs., LLC v. Amazon.com, Inc.*,
  No. 13-1771, 2015 WL 1387815 (D. Del. Mar. 25, 2015) ................................................. 3

*Ultramercial, Inc. v. Hulu LLC*,
  __ F.3d __, 2014 WL 5904902 (Fed. Cir. Nov. 14, 2014) ........................................... passim

*Vehicle Intelligence and Safety, LLC v. Mercedes-Benz USA, LLC*,
  No. 13 C 4417, 2015 WL 394273 (N.D. Ill. Jan. 28, 2015) ............................................... 4

*Walker Digital, LLC v. Google, Inc.*,
  --- F. Supp. 3d. ---, C.A. No. 11-318-LPS, 2014 WL 4365245 (D. Del. Sept. 3, 2014) ........... 4

*Wolf v. Capstone Photography, Inc.*,
  No. 13-09573, 2014 WL 7639820 (C.D. Cal. 2014) ..................................................... 2, 6

**Statutes**

35 U.S.C. § 101 ..................................................................................................... 2, 3, 37

**Rules**

Fed. R. Civ. P. 12(c) ................................................................................................................... 2

At least since the dawn of the printing press, people have imposed and enforced rights, restrictions and conditions on the use of written works.  For centuries, libraries and other repositories of written texts (and, later, audio and video recordings) have loaned and/or permitted restricted use of those works only to authorized patrons.  Anyone who has ever (a) presented a library card to a librarian, (b) written their name on a check-out card glued to the inside cover of a book or CD, and (c) agreed to abide by the return date and other restrictions spelled out on that check-out card (or printed inside the book's or CD's cover) before walking out the library door with an item, can attest to the fact that libraries restrict use of their works to authorized users who agree to abide by rules and restrictions on use.  Lose your library card, destroy a CD, or return a book well past its due date, and your borrowing privileges may be revoked and fees may be assessed.  This basic library loan concept was adapted for video movie rental stores in the 1980s and for video game rental stores in the 1990s.[1]

Plaintiff ContentGuard Holdings, Inc.'s ("ContentGuard") eight patents-in-suit do nothing more than take this basic library loan concept and effectively say "use computers to do this for digital works."  Using terms such as "repository," "trusted system" and "authorization object," the patent claims pretend to ground the library loan concept in specific computer requirements and components.  But, looking past the artificial complexity suggested by these carefully selected terms, it is apparent that ContentGuard's patents specify nothing beyond using generic computer hardware and software to perform the basic functions of a computer – secure storage, encrypted transmission of data, and reliable execution of instructions – to enforce usage rights and restrictions, just as librarians have done with pen and paper for hundreds of years. The Supreme Court, in *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2359 (2014) and other recent cases, and this Court have made clear that even when specified in great detail, "recit[ing] only generic computer components configured to perform otherwise conventional

---

[1] Though the Court likely is familiar with, and can take judicial notice of, the basic concepts of (a) a library card, (b) a library check-out card that is attached to the inside cover of a book, and (c) a library usage rights sticker that is similarly attached to the inside cover of a book, exemplars of such items are attached hereto as Exhibits 1, 2 and 3, respectively.

steps" cannot transform an abstract idea (like enforcing usage rights on works, as in a library loan transaction) into patentable subject matter. *Clear with Computers LLC v. Altec Indus., Inc.*, No. 6:14-cv-79, Slip Op. at 7 (E.D. Tex. Mar. 3, 2015) (invalidating claims directed to computer-created customized sales proposals due to unpatentable subject matter).

Applying the Supreme Court's and this Court's most recent guidance to ContentGuard's asserted patent claims makes clear (a) that all of those claims are invalid as drawn to unpatentable subject matter under 35 U.S.C. § 101 ("Section 101"), and (b) that judgment on the pleadings under Federal Rule of Civil Procedure 12(c) should issue in favor of Defendants.

## I.   STANDARD OF REVIEW

A Rule 12(c) motion for judgment on the pleadings is considered under the same standard as a Rule 12(b)(6) motion to dismiss. *Mack v. Midland Credit Mgmt., Inc.*, No. 14-265, 2015 WL 140034, at *2 (E.D. Tex. Jan. 7, 2015).  A court may consider documents referred to in the plaintiff's complaint, or which are central to the plaintiff's claims, *id.* at *3, such as the patents-in-suit attached to ContentGuard's Complaint as Exhibits C-K.  (Dkt. 1.)

The Court has broad discretion to determine when to decide Section 101 issues.  *I/P Eng., Inc. v. AOL Inc.*, 2014 WL 3973501, at *12 (Fed. Cir. Aug. 15, 2014) (Mayer, J., concurring).  Many district courts, including this one, have addressed Section 101 patentability on Rule 12 motions.  *See Altec*, Slip Op. at 7 (granting Rule 12(b)(6) motion to dismiss under Section 101); *Morales v. Square, Inc.*, No. 13-1092, 2014 WL 7396568 (W.D. Tex. Dec. 30, 2014) (same); *Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*, No. 12-674, Slip. Op. (E.D. Tex. Jan. 21, 2014) (granting Rule 12(c) motion under Section 101); *Wolf v. Capstone Photography, Inc.*, No. 13-09573, 2014 WL 7639820, at *5 (C.D. Cal. 2014).

Importantly, on March 20, 2015, this Court issued its Memorandum Opinion and Order construing various claim terms used in ContentGuard's patents.  (Amazon Dkt. 459; Google Dkt. 158.)  On April 9, 2015, the Court denied without prejudice Defendants' earlier-filed motions to dismiss and motions for judgment on the pleadings premised on Section 101, granting the Defendants "leave to promptly re-file in light of the Court's Claim Construction Order."

(Amazon Dkt. 482, Google Dkt. 166.) Accordingly, the Section 101 patentability issues are ripe for resolution with respect to the asserted ContentGuard patent claims.[2]

## II.   THE FRAMEWORK FOR SECTION 101 ANALYSIS.

Under 35 U.S.C. § 101, "whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."   Though Section 101 defines patentable subject matter broadly, it is well-accepted that laws of nature, physical phenomena, and abstract ideas may not be patented.   *Bilski v. Kappos*, 561 U.S. 593, 594 (2010).

In its recent decisions in *Mayo Collab. Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012) and *Alice Corp. Pty. v. CLS Bank*, 134 S. Ct. 2347 (2014), the Supreme Court established a two-part test for "distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts" (hereinafter "the *Alice* analysis").   *Id* at 2355.[3]   First, a court must determine whether the claims at issue are

---

[2] While the issue of patentable subject matter presents a question of law, the legal analysis "may contain underlying factual issues."   *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013) (as quoted in *Altec*, Slip Op. at 5).   Here, there are no material factual disputes that would prevent the Court from deciding the instant motion.

[3] Since the Supreme Court issued its decision in *Alice*, there has been a torrent of Federal Circuit and District Court cases holding that patents like the ones at issue are invalid under Section 101 because they are drawn to abstract ideas.   *See, e.g.*, *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, --- F.3d ----, 2014 WL 7272219 (Fed. Cir. Dec. 23, 2014) (finding and analyzing information contained in hard copy documents); *Ultramercial, Inc. v. Hulu LLC*, __ F.3d __, 2014 WL 5904902, at *4–5 (Fed. Cir. Nov. 14, 2014) ("distributing copyrighted media products over the Internet"); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354-55 (Fed. Cir. 2014) (creating a contractual relationship); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1006 (Fed. Cir. 2014) (managing bingo games); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) (organizing information); *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 (Fed. Cir. 2014) (using categories to organize, store, and transmit information); *Shortridge v. Foundation Construction Payroll Service, LLC*, Case No. 14-cv-04850-JCS, 2015 WL 1739256 (N.D. Cal. Apr. 14, 2015) ("cataloging labor data"); *OpenTV, Inc. v. Apple, Inc.*, No. 14-cv-01622, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015) ("[C]ompiling, organizing, and transmitting information, using identification codes as shorthand for that information."); *Adv. Auctions, LLC v. eBay, Inc.*, No. 13CV1612, 2015 WL 1415265 (S.D. Cal. Mar. 27, 2015) (auctions); *Tuxis Techs., LLC v. Amazon.com, Inc.*, No. 13-1771, 2015 WL 1387815 (D. Del. Mar. 25, 2015) (upselling products); *Priceplay.com, Inc. v. AOL Advertising, Inc.*, No. 14-92, 2015 WL 1246781 (D. Del. Mar. 18, 2015) (Internet sales transactions coupled with an auction component); *Tenon & Groove, LLC v. Plusgrade S.E.C.*, No. 12-1118, 2015 WL 1133213 (D. Del. Mar.

directed to an abstract idea. *Id.* A claim encompasses an abstract idea "when it describes a fundamental concept or longstanding practice." *Morales*, 2014 WL 7396568, at *6. "In determining whether a claim is directed to an abstract idea, courts look past the claim language to the purpose of the claim—in other words, what the invention is trying to achieve." *Id.*

In *Clear with Computers LLC v. Altec Indus., Inc.*, No. 6:14-cv-79, Slip Op. (E.D. Tex.

