```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                       MARSHALL DIVISION

 4   CONTENTGUARD HOLDINGS, INC.    )(

 5                                  )(    CIVIL DOCKET NO.

 6                                  )(    2:13-CV-1112-JRG

 7   VS.                            )(    MARSHALL, TEXAS

 8                                  )(

 9   AMAZON.COM, INC., ET AL.       )(    JULY 31, 2015

10                                  )(    9:15 A.M.

11   _____

12   CONTENTGUARD HOLDINGS, INC.    )(

13                                  )(    CIVIL DOCKET NO.

14                                  )(    2:14-CV-61-JRG

15   VS.                            )(    MARSHALL, TEXAS

16                                  )(

17   AMAZON.COM, INC., ET AL.       )(    JULY 31, 2015

18                                  )(    9:15 A.M.

19

20                       PRE-TRIAL HEARING

21         BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

22               UNITED STATES DISTRICT JUDGE

23

24   APPEARANCES:

25   FOR THE PLAINTIFF:  (See sign-in sheets docketed in
                          minutes of this hearing.)
```

```
1    FOR THE DEFENDANTS: (See sign-in sheets docketed in
                             minutes of this hearing.)
2

3    COURT REPORTER:       Shelly Holmes, CSR-TCRR
                           Official Reporter
4                          United States District Court
                           Eastern District of Texas
5                          Marshall Division
                           100 E. Houston Street
6                          Marshall, Texas  75670
                           (903) 923-7464
7
     (Proceedings recorded by mechanical stenography, transcript
8    produced on a CAT system.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

                          I N D E X
2

3  July 31, 2015

4                                                    Page

5        Appearances                                 1

6        Hearing                                     4

7        Court Reporter's Certificate                85

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              All right.  We're here this morning to continue with

 4    the pre-trial matters related to 2:13-CV-1112 and 2:14-CV-61.

 5    These are the ContentGuard/Google/Samsung and

 6    ContentGuard/Apple cases.

 7              For the record, let me ask for announcements before we

 8    proceed with today's pre-trial matters.  What says the

 9    Plaintiff this morning?

10              MS. TRUELOVE:  Good morning, Your Honor.  Jennifer

11    Truelove with McKool Smith here on behalf of Plaintiff,

12    ContentGuard.  Also here with me this morning is John Briody,

13    Sam Baxter, and Jonathan Yim will be joining us in just a

14    minute.  Mr. Briody will be providing the presentation this

15    morning, and we -- we drug him straight in from Queens, so

16    we'll have a translator present if we need it, but he'll be

17    handling the argument this morning.

18              THE COURT:  All right.  Thank you, Ms. Truelove.

19              Let me have announcements from the Defendants.

20              MR. JONES:  Thank you, Your Honor.  On behalf of

21    Samsung, Mike Jones, Mr. Michael Barta, Mr. Neil Sirota, and

22    here from Samsung, Mr. Chris Burrell, Your Honor.

23              THE COURT:  All right.  Other announcements?

24              MS. SMITH:  Good morning, Your Honor.  Melissa Smith

25    on behalf of Apple.  This morning I'm joined by Mr. David
```

1  Pritikin, Mr. Dave Anderson, Mr. Bryan Anderson, who will be

2  addressing the Court this morning, and also our client rep,

3  Mr. Ian Cunningham.  And, Your Honor, we're ready to proceed.

4              THE COURT:  Thank you.

5              Announcements for Google.

6              MR. MANN:  Thank you, Your Honor.  Good morning.  Mark

7  Mann for Google, and here today is Robert Unikel and Marisa

8  Williams and Peter Root, and then our representative from

9  Google, Ken Maikish.  And Mr. Root will be doing our

10 presentation today, Your Honor, I think.

11             THE COURT:  All right.  All right, then.  We have set

12 for today arguments on the following Daubert motions.  These

13 would be Documents 662, 663, 666, 701, and 723 in the

14 2:13-CV-1112 case, and document 256 in the 2:14-CV-61 case.

15             As I mentioned to counsel in chambers just a few

16 moments ago, the Court sees no reason to take these up one at a

17 time individually.  The duplicative nature of them would be

18 a -- I think a definite waste of both counsel and the parties'

19 time and the Court's time.  There's such overlap that these

20 make good sense to the Court to be presented in a composite

21 way.  And so I intend to hear argument from Defendants and

22 argument from Plaintiff, but as to all these pending presented

23 at one time.

24             With that, these are Defendants' motions, so they're

25 the movant, and I'll hear from the Defendants on these

1   damage-related Daubert issues at this time.

2          MR. JONES:  Your Honor, may it please the Court.

3          I am here to argue on behalf of the Defendants with

4   regard to the portions of motions that deal with Dr. Teece.

5          THE COURT:  All right.

6          MR. JONES:  Mr. Root will deal with those portions

7   that deal with Dr. Danaher.  And Mr. Anderson will deal with

8   those parts of the motions that deal with Dr. Prince, if it

9   pleases the Court.

10          As I open my regards here today, I must say I speak

11   with a little bit of reluctance because I've been at numerous

12   hearings.  I know Your Honor is very familiar with the subject

13   matter.  I have seen the best attorneys in this country argue

14   this subject matter to Your Honor.  I've read Your Honor's

15   decision.  And I reluctantly don't want to be presumptuous that

16   I have something to add, but I do think that I can tell the

17   Court the backdrop for which I approach these issues.

18          I have read the case law in this area for years, and

19   what I think I have learned from the case law, if I've learned

20   nothing else, is that with regard to reasonable royalty law,

21   there is no safe harbor.  There is no formulistic way to do it.

22          What we have to do is look at the specific facts of

23   each patented invention and then apply marketplace principles

24   to those specific facts and by that way come up with some kind

25   of valuation of the value of the patented invention in the

1    marketplace.

2            You know, many times we as lawyers want bright line

3    decisions, like we always thought that the Court would give

4    us -- the Federal Circuit would give us some bright line

5    decision on the Nash Bargaining Solution.

6            But instead, what they told us and it will be

7    applicable to this case, when they got to the Nash Bargaining

8    Solution, was that any methodology you use, any study you use,

9    you must first tie to the specific facts of the case.  They've

10   also taught us, and probably the -- the biggest example of this

11   we see is in LaserDynamics, that when you evaluate the

12   technology, you can't approximate -- certainly the case law

13   says that -- but you must tie it to specific facts in the case.

14           Now, those are the two points really that go to the

15   fatal flaws of Dr. Teece's reports and opinions.  He uses

16   methodology, and he uses studies that are not tied to the

17   specific facts and circumstances surrounding this patented

18   invention.

19           And then secondly, he does not evaluate only the

20   patented invention.

21           Now, in -- in order to -- to deal with those topics, I

22   would like to first discuss exactly what was done in this

23   particular case.

24           And if I could, could we go to Slide 4?

25           THE COURT:  Before you do that, Mr. Jones --

1          MR. JONES:  Yes, sir.

2          THE COURT:  -- let me ask this question.  I hear your

3    argument on tying, but to give you an analogy, when I was a Boy

4    Scout, knots was one of the only things I was good at, and

5    there are tight knots, and there are loose knots.  Tying is a

6    matter of degree.

7          MR. JONES:  Yes, sir.

8          THE COURT:  What amount of tying is necessary to cross

9    the threshold for Daubert, in your opinion and based on the

10   case law, and what amount of tying is too much and too little?

11         MR. JONES:  The amount of tying that I think is

12   required -- and, of course, the Court's --

13         THE COURT:  Tying is not a constant.  It is -- it is a

14   variable.

15         MR. JONES:  It -- it is certainly a variable.  And in

16   my understanding of the law, and I think the Court's question

17   is, it's a continuum.  We have cases that say you can

18   approximate, and we have cases that say you must look at the

19   technology involved.  And it's somewhere in the middle.

20         I think where you have to draw the line is you have to

21   evaluate the technology that you're looking at in the case in

22   question.

23         Now, that almost doesn't answer the question, it's so

24   broad.  Let's bring it down to this case.

25         In this case, the mistake that I think has been made

1   where they didn't tie it tight enough is they didn't look at

2   DRM technology.  What we are talking about here with regard to

3   these patents, I think all the experts that have spoken on the

4   subject have told us is an improvement to DRM technology.  We

5   know that this patent does not invent DRM technology.  I think

6   everybody agrees that it was there before this.  This is an

7   enhancement.  And where they didn't tie it, using your analogy,

8   Your Honor, the knot tight enough was they did not evaluate

9   improvements to DRM technology.  They evaluated something much

10  broader.

11          In fact, when we look at what the -- the --

12  ContentGuard itself has described and what Dr. Teece evaluated,

13  it's the ability to sell DRM protected digital content which is

14  much broader than what these patents are.

15          THE COURT:  All right.

16          MR. JONES:  I hope that answers your question.

17          THE COURT:  Continue your argument.

18          MR. JONES:  Thank you, Your Honor.

19          If I could, I'd like to go -- here's -- this is in my

20  own simple mind, and it was something that was done by Mr. Root

21  on behalf of Google, but it -- but it -- it tells the Court

22  exactly the formula that's being applied here.

23          And what was done was Dr. Teece, and he does this for

24  various products.  Of course, the accused products are with

25  regard to Google and Apple, the smartphones, the tablets.  And

1   also content with regard to my client, Samsung, it is just the

2   smartphones and just the tablets.  But with regard to the

3   accused products, he follows this formula with regard to all of

4   them.

5        And the first thing he does is he takes the price of

6   the phone in question.  Then the next thing he does is he looks

7   at a price conjoint survey -- and, again, this will be talked

8   about in detail by Mr. Anderson -- and he comes up with a

9   consumer willingness to pay for the ability to access the

10  digital content.  And this is 40 -- in this particular -- with

11  regard to this particular product, it was $41.21.

12        He then relies upon another survey that was done by

13  Price con -- concerning usage, and he looks at how many people

14  actually used it on their phone.  And he multiplies that

15  consumer willingness to pay times 25 percent.  He then looks at

16  a study.  It's a video game study by Mr. Shiller, or

17  Dr. Schiller, and this was provided for him by Dr. Danaher --

18  and, again, Mr. Root will talk more about that -- and he uses

19  that 58 percent figure as another multiplication, and he comes

20  up with a total of $7.12.  It's the consumer's willingness to

21  pay.

22        Now, then in his analysis, he says, the maximum Google

23  would be willing to pay is the $7.12.  And then he says has a

24  ContentGuard minimum willingness to accept.  And, Your Honor,

25  that's the only thing that I think I will talk about that is

 1   confidential.

 2          I've talked with counsel, and I've redacted what that

 3   figure is.  We all know what it is.  It's in the report.  If I

 4   could hand it to Ms. Lockhart, we'd just -- that way we

 5   wouldn't have to seal the courtroom.

 6          THE COURT:  I know what it is.

 7          MR. JONES:  Okay.  Great.  I'm sorry, Your Honor.  I

 8   didn't mean to --

 9          THE COURT:  I've seen it in the reports, so go ahead.

10          MR. JONES:  I'm -- I'm sorry, I apologize.

11          So -- so he then has the minimum willingness to

12   accept.  And then he uses the Rubinstein bargaining model where

13   he takes his -- his range, the maximum willingness to pay with

14   the minimum willingness to accept, and he -- really uses two

15   factors.  They're all that's used.  It's a weighted average

16   cost of capital of the parties and which party goes first, and

17   then he comes up with his royalty rate.

18          Now, with regard to -- and I'll use the Court's

19   analogy -- with regard to where he didn't tie this tight

20   enough, I would like to look at three different areas.  And the

21   first area I would like to look at is the use of the 58 percent

22   from the Shiller Video Game Study.

23          Now, what is the Shiller Video Game Study?  And if we

24   could, it is a -- the title of it is Digital Distribution and

25   the Prohibition of Resale Markets for Information Goods.  It's

1    by Benjamin Reed Shiller, and then this is the abstract or this

2    is the summary of what the article is all about.  And the Court

3    has this article, obviously, in the briefing that's has been

4    sup -- supplied.

5            THE COURT:  If I were to call this the Danaher paper,

6    we'd be talking about the same thing?

7            MR. JONES:  We would be, Your Honor.

8            THE COURT:  Okay.  Continue.

9            MR. JONES:  Thank you, sir.

10           And basically when you look at this abstract, it tells

11   us -- and I've tried to boil it down.  It tells us that there's

12   a proposition out there in economics, and the proposition is

13   this, that frictionless resale markets cannot reduce profits

14   of monopolistic producers of perfectly durable goods.  And it

15   says I want to test that idea because it says I want to test

16   that proposition because it seems logical that this finding

17   does not hold for goods where consumers tire of their value.

18           And what it does is it studies 14 highly acclaimed

19   video games.  And it says that, look, in the real world, there

20   is a marketplace where the people that produce the games sell

21   them, and there's a secondary marketplace for the used games.

