IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| CONTENT GUARD HOLDINGS, INC., § <br> § <br> Plaintiff, § <br> § <br> v. § <br> § <br> AMAZON.COM, INC., et al., § <br> § <br> § <br> Defendants. § | Case No. 2:13-CV-1112-JRG | |
| CONTENT GUARD HOLDINGS, INC., § <br> § <br> Plaintiff, § <br> § <br> v. § <br> § <br> GOOGLE, INC., § <br> § <br> Defendant. § | Case No. 2:14-CV-61-JRG | |

## MEMORANDUM OPINION AND ORDER

Before the Court are a number of motions concerning expert damages testimony: (1) Motion to Exclude Testimony of Dr. Teece (Dkt. No. 662); (2) Motion to Exclude Testimony of Dr. Prince (Dkt. No. 663); (3) Motion to Exclude Testimony of Dr. Danaher (Dkt. No. 666), all filed by the Defendant Apple Inc. Also before the Court is (4) the Defendants' Joint Motion to Exclude the Testimony of Dr. Teece, Dr. Danaher, and Dr. Prince (Dkt. No. 723). At the Court's request, the Defendants (other than Apple) consolidated previously filed docket entries 700, 701, 714, 715, 716, 717 & 718 in Case No. 2:13-cv-1112 and docket entries 244, 248, 249, 250, 251 & 252 in Case No. 2:14-cv-61 into a Joint Motion to Exclude the Testimony of Dr. Teece, Dr. Danaher, and Dr. Prince (Defs.' Joint Motion, Dkt. No. 723). ContentGuard responded to all

motions in a single Response (Pl.'s Resp., Dkt. No. 754). The Defendants, including Apple, filed a Consolidated Reply (Defs.' Consol. Reply, Dkt. No. 788). ContentGuard filed a single Sur-Reply (Pl.'s Sur-Reply, Dkt. No. 810). The Court requested that the parties submit copies of each expert report that was in dispute. For the reasons set forth below, the Defendants' motions to exclude are **GRANTED** to the extent specified below, and are otherwise **DENIED**.

### BACKGROUND & METHODOLOGY

To put the rest of this process into context, the Court will briefly set forth (in an oversimplified fashion) the relevant portions of ContentGuard's damages case. ContentGuard relies on the opinions of three damages experts:

(1) Dr. Teece, who provides the primary economic analysis;

(2) Dr. Prince, who conducts surveys and performs a microeconomic analysis that generates numbers used by Dr. Teece as inputs into his damages equation; and

(3) Dr. Danaher, who expresses opinions about academic literature and research, particularly one paper (the Shiller Paper), and establishes certain benchmarks that are also used as inputs to Dr. Teece's damages equation.

Teece submitted separate expert reports for Apple and Google, as well as a single report for Huawei, HTC, Motorola, and Samsung (the Android Defendants). Prince submitted separate expert reports for the 2:13-cv-1112 case (the Apple Case), and the 2:14-cv-61 case (the Google Case). Danaher submitted separate expert reports for the same.[1]

---

[1] The Court will only pincite to one version of each expert's report even when the Court comments on a principle proffered by Teece in all cases. Where relevant, the Court may draw distinctions between the different reports submitted by the same expert, as they are not all identical. The Court also notes that the experts submitted reports for Defendant Amazon, who is no longer part of the case.

Two primary calculations support ContentGuard's damages case: (1) damages allegedly owed to ContentGuard due to the Defendants' sales of accused devices, which are levied against all Defendants that sell accused devices; and (2) damages allegedly owed to ContentGuard due to the sale of accused content, which are only levied against Apple and Google, since they are the two Defendants left in the case that sell DRM protected content. Having provided this brief context, the Court now turns to the relevant portions of the experts' reports.

### A. Expert Reports of Dr. Prince

There are three main portions of Prince's expert report. First, Prince designed a set of conjoint surveys. Second, Prince designed a set of usage surveys. Third, Prince analyzed a microeconomics framework that Teece uses in his calculations.

The Court first addresses the two sets of surveys. The surveys in the first set are conjoint surveys that seek to determine the value attributable to a consumer's willingness-to-pay (WTP) for certain features of the Defendants' accused devices. (Pl.'s Resp. at 2, Dkt. No. 754). The methodology of the conjoint survey has been adequately explained by other district courts. *See, e.g.*, *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1020–27 (N.D. Cal. 2013). Through the conjoint survey, Prince seeks to "isolate the value of an individual device feature," which he describes as the "ability of a Relevant client device [i.e., an iPhone] to view or play Managed Content [i.e., Content managed with DRM]." (Prince Report Apple Case ¶ 16). Prince ultimately concludes that this consumer WTP equals $45.12, which is the lowest calculated value for any of the Defendants. (Pl.'s Resp. at 24, Dkt. No. 754).

