1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE EASTERN DISTRICT OF TEXAS

3    MARSHALL DIVISION

4    CONTENTGUARD HOLDINGS, INC., )(

5          PLAINTIFF,      )(  CIVIL DOCKET NO.

6                           )(  2:13-CV-1112-JRG

7    VS.                )(  MARSHALL, TEXAS

8                       )(

9    SAMSUNG ELECTRONICS CO. LTD.,)(

10   SAMSUNG ELECTRONICS AMERICA, )(

11   INC.,              )(  SEPTEMBER 17, 2015

12         DEFENDANTS.     )(  8:19 a.m.

13   _____

14   CONTENTGUARD HOLDINGS, INC., )(

15         PLAINTIFF,      )(  CIVIL DOCKET NO.

16                        )(  214-CV-61-JRG

17   VS.                )(  MARSHALL, TEXAS

18                      )(

19   GOOGLE, INC.,       )(  SEPTEMBER 17, 2015

20         DEFENDANT.      )(  8:19 a.m.

21

22   TRANSCRIPT OF JURY TRIAL

23   BEFORE THE HONORABLE RODNEY GILSTRAP

24   UNITED STATES DISTRICT COURT

25

```
 1    APPEARANCES:

 2    FOR CONTENTGUARD HOLDINGS, INC.:

 3                        Mr. Samuel F. Baxter
                          Ms. Jennifer Truelove
 4                        MCKOOL SMITH P.C.
                          104 East Houston Street
 5                        Suite 300
                          Marshall, Texas   75670
 6                        (903) 923-9099

 7                        Mr. Robert A. Cote
                          Mr. Radu A. Lelutiu
 8                        Mr. John C. Briody
                          Mr. David R. Dehoney
 9                        Mr. Jonathan R. Yim
                          Ms. Dana E. Vallera
10                        Ms. Karly Y. Valenzuela
                          MCKOOL SMITH P.C.
11                        One Bryant Park
                          47th Floor
12                        New York, New York   10036
                          (212) 402-9400
13
                          Mr. Dirk D. Thomas
14                        Mr. Robert A. Auchter
                          MCKOOL SMITH P.C.
15                        1999 K Street
                          Suite 600
16                        Washington, D.C.   20006
                          (202) 370-8300
17
                          Ms. Holly E. Engelmann
18                        Ms. Rosemary T. Snider
                          Mr. Seth R. Hasenour
19                        Mr. Eric S. Hansen
                          MCKOOL SMITH P.C.
20                        300 Crescent Court
                          Suite 600
21                        Dallas, Texas   75201
                          (214) 978-4000
22
                          Mr. Christopher J. Mierzejewski
23                        MCKOOL SMITH P.C.
                          300 West 6th Street
24                        Suite 1700
                          Austin, Texas   75201
25                        (512) 692-8700
```

```
1    APPEARANCES (CONTINUED):

2    FOR GOOGLE INC.:
                           Mr. James Mark Mann
3                          MANN TINDEL & THOMPSON
                           300 W. Main Street
4                          Henderson, Texas  75652
                           (903) 657-8540
5
                           Mr. Robert W. Unikel
6                          KAYE SCHOLER L.L.P.
                           80 W. Madison Street
7                          Suite 4200
                           Chicago, Illinois  60602
8                          (312) 583-2300

9                          Mr. Michael J. Malecek
                           Mr. Peter E. Root
10                         Ms. Marisa Armanino Williams
                           KAYE SCHOLER L.L.P.
11                         3000 El Camino Real
                           2 Palo Alto Square
12                         Suite 400
                           Palo Alto, California  94306
13                         (650) 319-4500

14
     FOR SAMSUNG ELECTRONICS CO., LTD., AND SAMSUNG ELECTRONICS
15   AMERICA, INC.:

16                         Mr. Michael J. Barta
                           BAKER BOTTS L.L.P.
17                         The Warner
                           1299 Pennsylvania Avenue
18                         Washington, D.C.  20004
                           (202) 639-7700
19
                           Mr. Neil P. Sirota
20                         Mr. Robert L. Maier
                           Mr. Brian Boerman
21                         Mr. Joshua Sibble
                           BAKER BOTTS L.L.P.
22                         30 Rockefeller Plaza
                           New York, New York  10112
23                         (212) 408-2500

24

25
```

```
1    COURT REPORTER:              SHELLY HOLMES,CSR, TCRR
                                  Official Court Reporter
2                                 United States District Court
                                  Eastern District of Texas
3                                 Marshall Division
                                  100 E. Houston, Suite 125
4                                 Marshall, Texas  75670
                                  (903) 923-7464
5
     (Proceedings recorded by mechanical stenography, transcript
6    produced on CAT system.)
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              (Jury out.)
3              COURT SECURITY OFFICER:  All rise.
4              THE COURT:  Be seated, please.
5              All right.  Is the Plaintiff prepared to read into
6    the record those items from the list of pre-admitted
7    exhibits used during yesterday's portion of the trial?
8              MS. ENGELMANN:  Yes, Your Honor.
9              THE COURT:  Please proceed to do so,
10   Ms. Engelmann.
11             MS. ENGELMANN:  The list of pre-admitted exhibits
12   used for trial yesterday are PX-79-C -- Your Honor, the
13   parties have agreed to use the C designation behind the
14   exhibit number for those that have to be sealed, if that's
15   okay with you.
16             THE COURT:  So noted.
17             MS. ENGELMANN:  Okay.  PX-80-C, 81-C, 82-C, 83-C,
18   84-C, 85-C, 86-C, 87-C, 181-C, 503.09, 503.15, 503.21,
19   503.22, 503.33, 518, 548, 576, 710, 738, 739, 747, 884.01,
20   DX-302, DX-1131, DX-1349, DX-2009, and DX-2031.
21             THE COURT:  Are there objections to that rendition
22   by the Defendants?
23             MS. WILLIAMS:  Your Honor, there are three
24   exhibits on that list that we would also designate with a C.
25             THE COURT:  Do you have any objections to what
```

 1  they've read into the record?

 2          MS. WILLIAMS:  No, Your Honor.

 3          THE COURT:  All right.  Do you have additional

 4  documents, from your perspective as Defendants, to read into

 5  the record?

 6          MS. WILLIAMS:  Yes, Your Honor.

 7          THE COURT:  Okay.

 8          MS. WILLIAMS:  PX-503.11, PX-503.33, DX-273,

 9  DX-690, DX-1120, DX-1131, DX-2065, DX-2075, DX-2086,

10  DX-2138, DX-2210, DX-2232, DX-2233, DX-2253.

11          THE COURT:  All right.  Are there objections to

12  Defendants' rendition from the list of pre-admitted exhibits

13  used during yesterday's portion of the trial that the

14  Plaintiff would like to lodge?

15          MS. ENGELMANN:  No, Your Honor.

16          THE COURT:  All right.

17          MS. WILLIAMS:  And, excuse me, Your Honor.  Just

18  to be clear, the three exhibits that require a confidential

19  designation from Plaintiff -- Plaintiff's list are PX-518,

20  PX-738, and PX-739.

21          THE COURT:  Okay.  Thank you.

22          All right.  Counsel, it appears that overnight a

23  dispute developed about a deposition designation for Robert

24  Kahn.  I assume this would be for use on Monday.

25          And I've reviewed the disputed section of the

1   deposition designation.  That portion in dispute, beginning

2   on Line 6 of Page 128 and extending through Line 2 of Page

3   129 is permitted, and the objection is overruled.

4          The second designation in dispute, beginning at

5   Line 12 on Page 130 and extending through Line 18, likewise,

6   the objection is overruled, and both of those are

7   acceptable.

8          All right.  We left off yesterday with Tim Dozois.

9   He's been -- we've completed his testimony, correct?  Is the

10   Plaintiff ready to proceed with its next witness?

11          MR. BAXTER:  We are, Your Honor.

12          THE COURT:  All right.  Is there anything from

13   either side that the Court needs to take up before we bring

14   the jury in that I've overlooked?  Anybody aware of

15   anything?

16          I take it by your silence that there's not.

17          Mr. Floyd, bring in the jury.

18          Mr. Unikel, do you have a list for me of witnesses

19   that will be crossed by both Samsung and Google, as opposed

20   to one counsel?

21          MR. UNIKEL:  Yes, Your Honor.

22          THE COURT:  Let's do that quickly before the jury

23   gets in.

