1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
2                   MARSHALL DIVISION

3   CONTENTGUARD HOLDINGS, INC.  )(   Civil Docket No.
                                 )(   2:13-CV-1112-JRG
4                                )(   MARSHALL, TEXAS
    VS.                          )(
5                                )(
                                 )(   NOVEMBER 17, 2015
6   APPLE, INC.                  )(   8:28 a.m.

7                 TRANSCRIPT OF JURY TRIAL

8           BEFORE THE HONORABLE RODNEY GILSTRAP

9              UNITED STATES DISTRICT COURT

10  APPEARANCES:

11  FOR THE PLAINTIFF:        Mr. Samuel F. Baxter
                              Ms. Jennifer Truelove
12                            MCKOOL SMITH, PC
                              104 East Houston Street, Suite 300
13                            Marshall, Texas 75670

14                            Mr. Robert A. Cote
                              MCKOOL SMITH, PC
15                            One Bryant Park, 47th Floor
                              New York, New York 10036
16
                              Mr. Dirk D. Thomas
17                            MCKOOL SMITH, PC
                              1999 K Street, N.W., Suite 600
18                            Washington, DC 20006

19  APPEARANCES CONTINUED ON THE NEXT PAGE:

20  COURT REPORTER:           SHELLY HOLMES,CSR, TCRR
                              Official Court Reporter
21                            United States District Court
                              Eastern District of Texas
22                            Marshall Division
                              100 E. Houston, Suite 125
23                            Marshall, Texas  75670
                              (903) 923-7464
24
    (Proceedings recorded by mechanical stenography, transcript
25  produced on CAT system.)

```
 1  APPEARANCES CONTINUED:

 2  FOR THE DEFENDANT:        Mr. David T. Pritikin
                             Mr. Nathaniel C. Love
 3                           SIDLEY AUSTIN LLP
                             One South Dearborn St.
 4                           Chicago, Illinois 60603

 5                           Mr. Dave Anderson
                             Mr. Theodore W. Chandler
 6                           SIDLEY AUSTIN LLP
                             555 California St.
 7                           San Francisco, CA 94104

 8                           Ms. Melissa Smith
                             GILLAM & SMITH
 9                           303 South Washington Avenue
                             Marshall, Texas 75670
10
                             Mr. Bryan K. Anderson
11                           SIDLEY AUSTIN LLP
                             1001 Page Mill Road, Bldg. 1
12                           Palo Alto, CA 94304

13                           Mr. Jeffrey P. Kushan
                             Mr. Michael P. Franzinger
14                           SIDLEY AUSTIN LLP
                             1501 K Street, N.W.
15                           Washington, D.C. 20005

16

17

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S
 2            (Jury out.)
 3            COURT SECURITY OFFICER:  All rise.
 4            THE COURT:  Be seated, please.
 5            All right.  Is the Plaintiff prepared to read into
 6   the record the items from the list of pre-admitted exhibits
 7   used during yesterday's portion of the trial?
 8            MS. ENGELMANN:  Yes, Your Honor.
 9            THE COURT:  Please proceed, Ms. Engelmann.
10            MS. ENGELMANN:  Good morning.
11            THE COURT:  Good morning.
12            MS. ENGELMANN:  The list of pre-admitted exhibits
13   used during yesterday's trial are as follows:  AX-650C,
14   826C, 962C, 1126C, 1252C, PX-59C, 61C, 70C, 79C, 80C, 81C,
15   82C, 83C, 84C, 85C, 86C, 87C, 88C, 181C, 1011.02, 1033C,
16   1065C, 1071C, 1080C, 1089C, 1095C, 1097C, 1098C, 1113C,
17   1121C, 1130C, 1137C, 1141.01C, 1141.04C, 1141.05C, 1141.06C,
18   1141.07C, 1141.09C, 1141.11C, 1141.13C, 1141.15C, 1141.18C,
19   1141.22C, 1169, 1186C, and 1191C.
20            Thank you.
21            THE COURT:  All right.  Are there objections from
22   that rendition from the Defendant?
23            MR. BRYAN ANDERSON:  If I may consult with
24   counsel, I just want to make sure I heard it right.
25            THE COURT:  You may.
```

```
1              (Counsel confers.)

2              MR. BRYAN ANDERSON:  Yes, Your Honor.  No

3    objection.

4              THE COURT:  All right.  Does the Defendant have a

5    similar rendition to offer?

6              MR. BRYAN ANDERSON:  We do, Your Honor.

7              THE COURT:  Please proceed.

8              MR. BRYAN ANDERSON:  AX-1, AX-229C, AX-635C,

9    AX-640C, AX-743C, AX-117C, AX-819C, AX-820C, AX-821C,

10   AX-822C, AX-823C, AX-8 -- 824C -- one 8 there -- AX-825C,

11   AX-826C, AX-899, AX-1109, AX-1150C, AX-1151C, AX-1158C,

12   AX-1327C, PX-0181C, PX-1113C, PX-1130C, PX-1141.22C,

13   PX-1141.23C, PX-1141.24C, PX-1141.25C, PX-1141.26C,

14   PX-1141.71C.

15             THE COURT:  Is there objection to that

16   rendition --

17             MS. ENGELMANN:  No, Your Honor.

18             THE COURT:  -- by the Plaintiff?

19             MS. ENGELMANN:  No, Your Honor.

20             THE COURT:  All right.  Thank you, Counsel.

21             All right.  We left off yesterday with Mr. Tribble

22   on -- Dr. Tribble on the stand.

23             Dr. Tribble, if you'll return to the witness

24   stand.

25             Mr. Baxter, you're going to complete your direct,
```

1  I believe.

2       MR. BAXTER:  Well, cross maybe, Your Honor, but

3  yes, sir.

4       THE COURT:  Cross.  I'm sorry.  You may go to the

5  podium.

6       MR. BAXTER:  Thank you, Your Honor.

7       THE COURT:  And, Mr. Nance, if you would, bring in

8  the jury.

9       COURT SECURITY OFFICER:  All rise for the jury.

10      (Jury in.)

11      THE COURT:  Good morning, ladies and gentlemen.

12  Please be seated.

13      We will continue with the Plaintiff's

14  cross-examination of the witness, Dr. Bud Tribble.

15      Mr. Baxter, you may continue when you're ready.

16      MR. BAXTER:  Thank you, Your Honor.

17      Ms. Lockhart, can I get the ELMO?

18      COURTROOM DEPUTY:  Yes, sir.

19      MR. BAXTER:  Thank you.

20    GUY "BUD" TRIBBLE, Ph.D., DEFENDANT'S WITNESS,

21                  PREVIOUSLY SWORN

22            CROSS-EXAMINATION (CONTINUED)

23  BY MR. BAXTER:

24  Q    Dr. Tribble, I took up your kind offer to get Google

25  Play on an iPhone.  I had to borrow my partner's because I

```
 1   can't do this on mine.
 2        And do you see here, sir, that on his phone at least,
 3   I've got -- I have Google there as an icon, but that's a
 4   search Google engine, but I've got the Google Play there
 5   where it says "Play Movies"?
 6        Do you see that, sir?
 7   A    Yes.
 8   Q    Do you have Google Play on your iPhone?
 9   A    I don't.
10   Q    Okay.  So are you familiar with how that works?
11   A    Generally.
12   Q    Okay.  So if I were to hit under your rendition --
13   under your rendition about Apple being kind enough to allow
14   Google Play on the iPhone, I'd take it I can download some
15   movies, right?
16   A    I believe so.
17   Q    Okay.  So I'm going to hit the Google Play.  And it
18   comes up, and it says "watch now."  Well, I don't have any
19   movies in the movie queue.  And if I hit "watch now,"
20   nothing's going to happen, is it?
21   A    Well, I don't know which version of Google Play you're
22   running here.
23   Q    Well, I'm running the latest one.  I downloaded it last
24   night.
25   A    Okay.
```

1    Q    Okay.  So, now, if I -- if I go to the only other

2    screen I have, which is the contents, it says, "watch now"

3    or "my library."  And do you see any place on there I can

4    download a movie?

5    A    Not on this screen.

6    Q    Well, do you -- would you trust me if I told you that's

7    the only two screens there are?

8    A    Well, I guess I'd trust you if you say that's the only

9    two screens you found.

10   Q    Well, I -- I can hit "watch now," and nothing's going

11   to happen.  And I can hit "my library," but because I don't

12   have any movies in the library, that's not going to work.

13   "Download only" is not going to work, and "settings" is not

14   going to work.

15        And would you agree with me that there's no way to

16   download a movie using Google Play on the iPhone?

17   A    You appear to be having problems doing that, yes.

18   Q    And the reason for that is that Apple is going to get

19   and charges a 30-percent cut, 30 percent of the total

20   purchase price of the movie.  If it's downloaded on Google

21   Play, then Apple's going to charge Google 30 percent of the

22   movie price that goes to Apple, doesn't it?

23   A    I'm not familiar with that particular issue.

24   Q    Well, would you trust me on that, that Apple charges

25   Google 30 percent of the movie price if you download a movie

1  on Google Play on an Apple phone?

2  A    We may do that.

3  Q    Okay.  And as a result of that, Google, therefore,

4  won't allow a download on the Google Play on an iPhone.

5  That make sense to you?

6  A    As I say, I don't have it on my phone.  I'm not

7  familiar with it.

8  Q    Okay.  So the idea that Apple welcomes Google Play to

9  its iPhone turns out to be kind of an illusion, doesn't it?

10  A    Like I say, I'm not familiar with it.  I don't have

11  Google Play on my phone.

12  Q    Okay, sir.  The truth is that Google Play is not really

13  welcome, is it?

14  A    I -- we allow Google Play on the iTunes Store.

15  Q    Well, there it is right there.  I see it.  But it

16  doesn't work very well, does it?

17  A    Well, I don't know why it doesn't show you movies.

18  Q    Well, the reason is -- I explained to you, is because

19  Apple charges Google 30 percent, and Google won't stand for

20  it.  So at least using the Google app, you can't download a

21  movie, can you?

22  A    Well, like I say, I don't have it on my phone and not

23  familiar with it.

24  Q    Okay.  Well, those are the only two screens.  I can't

25  get another one up.  That's it.  I can twirl and twist and

1    move it, but those are the only two.  That's it.

2            THE COURT:  Is that a question, Counsel?

3            MR. BAXTER:  Yes, sir.

4    Q    (By Mr. Baxter) Do you know of anything different from

5    that, Dr. Tribble?

6    A    Well, I believe there are other apps that play movies

7    on your iPhone.

8    Q    Well, they talked about one yesterday, and let me talk

9    about that, and that's Disney.  Did you hear yesterday

10   Counsel asked about the Disney app, and you could just

11   download that all you wanted to?  Do you remember that?

12   A    I think I heard you could play movies on the Disney

13   app.

14   Q    Okay.  I'm going to hit the Disney app next, and that

15   one says -- well, here's up and coming, Monsters, Inside

16   Out, and I think that's an Iron Man movie.  And so it says

17   "get started."  And I'm going to hit, if I can find it, "get

18   started."  If I get it back where I don't have to start all

19   over again, hopefully.  Oops.  Well, preview -- I have to

20   have a techno.

21        There we go.  "Get started."  And when I hit "get

22   started," it won't let me download a movie, but it instead

23   gives me some places to go.  One of them is Google Play.

24   I'm going to hit Google Play.  And it says:  Well, connect

25   to Google.  And Google Play, which we know won't work,

1    right?  I'm going to cancel that.

2         The next one says that I can go to VUDU, and that means

3    I've got to go to my VUDU account, doesn't it?  It won't let

4    me download a movie unless I've got an account with VUDU,

5    does it?

6    A    On this screen, that's true.

7    Q    Okay.  I'm going to cancel that.

8         The next one says Amazon.  I'm going to try to hit it.

9    It won't work at all.  I'm going to hit Microsoft.  It says

10   I've got to contact the accounts, please, and continue to

11   Microsoft.  It won't let me download a movie, will it?

12   A    Not on this page.

13   Q    And I will tell you that the last one is iTunes, which

14   is the store that we said this was going to be a substitute

15   for, and because I know that my colleague uses your store

16   and is hooked up to iTunes, if I hit iTunes, it will go

17   straight to iTunes.

18        But Disney itself, the icon that your lawyer said we

19   could download anywhere, anytime, doesn't download anything,

20   does it?

21   A    Well, I think I saw a buy button on the previous page.

22   Q    On which one?

23   A    Previous page before you brought this page up.

24   Q    Well, it won't -- if I can't get started -- I've got to

25   get started and go to one of these particular sites in order

```
1   to buy anything, don't I?

2   A    Well, I think this is the only page in the app.  Like I

3   say, I saw a buy button on the previous page.

4   Q    Would it surprise you to learn, sir, that you can't buy

5   unless you're in one of these five places, that you can't

6   buy straight from Disney, that you have to go to one of

7   these websites in order to buy?

8   A    That would be surprising.

9   Q    Okay.  Now, Dr. Tribble --

10            MR. BAXTER:  If I can get up the slide, please?

11  Q    (By Mr. Baxter) Now, this is a slide I think we've seen

12  before -- the jury has seen before, Dr. Tribble, and you --

13  which shows up on an iPhone if you're trying to rent a

14  movie, in this case, Antarctica.  Are you familiar with

15  that?

16  A    I haven't seen the movie, but yeah.

17  Q    Not the movie, sir?

18  A    Not familiar with the service.

19  Q    Just the -- just the rules that show up on the screen.

20  In this case, we've rented a movie, and it's got some

21  conditions and rules that show up on the screen, does it

22  not?

23  A    Well, it's got a play button.

24  Q    All right.  Let me -- let me start at the top.  The

25  first thing it says is "no service," right?  Do you see at
```

```
 1   the top where it says "no service"?

 2   A    Right.  That means you have no Internet service.

 3   Q    Okay.  And that means that even though I have no

 4   service, I can play it anywhere, anytime; is that correct,

 5   sir?

 6   A    In some cases, yes.

 7   Q    Well, would there be cases I couldn't play it, even

 8   though I don't have an Internet or cellular connection?

 9   A    Sure.  There might be if -- if you weren't logged in

10   as -- as the account owner.

11   Q    Okay.  Well, and we talked about that yesterday,

12   because Apple wants to verify that I'm a trusted person,

13   right, that I'm, in fact, the account owner?

14   A    Wants to verify that you're the account owner.

15   Q    And it does that by sending messages back and forth

16   between the iTunes Store and this trusted system right here,

17   this handheld device, this iPhone, doesn't it?

18   A    Well, I don't know if the iPhone is a trusted system,

19   but it does send the message back to the iPhone.

20   Q    Well, the iTunes Store wants to know that I'm trusted,

21   doesn't it?

22   A    They want to know that you are trusted.

23   Q    Yes, sir.  And the device is trusted?

24   A    They want to know that you are trusted.

25   Q    Well, sir, it can't tell whether I'm the one sending
```

1   the message or it's my son sending the message, can it?

2   A    Well, it asks you for a password to make sure it's you

3   sending the message.

4   Q    And if he knows my password, the iTunes Store can't

5   tell the difference, can it?

6   A    In that case, the iTunes -- iTunes Store really can't

7   trust you because you gave your password to someone else.

8   Q    Okay.  Well, it will send me the movie anyway, won't

9   it?

10  A    It will.

11  Q    Okay.  What it really wants to know is, is the device

12  trusted, doesn't it?

13  A    It wants to know whether you are -- you and your credit

14  card is good.

15  Q    Okay.  But it also wants to know if the device is an

16  Apple device and if it's trusted, doesn't it?

17  A    ITunes -- you know, it could be a Windows PC device.

18  Q    Then it wants to know if the Windows PC device is

19  trusted, doesn't it?

20  A    Well, it knows that the Windows PC device is not

21  trusted.

22  Q    Okay.  Will it send the movie to a non-trusted device?

23  A    It will send it to a Windows PC which it doesn't trust,

24  if it trusts you.

25  Q    Okay.  If it's got the -- if it's got the right

1    password?

2    A     Yes.

3    Q     Okay.  In this case, however, you know that it

4    doesn't -- isn't connected to the Internet, which means it

5    can play anywhere, anytime, right, Dr. Tribble?

6    A     Yes, if it has the correct account keys.

7    Q     Okay.  And the account keys are established early on

8    when the phone was first turned on and established an

9    account with the iTunes Store, was it not?

10   A     Well, the account is established when you type in your

11   name and password.

12   Q     All right, sir.  But that was done right at the

13   beginning, wasn't it?

14   A     Not necessarily.

15   Q     Well, whenever I joined the iTunes Store, whenever I

16   determined that I was going to do business with the iTunes

17   Store, whenever that was, that's when it was established,

18   right?  And it gave my phone a unique number, didn't it?

19   A     It doesn't give the phone a unique number.  It

20   establishes that you are you because it knows you know your

21   password.

22   Q     It doesn't know me from Adam's old fox, does it?  It

23   knows my phone.

24   A     No.  The password establishes that you are you, and you

25   are connected to your credit card which we store at Apple.

1   Q    All right, sir.  In any case, Dr. Tribble, can we get

2   back to the point of whether or not it's not connected to

3   the Internet and you can play it anytime, anywhere?

4   A    There are cases where it will play it when you're not

5   connected to the Internet.

6   Q    Well, are there cases when it won't play it when I'm

7   not -- when I'm not connected to the Internet?

8   A    Well, I believe if -- if you had transferred that movie

9   to a different device you have, it will ask you for your

10  name and password again.

11  Q    Assuming I ordered the phone -- the movie for this

12  device, and I have downloaded it, and I rented it.  Are you

13  with me, sir?

14  A    Yes, I am.

15  Q    And I'm now on a camping trip or I'm on an airplane --

16  A    Yes.

17  Q    -- and I don't have cell service, and it says, "no

18  service."

19       Are you with me, sir?

20  A    Yes, I am.

21  Q    Will you agree with me that this demonstrates it will

22  play anywhere, anytime?

23  A    Yes, at that point it will.  I agree.

24  Q    Thank you.

25       Now, down at the bottom, you said there is a black

1    triangle that says "right to play."

2         Do you see that?

3    A    I see that.

4    Q    Okay.  And if I push it, hopefully, the movie's going

5    to play.

6    A    That is the play button.

7    Q    Okay.  And that's a manner of use, is it not?

8    A    Well, that's playing the movie.

9    Q    That's a manner of use, is it not?

10   A    It's -- I would say, yeah, it's a manner of use.

11   Q    Okay.

12         MR. BAXTER:  Back out, Mr. Diaz.

13   Q    (By Mr. Baxter) Now, at the top, it says "HD," and it

14   could say "HD" or "SD"; is that correct?

15   A    Correct.

16   Q    And tell the jury what a HD or SD means.

17   A    Well, HD is high definition, and SD is standard

18   definition.  Movies come in usually two flavors, standard

19   definition and high definition, which has more pixels and

20   you can see more detail.

21   Q    And is that a choice that I made early on when I rented

22   the movie?

23   A    Yes.

24   Q    And is the phone going to enforce whether it's HD or

25   SD?

1  A    Well, it will -- it will let you see the HD or SD

2  depending on which version you chose.

