```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     MARSHALL DIVISION

 3   CONTENTGUARD HOLDINGS, INC.  )(   Civil Docket No.
                                  )(   2:13-CV-1112-JRG
 4                                )(   MARSHALL, TEXAS
     VS.                          )(
 5                                )(
                                  )(   NOVEMBER 19, 2015
 6   APPLE, INC.                  )(   8:39 a.m.

 7                  TRANSCRIPT OF JURY TRIAL

 8          BEFORE THE HONORABLE RODNEY GILSTRAP

 9             UNITED STATES DISTRICT COURT

10   APPEARANCES:

11   FOR THE PLAINTIFF:        Mr. Samuel F. Baxter
                              Ms. Jennifer Truelove
12                            MCKOOL SMITH, PC
                              104 East Houston Street, Suite 300
13                            Marshall, Texas 75670

14                            Mr. Robert A. Cote
                              MCKOOL SMITH, PC
15                            One Bryant Park, 47th Floor
                              New York, New York 10036
16
                              Mr. Dirk D. Thomas
17                            MCKOOL SMITH, PC
                              1999 K Street, N.W., Suite 600
18                            Washington, DC 20006

19   APPEARANCES CONTINUED ON THE NEXT PAGE:

20   COURT REPORTER:          SHELLY HOLMES,CSR, TCRR
                              Official Court Reporter
21                            United States District Court
                              Eastern District of Texas
22                            Marshall Division
                              100 E. Houston, Suite 125
23                            Marshall, Texas  75670
                              (903) 923-7464
24
     (Proceedings recorded by mechanical stenography, transcript
25   produced on CAT system.)
```

```
1    APPEARANCES CONTINUED:

2    FOR THE DEFENDANT:        Mr. David T. Pritikin
                               Mr. Nathaniel C. Love
3                              SIDLEY AUSTIN LLP
                               One South Dearborn St.
4                              Chicago, Illinois 60603

5                              Mr. Dave Anderson
                               Mr. Theodore W. Chandler
6                              SIDLEY AUSTIN LLP
                               555 California St.
7                              San Francisco, CA 94104

8                              Ms. Melissa Smith
                               GILLAM & SMITH
9                              303 South Washington Avenue
                               Marshall, Texas 75670
10
                               Mr. Bryan K. Anderson
11                             SIDLEY AUSTIN LLP
                               1001 Page Mill Road, Bldg. 1
12                             Palo Alto, CA 94304

13                             Mr. Jeffrey P. Kushan
                               Mr. Michael P. Franzinger
14                             SIDLEY AUSTIN LLP
                               1501 K Street, N.W.
15                             Washington, D.C. 20005

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2            (Jury out.)

3            COURT SECURITY OFFICER:  All rise.

4            THE COURT:  Be seated, please.

5            All right.  Do the parties have items from the

6   list of pre-admitted exhibits to read into the record used

7   during yesterday's portion of the trial?

8            MS. ENGELMANN:  Yes, Your Honor.  Good morning.

9            Plaintiff's list of preadmitted used in -- used

10  during yesterday's trial are as follows:  AX-919C, 921C,

11  923C, 1175C, and 1176C.

12           THE COURT:  Is there objection from the Defendant?

13           MR. BRYAN ANDERSON:  No objection, Your Honor.

14           THE COURT:  Do you have an additional list,

15  Mr. Anderson?

16           MR. BRYAN ANDERSON:  We do, Your Honor.

17           THE COURT:  Please proceed.

18           MR. BRYAN ANDERSON:  AX-5, AX-6, AX-401, AX-502,

19  AX-504, AX-508, AX-509, AX-515, AX-548, AX-919C, AX-921C,

20  AX-923C, AX-1173, AX-1175C, AX-1176C, AX-1184, AX-1350.

21           THE COURT:  Any objection from the Plaintiff,

22  Ms. Engelmann?

23           MS. ENGELMANN:  The only correction, Your Honor,

24  would be the AX-1173, 1184, and 1350 will be filed as

25  confidential with a C designation.
```

```
 1            THE COURT:  Do you concur, Mr. Anderson?

 2            MR. BRYAN ANDERSON:  I do, Your Honor.

 3            THE COURT:  All right.

 4            All right.  Mr. Pritikin, do you have something to

 5  raise?

 6            MR. PRITIKIN:  I do, Your Honor.

 7            THE COURT:  All right.

 8            MR. PRITIKIN:  We discussed in chambers this

 9  morning the procedure we're going to use with respect to the

10  rsync and SSH materials, and the Court gave us guidelines,

11  which obviously we're going to follow.

12            I just wanted to put on the record that Apple does

13  object to the introduction of the additional infringement

14  evidence that is going to be offered on rebuttal by

15  Dr. Goodrich and the -- and the fact, in addition, that

16  we're not going to be permitted to refute this through

17  Dr. Kelly beyond the one question that we will be asking

18  him.

19            But we understand what the Court's ruling is, and

20  obviously we're prepared to follow that and will do so, Your

21  Honor.

22            THE COURT:  All right.  Your objection is noted.

23            And while we're involved in making clear the

24  record, the Plaintiff's filed motion for reconsideration of

25  the Court's denial to admit the demonstrative identified as
```

1  Bates No. APL-CG_01304517 that's set forth in Document 1044

2  on file in this case is denied.

3            And Apple's request to present a surrebuttal case

4  as filed in the record is also denied, as well as Apple's

5  request to present additional direct testimony.  That is

6  granted in part and denied in part as I've outlined with

7  counsel, and counsel understands.  I think that should

8  clarify the record.

9            Dr. Prowse, if you're here, please return to the

10  witness stand.

11            And, Mr. Anderson, you're still in your direct

12  examination, correct?

13            MR. BRYAN ANDERSON:  Yes, Your Honor.

14            THE COURT:  You may return to the podium.

15            And, Mr. Nance, if you would, bring in the jury,

16  please.

17            COURT SECURITY OFFICER:  All rise for the jury.

18            (Jury in.)

19            THE COURT:  Please be seated, ladies and

20  gentlemen.  Welcome back.

21            Just to bring you up-to-date, there were matters

22  raised as objections at the time I sent you home yesterday

23  afternoon.  Those objections are overruled by the Court.

24  We'll continue with the direct examination of Dr. Stephen

25  Prowse by the Defendant.

 1          Mr. Anderson, you may continue with your direct

 2   examination.

 3          MR. BRYAN ANDERSON:   Thank you, Your Honor.

 4   STEPHEN PROWSE, Ph.D., DEFENDANT'S WITNESS, PREVIOUSLY SWORN

 5                DIRECT EXAMINATION (CONTINUED)

 6   BY MR. BRYAN ANDERSON:

 7   Q    Dr. Prowse, will you please remind the jury why you are

 8   here today to testify?

 9   A    Yes.

10        I'm here to tell the jury my opinions with regards to

11   my Georgia-Pacific analysis of a reasonable royalty that

12   Apple would pay ContentGuard for use of its patents, should

13   the jury find the patents valid and infringed.

14   Q    The jury has heard some discussion of the hypothetical

15   negotiation.  Can you please explain to them your

16   application of that in this matter?

17   A    Yes.

18        The hypothetical negotiation is a part of the

19   Georgia-Pacific analysis.  It requires me, as a damages

20   expert and economic expert, to assume the patents are valid

21   and infringed and to assume that the parties come to an

22   agreement about what a reasonable royalty would be for the

23   patents that are asserted by the Plaintiff and that this

24   negotiation takes place approximately around the beginning

25   of the first alleged infringement, which in this case would

1    be sometime late in 2005.

2    Q    Now, Dr. Prowse, you understand that Apple contests

3    that it infringes any claims that are asserted here,

4    correct?

5    A    Yes.  I -- I understand that Apple does not believe it

6    infringes.

7    Q    It also contests that the claims asserted against it

8    are valid, correct?

9    A    Yes, I understand that, too.

10   Q    So for purposes of your analysis, you have to adopt a

11   fiction that there is an actual negotiation between the

12   parties where they assume they agree on infringement and

13   validity.

14        Is that a fair summary?

15   A    Yes, that is, yes.

16             MR. BRYAN ANDERSON:  If we could pull up AX-923,

17   Mr. Simmons.

18   Q    (By Mr. Bryan Anderson) This is the document we were

19   looking at yesterday at the end of your testimony.

20        Do you recall that, Dr. Prowse?

21   A    Yes, I do.

22   Q    So do you recognize this AX-923 document?

23   A    Yes.  This is a document I prepared in the course of my

24   analysis and I included in my report.

25   Q    What -- what information is reflected in this

1   particular exhibit?

2   A     So this is my estimate of the costs of physical

3   delivery of FairPlay updates to the FairPlay servers.

4   Q     Was this information actually provided in the report

5   you submitted some months ago?

6   A     Yes, it was.

7   Q     And where did you obtain the information that's

8   reflected in this Exhibit AX-923?

9   A     I obtained this information from discussions with

10  Mr. Ward and Mr. Michael James, who are Apple employees, and

11  also from Mr. James' deposition.

12  Q     Why did you compile this information, Dr. Prowse?

13  A     So I compiled this information because I thought it was

14  a relevant data point that would be considered around the

15  time of the hypothetical negotiation.

16  Q     And why was that, sir?

17  A     And that is because, at the time of the hypothetical

18  negotiation, I have to assume, as I've -- as I've said, that

19  the patents are valid and infringed, but I wanted to

20  understand, even assuming if ContentGuard's theories of

21  infringement are correct, was there a way for Apple to make

22  FairPlay updates without using a secure connection, which I

23  understood from a conversation with Dr. Kelly would not

24  infringe the patents, even according to ContentGuard's

25  theories.

```
 1              MR. BAXTER:  And I object to that, Your Honor.
 2    It's hearsay to begin with, and the same objection.
 3              THE COURT:  Response?
 4              MR. BRYAN ANDERSON:  Your Honor, this is the basis
 5    in his report that's described for his understanding of the
 6    non-infringing alternative of SSL that we discussed
 7    yesterday.
 8              MR. BAXTER:  Just for the record, Your Honor, it's
 9    not based on sworn testimony.
10              THE COURT:  Well, as an expert, I think he's
11    entitled to rely on hearsay.  I'll overrule the objection.
12    Q    (By Mr. Bryan Anderson) Dr. Prowse, were you able to
13    review the trial testimony of Mr. Ward in this case?
14    A    I was.
15    Q    Were you able to review the trial testimony of
16    Dr. Kelly in this case?
17    A    I was -- parts of it, yes.
18    Q    Was that testimony consistent with the discussions you
19    had with them on the ability of Apple to upload FairPlay
20    software on to its servers without using a secure
21    connection?
22    A    Yes, it was.
23    Q    So what did you learn from your investigation as to the
24    ability of Apple to upload FairPlay software without using a
25    secure connection?
```

1   A     So I understood that this was -- from Dr. Kelly, that

2   this was a feasible way to deliver FairPlay updates to

3   FairPlay servers without using a secure connection.

4            MR. BAXTER:  Excuse me, Your Honor.  Your Honor, I

5   mean, not to object again.  Can I just have a running

6   objection to all his competing hearsay, Your Honor?

7            THE COURT:  You may.

8            MR. BAXTER:  Thank you, Your Honor.

9            THE COURT:  Same ruling.

10           Let's continue.

11           Go ahead and finish your answer, Dr. Prowse.

12           THE WITNESS:  Sure.

13  A     So I understood from Dr. Kelly that it was

14  physically -- it was feasible to deliver FairPlay updates to

15  FairPlay servers without using a secure connection and that

16  that would not infringe, even according to ContentGuard's

17  theories.

18       So my next investigation was to understand how much

19  that would cost, what would it involve, and would it impact

20  Apple's customers or the FairPlay system or Apple -- or the

21  content owners that provide Apple with content in any

22  material way.

23           MR. BRYAN ANDERSON:  Just to go back for a moment,

24  Mr. Simmons, if you could pull up the trial testimony of

25  Mr. Ward at Pages 92 through 93, Lines 25 through Line 13 on

1   93.

2   Q    (By Mr. Bryan Anderson) Is this the testimony that you

3   were able to review from Mr. Ward that was consistent with

4   your conversations with him about the ability to not use a

5   secure connection?

6   A    Yes.  And his discussion about hand-delivering the

7   software, yes.

8           MR. BRYAN ANDERSON:  Mr. Simmons, if we could pull

9   up trial testimony from Dr. Kelly on Page 55, Lines 18

10  through 21 -- Page 55, please.

11          Thank you.

12  Q    (By Mr. Bryan Anderson) Is this the testimony you

13  reviewed from Dr. Kelly that was consistent with your prior

14  conversations that SSL was not a requirement for uploading

15  FairPlay software?

16  A    Yes, it is.

17          MR. BRYAN ANDERSON:  So let's go back to AX-923,

18  please, Mr. Simmons.

19  Q    (By Mr. Bryan Anderson) Based on the information that

20  you were able to obtain on your investigation, talking to

21  Mr. James and Mr. Ward and Dr. Kelly, please explain to the

22  jury how you compiled the information here and -- and what

23  its significance is.

24  A    So one way of avoiding a secure connection is literally

25  to -- my understanding is, put the update in a sealed bag

1    and physically transport it to the servers.  And there are

2    servers located in Newark, California, and in Maiden, North

3    Carolina.

4         So my objective was to understand, well, what's the

5    physical -- what are the actual costs of doing that

6    physical transportation of the FairPlay update to the

7    FairPlay server.

8         And I understood that -- from Mr. Ward, that there

9    would be approximately updates needed to be made

10   approximately twice a month, and it would cost -- obviously

11   the travel costs, plus the cost of the software engineer's

12   time to actually transport -- take the software to the

13   servers.

14        And so based on my analysis of compensation costs for

15   software engineers and travel costs, I estimated the costs

16   of physically transporting or physically delivering FairPlay

17   updates to FairPlay servers over the entire life of the

18   patents from 2005 all the way out to 2026.

