```
 1                   IN THE UNITED STATES DISTRICT COURT
                      FOR THE EASTERN DISTRICT OF TEXAS
 2                           MARSHALL DIVISION

 3      CONTENTGUARD HOLDINGS, INC.  )(   Civil Docket No.
                                     )(   2:13-CV-1112-JRG
 4                                   )(   MARSHALL, TEXAS
        VS.                          )(
 5                                   )(
                                     )(   NOVEMBER 20, 2015
 6      APPLE, INC.                  )(   9:32 a.m.

 7                         TRANSCRIPT OF JURY TRIAL

 8                 BEFORE THE HONORABLE RODNEY GILSTRAP

 9                     UNITED STATES DISTRICT COURT

10      APPEARANCES:

11      FOR THE PLAINTIFF:         Mr. Samuel F. Baxter
                                   Ms. Jennifer Truelove
12                                 MCKOOL SMITH, PC
                                   104 East Houston Street, Suite 300
13                                 Marshall, Texas 75670

14                                 Mr. Robert A. Cote
                                   MCKOOL SMITH, PC
15                                 One Bryant Park, 47th Floor
                                   New York, New York 10036
16
                                   Mr. Dirk D. Thomas
17                                 MCKOOL SMITH, PC
                                   1999 K Street, N.W., Suite 600
18                                 Washington, DC 20006

19      APPEARANCES CONTINUED ON THE NEXT PAGE:

20      COURT REPORTER:            SHELLY HOLMES,CSR, TCRR
                                   Official Court Reporter
21                                 United States District Court
                                   Eastern District of Texas
22                                 Marshall Division
                                   100 E. Houston, Suite 125
23                                 Marshall, Texas  75670
                                   (903) 923-7464
24
        (Proceedings recorded by mechanical stenography, transcript
25      produced on CAT system.)
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE DEFENDANT:        Mr. David T. Pritikin
                               Mr. Nathaniel C. Love
 3                             SIDLEY AUSTIN LLP
                               One South Dearborn St.
 4                             Chicago, Illinois 60603

 5                             Mr. Dave Anderson
                               Mr. Theodore W. Chandler
 6                             SIDLEY AUSTIN LLP
                               555 California St.
 7                             San Francisco, CA 94104

 8                             Ms. Melissa Smith
                               GILLAM & SMITH
 9                             303 South Washington Avenue
                               Marshall, Texas 75670
10
                               Mr. Bryan K. Anderson
11                             SIDLEY AUSTIN LLP
                               1001 Page Mill Road, Bldg. 1
12                             Palo Alto, CA 94304

13                             Mr. Jeffrey P. Kushan
                               Mr. Michael P. Franzinger
14                             SIDLEY AUSTIN LLP
                               1501 K Street, N.W.
15                             Washington, D.C. 20005

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2            (Jury out.)

 3            COURT SECURITY OFFICER:  All rise.

 4            THE COURT:  Be seated, please.

 5            Are the parties prepared to read into the record

 6   those items from the list of pre-admitted exhibits used

 7   during yesterday's portion of the trial?

 8            MS. ENGELMANN:  Yes, Your Honor.

 9            THE COURT:  Please proceed, Ms. Engelmann.

10            MS. ENGELMANN:  Plaintiff, ContentGuard, has one

11   pre-admitted exhibit to read into the record, and it's

12   PX-1055C.

13            THE COURT:  Any objection from Defendant?

14            MR. BRYAN ANDERSON:  No, Your Honor.

15            THE COURT:  Does Defendant have a similar

16   rendition to make?

17            MR. BRYAN ANDERSON:  We do, Your Honor.

18            THE COURT:  Please proceed.

19            MR. BRYAN ANDERSON:  AX-385, AX-778C, AX-606C,

20   AX-897, AX-974C, AX-965C, AX-1102, AX-1147C.

21            THE COURT:  All right.  Are there objections from

22   the Plaintiff, Ms. Engelmann?

23            MS. ENGELMANN:  No, Your Honor.

24            THE COURT:  All right.

25            All right.  Counsel, I have considered carefully
```

1   the written motions for judgment as a matter of law filed

2   under Rule 50(a) of the Federal Rules of Civil Procedure,

3   which were filed with the Court yesterday evening.

4           Under the rule, it is clear that if a party has

5   been fully heard on an issue during a trial and the Court

6   finds that a reasonable jury would not have a legally

7   sufficient evidentiary basis to find for that party on that

8   issue, the Court may resolve the issue by way of granting

9   judgment as a matter of law.

10          It's clearly stated in the rule that it's "may"

11  and not "shall."  The parties have a right under Rule 50 to

12  reurge any motion not granted at the pre-verdict stage after

13  the verdict is entered.

14          Having considered the motions on their face and

15  the evidence presented during the course of the trial, the

16  Court is of the opinion that each and all of the motions

17  under Rule 50(a) should be and they are hereby denied.

18  Those include the motions set forth in Documents 1052, 1053,

19  1054, and 1055 filed in this case.

20          The parties' rights to reurge such post-verdict

21  remain unaffected.

22          All right.  Is there anything from either party

23  before I bring in the jury and begin the final jury

24  instructions?

25          MR. BAXTER:  Not from the Plaintiff, Your Honor.

```
1          MR. PRITIKIN:  Not from the Defendant, Your Honor.

2          THE COURT:  All right.  I remind our guests in the

3     gallery that this is the most serious and important part of

4     a very serious and important proceeding.  To the extent that

5     it is possible, I would request that our guests remain

6     seated, not come and go from the courtroom, and otherwise

7     use their best efforts to avoid any disruptions of any kind.

8          All right.  Bring in the jury, Mr. Nance.

9          COURT SECURITY OFFICER:  All rise for the jury.

10         (Jury in.)

11         THE COURT:  Good morning, ladies and gentlemen.

12    Please have a seat.

13         Members of the jury, you have now heard the

14    evidence in this case.  I'll now instruct you on the law

15    that you must apply.  It is your duty to follow the law as I

16    give it to you.

17         As I've said previously, however, you, the jury,

18    are the sole judges of the facts.

19         Do not consider any statement that I have made

20    during the trial or that I make in these instructions as an

21    indication that I have any opinion about the facts in this

22    case.

23         These final jury instructions that I'm about to

24    give you orally now have been reduced to writing, and each

25    of you will have your own individual copy of these
```

1    instructions when you retire to the jury room to deliberate.

2           Accordingly, there's no pressing need for you to

3    take notes on these instructions unless you just

4    particularly want to.  I would suggest to you that it is

5    more beneficial if you just listen to what I say and then

6    you'll have your own written copies to look at, if you need

7    to, once you retire to deliberate.

8           After I give you these instructions, the attorneys

9    in the case will make their closing arguments.  Statements

10   and arguments of the attorneys are not evidence and are not

11   instructions on the law.  They're intended only to assist

12   you, the jury, in recalling and understanding the evidence

13   and the parties' contentions.

14          A verdict form has been prepared for you.  You

15   will take this verdict form with you to the jury room when

16   you retire to deliberate.  And when you have reached a

17   unanimous agreement as to your verdict, you will have your

18   foreperson fill in the blanks in the verdict form, date it,

19   and sign it.

20          Answer each question in the verdict form from the

21   facts as you find them to be.  Don't decide who you think

22   should win and then answer the questions to reach that

23   result.

24          Your answers and your verdict in this case, ladies

25   and gentlemen, must be unanimous.

1    In determining any fact and whether it has been

2    proven in this case, you may, unless otherwise instructed,

3    consider the testimony of all the witnesses, regardless of

4    who may have called them, and all exhibits received into

5    evidence, regardless of who may introduce -- who may have

6    introduced them.  You may also consider any agreements or

7    stipulations of the parties during the case.

8    Certain exhibits were shown to you during the

9    trial as illustrations only.  We call these documents

10   "demonstrative exhibits."  Demonstrative exhibits are a

11   party's depiction, picture, or model to describe something

12   involved in the trial.

13   If your recollection of the evidence differs from

14   the demonstrative, rely on your recollection.  While

15   demonstrative exhibits may be helpful to you in determining

16   the issues, demonstratives of both parties are not evidence,

17   and they are not proof of any fact.

18   If they do not correctly reflect the evidence in

19   the case, you should disregard the demonstratives and

20   determine the facts from the underlying evidence.

21   Demonstrative exhibits will not be available for you to view

22   during your deliberations.

23   Some evidence has been presented to you in the

24   form of answers to one of the party's written

25   interrogatories.  These answers were given in writing and

1    under oath before the trial in response to questions that

2    were submitted in writing under established procedures of

3    the Court.  You should consider the answers insofar as

4    possible in the same way as if they were made from the

5    witness stand.

6            By allowing the testimony or other evidence to be

7    introduced over the objection of an attorney, the Court did

8    not indicate an opinion as to the weight or effect of such

9    evidence.  As I've said before, you are the sole judges of

10   the credibility and believability of all the witnesses and

11   what amount of weight and effect to give to all of the

12   evidence in the case.

13           When the Court sustained an objection to a

14   question addressed to a witness, you must disregard the

15   question entirely, and you may draw no inference from its

16   wording or speculate about what the witness would have said

17   if he or she had been permitted by the Court to answer the

18   question.

19           At times during the trial, it was necessary for

20   the Court to talk with the lawyers here at the bench outside

21   of your hearing or by calling a recess and talking to them

22   when you were outside of the courtroom.

23           This happened because often there are things that

24   occur during a trial that do not directly involve the jury.

25   You should not speculate about what was said during any

1    discussions that took place outside of your presence.

2            Additionally, the following are not evidence, and

3    you must not consider them as evidence in deciding the facts

4    in this case:  Statements, arguments, questions, or

5    objections of the attorneys, or anything that you may see or

6    hear when the Court is not in session, even if what you see

7    or hear is done or said by one of the parties or by one of

8    the witnesses or the attorneys.

9            As I said during jury selection and during my

10   preliminary instructions to you, your decisions in this case

11   should be based solely on the sworn testimony that you heard

12   from the witness stand during the trial and from the

13   exhibits that have been admitted into evidence as a part of

14   the record in this case.

15           Certain testimony in this case has been presented

16   to you through depositions.  A deposition is the sworn,

17   recorded answers to questions asked to a witness in advance

18   of the trial.  If a witness cannot be physically present to

19   testify in person from the witness stand, the witness's

20   testimony may be presented under oath in the form of a

21   deposition.

22           Before the trial, the attorneys representing the

23   parties in the case questioned these deposition witnesses

24   under oath.  A court reporter was present and recorded the

25   testimony.

1          Deposition testimony is entitled to the same

2    consideration as testimony given by a witness in person from

3    the witness stand in open court.  Accordingly, you should

4    judge the credibility and weigh the importance of deposition

5    testimony to the best of your ability, just as if the

6    witness had testified in open court.

7          While you should consider only the evidence in

8    this case, you are permitted to draw such reasonable

9    inferences from the testimony and exhibits as you feel are

10   justified in the light of common experience.

11         In other words, ladies and gentlemen, you may make

12   deductions and reach conclusions that reason and common

13   sense lead you to draw from the facts that have been

14   established by the evidence and the testimony in this case.

15   You're the sole judges of the credibility or believability

16   of each witness and the weight to be given to each of the

17   witness's testimony.

18         An important part of your job will be making

19   judgments about the testimony of witnesses who testified in

20   this case.  You should decide whether you believe all or any

21   part of what each person had to say and decide how important

22   that testimony was.

23         In determining the weight to give to testimony of

24   a witness, you should ask yourself whether there was

25   evidence tending to prove that the witness testified falsely

1   concerning some important fact or whether there was evidence
2   that at some other time the witness said or did something or
3   failed to say or do something that was different from the
4   testimony the witness gave during the trial held before you.
5          Unless I instruct you otherwise, you may properly
6   determine the testimony of a single witness to be sufficient
7   to prove any fact, even if a greater number of witnesses may
8   have testified to the contrary if, after considering all of
9   the evidence, you believe that single witness.
10         There are two types of evidence that you may
11  consider in properly finding the truth as to the facts in
12  this case.
13         One type of evidence is called direct evidence,
14  such as the testimony of an eyewitness.
15         The other type of evidence is called indirect or
16  circumstantial evidence; that is, the proof of a chain of
17  circumstances that indicates the existence or non-existence
18  of certain other facts.
19         As a general rule, members of the jury, the law
20  makes no distinction between direct evidence or
21  circumstantial evidence but simply requires that you find
22  the facts, based on the evidence presented, both direct and
23  circumstantial.
24         When knowledge of a technical subject may be
25  helpful to the jury, a person who has special training or

1   experience in that technical field, called an expert

2   witness, is permitted to state his or her opinions on those

3   technical matters.

4          However, you're not required to accept those

5   opinions.  As with any other witness, it is solely up to you

6   to decide whether or not to rely on the testimony of any and

7   all of the witnesses.

8          There are two standards of proof to be applied in

9   this case, two burdens of proof to be applied in this case.

10  One is the preponderance of the evidence.  The other is

11  clear and convincing evidence.

12         ContentGuard, the Plaintiff, has the burden of

13  proving infringement and damages by a preponderance of the

14  evidence.

15         As I mentioned at the beginning of the trial,

16  preponderance of the evidence means evidence that persuades

17  you that a claim is more likely true than not true.  If the

18  evidence is equally weighted, then the preponderance burden

19  of proof has not been met.

20         ContentGuard has the burden of proving willful

21  infringement and invalidity by clear and convincing

22  evidence.  Apple -- excuse me -- ContentGuard has the burden

23  of proving willful infringement by clear and convincing

24  evidence.

25         Apple, the Defendant, has the burden of proving

1    invalidity by clear and convincing evidence.

2              Clear and convincing evidence means evidence that

3    produces in your mind a firm belief or conviction as to the

4    matter at issue.

5              When a party has the burden of proving any claim

6    or defense by clear and convincing evidence, it means that

7    the evidence must have persuaded you that the claim or

8    defense is highly probable.

9              Although proof to an absolute certainty is not

10   required, the clear and convincing evidence standard

11   requires a greater degree of persuasion than is necessary

12   for the preponderance of the evidence standard.

13             However, the clear and convincing evidence

14   standard is not so high as the standard used in criminal

15   law, which is evidence beyond a reasonable doubt.  If the

16   proof establishes in your mind a firm belief or conviction

17   that something is true, then the clear and convincing

18   evidence standard has been met.