---

11, 2015) (using a computer to facilitate negotiations); *Hewlett Packard Co. v. ServiceNow, Inc.*, No. 14-cv-00570, 2015 WL 1133244 (N.D. Cal. Mar. 10, 2015) (monitoring deadlines, hierarchical organization of data, and automating IT incident resolution); *Intellectual Ventures I, LLC v. Motorola Mobility, LLC*, No. 11-908, 2015 WL 846532 (D. Del. Feb. 24, 2015) (distribution of software updates); *Essociate, Inc. v. Clickbooth.com, LLC*, No. 13-01886, 2015 WL 1428919 (C.D. Cal. Feb. 11, 2015) (gaining access to customers without having to compete with other merchants); *Enpat, Inc. v. Tenrox, Inc.*, No. 6:13-cv-948, 2015 WL 541673 (M.D. Fla. Feb. 10, 2015) (project management); *In re TLI Comms., LLC Patent Litig.*, MDL No. 1:14md2534, 2015 WL 627858 (E.D. Va. Feb. 6, 2015) ("taking, organizing, classifying, and storing photographs"); *Vehicle Intelligence and Safety, LLC v. Mercedes-Benz USA, LLC*, No. 13 C 4417, 2015 WL 394273 (N.D. Ill. Jan. 28, 2015) (testing vehicle operators for physical and mental impairment); *The Money Suite Co. v. 21st Century Ins. and Fin. Servs.*, C.A. No. 13-984-GMS+, 2015 WL 436160 (D. Del. Jan. 27, 2015) (generating price quotes for financial products); *CertusView Techs., LLC v. S & N Locating Servs., LLC*, Civil No. 2:13cv346, 2015 WL 269427 (E.D. Va. Jan. 21, 2015) (creating electronic records); *Open Text S.A. v. Box, Inc.*, Case No. 13-cv-04910-JD, 2015 WL 269036 (N.D. Cal. Jan. 20, 2015) (collaborating and sharing information); *Synopsys, Inc. v. Mentor Graphics Corp.*, No. C 12-6467 MMC, 2015 WL 269116 (N.D. Cal. Jan. 20, 2015) ("the process of inference"); *East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc.*, Civil No. 12-cv-517-LM, 2015 WL 226084 (D.N.H. Jan. 15, 2015) (mapping); *Mortgage Grader, Inc. v. Costco Wholesale Corp.*, Case No. SACV 13-00043 AG (ANx), 2015 WL 778125 (Jan. 12, 2015) (allowing consumers to anonymously assess their borrowing ability); *KomBea Corp. v. Noguar L.C.*, No. 2:13-CV-957 TS, 2014 WL 7359049 (D. Utah Dec. 23, 2014) *cords, Inc. v. Walgreen Co.*, No. 2:13-cv-00631-ODW (SHx), 2014 WL 7339201 (C.D. Cal. Dec. 23, 2014) (accessing and managing records); *Morsa v. Facebook, Inc.*, No. SACV 14-161-JLS (JPRx), 2014 WL 7641155 (C.D. Cal. Dec. 23, 2014) (targeted advertising); *Cloud Satchel, LLC v. Amazon.com, Inc.*, --- F. Supp. 3d ----, 2014 WL 7227942 (D. Del. Dec. 18, 2014) (cataloging documents to facilitate their retrieval from storage); *Intellectual Ventures I LLC v. Mfrs. & Traders Trust Co.*, --- F. Supp. 3d ----, 2014 WL 7215193 (D. Del. Dec. 18, 2014) (budgeting, applying metadata to images based on their organization, and use of substitute billing information); *IpLearn, LLC v. K12 Inc.*, --- F. Supp. 3d ----, 2014 WL 7206380 (D. Del. Dec. 17, 2014) --- F. Supp. 3d ----, 2014 WL 7185921 (N.D. Cal. Dec. 16, 2014) (delivering targeted advertising outside the home and scheduling delivery of online content); *Joao Bock Transaction Sys., LLC v. Jack Henry & Assocs., Inc.*, Civ. No. 12-1138-SLR, 2014 WL 7149400 (D. Del. Dec. 15, 2014) (consulting a list of disapproved transactions before processing a payment); *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, __ F. Supp. 3d __, No. 2:13-CV-655, 2014 WL 4364848, at *14 (E.D. Tex. Sept. 3, 2014) (Bryson, J., sitting by designation) (currency exchange); *Amdocs (Israel) Ltd. v. Opennet Telecom, Inc.*, No. 1:10CV910 (LMB/TRJ), 2014 WL 5430956, at *5 (E.D. Va. Oct. 24, 2014) (managing network use); *Open Text S.A. v. Alfresco Software Ltd*, No. 13-CV-04843-JD, 2014 WL 4684429, at *5 (N.D. Cal. Sept. 19, 2014) (interacting with customers to promote marketing and sales); *Walker Digital, LLC v. Google, Inc.*, --- F. Supp. 3d. ---, C.A. No. 11-318-LPS, 2014 WL 4365245, at *10 (D. Del. Sept. 3, 2014) (exchanging information between anonymous parties); *Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*, --- F. Supp. 3d ---, Civil Action No. 12-205-RGA, 2014 WL 3542055, at *6 (D. Del. July 16, 2014) (conditional decision-making).

Mar. 3, 2015), for example, this Court found that asserted claims were "directed to the abstract idea of creating a customized sales proposal for a customer," *id.* at 6, notwithstanding that the claims explicitly "state[d] that the pictures and text are stored on a computer" and that the claims required that "customer information is stored in an 'active database.'" *Id.* at 7.  The Court explained:

> The steps performed by the claimed computer elements are functional in nature and could easily be performed by a human.  The claims essentially propose that, instead of a human salesman asking customers about their preferences and then creating a brochure from a binder of product pictures and text using a rolodex to store customer information, a generic computer can perform those functions.

*Id.*  The mere facts that (a) the pictures and text called out in the claims necessarily were in digital form in order to permit computer storage, and (b) the creation of customized sales proposals using computer-collected information and computer-selected images was not "a longstanding commercial practice" did not alter the Court's view that the claims were directed to abstract ideas: "There is no meaningful distinction for §101 purposes between the abstract concept embodied by these claims and the abstract ideas identified in prior cases . . . ." *Id.*

Similarly, in *Bascom Research, LLC v. LinkedIn, Inc.*, No. 12-6293, 2015 WL 149480, at *2, 7-8 (N.D. Cal. Jan. 5, 2015), the patent claim at issue claimed a method for "providing a framework for document objects located on a network"; the patentee argued that it covered a concrete technological development, requiring "a particular type of data structure for linking data" involving "link directories."  The court rejected this argument, looking past computer jargon in the patent claim to the function that the computer actually was performing, and holding that the claim "describes the abstract idea of creating, storing and using relationships between objects." *Id.* at *8.

In *Morales*, 2014 WL 7396568, at *2, 5, the claim at issue recited a method of data communication, including "generating a unique signal by receiving an audible signal from an electronic device," combining it with a unique identifier, communicating it to a "repeater station," and verifying the signal, which the patentee described as narrowly drawn to cover a "specific method for data communications."  The district court held these elements merely

described the abstract idea of "relaying a signal containing the sender's identity." *Id.* at *7.  The court noted that terms such as "repeater station" and "response unit" were used to refer to known communication processes using satellite or telephone communications. *Id.* at *7 n.2.

If a patent claim is directed to an abstract idea, the court moves to step two of the *Alice* analysis: "consider[ing] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (as quoted in *Altec*, Slip Op. at 6). A claim that merely implements an abstract idea on a computer fails to transform the abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2357.  "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional feature[s] that provides any practical assurance than the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* at 2358 (quoting *Mayo*, 132 S.Ct. at 1297, as quoted in *Altec*, Slip Op. at 8).  As explained by this Court in *Altec*, when invalidating claims written at the same level of abstractness as ContentGuard's presently asserted claims:

> "A claim that recites an abstract idea must include additional features" which "must be more than well-understood, routine, conventional activity." . . . A general purpose computer with minimal programming can perform functions "automatically" and "dynamically," and implementation of an abstract idea on such a computer is not an inventive concept.

*Id.* at 8 (quoting *Ultramercial, Inc. v. Hulu, Inc.*, 772 F.3d 709, 715 (Fed. Cir. 2014)); *see also Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1279 (Fed. Cir. 2012) (claims reciting "digital storage" are unpatentable because "[u]sing a computer to accelerate an ineligible mental process does not make that process patent-eligible.").[4]

---

[4] The asserted "novelty of any element or steps in a process, or even the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possible subject matter.  What is relevant is whether the claimed subject matter is directed to an abstract idea, and if so, whether there is an inventive concept that sufficiently limits the claims to a patentable application thereof."  *Wolf*, 2014 WL 7639820, at *10.  As recognized by this Court, "'Although the § 101 patent-eligibility and, say, the § 102 novelty inquiry might sometimes overlap,' the fact that the claim previously passed novelty and nonobviousness hurdles does not necessarily preclude invalidation under § 101 in this case."  *Altec*, Slip Op. at 11 (quoting *Mayo*, 132 S.Ct. at 1304); *see also Diamond v. Diehr*, 450 U.S. 175, 190 (1981) ("The question therefore of whether a particular invention is novel is 'wholly apart from whether the invention falls into a category of statutory subject matter.'").

In *Bascom*, while the claim at issue required that the computing device create "link directories" and "link relationships," the court noted that these terms were merely used to describe tables or databases, "which were known prior to Bascom's patents," and thus were not inventive elements.  2015 WL 149480, at *10.  Likewise in *Morales*, the court found that though the claim explicitly referenced various computer hardware elements (e.g., local area repeater, response unit, data center), these elements were "conventional electronics" that were "well known in the prior art," used for their generic purposes, and, thus, were insufficient to establish an inventive element that would render the claim patentable.  2014 WL 7396568, at *8.

In short, it is well-established that a court must look past patent claim terminology suggesting technological complexity and/or referencing digital age concepts, and, instead, must determine whether a claim truly encompasses features that are "more than well-understood, routine, conventional activity" performed using known technologies. *Altec*, Slip Op. at 8 (quoting *Ultramercial*, 772 F.3d at 715) (internal quotation marks omitted).  Artful claim drafting cannot substitute for patentable invention.

## III.    THE ASSERTED PATENT CLAIMS ARE DRAWN TO UNPATENTABLE SUBJECT MATTER.

ContentGuard has asserted twenty-six patent claims against Defendants, involving eight patents in two separate patent families.[5]  Each of the asserted patent claims is drawn to unpatentable subject matter, and should be invalidated under Section 101.

### A.    The Stefik Patents

ContentGuard has asserted twenty claims from six related patents issued to Mark Stefik (and others): Claims 1, 3, 6, 8, 11 and 13 from U.S. Patent No. 8,393,007 ("the '007 patent") (Ex. 4); Claims 1, 7 and 13 from U.S. Patent No. 8,370,956 ("the '956 patent") (Ex. 5); Claims 1 and 8 from U.S. Patent No. 7,523,072 ("the '072 patent") (Ex. 6); Claims 18, 21 and 34 from U.S. Patent No. 7,269,576 ("the '576 patent") (Ex. 7); Claims 1, 21 and 58 from U.S. Patent No. 6,963,859 ("the '859 patent") (Ex. 8); and Claims 1, 2 and 9 from U.S. Patent No. 7,225,160

---

[5] The parties have agreed in principle on a stipulation that will result in removal of the '556 Patent from these actions.

("the '160 patent") (Ex. 9).  While these claims contain a number of elements, each claim is directed to the abstract idea of enforcing usage rights and restrictions on digital content.  This fundamental concept has been implemented for at least the last three centuries, since American lending libraries began loaning content of various types (initially non-digital, such as books and manuscripts, and later, digital, such as CDs and DVDs),[6] None of the specific limitations appearing in the claims contains any inventive element that renders the claims patentable.

      1.      **The '007 patent**

          a.      **Representative Claim 1 is drawn to an abstract idea.[7]**

Claim 1 is drawn to the abstract idea of distributing content subject to usage rights and restrictions.  As illustrated by a basic library loan example, the claim simply recites elements of a process that can be, and has been, performed by humans without computers.[8]

| Claim Element | Corresponding Human Action(s) |
|---|---|
| 1. A computer-implemented method of distributing digital content to at least one recipient computing device to be rendered by the at least one recipient computing device in accordance with usage rights information, the method comprising: | A library permits a patron to use library materials, such as a book or CD, in accordance with certain restrictions, e.g., how long materials may be used or borrowed, or whether copies may be made.  (Exs. 1, 3.) |
|    [a] determining, by at least one sending computing device, if the at least one recipient computing device is trusted to receive the digital content from the at least one sending computing device; | A librarian examines a patron's library card or other credentials to determine whether the patron is a library member or is otherwise authorized to use the library materials. |

---

[6] Lending libraries have been well-established since at least the 1730s, when Benjamin Franklin established the first lending library in America.  *See http://en.wikipedia.org-/wiki/Library_Company_of_Philadelphia.*

[7] Courts analyzing the Section 101 validity of multiple patent claims routinely consider a representative claim under the *Alice* framework, and then, if the representative claim is determined to be unpatentable, move on to determine whether any additional limitations contained in the related patent claims are sufficient to render those claims patentable.  *Bascom*, 2015 WL 149480, at *10 n.7.