22           And it says I want to find out how much more profits

23   would be made if there was no market for the used games for

24   these 14 highly acclaimed.  And it says, well, they would have

25   made 140 percent more if they had not had that used market.

1          And then they go on to then do the math, and they say,

2    so we think it costs 58 percent because you have the used

3    market.  And that's what the study does.

4          Now, this case involves the use of a study that's not

5    tied to our facts, basically in three respects that I think are

6    glaring.  There are more, and I'm certainly not going to talk

7    in detail about Dr. Danaher.  But there are three things that

8    just jump off the page at you.

9          The first is, as I said in answer to your question, it

10   has nothing to do with DRM technology or any kind of security

11   technology.  It does not deal with, let's look at technology

12   like in question in this suit and find out how much value there

13   is to it.  No.  All it is, is a study about what happens when

14   you don't have a real set -- resale market for video games.

15         Secondly, it applies only to video games.  In fact, on

16   Page 425 of the article, the author himself said:  The result

17   for highly acclaimed games may not generalize to other games.

18   Well, that goes without saying.  Obviously, the resale

19   market -- the used market for games that are real popular is

20   going to be very different from those that aren't popular.  So

21   he's saying, you can't even apply this to other games.  You

22   know, the games have to be similar.

23         But in this case, what Dr. Teece does is he applies it

24   not to games, but he applies it to digital content, like books

25   and music and videos.  But -- but the comparison problem goes

1  beyond that because he uses the 58 percent without adjustment

2  to the price of the devices, the Smartflash -- excuse me, the

3  smartphones -- I missed the wrong case, didn't I -- the

4  smartphones and the tablets.  That's what he does.

5          THE COURT:  It's still alive from what the Circuit

6  tells me.

7          MR. JONES:  Yes -- yes, Your Honor.

8          THE COURT:  All right.  Let's continue.

9          MR. JONES:  I'm sorry.

10         But -- but he -- he applies it to devices.  Now --

11  now, the author of the paper tells us you can't even apply it

12  to other games.

13         THE COURT:  But isn't that really an expert's

14  conclusion, not an issue of methodology?  And am I, as a

15  gatekeeper under Daubert, supposed to challenge the conclusions

16  of an expert?

17         MR. JONES:  I -- I think so, Your Honor.  I would

18  answer yes to that question, and let me tell you why.

19         THE COURT:  Okay.

20         MR. JONES:  The -- the Courts have told us,

21  particularly in this area of your role as a gatekeeper, is that

22  we don't want experts coming up with studies or formulas -- the

23  Nash Bargaining Solution was a classic example of that -- which

24  close matters that really aren't related to the case in some

25  kind of authority just by the fact that an academic may use it

1    or it may be detailed and sound good.  And from that, give some

2    kind of authority and relevance to something that really

3    doesn't apply to the case.

4         THE COURT:  Well, from what I've seen, counsel,

5    efforts by well-known jurists -- I'm thinking of Judge Posner

6    who substitutes his own views -- have not been well received by

7    the appellate courts.  I mean, I'm not supposed to put myself

8    in the position of a Ph.D. expert with decades of experience in

9    a technical field just because I sit up here and wear a black

10   robe.  I do think I have an obligation to serve as a check on

11   the approach and the methodology and the means, but not the

12   ultimate conclusions.

13        Now, if you -- if you think I'm supposed to substitute

14   my conclusions for theirs, tell me -- tell me that's what you

15   think, but that's not what I -- that's not how I view my role

16   in this context under the Daubert authorities.

17        MR. JONES:  I -- no, No. 1, I'll tell you, I don't

18   think that.

19        No. 2, I will tell you I don't think that's what I'm

20   discussing you doing or the Court doing --

21        THE COURT:  Okay.

22        MR. JONES:  -- excuse me, the Court doing in this

23   instance.

24        THE COURT:  I'm trying to be clear on what you're

25   asking me to do.

1           MR. JONES:  Sure.  Thank you, Your Honor.

2           What I'm -- what I'm asking you to do is look at the

3    paper and -- and do exactly what the Court talks about in

4    VirnetX, and say, does this study apply to this situation?

5           And -- and my suggestion to you is that when you use a

6    study about 14 video games that the author says doesn't even

7    apply to other games and when you use a study that's about, for

8    example, manufacturers and you apply a decrease that's found in

9    a study about a manufacturer's profits to retailer profits,

10   which we both know are -- are not the same thing, that when you

11   use a study that deals with the sale of content and you apply

12   it to a sale of -- of products that you have crossed a line

13   that the Court as gatekeeper has to look at.

14          And it's the same thing that was done with things like

15   the Nash Bargaining Solution or -- or -- or with regard to

16   other studies.  For example, in the case that's cited here, the

17   Digital Regs of Texas case versus Adobe, in that case, there

18   was an attempt by a study to compare profits of the industry --

19   or, excuse me, losses of the industry with regard to piracy

20   with regard to the losses of a particular Defendant.  And the

21   Court says, no, you haven't tied it to the invention.  You

22   haven't shown that your analysis here, the methodology that

23   you're -- you are using is tied to the invention, and it should

24   not come in.

25          THE COURT:  I understand under VirnetX and others that

1   there the expert didn't tie or didn't apply the study to the --

2   to the facts.  But here, as I read it, the expert says, this is

3   analogous, it applies.  Granted, it's not factually identical,

4   but the expert says, in my opinion and based on the totality of

5   my examination, it -- it is analogous and it does apply.

6   Doesn't that get the Plaintiff beyond the VirnetX problem, and

7   doesn't the Court -- doesn't the Court then find itself in the

8   position of having to let the jury decide if it truly is

9   analogous or not, if that expert is believable and persuasive,

10  rather than trying to supplement my own analysis for the

11  expert's?

12          MR. JONES:  No, I -- I don't believe so.  My answer to

13  your question is -- straightforwardly is no, and let me tell

14  you why.  The -- the reason is, is because I think you have to

15  look at and the Court in its gatekeeper function has to look at

16  is there a tie to the facts and that --

17          THE COURT:  Well, if the expert says there is a tie,

18  it is analogous, what's the Court's responsive -- respond --

19  responsibility in response to that?  Am I supposed to challenge

20  that, or am I supposed to say he's the expert, he says it's

21  analogous, now it's up to him to persuade the jury that it is?

22          MR. JONES:  I -- I think your role is twofold.  It's

23  to make sure -- and I go back to your example -- that it's tied

24  somewhat.  That if there's no tie there, then I don't think it

25  can come in.

1          And I do think there's case law that says just because

2    an expert says this is relevant and this is why I do it, and

3    I'm an expert in the field, that is not good enough.  That does

4    not satisfy the tiring -- tying requirement.  So that's why I

5    answer your question no.

6          I mean, if -- if --

7          THE COURT:  I mean, if an expert who's qualified is

8    not entitled to give an opinion that this is analogous, and to

9    use what we've discussed already, it adequately ties this

10   together, where am I supposed to go to find that?  Isn't that

11   the role of the experts in our process to step in and provide

12   an experienced and knowledgeable explanation for some of these

13   conclusory technical issues that we as laymen and -- and

14   lawyers and judges are not experienced and knowledgeable in?  I

15   mean, if I'm not supposed to accept the expert's conclusion

16   that this is analogous and it does fit and it does tie, what am

17   I supposed to use to fill that void?

18         MR. JONES:  To -- to me, you use the record in the

19   case to find if what he did is tied to the facts and

20   circumstances surrounding the patented invention.

21         The -- the situation I think the Court's in is

22   probably aptly described by the Knight versus Kirby Inland case

23   which has been cited via the Court where it says in that case

24   there was an analytical gap between the studies or in which

25   that expert relied and his conclusions are simply too great and

1    that his opinions were thus unreliable.

2            So I think just like in that case, there can come a

3    time when an expert can tell you, hey, this is a reliable

4    study.  And I'm not saying that Dr. Shiller's paper couldn't be

5    reliable in some circumstances, but it's not reliable when you

6    look at it and compare it to the facts of these cases.  And

7    that's where it goes from being cross-examination material to

8    being inadmissible.

9            And I do think the case law supports my position that

10   there is a role for the Court to see within the facts of the

11   case I can find a tie to what the expert is using.  And if

12   there isn't a tie, I don't believe his bold opinion or his

13   conclusion will -- will -- will be enough to -- to bring it in.

14           THE COURT:  So I'm supposed to go behind his

15   conclusion?

16           MR. JONES:  I -- to some extent, yes, sir, Your Honor.

17           THE COURT:  Okay.  Continue.

18           MR. JONES:  Thank you, Your Honor.  I would like to

19   move now, if I could, to the second fatal flaw which I think

20   renders his opinion inadmissible.

21           And that involves the question of what did Dr. Teece

22   evaluate.  He -- and if you read his -- and I know you have,

23   so  I don't -- I didn't mean to presume you hadn't.  But when

24   you read his report, it's clear that he says, I have evaluated

25   a but-for scenario.  And that but-for scenario is these

1    patents -- the Defendant should not provide -- without these

2    patents, these Defendants could not provide DRM protected

3    digital content.

4         And the briefing matches on this, what I just said.

5    If you -- if you look at Page 2 of their response, they say

6    given that no Defendant has presented a commercially viable

7    non-infringing alternative without the teachings of the

8    patent-in-suit, Defendants would be unable to distribute

9    DRM-protected content or to make such content available in

10   their devices.  They said it again even more strongly in their

11   sur-reply concerning these motions, and I believe they said it

12   again on Wednesday.

13        Now, this is a description of what Dr. Teece

14   evaluated.  Now, that is not, though, the patented invention.

15   We have a disconnect because the evidence is clear in the

16   record that the patented invention is not DRM.  The patented

17   invention is not the ability to supply digital content -- tent

18   that is DRM-protected.  And the record is totally one way with

19   regard to that.

20        Dr. Teece, in his report, says that there are three

21   key enabling technologies for content distribution -- for the

22   content distribution industry, digital content -- distribution

23   industry.  He says it includes broadband which enables transfer

24   compression which is the transfer of the larger files and DRM.

25        Elsewhere in his report, he notes that there is other

```
 1   functionality that is not related to the patent that is

 2   involved in providing this DRM-protected digital content.  It

 3   involves, you know, displays.  The experts in this case have

 4   said without -- none of them contradict each other -- involves

 5   video, involves audio, involves speed of loading.

 6           So when you look at what he evaluated, it is clear to

 7   see that there are components in that that do not relate to the

 8   patented invention.

 9           Now, there's been some -- you know, in -- in the

10   briefing, particularly in the sur-reply, the Defendant --

11   excuse me, the Plaintiffs take the position that there's no

12   non-infringing alternative that was proven by the Defendants.

13   And so because of that, because there's no non-infringing

14   alternative, that -- that this is an adequate description of

15   what the patented invention is.

16           But now the record really doesn't show that.  If

17   you'll recall Wednesday with regard to preclusion, they took

18   the opposite position when they made that argument.  And the

19   reason they did is because these Defendants, and Amazon in

20   particular, and these Defendants use Microsoft's PlayReady DRM.

21           THE COURT:  You mean preemption?  You said,

22   preclusion.

23           MR. JONES:  Yes.  I meant preemption, Your Honor.

24           THE COURT:  Okay.

25           MR. JONES:  I apologize.
```

1        THE COURT:  I thought you did.  Go ahead.

2        MR. JONES:  And Microsoft's PlayReady DRM is obviously

3   used for these same purposes.  It's licensed.  It was released

4   in February of 2007.  Microsoft has a license to these patents.

5   It's -- it's used by these companies.  It is a DRM solution

6   that works on all kinds of digital content, and it has a

7   published licensing rate of 15 cents.

8        So we know there is a non-infringing alternative, and

9   that is part of the record.

10       Well, instead of evaluating what the record shows is

11  the patented invention, they've evaluated something much

12  broader when they evaluate the release of all digital content

13  that is in any way DRM-protected.

14       Now, it's black letter law.  Everybody knows it that a

15  reasonable royalty cannot overreach and encompass components

16  not covered by the patent.  You know, that goes back a hundred

17  years to Garretson.  Certainly LaserDynamics gives us the best

18  statement of that when they say carefully -- we have to

19  carefully tie the proof of damages to the invention's footprint

20  in the marketplace.

21       Well, there's one footprint in the marketplace, and

22  it's about a Size 8.  And then there's the one that they

23  evaluated, and it's about a Size 20.  And that's a fatal flaw

24  in the analysis, because they're not matching what the record

25  is about this invention with what they admittedly, in their own

1  briefing, say is the evaluation that has been done.

2       Now -- and, again, I probably talked about it too

3  much, but I go back to VirnetX.  What did VirnetX teach us?