The second set of surveys conducted by Prince relates to the percentage of customers that actually use the allegedly infringing features on the devices. Ultimately, Prince concludes that only a certain percentage of users of the accused devices actually use the infringing functionality existing within the accused devices. Prince then calculates that particular percentage for each

3

Defendant and for each of the Defendants' accused devices. *See, e.g.*, (Prince Report Apple Case tbls.U1-1a through U1-1d (usage results for Android Defendants)); (*id.* tbls.U2-1a through 1g (usage results for Apple products)). For example, Prince reports that on average only 37% of Apple iPhone users actually use the iPhones in an allegedly infringing manner. (Prince Report Apple Case tbl.U2-1a).

Finally, Prince analyzes a microeconomic framework that Teece uses to adjust or refine the final damages base. (Prince Report Apple Case ¶¶ 84–107). The Defendants do not substantively challenge the underlying methodology of this framework.

### B. Expert Reports of Dr. Danaher

In addition to a substantial amount of other "academic literature and research," Danaher analyzes a particular economic/academic paper (the Shiller Paper). (Danaher Report Apple Case ¶ 9). Danaher analyzes the Shiller Paper and concludes that "Shiller quantifies the impact [on the primary market for video games] of shutting down the secondary market for . . . video games," (i*d.* ¶ 40), and that the primary and secondary markets for the content at issue in this case "are consistent with the dynamics in the video game markets described in Shiller." (*Id.* ¶ 42). Specifically, he concludes:

> (1) Academic literature and research has shown that the inability to block the emergence of secondary markets for the kinds of content at issue in this case has a significant negative impact on primary market sales and profits.
> (2) If such secondary markets were allowed to emerge for the digital content at issue here, then the best available evidence indicates that primary market unit sales would be expected to fall by 58%.
> (3) [The report shows] the best available estimate of the incremental profit that the Defendants have gained from preventing the emergence of resale markets for the types of Content at issue. [The report] also shows the change in expected profit on a per unit basis.
> (4) The ability to rent content, as well as to sell content, allows Content Distributors to more effectively meet the needs of different market segments, and thereby reap higher sales and profits.

4

>  (5) If such Rental transactions were precluded, then total [Defendants] profits from content would be expected to fall by the amount shown in [his exhibits].

(*Id.* ¶ 9 (titled, "Summary of Opinions")). Danaher concludes that his 58% benchmark represents "the incremental revenue gained by [Defendants] due to the prevention of resale markets for digital content," from which he "subtracts" all costs leaving only the "incremental profit that has been obtained by the Defendant[s] as the result of preventing the emergence of resale markets for digital content." (*Id.* ¶ 44).

### C. Expert Reports of Dr. Teece

Teece conducts the economic analysis that underpins the damages numbers ContentGuard plans to present to the jury. His general framework is applicable to all Defendants, but he uses Defendant-specific evidence within his framework. As an overview, Teece first calculates values for what he calls the Defendants' "maximum willingness to pay" and ContentGuard's "minimum willingness to accept." He then applies a bargaining model (the Rubenstein bargaining model) to the hypothetical negotiation to determine at what point between the maximum and minimum willingness values the parties would reach an agreement.

Teece uses the numbers for consumer WTP generated by Prince and the "best available estimate" of the incremental profit, provided by Danaher, as inputs for his damages calculation. Ultimately, Teece calculates each Defendant's "maximum willingness to pay" based on these numbers. Particularly, Teece multiplies Prince's consumer WTP value (e.g., $45.12) by Danaher's benchmark (e.g., 58%), by Prince's second survey on usage (e.g., 34%), and finally adjusts that number through the microeconomics framework provided by Prince. These figures, unique to each Defendant's devices, equal the Defendant's "maximum willingness to pay" for a license from ContentGuard for the patents in suit.

Next, Teece calculates ContentGuard's "minimum willingness to accept" at the hypothetical negotiation. Based on a previous license with Nokia, Teece concludes that ContentGuard would not be willing to accept anything less than $0.15 per device. The Defendants do not challenge the methodology used in reaching the "minimum willingness to accept" number.