24          MR. UNIKEL:  Dr. Teece, Dr. Danaher -- no.  Just

25   Dr. Teece today.

```
 1              THE COURT:  All right.  Thank you.
 2              MR. UNIKEL:  Thank you.
 3              THE COURT:  Oh, it is 8:25.  I told the jury 8:30.
 4    We're a little early.  They won't believe it.
 5              Why don't you all have a seat.  It may be that
 6    it's going to take the CSO a minute to get them in here.
 7              (Pause in proceedings.)
 8              COURT SECURITY OFFICER:  All rise.
 9              (Jury in.)
10              THE COURT:  Good morning, ladies and gentlemen.
11    Please have a seat.
12              Plaintiff, call your next witness.
13              MS. TRUELOVE:  Your Honor, Plaintiff calls
14    Dr. Brett Danaher.
15              THE COURT:  All right.  Dr. Danaher, if you'll
16    come forward and be sworn, please.
17              (Witness sworn.)
18              THE COURT:  Please come around and have a seat
19    here at the witness stand.
20              Ms. Truelove, you may proceed.
21              MS. TRUELOVE:  Thank you, Your Honor.
22        BRETT DANAHER, Ph.D., PLAINTIFF'S WITNESS, SWORN
23                      DIRECT EXAMINATION
24    BY MS. TRUELOVE:
25    Q.   Good morning.
```

1   A.   Good morning.

2   Q.   Would you please introduce yourself to the jury.

3   A.   Hi.  My name is Brett Danaher.

4   Q.   And, Dr. Danaher, why are you here today?

5   A.   I was asked by ContentGuard to determine what would

6   happen to sales of digital videos and books if a resale

7   market were to exist for those goods, and I was also asked

8   to determine what would happen to Google's profits if they

9   could no longer rent digital movies.

10  Q.   And what did you conclude?

11  A.   I concluded that if a resale market were to emerge for

12  digital books and videos, that unit sales of those goods

13  would fall by 58 percent.  That would lead Google to lose

14  profits of 11 cents per digital video transaction.

15       And I also determined that if the digital video rental

16  market for Google were to go away, that they would lose 22

17  cents per digital video transaction.

18  Q.   Okay.  We'll -- we'll talk in detail about your

19  conclusions in a moment, but let's start off by just giving

20  the jury an idea of a little bit about you and your

21  background.

22       Where are you currently living?

23  A.   Los Angeles.

24  Q.   How long have you been out in LA?

25  A.   Since January.

```
 1    Q.    And what do you do out there?

 2    A.    I'm a visiting professor at Carnegie Mellon University.

 3    Q.    Professor of what?

 4    A.    Economics.

 5    Q.    And where are you visiting from?

 6    A.    Wellesley College in Boston.

 7    Q.    So that's a little bit of a change.  How are you

 8    adapting?

 9    A.    It's about 40 degrees warmer, and -- and I live on the

10    beach.  It's an easy change.

11    Q.    Okay.  So what -- what else are you doing out there?

12    Do you have any other type of professional engagement

13    besides teaching?

14    A.    Yeah.  I had the opportunity to work with a bunch of

15    the -- the big, you know, media firms out in Hollywood.  I

16    actually have a desk at the Motion Picture Association.  The

17    guys that -- those guys that put ratings on movies that you

18    see PG, PG-13, they also do a lot of research in how to

19    optimize distribution of content, and I -- I get to go in

20    and play with their data and, you know, figure things out.

21    Q.    Is it fair to say that's kind of your dream -- your

22    dream job?

23    A.    It's definitely a dream job for a researcher like me.

24    I'd do it for free, but don't tell Carnegie Mellon.

25    Q.    Okay.  How long have you been teaching, Doctor?
```

 1   A.   Almost 10 years.  I started at the University of

 2   Pennsylvania teaching as a graduate student.  And in 2009, I

 3   moved to Wellesley College.  I've been teaching economics

 4   there since.

 5              MS. TRUELOVE:  Mr. Diaz, can we see Slide 3,

 6   please?

 7   Q.   (By Ms. Truelove) This is just a summary of a little

 8   bit of your professional and educational experience.  Could

 9   you run through that with the jury, please?

10   A.   Yeah.  Sure.

11       I received my Ph.D. in applied economics from the

12   University of Pennsylvania.  I'm currently a professor at

13   Carnegie Mellon University, as well as Wellesley College.  I

14   specialize in the economics of digital media distribution.

15       I've published in four different leading peer-reviewed

16   economics and business journals.  I've written volumes for

17   the National Bureau of Economic Research, and I've consulted

18   for a bunch of major media firms you -- you might have heard

19   of:  The BBC Television, the Motion Picture Association, EMI

20   Music, and some major Hollywood music studios like Disney.

21   Q.   So you mentioned that you specialize in the economics

22   of digital media distribution.  What is that?

23   A.   Easiest way to explain this kind of -- maybe by an

24   example.  Say, take movies.  It wasn't that long ago that

25   you could only buy movies physically, you know, DVDs, VHS,

1    and then the Internet comes along, and all these new ways to

2    acquire videos online pop up, like the iTunes Store, the

3    Google Play Store.

4        So in that instance, I'm -- I'm the guy who will come

5    in and try to figure out what these new stores online mean

6    for the industry and how firms should respond to that.

7    Q.   So let's focus on your work in this case.  Tell the

8    jury, again, what it is you were asked to do by

9    ContentGuard.

10   A.   Yeah.  I was asked to determine what would happen to

11   sales of digital books and videos if a resale market were to

12   emerge for those goods, and I was asked to determine what

13   would happen to Google's profits if they could no longer

14   rent digital movies.

15   Q.   Okay.  Talking about that first assignment on the

16   resale market, how does that apply to this case?

17   A.   Yeah.  Well, today if you buy a digital book or video,

18   it's yours, but you can't later go and resell it to someone

19   else when you get tired of it.

20       So if you bought, you know, a digital copy of Avengers

21   from the Google Play Store, there's no online marketplace or

22   storefront where you can go and resell it to someone else.

23       But if you could resell some of your digital movies or

24   books, probably at least some of them you might do that to

25   get some cash back for them.  That place, that marketplace

1   or storefront online where you would do that is what we

2   would call the resale market.

3          THE COURT:  Dr. Danaher, try to slow the volume of

4   your speech down some, if you can.

5          THE WITNESS:  Yes, Your Honor.

6          THE COURT:  Thank you.

7          Go ahead, Ms. Truelove.

8          MS. TRUELOVE:  Thank you, Your Honor.

9   Q.   (By Ms. Truelove) So is that the same as my dad,

10  growing up, would fill up a paper sack, a paper Tom Thumb

11  sack with all of his science fiction paper -- paperback

12  books and take them to a store and resell them and come home

13  with different paperback books?

14  A.   Yeah, kind of like that, except it's files zipping

15  around online.

16  Q.   Well, what happens to Google in that scenario if I am

17  able to take my digital copy of Avengers and turn around and

18  sell it online or some other type of resale market?

19  A.   Yeah.  Well, you know, by example, if you were to take

20  that copy and you were to resell it to me, I've now

21  purchased that copy of Avengers from you, rather than

22  purchasing it from Google.  So that's potentially a lost

23  sale for Google.

24          Those new sales -- those new copies that Google sells

25  are called the primary market sales, and I was asked to

14

```
 1   determine what would happen to Google's primary market sales
 2   if the resale market were to exist.
 3   Q.   And just to be clear, is there a resale market for
 4   digital video and books, as we sit here today?
 5   A.   No.
 6   Q.   Okay.  So if there were a resale market, what did you
 7   conclude would happen to Google's primary market sales?
 8   A.   I concluded that primary market unit sales would
 9   decrease by 58 percent.
10   Q.   And how did you go about figuring that out?
11   A.   Well, like we said, the -- the resale market doesn't
12   exist today, so I had to go out and find a benchmark to
13   project what would happen if the resale market were to
14   exist.
15   Q.   And what benchmark did you use?
16   A.   The best available one is from a professor -- a study
17   by Professor Benjamin Shiller who studies the video game
18   industry.
19   Q.   Why did you choose Professor Shiller's study?
20   A.   Well, in the video game industry, resale does exist.
21   So, I guess, a lot of us here probably know that, you know,
22   you can go to the store, you can buy a new video game, take
23   it home, you play it or maybe it's your kids playing it, and
24   when you get bored of it, you can take it back to the store
25   and resell it.
```

1    Professor Shiller had data on both the new copy sales

2    or the primary market sales, as well as the used sales or

3    resale market sales of video games and he was able to use

4    that with his model to project what would happen if the

5    resale market were eliminated for video games.