3  Q    All right.  And then it says "expires in 26 days."

4  What does that mean?

5  A    That's the period you have in order to get your -- that

6  you're allowed to start watching the movie.

7  Q    How many days did I have originally?

8  A    Originally, 30 days.

9  Q    Is that a hint?  Is it just a hint about how long I

10  have?

11  A    No.  That's -- that's in the terms of use.

12  Q    Is it a suggestion about how long I have?

13  A    No, it's not.

14  Q    Is it a rule?

15  A    Yes, it's a rule.

16  Q    Is it a usage rule?

17  A    It's -- it's a rule that -- that we enforce with our

18  DRM.

19  Q    Is it a rule that came from the movie studio?

20  A    It's a rule that's in the contract with the movie

21  studio.

22  Q    Is the answer yes?

23  A    Well, it came from a negotiation between the movie

24  studios and Apple.

25  Q    Does the movie studios want you to enforce the contract

1    that says "rentals last only 30 days"?

2    A     Yes.  As in any DRM system, that's the purpose, to

3    enforce the rules from the movie studios.

4    Q     In your DRM system, is that the purpose, sir?

5    A     Yes.

6    Q     So "expires in 26 days" is not a mere hint or a

7    suggestion; it is a usage rule; is that correct?

8    A     It's a rule that -- that prevents the user from

9    watching it outside that time period.

10   Q     Is that a usage rule, sir?

11   A     Well, it's a rule enforced by the DRM.

12   Q     Is that a usage rule, sir?  Yes or no.

13   A     Yes.

14   Q     And it's enforced on this phone because it is somehow

15   connected to the content; is that right?

16   A     No, it's not.

17   Q     Okay.  If that rule is not with the content -- if the

18   content doesn't have the usage rules, can you play it?

19   A     If you have the keys present, you can play it.

20   Q     Answer my question, please, Dr. Tribble.

21              MR. BAXTER:  Your Honor --

22              THE COURT:  Counsel --

23              MR. BAXTER:  -- if I can get him to answer my

24   question, Your Honor, I'd appreciate it.

25              THE COURT:  Well, you need to raise it with me,

```
 1   Mr. Baxter, and I'll tell him to answer the question.
 2             MR. BAXTER:  Please, Your Honor.  If I could get
 3   him to answer my question.  I object.  It's nonresponsive.
 4             THE COURT:  All right.  Well, restate your
 5   question.  We'll try again.
 6   Q   (By Mr. Baxter) If the -- if the usage rules are not
 7   attached to the content in some manner or form, will the
 8   content play, Dr. Tribble?
 9   A   Yes.  The usage rules are not attached to the content.
10   Q   Okay.  So you're telling me that if the usage rules
11   never made it to the phone, that movie's going to play?
12   A   The movie will play when the keys are on the phone.
13             MR. BAXTER:  Your Honor --
14   A   The usage rules are not on the phone.
15             MR. BAXTER:  Your Honor, I object.  If he -- I
16   just want him to answer my question.  I asked him to please
17   answer it.
18             THE COURT:  Well, Dr. Tribble, if you don't know,
19   you need to say you don't know.  If you know the question
20   (sic), then try to answer the question that's asked.
21             So ask the question again, Mr. Baxter.
22   Q   (By Mr. Baxter) If the usage rules are not on that
23   phone, will the movie play?
24   A   If the usage rules are not on the phone and -- then the
25   movie will not play because the keys will not be on the
```

1    phone.

2    Q    And I'll limit it to just the usage rules, sir, please.

3    A    Well, I understood yesterday for you to say that the

4    keys were usage rules.

5    Q    No, sir.  I just asked you the question, if the usage

6    rules are not on the phone, will the movie play?

7    A    I'm not sure what you are intending to define as "usage

8    rules."

9    Q    Well, for example, whether -- how long you have --

10   well, let me back up.

11        You don't know what usage rules are?

12   A    Well, I think that might be something that the Court

13   has defined.

14   Q    And have you read the Court's claim construction?

15   A    Yes.

16   Q    Okay.  So you have an understanding of usage rules, do

17   you not?

18   A    I do.

19   Q    So let me ask it again.  If the usage rules aren't on

20   the phone, will the movie play?

21   A    Oh, my understanding is that usage rules are defined to

22   be attached or treated as attached to the content.

23   Q    Okay.

24   A    And we don't have usage rules like that.  We don't have

25   usage rules that are attached or treated as attached to the

```
 1   content.
 2   Q     Are you telling me you don't have usage rules?
 3   A     Not as defined by the Court.
 4   Q     All right.  Let's back up just a moment.
 5         Do you have usage rules?  Yes or no.
 6   A     We have usage restrictions that are defined by the
 7   studios.
 8   Q     Do you have usage rules?  Yes or no, Dr. Tribble.
 9   A     Not as defined by the Court.
10   Q     Okay.  Are you an expert on that, Dr. Tribble?
11   A     No, I am not.
12   Q     All right, sir.  Are you expressing an expert opinion
13   on that, sir?
14   A     No, I am not.
15   Q     Okay.  Do you -- are you expressing an expert opinion
16   on what "treated as attached" means?
17   A     No, I am not.
18   Q     So you have no earthly idea then, do you?
19   A     Well, I'm -- I'm giving you my opinion.
20   Q     Well, that's what I was afraid of.  You're not an
21   expert, are you?
22   A     No.
23   Q     And so you can't give an expert opinion on that, can
24   you?
25   A     No, I cannot.
```

```
 1   Q    All right, sir.  Let me try it one more time.
 2        Do you have usage rules that somehow get on this phone
 3   that govern how the content may be used by the customer?
 4   A    We do not have usage rules that are attached.
 5           MR. BAXTER:  And I object, Your Honor, because,
 6   once again, he's expressing an expert opinion which the
 7   Court told him not to do.
 8           THE COURT:  Well, I'll sustain that objection,
 9   primarily because it doesn't respond to the question.
10           Do you have usage rules that somehow get on the
11   phone and govern how the content may be used by the
12   customer?  That's the question.
13           And what would your answer to that question be,
14   Dr. Tribble?
15           THE WITNESS:  I don't believe we have that.
16   Q    (By Mr. Baxter) So what I see here on this phone, which
17   you told me shows up on the phone, is just a -- a what, a
18   figment of somebody's imagination here?
19   A    Well, those are rules that are the same for all movies
20   that are rented.
21   Q    And I think we agreed that those rules came from the
22   movie studios, right?
23   A    They were negotiated with the movie studios.
24   Q    They come from the movie studios, right?
25   A    They're an agreement between the movie studios and
```

1  Apple.

2  Q    Well, they're imposed by the movie studios.  Apple

3  doesn't care, do they?

4  A    In the contract that resulted, they're imposed, yes.

5  Q    From the movie studios, correct?

6  A    Yes, from the movie studios.

7  Q    All right, sir.

8           THE COURT:  Let's move on, Counsel.  We've

9  established that.

10  Q    (By Mr. Baxter) All right.  So the movie studios wants

11  their rentals to expire in 30 days, and that's a usage

12  right, is it not?

13  A    They want their rentals to expire in 30 days, and they

14  expect us to do that.

15  Q    And that's a rule they expect Apple to enforce?

16  A    That's a rule they expect Apple to enforce.

17           THE COURT:  All right.  Gentlemen, we're going to

18  talk one at a time.

19           MR. BAXTER:  Thank you, Your Honor.

20           THE COURT:  And both of you know what I mean, and

21  both of you can do that, so I don't expect to have to raise

22  this again.

23           All right.  Did you finish your answer,

24  Dr. Tribble?

25           THE WITNESS:  Yes, I did.

```
 1              THE COURT:  Then ask the next question,
 2    Mr. Baxter.
 3              MR. BAXTER:  Thank you, Your Honor.
 4    Q    (By Mr. Baxter) And Apple expects to follow the
 5    contract and enforce that usage rule, does it not?
 6    A    Yes, we do.
 7    Q    And it does, in fact, enforce it, does it not?
 8    A    We enforce that rule.
 9    Q    All right, sir.
10              MR. BAXTER:  Now, Mr. Diaz, do you have a slide
11    that's got the -- the screenshot that shows how many hours
12    are left to play a movie?  We had that at one time.  See if
13    you can find that.
14    Q    (By Mr. Baxter) There is another screenshot, is there
15    not, Dr. Tribble, that doesn't talk about days but talks
16    about hours left in which you can watch the movie; is that
17    correct?
18    A    I believe so.
19    Q    And is that also a usage rule?  Here it is right here.
20    It says "expires in 23 hours."  It says "hours remaining."
21         Do you see that?
22    A    Yes, I do.
23    Q    That also shows up on the iPhone screen, does it not,
24    or the tablet screen if you're watching it on a tablet?
25    A    Yes, it does.
```

```
 1    Q     Is that a usage rule, sir?

 2    A     That -- that's a rule that we enforce.

 3    Q     Is that a usage rule, sir?

 4    A     I think you could call it a usage rule.

 5    Q     Okay.  And does Apple enforce it on its phones and

 6    tablets?

 7    A     Yes, we do.

 8    Q     And does that come from the movie studios as well?

 9    A     The movie studios state that rule in their contracts.

10    Q     All right, sir.  And the contracts require you to

11    enforce it, do they not?

12    A     That is true.

13    Q     And is that treated as attached by the FairPlay

14    software to the content?

15    A     Not to my knowledge.

16    Q     Well, how does that usage rule, then, if it's not

17    somehow treated as attached to the content, get enforced?

18    A     Gets enforced by the keys that are on the system that

19    are used to decrypt the content.

20    Q     Sir, the key is just sitting there.  I want to know how

21    it is that the usage rules are somehow -- are they not

22    treated as attached to the content so that the content plays

23    and the usage rules govern when and how and what manner they

24    can be played?  Is that not correct, sir?

25    A     I believe the 23 hours are attached to the keys.
```

```
1    Q    Well, somehow the keys are going to have to be treated
2    as attached to the content, are they not?
3    A    I can't say.
4    Q    Okay.  You don't know?
5    A    I don't know.
6    Q    All right, sir.  In any case, we do know that after
7    23 hours, if I haven't finished watching the movie, what
8    happens?
9    A    After that happens, the keys time out, and the user is
10   no longer able to decrypt their content.
11   Q    Well, it's not the keys; it's the rules that time out,
12   don't they?
13   A    Well, when -- when we talk about -- at Apple, we say
14   the keys time out.
15   Q    Well, I understand that.  But truly the rules time out.
16   The rules have expired, have they not?
17   A    The keys have expired.
18   Q    Okay.  The rules say 24 hours once you start, and if
19   you don't finish, poof, it's gone; is that correct, sir?
20   A    That's what the rules say.
21   Q    Okay.  And somehow that rule gets enforced against that
22   movie, doesn't it, and against me as the consumer?
23   A    Somehow it does, yes.
24   Q    All right, sir.  Now, Dr. Tribble, I believe that one
25   of the things that your lawyers have told the jury is that
```

1   you have a license from InterTrust; is that right?

2   A     That is true.

3   Q     Okay.  Did -- after you got the license from

4   InterTrust, how long -- how much change did you make to the

5   FairPlay system?  Any at all?

6   A     I'm sure we have made some changes.  It's changing all

7   the time.  It's changing every few weeks.

8   Q     Okay.  But none that you can tell the jury about?

9   A     None that I can specifically talk about.

10  Q     No major overhaul after you got the InterTrust?

11  A     I don't believe so.

12  Q     Okay.  And how long did InterTrust knock on your door

13  trying to get you to take a license to their patents?

14          MR. PRITIKIN:  Your Honor, may we approach?

15          THE COURT:  Approach the bench, counsel.

16          (Bench conference.)

17          MR. PRITIKIN:  Your Honor, I was not in chambers

18  this morning.  Mr. Anderson was there.  Would it be all

19  right if he deals with this rather than me?

20          THE COURT:  That's fine.

21          MR. PRITIKIN:  Thank you.

22          MR. BRYAN ANDERSON:  This is exactly the issue

23  that was addressed in chambers, Your Honor.  They're trying

24  to get into the length of time --

25          THE COURT:  Speak up just a little bit.

1          MR. BRYAN ANDERSON:  -- related to the dispute

2   between InterTrust and Apple.  You have the testimony from

3   Dr. Tribble from yesterday, which was focused on Cloakware,

4   so we don't believe the door was opened.

5          THE COURT:  Well, as I said in chambers, we're not

6   going to get into the InterTrust litigation.  But so far, he

7   hasn't done that.

8          Now, one other thing while I have all you smart

9   lawyers in front of me.  We just had 30 minutes about usage

10  rules, and nowhere in the Court's construction do I construe

11  usage rules.  I construed usage rights.  I don't want this

12  record to be confused.

13         I don't know -- I'll leave it to you gentlemen as

14  to how best to make sure that's not a confusion in the

15  record, but without interrupting Counsel during the cross,

16  there was a lot of talk about the Court construing usage

17  rules, and the construction says "usage rights."

18         So I at least put everybody on notice of that.

19         You know, as long as -- as long as the inquiry is

20  as to the license without going into the litigation --

21         MR. BAXTER:  I can do it, Judge.

22         THE COURT:  -- I think that falls within the

23  instructions I gave in chambers, all right?

24         MR. BRYAN ANDERSON:  Very good.  Thank you, Your

25  Honor.

```
 1              (Bench conference concluded.)
 2    Q    (By Mr. Baxter) Well, let me ask it again, Dr. Tribble.
 3         How long did InterTrust knock on your door trying to
 4    get you to take a license to their patent?
 5    A    I don't know specifically how long that -- that deal
 6    was.  It was a large deal for over a thousand patents.  I
 7    don't know how long it took.
 8    Q    About seven years?
 9    A    I -- I wouldn't dispute that.
10    Q    Okay.  And the whole time Apple kept saying:  Don't
11    need them; isn't that right?
12    A    I'm not familiar exactly what we said, but that may
13    have been the case during the negotiations.
14    Q    And after you got them, you didn't change the FairPlay
15    system, did you?
16    A    Other than what I mentioned, that it's -- it's always
17    changing.
18    Q    All right, sir.  Let me see if I can talk a moment
19    about Cloakware, if I can, please, Dr. Tribble.
20              MR. BAXTER:  If I can get Slide 25 up, Mr. Diaz?
21    Q    (By Mr. Baxter) This is from the people that you bought
22    Cloakware from, and in one of their announcements, see if --
23    if you agree with this.
24              Successful employment of a DRM system requires a
25    trusted software component on the user's computer or device
```

1    to perform integrity checking, to decrypt the content, and

2    to enforce the usage rights associated with digital content.

3            Do you agree what Cloakware says about that?

4    A    Well, that is what Cloakware says about their product.

5    Q    Do you agree with it, sir?

6    A    I don't completely agree with it.

7    Q    DRM is all about trust, as we mentioned at the start.

8            Do you agree with that?

9    A    It involves trust, yes.

10   Q    DRM involves a chain of trust from content provider to

11   publisher to distributor to retailer to end-user.

12           Do you agree with that?

13   A    Yes, I do.

14   Q    Trusted software is a key requirement for any DRM

15   system.

16           Do you agree with that?

17   A    I don't agree with that.

18   Q    All right, sir.  So the people at Cloakware that

19   provide the software that you now tout as being an extra

20   layer of security, you don't agree with what they say about

21   the -- how the DRM systems work; is that right?

22   A    Not completely.

23   Q    All right, sir.  Now, one of the things that --

24           MR. BAXTER:  Thank you, Mr. Diaz.

25   Q    (By Mr. Baxter) -- That we heard yesterday from you is

1   that Apple wanted a system that was not intrusive; is that

2   right?  So that the customer wouldn't be bothered; is that

3   right?

4   A    Yes.  We wanted it to be easy and simple and

5   nonintrusive.

6   Q    All right, sir.  And I believe you talked a little bit

7   about behavioral integrity and about digital certificates.

8   Does the customer have -- have any earthly idea about

9   digital certificates and whether or not they're being used

10  or not used?  Is that something that improves upon the

11  customer's use of any DRM system?

12  A    Well, it -- it might or it might not.

13  Q    Well, if -- if I have this iPhone and I'm going to

14  download a movie, do I -- do I know whether or not a digital

15  certificate is being used back at the iTunes Store?

16  A    You don't know whether one's being used at the iTunes

17  Store.

18  Q    Okay.  Communications integrity, if I download a movie,

19  do I have any earthly idea if it's being transported across

20  a secure layer socket?

21  A    Typically, it's lower across a secure socket layer.

22  Q    Okay.  Do I have any earthly idea?

23  A    You might notice it being slower.

24  Q    Okay.  That's it?

25  A    That's about it.

1   Q      Will I know, whether it is or not, why it's slower or

2   why it's not?

3   A      No, you won't.

4   Q      Okay.  And as far as the physical integrity, would I

5   have any earthly idea about how the content is stored on

6   this phone or how the usage rules are enforced or the usage

7   rights are enforced?

8   A      Well, if -- if you -- depending on how those -- that

9   physical integrity is maintained, that can be intrusive.

10  Q      Okay.  Tell me how it's intrusive.

11  A      Okay.  If -- if the physical integrity doesn't allow

12  the user to do something they wanted to do, that would be

13  intrusive.

14  Q      Well, if what they wanted to do is against the usage

15  rights, I guess that would be intrusive, wouldn't it?

16  A      Well, I wouldn't include -- I wouldn't include that.

17  Q      Well, okay.  If it's something I have a right to do,

18  are you going to tell me that the usage rights prevent me

19  from doing something I have a right to do?

20  A      No.

21  Q      Okay.  Well, then, give me an example of what you're

22  talking about.

23  A      For physical integrity, I think that -- that it needn't

24  be intrusive for the customer.

25  Q      All right.  So in those three areas, you don't know of

1  any reason why the DRM system would be intrusive?

2  A    Well, for behavioral integrity, if you're going to

3  prevent users from downloading softwares that don't have

4  digital certificates, I think the user will notice that when

5  they try and download software that doesn't have a digital

6  certificate and you don't let them do that.

7  Q    All right, sir.  And does the DRM system apply to all

8  software or just to the software having to do with the Apple

9  system and downloading movies and books?

10  A    Could -- could you say that again, please, sir?

11  Q    Yes, sir.

12       Well, it is true, is it not, that they use certificates

13  for iTunes software on the iPhone, right?

14  A    Yes.  Certificates are used for many things on the

15  iPhone.

16  Q    Can I repeat my question to you, Doctor?

17       Apple uses digital certificates for the iTunes software

18  that is downloaded on the iPhone; is that not correct, sir?

19  A    Yes.

20  Q    Okay.  Do I know that when it happens?  Is that

21  intrusive to me?

22  A    It prevents you from downloading software that -- that

23  doesn't have those certificates.