19   Q    And what was -- I'm sorry, Dr. Prowse.  And what was

20   that cost?

21   A    And that cost is in the bottom right-hand corner of the

22   exhibit.  It's approximately $2.2 million.

23   Q    And -- and what does this analysis you've undertaken on

24   what it would cost Apple to not use the secure connection,

25   what does that tell you for purposes of the hypothetical

1    negotiation?

2    A    Well, I think it's another relevant data point for

3    purposes of a hypothetical negotiation, because at the

4    negotiation, the parties are going to assume the patents are

5    infringed and valid.

6         But if there are alternatives that Apple can enact to

7    avoid using a secure connection and those -- those

8    alternatives are not -- not very costly, as indicated by my

9    analysis here, and they don't impact materially customers or

10   content owners or the performance of FairPlay, then that

11   would be a very relevant piece of information for the

12   parties at the hypothetical negotiation and would influence

13   the amount that Apple would be willing to pay, assuming the

14   patents are valid and infringed, as a reasonable royalty.

15   Q    Did Dr. Teece undertake such an analysis of -- of

16   alternatives in his report, Doctor?

17   A    He did not.

18   Q    Is Dr. Teece's opinion that Apple would agree to pay a

19   hundred plus million dollars as a reasonable royalty

20   consistent with this alternative?

21   A    It's totally inconsistent, because if ContentGuard had

22   come with a demand for $880 million at the hypothetical

23   negotiation, Apple would have certainly considered and

24   presented evidence that would be around the fact that they

25   could avoid the use of a secure connection for much -- much

1    less money.

2    Q    In addition to looking at information about Apple, the

3    financial information you talked about -- let's take a step

4    back.

5         Let's remind the jury.  What are the financial pieces

6    of information that you looked at from Apple that you've

7    described today and yesterday, sir?

8    A    So I think there's really three pieces of relevant data

9    that would be relevant at the hypothetical negotiation.

10   This data that I've just discussed, the 2.2 million, to

11   avoid the use of using a secure connection; the $2.3 million

12   that I talked about the -- yesterday with regards to the

13   allocated portion of total FairPlay expenditures that can be

14   allocated to the accused transactions; and the

15   14-million-dollar Cloakware license, those are three

16   relevant data points, I think, that would be considered at

17   the hypothetical negotiation.

18   Q    In addition to looking at financial information

19   available for Apple, did you look at anything from

20   ContentGuard?

21   A    Yes, I did.

22   Q    For example, what were the types of material you looked

23   at from ContentGuard?

24   A    Well, I looked at a number of ContentGuard internal

25   valuations of a license to Apple.

1           MR. BRYAN ANDERSON:  Let's pull up AX-1252,

2    Mr. Simmons.

3    Q    (By Mr. Bryan Anderson) Do you recognize this document,

4    Dr. Prowse?

5    A    Yes, I do.

6    Q    Is this one of the documents you considered in your

7    analysis?

8    A    Yes, it was.

9    Q    Okay.

10           MR. BRYAN ANDERSON:  If we can go to Bates 1514

11   and blow that up, Mr. Simmons.

12           Thank you very much.

13   Q    (By Mr. Bryan Anderson) Do you recall Mr. Baker's

14   testimony about this subject?

15   A    Yes, I do.

16   Q    Was this also one of the internal ContentGuard analyses

17   you considered in your analysis?

18   A    Yes, it was.

19   Q    What significance did you find in this 2005 analysis by

20   ContentGuard?

21   A    Well, firstly, it's -- it's an analysis done by

22   ContentGuard in 2005, which is right around the time of the

23   hypothetical negotiation.

24        Secondly, it does have in it analysis of Apple,

25   analysis of the market for digital content, and analysis on

1    this page of a royalty rate applied to Apple.

2    Q    What was the -- what would the royalty be in light of

3    that royalty rate and the projected sales at the time?

4    A    Well, what this table tells you is that the envisioned

5    royalty rate would be 10 cents per unit, and there were --

6    were estimated 160 million units in this analysis.

7         And this is basically iPods and video iPods that

8    they're looking at here, and the 10 cents multiplied by the

9    160 million dollar -- 160 million units comes to

10   $16 million.

11   Q    Now, did you hear Mr. Baker's explanation that this

12   particular analysis would be limited to audio iPods?

13   A    I did.

14   Q    Was that consistent with your understanding of the

15   analysis here from 2005 based on your review of the

16   document?

17   A    Well, based on my review of the document and my -- and

18   my knowledge of when the iPod video launched, these numbers

19   would have -- or this analysis would have to have known that

20   the iPod video had launched in -- earlier in 2005 and was

21   being sold and was actually selling very well.

22        MR. BRYAN ANDERSON:  Would you please turn to

23   1400, next page, 1400, Mr. Simmons.

24        THE COURT:  And, Mr. Anderson, if you'll speak up

25   just a little bit.

```
 1              MR. BRYAN ANDERSON:  Yes, Your Honor.
 2    Q    (By Mr. Bryan Anderson) This is additional material
 3    from this 2005 analysis.  Do you consider that in forming
 4    your opinions in this case?
 5    A    I do.
 6    Q    What significance did you take out of this particular
 7    slide in the 2005 ContentGuard analysis?
 8    A    Well, this page of the -- of the document, which comes
 9    somewhat before the last page we just looked at, its first
10    bullet point under significant recent market
11    announcements/activities, specifically acknowledges what I
12    was just talking about, that the Apple iPod video had just
13    launched, had launched earlier that year.  And it signals a
14    broadening of deployment of DRM enabled content.
15              MR. BRYAN ANDERSON:  Let's take a look,
16    Mr. Simmons, at AX-962.
17    Q    (By Mr. Bryan Anderson) Do you recognize this board
18    presentation from 2008 by ContentGuard?
19    A    Yes, I do.
20    Q    Is this one of the documents that you considered in
21    your analysis?
22    A    Yes, it is.
23              MR. BRYAN ANDERSON:  If we could turn to the
24    Bates's page ending in 6159, Mr. Simmons.  And -- and blow
25    up this page.
```

1    Q      (By Mr. Bryan Anderson) Is this a particular analysis

2    that you considered in your -- in your analysis, Dr. Prowse?

3    A      Yes, it is.

4    Q      What significance did you take from -- from this

5    particular 2008 analysis by ContentGuard concerning Apple?

6    A      Well, this, again, is an analysis of the valuation of a

7    license to Apple.  It was the next one I noticed after the

8    one we just looked at in 2005.

9           And it's relevant because it's a couple -- few years

10   after the hypothetical negotiation, but it specifically

11   looks at Apple and the -- the value of a license to Apple at

12   that time.

13   Q      And what was the estimated license value for Apple in

14   2008?

15   A      Well, in the third bullet there, it says:  Preliminary

16   estimated license value believed to be approximately

17   $30 million.

18   Q      Would the iPhone have been included in this analysis,

19   to your understanding?

20   A      Yes.  The iPhone would have been included in this

21   analysis because the iPhone had launched in 2007.

22   Q      Do you see the specific references to iPhone here, sir?

23   A      Yes.  In the table below, they have three Apple devices

24   listed:  The Mac -- that's the computer -- the iPod and the

25   iPhone.

1   Q    The rates -- license rates that are in this table, are

2   they consistent with Dr. Teece's analysis of a reasonable

3   royalty based on his modeling?

4   A    No.  They're very inconsistent with Dr. Teece's rate,

5   which I believe was $1.75.

6   Q    Now, in this particular 2008 analysis, we do see the

7   10 cents for the iPad.

8        Do you see that, sir?

9   A    Yes.  The iPad is still at 10 cents.

10  Q    They have a 20-cents rate for the iPhone.  Do you see

11  that?

12  A    Yes, I see that.

13  Q    From an economic standpoint, do you have an opinion as

14  to whether a royalty at a double rate on the iPhone for the

15  five asserted patents in this case makes sense?

16  A    From -- from an economic perspective, I don't believe

17  it does make sense, no.

18  Q    Why is that, sir?

19  A    Well, again, we want to go back to what the

20  patents-in-suit here cover, and they cover a system for

21  protecting content.  They don't cover a device.

22       And the system for protecting content would be the same

23  for use for delivering content to the iPod as to the iPhone.

24  And so it doesn't make sense to me that there's a higher

25  rate on an iPhone because the feature differences between an

1   iPhone and an iPod have nothing to do with the

2   patents-in-suit and what they cover.

3          MR. BRYAN ANDERSON:  If you'll pull up AX-1102,

4   Mr. Simmons.

5   Q    (By Mr. Bryan Anderson) Did you consider in your

6   analysis and understanding of Apple's products this press

7   release about the iPod -- iPhone from January 9, 2009 (sic)?

8   A    Yes, I did.

9          MR. BRYAN ANDERSON:  If we could blow up the top

10  paragraph, sir, Mr. Simmons.

11  Q    (By Mr. Bryan Anderson) Could you please explain to the

12  jury how this description, if it does, influences you in

13  your view as to the differential rate between an iPod and an

14  iPhone?

15  A    Yes.  Well, this kind of illustrates what I was just

16  talking about, the iPhone, which launched in January 2007,

17  was basically described by Apple as combining three

18  products:  A revolutionary mobile phone, a widescreen iPod

19  with touch scrolls, and a Breakthrough Internet

20  Communications Device with desktop-class email, web

21  browsing, searching and maps, into one small lightweight

22  handheld device.

23      So really -- if you're looking at the difference in

24  features between the iPhone and the iPod, it's really in

25  those -- in the first one that -- the first product that

1   Apple discusses there, a revolutionary mobile phone.

2        And the third one, Breakthrough Internet Communications

3   Device with desktop-class email, web browsing, searching,

4   and maps, those are things that the iPod cannot do.  But

5   those are also things that the patents-in-suit don't cover.

6        And so it doesn't make any sense to me that a rate

7   would differ or be higher for an iPhone than an iPod.

8   Q    Turning back to the iPod, from an economic standpoint,

9   does it make sense for you to apply a royalty rate to an

10  iPod as opposed to content?

11  A    Well, yes, this gets back to sort of my -- one of my

12  base differences with Dr. Teece is I don't think it's

13  appropriate to apply a device rate at all for these patents

14  because, as we -- as I said, these patents cover a system

15  for protecting content.  They don't cover anything specific

16  to the device.

17       And so the various features of an iPod, widescreen,

18  touch controls, that -- those sorts of things don't have

19  anything to do with the patents-in-suit here.

20  Q    But this introduction to the iPhone from January 9,

21  2009 (sic) doesn't specifically identify the App Store.  Do

22  you know whether the App Store came after the introduction

23  of the iPhone?

24  A    Yes, the App Store actually was launched after the

25  launch of the iPhone.

1   Q    And based on your investigation in this case, do you

2   have any view or opinion on the significance of apps in the

3   App Store to the success of the iPhone?

4   A    Well, apps are a very important feature for the iPhone.

5   Lots of apps are downloaded on to the iPhone, lots of

6   different types of apps, such as Facebook, Twitter, ESPN,

7   ESPN app, Maps, entertainment apps, such as, Netflix and HBO

8   GO, those types of -- there's lots of different types of

9   apps that are used on iPhones.

10   Q    And it's your understanding FairPlay DRM is used to

11   protect apps?

12   A    Yes.  As I said yesterday, the purchase and downloading

13   of apps on any Apple device is all -- is processed through

14   FairPlay.

15   Q    And is it -- and FairPlay, is it accused in this case

16   for the use of protecting apps?

17   A    No, no.  Apps are not accused in this case.

18   Q    Now, in your -- does -- Dr. Teece's analysis, is that

19   consistent with your understanding -- well, let me take a

20   step back.

21        You understand that Dr. Teece applies a device royalty

22   rate of $1.75 to every iPhone that is accused in this case,

23   correct?

24   A    I do.

25   Q    Is Dr. Teece's application of a device royalty, for

1  example, to iPhones, consistent with your understanding of

2  the economic value of the patents-in-suit to such a device?

3  A     No, it's not.

4  Q     Why not?

5  A     Well, basically one reason is because very, very little

6  accused content -- digital TV shows, books, or movies -- is

7  actually downloaded on to an iPhone.

8  Q     How much, sir, based on your analysis?

9  A     Based on my analysis, for all the accused iPhones that

10 Dr. Teece calculates royalty on, on average, less than

11 one-third of a unit of digital content is downloaded on to

12 an iPhone; in other words, less than one-third of a book or

13 less than one-third of a movie or less than one-third of a

14 TV show.  So the accused content is not used very much on

15 iPhones.

16 Q     How much of Dr. Teece's device royalty in total is

17 based on the iPhone, sir?

18 A     Well, if you -- if you look at his table, half of his

19 device royalties are attributed to the iPhone.

20 Q     In your review of Dr. Teece's analysis, did he concede

21 that there are technologies unrelated to the patents-in-suit

22 that are used in an iPhone?

23 A     Oh, yes.  He -- he recognized the fact that there are

24 lots of different technologies used in an iPhone that don't

25 have anything to do with what the patents-in-suit here

1  cover, such as --

2  Q    Give us some examples.  Thank you.

3  A    -- such as processing speed, broadband compression,

4  which enables you to bring digital content on to your phone,

5  high-resolution screens, all sorts of those -- those types

6  of technologies that are available and delivered on an

7  iPhone don't have anything to do with the patents-in-suit in

8  this matter.

9         MR. BRYAN ANDERSON:  Mr. Simmons, could you pull

10  up ADX-12.4?

11  Q    (By Mr. Bryan Anderson) So, Dr. Prowse, would you

12  summarize for the jury what significance your internal --

13  your analysis of ContentGuard's internal valuation of an

14  Apple license were in your opinions here?

15  A    Yes.

16         So as I talked about a little earlier, I think the 2005

17  ContentGuard value of an Apple deal and the 2008

18  ContentGuard value of an Apple deal are relevant data points

19  that should be considered to determine what the reasonable

20  royalty should be at the hypothetical negotiation.