19             In determining whether any fact has been proved,

20   you may, unless otherwise instructed, consider the

21   stipulations of the parties, the testimony of all the

22   witnesses, regardless of who may have called them, and all

23   of the exhibits received into evidence during the course of

24   the trial, regardless of who may have produced them.

25             As I did at the beginning of the case, I will

1    first give you a summary of each side's contentions in this

2    case, and I'll then provide you with detailed instructions

3    on what each side must prove to win on each of its

4    contentions.

5           ContentGuard has asserted five patents in this

6    litigation.  Four of the patents have generally been called

7    through the trial as -- been called to be the Stefik

8    patents.  Those are Patent -- U.S. Patent No. 6,963,859,

9    8,370,956, 8,393,007, and 7,523,072.

10          The other patent has generally been called the

11   meta-rights patent or the Nguyen patent, and that is United

12   States Patent No. 8,001,053.

13          The Plaintiff, ContentGuard, alleges that the

14   Defendant, Apple, has infringed Claim 1 of Patent

15   No. 6,963,859, which we've commonly called throughout the

16   trial as the '859 patent; Claim 1 of Patent No. 7,523,072,

17   which has been called, for shorthand purposes through the

18   trial, the '072 patent;

19          Claim 7 of Patent No. 8,370,956, which has been

20   called the '956 patent during the trial;

21          And Claim 6 of Patent No. 8,393,007, which has

22   been called the double 07 or the '007 patent;

23          And Claim 1 of Patent No. 8,001,053, which we've

24   called the '053 patent.

25          They've alleged infringement by making, using,

1 selling, and/or offering for sale in the United States

2 products with iTunes and/or iBooks applications, including

3 iPhones, iPads, iPods, Mac desktops, and laptops, and by

4 using Apple's iTunes servers to distribute DRM-protected

5 movies, TV shows, and books.

6         The patents listed are sometimes referred to as

7 the asserted patents, or they're sometimes referred to as

8 the patents-in-suit.  And the claims listed are sometimes

9 referred to as the asserted claims.

10        ContentGuard, the Plaintiff, also contends that

11 Apple's alleged infringement has been willful.  ContentGuard

12 seeks damages from Apple in the form of a reasonable

13 royalty.

14        Apple, the Defendant, denies that it has infringed

15 the asserted claims of these five patents.  Apple denies

16 that any infringement you find was willful.

17        Further, Apple contends that ContentGuard's

18 asserted claims are invalid because they would have been

19 obvious to a person of ordinary skill in the field at the

20 time the invention -- at the time of the invention in the

21 light of one or more prior art references.

22        Apple also denies that ContentGuard is entitled to

23 any damages.

24        I'll now give you instructions and definitions to

25 help you in answering the questions that will be presented

1   to you.

2          Your job is to decide whether the asserted claims

3   of the asserted patents have been infringed and whether any

4   of the asserted claims are invalid.

5          If you decide that any claim of a patent-in-suit

6   has been infringed and is not invalid, you will then need to

7   decide what amount of money damages, if any, is to be

8   awarded to ContentGuard as compensation for such

9   infringement.

10          I'm going to read that sentence over again.

11          If you decide that any claim of the patent-in-suit

12   has been infringed and is not invalid, then you'll decide --

13   need to decide what amount of money damages is to be awarded

14   to ContentGuard as compensation for such infringement.

15          Before you can decide many of the issues in the

16   case, you'll need to understand the role of patent claims.

17   The patent claims are the numbered sentences at the end of

18   each patent.

19          The claims are important because it is the words

20   of the claims themselves that define what the patent covers.

21   The figures and the text in the rest of the patent provide a

22   description and/or examples of the invention and provide

23   context for the claims, but it is the claims, ladies and

24   gentlemen, that define the breadth of the patent's coverage.

25          Claims may describe methods or products, such as

1    machines or chemical compounds or processes for making or

2    using a product.

3         In this case, ContentGuard has asserted both

4    product claims and method claims.

5         Claims are usually divided into parts or steps

6    called limitations or elements.

7         For example, a claim that covers the invention of

8    a table may recite a tabletop, four legs, and the glue that

9    secures the legs to the tabletop.  In this example, the

10   tabletop, legs, and glue are each separate limitations or

11   elements of the claim.

12        You first need to understand what each claim

13   covers in order to decide whether or not there is

14   infringement of the claim and to decide whether or not the

15   claim is invalid.

16        The law says it's my role as the judge to define

17   the terms of the claims, and it's your role as the jury to

18   apply my definitions to the issues that you are asked to

19   decide in this case.

20        Therefore, as I explained to you at the start of

21   the case, I have determined the meaning of the claims, and I

22   have provided to you my definitions of certain claim terms.

23   Those are in your juror notebooks.

24        You must accept my definitions of these words in

25   the claims as being correct.  It's your job to take these

1    definitions that I've supplied and apply them to the issues

2    that you are being asked to decide, including both the

3    issues of infringement and invalidity.

4            For claim terms that I have not construed or

5    defined, you are to use the plain and ordinary meaning in

6    the context of the asserted patents as understood by one of

7    ordinary skill in the art meaning in the field of technology

8    of the patent at the time of the invention.

9            Now, several times in these instructions I will

10   refer to a person of ordinary skill in the art or a person

11   of ordinary skill in the field of the invention.

12           A person of ordinary skill in the art of the

13   patents-in-suit, as of the filing date of the

14   patents-in-suit, is someone with a bachelor's degree in

15   electrical engineering, computer science, or a related field

16   and two years of industry experience in digital rights

17   management or computer security, or it may be a person with

18   a Master's of Science degree in electrical engineering,

19   computer science, or a related field.

20           I'll now explain how a claim defines what is

21   covered.

22           A claim sets forth in words a set of requirements.

23   If a device or method satisfies each of the requirements,

24   then it is covered by the claim.

25           There can be several claims in a patent.  A claim

1  may be narrower than another claim by setting forth more

2  requirements, or a claim may be broader than another claim

3  by setting forth fewer requirements.  The coverage of a

4  patent is assessed on a claim-by-claim basis.

5           In patent law, the requirements of a claim are

6  also -- are often referred to as the claim elements or the

7  claim limitations.

8           When a product or method meets all of the

9  requirements of a claim, the claim is said to cover that

10  product or method and that product or method is said to fall

11  within the scope of the claim.

12           In other words, a claim covers a product or method

13  where each of the claim elements or limitations is present

14  in that product or method.

15           If a product or method is missing even one

16  limitation or element of a claim, the product or method is

17  not covered by the claim.  If the product or method is not

18  covered by the claim, that product or method does not

19  infringe that claim.

20           The beginning portion, or the preamble, of a

21  number of the claims uses the word "comprising."  The word

22  "comprising," when used in the preamble, means "including"

23  or "containing."  When "comprising" is used in the preamble,

24  a device that includes all of the limitations of the claim

25  is covered by the claim even if the device contains

20

1    additional elements.

2              If any person makes, uses, sells, or offers to

3    sell within the United States what is covered by the patent

4    claims without the patent owner's permission, that person is

5    said to infringe the patent.

6              In reaching your decision on infringement, ladies

7    and gentlemen, keep in mind that only the claims of a patent

8    can be infringed.  You must compare the asserted claims, as

9    I have defined each of them, to the accused products and

10   determine whether or not there is infringement.

11             For determining infringement, you should not

12   compare the accused products with any specific example of

13   the invention set out in the patent with the patentholder's

14   commercial products or with the prior art.

15             The only correct comparison is to compare the

16   accused products with the language of the claims themselves,

17   as I've explained their meaning to you.

18             You must consider each claim individually and must

19   reach your decision as to each assertion of infringement

20   based on my instructions about the meaning and scope of the

21   claims, the legal requirements for infringement, and the

22   evidence presented to you by the parties.

23             I'll now instruct you on how to decide whether or

24   not Apple has infringed any of the Asserted Claims of

25   ContentGuard's patents.

1        Infringement is assessed on a claim-by-claim

2   basis.  Therefore, there may be infringement as to one claim

3   but no infringement as to another claim in a patent.

4        To prove infringement, ContentGuard must prove

5   that the accused products and the methods include every

6   limitation or element of an asserted claim.  If an accused

7   product omits any requirement required by an asserted claim,

8   it does not infringe that claim.

9        There are two types of claims that ContentGuard

10  alleges Apple has infringed:  Method claims and product

11  claims.

12       The asserted method claims in this case are Claim

13  1 of the '072 patent and Claim 1 of the '053 patent.

14       In general, a method claim is infringed only when

15  a single person or entity, without the patent owner's

16  permission, performs each and every step of the method claim

17  in the United States while the patent is in force.

18       Mere sale of a product capable of performing the

19  infringing method does not constitute infringing use of the

20  method.  Likewise, selling a product capable of practicing a

21  patented method does not constitute selling the patented

22  method.

23       The asserted product claims are Claim 1 of the

24  '859 patent; Claim 7 of the '956 patent; and Claim 6 of the

25  '007 patent.  Infringement of a product claim occurs when a

1    person, without the patent owner's permission, makes, uses,

2    offers to sell, or sells the patented invention anywhere in

3    the United States while the patent is in force.

4             As I've said, the product claims in this case are

5    Claim 1 of the '859 patent; Claim 7 of the '956 patent; and

6    Claim 6 of the '007 patent.

7             And the method claims are Claim 1 of the '072

8    patent and Claim 1 of the '053 patent.

9             ContentGuard, the Plaintiff, accuses Apple, the

10   Defendant, of directly infringing the following method

11   claims and product claims of the asserted patents:  Claim 1

12   of the '859 patent; Claim 1 of the '072 patent; Claim 7 of

13   the '956 patent; Claim 6 of the '007 patent; and Claim 1 of

14   the '053 patent.

15            You must determine separately for each asserted

16   claim whether or not there has been infringement.

17            A patent can be directly infringed even if the

18   alleged infringer did not have knowledge of the patent and

19   without the infringer's knowing that what it is doing is

20   infringement of the claim.

21            A patent may also be directly infringed even

22   though the accused infringer believes in good faith that

23   what it is doing is not infringement of the patent.

24            There are two types of direct infringement:

25   Literal infringement and infringement under the Doctrine of

1    Equivalents.  ContentGuard has alleged a type of direct

2    infringement known as literal infringement.

3            In order to prove literal infringement of a patent

4    claim, ContentGuard must show by a preponderance of the

5    evidence that the accused product or method includes each

6    and every requirement of ContentGuard's asserted claims.

7            In determining whether an accused product or

8    method of Apple literally infringes one or more of the

9    asserted claims of this case, you must compare the accused

10   product or method with each and every one of the

11   requirements of the claim to determine whether the accused

12   product contains each and every requirement recited in a

13   claim.

14           A claim requirement is present if it exists in an

15   accused product or method just as it is described in the

16   claim language, either as I've explained the language to

17   you, or if I did not explain it, as would have been

18   understood by one of ordinary skill in the art.

19           If any of the accused products or method omit any

20   requirement recited in a claim, then you must find that

21   particular product or method does not literally infringe

22   that particular claim.  Not all the claims of a patent must

23   be infringed for a patent to be infringed.

24           ContentGuard also alleges that Apple directly

25   infringes all of the asserted claims under the Doctrine of

1   Equivalents.

2          If a person makes, uses, sells, or offers to sell

3   within the United States a product or practices a method

4   which does not meet all the requirements of a claim and thus

5   does not literally infringe that claim, there can still be

6   direct infringement if that product or method satisfies that

7   claim under the Doctrine of Equivalents.

8          Under the Doctrine of Equivalents, a product or

9   method infringes a claim if the accused product or method

10  performs steps or contains elements corresponding to each

11  and every requirement of the claim that is equivalent to,

12  even though not literally met by the accused product or

13  method.

14         You may find that a step or element is equivalent

15  to a requirement of a claim that is not literally met if a

16  person having ordinary skill in the field of the technology

17  of the patent would have considered the differences between

18  them to be insubstantial or would have found that Apple's

19  action or structure (1) performs substantially the same

20  function (2) in substantially the same way (3) to achieve

21  substantially the same result as the requirement of the

22  claim.

23         In order to prove infringement by equivalents,

24  ContentGuard -- ContentGuard must prove the equivalency to a

25  claim element by a preponderance of the evidence.

1          In this case, the Plaintiff asserts that the

2     Doctrine of Equivalents applies in only -- excuse me.

3          In this case, Plaintiff asserts that the Doctrine

4     of Equivalents applies and is only applicable to the issue

5     of whether behavioral integrity exists on the iTunes servers

6     as among the claims in this suit.

7          ContentGuard also alleges that Apple has

8     indirectly infringed the asserted claims.  There are two

9     types of indirect infringement:  Inducing infringement and

10    contributory infringement.

11         ContentGuard alleges that Apple is liable for

12    indirect infringement by inducing another party or person to

13    directly infringe the following asserted claims literally:

14    Claim 1 of the '859 patent; Claim 1 of the '072 patent; and

15    Claim 7 of the '956 patent.

16         You must determine whether inducement has occurred

17    on a claim-by-claim basis.

18         Apple is liable for inducement of a claim if

19    ContentGuard proves by a preponderance of the evidence that:

20         (1) the acts are actually carried out by another

21    single Apple customer using the accused products or method

22    and those acts directly infringe that claim;

23         (2) Apple took action during the time the accused

24    patent was in force with the specific intent to cause and

25    did cause the infringing acts by Apple's customers;

1          And (3) Apple knew of the asserted patent at the

2    time of its action and knew that the acts, if taken by its

3    customers, would infringe the patent, or Apple was willfully

4    blind to the fact that by engaging in those acts, its

5    customers would commit infringement of the asserted patent.

6          To prove willful blindness, ContentGuard must

7    prove by a preponderance of the evidence that Apple believed

8    there was a high probability that Apple's customers were

9    directly infringing the asserted claims by engaging in acts

10   induced by Apple and that Apple took deliberate steps to

11   avoid confirming that high probability.

12         ContentGuard argues that Apple is liable for

13   contributory infringement by contributing to its own

14   customers' direct infringement of the following asserted

15   claims:  Claim 1 of the '859 patent; Claim 1 of the '072

16   patent; and Claim 7 of the '956 patent.