[8] Courts applying the *Alice* analysis recognize that a hypothetical scenario can be utilized to show how the elements of a claim can be performed without a computer, and thus are drawn to an abstract idea.  *See Joao Bock Trans. Sys., LLC v. Jack Henry & Assocs., Inc.*, No. 12-1138, 2014 WL 7149400, at *6 (D. Del. Dec. 15, 2014).  "Although performance by a human may be sufficient to find that an idea is abstract, it is not necessary."  *Amdocs (Isr.) Ltd. v. Opennet Telecom, Inc.*, No. 10-910, 2014 WL 5430956, at *7 (E.D. Va. Oct. 24, 2014)

| Claim Element | Corresponding Human Action(s) |
|---|---|
| [b] sending the digital content, by the at least one sending computing device, to the at least one recipient computing device only if the at least one recipient computing device has been determined to be trusted to receive the digital content from the at least one sending computing device; and | A patron may borrow certain library materials only when she can present proof (e.g., a library card) that she has been authorized by the library.  The library will issue such proof of authorization only after the patron fills out an application form, agrees to the library's terms of use, and, perhaps, provides a credit card number for payment of any late, damage or other fees.  Once she has obtained her valid library card, the patron is "trusted" by the library to borrow books, CDs or other materials.<br>Only after a patron shows a valid library card to a librarian will the librarian obtain requested materials from library storage and provide that material to the patron, or otherwise permit the patron to take custody of library materials, including the right to remove them from library premises.  (Ex. 1.) |
| [c] sending usage rights information indicating how the digital content may be rendered by the at least one recipient computing device, the usage rights information being enforceable by the at least on recipient computing device. | The librarian also provides the patron with rules regarding use of the materials.  The patron agrees to, and does, follow those rules.  (Ex. 3.) |

### b.      Claim 1 lacks any inventive element that could render it patentable.

There is no inventive element that renders Claim 1 of the '007 patent patentable; the generic references to "a computer-implemented method" and a "computing device" are insufficient.  *Alice*, 134 S. Ct. at 2358.  These terms, like the construed term "usage rights" (Dkt. 459 at 33), merely invoke general and *unspecified* computer programming that permits the use of common computer functionality.  That a computer may perform functions faster or more reliably than a human does not render these elements inventive.  *Altec*, Slip Op. at 7, 9 (invalidating claims that "invoke computer technology only to take advantage of the relative ease by which a computer, rather than a human salesman, could create individualized sales proposals to solve this problem."); *Bancorp. Servs., L.L.C. v. Sun Like Assur. Co. of Canada*, 687 F.3d 1266, 1279 (Fed. Cir. 2012).  Moreover, "sending" and "determining" from data are among the "most basic functions of a computer," which cannot render Claim 1 patentable.  *Alice,* 134 S. Ct. at 2359.  As noted in the '007 patent specification, "The transmission of digital works over networks is commonplace." (Ex. 4 at 1:46-47; *see also* 1:34-37 ("Electronically published materials are typically distributed in a digital form and recreated on a computer based system having the

9

capability to recreate the materials.").)

ContentGuard will claim that Claim 1 is "concrete" and "technology-based" because it mandates that the recipient computing device be determined to be "trusted," which requires the device to maintain three integrities: physical integrity, communications integrity and behavioral integrity.  (Amazon Dkt. 459 at 15; Google Dkt. 158  (defining "trusted" to mean "maintains physical, communications and behavioral integrity in the support of usage rights.").)  Yet, evaluated alone or together, these three integrities are nothing more than abstract ideas which implicate only "well-understood routine, conventional activity." *Ultramercial*, 772 F.3d at 715 (quoted in *Altec*, Slip Op. at 8).  Importantly, the Stefik patent specification makes clear that the integrities/"security levels" for a "trusted" system (which the specification also calls a "repository") are not even fixed or specifically defined: "The characterization of security levels described in Table 2 *is not intended to be fixed.  More important is* __the idea__ *of having different security levels for different repositories*.  It is anticipated that new security classes and requirements will evolve according to social situations and changes in technology."  (Ex. 4 at 15:45-50 (emphasis added).)

As construed by the Court, "physical integrity" means "preventing access to information in a repository by a non-trusted system."  (Amazon Dkt. 459 at 18; Google Dkt. 158.)  Neither this construction nor the Stefik patent specification requires any specific, technological or inventive way of maintaining physical integrity.  (Ex. 4 at 11:62-12:20.)  Of course, the idea of preventing access to information by non-trusted persons is conventional and routine, and is not a technical problem unique to computing environments.  A library "prevent[s] access to information" in its possession by non-trusted persons by, among other things, locking its doors, installing security gates at its entrances and exits and requiring patrons to present valid library cards in order to formally check out materials.  (Ex. 1.)  The '007 patent, itself, recognizes that conventional, prior art systems prevented non-trusted persons from accessing information in a variety of ways.  (*See* Ex. 4 at 1:65-2:4 ("For existing materials that are distributed in digital form, various safeguards are used.  In the case of software, copy protection schemes which limit

10

the number of copies that can be made or which corrupt the output when copying is detected have been employed.  Another scheme causes software to become disabled after a predetermined period of time has lapsed."); 2:12-15 ("Yet another scheme is to distribute software, but which requires a 'key' to enable its use.  This is employed in distribution schemes where 'demos' of the software are provided on a medium along with the entire product."); 2:51-3:3 (explaining that in prior art from VPR Systems, "The VPR system is self-contained and is comprised of : (1) point of sale kiosks for storing and downloading books; (2) personal storage mediums (cartridges) to which the books are downloaded, and (3) readers for viewing the book. . . . [T]he kiosk manages the number of 'copies' that may be checked out at any one time.  Further, the copy of the book is erased from the users cartridge after a certain check-out time has expired.").)  The Court's construction of "physical integrity" (and the Stefik specification's discussion of that element) does not specify any definite or unconventional ways of achieving physical integrity.

As construed by this Court, "communications integrity" means "only communicates with other devices that are able to present proof that they are trusted systems, for example, by using security measures such as encryption, exchange of digital certificates and nonces."  (Amazon Dkt. 459 at 18-19; Google Dkt. 158.)  Once again, neither this construction nor the Stefik specification requires any specific, technological or inventive way of maintaining communications integrity. (Ex. 4 at 11:62-12:20.)  A library maintains communications integrity by lending materials only to patrons who "are able to present proof that they are trusted" in the form of a valid library card—if a patron cannot present a library card, he or she cannot borrow a book or DVD.  (Ex. 1.)[9]  That the Court's construction and the Stefik specification identify "encryption, exchange of digital certificates and nonces" as *exemplary,* not mandatory, measures for establishing communications integrity does not make this element any less abstract, given that humans (like librarians) can, and do, use similarly effective means to assure that they are only communicating with trusted individuals. *See Altec*, Slip Op. at 8-9 (finding reference to

---

[9] In fact, some libraries may maintain library card data, including patron photos, on their computer systems, such that the library card information actually can be considered a "digital certificate" that attests to the identity of the patron seeking to borrow content.

"static" and "active" databases to be irrelevant to Section 101 analysis because those specified databases "are analogous to a binder full of static pictures and text and a rolodex of updateable customer information, respectively") (citing *Bancorp.*, 687 F.3d at 1278 ("To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not.")). The Stefik specification, itself, makes clear that the suggested, exemplary means of ensuring communications integrity (e.g., encryption) were conventional and widely-used when the patent application was filed.  (*See*  Ex. 4 at 25:67-26:4 ("[A]ll communications with repositories that are above the lowest security class are encrypted utilizing public key encryption technique. Public key encryption is a well-known technique in the encryption arts."); 3:31-35 (explaining that in the prior art Sprague patent, "A plurality of encrypted information packages (IPs) are provided at the user site, via high and/or low density storage media and/or by broadcast transmission. . . . The IPs of interest are selected by the user and are decrypted and stored locally."); 3:47-50 (noting that in the Wave Systems prior art, "The system is installed onto a computer and collects information on what software is in use, encrypts it and then transmits the information to a transaction center.").)

Finally, as construed by this Court, behavioral integrity means "requiring software to include a digital certificate in order to be installed in the repository." (Amazon Dkt. 459 at 21; Google Dkt. 158.)  In support of this construction, the Court noted and quoted the Stefik specification's stated reason for requiring a digital certificate: "The purpose of the certificate is to authenticate that the software has been tested by an authorized organization, which attests that the software does what it is supposed to do and that it does not compromise the behavioral integrity of a repository." (Ex. 8 at 12:36-50 (quoted in Amazon Dkt. 459 at 20; Google Dkt. 158).)  A library also uses "certificates" (digital and otherwise) to assure that behavioral integrity is not compromised.  For example, a library will maintain a database of authorized patrons and will issue to each of those patrons a "certificate" (in the form of a library card) that attests to his or her status as an authorized and trusted borrower.  A patron must present her card/certificate

before she is permitted to borrow a book and remove it from the library premises. (Ex. 1.) Similarly, a library will conduct a background/reference check of any person applying for a position as a librarian; as part of this process, the applicant will have to show proof of identity–a "certificate" in the form of a driver's license, passport or other government issued ID.   An applicant will only be hired (i.e., "installed in the repository") if he can establish his identity and if he is confirmed to be trustworthy by his background/reference check.   *See Altec*, Slip Op. at 8. The '007 patent specification's own description of "behavioral integrity" generally, and "digital certificates" specifically, establishes that this element involves nothing more than conventional means/steps for verifying the source of software—steps already taken by human consumers:

> The integrity of the software is generally assured only by knowledge of its source. Restated, a user will trust software purchased at a reputable computer store but not trust software obtained off a random (insecure) server on a network. Behavioral integrity is maintained by requiring that repository software be certified and be distributed with proof of such certification, i.e., a digital certificate.

(Ex. 4 at 12:49-55 (emphasis added).)[10]

Accordingly, Claim 1's use of the term "trusted" does not and cannot transform the recited abstract idea of enforcing usage rights and restrictions on content (as in a library loan transaction) into patentable subject matter.   As the Supreme Court explained when invalidating the claims in *Alice*, 134 S. Ct. at 2360:

> [W]hat petitioner characterizes as specific hardware—a "data processing system" with a "communications controller" and "data storage unit," for example—is purely functional and generic. Nearly every computer will include a "communications controller" and "data storage unit" capable of performing the basic calculation, storage, and transmission functions required by the method claims. As a result, none of the hardware recited by the claims "offers a meaningful limitation beyond generally linking 'the use of the [method] to a

---

[10] In updated infringement contentions provided by ContentGuard to some defendants on April 20, 2015, ContentGuard asserts that a "digital certificate" is not, in fact, required for "behavioral integrity." Instead, ContentGuard now suggests that under the doctrine of equivalents, *anything* that might indicate or suggest the source or the "trustworthiness" of software would be enough to satisfy the "behavioral integrity" element.   Not only does this position make clear that the asserted Stefik patent claims are not tethered to any specific or concrete technological problem/solution; ContentGuard's position also makes clear that the Stefik patent claims are broad enough to encompass even the human actions for establishing behavioral integrity described in the specification: "[A] user will trust software purchased at a reputable computer store."   (Ex. 4 at 12:49-55.)

particular technological environment,' that is, implementation via computers."

No other term appearing in the asserted '007 patent claim requires any specific hardware or software, or demands "the type of complex programming that confers patent eligibility." *Altec*, Slip Op. at 9. Indeed, as exemplified by the chart above, every element of the asserted '007 patent claim is analogous to an element or action found in the basic library loan transaction. Like the claims invalidated by this Court in *Altec*, the Stefik claims

> identify no inventive algorithms or otherwise creative means for [implementing the abstract idea] other than an instruction that the basic process be performed using generic computer components. . . . [T]he instant claims and the *Ultramercial* claims fail for the same reason: they comprise only "conventional steps, specified at a high level of generality, which is insufficient to supply an inventive concept." *Id.* at 716 (quoting *Alice*, 134 S.Ct. at 2357).

*Altec*, Slip Op. at 10. In sum, none of the individual limitations in the Stefik patent claim contains an inventive concept.