4  VirnetX said, look, when you get down to a component, if that

5  component of what you're evaluating still has unpatented

6  features in it, you have got to take them out, or we have a

7  LaserDynamics problem or a Garretson problems.  And that has

8  not been done here.  You know, I -- I don't know where we'd

9  find a case more on point than that, what we see in the VirnetX

10 opinion.

11      Now, if you look at the briefing, they rely basically

12 on two cases to escape this problem.  They rely upon the

13 Astrazeneca case and the University of Pittsburgh case.  But

14 when you look at those, they clearly indistinguishable.  In the

15 Astrazeneca case, the patents covered the infringing product as

16 a whole, not a single component.  They covered it as a whole,

17 and -- and it stated there were no -- it -- the decision itself

18 states there is no unpatented feature in the product.

19      With regard to the University of Pittsburgh case, the

20 patent was about the combination of all the components, so you

21 were dealing, again, with the whole thing, and it is a very

22 different situation than we have here.

23      Finally, Your Honor, the third flaw that I would point

24 out to the Court that renders this particular economic --

25 economic damages calculation not only subject to

1   cross-examination but inadmissible is the use of the Rubinstein

2   bargaining solution.

3          Now, again, we know what we've been taught because it

4   comes straight from the Nash Bargaining Solution.  We've been

5   taught that, you know, these models can only be used very

6   carefully when you tie them to the specific circumstances of

7   the case.

8          And I -- and I would like to say there's been some,

9   you know, back and forth in the briefing over an article that

10  was written by the -- Mr. Rubinstein himself about economic

11  models.  And -- and I do think, though, it is applicable to

12  this discussion.  He wrote a paper about economic models and

13  his role as an economic theorist.  And he explained in the

14  paper, and I think it teaches us why we've got to be careful

15  about using them, is that economic models are not trying to

16  predict what happens in the real world.  They are instead used

17  as teaching tools to teach principles.

18         For example, he says a good model in economic theory,

19  like a good fable, identifies a few themes and elucidates them.

20  We perform thought exercises which are only loosely connected

21  to reality.  If you look at Nash, if you look at economic law

22  concerning things like the Rubinstein bargaining model, what

23  you see is -- you know, economic theorists say all the time

24  these things with gaming, they are not predictors of real world

25  negotiations.

1          Now, turning to how it's used in this case, when you

2     use it in this case, you only have two features that really

3     determine the outcome.

4          THE COURT:  Well --

5          MR. JONES:  Excuse me, Your Honor.

6          THE COURT:  -- let me ask you a question.

7          MR. JONES:  Yes, sir.

8          THE COURT:  Obviously, by definition, a model is a

9     model.

10         MR. JONES:  Yes, sir.

11         THE COURT:  It's to a certain extent, a hypothesis of

12    what would occur based on modelling.  Are you then telling me

13    because it's not real world enough that a model is never

14    appropriate because a model in and of itself is separated from

15    actual application in the real world to some degree?

16         MR. JONES:  I'm certainly not telling you that because

17    the Federal Circuit would tell me that I was very wrong if I

18    were to tell you that.  It -- it can be -- obviously, they have

19    told us that you can use models in certain instances when

20    they're specifically tied to the facts and circumstances of the

21    patented invention and its footprint in the marketplace.  So

22    the answer to that question is, no, I'm certainly not telling

23    you that.

24         THE COURT:  Well, I expect the Plaintiff's going to

25    get up here in a minute and tell me they did tie them to the

1  facts in the case, and you've told them they weren't.  So

2  some -- some point in this discussion, we've got to get beyond

3  conclusory they did, conclusory they didn't, and let's talk

4  about specifics, or at least that would be most helpful to me,

5  I think.

6        MR. JONES:  Thank you, Your Honor, and I'll certainly

7  try to do that.

8        To -- and I think it's -- the best way I can approach

9  answering that, if I could, Your Honor, would be to tell you

10 what I think you would do to show that the Rubinstein

11 bargaining model is applicable to the facts and circumstances

12 in the case.

13       For example, it makes certain assumptions, and there's

14 a list in the opposition of all the assumptions that are made.

15 I would think that what you would do if you're going to show

16 that it's applicable to the facts and circumstances in this

17 case is you'd show that all of the assumptions apply to these

18 negotiations and apply to the parties in this negotiations.

19 There has been no such showing.

20       Even more importantly, Your Honor, and I hope this

21 answers your question with regard to specifics, is that in this

22 case, there's really only two variables in the way the model is

23 used that determines the outcome.

24       And could we go back to Slide 4, please, Ms. Tekell?

25       You know, what -- what we are really doing in the

1  model is picking between -- somewhere between the maximum

2  willingness to pay, the 7.12, and the minimum willingness to

3  accept.  And it's where they use Rubinstein to do that.  And in

4  order to come up -- excuse me, Your Honor.

5        THE COURT:  Are -- are you telling me that none of the

6  assumptions are met or that some of them are and some of them

7  aren't?  And if it's the latter, which ones aren't and why

8  aren't they?

9        MR. JONES:  And -- and I can't tell you that because

10  that -- I'm telling you that analysis has not been done.  For

11  example, there's an assumption with regard to continuity and an

12  assumption with regard to stationarity.

13        THE COURT:  So Plaintiffs just missed the boat

14  totally --

15        MR. JONES:  Yes --

16        THE COURT:  -- in your view?  Okay.

17        MR. JONES:  -- in my view.  And let me tell you where

18  I'm coming from.  I can't -- I can't even tell you from reading

19  the reports and reading the -- the -- the briefs -- and maybe

20  I'm just not very smart, but -- but I can't even tell you what

21  those things are.  I have some vague idea of what they are from

22  my studies, and they have something to do with the timing of

23  payments and the amounts of payment and what the two sides

24  want, but as far as the analysts -- the analytical necessity

25  being done to say, hey, this assumption can be made here, I

1    don't find that analysis anywhere.

2            THE COURT:  All right.

3            MR. JONES:  So that's what I'm telling Your Honor.

4            Secondly, Your Honor, the -- the -- the two important

5    factors that they use that determines the outcome of this

6    choice between those two figures are the weighted average cost

7    of capital of the parties, and, secondly, which party goes

8    first.

9            And, again, if -- again, to my mind, reading the case

10   law, what you need to do to justify the use of this particular

11   Rubinstein bargaining model is to show that between these

12   parties, those would be the two factors that would really

13   govern negotiations.  Yet there is no tying in any shape, form,

14   or fashion to showing that weighted average cost of capital

15   ever affected the way ContentGuard negotiated with regard to

16   any particular license, the Defendants negotiated with any

17   particular license, or as a general manner that it controls the

18   way licenses are negotiated.  Which party goes first?  There is

19   no showing that that's a really determinative factor.  And,

20   again, I think because of that, it is not tied.

21           Now -- and this brings me to -- well, the -- the

22   expert says it is tied, and, you know, I'm anticipating Your

23   Honor's question, why shouldn't that be good enough?

24           Well, again, I go back to VirnetX, and -- and in

25   VirnetX, the Federal Circuit taught us that just because the

```
 1   expert says, I've done a Georgia-Pacific factor evaluation and
 2   I've looked at all the factors, and they've all come together,
 3   and I know that this is the right way to do it, which I think
 4   is the position we're really in in this case, because when you
 5   look at the briefing, they say, well, he sees it's justified
 6   because he did the Georgia-Pacific analysis.  They've said
 7   that's not good enough.  You can't -- there is no formula.
 8   There are no magic words.  You've got to do the hard work of
 9   getting down into the nitty-gritty of the case.
10           And, again, for this third reason, I don't think
11   they've done that.
12           Your Honor, in conclusion, these flaws that I've
13   talked about, I don't believe they're nitpicks.  I believe they
14   are the essence of what the formula is that reaches their
15   numbers.  I believe that they are not tied to the case.
16           And I close with saying where I think Dr. Teece went
17   wrong.  You know, there is a marketplace for DRM technology.
18   There is records about that.  We've talked about one, the
19   Microsoft license published rate.  But there is a marketplace
20   for DRM technology, and the Court has before it and knows it --
21   what that range of rates would be.
22           This is a case where somebody has gone and started
23   with the price of a very complicated product and come up with a
24   much, much larger figure than we see in that particular
25   marketplace.  It reminds me a bit of the situation that Judge
```

1    Rader confronted in ResQNet when he said, look, everybody's

2    looking at all these economic factors, but I've got this one

3    license that actually deals with the technology involved and

4    y'all ought to be talking about that and not talking about all

5    these other things.

6         And I think that's where we've gone wrong in this

7    particular instance, that we haven't looked at the technology

8    we're dealing with -- it's DRM technology -- looked at those

9    rates and found a damage model that is in that ball game.

10        Thank you, Your Honor.

11        THE COURT:  Thank you, counsel.

12        Let me ask the Plaintiff to respond to this argument,

13   and then as we move on with Defendants' motion as to the other

14   experts, we'll take them in -- in turn.

15        So I'll hear from the Plaintiff at this juncture.

16        MR. BRIODY:  Good morning, Your Honor.

17        THE COURT:  Good morning.

18        MR. BRIODY:  I'm John Briody on behalf of

19   ContentGuard.

20        THE COURT:  Please proceed.

21        MR. BRIODY:  I think Your Honor hit on the right place

22   at the very beginning obviously of what's the standard here.

23   The Court's role here is to check is the methodology sound --

24        Slide 2, Mr. Diaz.

25        -- and are there facts to support it?  Each of the

1  criticisms that we've heard are all boiling down to criticisms

2  about Professor Teece's conclusions.

3          I'll set them off one-by-one.  Mr. Jones stated that a

4  fundamental problem was that Professor Teece didn't tie his

5  analysis to the patented invention.  And I think the right way

6  to look at that inquiry is in the facts of this case.

7          Slide 3, Mr. Diaz.

8          Slide 3 is a paragraph from Professor Teece's report.

9  An issue that has come up in this case throughout with both

10 parties' experts is whether or not the DRM technology, trusted

11 system for the secure enforcement of usage rights that's

12 enabled by the patents-in-suit, whether that could be pushed

13 aside in favor of an end user license agreement.  That's the

14 thing that you click when you get your iPhone update or do you

15 agree with these terms.

16          The assumption is that included among those terms is

17 the fact that you only have a license to the work and that you

18 will be -- that will be a self-executing mechanism.

19          Now, what discovery has shown us is that that doesn't

20 work and that the major book publishers and the major movie

21 production studios and the TV studios who insist on DRM

22 protection, that is not enough.  The content creators require

23 secure DRM, particularly for digital works like this, and this

24 is undisputed.

25          Slide 4.

1          Google's expert:  Many book publishers require DRM on

2     the books that they make available to online distributors?

3          Answer:  Yes.

4          And when you write "require DRM," that's in addition

5     to any sort of end user license agreement whereby the

6     distributor may make some statement that you're not allowed to

7     make a copy of this, right?

8          Answer:  That's my understanding.

9          THE COURT:  I'm well aware, counsel, that the --

10         MR. BRIODY:  Okay.

11         THE COURT:  -- providers are not satisfied with a

12    promise to act well --

13         MR. BRIODY:  Okay.  Okay.

14         THE COURT:  -- and that they want some more

15    self-enforcing protections on the delivery side, not just a

16    promise to -- to be a good person and not copy it.

17         MR. BRIODY:  Understood, Your Honor.

18         THE COURT:  That's why we're all here.

19         MR. BRIODY:  Understood.

20         THE COURT:  Okay.

21         MR. BRIODY:  So shifting -- shifting from that, that

22    was actually -- that actually has been a debated proposition.

23    That's the only reason why I touched on it.

24         So the question Mr. Jones got to, and it's not all in

25    order.  One of the things he mentioned is about PlayReady is

1    available as an alternative and that Professor Teece's opinion

2    is not reliable because he needed to consider PlayReady as an

3    alternative.

4            First of all, PlayReady is for the reasons -- one of

5    the alternatives cited by the Defendants.

6            And I'll ask Slide 6, Mr. Diaz?

7            This is the -- the opinions of Dr. Mike Goodrich,

8    ContentGuard's technical expert.  He notes that the NIAs that

9    were identified, prior art DRM schemes and systems that it

10   could have implemented, but failed to identify any specific

11   ones of those prior art DRM schemes that it would have adopted.

12   Thus, there is nothing for me to evaluate.

13           He then goes on to note that none of the other prior

14   art DRM schemes cited in the patents-in-suit were ever widely

15   adopted or commercially successful.  The point being PlayReady

16   will infringe and that the Defendants cannot point to that as

17   an alternative and the notion that they would take a license --

18           Slide 7, Mr. Diaz?

19           -- Professor Teece considers those arguments from

20   Defendants and rejects them.

21           Now, whether the Defendants agree with them or not,

22   that's a conclusion.  It's well-grounded in the facts of the

23   case.  So the fact that they may disagree that there's an

24   alternative is not a basis to exclude his opinion.