Finally, Teece applies the Rubenstein bargaining model to determine at what value between the "maximum willingness to pay" and the "minimum willingness to accept" the parties would ultimately reach an agreement. Rubenstein's model depends on a number of underlying premises, and Teece analyzes how and why these premises are met in this case. *See, e.g.*, (Teece Report Apple Case ¶¶ 514–526). Furthermore, in analyzing these premises, Teece uses Defendant-specific evidence to determine specific inputs to the model. *E.g.*, (*id.* ¶ 522). For example, as inputs to the model, Teece examines the Weighted Average Capital Cost for each Defendant at the time of the hypothetical negotiation. *E.g., (id.* ¶¶ 520–21).

## LEGAL STANDARDS

"The admissibility of expert testimony is governed by the Federal Rules of Evidence and the principles laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014).

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In other words, "[u]nder [the Federal Rules] and precedent, a district court judge, acting as a gatekeeper, may exclude evidence if it is based upon unreliable principles or methods, or legally insufficient facts and

6

data." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014), *rev'd on other grounds by Williamson v. Citrix Online, LLC,* No. 2013-1130, 2015 WL 3687459, at *6 (Fed. Cir. June 16, 2015) (en banc in part).[2]

"A [district] judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another," *Apple Inc.*, 757 F.3d at 1314. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993); *see also i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) ("*Daubert* and Rule 702 are safeguards against unreliable or irrelevant opinions, not guarantees of correctness."); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391–92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002) ("The trial court's role as gatekeeper [under Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note).

---

[2] Because of the somewhat unwieldy subsequent history of this case, in later portions of this Order, the Court will cite to *Apple Inc. v. Motorola, Inc.* without the subsequent history.

## ANALYSIS

1. **The Entire Market Value Rule**

The Defendants have taken somewhat inconsistent positions regarding whether ContentGuard's damages model implicates the entire market value rule (EMVR). *Compare* (Defs.' Joint Mot. at 3, Dkt. No. 723 (citing to Teece's deposition and stating, "Instead, [Teece] attempts to apportion the incremental value of the DRM covered by the ContentGuard patents to the Defendants' sales of accused devices")) *with* (*id.* at 22 (titled, "Dr. Teece's Damages Approach Violates the Entire Market Value Rule")).

*First*, the Court does not agree that ContentGuard violates that certain substantive legal rule known as the entire market value rule (EMVR) because Teece attempts to apportion the incremental value of the DRM covered by ContentGuard's patents in its damages analysis, as the Defendants stated. (Defs.' Joint Mot. at 3, Dkt. No. 723).

As noted by the Plaintiff, Teece does not use the entire market value of a multi-component product (for example, an iPhone). (Pl.'s Resp. at 15, Dkt. No. 754). Instead, Teece starts his analysis with the survey-derived consumer willingness-to-pay value provided by Prince. *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014) ("On the contrary, a patentee must be reasonable (though may be approximate) when seeking to identify a patent-practicing unit, tangible or intangible, with a close relation to the patented features."). As Prince notes in his report, the goal of the WTP survey was to "isolate the value of an individual device feature," which he describes as the "ability of a Relevant client device [i.e., an iPhone] to view or play Managed Content [i.e., Content managed with DRM]." (Prince Report Apple Case ¶ 16). The WTP for an individual device feature is not the "entire market value" of a device, such as a cell phone, under even the most strained reading of EMVR.

Instead, the Defendants argue that the apportionment developed (at all stages) was incorrectly or insufficiently done. However, phrased under the EMVR as Defendants have done, this argument conflates an allegedly failed attempt at apportionment with no apportionment at all. This situation—allegedly imperfect apportionment—is not what the entire market value rule contemplates, as this would allow the "narrow exception" of EMVR to swallow the rule of apportionment. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). The Court will address the sufficiency of the apportionment methodology (as raised by the Defendants) below, but now turns to the evidentiary principle of the entire market value rule.