6    Q.   Okay.  So what -- what led you to believe that a study

7    on video games would -- would -- could be used to determine

8    what would happen if a resale market emerged with digital

9    video and books?

10   A.   Yeah.  Well, I get that they're definitely different

11   goods, at least in the sense that a video game is a

12   cartridge or a disk that you put into a console and then

13   play a game, and a digital movie is a file you download and

14   then watch a movie, but when economists are trying to

15   determine the effect that resale will have on the primary

16   market, there's certain fundamental economic properties of

17   the goods that the economist will look at.  And it turns out

18   that video games share all of these core economic principles

19   with digital books and movies.

20        MS. TRUELOVE:  Could we see Slide 4, please,

21   Mr. Diaz?

22   Q.   (By Ms. Truelove) So what are those fundamental

23   properties that you mentioned?

24   A.   There's -- there's three of them.

25        The first is that all of the goods that we're talking

1    about are durable goods.  Durable goods means that they're

2    goods that don't wear out with use.

3         So a digital copy of <u>The Hunger Games</u> book doesn't get

4    dog-eared or stained as you read it when you -- or even a

5    digital movie.  But after you've watched it, it's in the

6    same condition as when you started, much like video games

7    when you play them.

8         The second property -- and this one is a really

9    important one -- is that people tire of these goods after

10   using them.  So people don't generally -- but a few

11   exceptions.  But people don't generally read the same book

12   over and over again.

13        After people have watched a movie, their value of

14   owning it is usually less after having watched it.  That's

15   also true with video games that people get bored of.

16        And finally, different people have different values for

17   the goods in question.  So just by example, you know, I may

18   have really heavily valued The Avengers movie and be willing

19   to pay full price for it.  You may also want to watch it,

20   but you might require a discount to be willing to buy it.

21   Q.   Okay.

22        MS. TRUELOVE:  Can we see Slide 5, please?

23   Q.   (By Ms. Truelove) What are you showing here in Slide 5?

24   A.   What I'm showing here is sort of the -- the -- the

25   exercise that I've undertaken.  In -- on the left, you can

```
 1    see Professor Shiller's world where he's studying video

 2    games, and in that market, resale existed.

 3         What he projected was that if resale were to go away,

 4    unit sales would increase by 140 percent.  I took that and

 5    did a little math and found the flip side of that, which is

 6    in my world, digital content, resale doesn't exist.

 7         But if resale were to emerge, that that -- the

 8    equivalent of that increase, that there'd be a 58-percent

 9    decrease in unit sales if resale emerged.

10    Q.   Can you -- can you walk the jury through that -- that

11    process and -- and explain in a little bit more detail so

12    they have a better understanding of -- of how you were able

13    to flip 140 increase to a 58 decrease?

14    A.   Sure.  I have a slide for that.

15    Q.   Okay.

16    A.   Yeah.

17         So these aren't the exact numbers in Shiller's paper,

18    but they're kind of -- consider these hypothetical numbers

19    just for a demonstration.

20         So imagine that Shiller's work -- I mean, Shiller's

21    looking at the world for video games where resale exists and

22    imagine that he saw in the primary market that there were a

23    hundred games sold.

24         All right.  Shiller's estimates and projections say

25    that if resale were eliminated, we'd get an increase of
```

140 percent in units sold.  So if we could advance that
slide, you can see here that increase of 140 leads to a
market of 240 video games being sold in the primary market
if resale were eliminated.

So I'm on the -- I'm -- I'm in this other world of
digital content.  So I'm starting where resale does not
exist, and in that world, we still -- so we're starting with
that market of 240 units being sold.

But if resale were to emerge, then we'd lose that 140
that we had gotten, all right, and we'd end up with a market
of back down to 100.  That decrease of 140 is a 58-percent
decrease because 140 is just about 58 percent of 240.

Q.  So is it your opinion that a 58-percent reduction in
sales is the best available estimate?

A.  Yes.

Q.  What did you conclude regarding the impact of the
emergence of a resale market would have on Google's profits?

A.  I concluded that the 58-percent reduction in unit sales
would lead to a reduction, 11 cents per digital video
transaction in profits for Google.

Q.  And how did you figure that?  How did you get to that
11 cents?

A.  I determined the profit loss that would occur if 58 --
if sales units were reduced by 58 percent, and I divided
that total profit lost by the number of digital video

1    transactions taking place to reach 11 cents per digital

2    video transaction.

3    Q.   Okay.  Let's -- let's talk about your second assignment

4    in this case.  What did you conclude regarding the impact of

5    taking away video rentals would have on Google?

6    A.   I concluded that if the digital -- the digital movies

7    were no longer able to be rented at the Google Play Store,

8    it turns out that that was sort of easier to figure out.

9         I looked over the period of time in question and

10   determined that Google had made about $21.9 million from

11   renting digital movies.  I determined that if they couldn't

12   rent digital movies, those profits would go away.

13             MR. MALECEK:  Your Honor?

14             THE COURT:  Yes.

15             MR. MALECEK:  May I approach?

16             THE COURT:  I'm sorry?

17             MR. MALECEK:  May I approach?

18             THE COURT:  Counsel, approach the bench.

19             (Bench conference.)

20             MR. MALECEK:  I apologize for interrupting.  The

21   goal was that we wouldn't have to seal the courtroom because

22   we weren't going to talk about any specific Google revenue

23   numbers.

24             His numbers are full of so much math that they

25   don't relate directly to those numbers, but now he's just

```
 1   said in open court the total revenue numbers, so --

 2            THE COURT:  Are you asking me to seal the

 3   courtroom?

 4            MR. MALECEK:  I guess that's what we should do.

 5            MR. BRIODY:  Your Honor, there was no intention

 6   for that to come out, frankly.  It was -- it was supposed to

 7   be profit numbers --

 8            THE COURT:  Are we talking about a MIL violation

 9   as well?

10            MR. BRIODY:  No, Your Honor.

11            MR. MALECEK:  It's not a MIL violation.

12            THE COURT:  Okay.

13            MR. MALECEK:  It's just a -- it's just a sealing

14   issue, a sensitivity to this business information.  I don't

15   know how we can put that genie back in the bottle.

16            THE COURT:  Usually the best way is to ignore the

17   fact that the genie is out of the bottle --

18            MR. MALECEK:  Uh-huh.

19            THE COURT:  -- not put everybody's focus on it.

20            MR. MALECEK:  Uh-huh.

21            THE COURT:  But, I mean, that's your call.

22            MR. MALECEK:  Uh-huh.

23            THE COURT:  I don't have a problem sealing the

24   courtroom.

25            MR. BRIODY:  Nor do we, Your Honor.  Nor do we
```

```
1   have a problem with that --

2           MS. TRUELOVE:  And my concern -- I'm sorry.  My

3   concern is I think that our conclusion slide, that number is

4   on there.

5           I think the 21.9 is on that conclusion part, which

6   I don't have to put up there, but if you're fine with

7   saying -- with me allowing him to say that he relied on

8   Google internal documents and you let me read those into the

9   record, I won't put the slide up there, and we won't say the

10  number again.

11          THE COURT:  Well, if we seal the courtroom it

12  won't matter, will it?

13          MS. TRUELOVE:  No, but I'm just saying I don't

14  have to have the slide up there.  He can say what his

15  conclusions are, and I can just ask him specifically what

16  the loss in transaction was without putting up that --

17          THE COURT:  If you need a minute to talk, talk.

18  Otherwise, we've got to get the show on the road.

19          MS. TRUELOVE:  Right.  Exactly.  You want me to do

20  that?

21          MR. MALECEK:  Yeah.

22          (Bench conference concluded.)

23          THE COURT:  All right.  At the request of defense

24  counsel, I'm going to order the courtroom sealed at this

25  time.  If you're present and not subject to the existing
```

```
 1    protective order in this case, you should excuse yourselves
 2    from the courtroom and remain outside until the courtroom is
 3    unsealed.
 4              (Courtroom sealed, in a separate volume, Page 5,
 5              Line 3 through Page 30, Line 4.)
 6              (Courtroom unsealed.)
 7              THE COURT:  Mr. Floyd, inform the public they're
 8    welcome to return.
 9              Now, Plaintiff, who's your next witness?
10              MS. ENGELMANN:  Your Honor, Plaintiff,
11    ContentGuard, calls Thomas Turvey, Google director of
12    strategic partnerships by deposition.
13              THE COURT:  All right.  And I assume the method of
14    presentation is going to be as in the past.
15              MS. ENGELMANN:  Yes, Your Honor.  And I'll be
16    brief.
17              THE COURT:  All right.
18              MS. ENGELMANN:  Your Honor, should we get started,
19    or do we wait?
20              THE COURT:  Just take a moment.
21              MS. ENGELMANN:  Okay.
22              THE COURT:  It's at counsel's request the public
23    is having to come in and find their seats.  We can at least
24    wait until they get seated.
25              (Pause in proceedings.)
```

1          THE COURT:  All right.  Proceed, Ms. Engelmann.

2          MS. ENGELMANN:  Okay.

3          (Deposition of Tom Turvey read.)