24  Q    Well, that's what you want, isn't it?

25  A    That's what we want.

```
 1    Q    Okay.  What do you think --
 2    A    It might not be what the user wants.
 3    Q    Well, do you think I, as a consumer, want some malware
 4    on my phone?
 5    A    I don't think you want malware on your phone.
 6    Q    Okay.  Is keeping the movies encrypted intrusive in any
 7    way?
 8    A    I don't think that's intrusive.
 9    Q    Okay.  Now, Dr. Tribble, I want to ask you about a
10    quote of yours, if I can, if I can find it.
11         Ah, here we go.
12         You've been quoted as saying this:  If you take
13    something -- and I assume from somebody else -- and make it
14    your own, it's your design, and that is the dividing line
15    between copying and stealing.  And that is part of Apple's
16    DNA.
17              Is that your quote?
18              MR. PRITIKIN:  Your Honor, may we approach?
19              THE COURT:  Approach the bench.
20              (Bench conference.)
21              MR. PRITIKIN:  Your Honor, this statement was made
22    in the context of when he was questioned or asked about that
23    Jobs' quote that was the subject of discussion at the
24    prehearing conference.  They were not supposed to do this,
25    get into that subject without fronting it with the Court.
```

1        Now they've sprung it with the jury here with this

2   statement.  It clearly relates to the Jobs' quote, and it's

3   improper for them to be confronting this witness -- first,

4   there's no allegation of copying in this case anyway.  Not

5   one of their experts have said that there was any copying.

6   It's not in the case.

7        This is highly prejudicial for them to spring a

8   quote like this.  And beyond that, I believe it should have

9   been fronted.

10       THE COURT:  What's -- what's the relevance of

11  this, Mr. Baxter?

12       MR. BAXTER:  Well, I think it has to do with the

13  whole Apple DNA, Your Honor, about whether or not they copy

14  or whether or not they're careful about using other people's

15  property, which he says:  I knew about it in 2005, and I

16  didn't bother to take a look until 2015.  I think it has to

17  do with their whole DNA.

18       THE COURT:  I mean, there is no allegation of

19  copying here, and this is very similar in substance to the

20  Steve Jobs' quote.

21       MR. BAXTER:  And you told me I couldn't use the

22  Steve Jobs' quote, but I ought to be able to use his quote,

23  Your Honor.  It's his quote, not Jobs.  I didn't ask a thing

24  about Jobs.

25       THE COURT:  I understand that, but it's the same

```
 1   subject matter.

 2            What's your intended question now that this is in

 3   front of the jury?

 4            MR. BAXTER:  My question is, in fact, isn't that

 5   in Apple's DNA, and didn't he, in fact, know about the

 6   patents from 2005 and turn a blind eye to them until 2015

 7   and didn't bother, and, in fact, they could take someone

 8   else's technology and try to adapt it to themselves and use

 9   it as their own.  And that's exactly what they've done in

10   this case.

11            MR. PRITIKIN:  That's outrageous, Your Honor.

12   It's highly prejudicial in a case where there is no copying

13   allegation.  None.  Those questions could have been asked.

14   I think that he should be instructed to take the slide down,

15   and the jury should be told to disregard this.

16            MR. BAXTER:  So --

17            MR. PRITIKIN:  It should have been fronted.

18            THE COURT:  One at a time.

19            MR. BAXTER:  I get to ask him about his own

20   statements, Your Honor, and about their disregard for other

21   people's intellectual property.

22            THE COURT:  Well, you get to ask him about his own

23   statement as long as it's relevant to the case, and there's

24   not any copying allegation here.

25            MR. BAXTER:  I understand that, Your Honor, but
```

1   there is allegations that they turned a blind eye after they

2   knew about our patents in 2005, and they did absolutely

3   nothing to investigate it -- he did nothing; none of their

4   people did anything -- and that they tried to take these

5   ideas and make it their own as they've testified.

6           It's all their idea and they did it themselves.

7   And that is -- that is the gray art that they've engaged in.

8           MR. PRITIKIN:  And I would submit that is not

9   copying; it's stealing.  The allegation in this case is

10  patent infringement, and they've had a full opportunity to

11  ask witnesses about the back and forth in the discussions.

12          MR. BAXTER:  And my allegation is they've stolen

13  our patents.

14          MR. PRITIKIN:  You don't steal patents, Your

15  Honor.

16          MR. BAXTER:  Well, if you take them and use them

17  for yourself, then they --

18          THE COURT:  That's infringement.  It's not

19  copying.

20          You know, you're free, Mr. Baxter, to pursue a

21  line of questioning about Apple's use of your patented

22  technology, but without copying in the case, I don't -- I

23  just don't think this is proper.

24          I think it's the same thing as the Steve Jobs'

25  quote.  It just has his name on it.  And it has the same

1  prejudicial effect, and it relates to copying when copying

2  is not in the case.

3          You're going to have a wide road with no

4  restrictions to question this witness about how they've used

5  your patented technology, but without an allegation of

6  copying, I don't think this is proper.

7          MR. BAXTER:  All right, Your Honor.

8          THE COURT:  We're going to take it down, and we're

9  going to move on.

10          MR. PRITIKIN:  Thank you, Your Honor.

11              (Bench conference concluded.)

12          THE COURT:  Ladies and gentlemen, I'm going to

13  strike the use of the last slide that you saw with the quote

14  from Dr. Tribble on it, and you're to disregard that quote.

15          Now we'll move on.

16  Q   (By Mr. Baxter) Dr. Tribble, is it my understanding,

17  sir, that you and Apple first learned about the Stefik

18  patents in 2005?

19  A    Well, I -- I believe Cloakware paid a visit to Apple

20  and -- and showed a set of slides that mentioned patents,

21  yes.

22  Q    Well, you heard from ContentGuard in 2005, did you not?

23  A    Yes, we did.

24  Q    And they told you that they had patents?

25  A    They did.

```
1    Q    Okay.  Nobody bothered to read them?

2    A    I don't know one way or the other.

3    Q    You didn't?

4    A    Not that I recall.

5    Q    And you have not talked to anybody at Apple that

6    bothered to read them; is that right?

7    A    No.

8    Q    You would agree with me that patents are important?

9    A    Yes, I do.

10   Q    You would agree with me it's an important part of

11   Apple's business to protect its own patents?

12   A    That's true.

13   Q    You take infringement of your patents very seriously,

14   do you not?

15   A    Yes, sir.

16   Q    And you wouldn't hesitate to come to court about

17   infringement of one of your patents?

18   A    No, sir.

19   Q    And I take it you don't fault anybody from coming to

20   court about infringement of their patents?

21   A    No, sir.

22        MR. BAXTER:  Thank you, Your Honor.  That's all I

23   have from Dr. Tribble.

24        THE COURT:  All right.  You pass the witness?

25        MR. BAXTER:  I do, Your Honor.  Thank you.
```

```
 1              THE COURT:  Redirect, Mr. Pritikin?

 2              MR. PRITIKIN:  Yes.

 3              And, Your Honor, may I approach briefly before I

 4    start my redirect?

 5              THE COURT:  All right.  Approach the bench,

 6    counsel.

 7              (Bench conference.)

 8              MR. PRITIKIN:  Your Honor, they told us about the

 9    iPhone demonstration just before they started this morning,

10    and I would like to do a demonstration with an iPad with the

11    witness.

12              THE COURT:  Well, you need to show it to opposing

13    counsel.

14              MR. PRITIKIN:  That's why I approached, Your

15    Honor.

16              And so what we're going to do is use this with

17    him, which has the Google Play app on it.  We're going to

18    touch the app, and we're going to show the movie play.

19              MR. BAXTER:  Well, as long as he asks him, is it

20    already downloaded.

21              MR. PRITIKIN:  It's been downloaded, and it's on

22    here.

23              MR. BAXTER:  As long as he makes it clear he can't

24    buy the movie, but I'll be glad to recross him on that,

25    because you can't buy the movie with that app.
```

```
 1            THE COURT:  We'll get -- we'll get that clear one
 2   way or the other.
 3            MR. PRITIKIN:  I just wanted to be clear on what
 4   I'm doing.
 5            MR. BAXTER:  That's fine.
 6            THE COURT:  Let's proceed.
 7            MR. PRITIKIN:  Thank you.
 8            (Bench conference concluded.)
 9            THE COURT:  All right.  Counsel, when you're
10   ready.
11                     REDIRECT EXAMINATION
12   BY MR. PRITIKIN:
13   Q    Good morning, Dr. Tribble.
14   A    Good morning.
15   Q    You were asked some questions about the Google Play app
16   during the cross-examination.
17        Do you recall?
18   A    I recall.
19   Q    And, now, do you understand that the DRM system that is
20   used by the Google Play app does not infringe the
21   ContentGuard patents?
22   A    That's my understanding, yes.
23   Q    And does that indicate to you a way -- that there are
24   ways to have an effective DRM system without using those
25   patents?
```

```
 1    A     Yes, it does.
 2    Q     What does that tell you about the claim we've heard in
 3    the case that the Stefik patents are the foundation for all
 4    of the modern DRM systems?
 5            MR. BAXTER:  Objection, Your Honor.  That calls
 6    for an expert conclusion.
 7            THE COURT:  Restate your question, Mr. Pritikin.
 8            MR. PRITIKIN:  Sure.
 9    Q     (By Mr. Pritikin) What conclusions do you draw from
10    that, sir?
11    A     Well, that tells me that there are many ways to do DRM,
12    and some of them infringe -- they infringe on the Stefik
13    patents, and some of them clearly do not infringe on the
14    Stefik patents.
15            MR. BAXTER:  Your Honor, excuse me.
16            THE COURT:  I'll sustain -- I'll sustain your
17    objection.
18            MR. BAXTER:  Thank you, Your Honor.  Ask that it
19    be --
20            THE COURT:  Last answer is stricken.
21            MR. BAXTER:  Thank you.
22    Q     (By Mr. Pritikin) Now, when Google wanted to make its
23    Google Play app available on the Apple iTunes Store, did
24    Apple give Google permission to do that?
25    A     Yes, Apple gave them permission to do that.
```

1  Q    And is the Google Play app available on the iTunes

2  Store today?

3  A    Yes, it is.

4  Q    And can the Google Play app be downloaded from the

5  iTunes Store and installed on iPhones and iPads?

6  A    Yes, it can.

7  Q    Now, would it be fair to say that despite some of their

8  other differences, Apple and Google do have a working

9  relationship today with respect to things like that?

10  A    Yes.  Apple works with Google on some things like that.

11  Q    All right.  Now, there was a demonstration a little

12  while ago where you were shown an iPhone that had the Google

13  Play app on it.

14      Do you recall that?

15  A    Yes, I do.

16  Q    And in the particular iPhone that was being used here,

17  there were no movies downloaded on it and none that could be

18  played.

19      Do you recall that?

20  A    I recall that.

21  Q    Now, I have an iPad here, and I'm going to put it on

22  the ELMO.  And do you see that -- it's a little big for

23  this.  We'll get it there.

24      Now, do you see that the app that is in the upper

25  left-hand corner is the Google Play app?

```
 1  A     I do.

 2  Q     And do you see that it has been installed -- installed

 3  on this iPad?

 4  A     I see that, yes.

 5  Q     Now, I'm going to touch that icon.  Do you see that

 6  opens the Google Play app?

 7  A     Yes.

 8  Q     And do you see that there in the -- by the way, do you

 9  see that this is offline from the little symbol in the upper

10  left corner?

11  A     Yeah.  The airplane symbol means it's not connected to

12  any networks or the Internet.

13  Q     So the movie has been downloaded and is on this device?

14  A     It appears so, yes.

15  Q     Now, the movie Big -- if I touch the icon for Big, what

16  happens?

17  A     It's playing the movie.

18  Q     So is it possible to use the Google Play apps on the

19  iPhones and the iPads to play movies that have been

20  downloaded to the phones and the iPads, sir?

21  A     Yes.

22  Q     And do you know how you get them through the Google

23  website?

24  A     You get them using the Google servers.

25  Q     And then you can install them on your iPad and iPhone
```

1    once you've done that?

2    A    Yes, you can.

3            MR. PRITIKIN:  Can we pull up PX-1130?

4    Q    (By Mr. Pritikin) And do you recall that this is the

5    email from Mr. Jobs that I had asked you about on direct

6    examination?

7    A    Yes, I do.

8            MR. PRITIKIN:  And let's pull up the top just to

9    remind everyone of what it is.

10   Q    (By Mr. Pritikin) Do you see the subject line on this

11   says:  Let's not use this DRM?

12   A    Yes, I see that.

13   Q    This was from 2005?

14   A    Yes.

15   Q    And if we look further down, do you recall that

16   Mr. Jobs was referring to the OMA standard -- the OMA 1.0

17   standard?

18   A    Yes.

19   Q    And do you recall you were asked some questions

20   yesterday by Mr. Baxter about the OMA standard?

21   A    Yes, I do.

22   Q    Now, looking at the transcript from yesterday,

23   Mr. Baxter said to you that the OMA 1 was a secure container

24   system and didn't use usage rights.

25           Do you recall him asking you about that?

```
 1   A     I recall that, yes.

 2   Q     And in the transcript, he also said usage rights didn't

 3   come along until OMA 2.0.  Do you remember him saying that

 4   to you yesterday?

 5   A     Yes, I do.

 6   Q     Mr. Baxter didn't show you the OMA 1 standard, did he?

 7   A     No, he did not.

 8              MR. PRITIKIN:  Could we pull up AX-135?

 9   Q     (By Mr. Pritikin) And this is AX-135, which is in

10   evidence.  And what is this, sir?

11   A     That's the OMA 1.0 standard.

12   Q     Now, I think -- did you say yesterday, when this came

13   out, you had some familiarity with it?

14   A     Yes.

15              MR. PRITIKIN:  Let's go to Page 4 of this

16   document, and let's look at the second paragraph under the

17   heading Scope.

18   Q     (By Mr. Pritikin) And do you see it says here that the

19   OMA standard allows content providers to express usage

20   rights?

21        Do you see that?

22   A     Yes, I see that.

23   Q     So do you agree with Mr. Baxter's statement yesterday

24   that OMA 1 was a secure container system that didn't use

25   usage rights and that they didn't come along until 2.0?
```

1   A      No.   Usage rights seemed to be in the OMA 1 standard as

2   well.

3   Q     Let's look at Page 6 of the OMA 1 standard.   And I want

4   to direct your attention to the definition for combined

5   delivery.

6         Do you see under "combined delivery," it says:

7   Delivery of the rights object and content together in a

8   single message?

9         What's your understanding of that?

10  A     My understanding of that is that the usage rights would

11  be attached to the content and delivered in a single

12  message.

13  Q     And is this something that you and Mr. Jobs and others

14  at Apple favored doing?

15  A     No, we did not favor doing that.

16  Q     Let's look at Page 7 of the document and specifically

17  at the drawing in the middle on combined delivery.   And can

18  you explain to the jury what's shown here?

19  A     Well, that -- this document shows a picture with the

20  content on the left in the middle box and the rights within

21  the same box on -- on the right where it says "you can play

22  only once."   That's a right.

23        And then it shows a -- what's call a WAP download where

24  that DRM message containing both the contents and the rights

25  are being downloaded to the device that the user has.

```
 1    Q    Now, did the OMA standard allow for various ways to do
 2    it, but was combined delivery one of them?
 3    A    Combined delivery was one of them, yes.
 4    Q    And is that something that Apple wanted to do?
 5    A    No, Apple did not want to do that.
 6         MR. PRITIKIN:  Let's go back to PX-1130, Mr. Jobs'
 7    email.
 8    Q    (By Mr. Pritikin) And the standard we just looked at,
 9    is that the standard that's being referenced in the article
10    attached here?
11    A    Yes, it is.
12    Q    Now, was Apple rejecting the secure container approach?
13    A    No.
14    Q    What was Apple objecting to?
15    A    Apple didn't want to use the approach that OMA 1 was
16    talking about, which was where the content and the rights
17    were combined and downloaded together to the user's device.
18    Q    Okay.
19         MR. PRITIKIN:  Mr. Simmons, can we pull up AX-145,
20    please.
21    Q    (By Mr. Pritikin) And do you see that this is the
22    article that has been the subject of previous testimony by
23    Ram, Ta, and Wang from 1997?
24    A    Yes.
25    Q    And do you recall testimony that these are people who
```

1    were working with Dr. Stefik at Xerox?

2    A    I do, yes.

3    Q    Now, let's turn over to Page 4 of the document.  And

4    let's pull up the sentence that says:  To date, there are

5    broadly two technical approaches, mainly the secure

6    container approach, Griswold 1994, IBM Cryptolope, and

7    InterTrust DigiBox.

8         And then it goes on to say:  And the trusted system

9    approach, Stefik, Tygar, and Yee and White.

10        Do you see that?

11   A    Yes, I do see that.

12   Q    Now, do you see that the people who are working at

13   Xerox classified InterTrust as a secure container approach?

14             MR. BAXTER:  Excuse me, Your Honor.  This is all

15   expert testimony.  This doesn't have anything to do with

16   cross-examination or his testimony originally.  This is all

17   expert testimony.  I object to all of this.

18             THE COURT:  Response, Mr. Pritikin?

19             MR. PRITIKIN:  Yes.  They -- I'm going to ask him

20   about InterTrust, which is the very subject that Mr. Baxter

21   questioned him about, and that's where I'm going with this.

22             THE COURT:  Well, let's get there.

23             MR. PRITIKIN:  All right.  I will.

24   Q    (By Mr. Pritikin) Do you see that InterTrust is

25   classified as a secure container approach?

```
 1    A    Yes, I do.
 2    Q    Now, you recall on cross-examination you were asked
 3    some questions by Mr. Baxter about InterTrust?
 4    A    Yes, I do.
 5    Q    And you were asked whether Apple had paid money to take
 6    a license from InterTrust for its DRM system?
 7    A    I think I recall that, yes.
 8    Q    And is that the InterTrust that's referred to here?
 9    A    Yes, it is.
10              MR. PRITIKIN:  You can take that down,
11    Mr. Simmons.
12    Q    (By Mr. Pritikin) Now, you were asked a number of
13    questions by Mr. Baxter on cross-examination about usage
14    rules.
15         Do you recall that -- recall those questions?
16    A    Yes, I do.
17    Q    The term "usage rules" doesn't appear in any of these
18    patent claims, does it?
19    A    I haven't seen it in any of the patent claims, no.
20    Q    The term there is "usage rights," correct?
21    A    I believe so.
22    Q    And the term that Judge Gilstrap construed and
23    interpreted was the term "usage rights," correct?
24    A    That's correct.
25    Q    Do the studios require Apple to enforce various usage
```

1  rules relating to -- relating to their movies?

2  A    Yes.  Of course they do.

3  Q    And does Apple comply with those contracts?

4  A    Yes, Apple does comply.

5  Q    And does Apple do that by requiring the use of secure

6  repositories throughout the system?

7  A    No, we do not.

8  Q    How does Apple make sure that the usage rules that it

9  is obliged by contract to honor are enforced within the

10  Apple system?

11  A    We enforce those rules by encrypting the content and

12  then carefully controlling whether the keys to decrypt that

13  content are available to the user on their system.

14  Q    And are you referring to the account key and the rental

15  key?

16  A    The account key and the rental key, yes.

17  Q    Now, you were present in the courtroom during the

18  testimony of ContentGuard's expert, Dr. Goodrich, weren't

19  you?