21         Now, they're for all of Apple's -- they're for --

22  sorry -- they're for all of ContentGuard's patents, not just

23  the five patents-in-suit here, and there's -- I have a

24  problem with the 2008 analysis, as we discussed, because I

25  think it captures a little too much value of the -- for the

1   iPhone.  But those are -- but those still are relevant data

2   points to consider at the hypothetical negotiation.

3       And the second point I draw from this chart is that

4   they are absolutely inconsistent with Dr. Teece's analysis.

5   Q    Were there other internal valuations by ContentGuard

6   that you reviewed in your analysis of a reasonable royalty,

7   other than the two we've discussed?

8   A    Yes, there were.

9   Q    Did you find those analyses significant as -- as these

10  two?

11  A    No, I didn't.

12  Q    Why not?

13  A    Well, generally, they were later in time.  And while

14  some were -- while some had actually lower values in terms

15  of rates that we've looked at here, others had much higher

16  values.

17      And so I think they were further away from the

18  hypothetical negotiation, and I also think they -- some of

19  them suffered from the same problem we just discussed here,

20  which is they were trying to capture value attributed to

21  iPhones and tablets that really didn't have anything to do

22  with the patents-in-suit here.

23          MR. BRYAN ANDERSON:  Your Honor, I'm going to go

24  into a number of ContentGuard's licenses now, which requires

25  sealing of the court.

```
 1            THE COURT:  All right.  At the request of Counsel,
 2   the Court will order the courtroom sealed.  If you're
 3   present and not subject to the current protective order in
 4   this case, you should excuse yourselves until the courtroom
 5   is unsealed.
 6            (Courtroom sealed, in a separate volume, Page 3,
 7            Line 3 through Page 38, Line 23.)
 8            (Courtroom unsealed.)
 9            THE COURT:  Mr. Nance, you may open the doors and
10   allow the public to return.
11            Members of the jury, if you'll leave your
12   notebooks in your chairs and not discuss the case among
13   yourselves.  Use this opportunity to get a drink of water,
14   stretch your legs.  We'll be back shortly and continue.
15            But with those instructions, you are excused for
16   recess at this time.
17            (Jury out.)
18            MR. BRYAN ANDERSON:  May Dr. Prowse be released,
19   Your Honor?  I forgot to ask that.
20            THE COURT:  Any objection from the Plaintiff?
21            MR. BAXTER:  No, Your Honor.
22            THE COURT:  Dr. Prowse is released.
23            We'll take about 10 or 12 minutes.
24            MR. PRITIKIN:  Well, Your Honor, under the
25   guidelines and the constraints that we can ask Kelly just
```

1    the one question in the five minutes that we have with Ward

2    and that we're not allowed to ask him about a digital

3    certificate --

4              THE COURT:  You told me that you could deal with

5    Mr. Ward in five minutes.  That's where the five minutes

6    came from.  What is your number?

7              MR. PRITIKIN:  I just want to say this, Your

8    Honor:  I would like -- could we have about a half-hour?  We

9    may not call them, and that obviously is going to save some

10   time.  I don't -- we only have one other witness left after

11   that, but I'd like a chance to just talk to my team about

12   where we're going, and I can advise the Court as to what

13   we're going to do then.

14             THE COURT:  We'll take 15 minutes, and then I'll

15   see you and see where you are.

16             MR. PRITIKIN:  You want us -- to see us in

17   chambers then, Your Honor?

18             THE COURT:  I'll -- I'll locate you one way or the

19   other.  Take 15 minutes, and we'll see where we are.

20             MR. PRITIKIN:  I appreciate that.  Thanks.

21             THE COURT:  The Court stands in recess.

22             (Recess.)

23             (Jury out.)

24             COURT SECURITY OFFICER:  All rise.

25             THE COURT:  Be seated, please.

1          All right.  Mr. Pritikin, it's my understanding

2     that despite our discussion in chambers this morning with

3     regard to recalling Mr. Ward and Dr. Kelly, you've decided

4     to rest at this point?

5          MR. PRITIKIN:  That is correct, Your Honor.  Apple

6     rests.

7          THE COURT:  All right.  We'll get that on the

8     record once I bring the jury in.

9          Mr. Thomas, are you going to present the rebuttal

10    case for the Plaintiff?

11         MR. THOMAS:  Yes, I will, Your Honor.  It will be

12    just Dr. Goodrich.

13         THE COURT:  And it will be, as we have discussed,

14    the same guidelines.

15         MR. THOMAS:  I have talked to Dr. Goodrich, and he

16    understands those guidelines, Your Honor.

17         THE COURT:  All right.  Then let's bring in the

18    jury, Mr. Nance.

19         COURT SECURITY OFFICER:  All rise for the jury.

20         (Jury in.)

21         THE COURT:  Please be seated.

22         All right.  Defendant, call your next witness.

23         MR. PRITIKIN:  Your Honor, Apple rests at this

24    time.

25         THE COURT:  All right.  The Defendant having

```
 1   rested its case, does the Plaintiff have a rebuttal case to
 2   present?
 3              MR. THOMAS:  Yes, we do, Your Honor.  In rebuttal,
 4   Plaintiff calls back to the stand Dr. Michael Goodrich.
 5              THE COURT:  All right.  Dr. Goodrich, if you'll
 6   return to the witness stand.  I remind you, you remain under
 7   oath.
 8              THE WITNESS:  Thank you, Your Honor.
 9              THE COURT:  Mr. Thomas, you may go to the podium.
10              All right.  Counsel, you may proceed.
11           MICHAEL GOODRICH, Ph.D., PLAINTIFF'S WITNESS,
12                        PREVIOUSLY SWORN
13                       DIRECT EXAMINATION
14   BY MR. THOMAS:
15   Q    Good morning, Dr. Goodrich.
16   A    Good morning.
17   Q    Dr. Goodrich, you were here to listen to the testimony,
18   I believe, of Dr. Kelly, correct?
19   A    Yes, sir.
20   Q    And, again, if you could just reprise for us what your
21   role in this case is, just very briefly?
22   A    So my role is to provide expert opinion with respect to
23   infringement of the Apple products, as well as to also be
24   rebutting the arguments with respect to invalidity.
25   Q    Now, you heard what Dr. Kelly said about his
```

1   disagreement with your opinions with respect to

2   infringement; is that correct?

3   A     Yes, sir, I heard that.

4   Q     And do you have responses to those -- those criticisms?

5   A     Yes, sir.

6   Q     So what are we looking at here, sir?

7   A     This is a summary of my opinions that I provided last

8   week during my direct testimony, and reiterates that now,

9   after hearing all the testimony that occurred in the court,

10  I -- I still have these same conclusions with respect to

11  usage rights and trusted devices.

12          MR. THOMAS:  Mr. Diaz, if you could please pull up

13  the Court's definition for usage rights from the sheet

14  that's in the jurors' notebooks.  And if you could highlight

15  that for us.

16  Q     (By Mr. Thomas) Now, do you recall, sir, that this is

17  the definition that the Court has given us for what "usage

18  rights" means in the claims of the patents that we're

19  asserting in this case, correct?

20  A     Yes, sir.

21  Q     Okay.  Now, sir, do you see any requirement anywhere in

22  this definition for permanent attachment of the usage rights

23  to the content?

24  A     No, sir.

25  Q     Has there been -- is there anything in this trial where

1    this question of permanent attachment has been addressed by

2    Judge Gilstrap?

3    A    I haven't heard anything during this trial about

4    permanent attachment.

5    Q    But permanent attachment, you know Judge Gilstrap has

6    ruled, is not a requirement --

7              MR. PRITIKIN:  May we approach, Your Honor?

8              THE COURT:  You may.

9              (Bench conference.)  ++CHECK

10             MR. PRITIKIN:  That last statement violates the

11   Court's orders.  We are not permitted to talk about --

12             THE COURT:  It does, Mr. Thomas.  The order in the

13   claim construction recites that you're not to discuss

14   anything before the jury other than the actual

15   constructions.

16             The language in the order does not require a

17   permanent attachment, is not part of the construction.  It's

18   a part of the analysis and the fuller explanation contained

19   within the order.

20             MR. THOMAS:  All right.

21             THE COURT:  I'll sustain the objection.

22             MR. THOMAS:  That's fine.

23             MR. PRITIKIN:  I think the jury should be

24   instructed, Your Honor, that that is not part of the Court's

25   construction.

 1          THE COURT:  No, I'm not going to do that, because
 2   it is in my order, but --
 3          MR. PRITIKIN:  We've been very careful not to say
 4   that you have ruled that a mere association is not enough,
 5   that a -- a mere reference is not enough.  We've been very
 6   careful just to ask --
 7          THE COURT:  You objected; I sustained it, just
 8   like this one.
 9          MR. PRITIKIN:  But now they've gone beyond that,
10   and they've said that -- that this is an explicit part of
11   the Court's construction ++.
12          THE COURT:  The answer -- the question hasn't been
13   answered.  I'm going to sustain the objection.  And my
14   instructions to the jury have been all along when the
15   objection has been sustained they're to disregard the
16   question ++.
17          MR. PRITIKIN:  All right.
18          THE COURT:  Let's move on.
19          MR. PRITIKIN:  Thank you.
20          (Bench conference concluded.)
21          THE COURT:  All right.  I sustained the objection.
22          Ask your next question, Counsel.
23   Q    (By Mr. Thomas) The word "permanent" doesn't appear in
24   this claim construction, does it, this definition?
25   A    No, sir.

1   Q    Okay.  And you see here where we've got the expression
2   "attached or treated as attached" in that construction?
3   A    Yes, sir, I saw.
4        MR. THOMAS:  If we could go back to that,
5   Mr. Diaz, that same -- pull out -- and then where it says
6   "attached or treated as attached."
7   Q    (By Mr. Thomas) And were you here yesterday to hear
8   Dr. Kelly say that he thinks that attached, comma, or
9   treated as attached, comma, that they mean the same thing;
10  they don't have any difference between them, that he's
11  applying?  Did you hear that?
12  A    Yes, sir, I heard that.
13  Q    Do you think that's a reasonable way to apply this
14  definition?
15  A    No, sir.
16  Q    Why not?
17  A    Because the Court has given us this definition of
18  "attached or treated as attached" to distinguish these two
19  concepts; that attached, for example, could mean that the
20  content has to travel together with the usage rights;
21  therefore, treated as attached has got to mean something
22  else; that in this case, the content doesn't have to always
23  travel with the usage rights, as long as the usage rights
24  are treated as attached by the enforcement software on the
25  repository.

1   Q    And is there anything in this definition of usage

2   rights that says that the usage rights have to travel with

3   the content to get to the customer's device?

4   A    No, sir.

5   Q    Now, with respect to --

6        MR. THOMAS:  If I could go back to Slide --

7   Slide 1 that we had up here before, please, Mr. Diaz.

8   Q    (By Mr. Thomas) With respect to whether or not there's

9   an indication of manners of use and any conditions of use,

10  what do you say with respect to whether or not that does,

11  indeed, exist in Apple's accused system?

12  A    Yes, sir.  I still conclude that it does exist.

13  Q    Okay.

14       MR. THOMAS:  If I could go to the next slide,

15  please?

16  Q    (By Mr. Thomas) What is this that we're looking at,

17  Dr. Goodrich?

18  A    So this is a slide from my testimony last week that's

19  talking about this "isRental" field.  And as I heard

20  Dr. Kelly say, he was saying that I'm identifying the "kind"

21  field and the "isRental" field as the usage rights in the

22  Apple system.  But that's actually not accurate.

23       Instead, what I'm saying is that it's all the

24  information that is to be enforcing usage rights that's

25  coming down in that purchase response.

1    And that includes the "isRental" field as an indication

2  when you have the right to rent a movie and watch a rental

3  movie and that "kind" field, which says that you have

4  information about the kind of content that you can play.

5    But here on this slide last week, which is unchanged, I

6  identified that, indeed, it is this information with respect

7  to these rental conditions that is being enforced by

8  FairPlay from the Rentalbag.

9    And as we heard in court, those values are the same

10  values, that 30-day time limit, the 24-hour time limit you

11  have once you start watching, that is coming down in the

12  purchase response.

13    MR. THOMAS:  And if I could go to the next slide,

14  please.

15  Q    (By Mr. Thomas) And what did you tell us and how has

16  your analysis changed at all by what Dr. Kelly said with

17  respect to how the "kind" field and the "explicit" and

18  "rating conditions" are indications of manners of uses?

19  A    So I -- I still conclude that the "kind" field is still

20  this indication.  It's telling us, as an indication, the

21  code -- like in that Figure 10 that I showed from the Stefik

22  patents in yellow, green, and orange, this would be that

23  yellow part -- the code that is telling us this indication

24  of the manner of use that's indicating in this case that the

25  user would have the right to watch a movie, watch a TV show,

1    or view a book.

2        And I heard people in court saying that this is not

3    enforced by FairPlay, and it's not.  I agree with that.

4        Instead, what we're saying -- what I'm concluding,

5    based on how both iTunes, together with FairPlay work, is

6    that they work in concert.  And in this case, the iTunes

7    code -- the iTunes software on the iPhone, iPad, or other

8    computer that's -- that's running this software is going to

9    be using this "kind" field to only present to the users the

10   movies and books that they're allowed to watch.

11       And, therefore, it's enforcing a usage right, together

12   with these conditions about parental controls of "explicit"

13   or "ratings" that they would only be showing things that

14   the -- the user's allowed to watch.

15       Therefore, it's controlling what they can watch.  It's

16   only showing things that they are allowed to watch.