17         You must determine whether there has been

18   contributory infringement on a claim-by-claim basis.

19         Apple is liable for contributory infringement of

20   an asserted claim if ContentGuard proves each of the

21   following by a preponderance of the evidence:

22         (1) Apple sold or offered to sell within the

23   United States a component for use in a product during the

24   time the asserted patent was in force.

25         (2) The component has no substantial,

1  non-infringing use.

2       (3) The -- the component constitutes a material

3  part of the invention.

4       (4) Apple was aware of the asserted patent and

5  knew that the product or processes for which the component

6  has no other substantial use would be covered by a claim of

7  the asserted patent or would satisfy a claim of the asserted

8  patent under the Doctrine of Equivalents.

9       And (5) that use directly infringes the asserted

10  claim.

11       If you find that the component or apparatus

12  ContentGuard accuses has any substantial use for any purpose

13  other than infringement, you should find that Apple is not

14  liable for contributory infringement.

15       In this case, ContentGuard contends that Apple has

16  infringed ContentGuard's patents and further that Apple

17  infringed them willfully.

18       Apple denies that it infringed or willfully

19  infringed any of the asserted claims.

20       If you decide that Apple has infringed, you must

21  address the additional issue of whether or not Apple's

22  infringement was willful.

23       Willfulness requires ContentGuard to prove by

24  clear and convincing evidence that Apple acted recklessly.

25       To prove that Apple acted recklessly, ContentGuard

must prove by clear and convincing evidence that Apple actually knew or should have known that its actions created an unjustifiably high risk of infringement of a valid patent.

To determine whether Apple had this state of mind, consider all the facts, which may include but are not limited to the following:

(1) whether or not Apple acted in accordance with the standards of commerce for its industry;

(2) whether or not Apple intentionally copied a ContentGuard product that is covered by an asserted patent;

(3) whether or not there is a reasonable basis for Apple to have believed that it did not infringe or had a reasonable defense to infringement;

(4) whether or not Apple made a good-faith effort to avoid infringing the asserted claims of the asserted patents -- for example, whether it attempted to design around the asserted -- the asserted ContentGuard patents;

And (5) whether or not Apple tried to cover up its infringement.

None of these factors is alone determinative, and this list of factors is not an exhaustive list of things you should consider.  Your determination of willfulness should incorporate the totality of the circumstances based on the evidence presented during the trial.

1          If you decide that any infringement was willful,

2     that decision should not affect any damage award that you

3     make.  I will take willfulness into account later.

4          Apple has challenged the validity of the asserted

5     claims on a number of grounds.  Patent invalidity is a

6     defense to patent infringement.  Even though the Patent

7     Office Examiner has allowed the claims of a patent, you, the

8     jury, have the ultimate responsibility for deciding whether

9     the claims of the patent are valid.

10          I'll now instruct you on the rules you must follow

11    in deciding whether or not Apple has proven that the

12    asserted claims of the asserted patents are invalid.

13          An issued patent is accorded a presumption of

14    validity based on the presumption that the United States

15    Patent and Trademark Office acted correctly in issuing the

16    patent.  To prove that any claim of a patent is invalid,

17    Apple must persuade you by clear and convincing evidence

18    that the claim is invalid.

19          Again, the ultimate responsibility for deciding

20    whether the claims of the patents-in-suit are valid is up to

21    you, the members of the jury.

22          Keep in mind, however, ladies and gentleman, that

23    everyone has the right to use existing knowledge and

24    principles.  A patent cannot remove from the public the

25    ability to use what was known or obvious before the

```
1    invention was made or patent protection was sought.
2            I'll now explain to you Apple's grounds for
3    asserting invalidity of the claims of the asserted patents.
4    In making your determination as to invalidity, you should
5    consider each claim separately.  Claims are construed the
6    same way for determining -- for determining infringement as
7    for determining invalidity.
8            In patent law, a device, method, publication, or
9    patent that predated the patent claims at issue is called a
10   prior art reference.
11           Prior art may include items that were publicly
12   known, in public use, or offered for sale before a certain
13   date.  It may also include publications or patents that
14   disclose the claimed invention or elements of the claimed
15   invention.
16           In determining whether or not the invention is
17   invalid, you must determine the scope and content of the
18   prior art at the time the invention was made.
19           Prior art includes previous devices, articles, and
20   printed publications or patents that disclose the invention
21   or elements of the invention.  You must decide what those
22   references would have disclosed or taught one of ordinary
23   skill in the field of technology of the patent at the time
24   the invention was made.
25           To qualify as a prior art reference, a printed
```

1    publication must be reasonably accessible to those

2    interested in the field, even if it's difficult to find.  An

3    electronic publication, including online or Internet

4    publications, is a printed publication if it is reasonably

5    accessible to those interested in the field, even if it's

6    difficult to find.

7           The dates of ContentGuard's claimed inventions are

8    November the 23rd, 1994, for patent -- for the '859

9    patent -- excuse me -- the '85 -- yes -- the '859 patent,

10   the '956 patent, the '007 patent, and the '072 patent, which

11   you'll recall are referred to as the Stefik patents.

12          And November the 20th, 2001, for the '053 patent,

13   which you'll recall has been called the meta-rights patent

14   or the Nguyen patent.

15          The effective filing dates for the asserted claims

16   are the same.

17          The Defendant, Apple, contends that the asserted

18   claims of the asserted patents are invalid as being obvious.

19   Even though an invention may have -- may not have been

20   identically disclosed or described in a single prior art

21   reference before it was made by an inventor in order to be

22   patentable, the invention must also not have been obvious to

23   a person of ordinary skill in the field of the technology of

24   the patent at the time the invention was made.

25          Apple may establish that a patent claim is invalid

by showing by clear and convincing evidence that the claimed
invention would have been obvious to persons having ordinary
skill in the art at the time the claimed inventions were
made.

In determining whether a claimed invention is
obvious, you must consider the level of ordinary skill in
the field that someone would have had at the time the
claimed invention was made, the scope and content of the
prior art, and any differences between the prior art and the
claimed invention.

Keep in mind that the existence of each and every
element of the claimed invention in the prior art does not
necessarily prove obviousness.  Most, if not all, inventions
rely on building blocks of prior art.

In considering whether a claimed invention is
obvious, you should consider whether there was a reason that
would have prompted a person having ordinary skill in the
field to combine the known elements in a way that the
claimed invention does, taking to account -- taking into
account such factors as:

(1) whether the claimed invention was merely the
predictable result of using prior art elements according to
their known functions;

(2) whether the claimed invention provides an
obvious solution to a known problem in the relevant field;

1          (3) whether the prior art teaches or suggests the

2    desirability of combining elements in the claimed

3    inventions;

4          (4) whether the prior art teaches away from

5    combining elements in the claimed invention;

6          (5) whether it would have been obvious to try the

7    combination of elements, such as when there is a design need

8    or market pressure to solve a problem, and there are a

9    finite number of identified predictable solutions;

10          (6) whether the change resulted more from design

11    incentives or other market forces.

12          To find that prior art rendered the invention

13    obvious, you must find that the prior art provided a

14    reasonable expectation of success.

15          In determining whether the claimed invention was

16    obvious, do not use hindsight.  In other words, you should

17    not consider whether a person of ordinary skill in the art

18    would know now or what has been learned from the teaching of

19    the patent-in-suit.

20          The ultimate conclusion of whether a claim is

21    obvious should be based on your determination of several

22    factual issues, including:

23          (1) You should consider the level of ordinary

24    skill in the field of the invention that someone would have

25    had at the time the claimed invention was made under the

1    instructions that I've previously given you.

2           (2) You must decide the scope and content of the

3    prior art.  In determining the scope and content of the

4    prior art, you must decide whether a reference is pertinent,

5    or analogous, to the claimed invention.

6           Pertinent, or analogous, prior art includes prior

7    art in the same field of endeavor as the claimed invention,

8    regardless of the problems addressed by the reference and

9    prior art from different fields reasonably pertinent to the

10   particular problem with which the claimed invention is

11   concerned.

12          (3) You must decide what difference, if any,

13   existed between the claimed invention and the prior art.

14          In making these assessments, you should take into

15   account any objective evidence, sometimes called "secondary

16   considerations," that may have existed at the time of the

17   invention and afterwards that may shed light on the

18   obviousness or not of the claimed invention, such as:

19          (1) whether the claimed invention was commercially

20   successful as a result of the merits of the claimed

21   invention, rather than the results of design needs or market

22   pressure, advertising or similar activities;

23          (2) whether the invention satisfied a long-felt

24   need;

25          (3) whether others had tried and failed to make

1    the invention;

2            (4) whether others invented the invention at

3    roughly the same time;

4            (5) whether there are changes or related

5    technologies or market needs contemporaneous with the

6    invention;

7            (6) whether the invention achieved unexpected

8    results;

9            (7) whether others in the field praised the

10   invention;

11           (8) whether persons having ordinary skill in the

12   art of the invention expressed surprise or disbelief

13   regarding the invention;

14           (9) whether others sought or obtained rights to

15   the patent from the patentholder.

16           (10) whether the inventor proceeded contrary to

17   accepted wisdom in the field.

18           If and only if you find that Apple infringed any

19   claim of the asserted patents and such claim is not invalid,

20   you must then consider the amount of damages to award to

21   ContentGuard.

22           I'll now instruct you on the measure of damages.

23   By instructing you on damages, I'm not suggesting which

24   party should win this case on any issue.

25           The damages you award must be adequate to

1    compensate ContentGuard for the infringement you find.

2    Damages are not meant to punish an infringer.

3         ContentGuard has the burden to establish the

4    amount of its damages by a preponderance of the evidence.

5    ContentGuard is not entitled to damages that are remote or

6    speculative.

7         ContentGuard seeks a reasonable royalty as the

8    measure of damages in this case.  No more, no less.

9         A reasonable royalty is defined as the amount of

10   money ContentGuard and Apple would have agreed upon as a fee

11   for Apple's use of ContentGuard's inventions at the time the

12   infringement began.

13        ContentGuard must prove its damages with

14   reasonable certainty, but the determination of a damage

15   award is not an exact science and the amount need not be

16   proven with unerring precision.

17        While the damages may not be determined by mere

18   speculation or guess, it is proper to award a damages amount

19   if the evidence shows the extent of the damages as a matter

20   of just and reasonable inference.

21        I'll give you more detailed instructions regarding

22   damages shortly; however, if you find that Apple has

23   infringed any valid claim of the patents-in-suit,

24   ContentGuard is entitled to recover no less than a

25   reasonable royalty for each infringing sale or use of its

1    inventions by Apple.

2         A royalty is a payment made to a patentholder in

3    exchange for the right to make, use, or sell the claimed

4    invention.

5         A reasonable royalty is the amount of royalty

6    payment that a patentholder and the infringer would have

7    agreed to in a hypothetical negotiation taking place between

8    them at a time prior to when the infringement first began.

9         In considering this hypothetical negotiation,

10   ladies and gentlemen, you should focus on what the

11   expectations of the patentholder and the infringer would

12   have been had they entered into an agreement at that time

13   and had they acted reasonably in their negotiations.

14        In determining this, you must assume that both

15   parties believed the patents were valid and infringed and

16   the patentholder and the infringer were willing to enter

17   into an agreement.

18        The reasonable royalty you determine must be a

19   royalty that would have resulted from this hypothetical

20   negotiation and not simply a royalty either party would have

21   preferred.

22        Evidence of things that happened after the

23   infringement first began can be considered in evaluating the

24   reasonable royalty only to the extent that the evidence aids

25   in assessing what royalty would have resulted from a

1    hypothetical negotiation.

2            In determining a reasonable royalty, you should

3    consider all the facts known and available to the parties at

4    the time the infringement first began.

5            Some of the kinds of factors that you may consider

6    in making your determination are:

7            (1) the royalties received by ContentGuard for the

8    licensing of the patents-in-suit proving or tending to prove

9    an established royalty;

10           (2) the rates paid by Apple for the use of other

11   patents comparable to the patents-in-suit;

12           (3) the nature and scope of the license as

13   exclusive or non-exclusive or as restricted or

14   non-restricted in terms of territory or with respect to whom

15   the manufactured product may be sold;

16           (4) ContentGuard's policy of licensing its patents

17   rather than keeping its inventions to itself by refusing to

18   license others to use them;

19           (5) the commercial relationship between

20   ContentGuard and Apple, such as whether they are competitors

21   in the same territory, in the same lines of business, or

22   whether they are inventor and promoter;

23           (6) the effect of selling the patented specialty

24   in promoting sales of other products of the licensee, the

25   existing value of the invention to ContentGuard as a

generator of sales of its non-patented items, and the extent of such derivative or convoyed sales;

(7) the duration of the patent and the term of the license;

(8) the established profitability of the product made under the patents, its commercial success, and its current popularity;

(9) the utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;

(10) the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by ContentGuard, and the benefit to those who have used the invention;

(11) the extent to which Apple made use of the invention and any evidence probative of the value of that use;

(12) the opinion and testimony of qualified experts;

And (13) the amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon at the time the infringement began if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee who desired as a business proposition to obtain a license to

1  manufacture and sell a particular article embodying the

2  patented invention would have been willing to pay as a

3  royalty and yet be able to make a reasonable profit and

4  which amount would have been acceptable by a prudent

5  patentee who was willing to grant a license.

6       No one factor is dispositive, and you can and

7  should consider the evidence that's been presented to you in

8  this case on each of these factors.

9       You may also consider any other factors which, in

10  your mind, would have increased or decreased the royalty

11  Apple would have been willing to pay and ContentGuard would

12  have been willing to accept acting as normally prudent

13  business people.

14       For purposes of determining a reasonable royalty,

15  you should consider whether, at the time of the hypothetical

16  negotiation, Apple had non-infringing alternatives to taking

17  a license from ContentGuard.

18       A non-infringing alternative is a way of proving

19  the same or comparable functionality or achieving the same

20  or a comparable result that does not require using the

21  asserted claims.

22       The final factor establishes a framework which you

23  should use in determining a reasonable royalty; that is, the

24  payment that would have resulted from a negotiation between

25  the patentholder and the infringer taking place at a time

1    prior to when the infringement began.

2         The law requires that any damages awarded to

3    ContentGuard correspond to the value of ContentGuard's

4    alleged invention, not to the value of features of Apple's

5    products that are not covered by ContentGuard's asserted

6    patent claims.  This is particularly true where the accused

7    products have multiple features and multiple components, as

8    in this case.