Nor does the arrangement of the claim limitations in ordered combination amount to an inventive concept. The ordering of the claim limitations is purely conventional. As discussed above, the claims follow the basic steps of a library transaction: a library sets rules for the use of its materials, a patron makes a request to check out a book, and the patron uses the book in accord with the library's rules. Nothing about this ordering of steps demonstrates novelty or inventiveness. *See Alice Corp.*, 134 S. Ct. at 2359 ("Considered as an ordered combination, the computer components of petitioner's method add nothing that is not already present when the steps are considered separately." (internal quotation marks omitted)). In fact, the Stefik specification recognizes that this same ordering of steps was practiced by users of the prior art VPR Systems book "kiosks":

> In a purchase transaction, a purchaser will purchase a voucher card representing the desired book. The voucher will contain sufficient information to identify the book purchased and perhaps some demographic information relating to the sales transaction. To download the book, the voucher and the cartridge are inserted into the kiosk.
> 
> The VPR system may also be used as a library. In such an embodiment, the kiosk manages the number of "copies" that may be checked out at one time. Further the copy of the book is erased from the users cartridge after a certain check-out time has expired. However, individuals cannot loan books because the cartridges may only be used with eh owners reader.

14

(Ex. 4 at 2:57-3:1.)

ContentGuard will suggest that because its patent claim deals with "digital" content, that claim somehow is not abstract and is "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014) (quoted in *Altec*, Slip Op. at 9). Yet, this suggestion is wrong for three reasons.  <u>First</u>, for the past 30 years, even the basic library loan transaction has involved the enforcement of usage rights on "digital content," including digital books, CDs and DVDs. There is nothing in the '007 patent claim that would exclude from its reach these long-used types of "digital content".[11]  <u>Second</u>, unlike the Stefik patents, the patents at issue in *DDR Holdings* did more than merely recite a longstanding practice applied in the realm of computer networks.  They offered a specific solution to a technological problem by claiming a particular way of changing the normal operation of the Internet.  *See id.* at 1258–59 ("[T]he claims at issue here specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink.").  Importantly, the patents at issue in *DDR Holdings* claimed just one specific solution to the problem of losing website traffic.  *See Alice Corp.*, 134 S. Ct. at 2357 ("A claim that recites an abstract idea must include 'additional features' to ensure 'that the claim is more than a drafting effort designed to monopolize the abstract idea.'").  By contrast, ContentGuard's '007 patent claim is not limited to (and does not specify) a single way of enforcing usage rights and restrictions on digital content.  Thus, unlike the patents in *DDR*, ContentGuard's patent claim "risk[s] disproportionately tying up the use of the underlying

---

[11] The Stefik specification, itself, recognizes that distribution of digital content was commonplace in 1994, when the priority patent application was filed, and that efforts to enforce usage rights on such digital content were also well-known.  (*See* Ex. 4 at 1:34-41 ("Electronically published materials are typically distributed in a digital form and recreated on a computer based system having the capability to recreate the materials.  Audio and video recordings, software, books, and multimedia works are all being electronically being published."); 1:65-2:4 ("For existing materials that are distributed in digital form, various safeguards are used.  In the case of software, copy protection schemes which limit the number of copies that can be made or which corrupt the output when copying is detected have been employed. Another scheme causes software to become disabled after a predetermined period of time has elapsed."); 2:51-3:3 ("A system for controlling the distribution of digitally encoded books is embodied in a system available from VPR Systems, LTD. of St Louis, Miss.").)

ideas". *Id.* at 2354 (internal quotation marks omitted). Third, courts consistently have rejected the notion that specifying actions to "digital" data necessarily roots a patent claim in computer technology, rendering it patentable. As explained by the court in *Compression Technology Solutions LLC v. EMC Corp.*, 2013 WL 2368039, at *1 (N.D. Cal. May 29, 2013), when invalidating claims relating to parsing of digital information streams:

> [Plaintiff] argues that a finding that the patent is limited to digital data decides the issue because 'if digital data is required, the human mind cannot utilize or comprehend it. This is simply not true. The Federal Circuit has found a "computer readable medium" limitation—effectively the same as a digital data limitation—does not make an "otherwise unpatentable method patent-eligible under § 101." Performing digital calculations may be more difficult, but *Gottschalk, Bilski, CyberSource, Dealertrack v. Huber*, and *Bancorp* demonstrate manipulations of digital data alone are not sufficient for a finding of patentability.

*Id.* at *5 (internal citations omitted).

Thus, just as this Court found with respect to the invalidated *Altec* claims, the Stefik patents' "claimed elements do not 'add *enough*' to allow the claim[s] to qualify as patent eligible." *Altec*, Slip Op. at 9 (quoting *Mayo*, 132 S.Ct. at 1297) (emphasis in original).

### c. The remaining claims of the '007 patent do not add any inventive elements.

After determining that a representative claim is invalid under Section 101, courts consider the additional limitations contained in the remaining claims to determine whether they constitute an inventive element that renders the claim drawn to "significantly more" than the abstract concept of the representative claim. *See, e.g., Open Text S.A. v. Alfresco Software Ltd.*, No. 13-4843, 2014 WL 4684429, at *5 (N.D. Cal. Sept. 19, 2014). The remaining claims of the '007 patent do not add any inventive elements to Claim 1. Independent Claims 6 and 11 must fall with Claim 1, as they include the same elements as Claim 1, rewritten in "apparatus" (Claim 6) and "computer-readable medium" (Claim 11) forms. It is well-established that the generic computer components added by these claims: "processors," "memories coupled to processors," and "instructions," cannot qualify as an "inventive element" that renders a claim patentable. *Ultramercial,* 772 F.3d at 716; *Joao Bock*, 2014 WL 7149400, at *7.

Claims 3, 8, and 13 add the same limitation, that the determination of trust comprises:

| Additional Claim Element | Corresponding Human Action(s) |
|---|---|
| receiving a request from at least one recipient computing device for an authorization object required to render the digital content; and | A patron requests, and must obtain, a valid library card before she is able to access, read, listen to, view, or otherwise use library materials. |
| transmitting the authorization object to the at least one recipient computing device when it is determined that the request should be granted. | The library will issue the library card only after the patron fills out an application form, agrees to the library's terms of use, and, perhaps, provides a credit card number for payment of any late, damage or other fees.  Once she has obtained her valid library card, the patron is "authorized" by the library to borrow books, CDs or other materials. |

These claims' use of the term "authorization object" does not render the claims inventive.

An "authorization object" is "a digital work that can be moved between repositories and that must be possessed in order to exercise a usage right."  (Amazon Dkt. No. 459 at 51; Google Dkt. 158.)  This is nothing more than the digital equivalent of a library card, which patrons must possess to obtain access to works, and which patrons may be able to share with certain other individuals such as family members.  Nor is the ordered combination of the claim limitations inventive—it is utterly conventional to verify that a user is authorized to access materials before granting access.  Further, the reference to basic computing functions, "receiving" and "transmitting" cannot, and do not, not render these claims patentable.  *Alice,* 134 S. Ct. at 2359.

## 2.    The '956 patent

### a.    Representative Claim 1 is drawn to an abstract idea.

Claim 1 of the '956 patent is drawn to the abstract idea of restricting access to materials.  As illustrated by the library example, the claim simply recites a process that can be performed by humans without computers:

| Claim Element | Corresponding Human Action(s) |
|---|---|
| 1. A computer-implemented method of rendering digital content by at least one recipient computing device in accordance with usage rights information, the method comprising: | Library patrons may use library materials pursuant to usage rules. |

| Claim Element | Corresponding Human Action(s) |
|---|---|
| [a] receiving the digital content by the at least one recipient computing device from at least one sending computing device only if the at least one recipient computing device has been determined to be trusted to receive the digital content from the at least one sending computing device; | A patron may borrow certain library materials only when she can present proof (e.g., a library card) that she has been authorized by the library.  The library will issue such proof of authorization only after the patron fills out an application form, agrees to the library's terms of use, and, perhaps, provides a credit card number for payment of any late, damage or other fees.  Once she has obtained her valid library card, the patron is "trusted" by the library to borrow books, CDs or other materials. |
| [b] receiving, by the at least one recipient computing device, a request to render the digital content; | The patron requests to use certain library materials. |
| [c] determining, based on the usage rights information, whether the digital content may be rendered by the at least one recipient computing device; and | The librarian determines whether the borrower is authorized to access and use the materials as requested. |
| [d] rendering the digital content, by the at least one recipient computing device, only if it is determined that the content may be rendered by the at least one recipient computing device. | If the rules permit the requested use, the patron is given the materials to use. |

### b.     Claim 1 lacks any inventive element that could render it patentable.

There is no inventive element that renders the claim patentable; the generic computer functionality called out in the claim cannot take it out of the category of an abstract idea.  Claim 1 recites that a generic "computer-implemented method" is used, with no particular hardware or software identified.  *Alice,* 134 S. Ct. at 2358-60.  The actions of "receiving," "determining," and "rendering" digital information are among the "most basic functions of a computer," *id.* at 2359, and thus cannot render Claim 1 patentable.  *Alice,* 134 S. Ct. at 2359.

As with the '007 patent, the fact that Claim 1 includes an element requiring that a "recipient computing device has been determined to be trusted" is insufficient to allow the claim to qualify as patent eligible.  For all the reasons set forth in the discussion, *supra*, at pages 10-16, the three integrities required for a "trusted" device are, themselves, nothing more than abstract ideas that find analogs in the basic library loan transactions discussed.  Given the high-level and minimal requirements for a device to be "trusted" under the Court's constructions, and given that "the steps performed by the claimed computer elements are functional in nature and could easily be performed by a human", *Altec*, Slip Op. at 7, "there is no meaningful distinction for § 101

18

purposes between the abstract concept embodied by [this claim] and the abstract ideas identified in prior cases, and [plaintiff] points to none." *Id.* And as in the '007 patent claims, there is nothing in the ordering of the limitations in Claim 1 of the '956 patent that is unconventional or inventive.

### c. The remaining claims of the '956 patent do not add any inventive elements.

The remaining claims of the '956 patent do not add any inventive elements to those of Claim 1, and thus are also drawn to unpatentable subject matter. The other independent asserted claims, Claims 7 and 13, must fall with Claim 1, as they include the same elements as Claim 1, rewritten in "apparatus" (Claim 7) and "computer-readable medium" (Claim 13) forms. It is well-established that the generic computer components added by these claims: "processors," "memories coupled to processors," and "instructions," cannot qualify as an "inventive element" that can render a claim patentable. *Ultramercial*, 772 F.3d at 716; *see also, e.g.*, *Cloud Satchel LLC v. Amazon.com, Inc.,* No. 13-941, 2014 WL 7227942, at *8 (D. Del. Dec. 18, 2014). Moreover, the ordered combination of the claim limitations is far from inventive—it is utterly conventional for, e.g., a librarian to determine that a patron is "trusted" to borrow library materials before being permitted actually to borrow those materials. *Alice,* 134 S. Ct. at 2359.