25           That gets us to why the analysis done by Professor

1   Teece is aligned with the benefits created by the

2   patents-in-suit.

3           The patents-in-suit, while there are other ways to do

4   DRM out there, there are none that have been presented that are

5   commercially viable or would be successful.  And what does that

6   mean?  That means that ContentGuard's technology enabled this

7   business model the ability to sell DRM-protected books and

8   content.

9           And the Defendants have their users on their devices

10  looking at them using Google application or the Apple

11  applications.  That has created and that is what parallels the

12  Astrazeneca case because we have enabled a marketplace.  And

13  that is the first apportionment of the footprint of

14  ContentGuard's invention.

15          Now, the Defendants may disagree with the scope.

16  That's a disagreement with the conclusion, an evaluation of the

17  significance of the patented technology.  Professor Teece has

18  ample technical support for his conclusions.  There's no

19  dispute about that.  They cannot attack the grounding of his

20  opinion, and so when he begins his analysis --

21          Slide 9, Professor -- too many professors here --

22  Mr. Diaz.

23          This is an abstract of the '859 patent.  And what does

24  it talk about?  I'll focus you on the end.  Permit the

25  rendering device to render the content in accordance with a

1    manner of use specified by the usage rights.

2         What does that tell you?  The patent itself, just like

3    in the Astrazeneca case, is contemplating this functionality.

4    You're going to be able to view this content, but you're going

5    to have secure digital rights management enforcement.

6         So what was surveyed?  And he touched briefly on

7    Dr. Prince's work.  What was surveyed was the value of this

8    invention.  And under Astrazeneca, that could have -- it's my

9    position we could have stopped right there, but Professor Teece

10   apportions further.  He makes the usage adjustments and then he

11   makes the adjustments for using the benchmark analysis and the

12   opinions provided by Professor Danaher.  I'm just going to

13   touch on that briefly, and I'll -- I'll save the rest.

14        But the -- I guess the one critical point I think

15   that's worth making right now is that Professor Danaher looked

16   at an array of studies.  He's analyzing the counter factual

17   world.  Professor Teece is using Dr. Danaher's conclusions in

18   his apportionment analysis -- in his apportionment analysis to

19   isolate the benefit created by the patents-in-suit.

20        Dr. Danaher studies the goods at issue, digital

21   movies, digital books, and makes a determination, based on

22   common product characteristics that are shared with the video

23   games that provide a natural experiment where a resale market

24   is existing and is impacting primary market sales.  And he uses

25   those three criteria and not a single Defendant expert comes

1   forward and says, those characteristics don't make sense.  You

2   should never look at those characteristics.  It would make --

3   it would make no sense at all to do that.  They don't have

4   that.  They don't have a single adjustment that they could say

5   should be made in one direction or another.

6        THE COURT:  Well, let me ask you with regard to

7   Danaher, it's clear that it talks about and applies to content,

8   but where is the support to show that it applies to devices,

9   other than they say so?

10        MR. BRIODY:  So I think the best way to understand

11  that is to understand the purpose in this context, because

12  Mr. Jones was clamoring for tying an analysis to the facts of

13  the case.  And the case law we cited to Your Honor makes clear

14  that the apportionment task is a flexible one.

15        So how does it apply to the devices?  Here's how.  If

16  you assume -- and Pro -- Professor Teece does, I'm going to

17  credit them, I need to apportion further, I'm going to a map --

18  understand and acknowledge that there are other things out

19  there, there are clunkier DRMs, there are other forces in play.

20  How do I assess the value of DRM technology?  Well, let's look

21  at how that unfolds in the real world.

22        What happened when DRM was stripped out of Microsoft's

23  music?  A secondary market emerged and content creators were

24  quick to try and shut it down.  And you'd say to me -- the

25  natural question that I would ask probably is, well, that just

1    relates to content.  How does that relate to devices?

2           Well, if you're trying to apportion based on the

3    benefit of DRM protection, what you're going to look at is it's

4    utility is in suppressing this resale market.  Without it, the

5    resale markets would emerge.  And in turn, what will happen?

6    Less content will be viewed on the devices.  The devices will

7    become marginally less valuable.  The willingness to pay will

8    decrease.  That is how it ties in.

9           Now, Defendants clamor for specificity and well

10   grounding opinions in the facts of the case.  These opinions

11   are well grounded in the facts of the case.  They're cited in

12   Professor Teece's report.  He cites the -- it's the ReDigi

13   situation.

14          So that's how those two concepts relate.  If I'm going

15   to assume that DRM is constraining this resale market, I will

16   understand as well that in devices, I have to acknowledge that,

17   and I have to apportion, because the fair point is at the

18   hypothetical negotiation when people are valuing this

19   technology, they're going to understand that what separates

20   this from it all and what critically separates it from

21   everything else in connection with digital distribution of

22   content is its ability to constrain resale.  That is how --

23          THE COURT:  And to be your argument based on these

24   experts that that -- that's the case whether it's a sale of

25   content or that's the case whether it's a sale of devices?

1          MR. BRIODY:  Let's --

2          THE COURT:  The effect is the same, the restraint on

3    the secondary market.

4          MR. BRIODY:  I think the way I would put it is the

5    effect on the second -- the restraint on the secondary market

6    will be felt proportionately to devices that are viewing the

7    content.  So I think -- I think I might be missing the

8    terminology, but, yes, the effect would be the same, and it

9    would cascade across value held by those users of devices.

10         THE COURT:  So what I think I hear you saying is this

11   is an achieved effect, and that achieved effect would be the

12   same whether you're dealing with content or whether you're

13   dealing with devices or whether you're dealing with a

14   combination of content and devices; is that --

15         MR. BRIODY:  I think --

16         THE COURT:  Is that accurate?

17         MR. BRIODY:  I -- I -- I think that's true, but I do

18   want to put -- I -- I do think that's accurate, and I do want

19   to --

20         THE COURT:  Feel free to expand on it.

21         MR. BRIODY:  Yeah, I do want to put one marker in

22   there, and that is, again, the tool that's being -- what this

23   is being used as a tool to accomplish is apportionment.

24         So, you know, the -- the -- the position here is and

25   remains -- I only note this because this is something that the

1   Defendants have made much ado about.  The but-for world is a

2   decision where you take a license or your customers can view

3   this content.  I just want to be clear on that, that there's

4   a -- there's a content issue that some of the guys selling

5   content have, and the device people likewise would be in that

6   same position.

7          So turning back to -- so the application of Professor

8   Danaher's benchmark is a correct proper apportionment method.

9   There's a reasoning and rationale behind it.

10          The Defendants are basically quibbling with that

11   number.  And that number they cannot say somebody adjusted up.

12   They can't say it should be adjusted down.  They say it would

13   be different.  They challenge that we might be getting too much

14   into Professor Danaher's work, but when he submitted a

15   declaration rebutting their various criticisms, they just said

16   it should be struck.  There -- they have no experts to refute

17   Professor Danaher's expertise in digital markets, nor do they

18   have any argument that what Professor Teece did here for his

19   apportionment tool made no sense.

20          So I -- I want to focus as well -- so the survey, as

21   it was constructed, was assessing the value that consumers

22   place on viewing DRM-protected content.  And I want -- I note

23   this --

24          Slide 11, please, Mr. Diaz?

25          -- because this is something that Defendants gloss

```
 1   over.  They don't acknowledge -- they say there's a
 2   misalignment between what Dr. Prince surveyed and what
 3   Professor Teece is supposed to be assessing with respect to
 4   DRM-protected conduct -- content.
 5          Professor Prince did his survey mapping to the
 6   capability that the patents-in-suit enabled and then adjusted
 7   them downward to make sure that only DRM-protected content was
 8   reflected.
 9          Next slide, Mr. Diaz.
10          This is Slide 12.  These are a couple of cases I just
11   want to point out to the Court, they're cited in our briefs,
12   acknowledging what's going on here and the apportionment task
13   and how it is a matter of approximation.  And estimating a
14   royalty is -- I think Mr. Jones agreed, is not an exact
15   science.  It just needs to be grounded in the facts of the
16   case.
17          I think then if I could address the arguments raised
18   about the Rubinstein model, unless Your Honor has something
19   else?
20          THE COURT:  No.
21          MR. BRIODY:  I mean, I'm not going to -- I want to
22   just deal with what was -- what's before the Court presented
23   here and not necessarily --
24          THE COURT:  That's fine.
25          MR. BRIODY:  -- rehash all our brief.
```

1          THE COURT:  I'm happy to go into that.

2          MR. BRIODY:  So -- so the Rubinstein bargaining model,

3    Professor Teece does analyze and apply it to the facts of this

4    case.  And we cite it in our brief.  And I -- I think I'd like

5    to start, though, dealing with the criticism --

6          Slide 19, Mr. Diaz.

7          VirnetX held that in order to apply a theorem, it has

8    to apply to the facts of the case at hand.  And you have to

9    show that the analysis fits within the task of what's being

10   done, whether it makes sense, whether the prerequisites for its

11   application fit.

12         Now, in the analysis that Profess -- Professor Teece

13   does, he does a bargaining range analysis.  What he estimated

14   based on apportioning the value of the patents onto Professor

15   Prince's survey and in his further apportionments, he came to

16   value, a maximum willingness to pay on behalf of the Defendant

17   and a minimum willingness to accept on behalf of ContentGuard.

18         This is uncontroversial.  Bargaining range theory is

19   an accepted way of analyzing a reasonable royalty, and it's

20   provided under Georgia-Pacific 15.  And so in -- in analyzing

21   that --

22         Slide 22, Mr. Diaz.

23         -- he goes into the four factors of figuring out where

24   in the bargaining range the parties will land.  And within the

25   backdrop of that, of course, is the entire analysis of what's

1    going on in this case.  The significance of the patented

2    invention to the Defendants, the significance of getting a

3    license to ContentGuard.

4            And so Professor Teece looks at four factors here.

5    The parties' degree of risk aversion and patience, the discount

6    rate; the parties' negotiating skill; the presence of

7    informational asymmetries; and the demand and supply conditions

8    and the presence of scarce resources or bottleneck assets.

9            So Professor Teece's Factor 15 bargaining range

10   analysis takes into account a wide variety of factors.  And the

11   Defendants quibble is his application of Rubinstein to

12   determine where the parties at the hypothetical negotiation, as

13   rationale economic actors --

14           Slide 21, Mr. Diaz.

15           -- that would be considered -- this is expanding --

16   Slide 21 is the cite to Georgia-Pacific, 318 F.Supp. at 1121 --

17   the economic factors that would be considered under -- by

18   prudent businessmen under similar circumstances.

19           So to figure out where the parties are going to land,

20   he assesses whether Rubinstein applies.  Here he applies the

21   model, but he -- his report sets forth the factual

22   prerequisites for it to do so.

23           The parties would prefer to reach an agreement.  And I

24   agree, Your Honor, some of this is a by-product of the

25   circumstance of the hypothetical negotiation.  The parties

1    would prefer to reach an agreement.  You have a willing

2    licensor and a willing licensee.  Disagreement is the worst

3    outcome for -- for both parties.  Yes, there's a valuable

4    asset, and the patentholder wants to be paid.  The asset being

5    divided is desirable.

6         This is -- I'm -- I'm just reciting the brief.  We

7    have paragraph citations in the report.  Time is valuable.  The

8    parties would rather reach a deal sooner than later.  Certainly

9    in this case, this is analyzed by Professor Teece who notes for

10   each one of these Defendants, the ability to distribute digital

11   content is an important and valuable aspect of their technol --

12   of -- of their tech -- of their products.  These were table

13   stakes, some of these Defendants have said, to have these kinds

14   of capabilities.

15        So there's certainly urgency in getting this done.

16   Continuity and stationarity, what does that mean?  Those terms

17   mean do I have a continuous increasing function?  Do I want

18   more money today rather than tomorrow.

19        Stationarity, is -- is that fixed?  And there's some

20   issues in the briefing about what should be applied or weighted

21   average cost of capital for a month or a day.  Well, the

22   hypothetical negotiation tells us that the negotiate -- the

23   negotiation takes place at or near the time of infringement.

24        Now, we pointed these paragraphs out to the other

25   side, and they just ignore them.  Okay.  They have no --

1    they -- they -- they are -- and moreover, they don't correct

2    them and say they're untrue.  Continuity and stationarity, yes,

3    those conclusions are drawn based upon rational -- parties

4    acting rationally supported by Georgia-Pacific 15 and supported

5    by the company's issue in this case.

6         The last criteria, the payer's gain from and the

7    payee's loss from delay.  Is it an increasing function of the

8    amount of the payment?  What does that mean in English?  If I

9    lost a million dollars today, it hurts me more than if I lost a

10   buck.  That's true.  Defendants don't say that these don't

11   apply.  They just say it's a rule of thumb.