*Second*, the Court agrees with the Defendants that there is some potential for ContentGuard to violate the evidentiary principle of the entire market value rule depending on what numbers and calculations are ultimately presented to the jury. *See Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226–27 (Fed. Cir. 2014) (contemplating what values are presented to the jury under the evidentiary principle). This conclusion is not unique to this case because, as recognized by other Courts, "[o]ne can characterize any damages figure . . . as a percentage of the defendant's total lost profits or revenue." *Sentius Int'l, LLC v. Microsoft Corp.*, 2015 WL 451950 at *11 (N.D. Cal. Jan. 27, 2015). However, the ability to re-characterize an apportionment damages model does not convert such a model into "a hidden attempt to avoid the entire market value rule." *Id.*

The Federal Circuit's guidance on this point is instructive: "The [evidentiary] principle, applicable specifically to the choice of a royalty base, is that, where a multi-component product is at issue and the patented feature is not the item which imbues the combination of the other features with value, care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product." *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014). Therefore, ContentGuard's damages experts' testimony regarding the value of an

entire multi-component product (if testimony to that effect is, in fact, elicited by ContentGuard) must be limited to only what is necessary to present its case, in order to "avoid misleading the jury by placing undue emphasis on the value of the entire product."[3] *Id.*

Accordingly, the Court GRANTS-IN-PART this request to exclude; specifically, if as alleged by Defendants, "Dr. Teece undoubtedly [plans] to disclose the[] overall revenue to the jury so that he can explain how he arrived at his damages numbers," then that testimony is excluded. (Defs.' Joint Mot. at 22, Dkt. No. 723). To the same extent, ContentGuard's experts are precluded from testifying about the entire amount of profit earned by any of the Defendants, or the entire amount of revenue or profit earned by the total sales of Defendants' products. These figures have been excluded as violating principles of the entire market value rule in previous Federal Circuit case law. *See, e.g.*, *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (excluding damages calculations that rely on the all the sales of the entire product); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1319 (Fed. Cir. 2011) ("As such, the use of the entire market value of [the accused products] in the form of the $19 billion figure was irrelevant and tainted the jury's damages award." (internal quotation and alterations removed)). All other relief requested regarding the EMVR is otherwise DENIED.

---

[3] When presented with a similar issue, courts in the Northern District of California have reached similar conclusions. *See Sentius Int'l, LLC v. Microsoft Corp.* 2015 WL 451950 at *11 (N.D. Cal. Jan. 27, 2015) (Grewal, MJ) (excluding "Microsoft's profitability at trial" and all "overall profitability and revenue[s] a trial," but allowing testimony concerning a multi-component product's "profit margin" and "revenue to the extent necessary to support" the damages theory). To the extent requested by the accused infringer, the Court will also consider granting a "cautionary instruction regarding the limited purposes for which such testimony is proffered," as approved under the *Georgia–Pacific* framework in *Ericsson*. *See Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1228 (Fed. Cir. 2014) (discussing a limiting instruction to cure the potential effect caused by showing the entire value of multi-component product to the jury).

### 1. ContentGuard's Appointment

As noted, the Defendants' primary argument concerns the allegedly flawed manner in which ContentGuard attempted to apportion the incremental value of the patented features from the value of the unpatented features. *See* (Defs.' Consol. Reply at 4, Dkt. No. 788 (contemplating "Dr. Teece's failed attempt at apportionment")). Principally, Defendants take issue with ContentGuard's use of the Danaher benchmarks. Defendants also seek to exclude the testimony of Teece because they allege his conclusions about the "but-for" world are inconsistent.

*A. Danaher Benchmark*

The Defendants focus on Danaher's benchmark of 58%, and argue that Danaher cannot reliably apply the benchmark from the Shiller Paper (regarding the video game market) to ContentGuard's damages model (regarding the digital content market). The Court addresses the Defendants' arguments on this point.

*i.* Shiller Paper as Unreliable Data

The Plaintiff and Defendants both acknowledge that Danaher attempts to use the 58% benchmark to apportion the incremental value added by the patented features of the accused devices. The Defendants argue that the benchmark cannot be used for such a purpose, while the Plaintiff takes the opposite position.

The Defendants rely on *Digital Reg of Texas, LLC v. Adobe Systems*, No. C 121-1971 CW, 2014 WL 4090550 (N.D. Cal. Aug. 19, 2014) to show that Danaher's use of the Shiller Paper is unreliable because the data used in the Shiller Paper is not related to what is at issue in the case. In *Digital Reg*, the plaintiff's expert attempted to calculate the "percentage of sales [the defendant] saved from piracy" because of defendant's use of the plaintiff's patented DRM technology. *Id.* at *1; (Defs.' Joint Mot. at 19, Dkt. No. 723). Plaintiff's expert used "data spanning the entire software industry, regardless of the type of software or whether the software