4          QUESTION:  All right.  Would you please introduce

5  yourself for the record, sir?

6          ANSWER:  Sure.  My name is Tom Turvey.

7          QUESTION:  And am I right that you are employed by

8  Google presently, sir?

9          ANSWER:  I am.

10          QUESTION:  Okay.  And there are major -- are there

11  major publishers that you would consider personally to be a

12  major publisher in the States?

13          ANSWER:  Yes.

14          In the United States, there are somewhere between,

15  depending on how you define it, 25 and 30 major publishers

16  across all the verticals.

17          QUESTION:  Does Google have agreements with all of

18  these publishers?

19          ANSWER:  Yes.

20          QUESTION:  And do those agreements require the use

21  of DRM?

22          ANSWER:  DRM is contemplated in all of those

23  agreements that I am familiar with, and there is a

24  requirement that we provide it as an option to the

25  publishers.

```
 1              QUESTION:  Do you have an understanding as to what
 2   the concerns are that result in DRM being required to be
 3   included in those contracts?
 4              ANSWER:  I think publishers have a generalized
 5   concern around privacy (sic) and they want some DRM
 6   provisions typically in the agreements that they can use.
 7              QUESTION:  Did you say that the concern is about
 8   piracy?
 9              ANSWER:  Yes.
10              (End of Deposition of Tom Turvey.)
11              MS. ENGELMANN:  No further questions, Your Honor.
12              THE COURT:  All right.  This presentation includes
13   both Plaintiff's designations and Defendants'
14   counter-designations, correct?
15              MS. ENGELMANN:  Yes, Your Honor.
16              THE COURT:  All right.  Do you have other
17   witnesses by deposition?
18              MS. ENGELMANN:  No, Your Honor.
19              THE COURT:  All right.  You may step down.
20              MR. DEHONEY:  Thank you, Your Honor.
21              THE COURT:  Plaintiff, call your next witness.
22              MR. COTE:  Plaintiff calls Professor David Teece.
23              THE COURT:  If you'll come forward and be sworn.
24              (Witness sworn.)
25              THE COURT:  Please come around and have a seat.
```

```
 1          DAVID TEECE, Ph.D., PLAINTIFF'S WITNESS, SWORN
 2                       DIRECT EXAMINATION
 3  BY MR. COTE:
 4  Q.    Good morning, Professor Teece.
 5  A.    Good morning.
 6  Q.    Please introduce yourself to the jury.
 7  A.    Sure.  My name is David John Teece.  I'm a professor at
 8  the University of California Berkeley.
 9  Q.    Can you provide the jury with some of your background?
10  And I'll pull up a slide for that.
11  A.    Sure.
12        I have my Ph.D. from the University of Pennsylvania.
13  As I said, I'm a professor at Cal Berkeley.  I'm a chaired
14  professor.  I have testified before Congress, the Department
15  of Justice, the Federal Trade Commission.
16        And I'm proud to say that on the research side, I'm one
17  of the ten most cited scholars globally in economics and
18  business.
19        In fact, we have a way of tracking that these days, and
20  one way to do it is through Google Scholar, and I have
21  80,000 plus cites, which means that there are 80,000 other
22  scholars who have referenced my work in their own scientific
23  papers.  And I've published over 200 papers and books over
24  my career.
25  Q.    Have you prepared a slide to show the jury some of
```

1   those books that you've written?

2   A.   I have.

3   Q.   Let's take a look at that.

4       Please describe for the jury what these books are all

5   about.

6   A.   What's core to my research is the -- the economics of

7   innovation.  I'm an innovation scholar.  I got into the

8   field before it was popular, way back 30 years ago.

9       So you'll see from those titles, a lot of them relate

10  to technology, innovation, competitiveness, the role of

11  intellectual property, and on the bottom right there, the

12  role of licensing, because technology licensing and patent

13  licensing is a key part of the innovation system here in the

14  United States and around the world.

15  Q.   Can you describe for the jury some of your more recent

16  activities?

17  A.   Yes.  Recently, I've established a new center at the

18  University of California Berkeley that focuses on the role

19  of what I call intellectual capital in the economy because I

20  think it's a neglected topic.

21      Most of the textbooks are written talking about

22  physical products and tangible products, but as we're seeing

23  here in this courtroom, intangible assets, intellectual

24  property are of increasing importance, and that's what this

25  is focused on.

```
 1   Q.   So what role do inventors play in this process of
 2   innovation that you've described?
 3   A.   Yeah.
 4        Inventors come in the early phase of the innovation
 5   process.  Inventors are the creative people that come up
 6   with great new concepts, the breakthrough technologies,
 7   which therein typically other people and often other
 8   companies bring to market.
 9   Q.   Do you distinguish -- or how do you distinguish between
10   invention and innovation?
11   A.   Yes.
12        The invention doesn't necessarily involve significant
13   commercial activity; it's getting the breakthrough ideas,
14   the breakthrough concepts.  And then other companies and
15   entrepreneurs take those concepts and bring them through to
16   market.
17        Sometimes it's one and the same, but in our system in
18   the United States, invention is often done by different
19   groups of people working in research labs, such as Xerox
20   PARC.
21   Q.   Is one less valuable than the other?
22   A.   No.  They're both critical, and they both compliment
23   each other.  And in our economy, we need both.  The -- the
24   invention provides the seed corn, basically, and the others
25   harvest the corn.  That's -- that's the commercialization
```

1    function.

2    Q.    So in -- in your research over the past 30 years,

3    how -- how important has this process of invention and

4    innovation been to the American economy?

5    A.    There's just no doubt that it's the foundation of our

6    wealth and what distinguishes us from other countries.

7    We're really good at it as a nation, and we remain good at

8    it so long as we continue to have a viable system to

9    continue to invest in the early stage activity which allows

10   commercialization and subsequent development.

11   Q.    Please tell the jury why you're here today, Dr. Teece.

12   A.    I'm here because I've been asked to compute the

13   reasonable royalty damages that would be owed by the

14   Defendants, assuming a finding of validity and infringement.

15   Q.    And how did you go about doing that in this matter?

16   A.    There's a well-described and defined framework known as

17   the Georgia-Pacific framework, which is actually required

18   and mandated by the legal system as the organizing framework

19   for thinking about and calculating reasonable royalty

20   damages.

21   Q.    Do you have a slide that would help the jury get a

22   sense of the approach?

23   A.    I do.

24          MR. COTE:  Let's take a look at the next slide.

25   Q.    (By Mr. Cote) Please describe to the jury the approach.

```
 1   A.   The approach -- the nub of the approach is to set up
 2   what's called a hypothetical negotiation.  We have a
 3   difficult problem here because we're trying to figure out
 4   what would have been paid for the technology, what would
 5   have been the terms of a licensing agreement had one been
 6   entered to.
 7        One wasn't entered into, so we have to go back and
 8   simulate, if you will, what would have happened, and that's
 9   called a hypothetical negotiation.
10        So we have to go back and imagine, had the parties sat
11   down in 2010, in the fourth quarter of 2010 and negotiated
12   through to agreement -- not just sat and talked, but
13   negotiated through to agreement under the assumption that
14   both parties were willing and under the assumption that the
15   patents were valid and infringed, what would have been the
16   outcome of that negotiation.
17        That is sort of the nub of the Georgia-Pacific
18   framework because there's a lot of factors that spill into
19   that.
20   Q.   Now, you mention the fourth quarter -- quarter of 2010.
21   Why -- why did you pick the fourth quarter of 2010 to have
22   this, quote, hypothetical negotiation?
23   A.   Because the -- the -- the legal framework requires that
24   the negotiation take place at or about the time of first
25   infringement.
```

1    So that's approximately when the Defendants are alleged

2    to have infringed, and so that's when we have to go through

3    the simulation exercise that I call, and that is known as

4    the hypothetical negotiation.