20  A    Yes, I was.

21  Q    Did you ever hear Dr. Goodrich say even once that the

22  account and the rental keys in the Apple system are usage

23  rights under the Stefik patents?

24  A    I didn't hear him say that.

25  Q    In terms of the expiration of the rental period when

1    someone rents a movie, how is that enforced by Apple?

2    A    The rental keys and the rental KeyBag have a time that

3    is included, which is the time that the user is allowed to

4    rent the movie.

5    Q    And is that done through the keys?

6    A    That's done through the keys, correct.

7    Q    On direct examination, did I ask you, Dr. Tribble --

8    Tribble, for your opinions on the consulting agreements that

9    ContentGuard entered into with three of the inventors on its

10   patents?

11   A    I'm not sure if I recall that.

12   Q    Okay.  Well, it was Mr. Baxter who asked you to give

13   opinions on that to the jury, didn't he?

14   A    He did, yes.

15   Q    All right.  And to be clear, do you think there's

16   anything wrong with either side paying expert witnesses

17   their standard rates?

18   A    No, I don't think there's anything wrong with that.

19   Q    And when Apple was sued by ContentGuard, did Apple hire

20   experts to defend itself in this case?

21   A    Yes, we did.

22   Q    Has it been expensive for Apple to pay all the expert

23   it needed?

24   A    I would say yes.

25            MR. BAXTER:  Excuse me, Your Honor.  I object to

```
1   that.  That's in direct violation of the Court's order.
2            THE COURT:  Approach the bench, counsel.
3            (Bench conference.)
4            THE COURT:  Mr. Pritikin?
5            MR. PRITIKIN:  Yeah, Your Honor.  I'm not going to
6   ask him how much has been spent on this or what the legal
7   fees were.  They opened the subject and questioned him
8   extensively yesterday on the money he'd been paid, and I
9   think it's only fair for me to ask him some questions about
10  what his views are on the subject.
11           That's all I intend to ask him.  And it relates to
12  the expert fees.  I didn't intend to cover the legal fees.
13           THE COURT:  Well, the issue, as raised, had to go
14  with the trustworthiness because they were compensated.  It
15  did not go to the parties' expenses, and you went to that.
16  I'm going to strike that answer.
17           MR. PRITIKIN:  That's fine, Your Honor.
18           MR. BAXTER:  Thank you, Your Honor.
19           MR. PRITIKIN:  Sure.
20           (Bench conference concluded.)
21           THE COURT:  Ladies and gentlemen, I'm going to
22  direct you to disregard the question and answer regarding
23  whether or not the expenses to retain experts was expensive
24  to the Defendant, Apple.  You should disregard that.
25           All right.  Let's continue.
```

```
 1           MR. PRITIKIN:  Sure.

 2    Q     (By Mr. Pritikin) Dr. Tribble, do you think it's

 3    reasonable that the jury should know how much the experts on

 4    both sides have been paid?

 5    A     Sure.  I think that's reasonable.

 6    Q     And do you recall us asking Mr. Baker or Mr. Dozois,

 7    employees of ContentGuard, any questions about how much

 8    they're paid?

 9    A     Yes, I do.

10    Q     Do you recall that you were asked some questions about

11    the three consulting agreements that ContentGuard signed

12    with Mr. Chen, Mr. Lao, and Mr. Ta?

13    A     Yes.  Ms. -- Mr. Baxter asked me about that.

14    Q     All right.  Again, to be clear, do you think there's

15    anything wrong with a company making severance payments to

16    long-time employees who are laid off?

17    A     No, I don't think there's anything wrong.

18    Q     Now, in response to the questions you were asked by

19    Mr. Baxter, I believe you testified that you thought some

20    aspects of those agreements were unusual.

21           Do you recall that?

22    A     Yes, I do recall that.

23    Q     And can you -- can you explain to the jury what it is

24    you thought was unusual about those agreements?

25    A     The unusual part, in my experience, was the part that
```

1    asked them to support ContentGuard in their litigation.

2    Q    Did you consider it unusual that the -- if they're

3    severance agreements, they came with those strings attached?

4    A    In my experience, if it was just a severance agreement,

5    I -- I wouldn't expect to find a string like that.

6    Q    Did you think it was unusual that if they're severance

7    agreements, they said they were going to lose their

8    severance if they didn't tow the line and help support the

9    patents?

10   A    Yes, I felt that was unusual.

11   Q    Now, did you say on -- you testified that Apple has at

12   least 50 patents on DRM?

13   A    That's correct.

14   Q    And do you have patents of your own?

15   A    I do.

16   Q    You were shown just one of Apple's DRM patents

17   yesterday.

18        Do you recall?

19   A    Yes, I do.

20   Q    And do you recall that was a patent that issued to

21   Augustin Farrugia and GP Fasoli?

22   A    Yes, I do.

23        MR. PRITIKIN:  And would it be possible to put up,

24   Mr. Diaz, the slide that has that patent on it?

25   Q    (By Mr. Pritikin) Do you recall, this is the slide that

1    Mr. Baxter showed you yesterday?

2    A    Yes, I do.

3    Q    And do you see in the section of prior art, one of the

4    patents that is cited here is a Stefik patent?

5    A    Yes, I do.

6    Q    Now, you understand that when you apply for a patent,

7    the Patent Office compares your patent application to the

8    prior art to decide if what you have is patentable.

9    A    Yes, that's what I understand.

10   Q    And in this case, did the Patent Office grant

11   Mr. Farrugia and Mr. Fasoli a patent on their DRM system,

12   knowing about the earlier Stefik patent and what it

13   described?

14   A    Yes, they did.

15   Q    Do you think for -- Mr. Farrugia and Mr. Fasoli could

16   have gotten this patent on FairPlay if FairPlay --

17            MR. BAXTER:  Objection, Your Honor.  Once again,

18   calls for an expert opinion.

19            THE COURT:   Calls for speculation.  I'll sustain.

20            MR. BAXTER:  Thank you, Your Honor.

21            MR. PRITIKIN:  Let me -- let me try rephrasing it,

22   Your Honor, to avoid that.

23            THE COURT:  Have a seat, Mr. Baxter.

24            MR. BAXTER:  Thank you, Your Honor.

25            THE COURT:  If you want to raise another

1    objection, you can stand at that time.

2              MR. BAXTER:  I will.

3    Q    (By Mr. Pritikin) The Patent Office granted the patent

4    to Mr. Farrugia and Mr. Fasoli even though the Stefik patent

5    described certain DRM information, correct?

6    A    That is correct.

7    Q    And the system described by Mr. Farrugia and Mr. Fasoli

8    in their patent had to have been different from what was in

9    the Stefik patent in order for the patent to be issued,

10   correct?

11             MR. BAXTER:  Speculation, Your Honor, and I

12   object.

13             THE COURT:  Sustained.

14             MR. PRITIKIN:  I have no further questions, Your

15   Honor.  I pass the witness.

16             THE COURT:  All right.  Additional cross,

17   Mr. Baxter?

18             MR. BAXTER:  Oh, yes, Your Honor.

19                      RECROSS-EXAMINATION

20   BY MR. BAXTER:

21   Q    Let me start with the Big movie, if I can, Dr. Tribble.

22   Do you know how that movie got on that iPad?

23   A    I don't personally know how it got on there.

24   Q    It wasn't through Google Play, was it?  Because you

25   can't download it from Google Play, can you?

1    A    I don't know.

2    Q    Well, you saw my phone.  There's no place on this

3    earth, if you download Google Play on an iPhone or an iPad,

4    it would allow you to download a movie, will it?

5    A    I don't know.

6    Q    Well, you want me to show it to you again?  Did you see

7    any place, sir?

8    A    I didn't see any place there, no.

9    Q    All right, sir.  You've got to go someplace else and

10   get a movie, don't you?

11   A    I don't know.

12   Q    Okay.  Doesn't sound very handy, does it?

13   A    It doesn't sound very handy, no.

14   Q    And Apple doesn't make it very handy to use Google Play

15   on its iPads and iPhones, does it?

16   A    Well, it may be that Google doesn't make it handy.

17   Q    Well, Apple's the one that controls that, isn't it?

18   A    No.  Google controls the experience in their apps.

19   Q    My point exactly, I guess, then.  Google and Apple

20   don't get along very well, do they?

21   A    Sometimes we do; sometimes we don't.

22   Q    Well, in this case, downloading on the iPhone, you

23   don't get along, do you?

24   A    We let them sell it in our store.  We give them

25   permission to do that.

```
 1   Q    And it does -- it's clunky, and it doesn't work very
 2   well, does it?
 3   A    Some people might think that, yes.
 4   Q    And not only that, Apple takes a 20-percent slice if
 5   you try to get one, doesn't it?
 6   A    I don't know.
 7   Q    Not very friendly, is it?
 8   A    Well, if it's a business deal, it's usually friendly.
 9   Q    You think that's friendly, taking a 20-percent slice
10   out of somebody else's movie?
11   A    Well, it's -- maybe it's not friendly, no, it's
12   business.
13   Q    Okay.  Now, did you give any thought overnight to what
14   that ad looks like for Apple going forward about "buy the
15   Apple phone so you can use the Android system; it's a whole
16   lot better system than ours"?  Did you think about what that
17   ad might look like?
18   A    I didn't think about that, no.
19   Q    It's too terrible to even think about, isn't it?
20   A    No.  I can think about it.
21   Q    Okay.  Doesn't -- doesn't give you -- make you warm and
22   fuzzy, does it?
23   A    It wouldn't be a preference.
24   Q    Okay, sir.  Now, the patent that your counsel just
25   talked to you about, he called it a system.  It's actually
```

```
 1    some sort of media storage, isn't it?  It's not really a
 2    system.
 3         Did you look at that patent?  It's a media storage
 4    structure, isn't it?
 5    A    Yes, it is.
 6    Q    All right.  All right.  It's not a DRM system, is it?
 7    A    It's a media storage structure.
 8    Q    Okay.  Not a DRM system at all, is it?
 9    A    It doesn't appear to be, no.
10    Q    All right, sir.  Now let's talk about the OMA structure
11    just a minute.
12            MR. BAXTER:  Do you have that -- that, Mr. Diaz?
13    Q    (By Mr. Baxter) Now, one of the things that Counsel
14    showed you here was combined delivery, but he didn't show
15    you separate delivery, did he?  He didn't ask you about
16    that.
17         Is that one of the things that Mr. Jobs said he didn't
18    want was separate delivery?
19    A    Well, I think he said he didn't want the whole thing.
20    Q    Well, okay.  There's Forward Lock, there's combined
21    delivery, and there's separate delivery.  So, actually, you
22    don't know what he didn't want, do you?
23    A    I don't know what was in his mind specifically.
24    Q    Because you're doing separate delivery, aren't you?
25    A    We believe we are.
```

1    Q    So you don't have a clue what he was talking about, do

2    you?

3    A    I don't know what was in his mind.

4    Q    Okay.  Except you know that whole system was a secure

5    container, don't you?

6    A    No.

7    Q    Okay.

8              MR. BAXTER:  Thank you, Mr. Diaz.

9    Q    (By Mr. Baxter) Now let's talk about what comes down on

10   the -- on the Apple phone or the Apple iPad.

11        And apparently, your counsel wanted to split hairs with

12   me about usage rules and usage rights.  Usage rules and

13   usage rights are exactly the same thing, aren't they?

14             MR. PRITIKIN:  Your Honor, I object to that.

15             THE COURT:  What's your objection?

16             MR. PRITIKIN:  Based on the Court's claim

17   construction and claim terms.

18             THE COURT:  Overruled.  He can ask him if he

19   considers those terms the same or not.

20             Answer the question, please.

21   A    I don't consider them the same.

22   Q    (By Mr. Baxter) Well, tell me the difference.

23   A    Well, usage rights are defined by the Court in the

24   claim construction.

25   Q    Well, I understand that.  I want to know what your

1    explanation is about what the difference between usage rules

2    and usage rights are.

3    A    So usage rights, as defined by the Court in the claim

4    construction, are attached or treated as attached to the

5    content.

6    Q    But --

7    A    Usage -- usage rules are present in any DRM system,

8    whether there are usage rights attached or not.

9    Q    Okay.

10              MR. BAXTER:  Can you put Antarctica back up,

11   please, Mr. Diaz?

12   Q    (By Mr. Baxter) Let me ask it to you this way,

13   Dr. Tribble:  Would it be fair to say that if you rented

14   Antarctica, you have a right to view it for 30 days?

15   A    Yes.

16   Q    Okay.  That's a usage right, isn't it?

17   A    Well, not necessarily as defined by the Court.

18   Q    Sir, just plain everyday language.  You have a right to

19   view it for 30 days, do you not?

20   A    Yes.

21   Q    Okay.  Once you start playing it, you have a right to

22   view it for 24 hours, do you not?

23   A    That is correct.

24   Q    Okay.  And that's a usage right, isn't it?

25   A    Not if it requires attachment.

1   Q    Well, sir, we've already established, you're not an

2   expert on attachment, okay?  I'm just asking you in plain

3   everyday language if that's not a usage right.

4             MR. PRITIKIN:  Your Honor, may we approach?

5             THE COURT:  Approach the bench, Counsel.

6             (Bench conference.)

7             MR. PRITIKIN:  Your Honor, this gets into the

8   subject that we talked about a few minutes ago.  Usage

9   rights is a claim term.  It is a term defined by the Court.

10            And for Mr. Baxter to say to the witness, oh, just

11  tell me the ordinary everyday layman's meaning of usage

12  rights, is that what this is --

13            THE COURT:  I understand, Mr. Pritikin, but we're

14  well past that question.  That was four or five questions

15  ago.

16            I'm not going to permit testimony into what a

17  usage right is, because I have construed that, and the jury

18  and the parties are bound by that.  But questions about

19  whether the ability to see it within 24 hours is a right or

20  not, those are permissible.

21            MR. BAXTER:  Thank you, Your Honor.

22            MR. PRITIKIN:  Thank you, Your Honor.

23            THE COURT:  Let's proceed.

24            (Bench conference concluded.)

25            THE COURT:  Let's proceed.

```
 1            MR. BAXTER:  Thank you.
 2   Q    (By Mr. Baxter) I believe I asked you, Dr. Tribble, if
 3   the ability to view it in that 24 hours, that wasn't a usage
 4   right.
 5   A    And I said I didn't think it was according to the
 6   Court's claim construction.
 7   Q    Okay.  And we already determined you weren't an expert
 8   on that.  Just in everyday language, that's a right, is it
 9   not?  You have a right to view it within 24 hours?
10   A    In everyday language, that's a right.
11   Q    All right, sir.  And you have the right to watch it in
12   HD, do you not?
13   A    That's correct.
14   Q    And you have a right to hit that play button, which we
15   agreed earlier was a manner of use, didn't we?
16   A    You have a right to hit the play button.
17   Q    And that's a manner of use, is it not?
18   A    I believe so.
19   Q    Okay.  And if there were restrictions about a rating,
20   that would also be a usage right, would it not?  You either
21   have a right to view all the ratings or some of the ratings,
22   isn't that correct, and the phone enforces those?
23   A    The ratings are actually enforced by the owner of the
24   phone.
25   Q    Well, it sets -- sets the rating, but after he sets it,
```

1    the phone enforces it, doesn't it not?

2    A    After the user sets what ratings are allowed to be used

3    on that phone, then the phone enforces it.

4    Q    Okay.  And that also is a usage right, is it not?

5    A    Well, that's a restriction that comes from the user.

6    Q    It's still a usage right, is it not, that the phone

7    enforces?

8    A    I don't think so.

9    Q    Okay.  Well, if I have a right to view all the ratings,

10   that's a usage right, is it not?

11            THE COURT:  Counsel, approach the bench.

12            (Bench conference.)

13            THE COURT:  Just to make sure you understood my

14   prior direction --

15            MR. BAXTER:  Okay, Judge.

16            THE COURT:  -- Mr. Baxter, you can't use "right"

17   and "usage right" interchangeably.  If you want to ask what

18   conduct is permitted and whether the user has a right to do

19   that --

20            MR. BAXTER:  Okay.

21            THE COURT:  -- that's fine.

22            MR. BAXTER:  All right.

23            THE COURT:  But you can't call that a usage right.

24            MR. BAXTER:  I'll do it, Judge.

25            THE COURT:  All right.

1          MR. BAXTER:  Thank you.

2          MR. PRITIKIN:  Proceed.

3          (Bench conference concluded.)

4          THE COURT:  Let's proceed.

5    Q    (By Mr. Baxter) If -- if I have the right to view all

6    sorts of ratings, that's a right, is it not, Dr. Tribble?

7    A    Seems to be -- to be the same as the right to play any

8    movie, yeah.

9    Q    Fair enough.

10         Now, finally, Dr. Tribble, I believe we got back into

11   the three Content employees, and you found it, once again,

12   to be unusual that their severance agreement said that they

13   were to support ContentGuard about the patents.  And you

14   found that to be unusual?

15   A    I found it to be unusual, yes.

16   Q    Okay.  And here you are sitting in Marshall, Texas for

17   a couple of weeks supporting Apple in its defense of this

18   case, and you find it unusual that these people that had

19   worked for ContentGuard for 30 years and were intimately

20   involved with their patents might be required to come and

21   testify or give help to the ContentGuard people about the

22   patents?

23   A    Was there a question?

24   Q    Yes, sir.  Wouldn't you rather be home writing code?

25   A    I have no agreement with Apple that requires me to come

1  here --

2  Q    Okay.

3  A    -- and says they'll stop paying me if I don't.

4  Q    And you volunteered to come, did you?

5  A    I did.

6         MR. BAXTER:  I pass the witness, Your Honor.

7         THE COURT:  Redirect, Mr. Pritikin?

8         MR. PRITIKIN:  Thank you, Your Honor.

9                    REDIRECT EXAMINATION

10 BY MR. PRITIKIN:

11 Q    Now, with the Google Play app, whether one downloads

12 the movie directly from the Google Play app or you go to a

13 website and download it and then put it on your device, is

14 that a decision that's made by Apple or by Google?

15 A    That's made by Google.

16 Q    Now, with respect to the OMA standard that you were

17 asked about, how did Apple feel in general about the idea of

18 having a DRM system that was consistent with a standard?  Is

19 that something that you liked or didn't like?

20 A    Well, we didn't like the idea of implementing a DRM

21 standard because that meant that everyone implementing that

22 standard was implementing the same system, and we felt that

23 it made it more difficult to keep the secrets required that

24 are for any DRM system.

25 Q    All right.  And -- and I'm not going to ask you what

1 was in Steve Jobs' mind, but I do want to ask you whether --

2 what the feeling was at Apple generally, what the objection

3 was -- specific objection was to this proposed standard.

4     MR. BAXTER:  Objection, Your Honor.  Calls for

5 speculation.

6     THE COURT:  Sustained.  He can't testify to what

7 the feeling at Apple was generally.  That's speculative.

8 I'll sustain that.

9     MR. PRITIKIN:  All right.

10 Q (By Mr. Pritikin) What was your view, Dr. Tribble, at

11 the time, with the specific objection?