17            MR. THOMAS:  Can I go to the next slide, please?

18   Q    (By Mr. Thomas) And if you could, remind us what you

19   told us in your earlier deposition -- I mean, your earlier

20   testimony --

21            MR. THOMAS:  Let me strike that.

22   Q    (By Mr. Thomas) Did anything that Dr. Kelly had to say

23   in his testimony convince you that the conditions and the

24   manners of uses and the indications thereof are not attached

25   or treated as attached to the digital content in Apple's

1   system?

2   A      No, sir.  All these conclusions that I had from before

3   still hold.

4   Q      And why is it?  What is it that you pointed to and are

5   you relying on to establish that the repositories treat the

6   indications of the manners of use and the conditions as

7   being attached to the digital content?

8   A      So what I'm showing here -- again, just to -- to remind

9   on the right the parts that I discussed last week -- is this

10  conclusion that usage rights in the Apple system are treated

11  as attached to the content.

12         And I'm not trying to opine that they're attached, that

13  they always have to travel together or always be stored

14  together.  Instead, I'm concluding that they're treated as

15  attached because it's that enforcement software, the iTunes

16  and FairPlay on the Apple device, that is treating as

17  attached these usage rights to the content through all these

18  four different ways, that there's an identifier, and that

19  AdamID that identifies the movie or the book.

20         There's the links of the URL that links to the content

21  that you can then have sent to you through the Akamai

22  content delivery network.  There's that decryption key that

23  we heard about, that content key in the SINF, that allows

24  you to decrypt the content that was encrypted.

25         And then finally, once these usage rights are stored on

1    the device, there's this link that links up the usage rights

2    information that came down in the purchase response and now

3    is being stored in that media library.  That links that up

4    with where that content file and that content key are being

5    stored on the device.

6    Q    Do you recall hearing Dr. Kelly explain his view of why

7    there's no physical integrity in the accused Apple devices

8    and system?

9    A    Yes, sir, I do.

10   Q    Did that make you change any of your opinions with

11   respect to whether there is, indeed, physical integrity

12   being maintained as part of the repositories that Apple uses

13   in its system?

14   A    No, sir.

15        MR. THOMAS:  If I could go to the next slide.

16   Q    (By Mr. Thomas) If you could, remind us, sir, why --

17   what is it that you were pointing to that comprises this

18   physical integrity?

19        MR. THOMAS:  But before I do that, Mr. Diaz, can I

20   please have up the Court's definition of physical integrity?

21   Q    (By Mr. Thomas) Now, you see this definition, sir,

22   where it says:  Preventing access to information in a

23   repository by a non-trusted system?

24   A    Yes, sir.

25   Q    Does that definition require any particular way to

1    prevent access to information in a non-trusted system?

2    A     No, sir.

3    Q     Okay.

4          MR. THOMAS:  And if I could go back to Slide 6.

5    Q     (By Mr. Thomas) And if you could, please explain to us

6    what it is that you found that you believe prevents access

7    to information in a non-trusted system in the Apple devices.

8    A     So this is a replay of a slide that I -- I gave last

9    week as a part of my direct testimony.  And all these

10   conclusions still hold.

11        Digital content is stored encrypted with content keys.

12   The content keys are protected in SINFs, these security

13   information.  These SINFs are encrypted with the account

14   keys or -- and then -- or the rental keys.

15        And then these account keys are protected and encrypted

16   in Keybags and Rentalbags.  And then this protection is

17   being provided by a combination of a number of different

18   techniques.

19        There's the hardware on things like the iPhone and the

20   iPad that have special kind of protections and hardware, but

21   on, say, a PC and a Mac, as we heard, there's this process

22   of Cloakware or obfuscation that's hiding the keys on these

23   devices and providing physical integrity through the use of

24   software.

25   Q     Now, sir, we've heard a lot of discussion in this case

1   about secure containers.

2       Do you recall that?

3   A    Yes, sir.

4   Q    Does Apple actually use what it's been calling the

5   secure container approach for any particular kind of content

6   that it sells through the iTunes Store currently?

7   A    Yes, sir, I believe they do.

8   Q    And what is it that they use the secure container

9   approach for?

10  A    They use the secure container approach for this

11  DRM-free music, because as I talked about last week,

12  DRM-free music is sent encrypted, just like you need for

13  secure container.

14      A decryption key is sent to the customer's device that

15  permanently decrypts that music, and then once it's

16  permanently decrypted, that music is no longer under DRM

17  control.

18      So this would be what in those documents was -- would

19  be calling the secure container approach.

20  Q    And is that how Apple treats and sells and rents

21  movies, books, and TV shows that it protects with digital

22  rights management?

23  A    No, sir, it doesn't.

24  Q    What's the difference?

25  A    So the difference -- if you -- if you go back to those

1   documents that we were shown in court with respect to the

2   secure container definition, what we see is that the

3   definition of a secure container is this -- what I've just

4   highlighted here with these three bullets.

5       The content is sent encrypted, a decryption key is then

6   sent, and then that content is permanently decrypted for all

7   times.

8       Dr. Kelly, in his testimony, said that he saw this word

9   "basic methods" when -- in that passage that talked about

10  secure container.  And he interpreted that word "basic" to

11  mean simple and that now Apple is doing a more complicated

12  version of the secure container because they add the

13  Cloakware to the secure container approach.

14      But that cannot be the interpretation of that word

15  "basic" in that passage because that passage is also

16  referring to the trusted system report -- approach and

17  including in that trusted system, in a broad generalization,

18  this method that we heard about from Dr. White the Dyad

19  method and the ABYSS method where they built that computer,

20  they had that big hardware in there that you had to shove

21  in.

22      And all those kind of things that it talked about in

23  respect to that trusted system with that extra hardware that

24  would be hard to fit in a Mac because it wouldn't be

25  compatible, all those things that they were saying were bad

1    about a trusted system, were also saying something was

2    fairly complicated.

3         So that word "basic" really is talking about some

4    things -- that there's two fundamentally different ways:

5    Secure container, which is here, how they do DRM-free music;

6    and the trusted system approach, which is, for example, how

7    the Stefik patents work.

8    Q    Now, sir --

9         MR. THOMAS:  If I could pull up the definition of

10   "communications integrity," please, Mr. Diaz.

11   Q    (By Mr. Thomas) In the communications integrity

12   definition, sir, it says:  Only communicates with other

13   devices that are able to present proof that they are trusted

14   systems, for example, by using security measures such as

15   encryption, exchange of digital certificates, and nonces.

16        Do you see that, sir?

17   A    Yes, sir.

18   Q    Now, what's your conclusion with respect to whether or

19   not the Apple system for selling books, movies, and TV shows

20   through its DRM system meets this definition of

21   communications integrity?

22   A    I still conclude that it satisfies this definition of

23   communications integrity when it's talking between those

24   store servers and the customer devices.

25        MR. THOMAS:  Could I have Slide 8, please,

```
 1   Mr. Diaz?

 2   Q    (By Mr. Thomas) And if you could, tell us, sir, what is

 3   it that you were relying on to establish that there's this

 4   communications integrity?

 5   A    So what I was relying on is this deposition testimony

 6   from Mr. Ward that identifies that when the customer devices

 7   and the iTunes Stores are communicating with each other,

 8   they use this Secure Socket Layer, SSL protocol we've been

 9   hearing about, to protect that communication, to encrypt it,

10   to make sure that both sides know that this is something

11   that they can trust as a way of communicating with each

12   other.

13   Q    Now, does this SSL, this Secure Socket Layer protocol

14   and software -- can it also be used to provide behavioral

15   integrity in Dr. Stefik's patented systems?

16   A    Yes, sir.  It just depends on who you're talking to.

17   If it's a device talking to a store, it can be used for

18   communications integrity.  If it's a software installer

19   talking to a server, it could be used for behavioral

20   integrity.

21   Q    Now, what are we showing on this slide?  What are you

22   showing here, Dr. -- Dr. Goodrich?

23   A    Well, there was some discussion that I heard during the

24   trial about how Akamai servers would have to be repositories

25   and -- under the Stefik approach to DRM.  And that is
```

1   actually not the case, because Akamai is just a content

2   delivery network.  That's what CDN stands for.

3       And sent -- and we already know from depositions and

4   what we've heard in court that usage rights travel to the

5   devices from the iTunes Stores.  We know that content is

6   delivered to the devices because it originally comes from

7   the iTunes Stores, is sent through this Akamai content

8   delivery network, and then finally arrives at the devices.

9       And so, moreover, we also know that those content

10  files, those protected movies, books and TV shows, when they

11  are sent, they are sent as encrypted files.

12      And so it's satisfying this communications integrity

13  because they're using encryption to communicate from the

14  store to the device through the Akamai content delivery

15  network.

16      So the content delivery network is not a repository.

17  In fact, they showed this funny picture of me admitting to

18  that, because it's true.  It doesn't have to be a

19  repository, because the content is being sent encrypted.

20          MR. THOMAS:  Mr. Diaz, may I please have up the

21  testimony of Mr. Fasoli from November 17th in the afternoon,

22  Page 6, Lines 11 to 16.

23  Q    (By Mr. Thomas) Do you recall when I asked Mr. Fasoli

24  the following question:  Now, as far as FairPlay is

25  concerned, FairPlay is -- has -- from FairPlay -- from

```
 1    FairPlay's point of view, Akamai is not relevant to how
 2    Apple's DRM system protects content; isn't that true?
 3         And his answer was:  That is correct.  We only use it
 4    to store the distribution copies of the movies.
 5         Is that consistent with what your view of the Akamai
 6    content delivery system is as it relates to the accused
 7    Apple systems in this case?
 8    A    Yes, sir.  That's -- that's consistent with my
 9    understanding of how Akamai is used, what role it plays, and
10    also is something that I recollect as well from Mr. Ward
11    saying that.
12    Q    This -- Mr. Fasoli?
13    A    I mean Mr. Fasoli.  I'm sorry.
14    Q    Mr. Fasoli was Apple's engineer, the first one we heard
15    from in this case.
16         Do you recall that?
17    A    Yes, sir.  I'm sorry.  I just misspoke.
18              MR. THOMAS:  Now, can I have up the --
19    Q    (By Mr. Thomas) You heard Dr. Kelly also discussing
20    behavioral integrity, and his conclusion that behavioral
21    integrity wasn't being practiced in the Apple system.
22    A    Yes, sir.
23    Q    Did any -- did any of his testimony change your mind on
24    that?
25    A    No, sir, it did not.
```

1  Q     What do you say, sir, with respect to -- with respect

2  to whether there is behavioral integrity in Apple's system

3  on the customer devices?

4  A     I conclude that there still is behavioral integrity on

5  the customer devices.

6  Q     And for what reason?

7  A     Because if we recall back to the definition of

8  behavioral integrity, as I recall, it's requiring software

9  to include a digital certificate in order to be installed in

10 a repository.

11       And we have to understand that word "include" from the

12 perspective of somebody of ordinary skill when they're

13 reading the patents and understanding the Court's

14 definition, that it's not that this digital certificate has

15 to be jammed into the software and be a part of the

16 software.

17       If I could, by way of analogy, explain what this is --

18 and how that would be understood, it's -- it's the same

19 policy that my wife and I have when it comes to Christmas

20 presents.  We have a policy -- and if I could borrow the

21 Court's language a little bit -- it's requiring electronic

22 toys to include batteries in order to be installed under the

23 Christmas tree.

24       And it's not that those toys have the batteries as a

25 part of the toy; it's that they're included in the box that

1   comes with the toy.  And, in fact, in some years, we had to

2   tape the battery next to the box in order to satisfy our

3   rule.

4       The point is that as long as a part of the -- the

5   process that installs the software requires as a part of

6   that process that there has to be a digital certificate

7   included in that process and the purpose of which is to make

8   sure that the recipient of that software knows that it's

9   coming from a trusted source, in this case, Apple, then it

10   would be satisfying this definition of behavioral integrity.

11   Q   Now, sir, what about for the iTunes -- the servers in

12   the iTunes Store?  What was -- what is your conclusion with

13   respect to behavioral integrity as being practiced there and

14   whether that behavioral integrity -- that requirement for

15   behavioral integrity is literally met by what's happening in

16   Apple's system?

17   A   So what I concluded before -- I'm not showing it on

18   this slide, but what I included before was this discussion

19   about how, if you're sending software using this SSH

20   protocol to update an iTunes Store server, then it would be

21   satisfying the construction for behavioral integrity.

22       And then what I'm showing on -- on this slide is

23   that -- how that -- that same analysis with respect to SSH

24   also applies to the FairPlay DRM servers.

25       In particular, when those are being updated using this

1   rsync protocol over SSH, which is how I understood is being

2   done based on what -- from my studies and understanding,

3   that when that SSH protocol is set up, the way that that --

4   that occurs is the one of -- the first kind of messages that

5   is sent back and forth is -- is a signed message where

6   inside that message is identifying information about the

7   entity that is proposing this SSH connection.

8        So in this picture, it would be the server team who is

9   setting up this connection.  They would put in as their

10  identifying information their user name -- that's the system

11  administrator user's name -- digitally signing that, and

12  sending that over as a part of this installation process.

13  Hence, the thing that's being sent over is a digital

14  certificate by the Court's definition.

15            MR. THOMAS:  Mr. Diaz, if we may please have the

16  Court's definition of "digital certificate."

17  Q    (By Mr. Thomas) So we have up here the Court's

18  definition of digital certificate, Dr. Goodrich.  It says:

19  A signed digital message that attests to the identity of the

20  possessor.

21       And how does this rsync over SSH accomplish that

22  definition?  If you could explain that to us, just briefly.

23  A    Certainly.

24       So the idea is that when that message goes across to

25  set up the connection, it is including in there a signed

1   digital message that attests to the identity of the

2   possessor because it's literally a digital signature on

3   their user name that's being sent.