9         Accordingly, any reasonable royalty award must be

10   based only on the incremental value that ContentGuard's

11   patented invention adds to the -- Apple's accused products.

12        ContentGuard bears the burden to establish the

13   amounts attributable to the patented features; that is,

14   ContentGuard must give evidence tending to separate or

15   apportion between the patented components or features and

16   the unpatented components and features and such evidence

17   must be reliable and tangible and not conjectural or

18   speculative.

19        In determining the amount of damages, you must

20   take into account when damages begin and end.  For each

21   asserted patent, no damages can be awarded for any

22   infringement that occurred before the date the patent was

23   issued or for any infringement that occurred more than six

24   years before ContentGuard sued Apple on December the 18th,

25   2013.

1          The date each patent was issued is in the chart

2     which will be included in these jury instructions and which

3     you will have, but just for the record, I will advise you

4     that the '859 patent was issued on November the 8th, 2005;

5     the '072 patent was issued on April the 21st, 2009; the '956

6     patent was issued on February the 5th, 2013; the '007 patent

7     was issued on March the 5th, 2013; and the '053 patent was

8     issued on August the 16th, 2010.

9          For each patent, you must determine the date that

10    Apple received actual notice of the patents and the specific

11    product alleged to infringe.  Your job is to calculate

12    damages from the date that Apple received actual notice of

13    infringement by the products accused in this case.

14         ContentGuard bears the burden of proving by a

15    preponderance of the evidence that it provided actual

16    notice.

17         Actual notice means that ContentGuard communicated

18    directly to Apple a specific charge of infringement of the

19    patents by a specific accused product or device.  For

20    purposes of actual notice, discovery of other models or

21    products related to those in the notice may bring those

22    products within the scope of the notice.

23         The filing of the complaint against Apple

24    qualifies as actual notice, so the damages period begins no

25    later than the date the complaint was filed in this case.

1          You should not award damages for any alleged

2     infringement by Apple occurring after each patent's

3     expiration date, which are as follows:

4          The '053 patent's expiration date is March the

5     5th, 2022;

6          The '072 patent's expiration date is November the

7     23rd, 2014;

8          The '859 patent expiration date is February the

9     5th, 2015 (sic);

10          The '007 patent expiration date is November the

11     23rd, 2014;

12          And the '956 patent expiration date is November

13     the 23rd, 2014.

14          Now, ladies and gentlemen, with those

15     instructions, we will now hear closing arguments from

16     counsel for each of the parties.

17          The Plaintiff may now present its first closing

18     argument to the jury.

19          Mr. Baxter, would you like a warning on your time?

20          MR. BAXTER:  I would, Your Honor.  If you would

21     let me know after 10 and then after -- after 18.

22          THE COURT:  Yes, sir.  I'll do that.

23          MR. BAXTER:  Thank you, Your Honor.

24          THE COURT:  You may proceed.

25          MR. BAXTER:  Thank you.

```
 1              May it please the Court.

 2              Ladies and gentlemen, also, we can't thank you

 3   enough for your patience and your attention for what seems

 4   like a long time now.  We hope that you have enjoyed at

 5   least some of your service here and learned a lot, and we

 6   have enjoyed bringing the case to you.

 7              I think I told you when we started some now two

 8   weeks ago that I had a freshman daughter in college.  She is

 9   from India and very shy.  And I talked to her last night

10   because she was giving her first speech in college

11   yesterday, a persuasive speech, she told me.

12              And I called her to check and see how it went.

13   She told me:  It went great.

14              And I said:  That's good.

15              I told her I was going to give a persuasive

16   speech, I hope today.

17              And she said, Daddy, I've got a hint for you.

18              I said:  What is it?

19              She said:  I found, if you stick to the facts,

20   you'll do a lot better.

21              So I'm going to try to do that and stick to the

22   facts of what we've learned during these last couple of

23   days.  And the first thing we learned is that, in fact, we

24   were going to hear a lot about trusted systems and secure

25   container.
```

1        And we told you that right up front, that we

2   thought they were going to try to pitch this case that there

3   was a trusted system that was Stefik but that they were a --

4   a secure container.  And, in fact, they did it right from

5   the beginning.

6        And remember, they put this slide up in their

7   opening statement, and here's what they said:  Apple's

8   FairPlay is the kind of DRM system that ContentGuard called

9   a secure container in its patent.

10       But there was a problem with that.  And the

11  problem, of course, is that it wasn't true.  And what

12  happened was that when you look at the rest of the quote

13  that we've looked at throughout this trial, here's what it

14  said.

15       It said that to actually have a secure container,

16  that a secure container does not provide any mechanism to

17  prevent legitimate users from obtaining the clear document

18  and then using and redistributing it in violation of the

19  content owner's intellectual property.

20       Now, that's what a secure container is.  And Apple

21  does that.  They absolutely do.  Since 2009, that's how they

22  let their music get out to you over iTunes.  There is no DRM

23  on their music after it comes to your iPhone or iPad.  No

24  usage rights.

25       But for the items that we're talking about in this

case, movies and books and TV shows, they absolutely have

usage rights, and they absolutely do not do --

           If you'll go back, Mr. Diaz, to that first slide .

           -- what their lawyer told you in opening statement

they do, is that they have a DR -- DRM system that's called

a secure container.  That is untrue.

           Go forward, Mr. Diaz.

           And we asked their engineer when he's up on the

stand -- you know what?  I thought he was a pretty honest

fellow.  And we said:  So does FairPlay do what this author,

the author of the patent we just read to you, was describing

as the secure container approach?

           He said:  Well, FairPlay doesn't allow to do that

for movies.  It does allow to do that for DM-free (sic)

books and DM-free (sic) songs.  And there are a few books

and all of their songs.  But for movies and TV shows and

almost all of their books, it's not true.

           As a matter of fact, it was interesting.  Remember

yesterday when I had their damage expert up on the stand,

and I read a portion of his expert report?  It turns out he

had interviewed their infringement -- non-infringement

expert.  Remember Dr. Kelly?

           And I said:  Well, you talked to Dr. Kelly.

           And he said -- and he told you that there was a

non-infringing alternative to the patents-in-suit, and that

1    would be a DRM system using a secure container scheme

2    combined with Cloakware.

3            And the importance of that is a non-infringing

4    alternative means they're not doing it now.

5            So, apparently, before Dr. Kelly got the signal

6    that they were going to tell you in this trial that they

7    were going to do a secure container, he told their damage

8    expert:  That's not what they do.

9            The truth came out.  And, in fact, you've learned

10   throughout this trial that's exactly what they do not do.

11   They do not leave their movies and their TV shows out there

12   unprotected.

13           Well, let's talk a little bit about their

14   infringement.  And you remember that the burden here is by a

15   preponderance of the evidence, and Judge Gilstrap told you,

16   if it tilts ever so slightly, if we prove ever so slightly

17   they infringe, then you must find infringement.

18           We're going to talk about the three integrities

19   and then the two other issues that are at issue here about

20   infringement.

21           Does Apple have physical integrity?  Well, we know

22   that they do, because on the iPhone and the iPads, we know

23   that their content is stored encrypted, that they're

24   protected by account keys and that the Cloakware hides the

25   keys.  And they do everything they can to make sure that

1    that information is protected, and they absolutely have

2    physical integrity.

3            Do they have communications integrity?  Here's

4    what they do.  They encrypt the content.  They send it over

5    the encrypted pipeline.  It's encrypted when it goes to

6    Akamai.  It's encrypted when it ends up on your iPhone and

7    on your iPad, and it's sent over an encrypted network.

8            Of course they have communications integrity.

9    They do everything they can to do that, and that's a

10   checkmark on that.

11           Well, do they have behavioral integrity?  Here's

12   what the Apple document says.  To ensure that all apps come

13   from a known and approved source and have not been tampered

14   with, iOS -- that's their operating system -- requires that

15   all executable code be signed using Apple-issued

16   certificate.

17           Now, that's what they printed and gave to the

18   world; that if you're going to have -- Apple-issued

19   certificates are going to be required for all executable

20   code, which is the code that comes down to your phone and

21   your iPad.

22           Of course, they have certificates that come down

23   to your phone, and they have to put it in writing, and they

24   did.

25           Well, the fight -- it turned out to be on their

1    servers, and we finally learned that the last hop of all the

2    updates is over a system using rsync and using SSH, which is

3    a pipeline that is secure and encrypted.

4           And you heard Dr. Martin tell you uncontradicted

5    that before they can send those updates over that secure

6    line, they have to send a digital certificate.  The whole

7    purpose of this digital certificate is to make sure that the

8    person that gets it can trust the person that sends it.

9    That's the whole purpose.

10          And that's exactly what Apple does, and they

11   absolutely have behavioral integrity.

12          The next issue, of course, is usage rights.  Do

13   they, in fact, have usage rights?  They at one point told

14   you they didn't have it.  Well, that didn't last very long.

15          Once Dr. Tribble got on the stand, he said:  Of

16   course we have usage rights.

17          Once Mr. Fasoli got on the usage rights -- on the

18   stand, he said:  Of course we've got usage rights.  He said:

19   Rules and usage rights are exactly the same thing.  That's

20   how Apple looks at it.

21          And if you look at the face of their phone, they

22   absolutely have usage rights.  You can tell -- and we looked

23   at their screenshot -- that they have usage rights right on

24   the front of it.

25          I said:  What's this black triangle?

```
1              He says:  It's a manner of use.

2              I said:  What's this 23 hours?  Is that a hint?

3    Is that a suggestion?

4              He said:  No.  It's absolutely a usage right that

5    is placed on the phone because the movie producers say it's

6    got to be there.

7              Remember we did the demonstration?

8              May I have the ELMO, please, ma'am?

9              If you were to take this iPad and you were to put

10   it as we did with a movie on it, and I would just hit the

11   movie and ask it to play, it's going to ask me:  Do you want

12   to rent this movie?

13             And I say:  Okay.  And it's going to come up and

14   let me rent the movie with all the usage rights right there

15   on the movie.  That's what it does.  It won't let me play

16   this movie unless the usage rights are on it.

17             And that's how it's set up.  It will not work any

18   other way.  Of course it's got usage rights, and we

19   presented that to us.

20             All right.  Let's talk about meta-rights just a

21   moment.

22             We didn't talk a lot about meta-rights during the

23   trial, but here's what it consists of.  Meta-rights are

24   patents that allow you to share among the family members.

25   It's called the sharing rights patents.
```

1          THE COURT:  Ten minutes have been used.

2          MR. BAXTER:  Thank you, Your Honor.

3          These patents, we only had one of them.

4          Let's go to the next one.

5          And it allows the studios to set the meta-rights.

6  And you saw Dr. Martin, when he got on the stand, fill out

7  the chart.  The chart that the movie studios sends to Apple,

8  that's how it works.

9          Now, remember there wasn't even a validity

10 challenge to this.  They didn't have a single word to say

11 about it.  Absolutely nothing.  And that's how the patent

12 works, and that's exactly how it works in the Apple system.

13         Well, there are certain excuses that Apple has,

14 and you've heard about all of these.

15         And the first one is they said:  Well, there's no

16 physical integrity because you can get access to

17 information.  And here's what they pointed to.  You could

18 get an encrypted file.

19         Now, the question is when the patent says that

20 you're going to have physical integrity if you protect the

21 information.  My question to you is:  If that's To Kill a

22 Mockingbird, and that's all you can get right there, did you

23 get information?

24         And the answer to that is:  No, you didn't.

25         And that excuse simply doesn't work.  And that was

1    their sole excuse about why they didn't have physical

2    integrity, because they said:  Well, every once in a while,

3    we could get an encrypted file.  But you didn't get

4    information.  You got an encrypted file.  And that doesn't

5    work.

6            Well, then they said:  Wait a minute.  There's a

7    communication integrity problem, because you can -- you --

8    you can't get the communication because you're going up to

9    the Akamai server, and that isn't safe.

10           And we asked their engineer:  Now, as far as

11   FairPlay is concerned, FairPlay has -- from FairPlay -- from

12   FairPlay's point of view, Akamai is not relevant to how

13   Apple's DRM system protects content; is that true?

14           And he says:  That is correct.

15           So when you start hearing a lot of excuses about,

16   well, we're going to communicate with FairPlay, what does

17   their engineer say?  It's not relevant.  As far as how

18   FairPlay protects Apple's content, it simply doesn't matter.

19           Well, what's the next excuse?  The next excuse

20   they said was:  Wait a minute.  On that behavioral

21   integrity, you've actually got to stick the certificate

22   inside the software disk because it said "included."

23           And I thought that probably Dr. Goodrich had the

24   best example I had heard lately of batteries included.  If

25   batteries are included and you put them in the box, that's

1   exactly what the language of that claim said.

2          And the Judge says, if he didn't define it, you're

3   to use the plain meaning.  And the word "included" is not

4   defined.  You're to use the plain meaning.

5          And what it says is:  If you include it, which

6   means that you send it ahead of the content that you're

7   trying to make sure is, you're telling the server, this is,

8   in fact, trusted material, then that's exactly what they do.

9   They send it ahead.  They say what's coming behind is

10  trusted; it comes from Apple.

11         And remember the whole purpose of that is to tell

12  the receiver it's coming from a trusted source.  And what do

13  they do?  Uncontradicted, they send a digital certificate up

14  that SSH line ahead of the content, ahead of the software.

15  And that's exactly how it's done, and they have behavioral

16  integrity.

17         Well, then the next one is on the usage rights.

18  Is it attached or treated as attached?  And remember we got

19  out the little key fob, and we said:  Well, there's two ways

20  you could think about this.