### 3. The '072 patent

### a. Representative Claim 1 is drawn to an abstract idea.

Claim 1 of the '072 Patent is drawn to the abstract idea of restricting the use of a document. Each element of the claim can be accomplished by people without use of a computer:

| Claim Element | Corresponding Human Action(s) |
|---|---|
| 1. A method for securely rendering digital documents, comprising: | A library controls access to and use of books and documents in its collection. |
| [a] retrieving, by a document platform, a digital document and at least one usage right associated with the digital document from a document repository, the at least one usage right specifying a manner of use indicating the manner in which the digital document can be rendered; | The library may receive a book or document from a publisher or distributor that includes certain usage restrictions (e.g., library patrons may not photocopy the book or document, or a document can only be viewed inside the library - it cannot be checked out). The book or document may be delivered, received and stored in digital form (e.g., on a CD or DVD). |

| Claim Element | Corresponding Human Action(s) |
|---|---|
| [b] storing the digital document and the at least one usage right in separate files in the document platform; | The library may store restricted books and documents in a secure storage area (and/or on digital media kept in a secure storage area), and the rules pertaining how those books and documents may be used may be listed and kept at a librarian's desk and/or posted on a library wall. |
| [c] determining, by the document platform, whether the digital document may be rendered based on the at least one usage right; and | When a patron asks the librarian for access to and use of a restricted document, the librarian will determine whether the access or use that the patron has requested is allowed by the usage rights (e.g., does the patron want to check out a document, or does he wish to view the document in the library). If the patron's requested use is permitted, the librarian will provide the patron with access to the requested document. |
| [d] if the at least one usage right allows the digital document to be rendered on the document platform, rendering the digital document by the document platform. | If the use requested by the patron is allowed, the librarian will permit the patron to access and read the requested document. |

**b.      Claim 1 lacks any inventive element to render it patentable.**

Claim 1 lacks any inventive element that would render it patentable under the second step

of the *Alice* analysis. Recitation of the generic computer functions and elements "retrieving,"

"storing," "determining," "rendering" and "digital document" do no more than restrict the

abstract idea to the general realm of computers, which does not render the claim patentable.

*Alice,* 134 S. Ct. at 2358-60; *Bascom*, 2015 WL 149480, at *6.

ContentGuard undoubtedly will contend that this claim is "concrete" and "technology-

based" because it references a "repository", which is "a trusted system in that it maintains

physical, communications, and behavioral integrity in the support of usage rights"). (Amazon

Dkt. 459 at 15; Google Dkt. 158.)  As previously discussed on pages 10-16, evaluated alone or

together, these three integrities are nothing more than abstract ideas which implicate only "well-

understood routine, conventional activity." *Ultramercial*, 772 F.3d at 715 (quoted in *Altec*, Slip

Op. at 8).  And these three integrities find analogues in the library loan transaction described

above. A library "prevent[s] access to information" in its possession by non-trusted persons—

physical integrity—by, among other things, locking its doors, installing security gates at its

entrances and exits and requiring patrons to present valid library cards in order to check out

materials. A library maintains communications integrity by lending materials only to patrons

20

who "are able to present proof that they are trusted" in the form of a valid library card—if a patron cannot present a library card, he or she cannot borrow a book. (Ex. 1.) And a library uses "certificates" (digital and otherwise) to assure that behavioral integrity is not compromised by requiring patrons to present their "certificates" (in the form of a library cards) attesting to their status as authorized borrowers, and by requiring potential librarians to present their "certificates" (in the form of valid IDs) and pass a background check before being "installed" as library employees. The mere fact that library patrons and prospective librarians are not "software" or "devices" is irrelevant to the Section 101 patentability analysis. *Alice*, 134 S. Ct. at 2360; *Altec*, Slip Op. at 8-9.

Additionally, the ordering of the '072 patent claim limitations does not amount to an inventive concept. As discussed above, the claims follow the basic steps of a library transaction: a library sets rules for the use of its materials, a patron makes a request to check out a book, and the patron uses the book in accord with the library's rules. Nothing about this ordering of steps demonstrates novelty or inventiveness. *See Alice Corp.*, 134 S. Ct. at 2359 ("Considered as an ordered combination, the computer components of petitioner's method add nothing that is not already present when the steps are considered separately." (internal quotation marks omitted)).

### c.     The remaining claim of the '072 patent lacks any inventive element.

The remaining claim of the '072 patent fails to include any additional elements that contain an inventive concept. Claim 8 requires that "at least one part of the digital document and at least one usage right are stored on different devices."   As in the library example above, this element can be performed when the librarian keeps the restricted materials and the rules regarding their use in different places.

### 4.     The '576 patent.

### a.     Representative Claim 18 is drawn to an abstract idea.

Claim 18 of the '576 patent is drawn to the abstract idea of permitting access to a work only upon verification that access is authorized. This is an old and conventional idea, which Claim 18 merely restricts to performance on generic computing elements. As with the related

Stefik patents, all the elements can be performed without a computer, as shown in a library "special collections" exchange:

| Claim Element | Corresponding Human Action(s) |
|---|---|
| 18. A method for controlling rendering of digital content on an apparatus having a rendering engine configured to render digital content and a storage for storing the digital content, said method comprising: | A library restricts access to "special collection" manuscripts, which are stored in secure storage facilities within the library, to certain registered patrons, who may peruse them only in a climate-controlled room of the library with library attendants present. |
| [a] specifying rights within said apparatus for digital content stored in said storage, said rights specifying how digital content can be rendered; | The library specifies that the manuscripts can only be read/viewed by registered patrons in a specific, controlled room of the library with library attendants present, and only for a one hour period of time.  The library further specifies that no part of the manuscript can be copied by a patron. |
| [b] storing digital content in said storage; | The library keeps manuscripts in its secure storage facilities. |
| [c] receiving a request for rendering of said digital content stored in the storage; and | The library receives a request from a registered patron may to access the manuscripts. |
| [d] checking whether said request is for a permitted rendering of said digital content in accordance with said rights specified within said apparatus; | A librarian checks whether the request is for a permitted use of the requested manuscript (i.e., has the requesting patron agreed to review the manuscript in the designated room for the designated period of time). |
| [e] processing the request to make said digital content available to the rendering engine for rendering when said request is for a permitted rendering of said digital content;, | If the librarian determines that the request is for a permitted review of the requested manuscript (i.e., the patron is authorized, and has agreed to the restrictions on access and use), the librarian transfers the requested manuscripts from the storage facility to the "special collections" reading room and makes the manuscript available to the patron in the reading room. |
| [f] authorizing a repository for making the digital content available for rendering, wherein the digital content can be made available for rendering only by an authorized repository, the repository performing the steps of: | the patron can request access to the manuscripts only by first applying for, receiving from the library, and possessing required authorization(s), such as a library card indicating "special collections" rights. |
| [g] making a request for an authorization object required to be included within the repository for rending of digital content; and | The patron can receive his "special collections" library card or credentials only by first filling out an application and requesting such card or credentials from the library. |
| [h] receiving the authorization object when it is determined that the request should be granted.: | If the library approves the patron's application, the patron can then show his card or credentials to a librarian in order to access the manuscripts in the "special collections" reading room. |

**b.**     **Claim 1 lacks any inventive element that could render it patentable.**

Claim 18 lacks any inventive element that would render it patentable.  Rather, the claim simply invokes generic computer functionality and elements to define the method—"storage" and "storing", "receiving a request," "processing the request," "checking [a request]," a "rendering engine," and "authorizing."   The specification does not require any particular hardware or software to perform the recited functions or create the identified elements; off-the-shelf products can be used.  This is confirmed by the Court's claim constructions.  (*See, e.g.*, Amazon Dkt. 459 at 84; Google Dkt. 158 ("The Court accordingly hereby finds that for the 'means for processing a request from the means for requesting,' the function is 'processing a request from the means for requesting,' and the corresponding structure is 'a general-purpose computer; and equivalents thereof.'"); *see also* pp. 87, 90-91, 94, 97-98.)   *See Intellectual Ventures I LLC v. Mfgs. & Traders Trust Co.*, No. 13-1274, 2014 WL 7215193, at *8 (D. Del. Dec. 18, 2014) ("That the system of claim 1 at bar recites a 'means for storing' and a 'means for presenting transaction summary data,' . . . does not change the analysis, as only generic computers and components are disclosed in the specification." ); *Enfish LLC v. Microsoft Corp.*, 2014 WL 5661456, at *8 (invalidating claim that recited basic and conventional computer concepts and actions).[12]

Similarly, the claim's use of the term "authorization object" does not render the claim inventive.  As construed by the Court, "authorization object" is nothing more than the digital analog of a library card, which patrons must possess to obtain access to works, and which patrons may be able to share with certain other individuals such as family members.  Nor is the ordered combination of the claim limitations inventive—it is utterly conventional to verify that a user is authorized to access materials before granting access.

The dependent claims likewise add no inventive concept to the abstract idea of Claim 1.

---

[12] To the extent that ContentGuard suggests that the '576 patent claim's inclusion of a "repository" element and/or a "digital content" element somehow renders that claim patent-eligible, see discussion, *supra*, at pages 10-16 for the various reasons why those elements are legally insufficient to render the claim patentable.

Claim 21 adds a limitation of "requesting a transfer of the digital content from an external memory to the storage."  This simply recites common computer functionality, and can be illustrated with the abstract idea of the library transferring a manuscript from an external storage facility to the "special collections" reading room.  Claim 34 adds "requesting receipt of digital content stored externally; and receiving the digital content if it is permitted to receive the digital content."  This simply claims computer implementation of the idea of, e.g., a patron requesting materials from the library stored externally, and receiving the materials if she is authorized.

### 5.  The '859 patent

#### a.  Representative Claim 1 is drawn to an abstract idea.

Claim 1 of the '859 patent specifies nothing more than use of a generic computer system and generic computer concepts to execute the abstract idea of enforcing usage rights and restrictions on digital content.  The following shows how each claim element is analogous to an element and/or action in a basic library loan transaction:

| Claim Element | Corresponding Human Action(s) |
|---|---|
| 1.  A rendering system adapted for use in a distributed system for managing use of content, said rendering system being operative to rendering content in accordance with usage rights associated with the content, said rendering system comprising: | A library maintains a set of rules ("usage rights") regarding the usage of its books, CDs and videos ("content"), and librarians distribute books, CDs and videos in accordance with these usage rules.<br>The library stores its materials in a secure location until specific materials are requested by patrons.  In this way, the library is a "repository" for its materials.  The library will only lend or permit use of its materials by patrons who are authorized and trusted to honor the usage rights specified by the library for particular content.  These trusted patrons ("repositories") are given a library card establishing their authorization to borrow and use materials and verifying their commitment to honor the rules. |
| [a] a rendering device configured to render the content; and | A library patron can borrow a book, CD or video and can use ("render") them by opening and reading the book, listening to the CD on a CD player, or watching the video on a television. |
| [b] a distributed repository coupled to said rendering device and including a requester mode of operation and server mode of operation, | When a library patron (the "distributed repository") asks to borrow a book, CD or video, he is acting in a "requestor mode", meaning he is requesting use of the content.  When the patron places the CD in a CD player, inserts the video into a DVD player, or opens the book to read it, he is acting in "server mode", in that is he is "serving" the content to a "rendering device." |

| Claim Element | Corresponding Human Action(s) |
|---|---|
| [c] wherein the server mode of operation is operative to enforce usage rights associated with the content and permit the rendering device to render the content in accordance with a manner of use specified by the usage rights, | When the patron obtains the book, CD or video from the library, he agrees to and does use that content only in accordance with the library's specified rules and restrictions on usage (i.e., he "enforces the usage rights associated with the content"). If for example, the usage rights permit making a single copy of a book chapter, the patron will make only a single copy; if the library requires that the CD be listened to inside the library, the patron listens to the CD only in the library; or if the rights permit a video to be borrowed, but returned in one week, the patron will borrow the video and return it in one week. |
| [d] the requester mode of operation is operative to request access to content from another distributed repository, and | The patron requests access to and use of a book, CD or video from the library ("another distributed repository"), which securely stores that content until it is requested by patrons. |
| [e] said distributed repository is operative to receive a request to render the content and permit the content to be rendered only if a manner of use specified in the request corresponds to a manner of use specified in the usage rights | The patron (the "distributed repository") agrees to and does use/"render" the book, CD or video only in a manner permitted by the library rules. |

### b.    Claim 1 lacks any inventive element sufficient to render it patentable.

Claim 1 lacks any inventive element under the second part of the *Alice* analysis. The claim is drawn to a generic "rendering system," which the specification states can be any known device, such as a generic computer or printer. (Ex. 8 at 7:30, 7:50-55.) Similarly, the references to server and requester "modes of operation," as well as the references to enforcing "usage rights," merely invoke general and *unspecified* computer programming that permits the use of common computer functionality, such as sending and receiving "requests" and executing instructions. That a computer may perform these functions faster, more efficiently or more reliably than a human does not render these elements inventive. *Altec*, Slip Op. at 7, 9 (invalidating claims that "invoke computer technology only to take advantage of the relative ease by which a computer, rather than a human salesman, could create individualized sales proposals to solve this problem"); *Bancorp*, 687 F.3d at 1279. [13]

---

[13] To the extent that ContentGuard suggests that the '859 patent claim's inclusion of a "repository" element somehow renders that claim patent-eligible, see discussion, *supra*, at pages 10-16 for the various reasons why this element is legally insufficient to render the claim patentable.