12        They -- they ignore the fact that a specific

13   bargaining -- a specific weighted average cost of capital is

14   affixed to each individual Defendant, and it's fixed at the

15   time of the hypothetical negotiation.

16        And another thing that Mr. Jones said -- I -- I assume

17   he was mistaken -- he said, there's no evidence that anybody

18   ever considered WACC in connection with their analysis.  That's

19   just not true.

20        Slide 24, Mr. Diaz.

21        This is a ContentGuard document relating to its own

22   internal analysis of its Nokia license.  Discounted annual

23   rate, 19 percent.  That's the same thing as WACC.  This is

24   ContentGuard using an actual business document.  And that 19

25   percent is estimated to be whose WACC?  Nokia's.  It's

1    counterpart in the hypothetical negotiation.

2           So there's an evidentiary record for this, Your Honor.

3    Moreover, no Defendant comes in and says, WACC isn't a

4    consideration I -- I have in mind when I'm parting with funds.

5    They don't say we're wrong.

6           THE COURT:  And just for the record, tell us what WACC

7    is.

8           MR. BRIODY:  Weighted Average Cost of Capital.  It's a

9    function of -- basically it's -- it's how much does it cost me

10   to borrow.

11          THE COURT:  I know what it is.  I just want the record

12   to reflect what WACC is.

13          MR. BRIODY:  Sorry.

14          THE COURT:  Keep going.

15          MR. BRIODY:  Some might say I'm a little WACC, but

16   that's it.

17          So I think the notion that the showing hasn't been

18   made that the model fits, that's what VirnetX requires.  The

19   model does fit.  The showing has been made.  No one's coming

20   forward and saying, the factual prerequisites aren't there to

21   apply the model.  They're just saying, we don't like it very

22   much.

23          Now, there's comments about what Professor Rubinstein

24   has said about the model, and I think Your Honor hit on the

25   core point of what I was thinking of.  If you take what

```
 1   Professor Rubinstein said commenting about his model and
 2   commenting about economic theory in general, well, we might as
 3   well throw out regression analysis.  We might as well throw out
 4   every economic theory that's there because his comments go that
 5   far.
 6           The issue is his analysis is science, and there's no
 7   dispute about that.  It is accepted in the industry.  It's
 8   accepted bargaining range theory in the industry.  It's used
 9   properly by Professor Teece because the facts fit for it to do
10   so.
11           Your Honor, if you don't have any further questions
12   for me on Professor Teece, I think our briefs address
13   everything.  I think I've addressed Mr. Jones's arguments on --
14           THE COURT:  All right.  Thank you, counsel.
15           MR. BRIODY:  Thank you, Your Honor.
16           THE COURT:  All right.  I'll now hear from the
17   Defendants on their next challenged expert.
18           MR. ROOT:  Your Honor, Peter Root of Kaye Scholer,
19   lead counsel for Google and Motorola, and I'm here to argue
20   with respect to Dr. Danaher on behalf of the Defendants.
21           THE COURT:  All right.  Proceed.
22           MR. ROOT:  Before I jump into Dr. Danaher, with the
23   Court's indulgence, if I could just address a couple of the
24   points that Mr. Briody made.  There's obviously a lot of -- of
25   interrelationships between these experts, but let me just say
```

1    this.

2            THE COURT:  I'm -- I'm trying to minimize the overlap,

3    but I'll give you just a brief --

4            MR. ROOT:  Thank you.

5            THE COURT:  -- period of time.

6            MR. ROOT:  What -- what Mr. Briody just said calls up

7    to you why there's a fatal flaw in Dr. Teece's analysis that

8    renders his whole damages model inapplicable.  And that is his

9    argument -- and it's in the brief, and it's doubled down in

10   their sur-reply brief, that the footprint for this DRM

11   technology is equivalent -- they use the word "congruent" --

12   equivalent to the ability to view digital content on a device.

13           But that is contrary to their own experts who say that

14   there's not only DRM that goes into the ability to view content

15   on a device, there is broadband technology, Internet

16   connections, download speeds, things of that sort.  There is

17   compression technology in order to make the file small enough

18   that you can actually get it down to a -- a device, and then

19   there's decompression technology to make it big enough to view.

20           There's also, as Dr. Teece says in his report,

21   necessary components and features to view content.  There is

22   the display, there's audio, there's touchscreen technology, all

23   sorts of non-DRM technology that's involved.

24           And as they admit, they do not back out that non-DRM

25   technology from what they're claiming.  As -- as Mr. Briody

1    said, Dr. Prince, from his survey, did a willingness to pay for

2    the ability to view content on a device.  He comes up with a

3    willingness to pay number.  It's $45.21 in the case of Google

4    and the Android Defendants, which, again, applies to Apple for

5    some reason which Mr. Anderson will probably address.  But that

6    $45.21, that includes all the non-DRM technology that goes into

7    the ability to view content on a device.

8            THE COURT:  I understand that it --

9            MR. ROOT:  That's not backed out at all, Your Honor.

10   That's not the apportionment required by law.

11           THE COURT:  Well, I understand that's there, but

12   the -- the first Prince survey, the second Prince survey, the

13   apportionment brought about through the Danaher paper, you're

14   telling me that all of these steps taken as a whole still don't

15   isolate the DRM by itself, that it's not adequately apportioned

16   down to the real technology at issue?

17           MR. ROOT:  That's absolutely correct, Your Honor.  It

18   is not.  And, you know, if I may, the $45.21, the first step

19   that Dr. Teece does is to multiply it by the 27 percent --

20   well, in the case of Google, it was 27 percent usage rate.  And

21   that usage rate -- Dr. Teece was very clear at his deposition,

22   that is not apportionment.  That is simply to back out what he

23   refers to as the option value.  In other words, when people are

24   taking the survey, they may say that they're willing to pay X

25   amount for the feature, but they actually never ever use it,

1    but they get -- you know, there's actual option value.  They

2    had the option to use it.  They just never did.

3            So what Dr. Teece said at his deposition is I'm going

4    to take that option value off the table so that people don't

5    get confused in thinking that how can it be all that valuable

6    if only 25 percent of the people are using it?  So -- so

7    that's --

8            THE COURT:  The problem --

9            MR. ROOT:  -- the 25 percent.

10           THE COURT:  The problem is that the Court's often

11   confront -- confronted with arguments that in the overall

12   broader context of damages, that first we start off with

13   being -- being -- I'm told this is entire market value rule.

14   And then we get past that, and, well, it's not entire market

15   value rule, it's apportionment.  But then we quickly fall into

16   the posture where no matter how much the Plaintiff apportions,

17   how many levels they drill down to, I've never yet had a

18   Defendant tell me they went far enough.  There's always one

19   more step of apportionment that's not there, that -- that --

20   you know, if you go down 10 steps, you should have gone down

21   12.  If you go down 20 steps, you should have gone down 21

22   steps.

23           Is it possible to adequately apportion, or is that

24   some kind of ideal that no matter how much effort and analysis

25   goes into it, you just can't quite ever get there?

1          MR. ROOT:  No, Your Honor, I think --

2          THE COURT:  Because sometimes I'm -- I'm left with the

3    conclusion that's really what Defendants think.

4          MR. ROOT:  No, I -- I understand exactly what you're

5    saying, Your Honor, and I think that there is a way to do a

6    proper apportionment.

7          And what the Federal Circuit has said is -- again, the

8    case law is -- you know, we can -- it doesn't have to be

9    precise, but what you have to do is you have to make an effort

10   to back out the non-patented -- the non-infringing technologies

11   that contribute to the value of the product or the component of

12   the product.

13         I think what Mr. Briody was arguing is that, hey, you

14   know, we're starting with a smartphone or a tablet.  Dr. Prince

15   brings this down to the patented footprint, you know, the --

16   the footprint of the patent, the ability to view DRM

17   technology.

18         Again, there's a lot of other technologies -- non-DRM

19   technologies putting aside whether their DRM is better than

20   prior art DRM, but just simply non-DRM technologies.  And

21   Dr. Teece recognized that in his report.  We have it in our

22   briefs.  And that's -- they have to at least address that.

23   Whether we would quibble with the way they addressed it is one

24   thing, but they need to at least address the contribution of

25   these non-DRM technologies to the ability to view content.  And

1     they haven't even made an effort to do that.

2           And what -- you know, what Mr. Briody was trying to do

3     and what they tried to do in their briefs is to excuse that and

4     say, well, there's no non-infringing alternatives out there, so

5     we don't have to apportion it.  There's no such law.  Just

6     because there's no non-infringing alternatives, which in a lot

7     of cases there isn't, you still have to apportion out the

8     non-patented features so that you're not getting compensation

9     for more than your invention.

10          THE COURT:  All right.  Let's pivot back to the expert

11    you're here to address.

12          MR. ROOT:  Thank you, Your Honor.

13          Dr. Danaher's sole contribution to this case is his

14    opinion that a study of 14 highly acclaimed video games applies

15    without adjustment to the millions of titles that were sold by

16    the content Defendants, Google, Apple, Amazon.

17          And I really just have four points that I want to make

18    with respect to Dr. Danaher.

19          The first point is that Dr. Danaher did not do what

20    Dr. Teece relied on him to do.  Dr. Teece assessed damages

21    based on the use of ContentGuard's patents to prevent the

22    emergence of an illegal secondary market.  And he -- Dr. Teece

23    relied on Dr. Danaher to estimate the value of preventing that

24    emergence of an illegal secondary market.  That's not what

25    Danaher did.

1          Danaher looked at the impact of an emergence of a
2     legal secondary market.  Dr. Danaher assumed that consumers in
3     the but-for world that he was playing in would have the legal
4     option to purchase content.  So there's a huge disconnect
5     there.
6          And Dr. Danaher admits that the legal -- you know, the
7     assumption of a legal research market carries over from the
8     Shiller paper.  Shiller assumed a legal research -- there was a
9     legal research -- excuse me, a legal resale market in the
10    physical video game context.  So it's a -- it's a legal resale.
11         Dr. Danaher just carried that assumption forward.  He
12    did not consider at all what the impact would be if the
13    secondary market were illegal.  And he admits that in his
14    deposition.  We have that in our -- in our -- our briefs, Your
15    Honor.
16         At the same time, Dr. Danaher also recognizes and
17    acknowledges that there is no legal research -- resale market
18    for content, digital content.  So his attempt to take wholesale
19    the Shiller paper and just apply it falls down on this very
20    point here that he does not examine the but-for world that
21    Dr. Teece imagined.  And it also doesn't fit the facts of this
22    case because there is no legal resale market.
23         So it really is -- his -- Dr. Danaher's opinions,
24    which all rest on -- on, you know, what the emergence of a
25    secondary market, really are not applicable at all.  And

1    Dr. Danaher's own academic work shows that if you have an

2    illegal secondary market, that -- if you -- if you put -- you

3    have legal regimes obviously when you have an illegal secondary

4    market, and that has an impact on the loss of sales in the

5    primary content market.  Essentially if you make the secondary

6    markets illegal, you drive sales back to the primary market.

7            THE COURT:  Well, does your expert say that the 58

8    percent needs to be adjusted because of this distinction?

9            MR. ROOT:  The -- our expert says a couple of things.

10   One -- and first and foremost is that there's no basis for

11   applying the 58 percent adjustment with respect to devices.

12           And let me -- let me -- if I -- if I may, Your Honor,

13   go off on that.

14           Dr. Danaher, in his analysis -- I -- I misspoke, he

15   did no analysis.  What Dr. Danaher is saying is that because of

16   the Shiller paper, there's going to be a 58 percent decrease in

17   the primary market for digital content sales.  He just -- he

18   just applies Shiller and says that same thing will apply in

19   the -- in the market for digital content.

20           THE COURT:  Right.  But my question was does your

21   expert say that the 58 percent needs to be adjusted because of

22   that distinction?

23           MR. ROOT:  It doesn't apply -- it doesn't apply to

24   devices at all.  And if I can make one more point on that, then

25   I'll -- I'll get to -- get to the next point, Your Honor.

1          THE COURT:  Well, I'm looking for an answer.

2          MR. ROOT:  Yeah.  So the answer is it doesn't apply to

3    devices, and then our expert doesn't say that there is a -- an

4    adjustment that needs to be made or should be made to the 58

5    percent.  They're saying it just doesn't apply.  It's not an

6    appropriate study.