11

uses some form of DRM or not" but did not consider piracy "data specific to" defendant. *Digital Reg*, 2014 WL 4090550, at *1. Our sister court in California concluded that the data was unreliable because of the variance between the types of software in the data and the software in the case, but ultimately relied on the fact that the expert failed to "justify his assumption that . . . industry data are an accurate representation of what would occur with Adobe," the specific defendant in the case. *Id.*

That precise problem—that the expert did not attempt to justify his assumption—is not present in this case. Danaher listed the reasons why his assumption (that video game markets are comparable to digital content markets) is justified. *See* (Danaher Report Apple Case ¶ 42 ("I have studied markets for digital content . . . throughout my career and the dynamics in these markets are consistent with the dynamics in the video game markets described in Shiller (2013). First, the value that consumers place on videos, books and video games is generally believed to decline with use as consumers tire of the content or absorb the relevant information from that content. . . . Second, consumers of these types of content . . . . Third, . . .)). The Court sees no analytical gap between his assumption and his conclusion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). To adopt the Defendants' position, the Court would be forced to "question[] the conclusions of [Plaintiff's] expert, rather than focus[] on the reliability of the principles and methods used . . . ." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1316 (Fed. Cir. 2014). The Federal Circuit has warned against just such a practice. *Id.* Here, the Plaintiff's expert has sworn under oath that the Shiller benchmark "represents the best available estimate of the likely impact that selling non-resellable content has had on the online markets for digital video or eBook content." (Danaher Report Apple Case ¶ 43). The Defendants have presented no alternative. *Apple Inc.*, 757 F.3d at 1319 ("Factually, if the [compared product] is not an accurate benchmark, Motorola is free to challenge the benchmark or argue for a more accurate

benchmark."). The Court will not "question[] the conclusions of [Plaintiff's] expert" on this point, especially where he has justified his conclusions with supporting facts. *Id.* at 1316. This task is more appropriately left to Defendants' counsel via vigorous cross examination. *Id.* at 1319 ("But such an argument goes to evidentiary weight, not admissibility, especially when, as here, an expert has applied reliable methods to demonstrate a relationship between the benchmark and the infringed claims.").

        ii.        Legal/Illegal Distinction

The next argument raised by Defendants is whether Danaher and Teece's use of a secondary market that contemplates unlawful resale, versus Shiller's use of a secondary market that contemplates lawful resale, renders Danaher's conclusions unreliable. The Defendants contend "unlawful markets reduce primary market sales significantly less than lawful secondary markets." (Defs.' Consol. Reply at 3). They argue that these "substantial differences" derive from specific "legal protections that inhibit resale, such as copyright laws." (Defs.' Joint Mot. at 12, Dkt. No. 723). They allege that "Dr. Teece admits that he did not even try to quantify the relative contributions of copyright law and DRM technology to the prevention of a resale market." (*Id.* at 12). The Plaintiff contends that Danaher and Teece conclude that their benchmark is correct despite the difference between a legal resale market and an illegal resale market. (Pl.'s Resp. at 10, Dkt. No. 754).

This may be a compelling point for cross-examination, but to exclude these opinions under *Daubert*, the Court would have to judge the experts' conclusions rather than their methodology. This would be improper. The Court has been given clear guidance in these situations, and the Federal Circuit has found legal error when a district court "question[s] the conclusion[s] of [a party's] expert" or weighs "the credibility of one expert over another." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314, 1316 (Fed. Cir. 2014). Instead, the Circuit has

directed district courts to "focus[] on the reliability of the principles and methods used or the sufficiency of the facts and data relied upon." *Id.* The Court finds that Teece and Danaher analyzed the record of the case, used reliable economic principles and methods, relied on sufficient facts and data, and reached an expert conclusion on the economic adjustment that would be needed to distinguish between the two positions. *See, e.g.*, (Danaher Report Apple Case ¶¶ 33–44); (Teece Report Apple Case ¶¶ 328–39). Danaher concludes that the "dynamics in these markets are consistent with the dynamics in the video game markets described in Shiller (2013)," and he laid out the reasons why his conclusion is justified. (Danaher Report Apple Case ¶ 44). For the same reason, the Court rejects the other arguments raised by the Defendants concerning Danaher's selection of the benchmark. All of these attacks are the proper focus of cross-examination. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1319–20 (Fed. Cir. 2014) (argument about the selection of a benchmark "goes to evidentiary weight, not admissibility"); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010). This request to exclude by the Defendants is DENIED.