5    Q.   Tell us why -- what the difference is between this,

6    quote, hypothetical negotiation for determining damages for

7    infringement -- what the differences are between that

8    process of determining damages and the process that would

9    happen in the real world if the parties were to sit down

10   outside of litigation and negotiate an amicable royalty

11   rate.

12   A.   Yes.   This is a -- in the hypothetical negotiation,

13   it's a very crisp process.   The parties kind of know each

14   other's business, and they're also willing -- they -- they

15   know they can't walk away from this.   And they also assume

16   that the patents are valid and infringed.

17        So -- so it's a crisp negotiation, a well-informed

18   negotiation that takes into account the specific context.

19        The reason why we have this hypothetical negotiation,

20   there's no lookup number I can go to to figure out what the

21   per-device royalty is.   There's no lookup number I can find

22   in the "Wall Street Journal" or anywhere.   I have to

23   actually figure out, taking into account all facts and

24   circumstances, what the parties would have arrived at.

25   Q.   Do you have a slide that would take the jury through

1  the key steps in this Georgia-Pacific analysis, sir?

2  A.   I do.

3       MR. COTE:  Let's take a look at the next slide.

4  Q.   (By Mr. Cote) Is this the slide?

5  A.   It is.

6  Q.   Can you let -- actually, let's take these one by one.

7       Let's start with the first element, which is:  Analyze

8  the circumstances and use of the patented technology by

9  Samsung and Google.

10      Can you tell the jury what that is, what that means?

11 A.   Yes.

12      We've got to set the table for the negotiation.  What

13 is the industry context?  What's going on here?  What --

14 what have the parties got in mind when they sit down?

15      So we have to understand the industry context and the

16 circumstances surrounding the negotiation, and that's what I

17 do in this first bullet.

18 Q.   Do you have a slide describing your findings on this

19 particular factor?

20 A.   I do.

21      MR. COTE:  Let's take a look at the next slide.

22 Q.   (By Mr. Cote) Is this the slide, sir?

23 A.   Yes.

24 Q.   Please explain to the jury what you're attempting to

25 convey here.

```
 1    A.    I'm an economist, and so I'm not an engineer or

 2    mechanical expert.  So I'm looking at this from a business

 3    point of view.  What ContentGuard's trusted systems support

 4    is creating usage rights for video from online stores,

 5    distributing them, and then enabling the consumer, on

 6    devices, to view them.  So it's creating, distributing,

 7    displaying.

 8         The Stefik patents and the other patents enable these

 9    three economic activities to take place in a highly

10    articulated and beneficial way that is being described

11    elsewhere.

12    Q.    How did you learn about the patented technology in this

13    case?

14    A.    There -- there's a number of sources.  I've had access

15    to Drs. Martin and Goodrich and their reports.  They are the

16    technical experts.  And I've learned to -- a lot from them.

17    There's also general literature out there that I've looked

18    at.

19         And also, of course, I've had the chance to understand

20    what Dr. Stefik has done and heard his testimony here in

21    court.  But I've looked at all the -- the relevant facts and

22    circumstances in this case, what's in the academic

23    literature, what's in the trade press to pull together

24    the -- the best understanding I can of the facts and

25    circumstances that would surround that negotiation had it
```

```
 1   actually taken place.
 2   Q.    Do you have an example of something you reviewed, a
 3   report that you felt best illustrates the significance of
 4   the invention in your mind?
 5   A.    Well, there -- there's one document, which is pertinent
 6   from the -- the PTO, the patent -- the Patent Office.
 7   Q.    Is this the document you're referring to, Plaintiff's
 8   Exhibit 129?
 9   A.    Yes.  I found this a significant summary document,
10   because here, we have the Patent Office, which is an arm of
11   the United States Government, informing Congress about
12   trusted computing.
13        And here -- and it's highlighted -- the trusted
14   computing technologies trace back to Dr. Mark Stefik's
15   pioneering work at Xerox PARC.  So the fact that it was
16   flagged by the Patent Office as it being pioneering, to me,
17   means a lot.
18   Q.    And what do you understand Dr. Stefik's trusted
19   computing or trusted system technology to -- to -- to bring
20   to the marketplace?
21   A.    Well, it -- it really brings control of -- of content.
22   Remember, the context that we had was significant piracy and
23   the inability of the content owners to come up with a viable
24   business model so they could actually sell stuff on the
25   Internet.
```

```
 1        The Internet was their enemy.  What trusted computing
 2   did was turn it into their friend.  And that -- that was a
 3   significant business development.
 4   Q.   What does it mean to develop fundamental technology, in
 5   your experience?
 6   A.   Yeah.  There's technology, and then there's enabling or
 7   fundamental technology.  Fundamental technology or enabling
 8   technology is what everybody else builds on.
 9        So what Stefik came up with is what I call fundamental
10   technology.  It's -- when you hear the word "pioneering,"
11   that usually means fundamental, and it means enabling.
12        It's like the foundation for a house.  Other people can
13   then go build whatever they want on those foundations, but
14   someone has to lay the foundation.  Someone has to do the
15   breakthroughs that are necessary for other people to
16   innovate.
17        So it doesn't mean they're displacing other innovation,
18   but they do the foundational work and that involves, you
19   know, really long-term commitment to -- to big issues.
20   Q.   Have you been to Xerox PARC, sir?
21   A.   Oh, absolutely, yes.
22   Q.   Can you describe for the jury your experiences with
23   Xerox PARC?
24   A.   Yeah.  I -- I was fortunate because I live in Berkeley,
25   California, and at the time I was at Stanford.  I -- I went
```

```
 1    to Xerox PARC.  I was invited there to give -- to give

 2    talks.

 3          And -- and -- and I got to understand their commitment

 4    to making the investments that were necessary to unlock the

 5    potential of what turned out to the personal computer

 6    industry and -- and the Internet.

 7          There -- there's so much that we owe to the researchers

 8    at -- at Xerox PARC.  Just like we owe the -- the

 9    researchers at AT&T Bell Labs for the transistor, Xerox

10    really was fundamental to many of the great things that we

11    enjoy today.

12    Q.   What role does a -- does a laboratory or research

13    facility like Xerox PARC play in this invention/innovation

14    process you -- you described previously?

15    A.   Yeah.

16          It's early stage long-run research.  They're not

17    thinking about, you know, the day after tomorrow.

18    They're -- they're thinking decades ahead.  They -- they

19    were there because Xerox saw the future on the computer

20    industry long before anybody else.

21          They didn't necessarily capitalize on it themselves,

22    but they funded the research, as people like Dr. Stefik and

23    others, to do the hard thinking and -- and help the rest of

24    the world, not just the United States, figure out how to

25    build personal computers and how to make the Internet work.
```

```
 1    Q.    Do the technologies at issue have business relevance --
 2    technologies in this case?
 3    A.    Absolutely.  They were apparent at the time, manifested
 4    broadly much later.
 5    Q.    Do you have a slide describing the influence that
 6    they've had, the trusted system technologies?
 7    A.    I do.
 8              MR. COTE:  Let's take a look at the next slide.
 9    Q.    (By Mr. Cote) Can you describe this to the jury,
10    please.
11    A.    Yes.
12          At the end of the day, the technological innovation
13    enabled business innovation, and the Google Play DRM, which
14    is, in my view, from what I understand from the technical
15    experts, underpinned by the patents-in-suit, enables two key
16    things, which I have in the right box.
17          A strong protection.  So it's -- the fact that the
18    content owners who have confidence that their -- their work
19    isn't going to be pirated, to put it in a nutshell.
20          But equally important is what I call precise control
21    that enables flexible content distribution.  So that enables
22    them to run rental markets.  That enables them to do a fully
23    articulated commercial structure that will make it a
24    sensible proposition for them to -- to use the Internet for
25    distribution.
```

1    Q.    Have you investigated or looked at the importance of

2    DRM to Google and Samsung's specific businesses?

3    A.    I have.

4    Q.    And what have you concluded?

5    A.    I've concluded that Google and Samsung both benefited

6    enormously from DRM.  It was, you know, at the end of the

7    day, a key part of the -- what I call the ecosystem that

8    enables them to be as good as they are today.