12 A So my view at the time was that since we didn't need to

13 have different usage rights with each studio, that the idea

14 of having usage rights come down with every piece of content

15 was a necessary complication.

16   And if those rights, indeed, were different for

17 different content, that -- that would be -- to the extent

18 that -- that each content was different, that would confuse

19 the user.

20 Q And finally -- and the last series of questions

21 Mr. Baxter asked you about, I think, was parental controls

22 and ratings.  Do you consider the parental controls on the

23 device to be part of the DRM system at all?

24 A No.  The parental controls are separate from the DRM

25 system.

1  Q    And why is that?  Would you explain to the jury why

2  they are separate from DRM?

3  A    Well, parental controls are a way for a parent to

4  control what their kids can see if they give their device to

5  their children.  It lets them go in, and using a password,

6  set a maximum ratings, like PG-13, that are viewable on that

7  phone.

8       And it's totally under the parents' control when

9  they're making that setting, and then typically they hand it

10  to their kids, and their kids would only be able to view up

11  to PG-13, for example.

12  Q    And how is that different from DRM?

13  A    Well, DRM is enforcing rules from the movie studios.

14  Parental controls is enforcing rules from the parent.

15            MR. PRITIKIN:  I have no further questions, Your

16  Honor.  Pass the witness.

17            THE COURT:  All right.  Additional cross,

18  Mr. Baxter?

19            MR. BAXTER:  No, Your Honor.  I'm through.

20            THE COURT:  Dr. Tribble, you may step down.

21            THE WITNESS:  Thank you, Your Honor.

22            THE COURT:  Ladies and gentlemen, before I ask the

23  Defendant to call their next witness, we're going to take a

24  brief recess.

25            You may leave your notebooks in your chairs.

1   Don't discuss the case among yourselves, and we'll be back

2   in here shortly to continue.

3           The jury is excused for recess at this time.

4           COURT SECURITY OFFICER:  All rise for the jury.

5           (Jury out.)

6           THE COURT:  Court stands in recess.  I expect this

7   to be about a 10-minute recess, counsel.

8           (Recess.)

9           COURT SECURITY OFFICER:  All rise.

10          THE COURT:  Be seated, please.

11          Is the Defendant prepared to call its next

12  witness?

13          MR. PRITIKIN:  We are, Your Honor.  We will be

14  calling Gianpaolo Fasoli.

15          THE COURT:  All right.  Let's bring in the jury,

16  Mr. Nance.

17          COURT SECURITY OFFICER:  Yes, sir.

18          All rise for the jury.

19          (Jury in.)

20          THE COURT:  Please be seated.

21          Defendant, call your next witness.

22          MR. PRITIKIN:  Your Honor, we call GP Fasoli as

23  our next witness.

24          THE COURT:  All right.  Has this witness been

25  sworn, Mr. Pritikin?

```
 1              Mr. Fasoli, have you been sworn?
 2              THE WITNESS:  Yes, Your Honor.
 3              THE COURT:  Then please have a seat.
 4              All right.  Counsel, you may proceed.
 5              MR. PRITIKIN:  Thank you, Your Honor.
 6        GIANPAOLO FASOLI, DEFENDANT'S WITNESS, PREVIOUSLY SWORN
 7                       DIRECT EXAMINATION
 8   BY MR. PRITIKIN:
 9   Q    Could you please introduce yourself to the jury?
10   A    Good morning.  My name is Gianpaolo Fasoli.
11   Q    And do you go by GP?
12   A    Yes, I do.
13   Q    Where do you work?
14   A    I work at Apple.
15   Q    You might want to move a little closer to the
16   microphone, Mr. Fasoli.
17        How long have you worked at Apple?
18   A    I've worked at Apple since June of 2005, so for over
19   ten years.
20   Q    And what is your position at Apple?
21   A    My current position is engineering manager of the DRM
22   technologies team.
23   Q    Can you tell the jury generally what your job
24   responsibilities are?
25   A    Yes, of course.  My responsibilities entail the design,
```

1    architecture, the implementation, the maintenance, and the

2    security of the FairPlay DRM system at Apple.

3    Q     Do you have degrees?

4    A     Yes, I do.

5          I have a bachelor's, which I got in 2000, and a

6    master's degree in 2003 in telecommunications.

7    Q     And where do you live, Mr. Fasoli?

8    A     I live in Redwood City, California with my wife and two

9    young kids, who are four and one.

10   Q     What did you work on when you first joined Apple in

11   2005?

12   A     I worked on FairPlay.

13   Q     Did iTunes exist when you joined Apple in 2005?

14   A     Yes, it did.  The application software existed since

15   2001 on the Mac, and since 2003, in Windows, and the iTunes

16   Store existed since 2003.

17   Q     And was Apple selling digital content over the Internet

18   when you joined the company?

19   A     Yes, they were selling music songs.

20   Q     Did Apple already have a DRM technology at that time?

21   A     Yes.  It was called FairPlay.

22   Q     And how was Apple using FairPlay when you joined the

23   company?

24   A     They were using it to protect the music songs that were

25   sold in the iTunes Store.

```
 1   Q    How many people worked on FairPlay when you joined

 2   Apple in 2005?

 3   A    Back then, there was three of us.

 4   Q    And how many engineers at Apple today work on FairPlay?

 5   A    A little over 25.

 6   Q    And why do you have so many people working on FairPlay

 7   now?

 8   A    Because attackers are consistently trying to bypass the

 9   FairPlay DRM, and so we need to stay ahead of the attackers

10   and work on the security system and performance.

11   Q    Can you estimate how much time Apple employees have

12   spent over the past decade working to improve FairPlay?

13   A    Yes.  We've spent over 200,000 man hours.

14   Q    And can you give the jury a sense of how much computer

15   code the FairPlay team has written?

16   A    Yes.  We've written over 1200 source code files.

17   That's a little more than 2 million lines of code.  So if

18   you were to print that out on paper, it would represent

19   roughly 75,000 pages.  If you stack them up, it's a

20   40-foot-tall column, which is higher than this courthouse.

21   Q    How often does Apple release a new version of FairPlay?

22   A    Roughly five times a year, with every new version of

23   iTunes on the desktop and with every major version of iOS

24   for the phone and iPad.

25   Q    Has Apple let other companies use its FairPlay DRM
```

1  system?

2  A     No, sir.

3  Q     Why not?

4  A     Because we believe that the security of FairPlay is

5  best guaranteed if we keep it to ourselves because it uses a

6  few secrets.

7  Q     Have you been awarded any patents by the U.S. Patent

8  and Trademark Office for your work on DRM technology at

9  Apple?

10 A     Yes, I have, about 20.  And I know there's also other

11 people in the FairPlay team that have patents for FairPlay.

12 Q     What are the basic technologies that are used in

13 FairPlay?

14 A     There are two fundamental technologies that we use.  We

15 use, first of all, encryption and keys to protect the

16 content and -- and enforce the -- control the usage.

17       And the second is the fact that we hide the keys during

18 usage on the user's devices.

19           MR. PRITIKIN:  Let's put up ADX-6.2, a

20 demonstrative.

21 Q     (By Mr. Pritikin) And can you explain what encryption

22 is?

23 A     Yes, of course.

24       Encryption is the process that allows us to protect the

25 movies, such as Captain America pictured on the left of the

1    slide and -- and effectively make it unusable because it is

2    encrypted.

3         On this picture, it's shown as being put in the

4    lockbox.  To perform the encryption, we use what we call a

5    content key, which is depicted in the red on the slide, to

6    encrypt the content.

7    Q    And what is a content key or an encryption key?

8    A    Encryption key is a number -- a series of numbers that

9    needs to be kept secret to guarantee protection of the

10   content.

11        MR. PRITIKIN:  Let's put up the next slide, 6.3.

12   Q    (By Mr. Pritikin) And what's shown here?

13   A    What's shown on the slide is decryption, which is the

14   inverse operation of encryption.  Using the same content

15   key, we decrypt the content, which is sort of like unlocking

16   the content and extracting the content in its useable form

17   for playback.

18   Q    Do you use the same content key to encrypt it and

19   decrypt it?

20   A    Yes, we do.

21   Q    Now, can you use encryption and decryption with files

22   other than movies?

23   A    Yes, of course, with any kind of digital file.

24   Q    And what other types of digital files or content does

25   Apple protect with encryption?

1  A    We use encryption for most of the files that we sell on

2  the Apple Store, so that includes songs, apps, movies, TV

3  shows, amongst others, and apps.

4  Q    Now, in the Apple system, is the content key that

5  you've shown here the only key that you need to unlock

6  content that is purchased from Apple?

7  A    No.  You need a second key -- at least one other key to

8  unlock the content.

9  Q    And when content is purchased, what is that other key

10  called?

11  A    That other key is called the user's account key.  It is

12  the key that protects the red content key.

13         MR. PRITIKIN:  Let's put up ADX-6.4.

14  Q    (By Mr. Pritikin) And can you explain what's shown

15  here?

16  A    Yes, of course.

17      What's shown is how we protect the red content key.  We

18  also use encryption for that, and what we do is we encrypt

19  the red content key with the user's blue account key.  On

20  the right-hand side of the slide, the inverse operation is

21  shown in which we decrypt that red encrypted content key

22  with the user's blue account key.

23  Q    So is there a double level of encryption?

24  A    You could say that.  There's at least two keys that are

25  needed, yes.

```
 1   Q     And so --
 2   A     Excuse me.
 3   Q     So is the movie encrypted with, in this case, the red
 4   content key?
 5   A     That is correct, yes.
 6   Q     And then the content key, in turn, is encrypted with
 7   the blue account key?
 8   A     Yes, that's what's done.
 9   Q     And to undo this at the other end, do you need the blue
10   account key to unlock the content key and the content key to
11   unlock the content?
12   A     That is correct.  The operations happen in inverse
13   order, yes.
14   Q     And why do you go to the trouble of encrypting the red
15   content key?
16   A     It has to be encrypted, because if it isn't, an
17   attacker could intercept that key and decrypt the content
18   and then steal the content and distribute it at his will.
19   Q     And in Apple's system, how many keys does the user's
20   device need to watch something that has been purchased?
21   A     The user's device needs at least two keys:  The blue
22   account key and the red content key.
23   Q     And suppose the user rents the movie instead of buys
24   it, how many keys does he need then?
25   A     We need at least two.  Again, the red content key is
```

1    needed to decrypt the content, and there would be another

2    key that we call the rental key in the rental case.

3    Q    And would the rental key decrypt the content key also?

4    A    That's correct.  It would be used for the same thing.

5         MR. PRITIKIN:  Let's put up the next slide, 6.5.

6    Q    (By Mr. Pritikin) And can you explain where Apple gets

7    the movies that it sells and rents?

8    A    Yes, of course.  Apple has contracts with most of the

9    major movie studios in the industry, and these are pictured

10   at the top of the slide, such as Disney, Paramount Pictures,

11   and Warner Brothers.

12        And when they release a new movie, they will send an

13   electronic copy of that movie from their servers to our

14   Apple servers, depicted at the bottom left of the slide.

15   Q    So the -- to be clear, the servers that are on the

16   lower left are Apple servers?

17   A    That is correct.

18   Q    And after Apple gets the movie from the movie studio,

19   what does it do with it?

20   A    Before -- it performs a -- a number of operations on

21   the movie, and one of the last operations on that movie that

22   it performs is the encryption of the movie.

23        So it will encrypt it with a red content key, and it

24   will then send that encrypted movie to the Akamai servers

25   that are pictured on the bottom right of the slide.

```
 1    Q      Are you familiar with the term "an MPEG 4 container"?

 2    A      Yes, I am.

 3    Q      And is that used by Apple?

 4    A      Yes.  That's the file -- that's the standard industry

 5    file format we use for our media files, such as songs and

 6    movies.

 7    Q      And I think you said the encrypted movie is sent to an

 8    Akamai server?

 9    A      That is correct.

10    Q      All right.  What is Akamai?

11    A      Akamai is a separate company that we use to make

12    downloads faster for our customers.

13    Q      Do other companies besides Apple use Akamai and its

14    servers?

15    A      Yes.  Akamai has many other customers.

16           MR. PRITIKIN:  Let's take a look at 6.6.

17    Q      (By Mr. Pritikin) And where are the Akamai servers

18    located?

19    A      They're located throughout the country, as shown on the

20    map.

21    Q      And what's the reason for locating servers all over the

22    country?

23    A      Well, that is one of the ways that they are able to

24    achieve faster downloads for our customers.

25           And I'm looking at the slide.  One -- such an example
```

1 would be if an iTunes customer would buy the Captain America

2 movie in Texas, they would be directed to the closest Akamai

3 server in Texas, whereas a customer on the East Coast buying

4 the same movie would be directed to download that movie from

5 an Akamai server on the East Coast.

6 Q    When the movies and other digital works are stored on

7 Akamai servers, do they include any encryption or decryption

8 keys?

9 A    No, they don't.  It's just the movies.

10 Q    Do the digital content files that are stored on the

11 Akamai servers contain any other information that can be

12 used to control their use or their playback?

13 A    No.

14 Q    Now, does Apple send a movie file to Akamai every time

15 a user buys a copy of the movie?

16 A    No.  The -- the encrypted movie file is sent by Apple

17 to Akamai when -- long before it is available on the store

18 for purchase by any of our customers.

19 Q    Does Apple ever send a movie file directly from its

20 servers to a customer's device?

21 A    No.

22 Q    And how long does Akamai store the movie files?

23 A    Pretty much forever.

24 Q    Is the entire movie file stored on the Akamai server?

25 A    Yes, it is.

```
 1   Q     Have you heard of the term "caching"?
 2   A     Yes, I have.
 3   Q     And what does that mean?
 4   A     It's a technique that's used in computers to place the
 5   most accessed pieces of data in faster memory, rather than
 6   storing it on disks, which is slower to access.
 7   Q     And does Akamai -- do the Akamai servers cache the
 8   movies?
 9   A     Yes.  That's one of the other ways that they can
10   achieve faster downloads.  What they do is they cache the
11   most commonly purchased movies in their -- in their cache
12   system.
13   Q     And that's in short-term memory?
14   A     That is in short-term memory, yes.
15   Q     And the benefit is the movie can be downloaded quickly?
16   A     That is correct.  That's one of the other ways that
17   they achieve faster downloads.
18   Q     And does Akamai also store movies?
19   A     They also store the full copy of the movies on their
20   slow storage, yes.
21   Q     Are the Akamai servers like routers on the Internet?
22   A     No, they aren't.  They don't route information to other
23   computers.  They store data that customer devices access.
24            MR. PRITIKIN:  Let's go to the next slide, 6.7.
25   Q     (By Mr. Pritikin) Now, in this slide, what does John's
```

1    device represent?

2    A     John's device on the bottom of the slide is -- is

3    represented by an iPad.

4    Q     And does FairPlay work with things besides iPads?

5    A     Yes.  FairPlay works on a wide variety of devices, such

6    as Mac laptops and desktops or Windows PCs, both laptops and

7    desktops.  It also works on iPhones and on Apple TV.

8    Q     And do you see the blue key labeled John's account?

9    Why is that on both John's device and on the Apple servers?

10   A     I do see that blue account key, and it is on both the

11   server and the device because the server needs to use it for

12   some operations, and John's device also needs to use it for

13   other operations, such as watching a movie.

14   Q     How does the blue account key get on to the user's iPad

15   in the first place?

16   A     Typically, John's blue account key gets on to John's

17   device with the very first movie or other item he purchases

18   from the iTunes Store.

19   Q     Does the user get a new account key every time they buy

20   a movie?

21   A     No.

22   Q     So, typically, when a user buys a movie, will they

23   already have the account key on their device?

24   A     Yes.  In most cases, they do.

25   Q     Does every customer get a different and unique account

1  key?

2  A     Yes.   Account keys are different per customer.

3  Q     And why is that?

4  A     Because we want to make sure that when John buys a

5  movie, only John and the devices that he uses can watch that

6  movie and not Jane, who has a different account key.

7          MR. PRITIKIN:  Let's go to the next slide.

8  Q     (By Mr. Pritikin) And when somebody orders a movie or

9  buys a movie from Apple, what's the first thing that

10 happens?

11 A     The first thing that happens after John presses the buy

12 button on the iPad is that John's device will prepare what

13 we refer to as the purchase request.

14       And that purchase request is sent to the Apple servers.

15 It contains information about the movie or the piece of

16 content that John is buying.  It has information about

17 John's account and the price of the item that John is

18 buying.

19         MR. PRITIKIN:  Let's go to the next slide, 6.9.

20 Q     (By Mr. Pritikin) And what do the Apple servers do when

21 they get the purchase request from the user?

22 A     Apple servers will process the incoming request from

23 John's device, perform a number of operations, such as

24 charging John for that purchase, so there's financial

25 operations involved.

```
1         And then towards the end of that processing, the Apple

2    servers will put together what we call the purchase

3    response, which contains information about the movie.  It

4    also contains an address to the movie for the download, and

5    it also contains an encrypted copy of the red content key.

6    Q    Now, on this drawing, the red account key is shown in a

7    locked container of some sort.  What does that represent?

8    A    That represents the red content key in this case, the

9    Captain America content key encrypted with John's blue

10   account key.

11   Q    Was it encrypted by the Apple server before it was

12   sent?

13   A    That is correct, yes.

14   Q    Does Apple have a name for the encrypted content key

15   after it's been locked with the user's blue account key?

16   A    Yes.  We call it the encrypted content key, and it is a

17   field in a data structure we call SINF.  SINF stands for

18   security information.

19         MR. PRITIKIN:  Let's go to the next slide.

20   Q    (By Mr. Pritikin) And can you explain to the jury what

21   the user's device does with the first series of items in the

22   purchase response that it receives?

23   A    Of course, yes.  With the first series of items, the

24   user's device will use those items and process them and --

25   and put them in what we call the iTunes library on the
```

1   user's device.

2        And that information is used by John to find the movies

3   that he purchased on the device and also to find out

4   information about the movie he purchased, such as the cast

5   and crew, the release date, or the title of the movie.

6   Q    And is there a name for the database in the -- in

7   iTunes for this information stored?

8   A    Yes.  We call it the iTunes library or the iTunes media

9   library.

10  Q    And looking down, what is the last item in the purchase

11  response?

12  A    The last item is an URL, which stands for Universal

13  Resource Locator, to the movie for the download from the

14  Akamai server.

15  Q    Is that like a web address where you can go -- where

16  your device can go get the movie?

17  A    That is correct.  It contains a host name to find the

18  computer on the Internet and -- and a file name to know what

19  file to download from that computer.

20  Q    Does the URL include something called apple.com in it?

21  A    Yes.  It has an apple.com suffix and some other prefix

22  in front of it, yes.

23  Q    Does that mean that it goes to an Apple server to get

24  it?

25  A    No, it doesn't.  The user's device will resolve that

1  human readable name to an IP address, which is a series of

2  numbers, and that is the address that is one of Akamai's

3  servers that they own and operate.  So John's device will go

4  directly to an Akamai server to get the movie.