4       Now, I think the confusion might be that this is not

5   what is commonly referred to as a digital certificate by

6   modern computer scientists.  Modern computer scientists, we

7   have a -- a standard that we call X.509, and digital

8   certificates have to be in that standard nowadays for us to

9   call it a digital certificate.

10      But the Court's definition for digital certificate

11  didn't say it had to be an X.509 certificate.  It just had

12  to be a signed digital message that attests to the identity

13  of the possessor.

14      And that's what happens in that SSH protocol when you

15  sign your user name and send it over.  It's literally a

16  signed digital message attesting to the identity of the

17  possessor of the software who's now doing that installation.

18  Q    So is an X.509 certificate just one type of signed

19  digital message that attests to the identity of the

20  possessor, according to the Court's definition?

21  A    Yes, sir.

22  Q    And the SSH over rsync, is that another way of

23  presenting a signed digital message that attests to the

24  identity of the possessor, as the Court has defined that

25  term?

```
 1   A     Yes, sir.
 2         And -- and another example would be this SINF that
 3   comes down before somebody can get content.  As we heard in
 4   court, that's also digitally signed by Apple so that
 5   somebody who gets the content knows that they have that
 6   content that's coming from Apple.
 7         It's a signed digital message attesting to the identity
 8   of where you're getting that movie or that book before you
 9   install it on your iPhone or iPad.
10   Q    Now, I'm going to switch to a different topic here.
11         Do you recall during your original testimony you
12   mentioned something to us, and you described something to us
13   called the Doctrine of Equivalents?
14         Do you recall that?
15   A     Yes, sir, I recall that.
16              MR. THOMAS:  Now, if I could have up slide -- got
17   it, Slide 12.
18   Q    (By Mr. Thomas) If you could, remind us what it is that
19   this Doctrine of Equivalents is and how it -- how it gets
20   applied in this case.
21   A     So I had this slide from before that was summarizing
22   how you have to have substantially the same function
23   that's -- in substantially the same way to achieve
24   substantially the same result.
25   Q     And how does that apply with respect to behavioral
```

1    integrity on the Apple servers?

2         THE WITNESS:  So if we could go to the next slide?

3    A    Again, this is a review from last week.  This talks

4    about my Doctrine of Equivalents analysis with respect to

5    SVN over SSH, that when an iTunes Store builder is

6    installing software using SVN over SSH to do this install,

7    that it would satisfy the Doctrine of Equivalents for

8    behavioral integrity of that requirement of requiring a

9    digital certificate to be required in order to install in a

10   repository.

11   Q    (By Mr. Thomas) And if you could go back and just

12   remind us, what is the -- the function of having behavioral

13   integrity for Apple's servers and the way in which that

14   function is presided -- is provided and the result that's

15   achieved, according to the patent?

16   A    According to the patent, which I excerpted here, again,

17   the function is:  Install permitted repository on a server.

18        The way is:  Install server software so as to require a

19   signed message attesting to the identity of the possessor,

20   including a measure of tamper resistance.

21        And the result is:  Only allow repository software from

22   a trusted and authenticated source to be installed on a

23   server.

24   Q    And if that function, that way, and that result is

25   performed in the Apple system, is that sufficient, in your

1  opinion, to meet the Court's requirement of behavioral

2  integrity and -- and comport with your finding of

3  infringement?

4  A     Yes, sir.

5  Q     And you were here for Dr. Kelly's testimony, correct?

6  A     Yes, sir.

7  Q     Did you hear Dr. Kelly say anything in his testimony to

8  challenge your Doctrine of Equivalents analysis?

9  A     I don't recall him ever mentioning the Doctrine of

10 Equivalents during his testimony.  I don't believe he did.

11 Q     You don't recall him saying that he disagreed with your

12 Doctrine of Equivalents analysis at any point in his

13 testimony?

14 A     No, sir, I don't recall that.  I don't -- I don't

15 recall ever hearing that.

16 Q     Dr. Goodrich, you were also here for the testimony of

17 Dr. White.

18        Do you recall that?

19 A     Yes, sir.

20 Q     And Dr. White expressed his opinion that the Stefik

21 patents -- Dr. Stefik's patents-in-suit in this case are

22 invalid because he said they were obvious -- it would have

23 been obvious to change some things that existed before

24 Dr. Stefik's invention to make it into his invention.

25        Do you recall that?

```
1    A    Yes, sir, I recall that.

2    Q    What's your response to that challenge that Dr. White

3    presented to the validity of Dr. Stefik's patents in this

4    case?

5    A    I similarly did an analysis of those same documents --

6    that document that they call the ABYSS, that document that

7    was called Dyad, compared what's -- what's taught in those

8    documents and what would be obvious to a person of ordinary

9    skill if they were combining them and determined it would

10   not be obvious to meet every single element of the Stefik

11   claims as is in those four Stefik patents.

12         MR. THOMAS:  And if I could go to Slide 18,

13   please, Mr. Diaz.

14   Q    (By Mr. Thomas) So what was it that you thought was

15   still missing, even if somebody did combine the system

16   described by Dr. White in his ABYSS article and whatever was

17   described by Dr. Tygar and Yee in that Dyad article?

18   A    I determined, based on this analysis, that in this

19   combined ABYSS and Dyad system, they would still -- there

20   would be no trusted repositories because there's no

21   behavioral integrity and no communications integrity.

22         There would be no usage rights enforced by a

23   repository, and then there would be no reason even to

24   combine these two papers.

25   Q    Now, did the Patent Office, when they were reviewing
```

1  Dr. Stefik's patents that are involved in this case, were

2  they aware of the Dyad article that Dr. White was describing

3  for us?

4  A    Yes, sir.

5       As we learned about how patents are structured, in that

6  section where you list the prior art for these patents, the

7  '859 and the '072, this reference to the Dyad paper was

8  included in the references.

9  Q    So what does it mean to you by the fact that the Patent

10  Examiner in the Patent Office knew about the Dyad reference

11  and yet still issued and gave Dr. Stefik and awarded

12  Dr. Stefik the patents involved in this case?

13  A    What that means to me is that the Patent Examiner --

14  Examiner, who was looking at the claims of these patents --

15  the patent application, understanding what's being taught in

16  Dyad, concluded that Dyad, combining with anything that the

17  Patent Examiner would have been aware of, would not be

18  obvious to then render these patents invalid.

19  Q    And I see you only have the '859 and the '072 patents

20  pictured here.  Did the Patent Office and the Patent

21  Examiner on the '007 and the '956 patents, were they also

22  aware of this Dyad article?

23  A    Yes, sir, because of something called the prosecution

24  history, that in the history of those '956 and '007 patents,

25  included references to earlier patents that had this

1   reference in them.

2   Q    Now, sir, why is it that you think that the ABYSS

3   system described in the article by Dr. White from 1987

4   doesn't have behavioral integrity?

5   A    Because in the ABYSS system, in order to install

6   software in that system, you were just going to be using a

7   token smart card, a physical thing that you would be using

8   with your device or something called a MAC, M-A-C, which

9   isn't the Mac like an Apple computer but a message

10  authentication code.

11       And neither one of these things are digital

12  certificates.  They don't amount to a signed digital message

13  attesting to the identity of the possessor.

14  Q    And what about in this article by Drs. Tygar and Yee

15  that are describing this thing called Dyad?  What did you

16  conclude with respect to whether Dyad exhibited behavioral

17  integrity?

18  A    I also concluded that Dyad does not have behavioral

19  integrity because it explicitly talks about -- in Dyad about

20  how a system administrator would be authorized to update the

21  secure coprocessor software.

22       And then even in the glossary, it talks about how

23  that's just done with passwords.  And a person of ordinary

24  skill in the art would not consider just a password as a

25  signed digital message, that it would be attesting to the

1    identity of the possessor.

2        So this would not be a digital certificate way to

3    update the -- the secure coprocessor software.

4    Q    Now, what about whether or not either ABYSS -- the

5    ABYSS system, as described in the article by Dr. White, or

6    this Dyad article, did either of those describe usage rights

7    that are enforced by a repository as required by

8    Dr. Stefik's patents and claims?

9    A    No, sir, they don't.

10   Q    And could you explain to us how you reached that

11   conclusion that they do not?

12   A    The reason they don't is because the things that

13   Dr. White was pointing to as usage rights was this

14   right-to-execute or RTE that's found in the ABYSS system and

15   how there's conditions in there and -- and -- and

16   indications of a manner of use to run the software.  But the

17   difference is not in the definition of usage rights.

18       But then in this other part that's found in every

19   single one of the claims of the patents and that as -- that

20   a repository then has to enforce those usage rights and

21   render the content only when you're allowed to.

22       But in this Dyad system, it's the software itself,

23   which is the content, the app, like that Pac-Man app, that

24   would be deciding for itself, after it's already starting to

25   run, whether or not it then is allowed to continue to run

1    based on some kind of conditions.

2        This isn't enforcement of usage rights because the app

3    is already running, and so it's too late, you know, in that

4    context.

5    Q    And does Dyad add any explanation or further teaching

6    or further suggestion about how to modify the ABYSS system

7    to cure this problem?

8    A    No, sir.  It just has a vague reference to how you

9    could be using rights to execute in a general way.

10   Q    Dr. Goodrich, are there any other reasons why you

11   believe that it's -- that Dr. Stefik's inventions were not

12   obvious back in 1994 when he filed his patent applications?

13       Has anything happened since the filing of those

14   applications that you think sheds light on whether it really

15   would have been obvious for those people back in 1994, just

16   somebody of ordinary skill in the art, to do what Dr. Stefik

17   invented?

18   A    Yes, sir.  I have some discussion of that on this next

19   slide.

20   Q    And why do -- what are you pointing to here that's

21   relevant to that?

22   A    So what -- the things that we can understand about

23   determining whether or not a patent is invalid is whether or

24   not there's what's something called secondary indicia,

25   things like praise of the inventor, praise of the patent.

1    And here's an example -- I don't know how it can get

2  any stronger than that, that the Patent Office itself is in

3  a report to Congress identifying Mark Stefik's pioneering

4  work at Xerox PARC in the DRM context, that it's talking

5  about having trusted systems that are then, you know, relied

6  on to follow and enforce usage rights.

7    So this is very strong praise that the Patent Office

8  itself believed these patents were not only valid but

9  something that should be praised to Congress.

10  Q    Did Congress identify Dr. White or Drs. Tygar and Yee

11  as being the inventors or founders of any kind of DRM

12  scheme?

13  A    I don't -- I don't recall ever seeing anything in this

14  document from the PTO to Congress mentioning ABYSS or Dyad.

15  Q    Was there any other places where Dr. Stefik was

16  recognized as being the originator of the technology

17  described in his patents?

18  A    Yes, sir.

19  Q    Where else?

20  A    So it's just -- this is just a collection of excerpts

21  of different places where Stefik's work on this trusted

22  system for DRM is praised, and I'm not going to go through

23  all these examples, but I think they speak for themselves.

24  Q    Anything else that occurred with respect to the patents

25  themselves, after they were issued by the Patent Office,

1   that you think sheds light on whether or not this really was

2   an invention and -- not obvious and really was a valuable

3   contribution that Dr. Stefik made to the field of digital

4   rights management?

5   A    So another kind of evidence that can be found is shown

6   on the next slide, and that is when licenses are formed by

7   companies who are licensing this technology, paying money so

8   that they can use the technologies shown in the license.

9   And here's some examples that I found that include licenses

10  to the Stefik patents.

11  Q    And these are pretty sophisticated companies over here

12  on the left that were willing and voluntarily took a license

13  to Dr. Stefik's inventions and patents?

14  A    Yes, sir.

15  Q    Okay.  So what is your ultimate conclusion about

16  Dr. White's opinion regarding whether it would have been

17  obvious and whether or not there's clear and convincing

18  evidence of that obviousness that's been presented in this

19  courtroom?

20  A    Yeah.  My conclusions are that it would not be obvious

21  to combine ABYSS and Dyad to render any of the Stefik

22  patents invalid, and certainly wouldn't be meeting, in my

23  opinion, that level of clear and convincing evidence.

24  Q    And then back to your opinions on infringement,

25  Dr. Goodrich.

1      Have your opinions with respect to whether infringement

2    of the asserted claims have been met in this case, has it

3    changed by anything that you heard Dr. Kelly say?

4    A    No.  None of my conclusions with respect to any of the

5    four Stefik patents and how they are infringed by the Apple

6    accused products, none of those opinions have changed based

7    on what I've heard in court over the last several days.

8    Q    And when you applied the Court's definitions for the

9    words in the claims, without adding anything else and

10   without adding extraneous requirements or further

11   restrictions, what was your ultimate conclusion as to

12   whether or not those claims have been infringed by Apple in

13   this suit?

14   A    My conclusion is that every single one of the elements

15   in each of those claims has been satisfied.

16   Q    And, therefore, your conclusion with respect to

17   infringement is what?

18   A    That there is infringement by Apple of these patents.

19            MR. THOMAS:  Your Honor, I have no further

20   questions for this witness, and I pass the witness.

21            THE COURT:  Cross-examination by the Defendant?

22            MR. PRITIKIN:  Could I have just a minute, Your

23   Honor?

24            (Pause in proceedings.)