21         You can take the key, and you can put it in the

22  car and turn it, and it's attached, or I can hit the open

23  button from 25 feet away or a hundred feet away, and it

24  sends a signal, and it does the same thing.  It opens the

25  door, and it's treated as attached.

```
 1              And we heard their expert yesterday say:  Well,
 2    when I read it -- that is the expert -- even though it's got
 3    the word "or" in there, it means exactly the same thing.
 4              Can I see my airplane slide, Mr. Diaz?
 5              You know, it says if you, for example, were going
 6    to take -- figure out how to get from Dallas to Atlanta, you
 7    could fly or you could take the train.  And somehow even I
 8    remember from English in high school that "or" and "and"
 9    don't mean the same thing.  They mean exactly the opposite.
10              So when Judge Gilstrap said it's attached or
11    treated as attached, he meant two different things.
12    Otherwise, it would have been redundant.  It would have
13    meant the same thing.  He wouldn't have said to say it.
14              And, therefore, when it's treated as attached,
15    that means it doesn't have to travel with it.  Nowhere --
16    nowhere in those claims does it say that the usage rights
17    have to travel with the content.  Absolutely noplace.  It
18    does not.
19              Let me tell you where it makes a difference.  When
20    it's on the phone and it's time to watch the movie, then
21    those usage rights are treated as attached, and that's why
22    you're allowed to watch the movie.  If they're not there,
23    you can't watch it.
24              And every Apple witness said that was true.  If
25    they're not downloaded, if they're not there, if they don't
```

1   come down to your phone, if they don't come in that purchase

2   response, if they don't come down, you can't watch the

3   movie.

4           And they sit on your phone waiting for the content

5   to be accessed; that is, for you to press the play button or

6   the read button.  And that's when they spring into action,

7   and they're treated as attached.  There simply is no

8   question about that.  That's actually a silly response for

9   them to say.

10          Well, what about validity?  They only had validity

11  about the Stefik patents.  Remember, that's clear and

12  convincing; that it's somewhere just short of reasonable

13  doubt, beyond a reasonable doubt, and the patents are

14  presumed to be valid.

15          Well, here's why, and you heard Dr. Goodrich talk

16  about this.  Here's why those two references don't make

17  those patents invalid.  There's no trusted repository.

18  There's no behavioral integrity.  There's no communication

19  integrity.  There's no usage rights enforced by a

20  repository.  And there simply was no rebuttal to that from

21  Apple.

22          Next slide.

23          These two patents, you'll see right on the face of

24  them -- in fact, all four patents, the Dyad was considered

25  by the Patent Office, and they didn't combine it with

1   anything else, and they didn't see anything wrong with it.

2           But here's the most compelling part, if you ask

3   me.  The Patent Office said that Dr. Stefik was the Father

4   of DRM.  They didn't have any problem with this.

5           And here's the problem with Dr. White.  Even

6   after -- even after the Stefik patents came out, five years

7   later, in 1999 while at IBM, he's still putting out a

8   product that doesn't work.  Even he didn't combine it.  He's

9   saying it would be obvious to a person skilled in the art,

10  and he didn't do it.

11          So it's hard to understand exactly how it is he

12  claims that a person of ordinary skill in the art would do

13  it when, in fact --

14          THE COURT:  18 minutes.  18 minutes, Mr. Baxter.

15          MR. BAXTER:  Thank you, Your Honor.

16          -- he wouldn't do it.

17          Now, ladies and gentlemen, there simply can't be

18  any question that the Apple system is not using the secure

19  container.  That is not what they're doing.  And they

20  thought that it would be confusing to you and maybe you

21  would go off on the rabbit trail of, well, they're using a

22  totally different system.  It's this secure container

23  system.

24          But, remember, when they get up here and talk to

25  you about this secure container, here's what they've got to

1    talk to you about.

2           At the end of the day, that system has to put all

3    of the content in the clear so that the user, that is me and

4    you, when we have it on our phones, can give it to anybody

5    we want to, and they can read it or play it or listen to it

6    or do anything they want.

7           And it will be interesting to see how they're

8    going to explain how the music has one system, DRM-free

9    music, but their contracts with the movie companies and the

10   book publishers says they absolutely cannot do that, and if

11   they did, their contracts are void, and they can't get

12   another movie, and they can't get another book.

13          So see how they're going to explain to you that

14   they're using the secure container approach when, in fact,

15   their own engineer said they absolutely do not do that.

16   They can't do it.  And the movie companies won't let them do

17   it.

18          I'm going to get to come back in a few minutes,

19   ladies and gentlemen, and explain to you about damages, talk

20   to you about any confusion that Apple may have brought up

21   during their speech, and I'll look forward to talking to you

22   then.

23          Thank you, Your Honor.

24          THE COURT:  All right.  The Defendant may now

25   present its closing argument to the jury.

1          MR. PRITIKIN:  Your Honor, may we approach for a

2    moment before I begin?

3          THE COURT:  You may.

4          (Bench conference.)

5          MR. PRITIKIN:  Mr. Baxter did not fully open.  He

6    did not cover the subject of damages.

7          And, you know, I know courts do these things

8    differently, but my impression would be that he ought to be

9    fully opening on the topics that he's going to address in

10   the remainder of his time; otherwise, there's a little

11   sandbagging that's involved in it.  He shouldn't be allowed

12   to come back and talk about --

13         THE COURT:  The practice in this court is to

14   require him to use at minimum half of his time in his first

15   opening -- his first closing statement, but there's not a

16   substantive requirement in the practice here that he touch

17   every topic.

18         MR. PRITIKIN:  That's fine.  Just want to be clear

19   on that, Your Honor.  Thanks.

20         THE COURT:  All right.  Let's proceed.

21         MR. BAXTER:  Thank you, Judge.

22         (Bench conference concluded.)

23         THE COURT:  Mr. Pritikin, would you like a warning

24   on your time?

25         MR. PRITIKIN:  I would, Your Honor.  Could I have

1    a warning at -- when I have 15 minutes left and then again

2    at 2?

3             THE COURT:  15 and 2, yes, sir.

4             All right.  You may proceed with your closing

5    argument to the jury.

6             MR. PRITIKIN:  Good morning, ladies and gentlemen.

7    On behalf of Apple, I do want to thank you again for your

8    time and attention over the last week-and-a-half.  We

9    understand and are aware of the sacrifices that you make to

10   be here as jurors, and I want you to know that all of us on

11   our trial team appreciate that.

12            In my opening statement last week, I told you that

13   Apple does not infringe ContentGuard's patents.  Now, I'm

14   going to try to focus, in the time that I have with you this

15   morning, on the facts that I think are going to be helpful

16   to you in trying to answer the questions on the verdict

17   form.

18            I said at the beginning that there are two basic

19   DRM systems:  The secure container and the trusted system.

20   And there's no dispute in the case that ContentGuard

21   patented a form of the trusted system.  Apple's FairPlay

22   uses the secure container approach.  And it's not what

23   ContentGuard patented.

24            Even though ContentGuard has the burden of proving

25   infringement in the case, we actually brought you the

1    evidence to show that Apple does not infringe, including

2    knowledgeable engineers like Mr. Fasoli and Mr. Ward, who

3    came to Marshall to explain to you how Apple's DRM system

4    works.

5            No witness from ContentGuard suggested that Apple

6    ever at any time copied anything from ContentGuard.

7            Now, I asked you to pay careful attention to the

8    things that ContentGuard said before the lawsuit and to

9    compare that with what ContentGuard says in the courtroom

10   during the trial.

11           At the time it was getting its patents,

12   ContentGuard said that there were two fundamentally

13   different ways to do DRM and that its locked-down trusted

14   system would not work very well if customers could buy

15   merchandise on computers like Macs and PCs.  But in this

16   lawsuit, they're saying really just the opposite.

17           Now, by contrast, Apple's documents show that as

18   long ago as 2005, it was not interested in a

19   ContentGuard-type system, and that's the same thing we're

20   saying in the courtroom here today.  Steve Jobs wrote in

21   2005, let's not use this DRM, referring to a complicated

22   system of attached usage rights.

23           We showed you the OMA system that's referred to

24   and the article attached to Mr. Jobs' email.  And that

25   article also included a quote from ContentGuard that its

1  patents covered the complicated system that Mr. Jobs was

2  rejecting.

3          Dr. Tribble explained to you when he testified why

4  Apple didn't want to use that sort of system that's

5  referenced in Mr. Jobs' email.  And this document is from

6  2005, ten years ago, long before this lawsuit, and it was

7  written in the ordinary course of business.

8          When ContentGuard contacted Apple over the years,

9  Apple wrote back and explained why it didn't use the

10  patents.  Apple didn't use Stefik's trusted system then, and

11  it's not using it today.

12         Apple uses encryption and keys to control the use

13  of digital works, and those are the critical elements of the

14  secure container approach:  Encryption and keys.  Apple does

15  not use trusted repositories.  It doesn't have usage rights

16  that are attached or treated as attached to the digital

17  works.  And it's really as simple as that.

18         Apple wanted a DRM system that was going to be

19  simple for users.  Otherwise, people wouldn't pay 99 cents

20  for songs.  They'd just keep getting them from CDs and from

21  these illegal sites.

22         It was also important to Apple that its DRM system

23  could be used on many different kinds of devices and

24  computers, including Macintosh computers made by Apple and

25  PCs over which Apple had little or no control.

1          It did not want to restrict iTunes to

2     ContentGuard-type repositories and make people have those.

3     And it needed to work on the Windows PCs because those were

4     and still are the most widely useable personal computers.

5          And Apple couldn't control Windows.  That's

6     controlled by Microsoft that makes the Windows operating

7     system.

8          As Dr. Tribble explained, Apple had to strike a

9     balance between the need for DRM on the one hand and making

10    it convenient for customers on the other.  But you don't

11    have to take my word for it, and you don't have to take

12    Dr. Tribble's word for it.

13         You saw the deposition testimony of Michael Miron

14    who served as ContentGuard's CEO, and he testified that the

15    reason Apple's iTunes succeeded is that Apple got that

16    balance between a DRM system that's too strict and customer

17    use and convenience that they got it right.

18         Can we take that clip, Mr. Simmons?

19         (Video clip played.)

20         ANSWER:  Protected content can be intrusive.  I

21    think it's intrusive considering we don't use it.  I think

22    the general reaction and the marketplace adoption indicated

23    that iTunes really did get that balance right, at least at

24    lunch.

25         Hence, consumers love the convenience of digital

content.  And the design folks at Apple who are pretty good

at this stuff figured out a way to make that not intrusive.

And I think that was the point of this, if I remember.  And

I remember being impressed with iTunes, too, that somebody

finally got the balance right.

(End of video clip.)

MR. PRITIKIN:  Now, the trusted system approach in

the ContentGuard patents is heavy-handed, and it's not

surprising that it's heavy-handed.

As Dr. Stefik testified, the idea, the inspiration

for it originated in the United States military in systems

that were used to protect the government's most classified

information.  And they didn't carry over very well to the

world of Internet merchandising.

When you go through ContentGuard's infringement

case piece by piece, you can understand why the patent

claims don't match with what Apple does.

Now, we've looked at this next slide several

times, but it serves as a good reminder.  If you find that

any claim element is missing in Apple's DRM system, there's

no infringement.

Let me give you one simple example.

Let's put up the next slide.

One of the claim requirements is that software has

to include a digital certificate in order to be installed on

1    the DRM servers.  It has to be in the software.

2              That's what the word "include" means, the software

3    "includes" the digital certificate.  Those are the words

4    we're obligated to follow, and that's behavioral integrity.

5              Mr. Fasoli and Mr. Ward came to Marshall and told

6    you that there are no digital certificates included in the

7    software that is installed on Apple's FairPlay servers.  The

8    FairPlay servers do not require software to include digital

9    certificates in order to be installed.

10             You heard Mr. Baxter just tell you that Mr. Fasoli

11   is a pretty honest fellow.  And those are the determinations

12   you have to make for yourselves.

13             ContentGuard's source code expert, Dr. Smedley,

14   agreed on the stand.  And all by itself -- all by itself

15   that means that it ends this case because none of the claims

16   are infringed if the FairPlay servers don't require that the

17   software installed on them include digital certificates.

18             Well, let's go back to the various claim

19   requirements, and we'll start with repositories.  This slide

20   highlights in blue all of the places in the claims where

21   repositories are required.  They're in every claim.

22             And that means that all of the servers and

23   computers and devices that touch the digital works have to

24   maintain the three integrities to be repositories in support

25   of usage rights.  And far from being able to prove that they

1    all are, ContentGuard can't prove that any of them are.

2            There are seven different servers, computers, and

3    devices that you heard about and that are involved with

4    iTunes and FairPlay.  For Apple to infringe the claims of

5    any of these patents, ContentGuard has to prove that every

6    one of these meets all of the three requirements of the

7    integrities in support of usage rights:  Physical integrity,

8    communications integrity, behavioral integrity.

9            Let's start with the Macintosh computers and the

10   PCs, the general purpose computers, on which users can

11   access iTunes and get movies and books.

12           ContentGuard didn't come close to proving that

13   these qualify as repositories.  You didn't hear any

14   testimony from ContentGuard's experts that Macs and PCs meet

15   the three integrities.

16           You heard Dr. Kelly explain why they lack physical

17   integrity of the kind that's defined by the Court.

18           And you heard Dr. Tribble testify that when

19   designing FairPlay, Apple knew that general purpose

20   computers don't require software to include digital

21   certificates to be installed.

22           People wouldn't want that.  They don't want that

23   on their general purpose computers.  They want to decide for

24   themselves what software they can put on to their PCs.

25           And it wouldn't be practical to design a system on

1  which Macs and PCs had to require digital certificates.  But

2  this was a key part of iTunes, that it would work on all of

3  these general purpose computers.

4        But you don't, again, have to take our word for

5  it.  You can look at the patent itself.

6        Let's look at the '053 patent, one of the

7  patents-in-suit, and this patent says that general purpose

8  computers are not repositories and would have to be

9  significantly redesigned to be repositories.

10        Well, that never happened.  And ContentGuard

11  didn't offer any proof that this happened, that there was a

12  major redesign of PCs, general purposes computers, to turn

13  them into repositories.

14        Now, this patent was filed in 2004, and it issued

15  in 2011.  And these statements are binding on ContentGuard.

16  They never went back to the Patent Office and said:  There's

17  a mistake in this patent.  Let's change these words.  We got

18  it wrong.

19        ContentGuard has utterly failed to produce

20  evidence, let alone meet its burden of proof, that Macintosh

21  computers and PCs meet the requirements of repositories,

22  because they just don't.

23        Now, what does that mean?  Does that mean that you

24  can just chop off the Macintosh computers and the PCs and

25  find that everything else uses the patents and reduce the

1    damages, as Mr. Thomas suggested at one point during the

2    trial?  No, it does not mean that.