Nor does the arrangement of the claim limitations in ordered combination amount to an inventive concept.  The ordering of the claim limitations is purely conventional.  As discussed above, the claims follow the basic steps of a library transaction: a library sets rules for the use of its materials, a patron makes a request to check out a book, and the patron uses the book in accord with the library's rules.  Nothing about this ordering of steps reflects inventiveness.  *See Alice Corp.*, 134 S. Ct. at 2359 ("Considered as an ordered combination, the computer components of petitioner's method add nothing that is not already present when the steps are considered separately." (internal quotation marks omitted)).

Thus, just as this Court found with respect to the invalidated *Altec* claims, the Stefik patents' "claimed elements do not 'add *enough*' to allow the claim[s] to qualify as patent eligible."  *Altec*, Slip Op. at 9 (quoting *Mayo*, 132 S. Ct. at 1297) (emphasis in original).

### c.    The remaining claims of the '859 patent lack any inventive element.

The remaining asserted independent claim of the '859 patent, Claim 58, does no more than rewrite Claim 1 as a claim directed to a "computer readable medium" rather than a "system," and thus must fall with Claim 1.  *Alice,* 134 S. Ct. at 2360; *Amdocs*, 2014 WL 5430956, at *5.  The dependent claim fares no better.  Claim 21 states that "the rendering device and the repository are integrated into a secure system having a secure boundary."  This is no more that the abstract idea implemented, e.g., by a library with doors that lock or a security gate at the exit to prevent people from walking out with books or CDs.

### 6.    The '160 Patent

### a.    Representative Claim 1 is drawn to an abstract idea.

Claim 1 of the '160 patent purports to cover the abstract idea of associating usage rights with a document or portions thereof.  This concept was well-known long before the purported invention.  For example, a library might place separate usage rights on each volume of a multi-volume book set, or a government agency might place various security clearance stamps on various portions of a "Top Secret" document.  The '160 patent does nothing more than suggest that this well-known practice be implemented on a generic computing device:

| Claim Element | Corresponding Human Action(s) |
|---|---|
| 1.  A  computer  readable  medium  having embedded thereon a digital work adapted to be distributed within a system for controlling use of digital works, said digital work comprising: | A library contains books and CDs that can be used and borrowed by library patrons subject to specific library rules. |
| [a]  a  digital  content  portion  that  is renderable by a rendering device; | A library book can be rendered when a patron opens the book and reads it; a library CD can be rendered when a patron puts it in a CD player and listens to it. |
| [b] a usage rights portion associated with said digital content portion and comprising one or  more  computer  readable  instructions configured to permit or prohibit said rendering device to render said digital content portion, said usage rights portion being expressed as statements from a usage rights language having a  grammar  defining  a  valid  sequence  of symbols,  and  specifying  a  manner  of  use relating to one or more purposes for which the digital  work  can  be  used  by  an  authorized party; and | The library sets rules as to how particular content can be used by patrons.  For example, the rules may state that only registered library card holders may have access to library materials, that card holders may only borrow books  for  a  two-week  period,  that  photocopying  of library materials is prohibited and/or that reference books may only be perused within the library for a limited period of one hour.  The library's policy and the specific usage rights and restrictions for a particular book or movie  are  set  forth  in  statements  in  English  (or  some other language) and are printed or affixed to the book or move, often on or inside the cover. |
| [c]  a  description  structure  comprising  a plurality of description blocks, each of said description  blocks  comprising  address information for at least one part of said digital work, and a usage rights part for associating one or more usage rights portions. | As discussed in the patent, printed materials (like a book or magazine) often include multiple elements, such as text and pictures or tables, which are laid out in a particular way or format.  The "description structure" simply refers to the layout of materials' various elements (which the patent calls "description blocks").  Thus, the library materials necessarily have a description structure as described in the patent.  The library's usage rights are associated with all portions of a book or magazine once they are printed or affixed to the cover. |

### b. Claim 1 lacks any inventive element sufficient to render it patentable.

The elements of Claim 1, either individually or in ordered combination, do not add any "inventive concept" to the abstract idea that is "sufficient to ensure that the patent in practice amounts to significantly more" than a patent on the abstract idea itself. *Alice*, 134 S. Ct. at 2355. Claim 1's reference to a "computer readable medium" is simply drawn to any generic computer medium, such as a CD.  Similarly, a "rendering device" is simply any generic device, such as a CD player or printer, that permits the medium to be used in some way.  Claim 1's references to a "usage rights language," "grammar" and "description structure" are merely references to generic computer programming under ContentGuard's proposed construction, with no special programming required by the claims.  Such a use of known computer-programming principles to

embody an abstract idea does not render the claim patentable.  *Alice,* 134 S. Ct at 2359.[14]

<b>c.       The dependent claims fail to add any inventive element</b>

The remaining asserted claims of the '160 patent fail to include any inventive element. Claim 2 adds the limitation of "said usage rights portion further specifies status information indicating the status of the digital work."  The patent explains that the "status" is simply information relating to "the state of a right and the digital work."  (Ex. 9 at 9:4-7.)  This adds nothing inventive to the abstract concept; in the library example, library records will include information about each digital work and its usage rights.  Claim 9 simply adds that the digital content portion and the usage rights portion are stored on the same physical devices.  Again, this does nothing to add any inventive element.  In the library example, usage rights for various types of library materials may be on a notice attached to the materials.

**B.       The Nguyen Patents**

ContentGuard asserts five claims from two patents to Nguyen: Claims 1 and 5 of U.S. Patent No. 7,774,280 ("the '280 patent") (Ex. 10) and Claims 1, 3 and 5 from U.S. Patent No. 8,001,053 ("the '053 patent") (Ex. 11) (collectively "the Nguyen patents").  Each of these patent claims is directed, in one way or another, to the abstract idea of enforcing sublicensing rights and restrictions (which the patents name "meta-rights") on digital content.  The fundamental concept of sublicensing of rights has been implemented for decades, if not centuries, by owners of content (both non-digital, such as books and manuscripts, and digital, such as CDs and DVDs).

The Nguyen patents are thus abstractions on top of the abstract idea recited by the Stefik patents.  (*See* Ex. 10 at 5:42-49.)  In Stefik's library loan scenarios, content already has usage rights attached to it.  The Nguyen patents describe the *creation* of usage rights by content publishers and libraries.   The Nguyen patents acknowledge that "[t]he interpretation and

---

[14] The '160 patent specification, itself, recognizes that the "description structure" of a digital work corresponds, e.g.,  to the layout of a conventional magazine page: "The structure of a digital work, in particular composite digital works, may be naturally organized into an acyclic structure such as a hierarchy.  For example, a magazine has various articles and photographs which may have been created and are owned by different persons.  Each of the articles and photographs may represent a node in a hierarchical structure.  Consequently, controls, i.e. usage rights, may be placed on each node by the creator."  (Ex. 9 at 7:54-62.)

enforcement of usage rights are well known generally and described in" the Stefik patents.  (Ex. 10 at 5:22-24.)  Irrespective of whether Stefik's usage rights claims are unpatentable (as set forth above, they are), the ostensible point of novelty of the Nguyen patents is the *sublicensing* of usage rights in a generic computer environment.  This abstract legal concept is not patentable. *Cf. In re Comiskey*, 554 F.3d 967, 981 (Fed. Cir. 2009) (claims "describ[ing] an allegedly novel way of requiring and conducting arbitration…are unpatentable").

The Nguyen patents attempt to obscure their abstractness by utilizing the seemingly technological terms "meta-rights" and "state variables."  (*See* Ex. 10 at 5:43-51, 1:18-20.)  But a "meta-right" is no more than a right to create, modify, or dispose of usage rights associated with content, or to create, modify, or dispose of meta-rights themselves.  (*Id.* at 5:47-50.)  In other words, the idea of "meta-rights" amounts to nothing more than the abstract idea of sublicensing. For example, a publisher can provide a book to a library, with permission for the library to lend it out to patrons.  The publisher thereby creates a meta-right held by the library, and the library can exercise that right by creating usage rights to the book for patrons.  A "state variable" simply records the status of some usage rights or meta-rights.  *Id.* at 7:67-8:3.  For example, a usage right might be the right to make three copies of particular content, and a state variable for that usage right might reflect that a patron already has made two out of the three copies.  *See id.* at 8:3-10.  Keeping track of such statistics (or "state variables") does not make the Nguyen patent claims directed to the idea of sublicensing any less abstract.

ContentGuard may contend that there is something inventive about the Nguyen patents' combination of meta-rights, repositories and state variables.  But this combination of admittedly-old elements is nothing more than the abstract idea of sublicensing with bookkeeping—there is no technological solution identified in the claims.  That in some other instance and some other innovation conventional elements *may* be combined to form a patentable combination provides no basis for a finding that combining the admittedly conventional elements (at the time of the Nguyen patents' filing) of meta-rights, repositories and state variables somehow converts the Nguyen patents' patent-ineligible process into an inventive combination.

Notably, during prosecution of both patent applications leading to the Nguyen patents, the examiner rejected the pending claims under Section 101.  (Ex. 12 at 5; Ex. 14.)  To overcome these rejections, the patentee amended claims of the '280 patent to indicate that claims were "computer implemented" and that "the meta-right is provided in digital form"  (Ex. 13.), and amended claims of the '053 patent to indicate that the limitations were performed "by a processor" (Ex. 15).  Although adding a reference to generic computer elements was considered sufficient to transform an abstract process claim into patentable subject matter in 2009-10 (when the Nguyen claim amendments were proposed), the Supreme Court now has made clear that this was error.  *Alice*, 134 S. Ct. at 2360.  These claims would not have issued but for the limitations that the Supreme Court has made clear are insufficient to render abstract ideas patentable.  *Alice*, 134 S. Ct. at 2360.[15]

## 1.    The Nguyen '280 Patent

### a.    Representative Claim 1 is Drawn to an Abstract Idea.

Claim 1 recites steps for the abstract idea of obtaining and exercising sublicensing rights to an item, like a movie or a book.  This idea can be (and has been historically) implemented

---

[15]  ContentGuard may contend that defendants' arguments concerning meta-rights are somehow inconsistent with statements made by Apple counsel at the *Markman* hearing.  There is no inconsistency.  At the hearing, ContentGuard contended that the parties' dispute with respect to "meta-right" concerned only "how to capture the specification teaching that a meta-right is something different than a usage right."   (Ex. 16 at 123:22-124:2.)   ContentGuard conceded that "meta-rights are enforced by a repository," *id.* at 123:11-14, which clarified its position and removed an area of disagreement.  Following ContentGuard's concession, counsel for Apple explained that as to the construction of "meta-rights,"

> I thought there were a couple of differences potentially, but I think maybe those have been resolved.  First, we believe that the meta-right is used by the repository, and that is very important.  It's not something that is abstract or generalized, but it is used by a repository.  But I just heard counsel for the Plaintiff say that it is enforced by the repository.  The parties are in agreement on that.  I think that resolves one of the differences between the two constructions that have been proposed.