7          But on -- on the devices, Your Honor, just to go back

8    to that for just a second.  The -- the key point is that

9    Dr. Danaher only looked at content, and that's his opinion.  As

10   a matter of fact, he's very clear in his deposition.  He says,

11   nothing in my opinion says anything about a connection between

12   what I quantify and what --

13         THE COURT:  I understand that.

14         MR. ROOT:  -- devices (sic).

15         Now, what Mr. Briody was saying is there's going to be

16   less content out there, so the -- the logical impact -- the

17   value of the devices is going to be less, but that -- that's

18   logically inconsistent with their own argument.  Their own

19   argument is that if you have a secondary market, that --

20         THE COURT:  And could you slow down just a little bit?

21         MR. ROOT:  Excuse me.  If you have a secondary market,

22   that is going to cannibalize sales from the primary market.

23   Somebody is buying those -- those -- that content in the

24   secondary market, and those are the very people who have the

25   device.  So the device owners have access to both primary and

1    second -- secondary markets, so their value is not diminished

2    at all.  If anything, Your Honor, the value of the device might

3    be more because now they can access a market that has

4    presumably lower prices for the same content.

5           I've addressed the first two points I want to make.

6           So, Your Honor, the third point is that Dr. Danaher

7    didn't do any analysis of his -- of his own.  He simply took

8    Shiller's conclusions and made them his own.  And he testified

9    that he made no modifications whatsoever to the Shiller study

10   based on any quantitative or qualitative study that Dr. Danaher

11   did.

12          The only thing he said is, well, I -- based on my

13   experience, I think it applies here in the digital world, as

14   well.  But that is nothing more than a subjective opinion, Your

15   Honor.  And the Federal Circuit is quite clear that you can't

16   base a -- a conclusion or an opinion on nothing more than your

17   own subjective beliefs and your own experience and your own

18   say-so.  You need to have an objective basis for that

19   conclusory opinion.

20          And here, as Mr. Jones touched on, the author of the

21   video game study, Benjamin Shiller himself, said, you know, my

22   study here of the 14 highly acclaimed video games, you can't

23   generalize that to other games.  And yet what Dr. Danaher does

24   is generalize that to the sales of million of titles of books

25   and movies without any adjustment whatsoever.

1          And as Mr. Jones showed, you know, what -- Dr. Teece

2     actually makes a further speculative leap and says it also

3     applies to the sale of devices.

4          Not only is it -- Dr. Danaher's opinion inadmissible

5     because it's nothing more than a subjective opinion and more

6     than his say-so, it's also belied by the admitted market

7     differences that he admitted that he didn't analyze.

8          The first one is the one I already mentioned, the

9     illegal versus the legal secondary market.  I won't do that

10    again.  But he admits he didn't look at what would happen if

11    you had an illegal secondary market.

12         Another difference is on the price of video games.

13    The -- there's a huge price disparity between video games and

14    digital content.  Dr. Danaher -- well, Dr. -- Dr. Shiller said,

15    you know, the average video game is $55.00.  Danaher confirmed

16    that at his deposition.  And Dr. Danaher also admitted that the

17    Defendants' digital content is substantially lower.  The

18    average sale of an Amazon book, which I -- I mention this

19    because it's in the brief, is $6.00, but we're talking about

20    single digital dollars for the majority of the Defendants'

21    content.

22         And Dr. Danaher said, well, there could be -- there

23    could be some differences between what happens in terms of

24    market behavior if you have a high price, as opposed to a low

25    price product.  And that only makes sense.

1          The whole premise of the Shiller study is that people

2    will wait to buy a video game until it comes down in price

3    because of the availability of the resale market.  Well,

4    people's willingness to wait may be a lot less if it's only a

5    few bucks to buy a movie or a television show or a book, as

6    opposed to, you know, well, let me -- I hope it goes down to,

7    you know, a half a buck.  I mean, they're just -- there's a

8    difference there that he admits he did not analyze.  And all he

9    says is, well, I don't think it would make much difference.

10   That's, again, just his say-so and not admissible.

11         THE COURT:  But I -- I do think -- and I'll ask you

12   what your opinion on this is.  I do think the Court's

13   obligation here, while looking at each of these experts

14   carefully, you're not telling me I need to look at them in

15   absolute isolation?  I mean, the Plaintiff's model incorporates

16   Teece and Danaher and Prince.  And there are some things Teece

17   talks about that Danaher doesn't.  Some things -- you know,

18   it's -- it's the composite of all three of them to see if taken

19   as a whole, they survive the analysis under Daubert and the

20   gatekeeping function and is the methodology correct or

21   reliable?  It's not did this one cover every point.  Otherwise,

22   we'd just have one expert on the Plaintiff's side.

23         Now, do you -- do you --

24         MR. ROOT:  No, I --

25         THE COURT:  -- object to that or -- or draw a

1    distinction there?

2           MR. ROOT:  No, I -- I believe I understand what Your

3    Honor is saying, and I do not object to that.

4           THE COURT:  Okay.

5           MR. ROOT:  Obviously, one expert can rely on another

6    expert, and not everything has to be covered with --

7           THE COURT:  Okay.  We're on the same page.

8           MR. ROOT:  And -- and, you know, if I can -- you know,

9    just for an example to -- to nail this down is that, you know,

10   again, Dr. Danaher does not address the impact of a secondary

11   market on willingness to pay for a device.  And he admits that.

12          Dr. Teece says, in one sentence of his report, I think

13   that there would be a corresponding drop in willingness to pay

14   for a device.

15          THE COURT:  Right.

16          MR. ROOT:  So, no, you -- you look -- okay.  You --

17   you don't -- he's not relying on Danaher for that opinion.

18   It's his own subjective opinion, which, again, is just his

19   say-so without any sort of empirical data or objective

20   analysis, but that's sort of the interplay that I see, Your

21   Honor.

22          THE COURT:  Well, and that's why I asked the question

23   because there's an example of where one expert says something

24   and the other expert says something that whether we argue

25   whether it fits with it or not, it comes after it, and it

 1    connects.  And just because Teece said it instead of Danaher

 2    doesn't mean that Danaher should be excluded.  You've got to

 3    look at the -- the totality of what's been said.

 4              MR. ROOT:  Yes.

 5              THE COURT:  Okay.

 6              MR. ROOT:  Yeah, I mean -- and, you know, we -- we

 7    went through this same exercise when we were taking depositions

 8    just to ferret out who is saying what.  And one of the things

 9    that we ferreted out was Dr. Teece saying, I'm the only one

10    that did any apportionment --

11              THE COURT:  Uh-huh.

12              MR. ROOT:  -- and -- and he went from there.

13              Now, in the -- you know, the -- the opposition in the

14    sur-reply, we see that, no, no, no, Prince is the one that did

15    the apportionment.  And for the all the reasons we discussed

16    earlier, he actually didn't do any apportionment.

17              THE COURT:  I think we can all agree there are a lot

18    of moving parts here.

19              MR. ROOT:  Yeah.

20              THE COURT:  All right.  Continue, please.

21              MR. ROOT:  So not -- in addition to the price

22    differential, there's also a -- a difference in the

23    demographics.

24              ContentGuard's experts agree that the video games --

25    the gamers, so to speak, are typically younger, have less

1    disposable income than folks who have iPhones or Android

2    devices and purchasing books and movies.  They tend to be bit

3    older and a little bit more disposable income.

4            And Dr. Danaher said, well, that could be a

5    difference.  I didn't look at that, but there could be a

6    difference there.  Again, just another assumption that's

7    carried over from the Shiller paper that isn't examined at all

8    in the context of the facts of this case.  Things that he would

9    say at his deposition, I can't rule that out as a possibility,

10   but I didn't look at it.

11           And, you know, these are precisely the kinds of

12   analytical flaws that the Court in the Digital Regs case said

13   that that's just not good enough.  And what the expert did in

14   that case was looked to see, okay, they're trying to figure out

15   how much did Adobe save in -- you know, from -- from not having

16   a loss of piracy by using -- or losses due to piracy from using

17   the Plaintiff's DRM solution.

18           And what the expert did there was to say, okay, I'm

19   going to go look on a -- you know, sort of industry-wide basis

20   on piracy for software, and he came up -- using that real data,

21   he came up with his estimation of the loss to Adobe.  And the

22   Court said, wait a second, you didn't look at anything with

23   partic -- in particular as to Adobe.  You know, there's lots of

24   different software out there.  There's different prices for

25   software.  There's different functionalities for software.  You

1   didn't look at any of that.  You just used broad industry-wide

2   data and excluded -- excluded the expert.

3         Now, here what Dr. Danaher did is even more egregious

4   because he did not look at any hard data at all.  He's relying

5   on a single counter factual study that Shiller did.  And, you

6   know, it's not even based on real data.  It's just based on,

7   you know, that -- that -- that study.

8         So, you know, I think that, you know, to sort of get

9   back to the -- the -- the first point that Your Honor made from

10  this morning was, you know, this is not something that just

11  goes to weight.  This is something that goes to, you know,

12  rely -- a study that just on its face is different, and they

13  haven't provided any explanation as to why it could be tied to

14  the facts of this case.

15        THE COURT:  Well, I think your comment is accurate,

16  counsel, that you -- you said a minute ago the question is, is

17  it good enough?  And I think -- I think under the case law, if

18  you -- if you take Daubert in a nutshell, that's really what

19  the Court's charge is, is to look at all of this, consider all

20  the analysis, consider how it connects or doesn't connect, and

21  at the end of the day, it's my role to say is this good enough

22  to go to trial on it and present it to the jury?

23        And the Plaintiff invariably tells me it is, and the

24  Defendant invariably tells me it's not.  And that's -- it's

25  that broad in between that I have to look at so carefully.

```
 1          I -- I don't think it's the role of the Court -- the
 2     trial court under Daubert to substitute my judgment for the
 3     experts, to put myself in the position of an expert and assert
 4     different theories or -- or solutions.  And I don't think that
 5     the analysis has got to be perfect.  It's got to be good
 6     enough.  And that's what we're here about today, and -- and I
 7     will -- I will take what you've just said, which I think is an
 8     accurate assessment of what my role is, and do my best to apply
 9     it.
10          What else have you got for me on Dr. Danaher?
11          MR. ROOT:  I have one final point, Your Honor, and
12     that is that the low market size for Defendants' content makes
13     it such that the Shiller paper on its face cannot be applied.
14     What Shiller said is that you have to have a certain market
15     size.  He said his study is sensitive to market size.  And what
16     he defines as market size is the installed base of platforms
17     that can play the video games, like your PlayStation, so forth.
18          And what he determined was that for the popular video
19     games, there was a -- a sufficient installed base.  What he
20     found, though, is that if you get down below 50 percent of the
21     installed base, then your -- his results are void.  They're
22     statistically insignificant.  So you need at least 50 percent
23     installed base.
24          And here, Your Honor, ContentGuard's own expert,
25     Dr. Prince, did a survey.  And I won't quibble with his survey.
```

1    But his own survey shows that less than 50 percent of any Apple

2    or Android or Amazon, to the extent it matters, device owners

3    ever view even a single piece of content, be it a book, movie,

4    TV show -- for -- for the -- the Android Defendants, it's 25

5    percent.

6           So you have a situation here where Shiller, by its own

7    terms on its own face, says you need to have at least a 50

8    percent market share.  ContentGuard's experts are saying it's

9    below 50 percent.

10          Simply put, the Shiller paper on its face does not

11   apply.

12          THE COURT:  All right.  Thank you, Mr. Root.

13          Let me hear a response to this argument on Dr. Danaher

14   from the Plaintiff.

15          MR. BRIODY:  Thank you, Your Honor.

16          I'll -- I'll lead off by briefly addressing Mr. Root's

17   comment that he began with and the suggestion that we didn't

18   apportion.  We do find ourselves in the position that Your

19   Honor referenced before.  We have apportioned.  The Defendants

20   disagree whether it's enough.  The apportionment and

21   identification of the value of the patents-in-suit begins with

22   Professor Prince's survey.

23          And to clarify one thing, Mr. Root said all along, and

24   I've probably -- given the three-ring circus we have here, I

25   should have clarified everyone's roles.  Professor Teece is the

1    expert who performs the Georgia-Pacific analysis and performs

2    the apportionment exercise in this case.

3          The other two experts provide inputs, but the opinions

4    concerning apportionment come from Professor Teece alone.  The

5    inputs come from the other experts.  And to suggest that we've

6    somehow switched our footing in the briefing is inaccurate.

7    That's just not right.

8          Another thing that Mr. Root said, and I'm very careful

9    about this because I was listening closely on issues.  He -- of

10   this type, and I'm sure the Court appreciates it.  He suggests

11   that we started with the phone or the device in our damages

12   analysis, and that is just not true.  The only thing that was

13   evaluated was the functionality of the patents-in-suit.  We

14   have no entire market value rule issue here.  We didn't start

15   with the phone or anything like that.

16         To address, in turn, the -- the first point Mr. Root

17   raised is the legal/illegal disconnect that they've asserted.

18   And -- and the problem here for Defendants is that --

19         Slide 18, Mr. Diaz.

20         THE COURT:  Why is this just not a battle of the

21   experts?