                *iii.*     Content/Device Distinction

Similarly, the Defendants assert that Teece's testimony should be excluded because Teece applies Danaher's benchmark to devices *and* content. Danaher himself expresses no opinion on whether his benchmark should be applied to both devices *and* content—he only opines on the subject of content. However, Teece does make just such a conclusion: "With a loss in Content of a certain magnitude, Consumer WTP for access to such content [i.e., devices] would be expected to fall in a corresponding way. I therefore adjust the Consumer WTP [for devices] by that ratio." (Teece Report Apple Case ¶ 369). In this conclusion, Teece takes a benchmark derived from data from the video game market, which Danaher applies to the market for content, and then Teece draws a conclusion about how a decrease in content sales would

14

affect the sales of devices (such as consumer WTP for an iPhone). Plaintiff contends that Teece's economic conclusions about the parallel relatedness of digital content sales versus devices-that-view-digital-content sales is just that: an expert conclusion.

Admittedly, this issue is a close call. On the one hand, the Court will not question economic conclusions, and the Defendants' own experts have not challenged his conclusions or methodology. On the other hand, there is little (cited) support for Teece's pivot from sales of content to sales of devices. Ultimately, the Court passes no judgment or opinion on the underlying conclusion or the logic of the underlying conclusion. However, without disclosing the methodology—or otherwise pointing to some facts that support that logic—the Court believes that Teece must either (1) supplement his report; or (2) file a declaration pointing to the facts in his report that support his conclusion. The Court agrees with ContentGuard that their expert's "own experience and expertise" might appropriately support this analysis. (Pl.'s Sur-Reply at 6, Dkt. No. 810, *citing Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1316 (Fed. Cir. 2014)). However, the Court does not find that Teece made any such statement in the context of the correlation between content sales to device sales. Thus, Teece's conclusion is unsupported as it currently stands. *Brown v. Ill. Cent. R. Co.*, 705 F.3d 531, 537 (5th Cir. 2013); *but see ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("At their core, however, Verizon's disagreements are with the conclusions reached by ActiveVideo's expert and the factual assumptions and considerations underlying those conclusions, not his methodology. These disagreements go to the weight to be afforded the testimony and not its admissibility."). To this limited extent, the Court **ORDERS** Teece to either file a declaration or supplement his report so as to show his source of support for this conclusion; this is to be done within five (5) days from the date of this Order.

B. *Expert's "But-For" World*

Defendants argue that the "but-for" world constructed by Teece and the but-for world contemplated by his analysis do not fit the facts of the case. According to Defendants, Teece bases his entire analysis on the assumption that the Defendants would have access to alternative DRM systems, but he analyzed a but-for world that prevented the sale of secondary resale markets by relying on the fact that the Defendants have proffered no non-infringing alternatives. (Defs.' Consol. Reply at 3, 5, Dkt. No. 788). Plaintiff argues that the but-for worlds are sufficiently the same in that both worlds contemplate a situation where Defendants' business models are not enabled based on the specific DRM contracts signed by the Defendants. (Pl.'s Sur-Reply at 3, Dkt. No. 810). In a related argument, Plaintiff also argues that the Danaher benchmark, used by Teece, isolates the value of the DRM at issue in this case.

The Court agrees with the Plaintiff. Teece's acknowledgement that there are other DRM systems, and thus, possible non-infringing alternatives, does not render his opinion inadmissible. *See, e.g.*, (Pl.'s Sur-Reply at 3 & n.1, Dkt. No. 810 (citing Teece's testimony)). Teece spends a substantial portion of his expert report analyzing each specific Defendant's business model. *See, e.g.*, (Teece Report Apple Case ¶¶ 213–83). He analyzes each of the specific Defendant's contracts with content providers (such as Disney, Universal, Fox, Paramount, Hachette, EMI, etc.). *E.g.*, (*id.* at ¶¶ 235–255). He analyzes how each Defendant has achieved economic gains based on these models. (*Id.*) Using this evidence, Teece's own experience, and the opinions of Dr. Goodrich—ContentGuard's technical expert—Teece states his conclusion about the incremental value attributable to Defendants' business models as related to the patents in suit. *See* (Pl.'s Sur-Reply at 3 & n.1, Dkt. No. 810 (citing Teece's testimony: "But it's my understanding that there isn't DRM-patented technology available that would support the particular business models that Apple and other Defendants were interested in and that, more

16

importantly, that the content providers wanted")); (Defs.' Consol. Reply at 4, Dkt. No. 788 (citing Teece's testimony)). In other words, Teece attempts to calculate the difference in value "created by the patents-in-suit." (Pl.'s Sur-Reply at 3, Dkt. No. 810). "He apportioned to capture the economic benefits created by preventing resale and enabling rental." (Pl.'s Sur-Reply at 3, Dkt. No. 810). This apportionment leads Teece to the "value added by" Plaintiff's DRM technology over that of other DRM solutions, and these benefits are grounded in the facts of the case. *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). Defendants request to exclude here is DENIED.