9    Q.    Do you have a slide that illustrates this importance,

10   sir?

11   A.    I do.

12        MR. COTE:  Let's take a look at the next slide.

13   Q.    (By Mr. Cote) Please describe this slide to the jury.

14   A.    Yes.

15        First of all, the title's important.  The Android

16   ecosystem that these things are all interdependent.  When I

17   say "these things," I mean content.  Let's begin at -- at

18   content.

19        Content generates user value.  In other words, it's

20   something of use to consumers.  It's something of use to

21   device-makers -- excuse me -- to device owners, and that

22   drives device sales.

23        So you have this virtuous circle that increases the

24   value of devices.  If you have the content being available

25   to users, that makes the device available.  Otherwise,

```
1    you've got a smartphone and nothing much to do with it.

2        So the more things that you can make viable on a

3    smartphone, the more value the smartphone brings to the

4    individual consumer.  And this is this ecosystem, of course,

5    where Google is developing and Samsung is participating in

6    and as are many other Android device-makers.

7    Q.    Have you investigated the -- the importance of the

8    Android ecosystem to Google independent of the importance of

9    the ecosystem to Samsung?

10   A.    Yes.

11   Q.    Can you describe for us how the Android ecosystem is

12   important to Google?

13   A.    Well, there's actually some documents I found that say

14   it better than I can say it.

15   Q.    So let's go to the next exhibit.

16            MR. COTE:  Let me clear this.  Actually, for the

17   record, I'd like to read in Plaintiff's Exhibit 876 from the

18   prior slide.

19            Let's go to Plaintiff's Exhibit 6 -- 568 and 637.

20   Q.    (By Mr. Cote) Can you tell us what we see here on this

21   slide?

22   A.    Yeah.

23        What I've highlighted is an internal Google memo which

24   says that Google Play strengthens the overall Android

25   ecosystem by providing consumers a compelling digital
```

```
 1    content offering.

 2        Google Play will -- will drive significantly more

 3    traffic and monetization.  And by monetization, I believe

 4    they mean profit.

 5              MR. COTE:  Let's take a look at the next slide,

 6    which is Plaintiff's Exhibit 583.01.

 7    Q.   (By Mr. Cote) Can you tell us what you're showing here

 8    for the jury.

 9    A.   Yeah.

10        This is an agreement between 20th Century Fox Film,

11    which is a content provider and Google.  This is an

12    agreement which essentially allows the content to be made

13    available to -- to Google.

14    Q.   And what's the significance of this agreement?

15    A.   First of all, under .3, it says:  No licensed program

16    shall be playable without a DRM license generated by

17    licensee using the applicable Security Solution.

18        Put differently is:  We're not giving you content

19    unless we're confident you've got a DR -- DRM system that

20    works to our satisfaction.

21    Q.   Anything else significant in this agreement you'd like

22    to draw to the jury's attention?

23    A.   Yes.

24        Then in Paragraph 11, it says:  Licensee, which is

25    Google, shall not make changes in an authorized application
```

```
 1   or the Widevine Security Solution.  Fox shall have the right
 2   to suspend and/or terminate this agreement immediately upon
 3   written notice.
 4       In other words, don't fiddle with it, which shows to me
 5   their sensitivity.  They really care about having a proper,
 6   functioning, highly articulated digital rights management
 7   system.  Otherwise, you don't get the content.
 8           MR. COTE:  Let's move to the next slide, PX-675.
 9   Q.  (By Mr. Cote) We see another agreement here.  Can you
10   explain to the jury what this agreement is and -- and what
11   significance it's had in your opinion?
12   A.   Yeah.
13       This is an agreement with NBC.  And you'll notice that
14   it says:  Google shall apply the specific security
15   technologies.  It's dictating to Google what's going to be
16   required if -- if NBC's contents is going to be made
17   available.
18       And it goes on to say:  Google shall provide advance
19   written notice to NBCUniversal of any plan of material
20   changes or upgrades that affect or relate to the security or
21   content protection.
22       And then further on it says -- well, it -- it's
23   basically saying that you can't do anything without our
24   permission.  They're very persnickety.
25       Why?  Because the control of their content is important
```

```
1    for them running their business and they're not going to

2    make their content available unless Google complies.

3    Q.   The next slide is Plaintiff's Exhibit 624.  Can you

4    describe for the jury the importance of this document?

5    A.   Is this the same one?

6    Q.   No.  It's a -- a further exhibit, 624.

7    A.   Oh, okay.

8         So now we have Google's director of content

9    partnerships.  This is not an agreement, but it's internal

10   email traffic at Google from a Jonathan Zepp.

11        It says:  My team handles the business and overall

12   contractual arrangements with the studios for licensing

13   content for distribution on Google Play.

14        And then it goes on to say at the bottom:  Our deals

15   don't allow any distribution without approved DRM support,

16   of course.

17        "Of course" means we all know this.

18            MR. COTE:  Next slide, Plaintiff's Exhibit 729.

19   Q.   (By Mr. Cote) What impact did this have on your

20   opinion, sir?

21   A.   Well, this, again, is confirmatory.  In this case, it's

22   not from Google; it's from Samsung, a device-maker.

23        Samsung says:  DRM is a technology that enables content

24   providers to distribute, promote, and sell digital content

25   in a secure way.
```

```
 1        And then I've highlighted below:  DRM creates an

 2   essential foundation of trust between authors and consumers

 3   that is a prerequisite for robust market development.

 4        Couldn't be a clearer statement that we need DRM in

 5   order for the market to evolve, develop, and grow in the

 6   fashion that we want it to.

 7   Q.   Do you have a slide that summarizes your opinions on

 8   the importance of DRM to both Google and Samsung?

 9   A.   I do.

10             MR. COTE:  Let's take a look at the next slide,

11   please.

12   Q.   (By Mr. Cote) Review this summary with the jury.

13   A.   Yeah.

14        The title is Business Model Conclusions.  I -- I

15   have -- a lot of my scholarship is on business models and

16   their importance to the proper functioning of businesses.

17        And what I'm saying here is that comprehensive access

18   to content was critical to the Android ecosystem; that the

19   content owners needed protection and control or they

20   wouldn't play and that ContentGuard's DRM thus accelerated

21   the growth of the Android ecosystem of smartphone and tablet

22   sales and of content sales.

23        So DRM is a key factor in this virtuous circle of

24   content becomes available; device sales goes up; the more

25   devices there are, the more content that gets provided; and
```

1    there's an upward virtuous spiral.

2    Q.    I'd like to go now to the second step or second factor

3    in the Georgia-Pacific analysis.  That's examining the

4    party's patent licensing history.

5          Can you describe to the jury what that factor entails?

6    A.    Yes.

7          One way, of course, to benchmark value is to see if

8    there are any comparable transactions.  And that's what

9    licensing history invites you to do.

10         But the point is they have to be comparable because the

11   licensing history may or may not be comparable to the facts

12   and circumstances at hand.  But, nevertheless, the

13   Georgia-Pacific framework directly invites one and requires

14   one to look at the licensing history.

15   Q.    And when are historic -- historic licenses good

16   indicators of value and when are they not?

17   A.    I think they're good indicators when you have a lot of

18   similarly situated parties and you have a very mature

19   technology and a very simple technology and where you don't

20   have a circumstance of what I call widespread unlicensed

21   use.

22   Q.    Do you have a slide that describes this, sir?

23   A.    I do.

24   Q.    Let's take a look at the --

25              MR. COTE:  Actually, may I approach the bench,

```
 1   Your Honor?
 2            THE COURT:  Approach the bench.
 3            (Bench conference.)
 4            THE COURT:  Mr. Cote?
 5            MR. YIM:  There's going to be evidence coming up
 6   concerning ContentGuard's licenses that are confidential
 7   business information that will require sealing the
 8   courtroom.
 9            MR. COTE:  But we don't have to seal it for this,
10   just the word widespread -- I apologize, Your Honor.
11            This is -- we will get maybe another 15 minutes,
12   and we'll have to seal the courtroom because we're getting
13   down to Nokia.  I was instructed that the widespread
14   unlicensed use needed to be sealed --
15            THE COURT:  All right.  You're telling me that in
16   about 15 minutes, you're going to ask to seal the courtroom?
17            MR. COTE:  15, 20 minutes, yeah.
18            THE COURT:  All right.
19            MR. COTE:  But maybe a half hour, and then it will
20   be the tail end of his examination, so it's not going to
21   break it up.
22            THE COURT:  And there will be a need to keep it
23   sealed during the cross?
24            MR. JONES:  Yeah.
25            THE COURT:  Are you going to cross the witness,
```

```
 1   Mr. Root?
 2           MR. ROOT:  I'm going to do a short cross, and
 3   Mr. Jones is going to do it, I think.  But for mine, I'm
 4   going to have to have it sealed for the tail end of it.
 5           THE COURT:  All right.  Well, let's keep going.
 6   When you get to the point, just look at me and say:  Your
 7   Honor, we move to seal the courtroom.
 8           MR. COTE:  All right.  Will do.
 9           THE COURT:  All right.  Let's go.
10           (Bench conference concluded.)
11           THE COURT:  All right.  Let's continue.
12   Q.   (By Mr. Cote) Professor Teece, can you describe for the
13   jury this slide on widespread unlicensed use that you just
14   described?
15   A.   Yes.  This is a complex point, so please bear with me.
16       In -- in the world of tangible products, we're talking
17   about, you know, houses and cars and so forth.  A typical
18   modality is at the top.
19       You get to an agreement, you pay, and you borrow money
20   for it, maybe you don't, and use the product.  And that's --
21   and then the pricing of the market reflects that -- that
22   circumstance.
23       With -- with patents, and this is below the dotted
24   line -- is different, because, remember, with a patent, when
25   the invention is made, it gets published in the patent.
```

1    So the whole world gets to learn about that technology

2    before you even go out and ask anybody to license it.  So

3    you can have two circumstances which is infringement, which

4    is there's no agreement, there's no money paid, but people

5    use it.

6    So patented technology can get used before there's any

7    agreement to license it and before there's any payment that

8    changes hands.

9    And so the pricing there I've put in quotes is -- is

10   free -- in other words, someone's actually using it, and

11   they haven't paid a nickel for it, at least not yet.

12   The last row there is the way you hope the world works,

13   which is that there's a license that people agree to pay,

14   and they -- they use more or less simultaneously.

15   But if it takes place, if you cut a license in a

16   circumstance where other people are infringing or there's

17   unlicensed use, it's hard to get a proper price because if

18   everyone's using it and not paying or if a lot of people are

19   using it and not paying and you come along and say, please

20   take a license, it's -- it's a hard job to get a licensing

21   program launched, and it's a hard job to get a fair price in

22   the market.

23   So in the bottom right there, I've got pricing can be

24   depressed if you have this circumstance where there's a lot

25   of unlicensed use of the technology.

```
 1   Q.    Have you looked at ContentGuard's licenses in this
 2   case?
 3   A.    I have.
 4   Q.    Do you have a slide summarizing those?
 5   A.    Yes.
 6              MR. COTE:  Let's take a look at the next slide.
 7   Q.    (By Mr. Cote) Can you describe this slide to the jury,
 8   please.
 9   A.    Yes.
10         In a circumstance where -- which I believe can be
11   characterized as widespread unlicensed use, you -- you have
12   got relatively low rates -- I've got some device rates on
13   the left there.
14         Nokia is 15 cents up to Casio at 43 cents.  But these
15   rates, in my view, are not comparable to the issues at hand
16   here in this court.  And I've indicated on the right three
17   reasons why.
18   Q.    And let's -- let's talk about the first reason.  Early
19   adopter incentive rates.
20   A.    As I said before, it's hard to get a licensing program
21   launched when people are using the technology anyway.  So
22   the term in the industry is "early bird special."
23         So sometimes you actually -- you lower the price just
24   to get someone to take a license, hoping that you can build
25   to a higher rate for the next guy.  So that's the early
```

1    adopter incentive.

2         And I've studied licensing extensively, and when you

3    have large market circumstances and many, many different

4    people using the technology, it's a common phenomenon.

5    Q.   Let's look at the second factor:  Worldwide licenses.

6    What influence did that have on these rates?

7    A.   Yeah.

8         If -- if you -- you know, what people pay for

9    technology is a function of not just the rate but the base,

10   the so-called royalty base.

11        So if you have -- if people are willing to sign up for

12   a global license and if they've got international sales,

13   then obviously the base is larger and the rate is often

14   lower on account of that.

15        So if you have worldwide licenses, then the -- the --

16   the base is larger, the rate is lower.

17        For purposes of this court here, we're only looking at

18   a U.S. license, so you would expect, if it was a U.S.-only

19   license, it would have a higher rate.

20   Q.   Let's look at the third point:  Dominated by feature

21   phones.  What -- what influence does that have on your view

22   of these licenses?

23   A.   Well, coming back to the point about enabling

24   technology, that -- that enabling technology value depends

25   in part on the use.  And feature phones may not use the

```
 1   enabling technology as much as smartphones.
 2        So here, feature phones, these -- these licenses in the
 3   name of feature phones, or at least what was being made at
 4   the time, was feature phones, which, you know, are not --
 5   you got small screens, if they've got a screen at all, and
 6   they -- they really don't enable video distribution and many
 7   of the other things that the Stefik patents permit, and --
 8   and not permit, but -- but support.
 9   Q.   Did ContentGuard have any licenses for the more
10   sophisticated devices, like smartphones and tablets?
11   A.   There was some that came later.
12   Q.   Do you know those -- which licenses those are?
13   A.   Pantech was one, I believe.
14   Q.   And the other?
15   A.   Fujitsu, I believe.
16             MR. COTE:  Let's pull up Baker Slide 7.  Baker
17   Slide 7.
18   Q.   (By Mr. Cote) Can you explain to the jury the
19   significance of this Pantech license in your consideration.
20   A.   Yes.
21        Pantech was, as I think we heard, a -- a new entrant
22   that was moving toward smartphones.  And you'll notice that
23   the -- the royalty rates go up as high as 80 cents here, as
24   compared to the earlier feature phone royalties which were
25   generally lower.
```

```
 1        You start to see an uptick as the licensing program
 2   evolves to include potential smartphone manufacturers.
 3   Q.    What conclusions do you draw from the fact that the
 4   rate goes up as the units go up, and once you get above
 5   1.5 million units here, the rate hits 80 cents per device?
 6   A.    The testimony I heard was that -- that ContentGuard was
 7   trying to help this company get launched and -- and didn't
 8   want the full burden of the royalty to kick in until it got
 9   some volume -- until the licensee got some volume.
10              MR. COTE:  Let's take a look at Baker Exhibit --
11   or Baker Slide 8.
12   Q.    (By Mr. Cote) Take a look at this agreement and explain
13   to the jury what influence it had on your opinion.
14   A.    Once again, you start seeing a trending upwards as --
15   as -- as time goes by and as smartphones become more
16   relevant in the licensing negotiations.
17   Q.    Are -- are these licenses comparable to the ones that
18   we're considering or the reasonable royalty hypothetical
19   negotiation that we're considering in this matter?
20   A.    I don't believe, in naked form, that they're
21   particularly pertinent.
22   Q.    Why is that?
23   A.    Because of the three factors that I mentioned.  It's
24   feature phones, rather than smartphones; it's done under the
25   context of a tremendous amount of unlicensed sales; and --
```

1  and ContentGuard is still struggling to launch a

2  comprehensive licensing program.

3  Q.   You mentioned, in the hypothetical negotiation, there's

4  an assumption that the patents are valid and infringed in

5  determining damages.  How does that influence your view of

6  these licenses?

7  A.   That -- that's a third factor.  Here, I'm instructed,

8  under the Georgia-Pacific framework that I mentioned, to

9  assume that the patents are valid and infringed.

10      And in a negotiation, one -- one may not have quite

11  that same strong sense of things, and so there might be a

12  discount on account of that.

13      But by the time you get to Court and there's a decision

14  that the patents are valid and infringed, then the nature of

15  the intellectual property has changed, and -- and those

16  discounts that may have been in the market before disappear

17  in the courtroom.

REDACTED BY ORDER OF THE COURT

18  Q.  ███ ███ ███ ████ ███ ████ ███ ███ ███ ███

19  █████ █████ ████ ███ ███ ████ ████ ███ ███ ████

20  ████ ███ ███ ████ ███ ███ ███ ████ ████ ██

21  ████ ███ ███ ███ ███ ███ ███ ████ ███ ███

22  ████ ███ ████ ███ ███ ████ ████ ███ ███ ████ ██

23  ████ ███ ███ ███ ███ ████

24  ██ ███ ███ ████ ████ ███ ████ ███ ███ ███

25  ████ ███ ███ ███ ████ ███ ████ ███ ███ ███



REDACTED BY ORDER OF THE COURT

14          THE COURT:  Mr. Jones?

15          MR. JONES:  May I approach the bench, Your Honor?

16          THE COURT:  Counsel, approach the bench.

17          Approach the bench, counsel.

18          (Bench conference.)

19          MR. JONES:  That information has been designated

20  as confidential attorney's eyes only information, and the

21  courtroom will have to be sealed when it's discussed.  Your

22  Honor, we would request that it be sealed.

23          THE COURT:  All right.  How close are you to being

24  to the point where you otherwise --

25          MR. COTE:  Pretty close.

```
 1              MR. BRIODY:  Sealing is fine.

 2              MR. COTE:  Okay.  Sealing is fine.

 3              THE COURT:  All right.  Let's continue.

 4              MR. JONES:  Yes, sir.

 5              (Bench conference concluded.)

 6              THE COURT:  All right.  I'm going to order the

 7    courtroom sealed at this time.  If you're present and not

 8    subject to the existing protective order in this case, you

 9    should excuse yourselves at this time and remain outside the

10    courtroom until it is unsealed.

11              (Courtroom sealed, in a separate volume, Page 30,

12              Line 6 through Page 49, Line 13.)

13              (Courtroom unsealed.)

14              THE COURT:  Court stands in recess.

15              (Recess.)

16              (Jury out.)

17              COURT SECURITY OFFICER:  All rise.

18              THE COURT:  Be seated, please.

19              Before we bring the jury back in, I'll remind

20    Plaintiff's counsel, the Court has no problem with them

21    approaching their colleagues when at the podium to pass them

22    a note or communicate with them, I simply would require and

23    request that you not walk between the defense table and the

24    jury, that you go around rather than back and forth.

25              You wouldn't want them walking in front of you if
```

 1    it were reversed.  So just keep that in mind going forward.

 2            Is there anything else before we bring in the

 3    jury?

 4            MR. UNIKEL:  Yes, Your Honor.

 5            THE COURT:  I had a suspicion there might be.  Go

 6    ahead, Mr. Unikel.

 7            MR. UNIKEL:  We tried to give you advance notice,

 8    Your Honor.

 9            During the last question and answer session,

10    Dr. Teece was asked about Google's -- what Google's business

11    was, and the answer related to advertising revenues, Search,

12    and other Google products that are not at all involved in

13    the case.

14            This was dealt with in an advance motion in

15    limine, and there was a ruling that would preclude any

16    reference even and testimony insinuation regarding revenues

17    and profits not derived from the accused products or

18    services.

19            This is an important issue because we don't want

20    the jury to have any confusion that those other services are

21    not implicated by these services.  And we believe that the

22    answer already has violated the MIL, but we're particularly

23    concerned about anything further that might be said about --

24    about it.

25            THE COURT:  All right.  And this is on Page 9 of

1   Document 8 -- 897 where the Court's orders on limine matters

2   is set forth?

3           MR. UNIKEL:  Correct, Your Honor.

4           THE COURT:  What's the response from the

5   Plaintiff?

6           MR. COTE:  The MIL is specific to not being able

7   to point to benefits -- profits or revenue not derived from

8   the accused products or services.  They derive their

9   advertising revenue from selling ads to the accused products

10  or services, so it is derived from the accused products or

11  services.

12          We don't intend to seek a reasonable royalty in

13  this case, based on that -- what I'll call that benefit.

14  And we -- we just used it so the jury would understand why,

15  in the case of Samsung, the damages amount is what it is,

16  much, much higher than the damages sought from Google.

17          So there's an explanation.  Otherwise, the jury

18  will be left confused.  But, again, it's only a reference to

19  bring context so the jury understands that discrepancy and

20  isn't somehow confused by it.

21          But, again, the MIL does not preclude me from

22  mentioning the advertising revenue.  Again, it says I can't

23  talk about revenues and profits not derived from the accused

24  products or services.

25          THE COURT:  Well, if you're talking about revenue

 1   that's derived from products that are not accused in this

 2   case, that clearly would violate the MIL.

 3           And I think that's the Defendants' point.  You're

 4   using -- at least from my hearing, you're using global

 5   advertising revenue numbers that, yes, cover the products in

 6   the case but also cover products that are not in the case.

 7   At least that's my understanding of Defendants' position.

 8           MR. COTE:  And actually, we just used the

 9   qualify -- we -- we didn't actually point to revenues and

10   profits.  There's no numbers being used.  We just

11   referenced --

12           THE COURT:  Let's -- let's do it this way,

13   counsel.  I don't hear any request for an instruction or

14   other relief from the Defendant.  I hear a concern about

15   prospective movement into this area during the remainder of

16   the testimony.

17           I'm just going to remind the Plaintiff that this

18   order in limine is in place, and if you think you're even

19   getting close, you need to approach and get leave from the

20   Court before you go into it.

21           And if you -- if you violate it, having had this

22   admonition, without coming and approaching the Court, I'll

23   consider it a serious matter.  There's no reason why this

24   should come out without us getting to the bottom of it

25   beforehand.

1          MR. COTE:  Yes, Your Honor.

2          THE COURT:  I -- you know, we'll -- we'll deal

3    with specifics going forward, but let's deal with them in

4    advance, not after they've already been presented to the

5    jury.

6          MR. COTE:  Yes, Your Honor.

7          MR. UNIKEL:  I'm sorry, Your Honor.

8          With that in mind, can I move to strike the last

9    answer that includes the reference to Google's advertising

10   revenue, please?

11         THE COURT:  Well, I assumed you'd elected not to

12   do that because you didn't ask for that when you first stood

13   up.

14         MR. UNIKEL:  I -- I apologize, Your Honor.  I was

15   raising the issue to the Court about that last question and

16   answer, and I should have made clear that I was also moving

17   to strike the answer.

18         THE COURT:  I'm going to deny your motion to

19   strike.  I'm going to let you clarify on cross what is and

20   what is not at issue in the case.  I think you can address

21   it fairly that way.  And quite honestly, I think that --

22   that will call less attention to it than if I grant your

23   application to strike.

24         But I do want both sides to understand, I

25   intend -- I intend to be consulted and to exercise my

1  gatekeeping role here vigorously going forward.  We're at

2  that point in the trial where these things get -- get tight

3  and get close.  And if there's any kind of a question, I

4  want to know about it before it happens, all right?

5           MR. UNIKEL:  Thank you, Your Honor.

6           MR. COTE:  Yes, Your Honor.

7           THE COURT:  Let's bring in the jury, Mr. Floyd.

8           Is there a need to reseal the courtroom as we

9  continue with this direct?

10          MR. COTE:  Yes, Your Honor.

11          THE COURT:  All right.  I'll order the courtroom

12  sealed.

13          If you're present and subject -- please be mindful

14  of the microphone, Dr. Teece.

15          THE WITNESS:  Thank you.

16          THE COURT:  If you're present in the courtroom and

17  not -- not subject to the existing protective order, please

18  excuse yourselves.

19          COURT SECURITY OFFICER:  All rise for the jury.

20          (Jury in.)

21          THE COURT:  Please be seated.

22          Again, I'll note for the record the courtroom is

23  sealed.  If for any reason you're not subject to the

24  protective order in this case, you should exit the courtroom

25  and remain outside until the courtroom is unsealed.

```
 1              (Courtroom sealed, in a separate volume, Page 49,

 2          Line 15.)

 3              (Courtroom unsealed.)

 4              THE COURT:  And with that, counsel, we stand in

 5   recess.

 6              (Lunch recess.)

 7

 8                      * * * * * * * * * * * * * * * * * * * * *

 9

10                      CERTIFICATION

11

12              I HEREBY CERTIFY that the foregoing is a correct

13   transcript from the stenographic notes of the proceedings in

14   the above-entitled matter to the best of my ability.

15

16

17   /s/Shelly Holmes                    9/17/15
     SHELLY HOLMES, CSR, TCRR           Date
18   Official Court Reporter
     State of Texas No. 7804
19   Expiration Date:  12/31/16

20

21

22

23

24

25
```