5          MR. PRITIKIN:  Let's go to the next slide.

6  Q    (By Mr. Pritikin) And can you explain how the user's

7  device actually gets the copy of the Captain America movie?

8  A    Yes.

9          So with the URL in hand, John's device will reserve --

10  resolve that to an address that is an Akamai server, and it

11  will connect to that server to initiate the download.

12          MR. PRITIKIN:  Let's go to the next slide.

13  Q    (By Mr. Pritikin) And what does the Akamai server do?

14  A    The Akamai server will respond and allow that data to

15  be downloaded from their server to John's device.

16  Q    And is that what's shown in the little suitcase with

17  the red padlock on it?

18  A    Yes, that is correct.  It's the encrypted version of

19  the Captain America movie that is downloaded from Akamai

20  servers to John's device.

21  Q    Now, at this point, can you explain what the two

22  different containers are that are on John's device?

23  A    Yes, of course.

24          So at this point, John's device is downloading the

25  movie.  And the container on the right on John's device says

1   "encrypted movie."  And, again, encrypted with the red

2   content key.  And on the left is a copy of that content key,

3   which itself is encrypted with John's blue account key.

4   Q    So, eventually, the blue account key is going to be

5   used to unlock the content key and then in turn will be used

6   to unlock the movie?

7   A    That is correct, for the purpose of playback, yes,

8   that's what happens.

9        MR. PRITIKIN:  Let's go to the next slide.

10  Q    (By Mr. Pritikin) Now, when the user's device downloads

11  content from the Akamai server, is that content delivered

12  over a secure communications channel?

13  A    No, it isn't.

14       MR. PRITIKIN:  And let's go to the next slide --

15  or no.  Let's go back.  I'm sorry.

16  Q    (By Mr. Pritikin) And why is it that Apple doesn't

17  require that the content be sent over a secure

18  communications channel from the Akamai servers to the user's

19  devices?

20  A    In -- in this case, we deemed it wasn't necessary, and

21  there was a tradeoff between security and performance.  And

22  we went with performance, because using an unsecured

23  connection allows for the download to happen faster.

24       And it also consumes less battery on John's device.  So

25  we are able to preserve battery and get the movie to the

1   device more quickly.

2   Q     Are there tradeoffs in designing a DRM system?

3   A     Yes.  There's always tradeoffs between security and

4   performance or security and size.

5             MR. PRITIKIN:  Let's go to the next slide.

6   Q     (By Mr. Pritikin) Now, can you walk us through this

7   slide and explain how the device unlocks the movies so that

8   it can be watched?

9   A     Of course, yes.

10         So when John decides to play the movie and -- and hits

11   the play button, the -- the -- these -- these containers

12   need to be unlocked.  And the way the system proceeds to do

13   that is that John's device and the software on it will

14   notice that the movie's encrypted, and so it will turn

15   around to FairPlay and ask assistance to decrypt that movie.

16         FairPlay will then look up John's blue account key, and

17   it will unlock the red content key, which is in the -- in

18   the left lockbox, extract that red content key from that red

19   lockbox and use that in turn to unlock and decrypt the

20   encrypted movie, therefore, allowing the movie to be

21   extracted from that lockbox and played.

22   Q     If both the blue account key and the red content key

23   are on the iPad, can the movie be played?

24   A     Yes, it can.

25   Q     Is there anything beyond those two keys that is needed

1   to play the movie on the iPad?

2   A    No.  That is it.

3         MR. PRITIKIN:  Your Honor, at this point, I'm

4   going to be getting into some confidential materials, so I

5   would ask that the courtroom be sealed.  It's Apple

6   confidential, so I don't have any objection to Apple people

7   being here, but, otherwise, we would ask the courtroom to be

8   sealed.

9         THE COURT:  All right.  At the request of Counsel,

10  I'll order the courtroom sealed at this time.  If you're

11  present, not subject to the protective order in this case,

12  you should excuse yourselves from the courtroom and remain

13  outside until the courtroom is unsealed.

14         (Courtroom sealed, in a separate volume, Page 3,

15          Line 3 through Page 9, Line 9.)

16         (Courtroom unsealed.)

17         THE COURT:  All right.  The courtroom is unsealed.

18         You may continue, Counsel.

19  Q    (By Mr. Pritikin) Mr. Fasoli, from the user's

20  perspective, how complicated is Apple's FairPlay system?

21  A    From the user's perspective, FairPlay is never seen.

22  It operates in the background and is what we call

23  transparent to the user.

24  Q    Now, if someone wants to buy or rent a movie from

25  Apple, do they need any special type of computer?

1   A     No.   That -- they just need any computer that can run

2   the iTunes programs, such as a Mac or a PC computer.

3   Q     Does Apple do anything to prevent a user from

4   physically accessing the digital movie and book files that

5   are stored on their devices and computers?

6   A     No, we don't do anything like that.

7   Q     And so, for example, if a user were to buy the Captain

8   America movie and download it, could the user physically

9   access that file on their device?

10  A     Yes, they can.

11  Q     Now, when you worked on FairPlay over the years, were

12  you aware of techniques that existed to prevent physical

13  access to data on computers or processors?

14  A     Yes, I have seen such.

15  Q     What examples are you aware of, sir?

16  A     There are cases in which banks or the military have

17  used systems that protect the physical integrity of a piece

18  of hardware or a processor in which, where an attacker or a

19  user to open that device, it would self-destruct.

20  Q     Has Apple ever considered requiring that the devices

21  running FairPlay employ those types of physical security

22  techniques?

23  A     No.

24  Q     And why not?

25  A     Because they are very costly to put in place, and they

1    would make our products more expensive and therefore less

2    accessible to our customers.  It would also greatly reduce

3    the amount of people that would be able to use our iTunes

4    Store.

5    Q    Can a user start watching a movie before they've --

6    that they've purchased before the movie has been completely

7    downloaded?

8    A    Yes.  They can pretty much start watching it as soon as

9    they've bought it if their bandwidth permits.

10   Q    And is there a name you use to describe this -- this

11   watching this way of movies?

12   A    Yes.  We call it play while downloading or streaming.

13   Q    Why is it called streaming?

14   A    It's called streaming because you're watching the movie

15   as it is being streamed from a server to the device.

16   Q    Is there an advantage to watching it in this way?

17   A    Yes, there are a few, amongst which is the fact that

18   the user can start playing while -- before it's fully

19   downloaded.

20        And there's also the advantage that because the user

21   doesn't need to wait for the movie to be fully downloaded,

22   that storage that would have been used by the downloaded

23   movie on the device is not used at that point.

24   Q    When the user streams the movie like that, do they get

25   the same file from Akamai that they would get if they

1    downloaded it and then waited to watch it?

2    A    Yes.  It's the same movie.

3    Q    And does FairPlay work the same way regardless of

4    whether it's downloaded or being streamed?

5    A    Yes, FairPlay works the same.

6    Q    Now, how long has FairPlay used account keys and

7    content keys and the Akamai servers in the manner that

8    you've been describing?

9    A    It's been used since before I joined the company, so

10   since before 2005.

11   Q    And does the general architecture for FairPlay that's

12   shown on the Demonstrative 6.14 apply across the different

13   types of DRM-protected content and different kinds of user

14   devices?

15   A    Yes.  It's pretty much the same on all the types of

16   user devices and also across all types of content.  There's

17   always a red content key and a blue content key.

18   Q    Does the FairPlay architecture also apply when a user

19   buys an app from the Apple App Store?

20   A    Yes.

21   Q    And what's the largest use of FairPlay in Apple's

22   system?

23   A    Apps, by a long shot.

24   Q    And why are apps protected by FairPlay DRM?

25   A    Apps are protected because we want to ensure that the

```
 1    developers that sell their apps on our store are
 2    compensated.
 3    Q    And to your knowledge, does ContentGuard accuse Apple's
 4    DRM system for apps of infringing its patents?
 5    A    No, not that I know of.
 6              MR. PRITIKIN:  Let's -- let's go to the next
 7    slide.
 8    Q    (By Mr. Pritikin) And on the left of this slide, do you
 9    see something you call a purchase response?
10    A    Yes, I do.
11    Q    And, now, where does the purchase response come from?
12    A    The purchase response comes from the Apple servers in
13    response to the device's request during the purchase.
14    Q    And is this an illustration of a purchase response?
15    A    This is an illustration, yes.  A purchase response has
16    many more fields and has a different format.  This is an
17    illustration.
18    Q    And what have you shown on the right side of this
19    slide?
20    A    On the right side is a screen that the user could get
21    to that shows information about the movie he or she
22    purchased.
23    Q    So if I had my iPad and I started clicking through
24    various parts of iTunes' interface, is this a page that I
25    could pull up on the right?
```

1   A    Yes.  Specifically this would be for iTunes on the

2   desktop, such as Mac or PC, but yes.

3   Q    All right.

4            MR. THOMAS:  Objection, Your Honor.  May we

5   approach?

6            THE COURT:  Approach the bench.

7            (Bench conference.)

8            MR. THOMAS:  They're trying to get this witness to

9   talk about how the iTunes software on a Mac and PC works,

10  and this is an iPhones and iPad case.  He should not be

11  allowed to talk about how the iTunes software works on a Mac

12  and PC because we did not have access to that software, and

13  we can't test what he's about to say.

14           MR. PRITIKIN:  Well, that's not where I'm going.

15  I'm just trying to describe what the interface is.  It's

16  irrelevant whether it's a -- I'm not getting into the

17  software on the Mac and the PC on this.

18           MR. THOMAS:  He's --

19           MR. PRITIKIN:  It's -- it would be the same thing

20  on the iPad, Your Honor.

21           THE COURT:  Let's talk about an iPad and not the

22  other devices.

23           MR. PRITIKIN:  Sure.  Okay.

24           MR. THOMAS:  And show -- and only show an iPad,

25  right?

1          MR. PRITIKIN:  Well, there was no objection to the

2     slide.  It was introduced --

3          MR. THOMAS:  No, Your Honor.  The objection was

4     that they're trying to get this witness to start to describe

5     how the software is working and the screens that get painted

6     and the fields that get shown and what can be changed and

7     what can get put in.

8          That's all the software controlling that.  And

9     that's all software controlling, and that's not the same on

10    an iPad as it is on a Windows or a Mac PC for iTunes.  It's

11    not.  It doesn't work the same way.

12          MR. CHANDLER:  Your Honor, this was -- this slide

13    was discussed in chambers, and the Court allowed this slide.

14    And our understanding of the ruling was that the -- was that

15    the witness was permitted to testify from personal knowledge

16    about how -- how FairPlay works.

17          THE COURT:  I mean, Mac and Windows are still

18    accused products, are they not?

19          MR. THOMAS:  They are, Your Honor, but this is

20    getting right to the point about whether or not the iTunes

21    software -- if they're about to try to get this guy to

22    explain what it does on a Mac and Windows PC is what we did

23    not have access to during discovery.

24          If they want to get this witness to explain what

25    the iTunes software does to display screens on an iPad or an

1    iPhone, that's fine because we had access to that.  But

2    they're getting -- they're having this witness explain what

3    the iTunes software on a Mac and Windows PC does --

4              THE COURT:  I understand.

5              MR. THOMAS:  -- and it's different.

6              THE COURT:  I understand, Mr. Thomas.

7              Where are you planning to go, Mr. Pritikin?

8              MR. PRITIKIN:  Your Honor, it's -- I'm not getting

9    into the bowels of the -- of that software.  What I'm trying

10   to show is what is done with the information that comes from

11   the purchase response and how it's used and allows material

12   to be displayed and categorized.

13             And that's the same on all the devices.  This is

14   the illustration we're using.  That point would be the same

15   across the different devices.  This is the example we have

16   on this slide.  I think it's -- these are the slides that I

17   have.  I could have done the same image with something else,

18   but it's all the same on this point.

19             MR. THOMAS:  I disagree, Your Honor.  It's not all

20   the same.  The screens that the software allows to be posted

21   up on a Mac is not the same.

22             THE COURT:  Mr. Thomas, the slides -- now, the

23   time to object to the slides are over.  We took that up this

24   morning.

25             MR. THOMAS:  But we did, Your Honor, and I believe

1  yesterday you told me that I could raise it again if they

2  started getting into how the excluded software and the

3  testimony about how the iTunes and Windows -- iTunes for Mac

4  and Windows software works, that I could raise this

5  objection again.

6          You're right, if it's just a picture of it, but if

7  they're going to get in here and start showing how fields on

8  that screen get changed --

9          MR. PRITIKIN:  I'm not going there.

10         THE COURT:  All right.  One thing, gentlemen, we

11 need to get straight, wearing a hole in the carpet from

12 counsel table to the bench in anticipation of something that

13 hasn't happened yet is not what this process is for --

14         MR. THOMAS:  Okay.

15         THE COURT:  -- all right?

16         Let's go forward.

17         (Bench conference concluded.)

18         THE COURT:  Let's continue.

19         MR. PRITIKIN:  Thank you, Your Honor.

20 Q   (By Mr. Pritikin) Now, I want to focus on -- ask you

21 about -- direct your attention to some of the fields that

22 are in the purchase response, Mr. Fasoli.

23 A    Okay.

24 Q    And is -- what is the term "field"?  Let's just start

25 with that.

1   A    Field is just typically a line entry in the purchase

2   response that has a description and value.

3   Q    And the first field, for example, is the title, Captain

4   America?

5   A    That is correct.

6   Q    And what's that used for in the iTunes system?

7   A    That is used for displaying the title on the top of the

8   movie.

9   Q    And that would be true regardless of whether you were

10  on an iPad or an iPhone or anything else, the -- the title

11  would be used to display the name of it?

12  A    That is correct.  It's for presentation purposes to the

13  user, regardless of the device.

14  Q    And are there examples of other things that are in the

15  purchase response that are for presentation purposes, like

16  cast and crew and so forth?

17  A    Yes, absolutely.  Cast and crew, the release date of

18  the movie, the plot, summary.  There's many such

19  presentation pieces of information in the purchase response.

20  Q    And why are those put there?

21  A    They are there because the user's device will use them

22  to organize the user's content and help the user both find

23  the content or find out information about the content.

24  Q    So could I click on something and find out who the cast

25  is?

```
 1   A      That is correct.

 2   Q      Now, I want to focus on the particular field here,

 3   which is the "kind" field.

 4          Do you see that?

 5   A      Yes, I do.

 6   Q      And what is the "kind" field in the purchase response?

 7   A      The "kind" field is what describes the type of content

 8   that the user just purchased, and it is used by the -- the

 9   iTunes software on the device to categorize the -- the

10   content in the right part of the library.

11   Q      So the right side would be the library on the user's

12   device?

13   A      That is correct.

14   Q      Okay.  In this instance, you show the "kind" field as a

15   movie.  If it were a book, what would be in the "kind"

16   field?

17   A      The "kind" field would be book.

18   Q      And suppose it were music?

19   A      It would be music.

20   Q      Does the "kind" field in the purchase response have

21   anything to do with DRM?

22   A      No, it doesn't.

23   Q      What is it used for?

24   A      It's used for presentation purposes and to organize the

25   content on the user's device.
```

1  Q    Is the "kind" field in the purchase response used to

2  restrict or control playback of the content?

3  A    No, it isn't.

4        MR. PRITIKIN:  Now let's go to the next slide.

5  Q    (By Mr. Pritikin) And what's shown here?

6  A    My screen just turned off.

7        THE COURT:  So did mine, but I think they're back.

8  A    What's shown on this slide is what the user would see

9  when they click on the music section of the iTunes library,

10 and that would be achieved by clicking on the blue notes on

11 the top left.  That would display, then, the -- the albums

12 or the songs that the user purchased on the iTunes Store.

13 Q    (By Mr. Pritikin) Now, let me just go back a step on

14 that, Mr. Fasoli.  The -- this is what the user would see on

15 the user's interface?

16 A    That's correct.  That's what they would see on their

17 screen.

18 Q    And let's -- do you see the little icons in the upper

19 left-hand corner there?  There's one on the left that's a

20 music note, and then there's one that looks kind of like a

21 piece of film.  And what are those different icons for?

22 A    Those are the icons that represent the different parts

23 of the user's iTunes library and its -- provides an easy way

24 for the user to navigate through the library and through the

25 content that they purchased on the iTunes Store.

```
 1   Q    So does the library show everything they've purchased?

 2   A    Yes, that's correct.  And it organizes it in an easy

 3   way for the user to find the content.

 4   Q    Okay.  So suppose I wanted to pull up and see what all

 5   the music is that I've purchased and that I have?  Would I

 6   click on the little music note thing?

 7   A    That is what you would do, yes.

 8   Q    And then it would pull up this page?

 9   A    That is correct.

10   Q    Now, how do you get iTunes -- how does iTunes know

11   whether it should list the -- the music on this page or the

12   page that shows the movies I've purchased?

13   A    It uses the "kind" field for that.

14   Q    And what does iTunes do with the information in the

15   "kind" field, movie, book, music?

16   A    It will use that information to put the content in the

17   right section of the library.  So if it says "music," it

18   will put it in the music section.  If it says "movie," it

19   will put it in the movie section.

20        MR. PRITIKIN:  Let's go to the next slide, 6.17.

21   Q    (By Mr. Pritikin) And on this slide, have we clicked on

22   the movie icon?

23   A    Yes, that's what happened.

24   Q    And are these the movies that this person has

25   purchased?
```

```
1    A     That is correct, yes.
2    Q     And, again, how did iTunes know to put these files
3    in -- in -- or excuse me -- in movies for display, as
4    opposed to putting them in music or books?
5    A     It used the "kind" field and the purchase response to
6    put the movies in the movie section.
7          MR. PRITIKIN:  Let's go to the next slide.
8    Q     (By Mr. Pritikin) And -- and what is shown here?
9    A     What's shown here is further details about a movie,
10   specifically the Captain America movie.
11         And that's what happens when the user clicks on the
12   movie.  The user can then navigate to an additional menu
13   that will show the media kind for this type of content.  And
14   in this case, it's set to movie, and, therefore, it is
15   classified and organized in the movie section.
16         MR. PRITIKIN:  Let's go back to 6.15, Mr. Simmons.
17   Q     (By Mr. Pritikin) And I want to focus again on the
18   information in the purchase response on the left, the "kind"
19   field.
20         Does the "kind" field restrict, control, or limit what
21   the user can do with the content?
22   A     No.
23   Q     And do you consider the "kind" field and the -- what is
24   the media "kind" field?
25   A     The media "kind" is just used for, again, presentation
```

1    purposes for the user to -- it's the same thing as the
2    "kind" field.
3    Q    And is the information put into the media "kind" field
4    on the user's device?
5    A    Yes.  The -- the content of the "kind" field in the
6    purchase response is put in the media "kind" field in the
7    screen, yes.
8    Q    And do you consider the "kind" field and the "media"
9    field, which tell you whether it's a movie or a book or
10   something else, to be part of Apple's DRM system?
11   A    No, it isn't.
12   Q    What happens if the media "kind" information in iTunes
13   gets corrupted or is changed?  Does that affect whether you
14   have the rights to play the movie?
15   A    No, it doesn't.
16   Q    Can you still play the movie if that information is --
17   is corrupted or disappears?
18   A    Yes, you can.
19   Q    Now, if an expert for ContentGuard told the jury that
20   this "kind" field from the purchase response is used by
21   FairPlay to control or permit playback, would that be an
22   accurate description?
23   A    No, that isn't correct.
24   Q    Is there an easy way to confirm that the "kind" field
25   is not needed or used by FairPlay to control or permit

1  playback?

2  A     Yes, there is.

3  Q     Is that something you do in your regular work?

4  A     Yes, it is.

5  Q     And can you explain how you can confirm that?

6  A     Yes.

7        The way we usually do it is we delete the iTunes

8  library, which stores this information, and then we find the

9  file on the device and play that movie file with another

10 piece of software, rather than with iTunes.

11             MR. THOMAS:  Objection, Your Honor.

12             May I approach?  This witness is testifying to

13 matters that are in violation of the Court's order on the

14 Daubert ruling.

15             THE COURT:  Approach the bench, counsel.

16             (Bench conference.)

17             MR. THOMAS:  He's now describing something that

18 can only be done with iTunes on a Mac or a Window and cannot

19 be done on an iPad.  And that is the software -- that is the

20 exact test that Dr. Kelly tried to get in and that we moved

21 to exclude on our Daubert motion.  That's exactly what he's

22 doing.

23             What he's just describing right now he cannot do

24 on an iPad or an iPhone, and that's the software we had.

25 And now he's saying he can do it on a Mac or a Windows

1   version of iTunes, but we didn't have that software to be

2   able to check this.

3            THE COURT:  I understand your objection.

4            What's the response?

5            MR. PRITIKIN:  I'll let Mr. Chandler explain.

6            MR. CHANDLER:  The response is this:  This does

7   not concern how the software works, and it applies equally.

8   The point is that the "kind" field is not enforced by

9   FairPlay whether on the iPad or the iTunes.  And what he's

10  describing is what is done in the ordinary course of

11  business, personal knowledge.

12           Our understanding of the Court's discussion of

13  the -- of the ruling was that it was limited to the specific

14  paragraphs stricken, and it was limited to Dr. Kelly and

15  that percipient witnesses, such as Mr. Fasoli, were

16  permitted to explain how things work, given that the Mac and

17  PCs are accused products.  And he's the most knowledgeable

18  witness.

19           MR. PRITIKIN:  And he's a part of the quality

20  assurance test that they do.

21           THE COURT:  Well --

22           MR. THOMAS:  Your Honor, we have no way of testing

23  the accuracy of what this fellow is saying because they

24  didn't give us that source code.  That's the bottom line.

25           THE COURT:  Well, when you didn't get that source

```
 1   code, you asked me to strike specific portions of

 2   Dr. Kelly's report, which I did.  But that's the relief you

 3   requested, and that's the relief you got.  You didn't ask me

 4   to prevent other witnesses from testifying with regard to

 5   the subject matter.

 6            Now, this is not an expert witness, and we're

 7   getting in the range of the line between fact witness and

 8   expert witness, and I'm mindful of that.  Their accused

 9   products -- my ruling was to Dr. Kelly's expert report.

10            I'm not going to grant your objection, Mr. Thomas.

11   I am going to instruct Mr. Pritikin to stay on the right

12   side of the line between fact witnesses and expert

13   witnesses.

14            MR. PRITIKIN:  I -- I will.  I will.

15            THE COURT:  All right.  Let's go.

16            (Bench conference concluded.)

17            THE COURT:  Let's proceed.

18   Q    (By Mr. Pritikin) All right.  You were about to

19   describe a test, Mr. Fasoli, and let me just ask you, are

20   these tests that you run for quality assurance in the course

21   of your work at Apple?

22   A    Yes, that's correct.

23   Q    And can you explain what the test is?

24   A    The test, again, is to find the movie on -- on the

25   device and delete the iTunes library and then play that
```

```
1  movie with another piece of software that's called
2  QuickTime.
3  Q    And can the movie be played when the "kind" field is
4  missing?
5  A    Yes.
6           MR. PRITIKIN:  Let's go to ADX-6.19.
7  Q    (By Mr. Pritikin) And, now, is the purchase response
8  shown on the left?
9  A    Yes, it is.
10 Q    And does it travel with the digital content, such as
11 the movie that comes from the Akamai servers?
12 A    No, it doesn't.
13 Q    And can you explain why?
14 A    Yes.
15      The purchase response on the left comes from the Apple
16 servers and goes directly from the Apple servers to John's
17 device.  Then using that URL at the bottom, John's device
18 will go download the contents from the Akamai servers so
19 that the keys in the purchase response never travel with the
20 content.
21           MR. PRITIKIN:  Let's go to 6.19.
22 Q    (By Mr. Pritikin) Now, does the --
23           MR. PRITIKIN:  I'm sorry.  I have another question
24 on 6.19.
25 Q    (By Mr. Pritikin) Does the blue account key travel with
```

1    the digital content?

2    A    No, it doesn't.

3    Q    And where does the red content key come from that's

4    used to unlock the movie?

5    A    The red content key also comes from the Apple servers

6    as depicted in the encrypted lockbox on the left.

7    Q    Now, once everything is on the user's device, is the

8    blue account key stored with the movie file, or are they

9    kept separate?

10   A    No.  They're separate.  The blue account key is in a

11   separate account file we call the Keybag.

12   Q    And the iTunes media library, is that library stored

13   with the movie file in the account key, or is that also

14   separate?

15   A    The iTunes library file is a separate file as well.

16   Q    Does the purchase response contain fields that -- I

17   think you've already said it contains additional fields

18   besides those that are shown on this illustration, correct?

19   A    Yes.  There's many other fields.

20   Q    And is one of those fields a field that's used for

21   parental controls?

22   A    Yes.

23   Q    And can you explain what parental controls are and how

24   they work on the devices?

25   A    Yes.  Parental controls is a feature that the user can

1  turn on in the configuration of the device to limit the

2  playback of, say, explicit content on the device.

3  Q    And who -- who controls that?  Is that Apple, or is

4  that the user?

5  A    That is controlled by the user.

6  Q    The user can turn the settings on and off?

7  A    That is correct.

8  Q    And do you consider those part of the DRM system?

9  A    No.  They're separate.

10  Q    And why is that?

11  A    Because the parental controls can be turned on and off

12  and are controlled by the user, whereas the DRM system

13  cannot be turned off by the user.  It would defeat the

14  purpose.  And the DRM system is controlled by Apple and

15  FairPlay, not by the user.

16        MR. PRITIKIN:  Let's go to the next slide, 6.20.

17  Q    (By Mr. Pritikin) When you purchase a movie from Apple,

18  can you see it or watch it on more than one device?

19  A    Yes, absolutely.

20  Q    And how many?

21  A    A user can watch the movie on up to five desktop or

22  laptop machines, such as a Mac or a PC, and on an unlimited

23  number of touch-based devices, such as an iPhone or an iPad.

24  Q    Do you need to have an account key on each device in

25  order to be able to watch the movie?

```
1    A     Yes, that's required.
2    Q     And how does Apple control the number of devices that
3    it can be watched on?
4    A     Well, the maximum number of five desktop or laptop
5    machines is controlled by Apple on the Apple server side
6    when it issues the blue account keys to those machines.  So
7    it's the number of desktops that have the blue account key
8    that controls where the content can be played.
9    Q     And so do you control it by whether you give an account
10   key or not?
11   A     That is correct.
12   Q     How does a user get an account key on -- key on a
13   different device?
14   A     Well, on touch-based devices, such as an iPhone or an
15   iPad, the account key gets that device on the first purchase
16   the user performs with that device, whereas on a desktop or
17   a laptop, such as the Mac or the PC that's on the bottom
18   left, a user would have to perform an explicit machine
19   authorization operation with iTunes.
20   Q     What's the benefit to the user of having the account
21   key on more than one device or computer?
22   A     Well, there's various benefits.  Having it on the
23   smaller touch-based devices means the user can watch the
24   movie on the go, such as in a car or on a plane, but the
25   user may also want to have it on a desktop system and watch
```

1    the movie on a bigger screen.

2    Q    If the user purchases the movie on an office computer

3    or a laptop, can they transfer that movie to another

4    computer they have at home?

5    A    Yes, they can.

6    Q    You consider that an attractive feature of the system?

7    A    Yes.  It's an interesting feature if you have high

8    bandwidth at work and very low bandwidth or no Internet at

9    home, yes.

10   Q    And how -- how would you get it from one to the other?

11   A    You could use a USB stick.

12   Q    Can a user buy and download a movie from iTunes using a

13   computer that does not have the blue account key at all?

14   A    Yes.

15        A user could use, for example, the machine on the

16   bottom right of the slide to purchase and download the

17   movie, but because it doesn't have the blue account key,

18   would not be able to play it.

19   Q    Does FairPlay prevent the user from copying the movie

20   file from one computer to another?

21   A    No, it doesn't.

22   Q    And does FairPlay prevent the user from uploading the

23   movie to storage in the Cloud like Dropbox or Google Drive

24   or something like that?

25   A    No, we don't prevent that.

```
 1    Q     Why doesn't FairPlay try to stop users from copying the

 2    files or transferring them from one location to another?

 3    A     Because the files the users have access to are always

 4    encrypted files, and they can copy those for whatever

 5    reasons they deem important.

 6          However, the content that's copied won't be playable

 7    unless the blue account key is present on the destination

 8    device.

 9    Q     So, again, is it the blue account key that controls

10    everything ultimately?

11    A     That is correct, yes.

12          MR. PRITIKIN:  Let's go to the next slide.

13    Q     (By Mr. Pritikin) And are you familiar with digital

14    certificates?

15    A     Yes, I am.

16    Q     In your experience, can a computer be programmed so

17    that it won't install new software if the software is

18    missing a digital certificate?

19    A     Yes.

20    Q     Are you familiar with the process by which Apple

21    updates its FairPlay servers?

22    A     Yes, I am.

23    Q     And how often is the server code updated?

24    A     At most, every two weeks.

25    Q     Are the Apple FairPlay servers programmed so that they
```

```
 1   will refuse to install software that does not include a

 2   digital certificate?

 3   A     No, they aren't.

 4          MR. PRITIKIN:  Let's go to the next slide.

 5   Q    (By Mr. Pritikin) And have you prepared this slide to

 6   show the process by which the Apple FairPlay servers are

 7   updated?

 8   A     Yes.

 9          MR. PRITIKIN:  And let's go to the next one, 6.23.

10   Q    (By Mr. Pritikin) And can you explain the first step

11   there?  There's something that says "Fasoli team, Ward

12   team," and explain to us what -- what's going on there.

13   A     Yes.

14        So as part of the process to update FairPlay software

15   on the Apple servers, my team, depicted on the left-hand of

16   the slide, will build the software or the update for the

17   software and will burn that software to a physical CD and

18   put that CD in a plastic evidence bag, as shown on the

19   slide.  And we will then walk to the building next to ours

20   and provide that -- that plastic bag to Mr. Ward's team.

21   Q     All right.

22          MR. PRITIKIN:  All right.  Now, Your Honor, we

23   have marked as Plaintiff's Exhibit AX-1174.

24   Q    (By Mr. Pritikin) And, Mr. Fasoli, is this the type of

25   plastic bag -- evidence bag that you put the disk into?
```

1    A    Yes.

2    Q    Now, when you -- when you put the updates on that CD,

3    do you include a digital certificate in them?

4    A    No, I don't.

5    Q    And how long have you been following this protocol of

6    updating the FairPlay software or putting it in a plastic

7    bag and -- and delivering it to Mr. Ward's team?

8    A    Ever since I joined Apple, so for over 10 years.

9         MR. PRITIKIN:  Let's go to the next slide.

10   Q    (By Mr. Pritikin) Now, what does Mr. Ward's team do

11   with the software that you give them?

12   A    Mr. Ward's team will open the evidence bag and -- and

13   take the CD from there, open it up, and he and his team will

14   typically add some extra software to that and prepare it for

15   deployment of the software.  And then they will share their

16   copy of that software with another team that we call the

17   server team.

18   Q    Does Mr. Ward's team include a digital certificate in

19   the software that they pass along to the server team?

20   A    No, they don't.

21   Q    And you show as one of the ways that they transfer the

22   software to the server team is by SSL.  Are you familiar

23   with SSL?

24   A    Yes, I am.

25   Q    What does it do?

```
1    A     SSL is a communication protocol that allows
2    communications to be encrypted over an electronic
3    communication.
4    Q     Is it a secure channel?
5    A     Yes.  You can consider it a secure channel, yes.
6    Q     Now, when Mr. Ward's team uses SSL, are -- do they
7    include a digital certificate in the software before sending
8    it through the channel?
9    A     No, they don't.
10          MR. PRITIKIN:  Let's go to the next slide.
11   Q     (By Mr. Pritikin) And what is the server team?
12   A     The server team is the team that's responsible for the
13   administration of the Apple servers.
14   Q     And does the server team include a digital certificate
15   in the FairPlay server software updates before it's
16   installed on the Apple FairPlay servers?
17   A     No, sir, they don't.
18   Q     Now, as you've described the process, the software does
19   not include a digital certificate.  Does that mean that it's
20   possible that corrupted FairPlay software could be loaded on
21   to the Apple FairPlay servers?
22   A     Yes, it's possible, but highly unlikely.
23   Q     And why is that?
24   A     Because we have rules and procedures in place for this
25   update, and I personally trust every member of those two
```

```
 1   teams, and I know them.  I've been working with them for

 2   over 10 years.  And we -- we trust our people and our

 3   process.

 4   Q    Now, in the 10 years that you've worked at Apple, has a

 5   digital certificate ever been included in the FairPlay

 6   server software as a requirement to install it on Apple

 7   servers?

 8   A    No, never.

 9   Q    In the 10 years you've been there, have the FairPlay

10   servers ever been hacked or corrupted?

11   A    No.

12          MR. PRITIKIN:  Let's go to the next slide.

13   Q    (By Mr. Pritikin) When a user downloads a movie from

14   Akamai, is a digital certificate included in the movie that

15   is checked before the movie is installed?

16   A    No.

17   Q    And is that true for all the movies that users buy or

18   rent from Apple?

19   A    Yes, that's true for all the movies.

20   Q    And is that also true for eBooks?

21   A    Yes.

22   Q    And is it also true for songs?

23   A    Yes, it is.

24   Q    And why don't you require digital certificates in order

25   to install these things?
```

1    A     Because it's burdensome and not necessary in this case.

2              MR. PRITIKIN:  Let's go to the next slide,

3    ADX-6.27.

4    Q    (By Mr. Pritikin) And suppose you have an iPad, and

5    now, instead of wanting to buy a movie, you want to rent it.

6    Does this describe the first step in the process?

7    A     Yes.  It's pretty much the same.  When the user clicks

8    the rent button, a purchase request will be issued from the

9    user's device to the Apple server.

10             MR. PRITIKIN:  Let's take a look at the next

11   slide.

12   Q    (By Mr. Pritikin) And, now, I want to go through the

13   different keys here.  Why do you show Toy Story and Captain

14   America here?  What -- what are we looking at?

15   A     What the slide is showing is that every movie we have

16   uses a different content key value, so we've got a green

17   content key for Toy Story and a red content key for Captain

18   America.  They have different values.

19   Q     But in this example, the green key and the red key are

20   both content keys to unlock the movies?

21   A     That is correct.  They're both content keys, yes.

22   Q     And the blue key is the account key?

23   A     The blue key is the account key used for the purchases,

24   yes.

25   Q     But the -- is the account key used when you rent?

1   A     No.   When you rent, there's a rental key that's used.

2   Q     So after the user rents the movie, what comes down from

3   the Apple servers?

4   A     Again, as part of the creation of the purchase

5   response, the Apple servers will include an encrypted copy

6   of the content key -- in this case, the green Toy -- green

7   Toy Story key encrypted with John's purple rental key -- and

8   the purchase response will contain the usual other fields

9   and a few more indicating that this is a rental operation.

10  Q     And is that purple rental key going to be used to

11  unlock the Toy Story account key so that the Toy Story movie

12  can be unlocked?

13  A     It -- it -- the purple rental is the one that's going

14  to be used to unlock the encrypted Toy Story content key.

15  Yes, the green one in the lockbox.

16          MR. PRITIKIN:  And let's go to the next slide.

17  Q     (By Mr. Pritikin) And what happens to the information

18  that's in the purchase response when you rent the movie?

19  A     Very similar to a purchase in the rental case.  Most of

20  the information in the purchase response is going to be

21  processed by the user's device and inserted into the iTunes

22  library for the purpose of organizing the content on the

23  device.

24  Q     Is that library called the media library?

25  A     Yes.  It's the iTunes media library.

1   Q     Same library we were talking about before?

2   A     The same one, yes.

3         MR. PRITIKIN:  Let's go to the next slide.

4   Q    (By Mr. Pritikin) Now, what -- when you rent the movie,

5   how do you actually get the movie?

6   A     Similar to the purchase.  There's going to be U --

7   excuse me -- a URL that points to that movie on the Akamai

8   servers, and so the user's device is going to use that

9   address to connect to the Akamai server and download the

10  movie from that server.

11  Q     Pretty much what we saw before with the purchase?

12  A     Yes.

13        MR. PRITIKIN:  Let's go to 6.31.

14  Q    (By Mr. Pritikin) And what's shown here?

15  A     What's shown here is the download of the Toy Story

16  movie to the user's device.

17  Q     And so at this point, the rental key is on the user's

18  device, the encrypted movie and the encrypted content key

19  for the movie?

20  A     That's correct.  They're all present on the device.

21        MR. PRITIKIN:  Let's go to the next slide.

22  Q    (By Mr. Pritikin) And can you explain, then, how the

23  movie gets unlocked and watched?

24  A     Yes.

25        Very similar to the purchase process, the user's device

1  will notice that the movie is encrypted, and so it will turn

2  around to FairPlay and request assistance for the decryption

3  of that movie.

4      And the way FairPlay does that is that it will look for

5  the purple rental key in John's rental bag, ensure that it's

6  valid, and if it's valid, it will use it to decrypt the

7  encrypted green content key, extract that green content key

8  from the lockbox and then unlock and decrypt the Toy Story

9  movie to make it available for playback.

10  Q    Now, when you rent a movie, how long do you have to

11  watch it with the Apple system --

12  A    There's -- there's two --

13  Q    -- in the United States?

14  A    In the United States, there's two limitations.

15      One is the user has 30 days from the moment of the

16  rental operation with the store to start the playback of the

17  movie.

18      And then the second limitation is, from the moment the

19  user started playback, the user has 24 hours to complete the

20  playback or watch the movie again.

21  Q    And how does Apple enforce those things?

22  A    The enforcement takes place in FairPlay thanks to the

23  durations that are associated to John's rental key.

24  Q    What happens to the rental key after 30 days?

25  A    The rental key -- after -- well, after 30 days, if the

1   movie hasn't been played, it becomes invalid, and the movie

2   can't be played anymore.

3   Q    And how is the rental key used with respect to the

4   24 hours?

5   A    In the same way.  Once the customer started playback of

6   the movie, when the 24 hours are expired, that purple rental

7   key becomes invalid and can't be used anymore to play the

8   movie.

9   Q    Are the time durations enforced through the rental key?

10  A    Yes.  They're associated to the rental key in the

11  Rentalbag.

12          MR. PRITIKIN:  Let's go to the next slide.

13          (Pause in proceedings.)

14          THE COURT:  You need a moment, Mr. Pritikin?

15          MR. PRITIKIN:  Oh, I think I'm there, Your Honor.

16  Thank you.

17          THE COURT:  All right.

18          MR. PRITIKIN:  I'm trying to cut some of this and

19  speed it up.

20  Q    (By Mr. Pritikin) Now, on the left, is -- is that the

21  purchase response again that we're looking at?

22  A    Yes, it is.

23  Q    And now, this time, I see a field we didn't see before,

24  "isRental."  Let me direct your attention to that.  The

25  "isRental" field, is that -- what is that field?

```
 1    A    It's a field that is in the purchase response and
 2    indicates to the iTunes software on the device to organize
 3    and put this movie in the rental tab in the iTunes library
 4    rather than the purchase tab.
 5    Q    Now, a few minutes ago, we looked at a screenshot that
 6    showed all the movies that had been purchased.
 7         Do you recall that?
 8    A    Yes, I do.
 9    Q    If -- if I have an account, can I view separately the
10    movies that I've purchased from those that I've rented?
11    A    Yes, you can.
12    Q    So iTunes will display them separately for me?
13    A    That is correct.  It's two different sections of the
14    library.
15    Q    And what does the "isRental" field do with respect to
16    that?
17    A    The "isRental" field allows iTunes to place the movie
18    that has that information set in the rental section of the
19    library.
20    Q    Does -- there's another field called "rental duration."
21         Do you see that?
22    A    Yes, I do.
23    Q    Does the iPad use those fields from the "purchase
24    response," "isRental" or "rental duration," does it use
25    those in any way to control the playback of the rented
```

1    movie?

2    A     No, it doesn't.

3    Q     Again, if an expert for ContentGuard said that the

4    "isRental" field, the "kind" field, and the "rental

5    duration" fields from this purchase response are used to

6    control or permit playback of a rental movie on an iPad,

7    would that be correct?

8    A     No, that's incorrect.

9    Q     And what do the "isRental," "rental duration," and

10   "kind" fields do in the Apple system?

11   A     They're used to organize and properly present the movie

12   in the library for the user.

13   Q     And do they also provide information to the user in

14   some instances and how much longer the movie is available?

15   A     Yes, absolutely.

16           MR. PRITIKIN:  Your Honor, I'm afraid I need to

17   seal the courtroom briefly again for a short series of

18   questions.

19           THE COURT:  All right.  At the request of Counsel,

20   I'll order the courtroom sealed.  If you're present and not

21   subject to the protective order in this case you should

22   excuse yourself and remain outside until the courtroom is

23   unsealed.

24           (Courtroom sealed, in a separate volume, Page 9,

25           Line 11 through Page 11, Line 21.)

```
 1              (Courtroom unsealed.)

 2              THE COURT:  All right.  The courtroom is unsealed.

 3              You may continue.

 4              MR. PRITIKIN:  Let's go back to APX-6.33 (sic),

 5    Mr. Simmons.

 6    Q    (By Mr. Pritikin) And you see the "isRental" field on

 7    the purchase response on the left?

 8    A    Yes.

 9    Q    And what's signified by the "rented" on the right?

10    A    On the right-hand side, that just shows which movies

11    are in the rented section of the library and in the

12    presentation to the user.

13    Q    Does the "isRental" field in the purchase response have

14    anything to do with DRM?

15    A    No.

16    Q    Is it ever used to restrict or control the playback of

17    the content?

18    A    No, it isn't.

19    Q    What happens if the "isRental" information in iTunes is

20    corrupted or changed?  Does that change or affect whether

21    you can play the rented movie?

22    A    No, it doesn't.

23    Q    And, again, if an expert for ContentGuard told the jury

24    that the "isRental" field from the purchase response is used

25    by FairPlay to control or permit playback, would that be
```

1   correct?

2   A     No, that's incorrect.

3   Q     And, again, based on the various tests that you run at

4   Apple, is there a way to confirm whether the "isRental"

5   field is needed by FairPlay to control or permit playback?

6   A     Yes, that can be tested.

7   Q     And can you explain how?

8   A     Yes.

9         The "isRental" field can be cut out from the purchase

10  response, which would cause the movie to land in a different

11  section, but then the movie can still be played.

12  Q     And -- and just to tie this down, where -- where do the

13  restrictions on rental come from in the Apple system if

14  they're not in the purchase response?

15  A     The restrictions come from the rental key that is

16  stored in the Rentalbag.

17  Q     Can rented movies be copied from one computer to

18  another?

19  A     Yes, they can.

20  Q     And if the new computer that it's copied to is offline,

21  can it play the rented movie that was copied?

22  A     No, it can't.

23  Q     And why is that?

24  A     Because the rules require that computers be online for

25  the transfer of rental content.  And in this specific case

1   you mentioned, the destination computer that receives the

2   movie won't have the rental key to play the content.

3   Q    And it would need the rental key in order to be able to

4   play rented content?

5   A    Yes, that is required.

6              MR. PRITIKIN:  Your Honor, I have no further

7   questions.  I pass the witness.

8              THE COURT:  All right.  Approach the bench,

9   counsel.

10             (Bench conference.)

11             THE COURT:  How long do you expect your cross to

12  be, Mr. Thomas?

13             MR. THOMAS:  At least 30 minutes, Your Honor.  I'm

14  happy to get it started now.  I'm sure there will be a break

15  point.

16             THE COURT:  All right.  Well, we'll go 10 or

17  15 minutes, and then we'll break.

18             Let's proceed.

19             (Bench conference concluded.)

20             THE COURT:  All right.  Cross-examination of the

21  witness by the Plaintiff.

22             MR. THOMAS:  Yes, Your Honor.

23             THE COURT:  You may proceed when you're ready,

24  Mr. Thomas.

25                          CROSS-EXAMINATION

```
 1   BY MR. THOMAS:

 2   Q    Good morning, Mr. Fasoli.  How are you?

 3   A    Good morning.  Good.  Yourself?

 4   Q    We met when I took your deposition, I believe, in this

 5   case.  I don't know if you recall, but it's good to see you

 6   again.

 7   A    Yes, we did.

 8   Q    Did I hear you right when your counsel just asked you

 9   whether you had reviewed all of the source code that was

10   produced to ContentGuard's source code reviewers in this

11   case?

12   A    He asked me if I was familiar with it.

13   Q    I believe he asked you if you reviewed it.  Now, did

14   you review all the source code that was produced to

15   ContentGuard's code reviewers in this case?

16   A    No.  Just the relevant portions.

17   Q    Okay.  And that was portions that you decided were

18   relevant, I take it, right?

19   A    Myself and another engineer, yes.

20   Q    Okay.  Because we know that there was a whole lot of

21   source code that was produced by Apple in this case.

22        Are you aware of that?

23   A    Yes, that's correct.

24   Q    In fact, it spanned over 22 different productions.

25   Were you aware of that?
```

1   A    Yes.

2   Q    And that our source code reviewers spent over 2700

3   hours sitting in front of computer terminals reviewing that

4   source code.

5        Are you aware of that?

6   A    I wasn't aware of that.

7   Q    Okay.  But that's not the kind of time that you spent

8   looking at that same source code, is it?

9   A    No, that's correct.

10  Q    Okay.  You just looked at the source code that you

11  thought was relevant, and that was it, right?

12  A    It's the one that's relevant and that I am most -- most

13  familiar with.

14  Q    No, but it was the source code you picked out as being

15  relevant, right?

16  A    Yes, because it's that part that handles the rentals,

17  yes.

18  Q    I understand, sir, but you weren't looking at what was

19  in the minds of our experts or our source code reviewers for

20  them to decide what was relevant, right?  You made your own

21  decisions on that point, right?

22  A    That is correct, yes.

23  Q    And in your testimony today, you pointed us to one line

24  of source code; is that correct?

25  A    Yes.

```
 1   Q    And you didn't point us today to any other Apple
 2   documents to support what you've just described is the way
 3   that Apple system's work, did you?
 4   A    I didn't use other documents.
 5   Q    You just took it -- we have to take it on faith that
 6   your recollection and your memory and your credibility about
 7   how the system works is all topnotch, right?
 8   A    Yes.  And my competence, yes.
 9   Q    Right.  Now, sir, when you were preparing to be deposed
10   in this case, you met with the lawyers for Apple to prepare
11   to give your testimony, didn't you?
12   A    Yes, that's correct.
13   Q    And at the same time you met with the lawyers, all of
14   the other witnesses that had any relevant information
15   regarding how the Apple system works were in the same room
16   with you and the lawyers, weren't they?
17   A    Not at all times, no.
18   Q    For most of the time, because you were there for almost
19   a whole day, right?
20   A    Yes.
21   Q    And I think one of those individuals, you testified,
22   actually may have left for about an hour, right?
23   A    Yes.
24   Q    Okay.  But the whole rest of the time for that whole
25   day, you guys were all together, right?
```

```
 1   A      Yes.

 2   Q      In the same room?

 3   A      Yes.

 4   Q      With the lawyers from Apple, right?

 5   A      Yeah.  I believe you're referring to the day back in

 6   March, but yes.

 7   Q      The day before -- well, if it was the day before -- but

 8   right before y'all were going to give your testimony, your

 9   sworn testimony in your deposition, you were all pulled into

10   the same room by the Apple lawyers to prepare to give that

11   testimony, right?

12   A      Yes.

13   Q      And that was Mr. Chandler, I think, one of the lawyers

14   over here for Apple, that was in that meeting with all of

15   you all, right?

16   A      That is correct.

17   Q      And also one of the in-house lawyers for Apple was

18   there, too, right?

19   A      Yes, I believe so.

20   Q      Okay.  Now, sir, at the end, right when you finished

21   there, you were talking about that rental information and

22   the "rental duration" and the "isRental" field and the

23   purchase response.

24          Do you recall that?

25   A      Yes.
```

1  Q    And that rental information that's in the purchase

2  response, that's the same rental information, "rental

3  durations," "rental time periods" that are in the rental

4  Keybag, isn't it?

5  A    Well, they're different copies.

6  Q    The same information, isn't it, sir?

7  A    The same values, yes, different copies.

8  Q    The same information, isn't it, sir?  It's the same

9  rental 24-hour period.  Starts at the same time, right?

10  A    Yeah.  The values are the same, yes.

11  Q    And the 30 days starts at the same time, both the

12  information for that 30-day period and what you call the

13  Rentalbag and what our expert called the purchase response,

14  it's the same information, right?

15  A    Yes, the same values, two different copies.

16  Q    Right.  You weren't trying to suggest that that was

17  somehow different information that was maintained in those

18  two places, right?

19  A    That is correct.  I wasn't.

20  Q    Because that information gets into those two places

21  from the same place, from the iTunes Store, right?

22  A    That is correct.

23  Q    And is created at the same time, right?

24  A    That is correct.

25  Q    And so they are the same values, aren't they, sir?

```
 1  A     They are the same values but different copies, yes.
 2  Q     Now -- and isn't it also true, sir -- actually, when
 3  you were in that conference room with the other witnesses
 4  that are going to testify here, when you were all together
 5  discussing what your testimony was going to be with the
 6  lawyers, you also reviewed the patents, didn't you?
 7  A     Yes, that's correct.
 8  Q     And actually one of those patents is the '053 patent.
 9  Do you remember that, sir?
10  A     I remember the number, yes.
11         MR. THOMAS:  Mr. Diaz, could you please bring up
12  the '053 patent, and if you could go to Column 2 in that
13  description of what is the secure container?
14  Q     (By Mr. Thomas) Now, you see, sir, this is that '053
15  patent that you -- it's one of the patents you reviewed
16  while you were preparing to give your testimony.
17         Do you recall that?
18  A     Yes.
19  Q     Okay.  And it says here there are two basic DRM schemes
20  that have been employed:  Secure containers and trusted
21  systems.
22         Do you see that?
23  A     I do see that.
24  Q     And you see that the author of this document goes on to
25  describe what he means by a secure container.
```

1      Do you see that?

2  A    Yes, I do.

3  Q    He says:  A secure container or simply an encrypted

4  document offers a way to keep document contents encrypted

5  until a set of authorization conditions are met and some

6  copyright terms are honored.

7      You saw that?

8  A    Yes, I do.

9  Q    Then the author goes on to say:  After the various

10  conditions and terms are verified with the document

11  provider, the document is released to the user in clear

12  form.

13      And then he goes on to say:  Clearly, the secure

14  container approach provides a solution to protecting the

15  document during delivery over secure channels but does not

16  provide any mechanism to prevent legitimate users from

17  obtaining the clear document.

18      Do you see that, sir?

19  A    Yes, I do.

20  Q    Now, iTunes and the FairPlay DRM is designed to do

21  exactly the opposite of that, isn't it?

22  A    No.

23  Q    Isn't it true, sir, that Fair -- is Fair -- is it your

24  testimony, sir, that FairPlay is designed to permit

25  legitimate users to obtain a clear movie file and then using

1  and redistribute -- redistributing it?  FairPlay doesn't

2  allow that, does it?

3  A    FairPlay does not allow that.

4  Q    That's right.

5       So FairPlay does not do what this author was describing

6  as the secure container approach, does it?

7  A    Well, FairPlay doesn't allow to do that for movies.  It

8  does allow to do that for DRM-free books and DRM-free songs.

9  Q    I'm talking about the DRM-protected content, the

10 DRM-protected movies, the DRM-protected TV shows, and the

11 DRM-protected books.  Apple, in its FairPlay system, does

12 not use the secure container approach that is described here

13 by this author to protect that content, does it?

14 A    I disagree.

15 Q    You say that Apple's FairPlay DRM, when it's protecting

16 DRM-protected movies, books, and TV shows, allows the

17 customer to obtain a clear copy of that file and then use it

18 as they wish from then on?

19      Is that your testimony?

20 A    No.

21 Q    No, because you know that's not what happens, is it?

22 A    No, it isn't.

23 Q    Okay.  But that's what this author says right here at

24 the bottom, isn't it, sir?  It says:  Does not provide any

25 mechanism to prevent legitimate users from obtaining the

```
 1   clear document.

 2        FairPlay does exactly the opposite of that, doesn't it?

 3   FairPlay provides a mechanism to prevent legitimate users,

 4   customers, from obtaining the clear document and then using

 5   and redistributing it.

 6        That's what FairPlay does do, right?  It prevents that

 7   from happening?

 8   A    For DRM content, that's correct.

 9   Q    That's right.  I'm only talking about DRM-protected

10   content right now, sir.  So the DRM-protected content that

11   FairPlay handles in Apple's scheme is not using the secure

12   container approach that this author describes in these

13   passages, is it?

14   A    I mean, I -- I'd have to see more context and a clearer

15   definition of the secure container.

16   Q    Well, that's all we got here, sir.  I mean, that's what

17   your lawyers have been pointing to throughout this trial as

18   describing the secure container approach.  So if somebody

19   were to say that the Apple DRM system --

20   A    Uh-huh.

21   Q    -- for protecting DRM-protected books, movies, and TV

22   allows a customer to obtain a clear copy, unencrypted with

23   no restrictions on use of that DRM-protected file, that's

24   not true, is it?

25   A    Well, as discussed earlier, there are flaws in our
```

1    system.  And if a user uses a tax offer they can get to that

2    point.

3    Q    We're not talking about whether you can be hacked, sir,

4    all right?  We're talking about how you design the system

5    and how you intend it to be used.

6    A    Okay.

7    Q    The way that you design the system and Apple intends it

8    to be used, you do not want your customers to obtain a clear

9    copy of that document at any time for DRM-protected content,

10   correct?

11   A    That is correct.  We do not want that.

12   Q    And this document says that's exactly what a secure

13   container approach allows, that a secure container approach

14   allows in this document the legitimate user to obtain the

15   clear document and then use and redistribute it as he sees

16   fit.

17        That's what this -- that's what the secure container in

18   this document is doing, isn't it, sir?

19   A    Yes, that's what's described.

20   Q    And that's not what Apple is doing, is it, for its

21   DRM-protected content?

22   A    It's certainly not a feature of FairPlay, yes.

23   Q    It's not a goal of FairPlay either, is it, sir?

24   A    No, not for DRM content.

25   Q    In fact, if you try and make that exactly the opposite

1  happen, you do not -- you don't want that unencrypted file

2  to be available to people without restrictions ever, right,

3  for DRM-protected content?

4  A    Until the content providers say so.

5  Q    Sir, we're talking about how these things get sold and

6  what you just described in your testimony.

7  A    Uh-huh.

8  Q    And all your testimony when your lawyer was asking you

9  questions, did you ever describe any instance where, if

10 there was a piece of content, that was sent in the clear

11 because some content owner had told Apple they could do

12 that?

13 A    No, not --

14 Q    No?

15 A    -- in this -- in the testimony.

16        THE COURT:  All right.  Let me stop you here for a

17 minute.

18        First of all, you both need to make sure the other

19 one is finished before you start with your next question,

20 Counsel.

21        Mr. Fasoli, uh-huh is not an acceptable answer.  I

22 don't -- I can't translate a nonverbal response.  So yes or

23 no is great, but uh-huh or huh-uh doesn't work.  So try to

24 refrain from giving those answers.

25        Also, we're just a few minutes short of noon, and

1    I'm aware that this cross-examination is going to go for

2    some considerable additional length of time, so we're going

3    to break for lunch at this time.

4            And ladies and gentlemen of the jury, because the

5    weather is so bad, we've made arrangements to have lunch

6    brought in to you in the jury room so you won't have to get

7    out in this bad weather.

8            I can't promise you that this will be an everyday

9    occurrence.  The government doesn't give me that much

10   latitude.  But I do have enough to make sure you don't have

11   to go out and fight the rain today.  So you'll have lunch

12   brought into by the clerk's office in just a few minutes.

13           If you will, take your notebooks with you.  Don't

14   discuss anything about the case with yourselves or with

15   anyone else.  Enjoy your lunch, and we'll try to start back

16   as close to 1:00 o'clock as we can.

17           With those instructions, you're excused for lunch

18   at this time.

19           COURT SECURITY OFFICER:  All rise for the jury.

20           (Jury out.)

21           THE COURT:  All right.  We're in recess for lunch.

22           (Lunch recess.)

23

24

25

1

2                              CERTIFICATION

3

4          I HEREBY CERTIFY that the foregoing is a correct

5    transcript from the stenographic notes of the proceedings in

6    the above-entitled matter to the best of my ability.

7

8

9    /S/Shelly Holmes                    11/17/15
     SHELLY HOLMES, CSR, TCRR            Date
10   Official Court Reporter
     State of Texas No. 7804
11   Expiration Date:  12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25