25            MR. PRITIKIN:  Sorry about that, Your Honor.

```
 1              THE COURT:  That's all right.  Let's proceed.
 2                        CROSS-EXAMINATION
 3   BY MR. PRITIKIN:
 4   Q    Good morning, Dr. Goodrich.
 5   A    Good morning.
 6              MR. PRITIKIN:  May we hand these up, Your Honor,
 7   in case we need them?  These are some exhibits that may be
 8   good for --
 9              THE COURT:  That's fine.
10              MR. PRITIKIN:  -- just to have some physical
11   copies.  Thanks.
12              THE COURT:  With all this paper, it's a good thing
13   we grow pine trees in East Texas.
14              All right.  When you're ready, Mr. Pritikin.
15              MR. PRITIKIN:  All right.  Thank you, Your Honor.
16   Q    (By Mr. Pritikin) Now, Dr. Goodrich, I thought I heard
17   you say a little while ago that -- and you may have said
18   it -- said it also when you were here earlier -- that Apple
19   uses the secure container system for its DRM-free music.
20       Is that the opinion you've offered in this courtroom?
21   A    Yes, sir.
22   Q    And -- but you have yourself said in your expert report
23   in this case that Apple's DRM-free music uses and infringes
24   the Stefik patents, have you not, sir?
25   A    Yes, sir, for that step of decrypting the content.
```

1    Q    And, now, you didn't offer the opinion in the courtroom

2    that the DRM-free music infringes.

3    A    It's my understanding the DRM-free music is not being

4    accused of infringement, so I did not offer that opinion in

5    the courtroom.

6              MR. PRITIKIN:  Could we put up, Mr. Simmons, the

7    slide that we have that shows the claim constructions for

8    behavioral integrity and communications integrity?

9    Q    (By Mr. Pritikin) And by now, everyone's familiar with

10   this.  You've obviously seen these before, Dr. Goodrich?

11   A    Yes, sir.

12   Q    And I think we agreed when I questioned you earlier in

13   the trial that communications integrity and behavioral

14   integrity are two separate and independent requirements for

15   a repository?

16   A    Yes, sir, we agree on that.

17   Q    And so if you pointed to something and said it was a

18   repository and, you know, it had physical integrity and it

19   had communications integrity, but it was missing behavioral

20   integrity, it wouldn't be a repository?

21   A    I agree with that.

22   Q    Now, when we look at the Court's definitions of

23   communications integrity and behavioral integrity, we see

24   that both of them reference digital certificates.

25         Do you see that?

```
 1   A     Yes, sir.

 2   Q     And the purpose of the communications integrity

 3   requirement is to set up a secure channel for

 4   communications, correct?

 5   A     When I use the -- the -- the -- for my analysis of

 6   communications integrity, I have always just used the

 7   Court's definition, so that could be one example, way of why

 8   you'd want to do it, certainly.

 9   Q     Well, that's why you'd want to have communications

10   integrity, is to make sure that you have a secure

11   communications channel.  You're not disputing that, are you,

12   Dr. Goodrich?

13   A     No.  Certainly, that's one of the things you would want

14   for communications integrity.

15   Q     And one way you can set up a secure communications

16   channel is by having an exchange of digital certificates to

17   set up that channel, correct?

18   A     There's other things that go into it, but that's one of

19   the steps that could be involved in such a setup.

20   Q     Well, in fact, when you set up an SSH or an SSL

21   channel, there can be an exchange of digital certificates to

22   set up the channel or tunnel, correct?

23   A     Yes, sir.

24   Q     Now, when we look down to behavioral integrity, it's a

25   little different, isn't it?  Because this requires the
```

1    software to include a digital certificate, correct?

2    A    Yes, sir.

3    Q    And the Court's claim construction is that it must

4    include it, correct?

5    A    Yes, sir.

6              MR. PRITIKIN:  Now, could we put up the --

7    Slide 10 that Dr. Goodrich used in his earlier testimony in

8    the case?  I think it's PD-2.10, Mr. Simmons.

9    Q    (By Mr. Pritikin) And this was your slide, correct?

10   A    Yes, sir.

11   Q    And you showed the three integrities?

12   A    Yeah.  I illustrated them here with some icons, but I

13   also gave some excerpts from the patent.

14   Q    And the way you illustrated communications integrity

15   was a secure communications channel.  That's what the

16   padlocks signify here at each end, right?

17   A    Yes.  That's an example of -- of how you can have

18   communications integrity.

19   Q    And once you set up the channel, you can send anything

20   you want to through it?

21   A    The -- the people on two ends can send messages through

22   that secure channel that can contain any message.

23   Q    You could send a virus.  You could send anything

24   through it, correct?

25   A    If the two parties wanted to send viruses to each

1   other, they could encrypt the channel and then send viruses

2   to each other.

3   Q    Now, for behavioral integrity, you portray that a

4   little differently, and there the image or drawing you have,

5   I take it, is intended to show that the digital certificate

6   is actually included in the software, correct?

7   A    According to the Court's claim construction, as I gave

8   with that analogy of the Christmas present.

9          MR. PRITIKIN:  And let's go to PD-2.14.

10  Q    (By Mr. Pritikin) This is another of your slides from

11  your earlier testimony?

12  A    Yes, sir.

13  Q    And this is where you're talking about communications

14  integrity?

15  A    Yes, sir.

16  Q    And you quoted language from the patent that says that

17  it refers to the integrity of the communications channels

18  between repositories, correct?

19  A    Yes, sir.  That's the -- the patent expounding on

20  communications integrity.

21         MR. PRITIKIN:  Now, you can take that down,

22  Mr. Simmons.

23  Q    (By Mr. Pritikin) You have yourself pointed to secure

24  communication channels like SSL or SSH as meeting the

25  communications integrity requirement; isn't that true, sir?

```
 1   A     Yes, sir, absolutely.
 2            MR. PRITIKIN:  And let's look at your original
 3   Slide 33.
 4            I'm sorry.  Let's go to Slide -- that's the wrong
 5   one -- Slide 58.
 6   Q    (By Mr. Pritikin) And in Slide 58, you talked about an
 7   SSL secure communications channel, correct?
 8   A     Yes, sir.
 9   Q     And you quoted Mr. Ward's testimony?
10   A     Yes, sir.
11   Q     And what you said here is that the SSL -- the secure
12   communications channel is communications integrity; is that
13   not true?
14   A     Yes, sir, it's true.
15            MR. PRITIKIN:  You can take that down,
16   Mr. Simmons.
17   Q    (By Mr. Pritikin) Now, the problem you had when you
18   were looking at the way the FairPlay software is updated is
19   that you couldn't find a behavioral integrity requirement;
20   isn't that true, sir?
21   A     No, sir.
22   Q     Well --
23   A     And I can explain --
24   Q     -- what --
25   A     -- why that's not true.
```

1          THE COURT:  All right.  Let's be sure we're one at
2     a time here.
3          Go ahead, Mr. Pritikin.
4     Q   (By Mr. Pritikin) So what you did, because you couldn't
5     find behavioral integrity, you could not find a requirement
6     that the software itself include a digital certificate, you
7     did a little switch and you pointed to secure communications
8     channels to meet that requirement; isn't that true, sir?
9     A    No, sir, that's not true.  That's not a fair
10    characterization of my analysis.
11         MR. PRITIKIN:  Let's take a look at your Slide 7
12    from the -- I'm sorry -- the one that we just saw this
13    morning, the rebuttal slide.
14    Q   (By Mr. Pritikin) So you created this slide?
15    A    Yes, sir.
16    Q    And what it purports to show is the software update
17    getting from Mr. Ward's team on to the Apple servers?
18    A    Yes, sir.
19    Q    And the -- what you've shown here is first, you've
20    shown an SSL connection.  That's a communications channel,
21    right?
22    A    Between Ward's team and the server team.
23    Q    That's --
24    A    Not between a customer device and the store but from
25    Ward's team to the server team.

1    Q    It is a secure communications channel that you're

2    showing.  That's what SSL is.  And that's why you've drawn

3    it with an arrow and with a padlock.  It's a channel.

4    A    It's a channel that is set up using a digital

5    certificate.  That is why I showed it.

6    Q    And then if we look at the next hop, the -- over the

7    SSH, that's another channel, correct, sir?

8    A    Yes, sir.  It's another channel that is set up using a

9    digital certificate.

10             MR. PRITIKIN:  You can take that slide down.

11   Q    (By Mr. Pritikin) So for purposes of establishing the

12   behavioral integrity requirement that the software include a

13   digital certificate, what you've pointed to with the

14   FairPlay server updates are the secure channels; isn't that

15   true, sir?

16   A    I pointed to secure channels that in order to set them

17   up to install software in a repository, you need to include

18   a digital certificate with the software when you send it

19   through that channel.

20   Q    You've pointed to the channels, correct, sir?

21   A    It's the protocol that sets up the channel that I'm

22   pointing to that has that digital certificate in it that

23   then when you send the software, it's included like that

24   analogy I gave of the Christmas presents that include

25   batteries.

1    Q     Now, you also offered some testimony about something

2    called the Doctrine of Equivalents this morning.

3    A     Yes, sir.

4    Q     And to be clear on that, sir, the only opinion you have

5    offered in this case is that there is an equivalence with

6    respect to the updating of the iTunes servers?

7    A     That is correct.

8    Q     You have not offered the jury any opinion that there

9    are -- somehow the secure communications channels are

10   equivalent to behavioral integrity for purposes of updating

11   the FairPlay servers?

12   A     No, sir.  If the jury reaches that conclusion, it would

13   be them reaching that conclusion, not based on my testimony

14   that I've given in court.

15   Q     Well, you haven't offered that opinion in court,

16   correct?

17   A     That is correct.

18   Q     So in order to find that the behavioral integrity

19   requirement is satisfied, the jury must be persuaded that

20   the software that is used to update the FairPlay servers

21   includes a digital certificate and that that requirement is

22   literally and exactly met; isn't that true, sir?

23   A     That's the opinion I'm offering in court, and that's

24   what that slide was showing based on that rsync over SSH

25   protocol that was, for example, discussed in court.

1  Q    Now, there was testimony about the -- the books and the

2  movies that are put on to -- or can be installed on the

3  Apple devices like iPhones and iPads, correct?

4  A    Yes, sir, that's right.

5  Q    And -- now, you would agree with me that a -- a movie

6  file is a digital work?

7  A    Yes, sir, I agree with that.

8  Q    And a movie file could contain a virus?

9  A    I don't know about a movie file, but certainly we heard

10  how books could.

11  Q    Do you have a copy of your -- can you find your

12  transcript -- this is from prior testimony that you gave,

13  Dr. Goodrich, on September 15th.

14  A    I've got three huge binders.  Which one is it?

15      Or if you put it up on the screen, I can see it that

16  way as well.

17  Q    It's -- I'm told it's Volume 2, Dr. Goodrich.

18  A    Okay.  And the tab it would be?

19  Q    It's -- it says -- I believe it's Volume 1.

20  A    Oh.

21  Q    And I think there's a tab there toward the back that

22  has your name on it.

23  A    It says:  Goodrich trial testimony --

24  Q    Yes.

25  A    -- rebuttal?

```
1    Q    Correct.  And if you'd turn to Page 124 at Line 14:
2         Question:  Do you disagree with your colleague,
3    Dr. Martin, when he says that a movie file can --
4              THE COURT:  Wait a minute, Mr. Pritikin.
5              Are you there, Dr. Goodrich?
6              THE WITNESS:  I'm not seeing what you're referring
7    to.  Maybe I'm --
8              MR. PRITIKIN:  Your Honor, if I might approach, I
9    may be able to help him.
10             THE WITNESS:  You said Page 124?
11             MR. PRITIKIN:  Yes, sir.
12             THE WITNESS:  Oh, in the -- I was in the wrong
13   124.
14             MR. PRITIKIN:  It is the second tab from the end.
15             THE WITNESS:  Now I'm there.
16             MR. PRITIKIN:  All right.
17             THE COURT:  All right.  Let's go.
18   Q    (By Mr. Pritikin) Page 124, do you have that
19   Dr. Goodrich?
20   A    Yes, sir.
21   Q    And at Line 14?
22   A    Yes.
23   Q    Question:  And do you disagree with your colleague,
24   Dr. Martin, when he says that a movie file can include a
25   virus?
```

1     Answer:  No, sir, I don't disagree with him.

2     Were you asked that question, and did you give that

3 response under oath, sir?

4 A    Yes, sir.

5 Q    Now, a book file is a digital work?

6 A    Yes, sir.

7 Q    And a book file could include a virus?

8 A    Yes, sir.

9 Q    And Dr. Stefik's solution in the threat of viruses was

10 to require software on the repository to include a digital

11 certificate, correct?

12 A    That's one of the purposes of behavioral integrity.

13 Q    Now, you were aware, are you not --

14     MR. PRITIKIN:  Let's -- could we put up AX-4, the

15 '072 patent?

16     And let's go to Column 12, Line 17.

17 Q    (By Mr. Pritikin) Dr. Stefik's patent characterizes the

18 content video and audio recordings as entertainment

19 software, correct?

20 A    Yes, sir.  With "software" in quotes, because it would

21 not be what a person of ordinary skill in the art would

22 consider to be the repository software, that enforcement

23 software.

24 Q    The patent is written to tell people and to describe

25 the invention, correct?

1   A     Yes, sir.

2   Q     The patent is the language that's given to the United

3   States Patent Office to describe the invention?

4   A     Yes, sir.

5   Q     And Dr. Stefik, in this patent, characterized the

6   content as software, correct?

7   A     With "software" in quotes, just like "attached" was in

8   quotes, to mean something that is a metaphorical concept.

9   Q     Sir, you don't disagree, do you, with Dr. Stefik's use

10  of the term "software" in his patents to describe audio and

11  video recordings?

12  A     In this broad sense of an abstract metaphor for what

13  video and audio recordings include, I don't disagree.

14  Q     Now, we can agree, can't we, that Dr. Stefik is not the

15  person who first came up with the idea of setting up secure

16  communications channels, like SSL and SSH?

17  A     SSL and SSH came after the Stefik patents.

18  Q     He did not invent the idea of secure communications

19  channels, did he?

20  A     No.  The idea of secure communications channels

21  themselves, he didn't.  It's just SSL and SSH came after

22  November of 1994.

23  Q     All right.  But at the time of the invention, the idea

24  of secure communications channels already existed?

25  A     Yes, sir.

```
1  Q    You're not giving him credit for inventing secure
2  communications channels, are you?
3  A    No.
4  Q    All right.  And, likewise, he didn't invent the use of
5  digital certificates?
6  A    Broadly construed, he did not invent digital
7  certificates.
8  Q    He didn't invent behavioral integrity?
9  A    I have not seen anything in the prior art that taught
10 behavioral integrity.  I believe he did invent behavioral
11 integrity.
12 Q    Well, behavioral integrity to the extent it requires
13 software to include digital certificates, people weren't
14 including digital certificates in software before 1994.  Is
15 that your testimony, Dr. Goodrich?
16 A    My testimony is that -- and I've studied a lot of the
17 prior art.  I was asked to study a lot of those accused
18 prior art references, besides just Dyad and ABYSS, to see if
19 any of them taught behavioral integrity the way the Court
20 has defined that term, which is requiring a software to
21 include a digital certificate in order to be installed in
22 the repository.  And none of them have that behavioral
23 integrity to -- all of the ones I analyzed.
24 Q    Did he invent the idea of putting digital certificates
25 in software?
```

1    A     No, he did not invent that component of behavioral

2    integrity.

3    Q     Did he come up with -- was he the first person to come

4    up with the idea of requiring software to include a digital

5    certificate?

6    A     Based on my analysis, he was.

7    Q     For other purposes?

8    A     I'm not sure I understand the question.

9    Q     All right.  We can agree, at least, that he is not the

10   person who invented the idea of putting digital certificates

11   into software?

12   A     Yes, sir, we can agree on that.

13   Q     Now, using digital certificates to check software

14   before it's installed was a well-known technique before

15   Dr. Stefik's patents?

16   A     It was known before the Stefik patents.  The part

17   that's new is this requiring, as the Court has defined --

18            THE COURT:  Dr. Goodrich, limit your answers to

19   the questions asked.  The Plaintiff can address anything

20   they want to on redirect.

21            THE WITNESS:  Yes, Your Honor.

22            THE COURT:  Go ahead, Mr. Pritikin.

23            MR. PRITIKIN:  Thank you, Your Honor.

24   Q     (By Mr. Pritikin) Using digital certificates to check

25   software before it's installed was a well-known technique

```
 1    before Dr. Stefik's patents, correct, sir?

 2    A     It was known, yes, sir.

 3    Q     And, in fact, you cited things in your own slides and

 4    your -- your expert report showing that it was a well-known

 5    technique in computer science?

 6    A     I'm not -- I'm not sure what you're referring to.  I'm

 7    sorry.

 8    Q     The Denning textbook, for example?

 9    A     Oh, the Denning textbook talks about digital

10    certificates and using them for various purposes.

11    Q     And that was published in 1983?

12    A     Yes, sir.

13    Q     In fact, Professor Denning had recommended digitally

14    signing all software you run on a computer might be a good

15    idea, didn't she?

16    A     I think so, with respect to digital signatures.

17    Q     Now --

18    A     Which is different --

19    Q     Could we --

20    A     -- than digital certificate.

21          MR. PRITIKIN:  Your Honor, it's easier if I ask

22    the questions and get the answers --

23          THE COURT:  Yes, it is.

24          MR. PRITIKIN:  -- rather than having things

25    volunteered.
```

```
 1              THE COURT:  Well, limit your answers to the

 2   questions asked.  Wait until the question is asked and then

 3   respond.  And then when the answer is finished, ask the next

 4   question.  These are not difficult rules.  Let's follow

 5   them.

 6              MR. PRITIKIN:  Can we put up AX-0385?

 7   Q    (By Mr. Pritikin) And do you recognize this as an

 8   article by Ralph Merkle?

 9   A    Yes, sir.

10   Q    And he was someone who also worked at some point in

11   time with Dr. Stefik at Xerox?

12   A    That's my understanding.

13   Q    And do you see at the bottom, this is an article that

14   goes all the way back to 1980, an IEEE article?

15   A    Yes, sir.

16   Q    And in this article -- you're familiar with the

17   article, aren't you, Dr. Goodrich?

18   A    Yes, sir.

19              MR. PRITIKIN:  And let's go over to Page 131.

20   Q    (By Mr. Pritikin) One of the things he wrote, that it

21   would be clearly undesirable for any node to start executing

22   the wrong software.

23        And he goes on to say:  On the other hand, it's very

24   desirable to send updates to the nodes over the network

25   itself.
```

```
 1        And he says -- said in 1980:  The obvious solution is
 2   for updates to be digitally signed by an appropriate network
 3   administrator and for the nodes to check the digital
 4   signature prior to executing them.
 5        You're aware that this is something that was published
 6   by Dr. Merkle in 1980, some 14 years before the Stefik
 7   patents?
 8   A    Yes, sir, I'm aware of that.
 9            MR. PRITIKIN:  We can take that down.
10   Q    (By Mr. Pritikin) Now, earlier this morning, there was
11   some testimony about the usage rights.  And to be clear on
12   this, usage rights have to include manners of use, correct?
13   A    They have to include indications of manners of use,
14   yes, sir.
15   Q    So if they only had conditions in them, it wouldn't
16   meet the Court's definition of a usage right.  There have to
17   be manners of use as well, right?
18   A    There has to be some indication of a manner of use.
19   Q    And the manners of use, two in particular that you've
20   identified, were the "isRental" and the "kind" fields.
21        Do you recall that?
22   A    I identified those as indications of manners of use,
23   yes, sir.
24   Q    And I thought I heard you say this morning -- and I
25   want to be clear on this, Dr. Goodrich -- I thought I heard
```

1   you say you -- you agree that in the Stefik patents, what

2   you identify as the manner of use has to be enforced by the

3   repository?

4   A    I think you misunderstood me.

5   Q    Well, let me ask the question this way:  I thought I

6   heard you say that in the Apple system, the iTunes software

7   uses the "kind" field to present movies and books that the

8   user is allowed to watch.

9        Do you recall that testimony?

10  A    Yes, sir.

11  Q    And when you used the word "present the movies and

12  books," I take it what you were referring to was the same

13  thing that Mr. Fasoli referred to yesterday.  That's when

14  they're displayed so that you can go in and see which movies

15  and books you have.

16  A    I think that's accurate, although -- except I don't --

17  I'm not sure it was yesterday.

18  Q    Whenever he testified.

19  A    Yeah.

20  Q    All right.

21       MR. PRITIKIN:  Let's put up PX-1030.

22  Q    (By Mr. Pritikin) And you see that this is a -- a

23  contract between Apple and Sony?

24  A    Yes, sir.

25  Q    And you understand that Sony is one of the content

1    providers that allows its movies to be distributed through

2    Apple?

3    A    That's my understanding.

4    Q    And you've seen this?  You're familiar with this

5    agreement?

6    A    Yes, sir.

7    Q    In fact, it's one of the things you considered in

8    reaching your opinions in the case?

9    A    That is correct, sir.

10   Q    Now, you're aware, aren't you, that the -- some of the

11   content providers like Sony actually have provisions in the

12   contracts that involve the way Apple handles the keys that

13   are used to unlock the content and allow the viewing of --

14   of the content?

15   A    Yes, sir.

16       As I cited in my direct testimony, there's these things

17   that they call the usage rights, the security solutions, and

18   that they had a number of different conditions in them.

19            MR. PRITIKIN:  Let's look at the bottom of

20   Page 27.

21   Q    (By Mr. Pritikin) Now, the contract with Sony

22   explicitly says that account keys -- you understand what an

23   account key is?  That's -- you need an account key to be

24   able to watch a -- a movie or a book that you've purchased,

25   right?

```
 1   A     Yes, sir.

 2   Q     And the contract with Sony says:  Account keys may not

 3   be transferred with the encrypted movie file but must

 4   instead be reissued by the online service each time a

 5   transfer occurs.

 6         Were you aware, sir, in forming your opinions in this

 7   case, that the contract with Sony actually prohibited --

 8   prohibited Apple from transferring the account keys with the

 9   encrypted movie file in this way, sir?

10   A     Yes, sir, I believe I recall that.

11         MR. PRITIKIN:  You can take that down.

12   Q     (By Mr. Pritikin) The -- now, you understand that when

13   Dr. White testified, that he said that he believes that what

14   is in the Stefik patents would have been obvious to a person

15   of ordinary skill in the art who read the ABYSS and the Dyad

16   articles, correct?

17   A     Yes, sir.  I understand that was his testimony.

18   Q     And there's no dispute that they're both prior art to

19   the Stefik patents, right?

20   A     I'm not disputing that.

21   Q     And, now, did I hear you say earlier this morning you

22   didn't think that a person of ordinary skill in the field at

23   the time would have thought to combine what is in these two

24   publications, these two articles?

25   A     Yes, sir, that's correct.
```

1  Q    Now, you've heard the phrase "patent lawyers" used

2  sometimes about a motivation to combine?

3  A    I have heard that, yes, sir.

4  Q    And when you're looking at two separate things that are

5  in the prior art and trying to figure out whether a patent

6  would have been obvious, sometimes patent lawyers talk about

7  whether there's a motivation to put them together?

8  A    Indeed, I've heard that.

9  Q    Now, you would agree with me, wouldn't you, that one

10 reason a skilled engineer would think about the ABYSS and

11 the Dyad papers together is that the Dyad paper talks about

12 Dr. White's earlier ABYSS paper?

13 A    Yes, sir, refers to it as being primitive.

14 Q    The one paper talks about the other?

15 A    Yes, sir.

16 Q    And you heard Dr. White's testimony that it takes what

17 is in the White paper and expands on it?

18 A    I did not agree with that testimony, based on my

19 reading of the Dyad paper.

20 Q    Now, you agree that Dr. White's earlier ABYSS paper

21 uses something called MAC or message authentication codes?

22 A    Yes, sir, I agree with that.

23 Q    And you've testified that method -- that MACs or

24 message authentication codes are not the same as digital

25 certificates; isn't that true?

```
 1    A     Yes, sir, that's correct.

 2    Q     And -- but the use of MACs comes up again in your

 3    infringement analysis, doesn't it?

 4    A     Yes, sir.

 5    Q     And in analyzing infringement, you turned around and

 6    said that MACs or message authentication codes that are used

 7    to set up SSH secure channels are digital certificates,

 8    didn't you, sir?

 9    A     No, sir.  That's not a fair characterization of my

10    testimony.

11    Q     You said that they are equivalent to the use of digital

12    certificates, did you not, sir?

13    A     No, sir.  That's still not a fair characterization of

14    my testimony.

15    Q     You pointed to the message authentication codes that

16    are used in setting up an SSH protocol as a part of your

17    infringement analysis to show behavioral integrity?

18    A     Yes, sir, they achieved that -- that component of

19    tamper resistance that I included in my Doctrine of

20    Equivalents analysis.

21    Q     You pointed to method -- message authentication codes

22    to help show equivalence to digital certificates -- to

23    behavioral integrity, correct, sir?

24    A     Yes, sir.

25    Q     And yet you said that the prior art that used message
```

1   authentication codes did not teach behavioral integrity?

2   A    Yes, sir.

3   Q    That was your opinion, wasn't it, sir?

4   A    Yes, sir, that's absolutely correct.

5   Q    Now, you heard the testimony from Mr. Fasoli that in

6   the Apple system, only a small piece of the encrypted movie

7   file is decrypted at one time, correct?

8   A    Yes, sir, I recall that.

9   Q    And you don't have any reason to disagree with that?

10  A    No, sir, I don't disagree with that.

11  Q    So what's in the clear is just the little segment

12  that's being viewed at one time?

13  A    I'm not even sure it's in the clear really.  It's being

14  stored in protected memory even at that time.

15  Q    Now, this technique of decrypting on the fly, this is

16  not something that Dr. Stefik invented, is it?

17  A    No, sir.  It's even in this Dyad reference that

18  Dr. White talked about, which has been characterized as a

19  trusted system approach.

20  Q    It was disclosed; it was known; it was in the public

21  realm before Dr. Stefik filed for his patents; is that

22  correct, sir?

23  A    Yes, sir.  Dyad calls it crypto-paging.

24  Q    Now, you gave some testimony about what you said was

25  the Patent Office praising what Dr. Stefik had had done, and

```
 1   you cited some other sources on that same slide.  One of
 2   them was an employee at Microsoft.
 3        Do you recall -- recall that, Dr. Goodrich?
 4   A    You mean those quotes --
 5   Q    Yes.
 6   A    -- about praise?  Yes, sir.
 7   Q    At the time, Microsoft was a part owner of
 8   ContentGuard, correct?
 9   A    I don't recall the timing just sitting here now.
10   Q    You're aware that Microsoft was a part owner of
11   ContentGuard at one time?
12   A    At one time, yes, sir, I'm aware of that.
13   Q    And did you hear the deposition testimony that was
14   played in court of Eddie Chen?
15   A    Yes, sir, I heard that.
16   Q    And Dr. Chen was at one time the acting CEO of
17   ContentGuard?
18   A    Yes, sir.  I heard that, too.
19   Q    And do you recall his testimony that around the time
20   they decided that they were going to try to license the
21   patents, there was a plan at ContentGuard to promote
22   Dr. Stefik as the Father of DRM?
23   A    Yes, sir, I recall that.
24   Q    Now, turning to the Patent Office document that you
25   testified about --
```

1          MR. PRITIKIN:  Can we put up PX-129?

2          And could we turn over to Page 8?

3          Let's go back to Page 7.

4    Q    (By Mr. Pritikin) And in context, this report that was

5    prepared by the Patent Office for Congress had a whole

6    section on digital rights management systems, didn't it?

7    A    Yes, sir, that's correct.

8    Q    And the section --

9          MR. PRITIKIN:  If you go down to the next page.

10   Q    (By Mr. Pritikin) Page 8, under trusted computing, that

11   was just one section on DRM systems, right?

12   A    Yes, sir, that's correct.

13   Q    And it was in this section on trusted computing that

14   there was mention of Dr. Stefik, correct?

15   A    Yes, sir.

16         MR. PRITIKIN:  Let's turn over to Section 4 on

17   Page 9 and look at the paragraph under types of DRM systems.

18   Q    (By Mr. Pritikin) And what the report said is that

19   "there is a wide range of DRM options that are available in

20   the marketplace today, probably reflecting the fact that no

21   single technology or solution can fulfill the remarkably

22   diverse requirements of the digital marketplace."

23         Do you see that language?

24   A    Yes, sir, I see that.

25   Q    And you have no reason to disagree with that, do you,

1   Dr. Goodrich?

2   A    No, sir, not at the time that this report was written.

3          MR. PRITIKIN:  I have no further questions, Your

4   Honor.  I pass the witness.

5          THE COURT:  Redirect, Mr. Thomas?

6          MR. THOMAS:  Yes, Your Honor.

7                    REDIRECT EXAMINATION

8   BY MR. THOMAS:

9   Q    Dr. Goodrich, is there anything in the Court's claim

10  constructions or anywhere else in the claims of the Stefik

11  patents that requires the three integrities we've been

12  talking about to be maintained at all times?

13  A    No, sir.

14  Q    You were asked some questions about SSL and SSH.

15       Do you recall that?

16  A    Yes, sir, I recall that.

17  Q    Is it possible to use those protocols, SSL and SSH, to

18  accomplish both communications integrity and behavioral

19  integrity?

20  A    Yes, sir, absolutely.

21  Q    Now, could you explain why -- why is it that they can

22  both be used to perform the requirements of those two

23  integrities?

24  A    The reason is, is that when you're setting up this

25  communications channel and you want to do it securely, there

1    is a digital certificate involved to create the secure

2    channel.  And then those certificates are signed digital

3    messages attesting to the identity of the parties performing

4    those communications.

5        If it's between the store and a customer's device, that

6    would be for communications integrity with respect to a

7    repository.  But if it's from a software installer to a

8    server, that digital certificate would be attesting to the

9    identity of the installer so that the repository on the

10   other side would know this is a trusted entity who's allowed

11   to install software on that repository.

12       So it's the same protocol, but being performed in

13   different ways by different entities.

14   Q    You recall being asked a couple of questions just a

15   moment ago by Mr. Pritikin about viruses being placed in

16   movies files or book files?

17       Do you recall that?

18   A    Yes, sir.

19   Q    Does Dr. Stefik's inventions require a hundred percent

20   certainty that his patented system can never be hacked?

21   A    No, sir.  And if -- if -- if we recall, I talked about

22   those -- that Table 2 that had those levels of security that

23   started zero, went up.

24       By Level 2, you would have something that would meet --

25   be meeting the Court's claim -- the definitions for

1    repository, but then it keeps going, 3, 4, 5, all the way up

2    to 10.

3        But if we go back to just that 2 where you would have a

4    repository, it said in there that you could hack it with

5    special tools or special knowledge.

6        And even in court, we heard how special tools could be

7    used to thwart the kind of things that Apple does.  So that

8    alone, just because something can be hacked, doesn't

9    suddenly mean it's not a repository.

10           MR. THOMAS:  Mr. Diaz, if I may have, please, the

11   '859 patent, and I believe it might be around Column --

12   towards the bottom of Column 4, but there's a table that

13   says "security levels."  I was wrong on 4.

14   A    Are you referring to Table 2?

15   Q    (By Mr. Thomas) Yes.  Table 2.

16       Do you happen to remember what column that's in,

17   Doctor?

18   A    Just off the top of my head, I don't remember the

19   column number.

20       There it is.

21           MR. THOMAS:  And if you could go to -- I think

22   it's in the next column.  It says:  Security Level 2.

23   Q    (By Mr. Thomas) And what was it you were referring to

24   here with respect to what's called basic security,

25   Dr. Goodrich?

1        And this is in each of the Stefik patents; is that

2    correct?

3    A    Yes, sir.   This Table 2 is in all the patents.

4        So it starts out by saying:   Like the previous class --

5    which the previous class was saying you have to use

6    encryption.

7        And this says:   Except that special tools and knowledge

8    are required to compromise the programming, the contents of

9    the repository or the state of the clock.

10       So it's saying now we're going to a next level that's

11   not bulletproof, but you'll at least need special tools and

12   knowledge in order to compromise it.

13   Q    And that would still constitute something that was

14   using and practicing Dr. Stefik's claimed and patented

15   inventions; is that correct?

16   A    Yes, sir.   Because it's still a person of ordinary

17   skill reading this description would understand it would

18   have those three integrities as required by the Court.

19   Q    Mr. Pritikin asked you a moment ago a couple of

20   questions about an article by, I believe, a Ms. Denning.

21       Do you recall that?

22   A    It was her book, yes, sir.

23   Q    And also an article by a Ralph Merkle.

24       Do you recall that?

25   A    Yes, sir.

1  Q    Did Dr. White or anybody else in this court allege that

2  either of those publications invalidated any of Dr. Stefik's

3  claims or patents?

4  A    No, sir, they didn't.

5  Q    Did the claims in Dr. Stefik's patents, applying the

6  Court's claim constructions, did they require that there be

7  more than one manner of use that the system can allow?

8  A    No, sir, they don't.

9  Q    How many manners of use do there have to be to meet the

10  Court's claim constructions?

11  A    There has to be at least one.

12  Q    So you were here for Dr. White's testimony regarding

13  his opinion that the patents were invalid.

14       Do you recall?

15  A    Yes, sir.

16  Q    Do you recall he, in answering my questions, explained

17  that there were dozens, if not hundreds, of skilled

18  researchers working in the field of DRM before Dr. Stefik

19  came up with his invention?

20  A    Yes, sir, I recall that testimony.

21  Q    And do you recall that Dr. White wasn't able to point

22  to a -- one single reference where somebody had described

23  the same thing as Dr. Stefik invented, correct?

24  A    Yes, sir, I recall that.

25  Q    What does it tell you that there were that many really

1   smart, skilled people trying to solve the same problems that

2   Dr. Stefik was trying to solve but that didn't come to the

3   same solution that Dr. Stefik did that he described in his

4   patents?  What does that tell you about the obviousness of

5   Dr. Stefik's invention?

6          MR. PRITIKIN:  Objection; leading, Your Honor.

7          THE COURT:  Sustained.

8   Q   (By Mr. Thomas) What does the fact that there were

9   these many people working in the field have on your opinion

10  with regard to obviousness, if anything?

11  A   It -- it is another indication that this would not be

12  obvious, to take two things that were known, combine them in

13  a way that then would be rendering all the elements of the

14  claims obvious.

15  Q   And why is that?

16  A   Because those people there didn't have hindsight the

17  way we do now to be able to look back and perhaps even use

18  the claims of the patent as a roadmap to say, you know, how

19  would I do this?  Well, I could just stick in Merkle.  How

20  would I do that?  Well, I would stick in Denning.  And then

21  I would do ABYSS and -- and all these things.

22          And even under that analysis, I still determine

23  behavioral integrity is still missing, even if you do that

24  hindsight analysis.  But even with that approach, if you

25  start to say now let's try to not be -- using hindsight, go

1   back in time and actually ask the question in the real

2   world.

3              In fact, I had this bullet on one of my slides, is

4   that these things were never combined in the real world to

5   render anything that would be satisfying every single one of

6   those claims.

7              I -- I presume that if Dr. White had found

8   something like that, he would have given an opinion that all

9   the claims were anticipated by a single reference, but he

10  did not offer that opinion.

11             MR. THOMAS:  Your Honor, I have no further

12  questions, and I pass the witness.

13             THE COURT:  All right.  Additional cross,

14  Mr. Pritikin?

15             MR. PRITIKIN:  Nothing further from me, Your

16  Honor.  I pass the witness.

17             THE COURT:  All right.  You may step down,

18  Dr. Goodrich.

19             THE WITNESS:  Thank you, Your Honor.

20             MR. THOMAS:  May Dr. Goodrich be excused, Your

21  Honor?

22             THE COURT:  Any objection?

23             MR. PRITIKIN:  No, sir.

24             THE COURT:  You're excused, Dr. Goodrich.

25             THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  Plaintiff, do you have additional

2     rebuttal witnesses?

3          MR. THOMAS:  We do not, Your Honor.  Plaintiff

4     rests its case.

5          THE COURT:  All right.  Both sides rest and close

6     subject to final instructions and closing arguments,

7     correct?

8          MR. THOMAS:  Yes, Your Honor.

9          MR. PRITIKIN:  Yes, Your Honor.

10         THE COURT:  All right.  Ladies and gentlemen of

11    the jury, you have now heard all the evidence in this case.

12    There are additional things the Court must take up with

13    counsel outside of your presence.

14         And the good news is that you only have to stay

15    here a half a day today.  I'm going to send you home.  And

16    what you do with the other half of the day is strictly up to

17    you, as long as you don't discuss this case with anybody.

18         We will be working over several things that don't

19    directly affect you this afternoon.  I will want you back in

20    the morning.  I believe in the morning we'll be in a

21    position to let the Court give you my final instructions,

22    hear the closing arguments from counsel, after which I'll

23    then direct that you retire to the jury room and deliberate

24    on your verdict.

25         At that time, but only at that time, it will be

1  your duty to discuss all the evidence you've heard among

2  each other and come to a unanimous decision on your verdict.

3          But until that time that I send you into the jury

4  room to formally deliberate, you are not to discuss the

5  evidence, the case, or anything about this process with

6  anyone, including each other.

7          That -- that instruction has been important from

8  the beginning.  It's even more important as we get to the

9  very end of things.  So please bear that in mind as you're

10 free and on your own this afternoon.

11         I'd like you here in the morning at 9:00 o'clock.

12 I think we can start a little later.  I cannot promise you

13 that things will be ready to go at 9:01.  You may have to

14 wait on me.  I may have to wait on you.  It's my best

15 approximation.  Some of the things I'm doing are not things

16 that I can give you an exact time limit on.

17         All of that said, I'll ask you to leave your

18 notebooks closed and on the table in the jury room as you

19 leave the courthouse.  I remind you of all my other

20 instructions.

21         And if we'll -- if you'll travel safely and have a

22 good afternoon, we will see you here tomorrow morning

23 assembled in the jury room at 9:00 a.m.

24         You're excused at this time.

25         COURT SECURITY OFFICER:  All rise for the jury.

1          (Jury out.)

2          THE COURT:  Please be seated.

3          Counsel, as I indicated by email communication

4    yesterday evening, I will expect your motions under

5    Rule 50(a) to be presented in written form and filed at the

6    time specified later today.  I will consider those

7    overnight, and I anticipate giving you rulings from the

8    bench first thing in the morning.

9          I also plan to meet this afternoon, starting at

10   1:15, with those counsel that will be involved in discussing

11   the final jury instructions and the verdict form.

12         I know both Mr. Baxter and Mr. Pritikin are going

13   to present the closing arguments for the respective sides.

14   They are welcome to join us, but they are not required to

15   join us.  If they would rather spend that time working on

16   their closing arguments, that's perfectly acceptable.

17         Those of you that are not involved in the process

18   do not need to attend, but I need those counsel from both

19   Plaintiff and Defendant that are participating in the charge

20   preparation to meet with me in chambers at 1:15.

21         I'll conduct an informal charge conference

22   reviewing the submitted proposals from both sides,

23   discussing the merits of those, hearing argument, and fully

24   exploring the competing proposals with regard to both the

25   final jury instructions and the verdict form.

```
 1          Having considered all that after the informal

 2  charge conference, the Court will assemble what it believes

 3  to be the appropriate result of that process and the final

 4  jury instructions and verdict form to be used.

 5          I'll deliver that to counsel, and hopefully later

 6  today, we'll have had enough time for that to be reviewed

 7  that I can then conduct a formal charge conference on the

 8  record where either side or both sides will be given an

 9  opportunity to make any objections for record purposes to

10  the resulting charge and verdict form.

11          If we can accomplish that today among us, counsel,

12  then I can give you immediate and ultimate rulings on your

13  50(a) motions from the bench in the morning and then proceed

14  to bring in the jury, give them the final jury instructions,

15  hear the closing arguments, and let them then retire to

16  deliberate.

17          If all of that goes as planned, we should have the

18  case in the jury's hand by or slightly before lunch

19  tomorrow.  That's the Court's plan.  That's the timetable

20  I'm working with.

21          We're going to recess, and I'll see those involved

22  in the informal charge conference at 1:15.

23          Are there questions from either side?

24          MR. PRITIKIN:  Yes, Your Honor.  I would request

25  that we be allowed at this point to release the rest of the
```

1    witnesses?

2            MR. THOMAS:  No objection, Your Honor.

3            THE COURT:  All the witnesses in the case are

4    hereby released.

5            Anything else from the Plaintiff?

6            MR. BAXTER:  No, Your Honor.

7            THE COURT:  Anything else from the Defendant?

8            MR. PRITIKIN:  No, Your Honor.

9            THE COURT:  I would like to see Mr. Baxter and

10   Mr. Pritikin in chambers for about five minutes as soon as I

11   recess.

12           Otherwise, we stand in recess until 1:15 for the

13   informal charge conference.

14           COURT SECURITY OFFICER:  All rise.

15           (Lunch recess.)

16

17

18

19

20

21

22

23

24

25

1

2                           CERTIFICATION

3

4           I HEREBY CERTIFY that the foregoing is a correct

5    transcript from the stenographic notes of the proceedings in

6    the above-entitled matter to the best of my ability.

7

8

9    /S/Shelly Holmes                    11/19/15
     SHELLY HOLMES, CSR, TCRR           Date
10   Official Court Reporter
     State of Texas No. 7804
11   Expiration Date:  12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25