3            Because ContentGuard has failed to prove that

4    Macintosh computers and PCs are repositories, the whole

5    house of cards comes falling down.  And let me tell you why.

6            Communications integrity requires that a

7    repository communicate only with other repositories in

8    support of usage rights.

9            Now, since Macintosh computers and PCs are not

10   repositories, then none of the other things that communicate

11   with them in the DRM system are themselves repositories.

12           Remember, that was the basic premise of the Stefik

13   patents, that the repositories communicate only with other

14   repositories when they're dealing with the digital content

15   and the use of it.

16           We know that the Apple servers communicate with

17   Macs and PCs, as do the Akamai servers.  We know that iPads

18   can be used to sync their movies and books with these

19   general purpose computers.

20           And that means that ContentGuard's failure to

21   prove that the Macs and the PCs are repositories is fatal to

22   the entire case.  It means that none of the other devices

23   and servers that communicate with the Macs and the PCs with

24   respect to the digital content meet the repository

25   requirements, so none of them are.

1          One untrusted device in the Stefik system infects
2     all of the others, and the other devices and computers then
3     don't qualify as repositories.
4          The failure of proof on the Macs and the PCs all
5     by itself, all by itself is enough to find that there is no
6     infringement of any of the patents in the case.
7          Well, what about the FairPlay servers?  We know
8     about the software updates for the FairPlay servers do not
9     include digital certificates and that Apple doesn't require
10    them.
11         Again, that ought to be the end of the case all by
12    itself.  All of the Apple witnesses, the engineers who
13    designed and maintained the system, compared that -- you
14    heard it from Dr. Tribble, from Mr. Fasoli, from Mr. Ward.
15         And even, again, ContentGuard's own expert,
16    Dr. Smedley, admitted that he couldn't identify any digital
17    certificates there.
18         ContentGuard's expert, Dr. Goodrich, tried to
19    confuse things.  He said that some of the updates to the
20    FairPlay servers are transmitted over a secure
21    communications channel and talked about digital certificates
22    that are used to set up the channel and tried to confuse you
23    with that.
24         But the basic problem was that he was double
25    counting.  He had already said that the secure

 1   communications channel showed that there is communications
 2   integrity.  And then he looked around and he was trying to
 3   find something that he could say is behavioral integrity.
 4   He couldn't find it because it's not there.  So he went back
 5   and he counted the secure communications channel again.
 6         But there are three integrities, not two.  He
 7   can't use the same thing over again because he admitted that
 8   communications integrity and behavioral integrity are
 9   different.  They're not the same.  And he can't use the same
10   thing for both.  He's missing something, and he's missing
11   something to show that there was behavioral integrity.
12         FairPlay servers don't require software to include
13   digital certificates, and it's as simple as that.  And if
14   you agree, that, too, by itself is the end of the case.
15         What about the iTunes servers?  Again, the
16   testimony of all of the Apple engineers was that the iTunes
17   servers don't require digital certificates, and Dr. Smedley,
18   again, didn't say there was anything wrong with that.
19         So what did Dr. Goodrich do?  Again, he double
20   counted by using the secure communications channel both for
21   communications integrity and for behavioral integrity.
22         Now, for the iTunes servers, Dr. Goodrich also
23   relied on something called the Doctrine of Equivalents, and
24   that's only relevant to the iTunes servers in this case as
25   you heard in Judge Gilstrap's instructions.

1          When a plaintiff can't prove their case of literal
2    infringement and they can't meet the claim requirements,
3    they sometimes fall back on the equivalents argument.  It's
4    basically an admission that the actual claim requirements
5    are not met.
6          There is nothing in the Apple system that is
7    equivalent to requiring software that is used in updates to
8    the iTunes servers to include digital certificates because
9    they simply don't.
10         And what about the Akamai servers?  All of the
11   experts on both sides agree that the Akamai servers are not
12   repositories under ContentGuard's patents.  So the dispute
13   for infringement is whether they need to be repositories.
14   And the answer is that they do.
15         Now, Apple has no reason to require that those
16   repository -- that the Akamai servers be repositories.  The
17   system works fine without them being repositories.  That's
18   what the testimony said that you were shown.
19         But there can't be infringement unless those
20   Akamai servers are repositories.  They're directly involved
21   in the distribution of movies, books, and music.  They're
22   communicating with other commuter -- computers and devices
23   that need to be repositories in connection with the content.
24         If we look at the patent, again, they run away
25   from the language of the patent, but the patent tells us

1    that content is stored in repositories.

2              In the Apple system, it's stored in the Akamai

3    servers, and they're not repositories.

4              And what about Dr. Stefik and Dr. Goodrich?  They

5    agreed that the content, the digital works, have to be

6    stored in repositories.  So there's no dispute that the

7    content is stored on the Akamai servers.

8              So how do they try to get around it?  Well,

9    Dr. Goodrich showed you a slide, and I think we saw it again

10   a few minutes ago, that tried to depict the Akamai servers

11   as routers on the Internet.

12             Now, routers on the Internet are kind of like the

13   plumbing on the Internet.  Those are all the computers out

14   on the Internet that things get channeled through.

15             But he admitted on cross-examination that the

16   Akamai servers are not part of the Internet plumbing, even

17   though they're shown that way on this drawing which is

18   misleading in that respect.

19             And you really have to wonder why he was trying to

20   confuse things when he prepared this slide that purported to

21   show the Akamai servers as just part of the Internet

22   plumbing when he knew they were not.

23             Because the Akamai servers are not repositories,

24   again, all by itself, that's the end of this case, because

25   they have to be or none of the patent claims are infringed.

1          There's another reason why the devices and the

2     computers on which the content is viewed are not

3     repositories.  Apple does not require that books and movies

4     that are downloaded and installed by users include digital

5     certificates.  And every witness in the case who was asked

6     about it agreed that the books and the movies can

7     potentially contain viruses.

8          Dr. Smedley agreed that the iPhones and the iPads

9     do not require movies and books to include digital

10    certificates in order to be installed.  And Dr. Kelly

11    explained to you that this means that they are not

12    repositories.

13         Now, you heard Dr. Goodrich try to explain this

14    one away by arguing the digital movies and books are not

15    software, that they're not software and, therefore, they

16    don't have to include digital certificates.  Again, that's

17    not consistent with the patents.  They're running away from

18    the language of the patents.

19         What the patents say, to the contrary, is that the

20    digital works, like video and audio recordings, are

21    software.  The patent tells us that explicitly.  So the

22    movies and the books need to include digital certificates if

23    you're using these patents, but they don't, and that's

24    another reason why there's no infringement.

25         Now, Mr. Baxter told you that apps that are

1    downloaded -- he showed you a slide on this -- to iPhones

2    and iPads are -- contain digital certificate.  Again,

3    they're trying to confuse you.  The apps are not accused of

4    infringement in this case.

5            And the problem is the books and the movies,

6    because all of the software that are downloaded have to

7    include digital certificates, and they don't.  Again, all by

8    itself, this one aspect of it dooms ContentGuard's case.

9            Now, I want to turn next to the second critical

10   element of the ContentGuard patent claims which are the

11   usage rights that have to be attached or treated as attached

12   to the digital works.

13           And the patents, we know that usage rights are

14   attached to the digital works when they're put into the

15   first repository.  And that way all of the later -- the

16   downstream repositories that get the digital works get the

17   usage rights, too, so they know what they can do with them.

18   And the usage rights are enforced by the repositories.

19           In Apple's system, of course, there are

20   restrictions on what users can do with the content.  That is

21   a false issue.  Of course, there are restrictions on what

22   they can do with it.  But Apple doesn't enforce them with

23   usage rights that are attached or treated as attached to

24   movies and books.

25           In Apple's FairPlay system, it's the keys that

1    indicate the manner in which you can use the movies and

2    books.  And in particular, you need an account key to view

3    purchased content, and you need a rental key to be able to

4    view a rented movie.  It's the hallmark of the secure

5    container.

6            The rental key is what controls how long you can

7    watch the movie, the duration.  All of the witnesses on both

8    sides who were asked about this agreed that without the

9    account or the rental key, it is impossible to view content.

10           Now, this is one of the most important points in

11   the whole case, and I want you to remember it when you

12   deliberate and to think about it.

13           Not a single witness for ContentGuard testified in

14   this courtroom that the account key or the rental key is a

15   usage right.  Dr. Goodrich never said that the account and

16   the rental keys are usage rights nor did Dr. Martin nor did

17   Dr. Smedley.  But those are the things in the Apple system

18   that are used to control what people can do.

19           Now, that was not a mistake or an oversight.  And

20   there are two reasons why ContentGuard did not want to argue

21   to you that the account and the rental keys are usage

22   rights.

23           First, if they tried to read the patents in that

24   way, they knew the patents would be invalid because the use

25   of keys to control decryption and the use of content was out

1    there before Dr. Stefik.

2           And second, we know that the account and the

3    rental keys cannot be sent with the movies, so they couldn't

4    be regarded as attached.  They can't be sent with movies

5    when they're transferred from one Apple device to another.

6           You remember yesterday, we looked at this contract

7    from Sony -- between Sony and Apple.  And the contract

8    prohibits Apple from transferring account keys with movies.

9    It actually says you cannot transfer the account key with

10   the encrypted movie file.

11          So ContentGuard knew that it would never be able

12   to prove that account keys were attached or treated as

13   attached to the digital work.  They were desperate to find

14   something they could say was a usage right and that's

15   attached or treated as attached to the digital work.

16          Now, remember, a usage right has to include, under

17   the Court's construction, a manner of use, and that's how

18   the work can be used.

19          In the end, Dr. Goodrich identified just two

20   things that he said were manners of use and the critical

21   part of the usage right, and that's kind of what his whole

22   argument came down to, two fields of information that are

23   sent to a user's device in a purchase response when they buy

24   or rent a movie or book.

25          You heard quite a bit about these two pieces of

1    information.  One is the "kind" field, and the other is the

2    "isRental" field.

3            Now, remember that usage rights have to be

4    enforced by repositories.  They don't just sit there.  They

5    have to do something.  And they have to enforce or control

6    playback.  They have to permit the playback or control it in

7    some way.

8            When ContentGuard was presenting its case,

9    Dr. Goodrich and Dr. Smedley testified that these two fields

10   are enforced and are used in FairPlay to control or permit

11   the playback of movies.

12           You may remember, Dr. Smedley showed you

13   confidential Apple source code.  It was on green paper that

14   he said was used for that purpose.  Dr. Goodrich's

15   conclusions were based on what Dr. Smedley told him.  And so

16   he had no independent way of knowing how the source code

17   worked.

18           Well, it turned out that Dr. Smedley made a

19   mistake.  The information in those two fields does not

20   control whether the content can be viewed.  It's there for

21   entirely different reason.

22           Mr. Fasoli, who is more familiar with the Apple

23   code, showed you the same source code.  And he testified

24   that the fields that Dr. Smedley had pointed to are not used

25   to control or permit the playback of the movie.

```
 1          Mr. Fasoli testified about the "kind" field, and
 2    he testified about the "isRental" field.  The information in
 3    those fields is used to organize the things you buy for
 4    convenient display.  Books are with books.  Rentals are with
 5    rentals.
 6          That is not DRM.  That has nothing to do with
 7    ContentGuard's patents, which involve controlling or
 8    restricting whether you can view it or play it.
 9          THE COURT:  Fifteen minutes remaining, Counsel.
10          MR. PRITIKIN:  Thank you, Your Honor.
11          Mr. Fasoli testified that you can even delete the
12    information in those fields, and you could still play the
13    movie or read the book.
14          Now, ContentGuard never brought Dr. Smedley back
15    in its rebuttal case to explain the mistake he had made.
16          In the rebuttal case, Dr. Goodrich finally
17    admitted that those fields are just used for presentation
18    and organization, not for controlling whether you can watch
19    the movie or read the book.  And, again, at that point,
20    ContentGuard's case collapsed.
21          The things that ContentGuard pointed to and that
22    they argued are usage rights are not usage rights at all.
23    The use of content in FairPlay is controlled with the
24    account and the rental keys.  And ContentGuard has never
25    contended that those keys are usage rights.
```

1          What this shows is that Apple's system is just
2    fundamentally different from the way the ContentGuard
3    patents work.  And the ContentGuard patents can't be
4    stretched or twisted or manipulated to cover FairPlay.
5          Even if the purchase response included usage
6    rights, the information that Dr. Goodrich pointed to is not
7    attached or treated as attached to the books and movies.
8          What does attached or treated as attached mean?
9    In the digital world, you may be familiar with email
10   attachments.  And if you send an email, the attachment
11   starts out and goes along with it.
12          And they stay together so that they're attached or
13   treated as attached.  And that's what you talk about in the
14   digital world, which is what we're dealing with here.
15          In contrast, if you have two files that are saved
16   on your computer, they're not attached or treated as
17   attached because -- simply because they're on the same
18   computer.
19          With FairPlay, we know you can transfer a movie
20   from one computer to another, and there are no rights that
21   go along with it.  They're not attached or treated as
22   attached.
23          Dr. Goodrich agreed that a mere association or a
24   reference from a digital work to the rights is not enough.
25   And in the end, that's all he had.

```
 1              I also want to mention the '053 patent.  And this
 2   has been referred to as the meta-rights patent, and it
 3   contains the same repository and usage requirements.  And
 4   Apple doesn't infringe this for all the same reasons.
 5              But Apple also does not use -- utilize the
 6   meta-rights in the system.  And these would be the kinds of
 7   rights that would be given by a distributor to Apple and
 8   that Apple, in turn, could give to its customers, but these
 9   were read by Dr. Martin in a nonsensical way where the
10   meta-rights were created by Apple itself, given to Apple
11   itself, and exercised by Apple itself, and that's not what
12   the patent is about.
13              So in the end, none of the claims in these patents
14   are infringed.  And every one of these requirements is
15   separate and independent.  Apple does use the secure
16   container approach.
17              ContentGuard has --
18              Can we put up the Slide 30, Mr. Simmons?
19              ContentGuard argues that in the secure container
20   approach, the document is in the clear once it's fully
21   decrypted.
22              Now, I told you in the opening statement that all
23   of our witnesses have confirmed that this is a potential
24   vulnerability in the secure container system.  Apple has
25   worked hard to solve the problem and to keep documents from
```

1    being in the clear even though it uses the secure container

2    approach.

3            They purchased Cloakware to hide the keys so that

4    hackers would have a difficult time finding them.  And it

5    makes it harder for the digital work then to be encrypted by

6    the end user.

7            But as Mr. Fasoli said, if a hacker gets the keys

8    and decrypts the document, it's in the clear, it's in the

9    open.  And that goes with the territory when you have an

10   encryption and key system.

11           In addition, Apple tries to decrypt just a few

12   frames at a time so as little is in the clear as possible.

13   As I said, Apple's engineers worked hard to minimize the

14   problems in the secure container system, but that's what

15   they use.

16           Now, can we put up the -- yeah, that's it.

17           The -- you heard about a license Apple has to

18   patents owned by a company called InterTrust.  And if you

19   look at this article written by the folks at Xerox, they

20   describe the secure container approach and they listed

21   InterTrust as an example of that, and that's why Apple paid

22   for a license from InterTrust.

23           Now, I also talked about the validity of the

24   patents in my opening statement, and we do have a clear and

25   convincing burden of proof on that, and we believe we

1    brought you evidence that is clear and convincing.  You are

2    the final authority in our system and are entrusted to

3    decide whether patents are valid or invalid.

4         We brought you evidence, including Dr. Steve

5    White, who began working in this field over a decade before

6    Dr. Stefik.  In 1987, he wrote a paper that explained his

7    invention, and he also told you about subsequent

8    improvements to his DRM system that were described in an

9    article by Tygar and Yee, and all of this was before the

10   Stefik patents.

11        Now, even Dr. Stefik's colleagues at Xerox

12   acknowledged that Dr. White invented a DRM system before

13   Dr Stefik.  We looked at this document a number of times

14   during the trial.

15        And it says right in it, the trusted system

16   approach, giving these examples, Stefik, Tygar, and Yee, and

17   White.  And they're pointing exactly and identifying White

18   and Tygar and Yee as coming -- having come up with trusted

19   systems before Dr. Stefik.

20        So there's really no question that White and Tygar

21   and Yee designed these before Dr. Stefik.

22        I want to talk for a few minutes about damages,

23   not because there's a question about whether Apple

24   infringes, but because we think it goes to the credibility

25   of the Plaintiff's case.  If you agree with us that there's

1    no infringement, then the damages are zero because

2    ContentGuard is not entitled to money.

3             As you have heard, damages in a patent case are

4    determined by a reasonable royalty, what would have been

5    negotiated in this case in 2005.

6             ContentGuard is asking you for almost a billion

7    dollars for five patents, four of which have expired.  And

8    you heard how they hired three experts to come up with this

9    theory.

10            You heard about the surveys that Dr. Prince did --

11   came up with numbers that people would pay $78 to download

12   movies to watch them on iPhones, and yet you heard from

13   witnesses in the case it isn't that common for people to use

14   iPhones to watch movies anyway.

15            He also asked people what they'd pay to have

16   Google Play on Google Android devices as part of this

17   survey.  They came up with a different number for the Google

18   Play.  And he admitted on the stand that he would never

19   apply these results to Apple devices.

20            But when he handed his survey results to

21   Dr. Teece, Dr. Teece did exactly what Dr. Prince said he

22   shouldn't do.  He took the Google Play number and then

23   applied it to Apple devices.  And he did all of this despite

24   the fact that the Google Play system doesn't infringe the

25   ContentGuard patents.

1          Now, let's pause for a moment on that.  Google has
2     a huge and successful business of selling and renting
3     digital works online, movies, books, videos, songs.  They
4     have a DRM system to protect the works.  You heard that
5     Google's DRM system does not infringe the ContentGuard
6     patents.  The ContentGuard witnesses and experts admitted
7     that.
8          And what that tells you is that there are ways to
9     have DRM without using ContentGuard's patents, and that's a
10    critical assumption that Dr. Teece made that you couldn't do
11    it without infringing these patents.  It's not true.  Google
12    has a system that doesn't infringe the patents.
13         So what is the real-world evidence?  And we have
14    quite a bit of real-world evidence, and we've put on the
15    slide, tried to summarize that real-world evidence.
16         We know there are other license agreements that
17    have been entered into.  They show what people paid to get
18    rights to hundreds of ContentGuard patents worldwide.
19         Now, remember, there is no evidence in this case
20    that any of these licensees are actually using the five
21    specific claims that are asserted in this case.  They paid
22    these amounts for the rights to hundreds of patents
23    worldwide.
24         You may see slides from Mr. Baxter that take these
25    numbers and manipulate them and distort them, but these are

1  the numbers -- the actual numbers that appear in those

2  agreements.

3          ContentGuard tried to run from these licenses, but

4  these represent the real-world arm's-length transactions.

5  They tried to pass them off saying they're for feature

6  phones, not smartphones.  But that isn't true.  These

7  licenses granted the right to make smartphones and lots of

8  other things.

9          ContentGuard tried to tell you that there are

10  per-unit rates in these licenses, tried to imply them.  But

11  the witnesses admitted that they're not there.  And the

12  per-unit rates that are there had never actually been paid.

13  The amounts are much lower.  These are the amounts actually

14  paid.

15          Apple's internal cost information is also shown,

16  and this is the cost of the Cloakware license and of

17  developing the DRM technology -- Apple's cost to develop it.

18  And this gives you a sense of what it's worth to companies

19  to have and develop DRM technology in the real world.

20          And we see the number 16 million and 30 million.

21  16 million is what ContentGuard internally valued an Apple

22  license at back in 2005, the relevant time, and they valued

23  it at 30 million in 2008.

24          And this was done a year after Apple had launched

25  the iPhone and five years after Apple launched the iTunes

1    Store.  So this is with full knowledge of what it is that

2    Apple was doing.  And this was put in a report to

3    ContentGuard's board of directors.

4           Now, ContentGuard and its new owner, Pendrell,

5    asks you to ignore it because it completely undermines the

6    billion-dollar claim they've talked about in this courtroom.

7           ContentGuard ignores the real-world evidence so

8    that they can give you this grossly inflated number.  And I

9    ask you to think, what does that tell you about the other

10   things that they've been saying in this case?

11          Now, there should be no damages because Apple does

12   not infringe and because the patents are invalid.  But if

13   you do award a reasonable royalty, I submit that you have

14   real-world evidence to guide you.

15          You could go on the low end of this scale and

16   award something like what Dr. Prowse pointed to, what Apple

17   would pay for the patents in the 2 to 3-million-dollar range

18   for the rights to that, or you could go with what

19   ContentGuard described that it would willingly take from

20   Apple in 2008 in a presentation to its own board of

21   directors, or you could find a number in between that you

22   considered reasonable.

23          Last week I told you that in the end, ContentGuard

24   hopes that you're going to throw up your hands and find that

25   Apple infringes because it has a DRM system, and you heard

1    plenty of that from the other side.

2            You heard them say that Apple's FairPlay system is

3    trusted and secure.  You heard them say that it is

4    unimaginable that Apple doesn't have good security.

5            And that's exactly what I expected them to tell

6    you because they can't prove the infringement case, which

7    has to be done, by the claims and the requirements and the

8    instructions we get from Judge Gilstrap.

9            FairPlay is different, and I submit that if they

10   could match the claims of the ContentGuard patents to what

11   Apple does, they wouldn't be arguing that FairPlay infringes

12   because it's a good system or a secure system or it works.

13           Now, the way our system works, Mr. Baxter's going

14   to get another chance to talk to you this morning, and I'm

15   not going to get a chance to respond to what he tells you in

16   the next 20 minutes.

17           THE COURT:  Two minutes remaining.

18           MR. PRITIKIN:  Thank you, Your Honor.

19           But I would ask you as you listen to what he says

20   in the next 20 minutes, keep in mind and ask yourself:  If

21   David Pritikin had a chance to respond to that, what would

22   he say?

23           This case is important to Apple.  Apple doesn't

24   take charges of patent infringement lightly.  And if you

25   look at the actual requirements of ContentGuard's patents,

1   if you think about the different ways that Apple's products

2   work, and if you apply the law as Judge Gilstrap has

3   instructed you, we're confident that you will conclude that

4   Apple does not infringe, and we ask you to return that

5   verdict.

6          Thank you, once again, for the time and the

7   attention that you have devoted to this case, and thank you

8   for your service as jurors.

9          THE COURT:  All right.  The Plaintiff may present

10  its final closing argument to the jury.

11         You have 20 minutes remaining, Mr. Baxter.  Would

12  you like a warning on your time?

13         MR. BAXTER:  Yes, at 10 and 2, Your Honor, if the

14  Court pleases.

15         THE COURT:  10 and 2.

16         MR. BAXTER:  Thank you.

17         THE COURT:  You may proceed.

18         MR. BAXTER:  Thank you, Your Honor.

19         May it please the Court.

20         I want to try to get to -- back to some facts,

21  Your Honor -- Your Honor, and ladies and gentlemen of the

22  jury, if I can, and let's see where we can start.

23         Let's start, first of all, with whether or not the

24  software has a digital certificate.  Remember, he said,

25  well, the content doesn't have a digital certificate so we

1   lose right there.

2          Can you get me up the Fasoli quote, please,

3   Mr. Diaz?

4          Well, we asked their engineer about this, and

5   here's what he says, and it's going to appear on your screen

6   here in just a second.  I'm going to go ahead and start

7   reading it.

8          So it's got to be there, that cryptographic

9   signature, that digital signature that accompanies a movie,

10  a TV shows, or a rental movie has to exist for FairPlay to

11  allow the consumer to play that movie, TV show, correct?

12         Here's what he said:  Yes, it has to be there.  It

13  has to be valid for the movie to play.

14         Listen to this:  So all the content, TV shows,

15  movies, rental, or purchased to be played have to be

16  accompanied by a digital signature when they arrive on the

17  consumer's device, correct?

18         Now, Mr. Pritikin would tell you the answer to

19  that question is no, and we lose.  But instead, his engineer

20  said:  Yes, that is correct.

21         Can you get that up, Mr. Diaz?  Do you have that

22  quote?

23         All right.  Well, that's what he said.  When we

24  asked him:  Do you have to have a digital signature for all

25  the content?  He said:  Yes.

1          Now, that's the end of that story.  Their engineer
2    said you had to have a digital certificate or it won't play.
3    And of course, that's absolutely true.
4          Let's talk about Akamai just a moment.  We already
5    know that he's told us that Akamai is irrelevant to how DRM
6    handles the Apple system.
7          He also told us this:  He said, how long have you
8    been at Apple, sir?
9          He said:  For over ten years.
10         How many times have you seen anybody compromise
11   Akamai and insert malicious code in the movies that a
12   customer got downloaded?
13         What'd he say?  Never.  Never.
14         Akamai, as you heard Dr. Goodrich say, is just out
15   there on the Internet.  And it uses Akamai just to cache the
16   movies.
17         Well, then his next point was:  Well, the patents
18   require you to have storage, that the repositories storage.
19         And we asked him this:  And I believe we heard
20   earlier testimony in this case that Apple has about 1.25
21   petabytes, I think that was, was the name of the information
22   that stores for its DRM-protected content.  Does that sound
23   about right?
24         That sounds about right.  Again, I'm not the
25   expert in that area, but that sounds about right.

```
 1              And that's stored on computers that Apple owned
 2  and controls at Apple's headquarters, right?
 3              Well, certainly not the distribution copies.
 4              The originals are stored there, right, sir?
 5              Yes, that's correct.
 6              So what does Apple do about storage of its
 7  content?
 8              They store them on servers that are iTunes
 9  servers.
10              Those Akamai servers, as he said, are irrelevant
11  to the DRM-protected content.  They simply don't make any
12  difference.  They store the original movies right there on
13  the iTunes Servers.  So -- so much for servers -- storage
14  and so much for software.
15              And then he said:  Well, it's not attached or
16  treated as attached.  And I kept waiting for him to explain
17  if that were true, why the Judge said "or."
18              You remember the slide -- can I see the slide,
19  Mr. Diaz, with the plane and the train?
20              Do you remember?  I said:  You can go to Atlanta
21  on the plane or you can go on the train.
22              The Judge said attached or treated as attached,
23  and it will not work if those usage rights are not treated
24  as attached to the content.
25              And I kept waiting for him to explain why his
```

1    expert said those are exactly the same, and I heard no

2    explanation.  And of course, the reason is they simply are

3    not the same, and that's not the way that it works.

4           Well, then I heard this new topic about:  Well,

5    the Macs and the PCs aren't trusted repositories and

6    therefore your whole case falls.

7           Now, remember, the Judge told you that they've got

8    to be trusted repositories when they're used in conjunction

9    with usage rights, when they're enforcing usage rights.

10   That's when they've got to be trusted repositories.

11          Well, when are they trusted repositories in

12   conjunction with this case?  And that is when they're using

13   the content off iTunes.

14          Well, when they're connected to the iTunes Store,

15   then they are trusted repositories, and here's the reason

16   why.  Because they're connected over an SSL.  They're

17   connected over a secure line over the iTunes Store because

18   that's how iTunes works.

19          The iTunes software is installed with digital

20   certificates.  That's how you know they're a trusted --

21   repository.  The rest of the time it doesn't make any

22   difference.  The rest of that software that's on the

23   computers doesn't count.

24          If they're doing some sort of spreadsheet, it's

25   not using something in conjunction with usage rights, and

1    that's why it doesn't make any difference.  But when it's

2    using content from the iTunes Store, it is a trusted

3    repository.  And now we're through with that.

4           Well, then he told you, well -- here's his last

5    one, the isKind -- "isRental" and the "kind" fields, he said

6    that Dr. Goodrich said:  Well, that's all I got, and

7    therefore you lose.

8           Well, here's the problem with that.  What

9    Dr. Goodrich really said is for the "isRental" field, those

10   numbers in the "isRental" field are exactly the same number

11   that are on the keys.  There's no difference.

12          And that he further explained to you that the

13   usage rights are enforced on the RentalBag, which is exactly

14   what he said both on direct and when we got up here in

15   rebuttal, that that's what enforces it is exactly the same

16   numbers, and they're enforced in both places.

17          As far as the "kind," which you saw there was a

18   trick where the engineer says:  Well, look, I'm going to act

19   like a hack -- hacker.  I've got special tools that nobody

20   else has.  I'm going to eliminate the fields and show it

21   doesn't work.

22          The problem is that the "kind" fields uses iTunes

23   to enforce as the usage right.  Dr. Goodrich never said the

24   "kind" field by itself does it.  What he said was that the

25   "kind" field, along with iTunes, enforces the usage rights,

1    and that's exactly what happens.

2            In the Apple system, those two fields, along with

3    the Rentalbag and the iTunes Store, enforces the usage

4    right, and you know that's happened because we saw it on the

5    phone.

6            You can pick up the phone, rent the movie,

7    purchase the movie, and you see the usage rights appear on

8    your phone.  They aren't suggestions.  They aren't hints.

9    It's actually what happens when you use the phone to enforce

10   the usage rights.  And if he didn't enforce the usage

11   rights, it won't work, and the movie studios won't let you

12   do it.

13           And then they said:  Well, we had that Internet

14   license -- that InterTrust license that they paid

15   $124 million for.

16           They said:  Look, that's what we used.  You know

17   what they needed the InterTrust license for that they

18   refused to take for seven years?  DRM-free music.

19           They finally said:  Well, if we're going to use

20   DRM-free music, we've got to have the InterTrust license

21   because that is a true secure container.

22           And I kept waiting for him to explain in the

23   secure container which says in the patents that the user,

24   me, you, can use it -- it's in the clear because that's what

25   he promised you when he started this case.

1          Not one word about it, not one.  Never explained

2     to you why he tried to trick you and fool you up front by

3     saying it was the secure container.  But at the end of the

4     day, it turned out not to be true because that's what

5     they've been trying to prove the whole time.

6          Well, those excuses didn't work.  So finally, he

7     said:  Well, damages, maybe -- maybe you won't penalize us

8     because the numbers are big.

9          Now, here's the situation that we're in.  The

10    Judge tells you that you're bound by the Georgia-Pacific

11    Factors and that you are to assume that the parties met in

12    2005, that they have all of this knowledge about what's

13    going to happen in the future, and the patents are valid and

14    infringed and they can't leave their room until -- room

15    until they cut a deal.

16          And here's what the Apple guy told you.

17          THE COURT:  Ten minutes remaining.

18          MR. BAXTER:  Thank you, Your Honor.

19          I believe the number ought to be what it costs to

20    buy the chainsaw that cut all your trees down.  Now, that's

21    what it amounted to.

22          We've taken your patent -- I'm sitting here in the

23    room saying:  I took your patent.  I'm saying your patent is

24    valid.  I'm saying that I'm not going to leave until we make

25    a deal.  And by the way, I only pay 195 for the chainsaw,

1    and I think that's fair.  And you ought to take it because

2    I'm Apple.  Now, that's what he said in this case.

3              Oh, he said one more thing.  He said:  By the way,

4    I've got this great idea about how I could walk or fly in a

5    bag, the update over to North Carolina and over the 10 or 15

6    years, that would cost about a million two and that'd be

7    fair.

8              Now, that tells you about their case right there.

9    It really tells you that all of their non-infringement came

10   down to this.  That's what they had their guy say.  I'm

11   going to fly it on a plane.

12             You know, if I could sing, I would have broken out

13   to I'm Leaving on a Jet Plane.  That's what I would have

14   done, because that's what they said.

15             How silly is that?  I believe it's the silliest

16   thing I've ever seen an expert say in my 45 years of trying

17   lawsuits, that they're going to take that precious cargo of

18   theirs and for 10 years they're going to fly it on a plane

19   to North Carolina and hope it gets there.

20             But that's really what their non-infringement case

21   boils down to.  They hoped they could hunt that one, and it

22   didn't work, and so they gave it up, and you didn't hear

23   anything about it in that closing statement, did you?

24             Well, here's what they really said:  I want to

25   give you less than a quarter of a penny for each of the

1    infringing devices and pieces of content that we have taken
2    in violation of your patents.  They're sitting there in the
3    room with the patent being valid and infringed telling us
4    that.
5           Here's what the facts are.  The rate card -- the
6    rate card that ContentGuard had at that time would give us a
7    number that was $259 million if we just got our rate card,
8    which is a whole lot more reasonable.
9           If we had gotten the rate that we'd gotten on one
10   of our other licenses, it'd be 314 million.  If we'd gotten
11   the rate we've gotten on another one of our licenses, it'd
12   be 335 million.
13          And if you look at the entire panoply of rates
14   that we've gotten and apply it to the Apple devices -- it'd
15   be 259, 312, 314, 335 -- the 882 doesn't seem out of line,
16   and that doesn't even take into consideration the Amazon
17   license of which they didn't want to talk about because you
18   heard what that rate was, and that would make the bars even
19   go higher.
20          Now, ladies and gentlemen, at some juncture, even
21   Apple has to come to heel about taking somebody else's
22   property, even Apple.
23          And they want to make fun of the number because
24   it's so big, and it is a big number, and I know it's a big
25   number, and I told you that up front.

1          But as we looked at those slides of cutting down

2    those trees and we talked about that during voir dire, we

3    talked about was it fair to cut down the trees and pay you

4    for one of them or half of them or two-thirds of them, and

5    each -- each of you told me that wasn't fair.

6          Now, I know the number is big, but I'm not ashamed

7    of that because Apple has used our patent in such a way as

8    to make themselves the largest technology company in the

9    world by using content.

10         And you saw those quotes from Jobs and from their

11   executives saying how incredibly important it was.  They

12   wouldn't have even gotten the iTunes Store off the ground if

13   they didn't have DRM-protected content.  And you saw all of

14   the contracts from all of those movie companies saying, if

15   you don't have DRM-protected material, you're not going to

16   get our movies.

17         Mr. Diaz, could I see one of those ads?  Let me

18   see the ad that -- that's got the -- the pop-out.

19         Here's their latest ad.  Here it is without us.

20   Great phone.  It's the Apple iPhone 7.  Better reception,

21   better email, better text, and less clutter because you

22   don't have any movies, you don't have any books, and you

23   don't have any TV shows, and you've got a lot more storage.

24         Now, don't you have a picture of that coming on

25   your TV screen that Apple's going to tell you that that's

1    their latest phone?  Good reception, great screen.  By the

2    way, you don't get this content.

3           Let me see the next one, Mr. Diaz.

4           He talked to you about Google, and he said:  Oh,

5    well, the Google -- the Google Play doesn't infringe.  And

6    we asked Dr. Tribble if he was going to put Google on his

7    phones, and basically, it was not in my lifetime.

8           We had a picture of this phone and the ad, all the

9    latest features.  Has a wonderful Android movie feature

10   straight from Google.  Just like Samsung, except you can't

11   download a movie directly from the app.

12          Remember when we showed you that demonstration and

13   you couldn't download from the app?  You can eventually get

14   it on your iPad or your phone.  It just takes you 14 steps.

15          Now, that's what they're left with, ladies and

16   gentlemen.  And for that -- for them not to be able to do

17   that, we're asking they pay a buck 75 for the phone one

18   time.  Not every time you download a movie or a book.  One

19   time.  That's all.

20          And they want to blame us because they've sold so

21   many of them.  And they say:  Well, we're too big to pay.

22   That's too much money.

23          Ladies and gentlemen, I'm here to tell you that

24   that's not right, that that's not how the system works.  And

25   when you take somebody's property, when you deliberately

1    take it, that's just not how it works.

2              There's another question, and I want to go over

3    the questions with you if I can.

4              Mr. Diaz, can you show me the verdict form?

5              Here's how it works.  The Judge is going to give

6    you a verdict form, and my suggestion to you is that when

7    you get to it, the very first question has to do with

8    infringement and asks if they infringe, and the answer to

9    each one of those questions on No. 1 is yes.

10             When you get to No. 2, it's going to ask you:  Are

11   the claims invalid?  And the answer to all of that is no.

12             Now, remember what the invalidity evidence is,

13   that Dr. White comes up here and says, oh, if you take my

14   efforts and you combine it later on with somebody else's,

15   it's obvious.

16             The problem is it was so obvious that he couldn't

17   even do it.  Five years later, he couldn't do it.  And

18   neither could anybody else.  And everybody in that field up

19   until 1994 was struggling how to do it, and nobody could.

20   But Dr. White now, 20 years later with lots of hindsight,

21   says, oh, it was very obvious.

22             THE COURT:  Two minutes remaining.

23             MR. BAXTER:  But in 1999, he couldn't do it.

24             Next question.

25             These are the numbers.  I suggest you write 882

```
 1    and a reasonable number in Question 3.

 2            And the next one, ladies and gentlemen, has to do

 3    with willfulness.

 4            If I could see the slide.

 5            The answer there is that they willfully did it.

 6            Can I see the slide, Mr. Diaz, about all the times

 7    we contacted them?

 8            Here is all the correspondence.  Here is all the

 9    meetings.  We went to Apple.  We said:  Here are our

10    patents.  We have this trusted system.  We want you to take

11    a look at it.  We even would like to go into business with

12    you.

13            They said, no, no, no, no, no.  Go away.  We don't

14    want to talk to you.  We're going to put out our own thing.

15    And their own thing turned out to be our thing.

16            That's willful, ladies and gentlemen, and we

17    suggest you answer that question yes.

18            Now, they've got lots of excuses.  We've gone over

19    those.

20            But at the end of the day, they've got to do the

21    right thing.

22            Now, we're a small company.  And I tell you what,

23    it take some courage to take on somebody as big as Apple.

24    This is life or death for us.  But we're willing to take

25    them on, the biggest company in America.
```

1          And we said:  You took our patent.  You used it.

2     You used it to do all these things that you've done, but at

3     the end of the day, you've got to do the right thing.

4          And we, ladies and gentlemen, trust you to do the

5     right thing.

6          We thank you very much for all of your attention

7     and for all of your hard work.  And we put our company in

8     your hands.

9          Thank you, Your Honor.

10          THE COURT:  Ladies and gentlemen, I'd like to

11     provide you with a few final instructions before you begin

12     your deliberations.

13          You must perform your duty as jurors without bias

14     or prejudice as to any party.  The law does not permit you

15     to be controlled by sympathy, prejudice, or public opinion.

16     All parties expect that you will carefully and impartially

17     consider all of the evidence, follow the law as I have given

18     it to you, and reach a just verdict, regardless of the

19     consequences.

20          Answer each question in the verdict form from the

21     facts as you find them to be.  Do not decide who you think

22     should win and then answer the questions accordingly.

23          I remind you, your answers and your verdict must

24     be unanimous.

25          Ladies and gentlemen, you should consider this

1  case and decide this case as a dispute between persons of

2  equal standing in the community, of equal worth, and holding

3  the same or similar stations in life.

4      Counsel may have argued about one company being

5  larger than the other, but I'm instructing you that you are

6  to answer the verdict form and decide this case as between

7  parties of equal standing, equal worth, and same or similar

8  stations in life.

9      This is true in patent cases between corporations,

10  partnerships, and individuals.

11      A patent owner is entitled to protect its patent

12  rights under the United States Constitution.  This includes

13  bringing a suit in the United States District Court for

14  money damages for infringement, as we have here.

15      An alleged infringer is entitled to defend itself

16  against such a suit as we have here.  This includes offering

17  proof that it does not infringe the patents and that the

18  patents are invalid.

19      The law recognizes no distinction between types of

20  parties.  All corporations, partnerships, and other

21  organizations stand equal before the law, regardless of the

22  size or who owns them, and they are to be treated as equals.

23      When you retire to the jury room and deliberate

24  upon your verdict, you'll each have a copy of these

25  instructions to take with you.

1        If you desire during your deliberations to see any

2   of the exhibits -- not the demonstratives, but the exhibits

3   that have been introduced during the course of the trial,

4   then you should advise me by sending a note to me by way of

5   the court security officer.  And in response to that note, I

6   will send you such exhibit or exhibits.

7        Once you retire, you should proceed to select your

8   foreperson and then to conduct your deliberations.

9        If you recess during your deliberations, follow

10  all the instructions that the Court has given you previously

11  about your conduct during the trial.

12       After you have reached your verdict, your

13  foreperson is to fill in the verdict form with your

14  unanimous answers to the questions.

15       Do not reveal your answers until such time as I

16  have discharged you as jurors or until I have directed

17  otherwise.  You must never disclose to anyone, not even to

18  me, your numerical division on any question.

19       Any notes that you've taken during the trial are

20  aids to your memory only.  You should rely on your memory

21  and not your notes.  The notes are not evidence.

22       A juror who has not taken notes should rely on his

23  or her independent recollection of the evidence and should

24  not be unduly influenced by the notes of other jurors.

25  Notes are not entitled to any greater weight than the

1   recollection or impression that each juror has of the

2   testimony.

3           If you want to communicate with me at any time,

4   please give a written message or a question to the Court

5   Security Officer who will bring it to me.  I will either

6   then respond to you in writing or by bringing you back into

7   the courtroom where I can address you orally.

8           In either case, I will respond as promptly as

9   possible.  However, I will always first disclose to the

10  attorneys your question and my response before I answer your

11  question.

12          After you have reached your verdict and have been

13  discharged by me as jurors in this case, you are not

14  required to talk with anyone about your service as jurors or

15  about this case unless the Court orders otherwise.

16          However, if you want to discuss at that time your

17  service as jurors, you may.  That decision, ladies and

18  gentlemen, is yours and yours alone.  It's solely up to you.

19          I'm now going to hand eight copies of these final

20  jury instructions, along with one clean copy of the verdict

21  form, to the Court Security Officer who will -- who will

22  deliver them to you in the jury room.

23          COURT SECURITY OFFICER:  Thank you.

24          THE COURT:  Ladies and gentlemen of the jury, you

25  may now retire to deliberate on your verdict.  We await your

1    decision.

2         COURT SECURITY OFFICER:  All rise for the jury.

3         (Jury out.)

4         THE COURT:  The Court stands in recess either

5    awaiting a question from the jury or a verdict.

6         We are in recess.

7         (Jury deliberations.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          CERTIFICATION

3

4          I HEREBY CERTIFY that the foregoing is a correct

5   transcript from the stenographic notes of the proceedings in

6   the above-entitled matter to the best of my ability.

7

8

9   /S/Shelly Holmes                    11/20/15
    SHELLY HOLMES, CSR, TCRR            Date
10  Official Court Reporter
    State of Texas No. 7804
11  Expiration Date:  12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25