*Id.* at 125:3-13.  The context is clear—Apple's position was that under the proper construction, the meta-rights in the claims are not free-floating, but must be used by the repository.  The phrase "abstract or generalized" was a criticism of ContentGuard's proposed, overly-vague construction of "meta-right" ("a right that when exercised creates or disposes of usage rights or other meta-rights but is not itself a usage right" (Dkt. 304 at 22)), which did not associate meta-rights with repositories.  The statement has nothing to do with whether the claims of the Nguyen patents are drawn to the abstract idea of sublicensing.

using written agreements and over-the-counter transactions.  Claim 1 is drawn to steps practiced in, for example, a basic video rental transaction, in which a video store has the right (granted to it by movie studios) to generate downstream rights for its video rental customers, allowing them to borrow and view videos.  Claim 1 does nothing more than suggest the use of general processors and electronic storage to automate the steps of this idea, and lacks any inventive, technological solution to any particular technical problem involving sublicensing usage rights.  The steps of the claim are analogous to the steps performed in a basic video rental transaction:

| Claim Element | Corresponding Human Action(s) |
|---|---|
| 1. A computer-implemented method for transferring rights adapted to be associated with items from a rights supplier to a rights consumer, the method comprising: | Video Store obtains a movie from Movie Studio and receives rights to sell or rent that movie to Customer subject to certain rights defined by Movie Studio. |
| [a] obtaining a set of rights associated with an item, the set of rights including a meta-right specifying a right that can be created when the meta-right is exercised, wherein the meta-right is provided in digital form and is enforceable by a repository; | Movie Studio specifies, in a license to Video Store, that Video Store may rent newly released movies to Customers for only 24 hours at a time, but that movies that have been available for more than two months may be sold to Customers for $10 or rented to Customers for 7 days at a time. The Movie Studio license may be provided in digital or non-digital form. Video Store ("a repository", in that it maintains physical, communications and behavioral integrity) will exercise and enforce its rights to rent and/or sell to Customers as needed. |
| [b] determining, by a repository, whether the rights consumer is entitled to the right specified by the meta-right; | Customer wishes to rent Movie A, which is a new release. Customer hands his membership card and Movie A to Video Store Clerk. Clerk looks up Customer's membership information and the rental price, and any rental restrictions, for Movie A.  Clerk determines (a) whether Video Store can rent Movie A (in accord with its "meta-right" from Movie Studio), (b) that Customer is authorized to rent Movie A upon payment of the rental fee (and does not have any unpaid late fees). |
| [c] and exercising the meta-right to create the right specified by the meta-right if the rights consumer is entitled to the right specified by the meta-right, | If Customer and/or Video Store are entitled to the right to rent Movie A, then Clerk exercises Video Store's "meta-right" and rents Movie A to Customer for 24 hours upon Customer's payment of the rental fee. |
| [d] wherein the created right includes at least one state variable based on the set of rights and used for determining a state of the created right. | Clerk notes in Video Store's computer system (or in a paper transaction log) the date and time of Customer's rental and the 24-hour rental period.  Customer's receipt indicates that Movie A must be returned within 24 hours of the initial rental, or late fees will automatically be charged to Customer's credit card on file.  Video Store's computer system (or Clerk) will keep track of the time since Customer's rental and will automatically charge Customer's credit card if Movie A has not been returned within the allotted 24 hour rental period. |

### b. Claim 1 lacks any inventive element sufficient to render it patentable.

Claim 1 does nothing more than attempt to limit the abstract idea of rights sharing and sublicensing to "a particular technological environment", using "well-understood, routine, conventional activity," by specifying the use of general "processors" and "repositories." *Bilski*, 130 S. Ct. at 3230; *Mayo*, 132 S. Ct. at 1294.   For example, a "meta-right" has been defined by this Court as "a right that, when exercised, creates or disposes of usage rights (or other meta-rights) but that is not itself a usage right because exercising a meta-right does not result in action to content." (Amazon Dkt. 459 at 106; Google Dkt. 158.)  Nothing in this definition requires any computer technology whatsoever, let alone specialized hardware or "the type of complex programming that confers patent eligibility." *Altec*, Slip Op. at 9.   Further, the mere fact that "meta-rights" are enforced by a "repository" does not add an inventive element to the abstract idea of sublicensing encompassed by the claim.[16]   As discussed above, the three integrities required of a "repository" all can similarly be found in a library loan or video rental transaction. A video store will maintain "physical integrity" by locking its doors and keeping security access gates at its doors (to prevent patrons from walking out with videos without paying).  The video store will maintain communications integrity by renting movies only to customers who can present valid "certificates"—in the form of a current video rental card, and/or a digital record on the store's computer system, identifying the customer as an authorized renter with a credit card on file (for payment of fees).  The video store maintains behavioral integrity by requiring its customers and employees to present "certificates" (in the form of membership cards and/or government-issued IDs) before being given access to the store's assets.[17]   The mere fact that a video store customer and a prospective clerk are not "software," and/or that a membership card

---

[16] The Court defined "repository" in the same way for the Nguyen patents as it did for the Stefik patents: "a trusted system in that it maintains physical, communications and behavioral integrity in the support of usage rights."  (Amazon Dkt. 459 at 99; Google Dkt. 158.)

[17] For example, a video store will conduct a background/reference check of any person applying for a position as a clerk; as part of this process, the applicant will have to show proof of identity–a "certificate" in the form of a driver's license, passport or other government issued ID.  An applicant will only be hired (i.e., "installed in the repository") if he can establish his identity and if he is confirmed to be trustworthy by his background/reference check.

or driver's license may not be "digital," is legally irrelevant; the behavioral integrity requirement in the Nguyen patent is directed at assuring that a repository will regularly and honestly enforce usage rights and restrictions (and will not provide access to unknown or dishonest actors); the behavioral integrity requirement is not directed to the use of any specific computer hardware or software.  *See Altec*, Slip Op. at 8-9.

Thus, the inclusion of the "wholly generic" computer "repository" element does not provide "practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself." *Alice*, 134 S. Ct. at 2358.  "Simply appending conventional steps, specified at a high level of generality," is not enough to supply an "inventive concept." *Mayo*, 132 S. Ct. at 1292.

No other term or limitation of Claim 1 requires any specific or specialized computer hardware or software.  "Usage rights" have been defined as "indications that are attached, or treated as attached, to digital content and that indicate the manner in which the digital content may be used or distributed as well as any conditions on which use or distribution is premised." (Amazon Dkt. 459 at 107-08; Google Dkt. 158.)  Such "indications" can be found in a video store in the form of a sticker affixed to the cover of a DVD stating, "ONE DAY RENTAL.  This movie is a new release, which is available to rent for only 24 hours.  Failure to return this movie within 24 hours will result in a late fee of $3.00 per day."  Similarly, a "state variable"—i.e., "a variable having a value or identifying a location at which a value is stored, that represents status of an item, rights, license or other dynamic conditions" (Amazon Dkt. 459 at 114; Google Dkt. 158)—can be found in a video store's monitoring of its customer's rental time remaining for a specific movie, the number of copies of a specific movie available for rental, or the time period in which a specific move must be treated as a "new release."  The mere fact that Claim 1 references "digital" data and suggests the use of computers is insufficient to save the claim from invalidity.  *Altec*, Slip Op. at 7-8; *Cybersource Corp.*, 654 F.3d at 1375 ("the incidental use of a computer . . . does not impose a sufficiently meaningful limit on the claim's scope").

33

### c.      The remaining claims lack any inventive element.

The additional limitations of the dependent claim also fails to contain any inventive element sufficient to render the claims drawn to "significantly more" than the abstract idea of the independent claims.  Claim 5 adds the limitation that "the state variable is updated upon exercise of a right associated with state variable."  This step is accomplished in a video store when the clerk records the due date of Movie A as the rental transaction is completed.

### 2.      The Nguyen '053 Patent.

### a.      Representative Claim 1 is drawn to an abstract idea.

Like Claim 1 of the '280 patent, Claim 1 of the '053 patent is drawn to the abstract idea of obtaining and exercising sublicensing rights to an item, like a movie or a book.  Like the risk hedging claimed in *Bilski*, the idea of granting and sharing rights to use content under licenses is an "economic practice long prevalent in our system of commerce."  561 U.S. at 619.  Claim 1's steps are no different than those practiced by video stores (or libraries) in acquiring materials, using them, and loaning them out to patrons.

| Claim Element | Corresponding Human Action(s) |
|---|---|
| 1. A method for sharing rights adapted to be associated with an item, the method comprising: | Video Chain (e.g., Blockbuster) obtains a movie from Movie Studio and receives rights to sell or rent that movie to Customers, through its Video Stores, subject to certain rights defined by Movie Studio. |
| [a] specifying, in a first license, using a processor, at least one usage right and at least one meta-right for the item, wherein the usage right and the meta-right include at least one right that is shared among one or more users or devices; | Movie Studio specifies in a license to Video Chain that its Video Store may rent newly released movies to Customers (for at home viewing – "usage right") for only 24 hours at a time, but that movies that have been available for more than two months may be sold to Customers for $10 or rented to Customers for 7 days at a time. The Movie Studio license may be provided in digital or non-digital form.  The Video Stores share the "meta-rights" to rent and/or sell movies as provided by the Movie Studio license. Each Video Store will exercise and enforce its rights to rent and/or sell to Customers as needed.  Further, members of a family who rent a movie as part of a "Family Plan" or "Family Membership" will all share the "usage right" to watch a rented movie on multiple devices for only 24 hours. |
| [b] defining, via the at least one usage right, using a processor, a manner of use selected from a plurality of permitted manners of use for the item; | The rental right granted by a Video Store to Customers may include the right to play/view the movie at home, the right to loan the movie to family members or friends (so long as the movie is returned within the prescribed rental period), or the right to re-rent the movie for an additional fee upon notice to Video Store. |

| Claim Element | Corresponding Human Action(s) |
|---|---|
| [c] defining, via the at least one meta-right, using a processor, a manner of rights creation for the item, wherein said at least one meta-right is enforceable by a repository and allows said one or more users or devices to create new rights; | Movie Studio specifies in a license to Video Chain that its Video Store may rent newly released movies to Customers (for at home viewing – "usage right") for only 24 hours at a time, but that movies that have been available for more than two months may be sold to Customers for $10 or rented to Customers for 7 days at a time. The Movie Studio license may be provided in digital or non-digital form.  The Video Stores share the "meta-rights" to rent and/or sell movies as provided by the Movie Studio license.  Each Video Store will exercise and enforce its rights to rent and/or sell to Customers as needed.  The Video Chain and each Video Store ("a repository", in that it maintains physical, communications and behavioral integrity) will exercise and enforce the "meta-rights" to rent and/or sell to Customers as needed. |
| [d] associating, using a processor, at least one state variable with the at least one right in the first license, wherein the at least one state variable identifies a location where a state of rights is tracked; | Video Chain may provide that no Video Store can own and rent more than four copies of Video Chain's total allotment of a new release movie from Movie Studio.  Video Chain will track (in a database on its computer system) how many copies each of its Video Stores actually possesses. Further, a Video Store Clerk notes in a Video Store's computer system (or in a paper transaction log) the date and time of a Customer's movie rental and the applicable rental period.  Customer's receipt indicates that Movie A must be returned within a certain number of hours/days of the initial rental, or late fees will automatically be charged to Customer's credit card on file.  Video Store's computer system (or Clerk) will keep track of the time since Customer's rental and will automatically charge Customer's credit card if Movie A has not been returned within the allotted rental period. |
| [e] generating, in a second license, using a processor, one or more rights based on the meta-right in the first license, wherein the one or more rights in the second license includes at least one right that is shared among one or more users or devices; | Video Chain specifies in a license to a Video Store that the Store may rent newly released movies to Customers (for at home viewing – "usage right") for only 24 hours at a time, but that movies that have been available for more than two months may be sold to Customers for $10 or rented to Customers for 7 days at a time. The Video Chain license may be provided in digital or non-digital form.  Video Stores share the "meta-rights" to rent and/or sell movies as provided by the Video Chain license.  Each Video Store will exercise and enforce its rights to rent and/or sell to Customers as needed.  Further, members of a family who rent a movie as part of a "Family Plan" or "Family Membership" will all share the "usage right" to watch a rented movie on multiple devices for only 24 hours. |
| [f] and associating at least one state variable with the at least one right that is shared in the second license, wherein the at least one state variable that is associated with the second license is based on the at least one state variable that is associated with the first license. | Video Chain may provide that no Video Store can own and rent more than four copies of Video Chain's total allotment of a new release movie from Movie Studio.  Video Chain will track (in a database on its computer system) how many copies each of its Video Stores actually possesses. Further, a Video Store Clerk notes in a Video Store's computer system (or in a paper transaction log) the date and time of a Customer's movie rental and the applicable rental period.  Customer's receipt indicates that Movie A must be returned |

| | within a certain number of hours/days of the initial rental, or late fees will automatically be charged to Customer's credit card on file.  Video Store's computer system (or Clerk) will keep track of the time since Customer's rental and will automatically charge Customer's credit card if Movie A has not been returned within the allotted rental period. |
|---|---|

### b.   Claim 1 lacks any inventive element sufficient to render it patentable.

Claim 1 lacks any inventive element.  It merely limits the abstract idea of rights sharing and sublicensing to "a particular technological environment" and "well-understood, routine, conventional activity," by specifying the use of general "processors" and "repositories." *Mayo*, 132 S. Ct. at 1294.  Just as with Claim 1 of the '280 Patent, discussed *supra* pages 30-33 , the '053 patent claim's reference to "repository," "meta-rights", "usage rights" and "state variable" do not render the claim patent-eligible, as these construed terms/elements do not require any specialized hardware or complex computer programming to execute.   As in the claims invalidated in *Altec*, "The steps performed by the claimed computer elements are functional in nature and could easily be performed by a human. . . . There is no meaningful distinction for § 101 purposes between the abstract concept embodied by these claims and the abstract ideas identified in prior cases, and [Plaintiff] points to none."  *Altec*, Slip Op. at 7.[18]  Moreover, "an abstract idea is  . . . not saved by the mere fact that the claim is lengthy and recites multiple steps."  *Cloud Satchel*, 2014 WL 7227942, at *6.

### c.   Remaining Claims of the '053 Patent.

Claim 15, the only other independent claim asserted in the '053 patent, is identical to Claim 1 in its elements, but is written as a "system" claim, rather than a "method" claim as is Claim 1.  Claim 15 thus necessarily falls with Claim 1.  *Amdocs*, 2014 WL 5430956, at *5. The dependent claims likewise fail to add any limitations that render them patentable.  Claim 3 adds that "the state variable in the first or second license shares a state thereof for content usage or

---

[18] The reference to "licenses" does not add an inventive element to, or a concrete restriction on, the scope of the '053 patent claims.  At ContentGuard's urging, this Court defined "license" to mean "data embodying a grant of usage rights and/or meta-rights."  (Dkt. 459 at 102.)  Nothing in this definition requires more than "well-understood, routine, conventional activity." *Ultramercial*, 772 F.3d at 715 (as quoted in *Altec*, Slip Op. at 8).

rights derivation with other generated usage rights and meta-rights." This adds nothing tangible or inventive to the abstract idea. Indeed, it could be performed in the human mind. In the video store, if Customer 2 rents a second copy of Movie A, Video Store updates its records to show that a second copy of the movie has been loaned and, as with Customer 1, tracks the number of hours/days remaining in Customer 2's borrowing period. The state variables of "copies loaned" and "time remaining in rental period" are shared between Video Store, Customer 1 and Customer 2. Claim 5 adds the limitation that "wherein the state variable in the first or second license is updated upon exercise of a right associated with the state variable"; again, this limitation does nothing to render the claim patentable. In the video store example, Claim 5 would be met when Video Store rents a copy of Movie A, and its record of the total number of copies retained in the store is updated; when the copy is returned, Video Store updates its record to reflect the increase in the available number of copies in the store.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant them judgment on the pleadings that all of the asserted claims in this actions are invalid as drawn to unpatentable subject matter under 35 U.S.C. § 101.

Dated: April 24, 2015                         Respectfully submitted,


                                              */s/ Robert Unikel*
                                              _____


Michael J. Malecek                            Gregory Blake Thompson
Michael.malacek@kayescholer.com               Blake@themannfirm.com
Timothy K. Chao                               James Mark Mann
Timothy.chao@kayescholer.com                  Mark@themannfirm.com
Kaye Scholer LLP                              Mann Tindel & Thompson
3000 El Camino Real                           300 W. Main Street
2 Palo Alto Square, Suite 400                 Henderson, TX 75652
Palo Alto, CA 94306                           Telephone: (903) 657-8540
Telephone: (650) 319-4500                     Facsimile: (903) 657-6003
Facsimile: (650) 319-4700
                                              Counsel for Defendant MOTOROLA
Counsel for Defendant                         MOBILITY LLC
MOTOROLA MOBILITY, LLC


Robert W. Unikel
Robert.unikel@kayescholer.com
Kay Scholer LLP
80 W. Madison Street, Suite 4200
Chicago, IL 60602-4231
Telephone: (312) 583-2300
Facsimile: (312) 583-2360


Counsel for Defendant
MOTOROLA MOBILITY LLC

*/s/ Jennifer Haltom Doan*

Glen E. Summers (admitted pro hac vice)
glen.summers@bartlit-beck.com
Alison G. Wheeler (admitted pro hac vice)
alison.wheeler@bartlit-beck.com
Katherine Hacker (admitted pro hac vice)
kat.hacker@bartlit-beck.com
BARTLIT BECK HERMAN PALENCHAR &
SCOTT LLP
1899 Wynkoop Street, 8th Floor
Denver, CO 80202
Telephone: (303) 592-3100
Facsimile:  (303) 592-3140:

Jennifer Haltom Doan
Texas State Bar No. 08809050
jdoan@haltomdoan.com
Joshua Reed Thane
Texas Bar No. 24060713
jthane@haltomdoan.com
HALTOM & DOAN
6500 Summerhill Road
Crown Executive Center, Suite 100
Texarkana, TX 75505
Telephone: (903) 255-1000
Facsimile:  (903) 255-0800

Counsel for Defendant AMAZON.COM, INC.

Counsel for Defendant AMAZON.COM, INC.

Michael Valaik (admitted pro hac vie)
michael.valaik@bartlit-beck.com
Abby Mollen (admitted pro hac vice)
abby.mollen@bartlit-beck.com
Joshua Ackerman (admitted pro hac vice)
joshua.ackerman@bartlit-beck.com
BARTLIT BECK HERMAN PALENCHAR &
SCOTT LLP
54 West Hubbard Street, #300
Chicago, IL  60654
Telephone: (312) 494-4400
Facsimile: (312) 494-4440

Counsel for Defendant AMAZON.COM, INC.

*/s/ Melissa Richards Smith*

Bryan K. Anderson
Bkanderson@sidley.com
Nathan Greenblatt
Ngreenblatt@sidley.com
SIDLEY AUSTIN LLP
1001 Page Mill Road, Building 1
Palo Alto, CA 94304
Telephone: (650) 565-7007
Facsimile: (650) 565-7100

Melissa Richards Smith
Texas State Bar No. 24001351
Melissa@gillamsmithlaw.com
GILLAM & SMITH LLP
303 South Washington Avenue
Marshall, TX 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257

Counsel for Defendant APPLE INC.

Counsel for Defendant APPLE INC.

David T. Pritikin
Dpritikin@sidley.com
Richard A. Cederoth
Rcederoth@sidley.com
Nathaniel C. Love
Nlove@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Counsel for Defendant APPLE INC.


*/s/ Scott Partridge*
Scott Partridge
Texas Bar No. 00786940
Scott.partridge@bakerbotts.com
Lisa Kelly
Texas State Bar No. 24041659
Lisa.kelly@bakerbotts.com
Bradley Bowling
Texas State Bar No. 24040555
Brad.bowling@bakerbotts.com
Baker Botts LLP
One Shell Plaza
901 Louisiana
Houston, TX 77002
Telephone: 713-229-1569
Facsimile: 713-229-7769

Counsel for Defendant HUAWEI
TECHNOLOGIES CO., LTD. and HUAWEI
DEVICE USA, INC.


Peter J. Wied
Pwied@goodwinprocter.com
Vincent K. Yip
Vyip@goodwinprocter.com
Jay Chiu
Jchiu@goodwinprocter.com
Goodwin Procter LLP
601 S. Figueroa Street, 41st Floor
Los Angeles, CA 90017

*/s/ Eric H. Findlay*
Eric H. Findlay
Efindlay@findlaycraft.com
Brian Craft
Bcraft@findlaycraft.com
Findlay Craft, P.C.
102 N. College Avenue, Suite 900
Tyler, TX 75702
Telephone: 903-534-1100
Facsimile: 903-534-1137

Telephone: 213-426-2500
Facsimile: 213-623-1673

Counsel for Defendants HTC CORP. and HTC
AMERICA, INC.


Neil Phillip Sirota
Neil.sirota@bakerbotts.com
Robert Lawrence Maier
Robert.maier@bakerbotts.com
Brian Boerman
Brian.boerman@bakerbotts.com
Guy Eddon
Guy.eddon@bakerbotts.com
Baker Botts LLP
30 Rockefeller Plaza, 44th Floor
New York, NY 10112
Telephone: (212) 408-2548
Facsimile: (212) 259-2548

Counsel for Defendants SAMSUNG
ELECTRONICS CO., LTD. SAMSUNG
ELECTRONICS AMERICA, INC. and
SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC

Michael E. Jones
Texas State Bar No.10929400
Mikejones@potterminton.com
Allen F. Gardner
Texas State Bar No.24043679
Allengardner@potterminton.com
Potter Minton, A Professional Corporation
110 North College, Suite 500
Tyler, TX 75702
Telephone: 903-597-8311
Facsimile: 903-593-0846

Counsel for Defendants SAMSUNG
ELECTRONICS CO., LTD. SAMSUNG
ELECTRONICS AMERICA, INC. and
SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC

Counsel for Defendants HTC CORP. and HTC
AMERICA, INC.


*/s/ Michael Joseph Barta*

Michael Joseph Barta
Michael.barta@bakerbotts.com
Baker Botts LLP
The Warner
1299 Pennsylvania Avenue NW
Washington, DC 20004
Telephone: (202) 639-7703
Facsimile: (202) 585-1058

Counsel for Defendants SAMSUNG
ELECTRONICS CO., LTD. SAMSUNG
ELECTRONICS AMERICA, INC. and
SAMSUNG TELECOMMUNICATIONS
AMERICA, LLC

41

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic service on April 24, 2015.  *See* Local Rule CV-5(a)(3)(A).

*/s/ Robert Unikel*