22         MR. BRIODY:  I believe this all is a battle of the

23   experts on the other side.

24         THE COURT:  I mean, on this particular point.

25         MR. BRIODY:  Oh, between -- oh, between the --

1          THE COURT:  The legal/illegal?

2          MR. BRIODY:  Well, the -- the -- I -- maybe I might be

3  misunderstanding what the Court's saying.  Are you suggesting a

4  battle of the experts between ContentGuard's?

5          THE COURT:  No.

6          MR. BRIODY:  Oh, okay, yes.

7          THE COURT:  No.

8          MR. BRIODY:  No, I -- I agree with you, Your Honor,

9  that I -- I only wanted to point out that Professor Teece

10  bridged the gap.  This is the type of stuff -- stuff that you

11  cross an expert on.  And I actually would say this even fails

12  to be a battle of the experts because we have no opinion on the

13  other side suggesting that the illegal/legal distinction makes

14  a difference.

15          You asked Mr. Root to identify who can tell you that

16  legal versus illegal makes a difference and -- and the number

17  would be different?  The answer is from the other side, no one.

18  No one has an opinion on that issue.

19          THE COURT:  Well, I meant between Danaher and Murphey.

20          MR. BRIODY:  Murphey is no longer in the case.  He's

21  not an expert on behalf of any of the current Defendants.  But

22  I would submit to you, as well, that I don't think it reaches a

23  battle of the experts because I don't think Murphey even gets

24  there.

25          THE COURT:  Okay.

1          MR. BRIODY:  The best that Murphy can do is speculate.

2          Now, I'm -- then addressing Mr. Root's comments in

3    order.  One thing I want to be clear on, Mr. Root made some

4    suggestion that the device manufacturers -- and he was

5    rehashing the arguments I think I covered before, so I won't

6    cover them again, about why the -- the -- the question Your

7    Honor asked concerning why the resale market adjustment is

8    appropriate for devices.  He suggested that device

9    manufacturers would -- and that the people who own the devices

10   still have access to primary and secondary content.  Well,

11   that's just not right because they have access to no content

12   without taking a license to the patents-in-suit.

13         Mr. Root made the same arguments Defendants made in

14   their briefs, and I won't rehash our response again.  The ipse

15   dixit point, it's a mantra that the Defendants have repeatedly

16   uttered.  It has no basis.  They have no response to the

17   criteria that Professor Danaher has selected -- and I apologize

18   for rehashing -- saying that they are not suitable criteria

19   based on the facts of this case supporting the selection of the

20   benchmark.

21         He also made the point, Danaher -- Shiller's paper, or

22   you were calling it the Danaher paper before, doesn't say that

23   you can apply the results of 14 games to other games.  It

24   doesn't say that, actually.  It says it may not apply.  There's

25   a scientific economic structural modelling, though, that people

1    in industry would use to estimate the impact of resale markets.

2    No one -- no expert from their side, by the way, gets up there

3    and -- and writes that you can't use the structural modelling

4    findings of this paper and make an extrapolation to another

5    market that shares the same characteristics.  They have a bunch

6    of experts.  Not one of them will say that.  Not one of them.

7         Then they raise various arguments, all of which are

8    addressed by Professor Danaher in his declaration, and they

9    brought them up at his deposition, as well.  Price matters.

10   Well, the difference in price actually is a relative function

11   of the utility and disutility.  Waiting versus not waiting.  It

12   will be commonly experienced by the people waiting to get the

13   good.  Professor Danaher makes this clear to the Defendants.

14   Their response?  Nothing.

15        Demographics.  Oh, demographics matter.  Any Defendant

16   expert say that that matters?  No.  Professor Danaher -- his

17   expertise in digital markets and these industries is

18   unchallenged by anyone.  They have nothing on the other side to

19   say it's wrong.  And what they basically have done is say,

20   okay -- the very thing that Your Honor addressed before -- let

21   me just inject my gut reaction here and say that this conclu --

22   these conclusions are not sound and shouldn't go to the jury.

23   They can make these points all they want.

24        The rule is --

25        Slide 17, Mr. Diaz.

1          -- if it's not an accurate benchmark, you can

2    challenge the benchmark or argue for a more accurate one.  It

3    goes to weight, not admissibility.  If they could show that

4    Danaher just said this paper, put them all in a bag, pick this

5    one out, no.  He has three very good reasons why this is the

6    right study to use as a benchmark.  They have no response to

7    any of that.

8          Then just the remark about the Digital Reg case.  The

9    Digital Reg case has nothing to do with this situation.  The

10   Digital Reg case was a royalty model based on profits that were

11   lost due to piracy.

12         In this situation, let's always remember where we are.

13   We begin with Professor Prince's survey which assesses the

14   value of the patents-in-suit.  We're not trying to set a value

15   here using Professor Danaher's -- with respect to devices.  We

16   are with respect to content because it aligns that way.  We

17   haven't heard anything on that.

18         But where we are is necessarily due to the

19   infringement, due to the absence of any viable -- commercially

20   viable NIA that the Defendants have proffered where we have to

21   estimate a counter factual world.  And that is -- this is the

22   only proper benchmark, and that renders Digital Reg completely

23   inapposite on this case.

24         Lastly, Mr. Root's final point related to market size.

25   I won't -- I think the easiest way to address the market size

1   point is no economist stands behind it.  Not one of them stands

2   behind this criticism because it makes no sense.

3         The market size, briefly, and this is all laid out in

4   Professor Danaher's declaration which Defendants want to strike

5   because he makes clear just how wrong they are.  Professor

6   Shiller in his paper, to assess the impact of resale markets on

7   primary sales of goods, makes an assumption about the market,

8   the people in the market to buy the products at issue.  In that

9   case, the PlayStation owners approximated and were a correct

10  market size for the PlayStation needs, the pieces of content.

11  And that enabled him to assess, for video games, who were the

12  subject of his study, what the impact of resale markets are.

13        Now, he noted in his paper, look, if I missed the mark

14  by 50 percent or more, which would -- itself would be a drastic

15  outcome, and one that the folks who reviewed his study said

16  this study is still good enough to publish in a leading

17  economic journal.  If I missed the mark, my findings are not

18  statistically significant, my findings in my study.  Nothing at

19  all, no conclusion, nothing in that paper suggests anything

20  about assessing market size based upon usage for these devices.

21  There's no relationship whatsoever.  And the suggestion that

22  there is, is completely misleading.

23        If one were to look at -- for the type of

24  functionality we're looking at here, which is viewing

25  DRM-protected movies and books, what would one look at?  Well,

```
 1   you -- you definitely, as Professor Danaher said, you wouldn't

 2   look at how many people own the devices and how many people use

 3   them to buy movies and books.  I think you probably might look

 4   at the number of people who actually use the device, and you'd

 5   start from that 23 percent.

 6          In any case, the criticism is a matter -- as a matter

 7   of economics is dead wrong.  It's set forth in the Danaher

 8   declaration.  Why?  All we have is lawyer argument that this

 9   makes no sense to me based on a flawed reading of a paper

10   that's been completely debunked by the only expert in the field

11   who has the authority to debunk it.  So we've got nothing on

12   the other side to say it's wrong, and Defendants could maybe

13   sing a different tune if they had anyone to say this is wrong,

14   but they don't.

15          I have nothing further, unless Your Honor has any

16   questions.

17          THE COURT:  All right.  That will complete argument

18   with regard to Dr. Danaher.

19          Before we take up the third expert challenged by the

20   Defendants, Dr. Prince, we're going to take a short recess.

21          The Court stands in recess.

22          COURT SECURITY OFFICER:  All rise.

23          (Recess.)

24          COURT SECURITY OFFICER:  All rise.

25          THE COURT:  Be seated, please.
```

1          We'll continue with the parties' presentations with

2    regard to the Daubert challenges to the Plaintiff's damages

3    experts, and I'll hear next from the Defendants with regard to

4    Dr. Prince.

5          MR. ANDERSON:  Good morning, Your Honor.

6          THE COURT:  Good morning, Mr. Anderson.

7          MR.  ANDERSON:  Bryan Anderson for Apple.

8          So Apple faces a damages claim of $1.3 billion.

9    1 billion of that is based on devices, however, it's

10   characterized by Dr. Prince and Dr. Teece, and the other 300

11   million on content.

12         You've heard quite a bit about Dr. Teece and Professor

13   Danaher.  I'm going to be talking about Professor Prince and

14   his survey with you.  And one of the first things I wanted to

15   address is the proposition that Professor Prince did some sort

16   of apportionment.

17         You saw a slide earlier by ContentGuard that stated

18   that he apportioned, but the apportionment was actually taking

19   out DRM-free content.  That is not an apportionment of the

20   patented feature or patented use with respect to an infringing

21   use.  And, in fact, when you look at what Dr. Prince actually

22   said in his report -- let me try to get this lined up

23   correctly.

24         THE COURT:  Just keep turning it.

25         MR. ANDERSON:  Yeah, keep turning it.

1          THE COURT:  It will get right eventually.

2          MR. ANDERSON:  He said in Paragraph 26, he did not

3    pose questions directly about DRM-managed content, and instead,

4    asked questions about the ability of the device to play

5    content.  And Professor Teece agreed with that.  Professor

6    Teece agreed that he needed to do the apportionment.  He said

7    that he took Professor Prince's numbers, and he did the

8    apportionment.

9          So -- and in his deposition, Professor Prince

10   confirmed that -- let me get it right there.  He did not survey

11   about the patented technology.  This was not something he did.

12   He asked the questions the attorneys asked him to ask.

13         So all the apportionment comes down to this 58 percent

14   number that Dr. Teece applied and that we heard about earlier.

15   So Professor Prince is not giving an apportioned valuation.

16   He's giving a value to watch iTunes content on an iPhone or an

17   iPod or an iPad.

18         There is another contrast.  The assertion was that

19   absent a license here, that you can't use iTunes to watch

20   DRM-protected content.  Put aside the fact you can use iTunes

21   to do lots of things that have nothing to do with DRM content.

22   You can rip your CDs into iTunes and play it on your iPod or on

23   your iPhone.  No DRM at all.  You can do home videos.  You can

24   do lots of things with iTunes.  iTunes is not useless absent

25   DRM.

 1          But in Dr. Teece's report at Paragraph 629 -- 628 and

 2    629, which I think Your Honor has a stack of, he recognizes

 3    that both Sony and Time Warner are licensees to ContentGuard.

 4    He states that I understand that both Sony and Time Warner have

 5    licenses with ContentGuard.  As such, I remove their

 6    transactions from any potential damages base.  Apple produced

 7    information that aggregated the content transactions associated

 8    with Sony from the launch of iTunes through March 2015.  He

 9    took that out.

10          Same thing with Time Warner.  Every time somebody

11    watches a Harry Potter film on an iPad, it's not infringing.

12    It's out of the content side.  It's out of the 300 million

13    side.  It isn't out of the billion size.  It's not out of the

14    devices.

15          Their argument is, iTunes, iPhone can't do anything

16    with content.  But Dr. Teece belies that by his own report.

17    That is a substantial percentage of movies, Judge, and a

18    substantial percentage of music.  Sony and Time Warner, Warner

19    Brothers music, Warner Brothers movies, Sony movies, Sony

20    music, it's not 1 percent or 3 percent or -- I'm not going to

21    get into the details because we're not on a sealed record, but

22    it is -- it is a high percentage, approaching a quarter of all

23    the content that got knocked out right there.  So a quarter of

24    the content that is available, you can still use on your -- on

25    popular things, on your iPad and iPhone.  And Prince does

1    nothing with that.  And Teece does nothing with that.

2           The proposition they put forward is it's a brick for

3    watching movies through iTunes absent our patent.  Well, but

4    they license content providers, big content providers, and

5    those content providers' content, Dr. Teece wiped out from the

6    $300 million side of the equation.  But it's still in the

7    billions side because they rely on there being no use of an

8    iPad or an iPhone or an iPod to watch iTunes-purchased content,

9    and that is not correct by their own expert analysis.

10          So we know Prince didn't apportion, and we know the

11   idea that there's no non-infringing use is just wrong according

12   to Dr. Teece's own admissions.

13          We have the Prince analysis of a margin of error that

14   he added, not in his report.  That's also discussed in this

15   portion of the testimony.  It's a little hard to see, so I'll

16   just read it to Your Honor.

17          In his deposition, he was asked did he calculate a

18   margin of error.  This is at Page 75 and 76 of his deposition.

19          He says, I can't remember.

20          So we pressed him.  Did you do it?

21          And he didn't recall.  He'd have to go back and look.

22          It wasn't in his report.  It's now in a declaration

23   they've submitted.  Absent margin of error, absent the Court's

24   ability to determine how big a swing in the error rate, this

25   stuff isn't admissible.

```
1            The Supreme Court said that in Kumho Tire.  So they

2    needed margin of error data.  And so they've come up with some,

3    and they've done it on Table C1-a where there's sample size

4    information.  This is what Dr. Prince has offered up his error

5    correction on.  But this is not the data that Dr. Teece relied

6    on to come to a billion dollars for his opinion on Apple

7    devices.  It's not a sample size of 324 for the iPhone.  It's

8    not 313 for the iPad, et cetera.  It's not.  It's -- it's this

9    one.

10           Now, on the other side of this page, Dr. Teece used a

11   subset.  Now, they don't give the sample size in C1-b, but it's

12   smaller -- it's much smaller.  It's a percentage.  It's

13   10 percent or 8 percent or 7 percent of those other numbers.

14   The error number is going to be bigger, and we don't know what

15   it is because Professor Prince has never calculated that.

16           And under the prior document, the C1-a where he did

17   calculate, that error difference by itself is a $2 billion

18   swing.  If you take the highest error rate and lowest error

19   rate and you apply those, you don't come up with 1.3 billion.

20   You come up with something at 200 million to -- or 2.2 billion.

21   A $2 billion swing, Your Honor, is not reliable, even if he had

22   tested it against the right data.

23           So he had Kumho Tire telling him you can't put it in

24   without knowing the error rate.  If the Court accepts this late

25   declaration, it's on the wrong data.  And what it demonstrates
```

1    is a huge swing, an unreliable swing, a swing that should not

2    be put in front of a jury, in our estimation.

3           And -- and going to Your Honor's question, we agree we

4    have three interlocking experts, three of them.  But Dr. Teece

5    didn't do the survey.  He can't pull the willingness to pay out

6    of nowhere.  If the willingness to pay data that Professor

7    Prince provides him is not admissible, is unreliable, is not

8    method -- methodologically sound or is so error prone as to not

9    be able to be put in front of a jury, then Dr. Teece can't rely

10   on that.  That goes out the window.

11          And the same thing with Professor Danaher.  If

12   Dr. Teece didn't do the analysis that came up with the 58

13   percent number.  If -- if -- if that 58 percent number that he

14   takes as an input isn't admissible, can't be put in front of a

15   jury, then Dr. Teece can't use that.

16          Now, that still leaves Dr. Teece with the licensing

17   history.  He uses some of that.  He uses that for his baseline.

18   Now, if you apply that baseline, and I understand it's not in

19   open Court so I'm not going to say what it is, but if you apply

20   that baseline number to Apple, you don't come up with 1.3

21   billion, you don't come up with a billion.  You don't come up

22   with 300 million.  You come up with $71 million.

23          So we're talking about huge, huge swings in this case,

24   dramatical differences, and differences that make a difference

25   where the experts didn't do -- and particularly Dr. Prince

1   didn't do the work he needed to do.  He -- he is built on an

2   assumption that there's no non-infringing alternative when

3   Dr. Teece understands that, yes, I can watch iPod -- iPad.  My

4   kids can -- my six-year-old can watch anything from Time Warner

5   or Sony all day long and not infringe this patent.  Doesn't

6   account for it.

7           A number of the other issues, Your Honor, are very

8   thoroughly briefed.  I'm not going to spend more time on the

9   other problems we've seen with Professor Prince's analysis.

10  Those two, I think, are critical.

11          You did defer until today, Your Honor, our motions in

12  limine on damages.  We did have Apple's Motion in Limine 8.

13  That really went to Dr. Teece's use of total revenues on

14  subjects.  Counsel said that they're not relying on the total

15  revenues for our products.

16          THE COURT:  What I said, counsel, was that your

17  motions in limine would rise or fall with my rulings on

18  Daubert.

19          MR. ANDERSON:  Understood, Your Honor.  This one is --

20  this one I do want to address in that in -- let me find my

21  notes on that.

22          In Professor Teece's report at his Table C1-b, he

23  provided the total for our content revenue, all of it, right?

24  If they've apportioned it like they said, they don't have to

25  have the total amount of our content revenue in front of the

1    jury, and that's a problem under LaserDynamics and other

2    Federal Circuit precedent.

3            In his Table C5-a, he has the total of our smartphone

4    revenue, all of it, every last dollar of it.  That is a huge

5    number and should not be in front of a jury if they're actually

6    apportioning down to what they say they're apportioning to.

7    There's no reason to have the jury look at the very total of

8    iPhone revenues, unit counts or revenues.  And then they have a

9    6 -- at Table 6C -- 6 -- C6-a that has our total tablet

10   revenues.  Same issue.  If they're apportioned down to

11   something less than that, there's no reason for the jury to see

12   those total revenues.

13           Now, their explain -- explanation is it's context, but

14   that's exactly the kind of context the Federal Circuit says you

15   don't get to look at it.  This is not an entire market value

16   rule case.  You do not get to look at the total revenue of

17   Windows Office or something like that in order to figure out a

18   date picker function.  Neither do you get to look at the total

19   revenues of our smartphones or tablets or content in order to

20   figure out what they're accusing as their subset, which is

21   still a pretty big number, and we think is problematic for all

22   the reasons set forth in the motion.

23           So -- oh, one last point that's specific to Apple.

24   Dr. Teece included a figure for Apple music in his calculations

25   of a royalty against Apple in that $300 million number.  He

1    took it straight from Dr. -- he applied Dr. -- Professor

2    Danaher's video number to do that without any analysis that

3    it's the same.  And we know Apple sells and has sold for years

4    DRM-free music, that CDs can be ripped and played with iTunes.

5    Music is a very different thing from video, and it is a simple

6    application without any analysis.  And so we've briefed that,

7    and we think that that's a further basis for exclusion of

8    Dr. Teece, at least with respect to Apple music, because he

9    just takes a -- a number out of Danaher where Danaher said, I

10   did no analysis of music at all, no opinion on whether my

11   analysis applies to music.

12          And -- and Dr. Teece just uses that number, and just

13   using a number willy-nilly is not an expert analysis.

14          I'll agree with Your Honor, if the expert does the

15   analysis and it's sound and thorough and based in sound

16   economic principles, they're the expert.  But when an expert

17   just says, well, I'm going to apply it because I'm going to

18   apply it, I'm going to take a 58 percent number, and I'm just

19   going to stick it here because I think it applies to devices

20   just as well as it does to content, that's not analysis.

21   That's not an expert explaining their methodology.  That's just

22   saying, I'm an expert, believe me.  And that's what Daubert

23   says you can't do.

24          THE COURT:  What else, Mr. Anderson?

25          MR. ANDERSON:  That's it, Your Honor.  Thank you.

1          THE COURT:  All right.  Let me hear a response from

2    ContentGuard.

3          MR. BRIODY:  Thank you, Your Honor.

4          I'm -- I'm going to just respond to the various issues

5    that Mr. Anderson raised.  I won't rehash the briefing for you.

6          First, as to the -- he began by raising the point, I

7    don't know if this was an objection or not, but not asking

8    about DRM technology in the survey itself, as Professor

9    Prince's report indicates, there was a very good reason to do

10   that.  It would certainly confuse people.  It would not reflect

11   the actual value choice that a -- a consumer would encounter.

12   And he conducted a DRM adjustment on the back end, and,

13   frankly, Defendants haven't even acknowledged it.  And the

14   first time I'm really hearing anything about this Time Warner

15   thing is today.  But I can easily answer it for the same type

16   of reasons.

17         One, at the end of the day, that's not -- this issue

18   about value and the ability to view DRM-protected movies and

19   books, if they have some objection about Time Warner and how it

20   could influence, they can go and figure out some way to

21   challenge that.  But the truth is, if you're going to evaluate

22   the value of the patents-in-suit, you need to assess what value

23   the consumer is going to place and the ability to view

24   DRM-protected content.  And this adjustment that Mr. Anderson

25   is suggesting, if he wants to bring it up, he can on cross, but

1    that's not going to impact the admissibility of the survey.

2           And, you know, in that regard, I think we should just

3    begin and be mindful.  I'm sure the Court is well aware, it's

4    stated in the briefs.

5           Slide 28, Mr. Diaz.

6           Methodological flaws in a survey bear on the weight of

7    the survey -- the weight the survey should receive.  Scott

8    Fetzer versus House of Vacuums, 381 F.3d 477.  Also, C.A. May

9    Marine Supply Co. versus Brunswick, 649 F.2d 1049, 1055, and

10   also Holiday Inns versus Holiday Out In, 481 F.2d 445.  Those

11   are all Fifth Circuit cases.

12          Then turning to the margin of error point that Apple

13   raises.  So first of all, as we pointed out in our brief, their

14   complaint is wrong.

15          Second of all, they have the data, and they could

16   run whatever error rates they want to.  If they could -- if

17   there -- if there was some big problem, they could come and

18   show the Court.  They could have their experts do the work.

19   They have Mr. Rossi -- Dr. Rossi to do that.  He didn't.

20          When we provided the declaration that set forth the

21   error rate, they complained and said it should be excluded.

22   And they ignore all along -- the essential gripe is that the

23   findings of the willingness to pay analysis that Professor

24   Prince does with his survey results are not reliable because he

25   didn't check them.  What they don't talk about is -- it's

1    Exhibit AA to our motion, Paragraphs 51, 52, where Professor

2    Prince discusses the robustness checks that he performs to

3    ensure that his findings and what he is extracting about

4    customer willingness to pay from each of the survey respondents

5    makes sense and is accurate.  No Defendant challenges those

6    robustness checks.

7          So this error rate issue that they're trying to

8    pigeonhole into a gateway of admissibility wouldn't even be one

9    because he's already done the robustness checks to show that

10   his science is right.  And when he did it, what did it show?

11   It showed he was right.  And then what happened?  Then they

12   wanted another check.  But their demand for a check is based on

13   a misapprehension of the data to begin with.

14          I think that really answers most of the criticism put

15   forth by Mr. Anderson.  To get to the back end, I didn't

16   understand that we would be dealing with motions in limine

17   today, but I --

18          THE COURT:  I didn't either.

19          MR. BRIODY:  I'm happy to address --

20          THE COURT:  And I don't intend to.

21          MR. BRIODY:  Okay.  Then I'm happy to reserve

22   comment --

23          THE COURT:  I'm going to rule on these Dauberts, and

24   then if somebody wants some clarification about a limine matter

25   that I carried, I'll be glad to offer any -- any clarification.

1          MR. BRIODY:  Okay.  Then, Your Honor, I have nothing

2   further.  We stand on our briefs.  I think we have these issues

3   covered.

4          THE COURT:  All right.  Counsel, these matters

5   regarding Defendants' challenges to the Plaintiff's damages

6   experts under Daubert are under advisement.

7          Let me just ask for purposes of completeness in the

8   record, is there anything in regard to Defendants' Daubert

9   challenges to Defendants' -- excuse me, to Plaintiff's damages

10  experts that I've not taken up or heard?  Seems to me we've

11  covered the -- the topic, but if we haven't, I want somebody to

12  say so.

13         MR. JONES:  On -- on behalf of the Defendants, I know

14  of nothing, and I'm sure they would let me know if there was

15  one, Your Honor.

16         THE COURT:  Okay.  Okay.  As I say, this is under

17  advisement.  I'll attempt to get you some written guidance by

18  way of a ruling as soon as possible.

19         I believe the next time I have counsel scheduled here

20  for an additional pre-trial in these cases is Wednesday of next

21  week where we'll take up Daubert challenges by the Defendants

22  to the Plaintiff's infringement and invalidity experts.

23         I would urge you to continue to -- and some of those

24  Daubert challenges, I believe, go both to Plaintiff's experts

25  and Defendants' experts.  But we'll take up the invalidity and

1  infringement Dauberts both ways next Wednesday.

2          I would continue to encourage you to meet and confer,

3  particularly on disputed exhibits.  I find that those are one

4  of the areas of pre-trial where there are multitudes of

5  documents that hopefully with concerted efforts in meeting and

6  conferring can be drastically reduced to hopefully a handful of

7  actually disputed and argued over exhibits, but we'll get to

8  that as we go forward.

9          I think I also have you back for Friday of next week,

10  as well.  At this point, those are the two remaining pre-trial

11  scheduled times on these cases for you all to be before the

12  Court.  It is possible -- I think we all recognize we may not

13  get through everything by Friday of next week.  If we don't,

14  we'll step back and assess what's left, and I'll set additional

15  dates as may be necessary to do that.

16          All right.  As I say, these matters are under

17  submission.  And I will see you Wednesday at 9:00 o'clock.  If

18  there's not anything further from either side, we'll stand in

19  recess.

20          COURT SECURITY OFFICER:  All rise.

21          (Hearing concluded.)

22

23

24

25

1                          CERTIFICATION

2

3         I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    /s/ Shelly Holmes                          8/3/15
     SHELLY HOLMES, CSR-TCRR                     Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25