### 2. Rubinstein Bargaining Model

Defendants argue that the Court should reject Teece's use of the Rubenstein bargaining model in his analysis. The Defendants' main objection is that the Rubenstein bargaining model is a bargaining model, as was the Nash Bargaining Solution that was rejected in *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332 (Fed. Cir. 2014). Plaintiff contends that the Federal Circuit did not *per se* bar the use of theoretical models in damages analysis, but instead, required that the expert "establish[] that the premises of the theorem actually apply to the facts of the case at hand." *Id.*

The Court agrees with the Plaintiff, and also agrees that Teece identifies the premises of the Rubenstein model and attempts to explain how they apply to the facts of this particular case. *See, e.g.*, (Teece Report Apple Case ¶¶ 514–526); (Pl.'s Resp. at 19, Dkt. No. 754). Plaintiff articulates each premise of the Rubenstein model and cites to specific evidence from Teece's report that supports the premise. (Pl.'s Resp. at 19–20). Teece also uses Defendant-specific evidence as inputs to some of the premises. (Pl.'s Resp. at 20). Teece's consideration of the model and the evidence of the case does not amount to a mere "rule of thumb," that would be

prohibited by the ruling from *Virnetx*. *Virnetx,* 767 F.3d at 1332. Defendants request to exclude in this regard is DENIED.

### 3. Miscellaneous Arguments

The Court now turns to four miscellaneous arguments raised by the Defendants.

First, Defendants argue that Prince failed to provide his calculation of the required "known or potential rate of error" regarding his surveys. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 151 (1991). However, Prince had already disclosed the underlying data concerning these calculations. (Pl.'s Sur-Reply at 14, Dkt. No. 810). Furthermore, Prince provided these calculations (which Defendants experts could have done) in response to Apple's request. (*Id.*) This is not a reason to exclude testimony.

Second, the Court rejects the Defendants' argument that Prince calculated the error rate using the wrong set of data. However, as Plaintiff acknowledges, the reliability statistics were calculated on the data ultimately used by Teece. (Pl.'s Sur-Reply at 14, Dkt. No. 810). This is not a reason to exclude testimony.

Third, the Court rejects the Defendants' arguments that Prince's survey data is unreliable because he did not use a random sample of a representative population. Prince did conduct checks for representativeness. (Prince Report Apple Case ¶¶ 35–38). Defendants' own experts, in other contexts, have used the same service that provides the representative population of survey takers. This service's reliability is not challenged, and there is no reason to exclude Prince's testimony on this issue for this reason.

Fourth, the Defendants' assertion that Prince's surveys used unclear questions is also rejected. Defendants do not assert that he used an improper methodology to draft the survey questions, but instead attack the questions asked. Defendants' dissatisfaction with the description

of the patented features in the survey goes to weight, not admissibility. For the same reasons, the Court also rejects the Defendants' remaining arguments concerning the reliability of his survey.

## CONCLUSION

Consistent with the opinion above, the Court **GRANTS-IN-PART** the Defendants' request under the evidentiary principle of the entire market value rule, in that: Plaintiff's experts are precluded from testifying about the overall revenue or profit earned by any of the Defendants' business models. The Plaintiff's experts are also precluded from testifying about the overall revenue or profit earned by the sales of Defendants' devices.

The Court **ORDERS** Teece to, within five (5) days, supplement his report or file a declaration setting forth his support for the economic conclusion that a drop in sales of managed content would equate to a drop in sales of accused devices. The Defendants shall be permitted two additional hours of deposition time with Dr. Teece on this topic only and related solely to his supplement/declaration.

All other requests for exclusion contained in the motions cited above are DENIED and rejected, as they are either unfounded or go to the weight of the evidence, not its admissibility.

**So ORDERED and SIGNED this 6th day of August, 2015.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE